Cynthia Y. Patane (SBN: 018439)
Rachel L. Werner (SBN: 033361)
**GORDON REES SCULLY MANSUKHANI, LLP**
Two North Central Avenue Suite 2200
Phoenix, AZ 85004
Telephone: (602) 794-3647
Facsimile: (602) 265-4716
cpatane@grsm.com
rwerner@grsm.com

*Attorneys for Defendants*
*Brendan Cassidy and Jane Doe Cassidy*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, an individual; Donald Sankey, Junior, an individual; S.Z.S., a minor, through his parents and guardians Honor Duvall and Donald Sankey,<br><br>Plaintiffs,<br><br>v.<br><br>Arizona Department Of Child Safety, a governmental entity; State of Arizona, a governmental entity; Brenda Gualajara, individually and as an employee with the State of Arizona Department of Child Safety and John Doe Gualajara, her spouse, Fernando Araizo, individually and as an employee with the State of Arizona Department of Child Safety and Jane Doe Araizo, his spouse; Alyssa Lucero, individually and as an employee with the State of Arizona Department of Child Safety and John Doe Lucero, her spouse; Jeffrey Duncan, individually and as an employee with the State of Arizona Department of Child Safety and Jane Doe Duncan, his spouse; Chantel Madson, individually and as an employee with the State of Arizona Department of Child Safety and John Doe Madson, her spouse; Phoenix Children's Hospital, INC., an Arizona corporation, individually and as a services provider for the State of Arizona Department of Child Safety; Brendan Cassidy, individually and as a services provider for the State of Arizona Department of Child Safety and Jane | **CASE NO. 21-CV-00167-PHX-ROS**<br><br>**DR. BRENDAN CASSIDY'S MOTION FOR SUMMARY JUDGMENT ON:**<br><br>**(1) CONSPIRACY UNDER 42 U.S.C. § 1983 (CLAIM 6);**<br><br>**(2) MEDICAL NEGLIGENCE (CLAIM 11);**<br><br>**(3) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (CLAIM 15); AND,**<br><br>**(4) PUNITIVE DAMAGES**<br><br>**(Oral Argument Requested)**<br><br>**(Assigned to the Hon. Roslyn O. Silver)** |

| | |
|---|---|
| 1 | Doe Cassidy, his spouse; William S. Wood, individually and as a services provider for the State of Arizona Department of Child Safety and Jane Doe Wood, his spouse; Kathryn Coffman, individually and as a service provider for the State of Arizona Department of Child Safety and John Doe Coffman, her spouse; Hailey Dietzman, individually and as a services provider for the State of Arizona Department of Child Safety and John Doe Dietzman, her spouse; Zachary Dion, individually and as a services provider for the State of Arizona Department of Child Safety and Jane Doe Dion, his spouse; Carey Lewis, individually and as a services provider for the State of Arizona Department of Child Safety and John Doe Lewis, her spouse; Gregory Mckay, as former Director, Arizona Department of Child Safety; Michael Faust, as Director, Arizona Department of Child Safety; John and Jane Does 1-5; and Black Entities 1-5, |

                                          Defendants.

Defendant Dr. Brendan Cassidy moves for summary judgment on Plaintiffs' claims of conspiracy under 42 U.S.C. § 1983 (Claim 6), negligence (Claim 11), intentional infliction of emotional distress (Claim 15), and punitive damages. Summary judgment is appropriate on Plaintiffs' claim of conspiracy to violate their rights under § 1983 because Plaintiffs have failed to come forward with evidence that Dr. Cassidy was a state actor and acted under color of state law. In fact, Dr. Cassidy had no relationship with the state. Summary judgment is appropriate on Plaintiffs' negligence claim because Plaintiffs failed to disclose a qualified expert to testify that Dr. Cassidy fell below the standard of care. Summary judgment should be granted on Plaintiffs' claims of intentional infliction of emotional distress and punitive damages because there is no evidence that Dr. Cassidy acted with the requisite intent for either claim.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL BACKGROUND

On February 22, 2019, Dr. Cassidy was contacted by Phoenix Children's Hospital and asked if he would perform an ophthalmology examination of S.Z.S., a two-month-old boy. (Ex. 1 at p.69, lns. 9-24.) The Arizona Department of Child Safety had already been contacted with a report of suspected child abuse and started an investigation into whether S.Z.S. had been abused before Dr. Cassidy arrived to perform the examination. (Ex. 2 at p. 266, lns. 14-25.) During the examination, Dr. Cassidy's findings included retinal hemorrhages in both eyes. Dr. Cassidy listed possible causes of the retinal hemorrhages as abusive head trauma, a crush injury, an acceleration/deceleration injury, a bleeding disorder, sepsis and/or cancer. (Ex. 3 at PCH 1281 cycn.) Dr. Cassidy did not communicate with DCS or law enforcement about the case. (Ex. 1 at p. 272, ln. 15, to p. 274, ln. 1.) DCS removed S.Z.S. from his parents' custody for approximately 8 1/2 months. Plaintiffs filed this lawsuit in November 2020.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence of the non-moving party is to be believed, and all reasonable inference drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits,

if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). However, if the non-moving party bears the burden of proof at trial, the moving party's summary judgment motion need only highlight the absence of evidence supporting the non-moving party's claims. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 323-25). The burden then shifts to the non-moving party who must produce evidence sustaining a genuine issue of disputed material fact. *Id.*

**III.   CONSPIRACY UNDER 42 U.S.C. § 1983 (CLAIM 6)**

Plaintiffs allege that Dr. Cassidy engaged in a conspiracy under 42 U.S.C. § 1983 with DCS employees Brenda Gualajara, Fernando Araiza, Alyssa Lucero and Jeffrey Duncan to violate their right to freedom of association under the First Amendment, due process under the Fourteenth Amendment, and to violate S.Z.S.'s right to be free from unlawful seizure under the Fourth and Fourteenth Amendments of the United States Constitution. (Doc 1. at ¶ 233.) Plaintiffs assert that Dr. Cassidy engaged in this conspiracy by alleging that Plaintiffs had abused S.Z.S. and by refusing to discharge S.Z.S. into the custody of Plaintiffs. (Doc 1. at ¶ 234.)

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 49 (1988). Section 1983 claims may not be brought against private actors who were not acting under color of state law. *Id.*

The Ninth Circuit utilizes four tests to determine whether a private actor's actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test. *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002). Here, Plaintiffs allege that Dr. Cassidy was a state actor via joint action with a state actor. To be engaged in a joint action, the private actor must be a "willful participant" with the state in an activity that deprives the plaintiff of her constitutional rights. *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). Such activity must be "inextricably intertwined" with those of the state, *Brunette v. Humane Society of Ventura County*, 294 F.3d 1205, 1211 (9th Cir. 2002), and "substantial cooperation" between the private actor and the state must be shown, *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996). Joint action or substantial cooperation may be shown through evidence of a conspiracy between the private actor and the state. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1546-47 (9th Cir. 1989).

To prove conspiracy, the plaintiff must show there was an agreement or meeting of the minds to violate the plaintiff's constitutional rights, and each co-conspirator must share the common objective of the conspiracy. *Id.* at 1540-41. Existing law does not recognize a claim under 42 U.S.C. § 1983 for conspiring to violate Plaintiffs' rights. "Conspiracy is not itself a constitutional tort under § 1983." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012). Conspiracy claims may be used to "enlarge the pool of responsible defendants by demonstrating their causal connections" to the underlying violation of constitutional rights. *Id.* If state actors conspire to deprive an individual of constitutional rights, each co-conspirator who participated in some way in furtherance of

the conspiracy can be held liable. *See Hostrop v. Board of Jr. College Dist. No. 515*, 523 F.2d 569, 576-77 (7th Cir. 1975). However, it is presumed at the outset that private action is not state action. *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011).

Here, Dr. Cassidy was not a state actor. If he were, Plaintiffs would not need to allege conspiracy. Dr. Cassidy was a private actor. Thus, the only mechanism to bring Dr. Cassidy within the realm of §1983 liability is to come forward with evidence that he conspired with a state actor.

Plaintiffs allege that Dr. Cassidy provided contract services for the State of Arizona through DCS, and he was acting under the color of law as a DCS service provider. (Doc. 1 at ¶14.) However, Dr. Cassidy was not a DCS service provider. In fact, DCS had no relationship with Dr. Cassidy, according to Gregory McKay, the former Director of DCS. (Ex. 4 at p. 210, lns. 10-17.) Dr. Cassidy was not employed by DCS or acting on behalf of DCS when he evaluated S.Z.S. (Ex. 4 at p. 207, lns. 23-25 and p. 208, lns. 14-18.) Dr. Cassidy did not receive any training from DCS, nor was he expected to comply with any DCS policies, procedures, or rules during his evaluation of S.Z.S. (Ex. 4 at p. 208, lns. 1-12.) Honor Duvall testified during her deposition that she understood on February 22, 2019, that Dr. Cassidy was not a DCS caseworker. (Ex. 2 at p. 268, lns. 17-23.) Plaintiffs have also alleged that Dr. Cassidy was bound by a contract between PCH and DCS. (Doc. 1 at ¶14.) However, Dr. Cassidy was not an employee of PCH. (Ex. 1 at p. 279, ln. 17, to p. 280, ln. 23.) He did not have a service contract with PCH. (Ex. 1 at p. 47, ln. 21, to p. 48, ln. 24.) Plaintiffs have failed to come forward with any evidence that Dr. Cassidy was

bound by any agreement or contract PCH may have had with DCS or that it had any bearing on his evaluation.

The first allegation by Plaintiffs in support of their claim that Dr. Cassidy violated their Constitutional rights is that Dr. Cassidy alleged that Plaintiffs had abused S.Z.S. (Doc 1. at ¶ 233.) Of note, a report of abuse had already been made to DCS and an investigation was already underway before Dr. Cassidy performed his evaluation. (Ex. 2 at p. 266, lns. 14-25.) The purpose of Dr. Cassidy's evaluation was to examine S.Z.S.'s eyes, not to determine if S.Z.S. had been abused or by whom. (Ex. 1 at p. 147, ln. 19, to p. 150, ln. 6.)

After his evaluation, Dr. Cassidy did not communicate with anyone other than the family members about the case, including DCS employees Gualajara, Araiza, Lucero and Duncan. (Ex. 1 at p. 273, ln. 6, to p. 274, ln. 1.) There is no evidence that Dr. Cassidy told anyone that he thought Plaintiffs had abused their child. Brenda Gualajara testified that she did not speak to Dr. Cassidy. (Ex. 5 at p. 120, ln. 8, to p. 121, ln. 7.) Alyssa Lucero (n/k/a Costello) testified that she did not speak to Dr. Cassidy. (Ex. 6 at p. 54, lns. 20-22.) Fernando Araiza testified that he never spoke to Dr. Cassidy. (Ex. 11 at p. 108, lns. 15-19.)

Dr. Cassidy testified that he did not speak with the detectives from the Buckeye Police Department who were investigating whether S.Z.S. had been abused. (Ex. 1 at p. 272, ln. 15, to p. 273, ln. 5.) He did not speak to Alyssa Lucero, Brenda Gualajara, Jeff Duncan, Fernando Araiza or any DCS investigators about his findings. (Ex. 1 at p. 273, ln. 6, to p. 274, ln. 1.)

Gregory McKay, the former Director of DCS, testified that Dr. Cassidy did not collaborate or consult with DCS in the evaluation or exam findings of S.Z.S. (Ex. 4 at p. 208, lns. 20-24.) He testified that Dr. Cassidy was not involved in any decision making by DCS during its investigation into whether S.Z.S. was abused. (Ex. 4 at p. 209, lns. 20-25.)

The second allegation by Plaintiffs in support of their claim that Dr. Cassidy violated their Constitutional rights is that he refused to discharge S.Z.S. to Plaintiffs. (Doc 1. at ¶ 234.) Plaintiffs have failed to come forward with evidence that Dr. Cassidy had any involvement in S.Z.S.'s discharge from Phoenix Children's Hospital on February 23, 2019. On the contrary, Mr. McKay testified that Dr. Cassidy was not involved in the decision by DCS to take custody of S.Z.S. in February 2019 or the decision to file the dependency petition in March 2019. (Ex. 4 at p. 210, lns. 18-21.) Dr. Cassidy's only involvement in this case occurred on February 22, 2019, when he evaluated S.Z.S.

**IV. MEDICAL NEGLIGENCE (CLAIM 11)**

Plaintiffs allege Dr. Cassidy fell below the standard of care in his evaluation of S.Z.S. on February 22, 2019, at PCH (Claim 11). Plaintiffs disclosed Dr. Todd A. Lefkowitz, M.D., as an expert witness on the standard of care against Dr. Cassidy.

Pediatric ophthalmology is considered a subspecialty of ophthalmology. (Ex. 1 at p. 15, ln. 3, to p. 16, ln. 5.) The pediatric and adult eye have numerous differences. Specifically, the anatomy of a child's eye is different from an adult's eye in every aspect, including the macula, vitreous, lens, optic nerve, cornea and the size of the eye. (Ex. 1 at p. 17, ln. 15, to p. 19, ln. 16; p. 21, lns. 6-25; p. 22, lns. 16-24; p. 23, lns. 2-23; and p. 24,

lns. 12-21.) The examination of a pediatric eye is different from that of an adult. (Ex. 1 at p. 25, ln. 11, to p. 26, ln. 19.) According to the American Academy of Ophthalmology, subspecialists in ophthalmology are those who have fellowship training in a particular area of the eye.[1] The Court may take judicial notice of this fact. Fed.R.Evid. 201(b).

Dr. Cassidy is a pediatric ophthalmologist. After completing medical school and a three-year ophthalmology residency, Dr. Cassidy completed a one-year fellowship in pediatric ophthalmology (Ex. 1 at p. 16, lns. 13-22.) During Dr. Cassidy's fellowship, he received additional training on signs and symptoms associated with non-accidental trauma and how it can affect a child's eyes. (Ex. 1 at p. 298, lns. 15-24.) Part of the training he received during his fellowship was how to diagnose injuries in the eyes that could be associated with non-accidental trauma. (Ex. 1 at p. 299, lns. 2-21.)

Dr. Cassidy has practiced in the subspecialty of pediatric ophthalmology in Arizona since 1994. (Ex. 1 at p. 32, ln. 6, to p. 33, ln. 24.) From approximately 1999 to 2017, Dr. Cassidy performed ophthalmology evaluations on hundreds if not thousands of children at Phoenix Children's Hospital for possible abusive head trauma. (Ex. 1 at p. 43, ln. 12, to p. 44, ln. 2.)

In contrast, Dr. Todd Lefkowitz, Plaintiffs' standard of care expert against Dr. Cassidy, is not a pediatric ophthalmologist. (Ex. 7 at p. 101, lns. 12-16.) Dr. Lefkowitz did not complete a fellowship in pediatric ophthalmology. (Ex. 7 at p. 14, lns. 21-23.) Dr. Lefkowitz has never worked at a pediatric ophthalmology practice. (Ex. 7 at p. 14, ln. 24,

---

[1] https://www.aao.org/eye-health/tips-prevention/ophthalmology-training-certification Retrieved on September 19, 2023.

-9-

to p. 15, ln. 1.) Dr. Lefkowitz has little experience examining the eyes of a newborn like S.Z.S. (Ex. 7 at p. 215, lns. 23-25.) Dr. Lefkowitz has personally seen only <u>one case</u> of retinal bleeding in babies or toddlers, and it was post-mortem. (Ex. 7 at p. 117, ln. 11, to p. 119, ln. 2; p. 216, lns. 4-19.) Dr. Lefkowitz saw mostly adults in his practice before he retired in 2020. (Ex. 7 at p. 107, ln. 21, to p. 108, ln. 1; p. 222, lns. 7-16.)

According to A.R.S. § 12-563, the standard of care is what a reasonable and prudent physician would do under the same or similar circumstances. Thus, the standard of care in a medical negligence case depends on the particular care or treatment at issue. *See Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 384, ¶12 (2013). Typically, the standard of care "must be established by expert medical testimony." *Seisinger v. Siebel*, 220 Ariz. 85, 94, ¶33 (2009); *see also Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 384, ¶31 (2013). A.R.S. § 12-2604 requires an expert witness designated to testify against a defendant to have specialized in the same specialty as the defendant and share comparable training and experience. *Fadely v. Encompass Health Valley of the Sun Rehab. Hosp.*, 515 P.3d 701 (App. 2022).

A.R.S. § 12-2604 requires a plaintiff's standard of care expert to have comparable training and experience as the defendant healthcare provider. *Fadely v. Encompass Health Valley of the Sun Rehab. Hosp.*, 515 P.3d 701, 708, ¶31 (App. 2022). There must be symmetry between the qualifications and experience of the defendant health care provider and the expert who testifies to the standard of care regarding the care and treatment at issue. *See Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 384, ¶12 (2013).

The purpose of this requirement is to ensure that physicians testifying as experts have sufficient expertise to truly assist the fact-finder on the issues of the standard of care and proximate causation. *See Awsienko v. Cohen*, 227 Ariz. 256, 259, ¶13 (App. 2011).

Dr. Lefkowitz did not complete a pediatric ophthalmology fellowship or practice in the subspecialty of pediatric ophthalmology. He is not a pediatric ophthalmologist. His training and experience are different and are not comparable to that of Dr. Cassidy. A court is permitted to preclude an expert from testifying based on A.R.S. § 12-2604 if she does not have training or experience in the treating physician's subspecialty, even though she is board certified in the same specialty as the treating physician. *Fadely v. Encompass Health Valley of the Sun Rehab. Hosp.*, 515 P.3d 701, 708, ¶¶33-34 (App. 2022).

In *Fadely*, a physician who was board certified in internal medicine and practiced in a skilled nursing facility was precluded by A.R.S. § 12-2604 from testifying against a treating physician who was also board certified in internal medicine but specialized as a hospitalist, providing care in an acute care hospital. The clear intent of A.R.S. § 12-2604 is that an expert witness share "comparable training and experience" with the physician accused of negligence. *Id.*, citing *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 383 ¶9 (2013) (holding that a medical doctor who specialized in hematology was not qualified to opine on the standard of care applicable to a medical doctor specializing in pediatric hematology).

Without a qualified expert to testify on the standard of care against Dr. Cassidy, Plaintiffs cannot establish that Dr. Cassidy fell below the standard of care and summary judgment is appropriate. *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 383, ¶31

(2013). The failure to provide a qualified standard of care expert in a medical malpractice action justifies summary judgment for the defense. *Rasor v. Northwest Hospital, LLC,* 243 Ariz. 160, 166, ¶31 (2017).

## V.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (CLAIM 15)

Plaintiffs have asserted a claim for intentional infliction of emotional distress ("IIED") against Dr. Cassidy for purportedly making false reports of abuse to DCS. (Doc. 1 at ¶ 291-295.) To state a claim for IIED, Plaintiffs' must plead three elements: (1) "the conduct by the defendant must be 'extreme' and 'outrageous;'" (2) "the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct;" and (3) "severe emotional distress must indeed occur as a result of defendant's conduct." *Citizen Publ'g Co. v. Miller,* 115 P.3d 107, 110 (Ariz. 2005) (internal quotation marks omitted). "Even if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" *Nelson v. Phx. Resort Corp.,* 888 P.2d 1375, 1386 (Ariz. Ct. App. 1994) (quoting *Ford v. Revlon, Inc.,* 734 P.2d 580, 585 (Ariz. 1987)).

Extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Christakis v. Deitsch*, 250 Ariz. 246, 250, ¶ 10 (App. 2020) (*quoting Cluff v. Farmers Ins. Exch.*, 10 Ariz. App. 560, 562, 460 P.2d 666 668 (App. 1969)). Such conduct "must completely violate human dignity" and "strike to the very core of one's being, threatening to shatter the frame upon

which one's emotional fabric is hung." *Id.* (*quoting Pankratz v. Willis*, 155 Ariz. 8, 15, 744 P.2d 1182, 1189 (App. 1987)). To reach the jury on their IIED claim, Plaintiffs were required to come forward with evidence that the acts of Dr. Cassidy were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *See Christakis,* 478 P3.d at 245.

Plaintiffs, however, never came forward with any facts or evidence to establish a prima facie case of IIED against Dr. Cassidy. Rather, Plaintiffs assert conclusory statements about what Dr. Cassidy allegedly did that was "extreme and outrageous." (Doc. 1 at ¶ 291-295.) There is absolutely no evidence from which the trier of fact could conclude that Dr. Cassidy intended to cause distress or recklessly disregarded a certainty that distress would occur to Plaintiffs when he documented findings of retinal hemorrhages during the ophthalmology consultation with S.Z.S. on February 22, 2019. Dr. Cassidy findings were not directed towards Plaintiffs, they were directed towards S.Z.S.

Dr. Cassidy even listed other possible causes of the retinal hemorrhages as a bleeding disorder, infection, cancer, a crush injury, an acceleration/deceleration injury or abusive head trauma. (Ex. 3 at PCH 1281 cycn.) After Dr. Cassidy's evaluation, on March 11, 2019, S.Z.S. was evaluated by a different ophthalmologist, Christopher Fecarotta, M.D., who noted the presence of bilateral retinal hemorrhages, thus, corroborating Dr. Cassidy's findings. (Ex. 8 at PCH 275, 278-279 cycn.) What is more, Plaintiffs have not disclosed a qualified expert to testify that Dr. Cassidy's conduct was unreasonable. In

contrast, Dr. Cassidy has disclosed a qualified medical expert to opine that his care was appropriate and accurate. (Ex. 9 at p. 6, ¶ 3.) There is no evidence that Dr. Cassidy told anyone that Plaintiffs abused S.Z.S. There is also no evidence that Dr. Cassidy's findings directly resulted in DCS taking custody of S.Z.S. Again, former DCS Director Gregory McKay testified that Dr. Cassidy did not collaborate or consult with DCS in the consultation or exam findings of S.Z.S. (Ex. 4 at p. 208, lns. 20-24.) Mr. McKay further testified that Dr. Cassidy was not involved in the decision by DCS to take custody of S.Z.S in February 2019. (Ex. 4 at p. 210, lns. 18-21.) Notwithstanding Plaintiffs' misperceptions, no trier or fact could reasonably find evidence that Dr. Cassidy's actions "completely violate human dignity" and "strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." Summary judgment is appropriate because the alleged acts and relevant facts do not constitute sufficiently outrageous acts, even assuming they are true.

None of Dr. Cassidy's alleged conduct could be considered "outrageous" or "extreme" as a matter of law. Even conduct that might otherwise be tortious or illegal may not be outrageous. *Pankratz v. Willis*, 155 Ariz. 8, 18 (App. 1987). For example, in *Norton v. Arpaio*, 2019 WL 1409536, at *1-2 (D. Ariz. Mar. 28, 2019), the plaintiff was arrested and later had the charges dismissed after the criminal court found that the arresting officer unreasonably and recklessly included or excluded information in the warrant affidavit. The plaintiff then sued the arresting officer and others, alleging IIED, among other claims. *Id.* The district court found that even if the arresting officer "either intentionally or recklessly disregarded the truth in his search warrant affidavits," this conduct did not rise

to the egregious level needed for an IIED claim. *Id.* at *11.

Other cases have also found that false statements made to others that resulted in the arrest of an individual did not rise to the high level of outrageousness required to support an IIED claim. *See, e.g., Adams v. Estrada*, 2014 WL 265660, at *8 (Ariz. Ct. App. Jan. 23, 2014). Similarly, Plaintiffs' IIED claim against Dr. Cassidy fails as a matter of law because Plaintiffs allege, at worst, that Dr. Cassidy's report included findings that were misdiagnosed and unsupported by a subsequent medical provider, which led the juvenile court to call into question the credibility of Dr. Cassidy's testimony during the dependency proceeding. Even if taken as true, this is not the sort of conduct that rises to the high level of outrageousness required to support an IIED claim. The extreme and outrageous conduct alleged by Plaintiffs is essentially the product of their perception (and misperceptions) that Dr. Cassidy was not acting as they thought he should. Accordingly, Dr. Cassidy should be granted summary judgment on Plaintiffs' IIED claim.

## VI.   PUNITIVE DAMAGES

If any claims against Dr. Cassidy survive the Motion for Summary Judgment, Plaintiffs should be precluded from requesting punitive damages at trial. Plaintiffs cannot meet the stringent standard to justify an award of punitive damages. Plaintiffs' request for punitive damages is based on their allegation that Dr. Cassidy's conduct evinces (sic) a reckless disregard for Plaintiffs' civil rights. (Ex. 13 at p. 4, lns. 16-19.) For punitive damages to be awarded under Arizona law, "there must be evidence of an 'evil mind' and aggravated and outrageous conduct." *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 331, 723 P.2d 675, 680 (1986). Punitive damages may be awarded in a § 1983 action

when "evil motive or intent" motivates the defendants' conduct or their conduct manifests "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Donahoe v. Arpaio*, 986 F. Supp. 2d 1091, 1139 (D. Ariz. 2013).

Plaintiffs have failed to come forward with evidence that Dr. Cassidy acted with an evil motive or intent or that he acted with reckless or callous indifference to Plaintiffs' rights. The Supreme Court has observed that "the purpose of punitive damages is to punish a defendant for his willful or malicious conduct and to deter others from similar behavior;" for that reason, "such damages are available only on a showing of the requisite intent." *Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 307 n. 9, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Indeed, punitive damages will only be awarded where a plaintiff has established to the satisfaction of a jury that the defendant's conduct was either "motivated by evil motive or intent" or involved "reckless or callous indifference to the federally protected rights of others." *Feldman v. Phila. Housing Auth.,* 43 F.3d 823, 833 (3d Cir.1994) (quoting *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).

Here, Plaintiffs have provided no document, testimony, or other evidence showing Dr. Cassidy had an evil motive, intent, or reckless indifference to Plaintiffs' rights. Rather, the evidence shows that for years, Dr. Cassidy evaluated children at PCH for possible abusive head trauma on an emergency basis and received little to no compensation besides gas money. (Ex. 1 at p. 44, ln. 15, to p. 46, ln. 16.) Indeed, Dr. Cassidy received no compensation for the exam of S.Z.S. at PCH on February 22, 2019. (Ex. 1 at p. 46, ln. 15,

to p. 47, ln 8.) For this reason, summary judgment should be granted to Dr. Cassidy as to the punitive damages issue.

## VII.  CONCLUSION

Summary judgment should be entered in Dr. Cassidy's favor on each of the claims Plaintiffs have brought against him. With respect to the claim that Dr. Cassidy violated Section 1983, Plaintiffs have failed to come forward with evidence that Dr. Cassidy was a state actor or that he conspired with a state actor to violate Plaintiffs' Constitutional rights. Without a qualified expert to testify on the standard of care against Dr. Cassidy, Plaintiffs cannot establish that Dr. Cassidy fell below the standard of care and summary judgment is appropriate on the negligence claim. None of Dr. Cassidy's alleged conduct could be considered "outrageous" or "extreme" to prove a claim of IIED. Finally, Plaintiffs have failed to come forward with evidence that Dr. Cassidy acted with an evil motive or intent or that he acted with reckless or callous indifference to Plaintiffs' rights in order to reach the jury on a claim for punitive damages.

Dated: September 21, 2023

**GORDON REES SCULLY MANSUKHANI, LLP**

By:   /s *Cynthia Y. Patane*
　　　Cynthia Y. Patane
　　　Rachel L. Werner
　　　*Attorneys for Defendants*
　　　*Brendan Cassidy and Jane Doe Cassidy*

**TABLE OF CONTENTS – EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Deposition Transcript - Dr. Brendan Cassidy, M.D. |
| Exhibit 2 | Deposition Transcript - Honor Duvall |
| Exhibit 3 | Report of Consultation |
| Exhibit 4 | Deposition Transcript – Gregory McKay |
| Exhibit 5 | Deposition Transcript – Brenda Gualajara |
| Exhibit 6 | Deposition Transcript – Alyssa Lucero Costello |
| Exhibit 7 | Deposition Transcript – Dr. Todd A. Lefkowitz, M.D. |
| Exhibit 8 | Dr. Christopher Fecarotta's Note |
| Exhibit 9 | Expert Report – Alex Levin, M.D. |
| Exhibit 10 | Plaintiff's 13th Supplemental Disclosure Statement |
| Exhibit 11 | Deposition Transcript of Fernando Araiza |

# **CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2023, I electronically filed the foregoing with the Clerk of Court, using the CM/ECF system, which will send notification of such filing to all parties, and will e-mail all notification of such filing to all non-CM/ECF system participants.

Thomas A. Connelly
Robert T. Mills
Sean A. Woods
Mills & Woods Law PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ  85014
*Attorneys for Plaintiffs*

DeeAn Gillespie Strub
Sandra Daussin
Gillespie, Shields, Goldfarb Taylor
7319 North 16th Street
Phoenix, AZ  85020
*Attorneys for Plaintiffs*

Kari B. Zangerle
Robert C. Stultz
Gust Rosenfeld, P.L.C.
One East Washington Street, Suite 1600
Phoenix, AZ  85004-2553
*Attorneys for Defendants Phoenix Children's Hospital;*
*Dr. William S. Wood and Rachel Wood; Dr. Kathryn Coffman;*
*Hailey Dietzman and Roald Dietzman; Zachary Dion; and Carey Lewis*

By: /s  Z. Seyferth

1308543/81911133v.1