# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

HONOR DUVALL, et al.,      )
                       )
      Plaintiffs,     )
                       )
        vs.         )  Case No.
                       )  21-CV-00167-PHX-ROS
ARIZONA DEPARTMENT OF CHILD )
SAFETY, et al.,        )
                       )
      Defendants.     )
_____)

DEPOSITION OF BRENDAN CASSIDY, M.D.

Phoenix, Arizona
October 5, 2022
10:20 a.m.

Prepared by:
MICHAELA H. DAVIS
Registered Professional Reporter
Certified Realtime Reporter
Certified Realtime Captioner
Certified LiveNote Reporter
AZ CR No. #50574
carrie@carriereporting.com

CARRIE REPORTING, LLC
Certified Reporters
2415 E. Camelback Road
Suite 700
Phoenix, AZ 85016
(480) 429-7573

(COPY)

1   equivalent, higher, or lower now.

2   BY MR. CONNELLY:

3       Q.    Is pediatrics considered a subspecialty?

4       A.    Usually it's referred to as pediatric

5   ophthalmology and strabismus, and that would be the

6   subspecialty.

7       Q.    Pediatric ophthalmology what?

8       A.    And strabismus.

9       Q.    In strabismus?

10      A.    And strabismus, S-T-R-A-B-I-S-M-U-S.

11      Q.    Spell it again, please.

12      A.    S-T-R-A-B-I-S-M-U-S.

13      Q.    So is pediatric ophthalmology a subspecialty?

14            MS. PATANE:  Form.

15            MR. PATEL:  Join.

16  BY MR. CONNELLY:

17      Q.    The subspecialty that you recognize involving

18  pediatrics is called pediatric ophthalmology and

19  strabismus?

20      A.    That's the full traditional name for it, yes.

21  But we abbreviate it --

22      Q.    Pediatric?

23      A.    -- peds oph.

24      Q.    Okay.

25      A.    Pediatric ophthalmology, yeah.

1       Q.    So we'll have an understanding today, can we,

2   please, that if we are just talking about pediatric

3   ophthalmology, we're talking about the subspecialty of

4   pediatric ophthalmology and strabismus?

5       A.    Yes, I understand that.

6       Q.    All right.  And what is the strabismus part of

7   that?  What does that mean?

8       A.    It's when the eyes don't work together.

9       Q.    So when one eye is going -- looking to the left

10  and one eye is not following along?

11      A.    Right.  They don't cooperate together in various

12  fashions.

13      Q.    All right.  So you did your three-year residency

14  at New York Medical College participating in all four

15  different hospitals from 1990 to 1993.  Then what did you

16  do?

17      A.    And then I went for one year to Atlanta, Georgia

18  and did a pediatric ophthalmology and strabismus

19  fellowship which also included oculoplastics.

20      Q.    What is oculoplastics?

21      A.    It's plastic surgery around the eye and the eye

22  socket.

23      Q.    When you did your pediatric fellowship, what is

24  it that you learned in your pediatric fellowship?

25              MS. PATANE:  Form.

1        MR. PATEL:  Join.

2        THE WITNESS:  That's a remarkably open

3  question.  It's hard to answer it.

4  BY MR. CONNELLY:

5     Q.   What did they teach you as a pediatric fellow?

6        MS. ZANGERLE:  Form.

7        MS. PATANE:  Join.

8        MR. PATEL:  Join.

9        THE WITNESS:  There are hundreds of books

10  and thousand of articles that we read and discussed, as

11  well as thousands of patients we took care of with various

12  diseases.  So to summarize it in seven hours would be not

13  doing it justice.

14  BY MR. CONNELLY:

15     Q.   Okay.  I hope we're not here today for

16  seven hours.  I don't want you to take seven hours

17  explaining what you learned in your fellowship, but what

18  did you learn in the fellowship that you didn't already

19  know as an ophthalmologist as far as the structure of the

20  eyes, let's say?

21        MS. PATANE:  Form.

22  BY MR. CONNELLY:

23     Q.   Is there anything different about the anatomy of

24  a pediatric eye that's different from the anatomy of the

25  adult eye?

DEPOSITION OF BRENDAN CASSIDY, M.D., 10/05/2022

1      *A.*    Sure.

2              MS. PATANE:  Form and foundation.

3              MR. PATEL:  Join.

4   BY MR. CONNELLY:

5      *Q.*    What is the difference?

6      *A.*    What age group do you want to talk about?

7      *Q.*    I want to talk about children versus adults.

8   And I don't want to talk about, you know, particular.

9   diseases that a geriatric patient might have that you're

10  not going to typically see in a minor, but I want to just

11  talk about the basic structure of the eye.

12              What's the difference in the basic structure

13  of the eye between a child and an adult?

14     *A.*    Sure.

15              MS. PATANE:  Form.

16              MR. PATEL:  Join.

17              THE WITNESS:  So there's quite a few

18  differences.  It would be nicer if we had a general

19  ophthalmologist by my side to ask them if they'd like to

20  do the next pediatric cataract they saw, and they will

21  tell you, no, thank you, we'll let the pediatric person do

22  that surgery because the eye is completely different.

23  BY MR. CONNELLY:

24     *Q.*    How is the eye different?  That's what I'm

25  trying to understand, doctor.  How is the eye different?

1    *A.*    So, for example, in the case of a cataract, and
2   I know you wanted to talk about anatomy, but it really
3   boils down to handling the different diseases that do
4   affect a child.
5              The case of a cataract for a small child,
6   the eye is much more malleable and softer, so when you go
7   to do your surgery, you're handling materials that have a
8   completely different feel than an adult cataract.  So the
9   instruments you use and the techniques you use and the
10  texture of the eye and the sutures that you'll use,
11  et cetera, all the way through the list would be
12  completely different than how you would handle an adult
13  cataract.  Your guidance and expectations for improving
14  the vision of that child are completely different than if
15  you had an adult cataract.  So just a completely different
16  beast.
17    *Q.*    Okay.  So I heard you say that the child's eye
18  is softer and more malleable than the adult eye, so you
19  have to be more delicate and your instruments have to be
20  different.
21              What else is different about the eye of a
22  child versus the eye of an adult?
23              MS. PATANE:  Form.
24              MR. PATEL:  Join.
25              THE WITNESS:  Well, each and every day when

1  retinal blood vessels and veins are fully developed.

2            MS. PATANE:  Form.

3  BY MR. CONNELLY:

4      Q.   Is that true or not?

5      A.   Almost true.

6      Q.   Okay.  Almost true.  So between a full-term

7  child or even, let's say, a two-month-old child and an

8  adult, their retinal vascularity -- you'll have to pardon

9  my stumbling over some medical terms -- but the

10 development of the veins and the arteries in the eye of a

11 two-month-old child is complete as that of an adult;

12 right?

13            MS. PATANE:  Form and foundation.

14            MR. PATEL:  Join.

15            MS. ZANGERLE:  Join.

16            THE WITNESS:  I would suggest there's some

17 fine differences in what's called the macula where the

18 blood vessels aren't fully mature until about six to

19 nine months old.

20            And then, in addition to that, the retina

21 that we're talking and the blood vessels have attachments

22 in children that aren't present in adults where there's an

23 attachment to the vitreous or jelly within the eye which

24 secures the jelly.  So that's a very critical portion of

25 the difference between anatomy of a child and an adult.

1  BY MR. CONNELLY:

2      Q.    And what age does that go away in a child?

3             MS. PATANE:  Form.

4             MR. PATEL:  Join.

5             THE WITNESS:  So it slowly withers, and it

6  depends on the person.  So people that experience what are

7  called floaters sometimes have a change where the blood

8  vessels are no longer attached, the retina is no longer

9  attached to that vitreous jelly, and that causes some

10  floaters and sometimes causes a retinal hole and sometimes

11  it causes a retinal detachment.  And again, that age is

12  variable.  Can be induced by trauma, it can be induced by

13  congenital diseases, and it can just happen over time.

14  It's more common in certain genetic dispositions.

15  BY MR. CONNELLY:

16      Q.    So the main differences right now from a child

17  and an adult, from what I've heard, is that the child's

18  eye is softer and more malleable, the macula in a child is

19  not fully mature until six to nine months, and there may

20  be this connection that -- what was it?  What's the

21  connection you were just discussing?

22             MS. PATANE:  Form.

23             THE WITNESS:  It's the junction between the

24  vitreous and the retina.

25             ///

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573   carrie@carriereporting.com

1  BY MR. CONNELLY:

2      *Q.*    Okay.  Are there any other notable differences

3  between the anatomy of a child's eye and that of an

4  adult's?

5                    MS. PATANE:  Form.

6                    THE WITNESS:  Sure.

7                    MR. PATEL:  Join.

8  BY MR. CONNELLY:

9      *Q.*    Go ahead and educate me.  What's the next one?

10     *A.*    For example, the lens in a small child is going

11  to be a lens that grows throughout their lifetime, and so

12  as the lens adds layers and thickness changes

13  consistency --

14     *Q.*    So let me stop you there for a minute.

15                    The lens continues to grow throughout a

16  person's entire life?

17     *A.*    Correct.

18     *Q.*    So it never stops growing?

19     *A.*    Correct.

20     *Q.*    So the fact that a child has a lens that's

21  growing does not differentiate a child from an adult who

22  also has a lens that's continuing to grow; right?

23     *A.*    Not correct.

24                    MS. PATANE:  Form.

25                    MR. PATEL:  Join.

1   BY MR. CONNELLY:

2       Q.    Okay.  As far as -- let me ask a different

3   question.

4                As far as performing an eye exam, is there

5   anything different between the anatomy of a child's eye

6   and that of an adult's eye that you must consider when

7   performing an eye exam?

8                MS. ZANGERLE:  Form and foundation.

9                MS. PATANE:  Join.

10               MR. PATEL:  Join.

11  BY MR. CONNELLY:

12      Q.    Does that make sense?  Do you understand what

13  I'm getting at?

14               If you're going to do an examination of the

15  retina of a child's eye, is there anything in the anatomy

16  of the eye that's going to be different, other than the

17  macula and the vitreous and the retina conjunction or

18  junction?

19      A.    And the lens and the optic nerve and the cornea

20  and the size of the eye, so pretty much every aspect of

21  the eye is different.

22      Q.    Well, let me ask this then.  Do you learn --

23  when you were doing your fellowship, are there different

24  instruments that you use to examine a child's eye than an

25  adult's eye?

1              MS. PATANE:  Form.
2   BY MR. CONNELLY:
3      Q.    Let me ask a different question.  Strike that
4   question.
5              When you examined Swayde Sankey in this
6   case, you were wearing a -- what's the tool you were
7   wearing to do that with?
8      A.    It's called an indirect ophthalmoscope.
9      Q.    An indirect?
10     A.    Ophthalmoscope.  O-P-H-T-H-A-L-M-O-S-C-O-P-E.
11     Q.    Okay.  And when you're examining an adult eye
12  performing the same kind of exam that you were performing
13  on Swayde, do you utilize an indirect ophthalmoscope?
14             MS. PATANE:  Form.
15             MR. PATEL:  Join.
16             THE WITNESS:  We do a number of additional
17   exams for an older child --
18  BY MR. CONNELLY:
19     Q.    I didn't ask about additional exams.  I asked
20  when you're examining an adult, when you're performing --
21  as far as the portion of the exam where you're looking
22  into the eye to examine the retina and you're wearing an
23  indirect ophthalmoscope to do that with Swayde, are you
24  also wearing an indirect ophthalmoscope to do that with an
25  adult?

1          MS. PATANE:  Form.

2          And, Tom, please let him finish his answer

3    before you start the next question.

4          MR. PATEL:  Form.

5    BY MR. CONNELLY:

6     Q.    Did you understand the question?

7     A.    My understanding of your question is when you

8    examine a child and you examine an adult, during the

9    portion of the exam that's using an indirect

10   ophthalmoscope, do you use the same instruments.

11    Q.    Yes.

12    A.    With a caveat, I would say no.

13    Q.    What's the caveat?

14    A.    Number one, you're examining a child as opposed

15   to an adult, so typically you have a more cooperative

16   person that can follow your instructions.  Number one.

17          And then, number two, most of the time when

18   I'm seeing an older child or an adult, the lens I use is

19   different in an adult versus a small child.

20    Q.    And in your practice, and we haven't gone into

21   all this yet, but in your practice -- you do have private

22   practice; right?

23    A.    That's correct.

24    Q.    And in your private practice, do you see adults?

25    A.    I have a few handicapped adults that I've seen

```
 1  the fees; right?
 2      A.    That's correct.
 3               MS. PATANE:  Form.
 4               MR. PATEL:  Join.
 5  BY MR. CONNELLY:
 6      Q.    So after you completed your fellowship in
 7  Atlanta, what did you do next?
 8      A.    I took a job in private practice in Phoenix,
 9  Arizona.
10      Q.    So you moved to Phoenix in 1994?
11      A.    Correct.
12      Q.    And you joined a practice that was existing here
13  already?
14      A.    Correct.
15      Q.    What was the name of the practice?
16      A.    Affiliated Eye Surgeons.
17      Q.    Are you still with that practice?
18      A.    No.
19      Q.    Were you doing eye surgeries at Affiliated Eye
20  Surgeons?
21      A.    Yes.
22      Q.    Were you doing surgeries on adults as well as
23  children?
24      A.    Not general ophthalmology surgeries.  Strabismus
25  surgeries, trauma surgeries, but I wouldn't do adult
```

1  cataracts or adult glaucoma like my partners would.  I was

2  doing pediatric ophthalmology and strabismus.

3      Q.   Is there some physical manifestation of the eye

4  that causes strabismus?

5                 MS. PATANE:  Form.

6                 MR. PATEL:  Join.

7                 THE WITNESS:  In a small proportion of

8  people, it will be an eye issue.  The great majority is

9  how the brain interprets vision and gets the cooperation

10  of the eyes.

11  BY MR. CONNELLY:

12      Q.   So if you're doing a strabismus operation, what

13  is it that you're doing?

14      A.   In the great majority of the cases, you're

15  repositioning the muscles on the surface of the eye.

16      Q.   How long did you work at Affiliated Eye

17  Surgeons?

18      A.   From 1994 to 2002.

19      Q.   And what happened in 2002?  Where did you go?

20      A.   I opened a practice called ABC Children's Eye

21  Specialists, and that was private practice initiated by

22  myself.

23      Q.   Is that practice still operating?

24      A.   Yes.

25      Q.   How many doctors are employed there?

1          MS. ZANGERLE:  Form and foundation.

2          MS. PATANE:  Join.

3          MR. PATEL:  Join.

4          THE WITNESS:  During that time period, from

5   1999 to present?  Or through 2019?

6   BY MR. CONNELLY:

7      Q.    '18, yeah.

8      A.    If we take that -- let's say it's an 18-year

9   chunk, I would have seen many hundreds if not thousands of

10  children in emergent and urgent situations that were

11  inpatient at Phoenix Children's Hospital.

12     Q.    Okay.  But specifically in relation to part of a

13  team that was investigating abuse, would you have done it

14  during that time in that -- in that situation?

15          MS. PATANE:  Form.

16          MS. ZANGERLE:  Form and foundation.

17          MR. PATEL:  Join.

18          THE WITNESS:  So, again, I wasn't a member

19  of a team, but I would be contacted by trauma or forensics

20  or, again, if we loosely label it "the team," I would be

21  contacted from 1999 through 2017 to do possible abusive

22  head trauma or shaken baby -- at the time, that was the

23  label being used in the early portion of that time

24  frame -- to evaluate children for the potential for eye

25  problems in that setting.  And, again, that would have

```
 1  been hundreds if not thousands of children over those
 2  years.
 3  BY MR. CONNELLY:
 4       Q.    And so then when this contract ended, if I
 5  understand your testimony correctly, the doctors that were
 6  part of Arizona Pediatric Eye Specialists then
 7  transitioned into being employees of PCH?
 8                 MS. ZANGERLE:  Foundation, form.
 9                 MS. PATANE:  Join.
10                 MR. PATEL:  Join.
11                 THE WITNESS:  That's my understanding, yes.
12  BY MR. CONNELLY:
13       Q.    And then in 2019 -- and let me go back for a
14  second.
15                 You said that between 1999 and 2018, this
16  18-year period we are talking about when the Arizona
17  Pediatric Eye Specialist contract was in place, that you
18  would get called upon to do an examination on an emergency
19  basis for children where there were suspicions for abuse.
20                 In those cases, how were you compensated?
21                 MS. ZANGERLE:  Form and foundation.
22                 THE WITNESS:  Typically --
23                 MR. PATEL:  Join.
24                 THE WITNESS:  -- my compensation was paying
25  for my gas to go to Phoenix Children's Hospital which is
```

1    typically about 30- to 60-minute drive and return to my

2    home.  If I was located at my work, it would be anywhere

3    from a one-hour drive to 15-minute drive, depending on

4    what year and what location I was at.

5                So my compensation was a negative

6    compensation in addition to all the time that I spent

7    reviewing cases and being deposed those dozen of times

8    that we talked about at the beginning of our conversation.

9    So it would be a negative compensation from a financial

10   standpoint, if that's what you're looking for.

11   BY MR. CONNELLY:

12       Q.   So you didn't get paid for your time doing the

13   examination?

14       A.   Occasionally I'd get reimbursed by an insurance

15   company that would submit a bill to the insurance company

16   for the examination, and sometimes we'd get paid, but the

17   great majority would not.

18                I would instruct my billing staff to strike

19   the bill to the families because these were tough

20   situations, so typically I'd ask them to cancel a bill

21   that was otherwise due by a family.

22       Q.   So all the thousands of consultations that you

23   undertook on an emergency basis at the request of PCH,

24   it's your testimony that you weren't compensated for that

25   other than for your gas?

1    *A.*    No, I was not compensated for my gas.  I'm

2  saying it was a negative compensation.  My time and energy

3  and gas were expenses.  Compensation was breathing the air

4  that I breathe during that time frame.  I wasn't

5  reimbursed by the hospital, I wasn't reimbursed by the

6  parents, and sometimes I was reimbursed by the insurance

7  company for doing the exam, but obviously it didn't cover

8  my time, gas, or energy.  It was done just to do the

9  examination.

10    *Q.*    Just out of the kindness of your heart?

11    *A.*    There's probably other motives there as well.

12    *Q.*    What are the other motives?

13    *A.*    Being able to help these children getting an

14  evaluation done.

15    *Q.*    In the case of Swayde Sankey, did you receive

16  any compensation for that examination?

17    *A.*    Same compensation we discussed.  I was able to

18  spend some --

19    *Q.*    It's a simple question.  Yes or no.  Did you get

20  compensated for the examination of Swayde Sankey?

21              MS. PATANE:  Form.

22              MS. ZANGERLE:  Form and foundation.

23              MS. PATANE:  Please don't talk over

24  Dr. Cassidy.  Please let him finish his answer.

25              MR. CONNELLY:  I don't have to if it's

1  nonresponsive.

2            MS. PATANE:  No, you're not allowed to talk

3  over him and interrupt him.

4  BY MR. CONNELLY:

5      Q.    The question is:  Did you receive any

6  compensation for the examination that you performed on

7  Swayde Sankey?

8      A.    I received approximately zero dollars.

9      Q.    Okay.  Thank you.

10            Are you currently on the staff at PCH?

11     A.    Yes, I am.

12     Q.    Have you ever participated in any Child

13  Protection Team staff meetings at PCH?

14            MS. PATANE:  Form.

15            THE WITNESS:  I don't know about the title

16  of it, but I remember going to a meeting many years ago

17  that would have been parallel to your question.  I just

18  don't remember what patient, but it was many years ago.

19  Probably 15 years ago.

20  BY MR. CONNELLY:

21     Q.    So as far as Swayde Sankey goes, did you

22  participate in any team meetings at PCH in regards to the

23  Swayde Sankey case?

24     A.    Not that I recall, no.

25     Q.    Is it a requirement of your contract in order to

 1  maintain your privileges at PCH to do these emergency

 2  consultations?

 3          MS. PATANE:  Form and foundation.

 4          MR. PATEL:  Join.

 5          THE WITNESS:  I believe I explained to

 6  you --

 7          MS. ZANGERLE:  Form and foundation.

 8          THE WITNESS:  I believe I explained to you

 9  that I don't have a contract with Phoenix Children's

10  Hospital, so the question is moot.

11  BY MR. CONNELLY:

12      Q.   Well, you have a medical staff contract you said

13  you sign every two years or so; right?

14      A.   The membership contract, yes.

15          MS. PATANE:  Form and foundation.

16          MR. PATEL:  Join.

17          MS. ZANGERLE:  Form and foundation.

18          THE COURT REPORTER:  Doctor, you need to

19  pause just a little before you answer.

20  BY MR. CONNELLY:

21      Q.   And does the medical staff contract require that

22  you do emergency consults in order to comply with the

23  terms of that contract?

24      A.   No.

25          MS. PATANE:  Form.

1   *Q.*   Right.  Okay.  Fair enough.  I understand that.

2   Sure.

3            So PCH then understood by 2019 that as far

4   as the emergency consultations you were willing to do,

5   they were for children zero to 4 where there was a

6   potential that any eye injuries might have been a result

7   of abuse?

8   *A.*   Correct.

9   *Q.*   So then when PCH sent you a consult request in

10  2019, and particularly in this case if you can recall,

11  what information did you get from PCH at the time of the

12  request for a consultation?

13  *A.*   I don't recall the specifics of this request.

14  All I can tell you is just looking over my notes, on the

15  day that I saw Swayde in the hospital, I was in the

16  outpatient surgery facility doing surgeries.  And as I

17  review the PCH notes, it suggests that they ordered eye

18  drops to start at 10:45 in the morning, so that implies

19  that they had contacted me in the operating room that

20  morning and asked me if I could see the child, and I said,

21  yes, I'm supposed to be finishing surgery around, you

22  know, 12, 12:30, and if you'd start the droops at noon for

23  me, please, so that way I can do the examination early

24  afternoon when I finish surgery since I'm on the campus.

25  *Q.*   You said "in reviewing your notes."  What notes

1  that's what I would expect to see.

2  BY MR. CONNELLY:

3      Q.    Okay.

4      A.    I don't have any recollection of the specifics.

5      Q.    What else would you expect to see as part of

6  your chart review?

7      A.    I would see CT scans.  I'd see CT reports, MRI

8  scan, MRI reports.  I might see some blood values, vital

9  signs.  I might have seen a -- again, an EMS.

10      Q.    Is it always your practice to just say

11  "chart reviewed," or would you more specifically identify

12  what's been reviewed if you reviewed all those -- if you

13  reviewed a CT scan and MRI, would you specifically note

14  that?

15              MS. PATANE:  Form.

16              THE WITNESS:  No, I use the general term

17  "chart reviewed."

18  BY MR. CONNELLY:

19      Q.    And then you note that you interviewed the

20  mother; right?

21      A.    Yes.

22      Q.    We talked about that a little bit.

23              When you interviewed the mother, did you

24  note her demeanor at all?

25              MS. PATANE:  Form.

1          THE WITNESS:  The recollection I have of her

2   demeanor was she was sad and she was sympathetic,

3   appropriate in that setting.  But I don't have too much

4   more that I can recall, but those two points I recall.

5   BY MR. CONNELLY:

6       Q.   Was there anything that you recall sticking out

7   to you as being an indicator of her being an abusive

8   person?

9               MR. PATEL:  Objection; form and foundation.

10              MS. PATANE:  Join.

11              MS. ZANGERLE:  Form and foundation.

12              THE WITNESS:  I wasn't in a position to

13   assess her for her capability of doing abuse.

14   BY MR. CONNELLY:

15      Q.   I didn't ask -- I didn't ask that.  I was just

16   asking was there anything about her demeanor -- I mean,

17   you've been doing this a long time.  You've -- at trial

18   you said you've examined thousands of kids in a short

19   period of time, and these days on your emergency consults

20   since 2007 or 2008, you're focusing mostly on cases where

21   there is some suspicion of trauma having been inflicted.

22   So I'm sure that you've, just through being an observant

23   human being, have come to recognize certain demeanor or

24   attitudes of people that might indicate, whether

25   consciously or subconsciously, whether the caretaker, the

1  parent might be one who tends towards abuse.

2            So was there anything along those lines in

3  her demeanor or her nature that you observed about Honor

4  Duvall?

5            MS. PATANE:  Form and foundation.

6            MR. PATEL:  Join.

7            THE WITNESS:  I wouldn't consider any of my

8  conversations elucidating somebody's capability of abusing

9  someone.  I come to examine the child's eyes and ascertain

10  some of their background but not to -- in a very rare case

11  will somebody tell me what they did to a child, but that's

12  extremely rare.  So other than a statement made by a

13  caregiver, I'm not assessing abuse capabilities.

14  BY MR. CONNELLY:

15      Q.   Do you always assume that someone has done

16  something to a child that you're examining in order to --

17  that caused the conditions you're seeing?

18            MS. PATANE:  Form and foundation.

19            MR. PATEL:  Join.

20            MS. ZANGERLE:  Join.

21            THE WITNESS:  (A), no.  Only a small

22  proportion of the kids that I see for this type of setting

23  have significant findings.  So probably half the kids have

24  no retinal findings whatsoever despite bleeding in the

25  brain and change in mental status and being quite sick.

 1  Another quarter will have some finding.  And then another
 2  quarter will have significant findings, roughly speaking.
 3  So I don't go into it with a presumption of somebody has
 4  done something to the child.  I have no idea.  I go to
 5  take a look at their eyes to see what their eyes are
 6  showing us.
 7  BY MR. CONNELLY:
 8      Q.    All right.  You see on this first line, you
 9  say -- you say:  "Visual acuity, follows large objects
10  with each eye."
11      A.    Right.
12      Q.    And that's what you would expect to find in a
13  normal functioning eye or vision for a child; right?
14      A.    For this age group.
15            MS. ZANGERLE:  Form and foundation.
16  BY MR. CONNELLY:
17      Q.    It's the only way you have to determine whether
18  their visual acuity is normal?
19            MS. PATANE:  Form.
20            MR. PATEL:  Join.
21            THE WITNESS:  What I was going to say is to
22  answer your question is this would be reasonable vision
23  for a child, as I said earlier.  You expect a child to
24  respond to light, and by three months, they will follow
25  mom pretty consistently.  So if they are doing more than

1  entered against you, the insurance company is not going to

2  pay?

3      A.    Currently that's their position, correct.

4      Q.    And if there's a settlement of the claim against

5  you, is the insurance company going to pay?

6      A.    I have no idea.  I don't know how that would

7  work.  I'm not privy to how that would work.  I can't

8  picture it happening.

9      Q.    Is the insurance company paying for Ms. Patane's

10  services at this time?

11      A.    Yes.

12      Q.    So you haven't come out of pocket at all in

13  regards to the defense of this case?

14      A.    That's correct.

15      Q.    Did you have a conversation at all in the

16  February 2019/March 2019 time frame with any of the

17  detectives from the Buckeye Police Department?

18      A.    I have no recollection.  I would doubt it.

19  Occasionally I'll be walking out of a room and somebody

20  will ask me.  I just don't recall that in this case.

21      Q.    Does the name Tamela Skaggs sound familiar to

22  you at all?

23      A.    Great name for a novel, but I don't recognize

24  the name.

25      Q.    She was the detective investigating the case on

1  behalf of the Buckeye Police Department.

2     A.    I don't remember having a conversation with her.

3     Q.    What about Detective Booher, B-O-O-H-E-R?

4     A.    Boy, I don't recognize the name, but I don't

5  recognize a conversation like that, no.

6     Q.    What about the investigator from DCS Alyssa

7  Lucero?  Did you talk to her at all?

8     A.    Not that I know of.  These wouldn't be

9  conversations I would typically have.  I can't picture

10 where it would occur, so I don't have any recollection of

11 that, no.

12    Q.    Okay.  So other than a conversation, and maybe

13 that's not the right word, but were you interviewed by any

14 investigators in relation to this case?

15    A.    Not that I recall, no.

16    Q.    Does the name Brenda Gualajara mean anything to

17 you or ring any bells for you?

18    A.    Brenda Guadalajara?

19    Q.    Gualajara.  No "D" in there.

20    A.    No, I don't recognize the name.

21    Q.    What about Jeff Duncan?

22    A.    Jeff?

23    Q.    Jeff Duncan.

24    A.    I don't place the name, no.

25    Q.    One last name.  Fernando Araiza, A-R-A-I-Z-A.

1     *A.*    No, I don't recognize the name.

2     *Q.*    Would the injuries that you report on the side

3   of the eye, the retina, would that affect Swayde's vision

4   at all?

5                 MS. PATANE:  Form and foundation.

6                 MR. PATEL:  Join.

7                 THE WITNESS:  At the time that I saw it?

8   BY MR. CONNELLY:

9     *Q.*    Yeah.

10    *A.*    Sure.

11    *Q.*    Would it affect his ability to fix and follow

12  when doing an exam?

13                MS. PATANE:  Form and foundation.

14                MR. PATEL:  Join.

15                THE WITNESS:  Again, he was able to see

16  large objects, and so he was able to complete that task

17  when I met him on February 22nd.  I wasn't startled, if

18  that's the question, that I looked in and say, oh, I

19  didn't expect to see hemorrhaging in there because he's

20  following a large object.  Is that what you're trying

21  to --

22  BY MR. CONNELLY:

23    *Q.*    No.  I'm just trying to understand what effect

24  it would have on his vision or visual acuity.

25    *A.*    It diminishes the acuity and it would be very

 1  for Phoenix Children's Hospital.  I am appearing by Zoom
 2  today, so if for any reason there is a gap in the
 3  transmission that makes my questions of you difficult to
 4  understand, just wave at me, and I'll wait until we can
 5  make sure that the link is sufficient for you to be able
 6  to hear my questions accurately.
 7      A.    Yes.
 8      Q.    All right.  It's been a long day.  I think we've
 9  been going for about eight hours with the breaks, so
10  there's been a lot of material that's been covered.  I'm
11  going to move around quite a bit to cover a variety of
12  areas.  If for some reason you are not following how I'm
13  skipping through the material, let me know.  I'll start
14  over.  If you don't understand my questions since I don't
15  have any medical training, also let me know that.
16      A.    Okay.
17      Q.    You were asked a number of questions today by
18  plaintiff's counsel about your relationship with Phoenix
19  Children's Hospital, and I wanted to follow up on that.
20              At the time you saw Swayde Sankey, you had
21  medical staff privileges at the hospital; correct?
22      A.    Yes.
23      Q.    That is a process in which you as a physician
24  submit information about your training and background to
25  be evaluated by your peers, and, based on your training

1  and experience, they can grant you privileges in order to

2  admit patients to the hospital, see them in consultation,

3  or perform procedures; correct?

4      *A.*   Yes.

5      *Q.*   About how long do you think you had been a

6  member of the PCH medical staff?

7      *A.*   As of 2019?

8      *Q.*   Yes.

9      *A.*   I'm guessing 25 years.  24 and a half years.

10     *Q.*   Very good.

11          And it's not a contract that you signed with

12  Phoenix Children's Hospital.  Would you agree that it's

13  documents that you agree to apply -- to abide by bylaws

14  and medical staff rules regulations as a member of the

15  medical staff; correct?

16          MR. CONNELLY:  Form and foundation.

17          THE WITNESS:  Yes.

18  BY MS. ZANGERLE:

19     *Q.*   So you don't have any contract with PCH to be a

20  member of the medical staff.  You are granted medical

21  staff privileges in order to see patients at the facility

22  or perform procedures at that hospital; correct?

23     *A.*   That's a good characterization, yes.

24     *Q.*   All right.  And that would be similar with the

25  other hospitals that you have medical staff privileges at.

1  can be some of the signs and symptoms associated with the

2  child that has an eye injury from that mechanism of

3  injury?

4           MR. CONNELLY:  Form and foundation.

5           THE WITNESS:  There were many presentations,

6  many lectures covering that topic, yes.

7  BY MS. ZANGERLE:

8      Q.    After you completed your ophthalmology

9  residency, you did additional training, and I think you

10 mentioned it was at New York Medical College?

11     A.    No, my residency was at New York Medical

12 College.  My additional training and fellowship was in

13 Atlanta through Scottish Rite Children's Medical Center.

14     Q.    Very good.

15           So you ended up doing additional training in

16 pediatric ophthalmology over and above what you learned in

17 your general ophthalmology residency?

18     A.    Correct.

19     Q.    So during your pediatric ophthalmology

20 fellowship, did you have additional training on signs and

21 symptoms associated with nonaccidental trauma and how it

22 can affect a child's eyes?

23           MR. CONNELLY:  Form and foundation.

24           THE WITNESS:  Absolutely.

25           ///

```
 1  BY MS. ZANGERLE:
 2      Q.    And part of that would be to teach you how to
 3  diagnose injuries in the eyes that could be associated
 4  with nonaccidental trauma?
 5                  MR. CONNELLY:  Form and foundation.
 6                  THE WITNESS:  Yes.
 7  BY MS. ZANGERLE:
 8      Q.    And would you say that that training that you
 9  received at the children's hospital gave you a good sense
10  of what the signs and symptoms would be associated with
11  children that have suspected nonaccidental trauma and eye
12  injuries associated with it?
13                  MR. CONNELLY:  Form and foundation.
14                  THE WITNESS:  Yes.  During the fellowship
15  year, we did quite a bit of didactic training with lecture
16  material, journal club, and we also examined children both
17  in the clinic and in the hospital setting for emergency
18  consults.  And that was overseen by a group of pediatric
19  ophthalmologists and retina specialists and oculoplastic
20  specialists for the traumas.  So we had extensive training
21  and experience with those topics, yes.
22  BY MS. ZANGERLE:
23      Q.    And so for people that may not understand what
24  journal club is, that is a process that you go through in
25  which you can go over current research and findings that
```