# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Honor Duvall, an individual; Donald )
Sankey, Junior, an individual;      )
S.Z.S., a minor, through his        )
parents and guardians Honor         )
Duvall and Donald Sankey,           )
                                    )
                Plaintiffs,         ) Case No.:
vs.                                 ) 21-CV-00167-PHX-ROS
                                    )
Arizona Department of Child Safety, )
a governmental entity; State of     )
Arizona, a governmental entity;     )
Brenda Gualajara, individually and  )
as an employee with the State of    )
Arizona Department of Child Safety  )
and John Doe Gualajara, her spouse; )
Fernando Araizo, individually and   )
as an employee with the State of    )
Arizona Department of Child Safety  )
and Jane Doe Araizo, his spouse;    )
Alyssa Lucero, individually and as  )
an employee with the State of       )
Arizona Department of Child Safety  )
and John Doe Lucero, her spouse;    )
Jeffrey Duncan, individually and as )
an employee with the State of       )
Arizona Department of Child Safety  )
and Jane Doe Duncan, his spouse;    )
et al.,                             )
                Defendants.         )
                                    )

DEPOSITION OF TODD ALLEN LEFKOWITZ, MD, FAAO

Phoenix, Arizona
November 14, 2022
10:11 a.m.

(COPY)

REPORTED BY:
HD REPORTING, LLC
HALEY DAWN WESTRA, RPR, CRR
Certified Court Reporter
AZ-CR No. 50762

BY MS. PATANE:

Q.   Didn't you just tell me that the only PCH records you had when you authored this report were the ophthalmology records?

MR. CONNELLY:  Form.  Foundation.

THE WITNESS:  No, I didn't say that.

There were the birth records, labor and delivery, any other records about the infant's stay at PCH.

But it was the ophthalmology records that I felt were relevant in the writing of this report.

BY MS. PATANE:

Q.   Was it your understanding that this baby was born at PCH?

A.   I believe so.  I'm not sure, though.

Q.   You were provided with a copy of the juvenile court ruling; correct?

A.   Correct.

Q.   And you reviewed that before you authored your report --

A.   Yes.

Q.   -- correct?

You knew the outcome, then, of the juvenile court proceedings before you formed your opinion in this case that Dr. Cassidy fell below the standard of

1  care; is that correct?
2      A.   Yes.  Yes.
3      Q.   Why was that important for you to review in
4  this case?
5           MR. CONNELLY:  Form and foundation.
6           THE WITNESS:  The juvenile court records?
7  BY MS. PATANE:
8      Q.   Yes.
9      A.   It wasn't that important in forming my
10 opinion.
11          I formed my opinions only on a medical basis
12 and not a legal basis; so, of course, ruling would have
13 no relevance to my writing of the report.
14          I looked at it just for completeness' sake, as
15 I always try to do.
16     Q.   Do you keep records in your file of
17 transmittals to you?
18          For example, if materials are sent to you by
19 the attorney via email, do you keep a record of the
20 email?
21     A.   I do.
22     Q.   And do you typically receive the documents
23 that you review by email, or do you like to have them
24 sent to you in regular U.S. mail?
25     A.   Usually by email would be my preference.

1  BY MS. PATANE:
2       Q.   Do you agree it was reasonable for him to find
3  that this was -- these retinal findings were consistent
4  with abusive head trauma?
5            MR. CONNELLY:  Form.  Foundation.
6            THE WITNESS:  I'm sorry.  Repeat your
7  question, please.
8  BY MS. PATANE:
9       Q.   You see also in Dr. Cassidy's report that he
10 writes under "Assessment" in the second sentence,
11 "This is most consistent with abusive head trauma"?
12           Do you see that?
13      A.   Yeah.
14      Q.   Do you agree that it was reasonable for
15 Dr. Cassidy to conclude that the findings were most
16 consistent with abusive head trauma?
17           MR. CONNELLY:  Form.  Foundation.
18           THE WITNESS:  No.
19 BY MS. PATANE:
20      Q.   Why do you not believe it was reasonable for
21 him to find that the retinal findings were consistent
22 with abusive head trauma?
23      A.   Because I think that it's a medical -- it's
24 not a medical decision that he's describing -- or this
25 is a legal definition, not a medical definition.

1   talk about pathognomonic signs, you know.
2           So here, they're saying that the past concept
3   of pathognomonic signs of retinal hemorrhage is debunk,
4   that clinicians should know that there's no
5   pathognomonic size, distribution, or location of
6   retinal hemorrhages seen only in AHT.
7           So that is consistent with my feelings and my
8   opinions.
9       Q.  Do you agree that abusive head trauma
10  frequently does show retinal hemorrhages?
11          MR. CONNELLY:  Form and foundation.
12          THE WITNESS:  I'm not sure I would agree with
13  that.
14  BY MS. PATANE:
15      Q.  Do you agree that there's a significant
16  relation between retinal hemorrhages and abusive head
17  trauma?
18          MR. CONNELLY:  Form and foundation.
19          THE WITNESS:  No, I wouldn't.
20  BY MS. PATANE:
21      Q.  Are you aware that that's what was set forth
22  in the Mattheij article?
23      A.  I'm sorry.  Am I aware...
24      Q.  ...that the Mattheij article states that
25  there's a significant relation between retinal

1      A.    (Nodding head.)

2      Q.    "Yes"?

3      A.    Correct.

4      Q.    Okay.  Are you aware that a preponderance of
5   the international and national professional medical
6   societies have publicly acknowledged the validity of
7   abusive head trauma?

8            MR. CONNELLY:  Form and foundation.

9            THE WITNESS:  Well, that's how strong the
10  lobby is.

11  BY MS. PATANE:

12     Q.    And are there any international or national
13  professional medical societies you're aware of who have
14  publicly taken a position that AHT is not a valid
15  medical diagnosis?

16     A.    I'm not aware of any.

17     Q.    And just to confirm, you believe that AHT is
18  not a valid medical diagnosis; correct?

19     A.    Yes, correct.

20     Q.    You believed that it was a valid medical
21  diagnosis prior to 2018?

22     A.    Well, I was as ignorant as the people of the
23  pediatric lobby.

24     Q.    And so was there any time in your career where
25  you believed that AHT was a valid medical diagnosis?

1   BY MS. PATANE:
2       Q.   Do you agree that retinal hemorrhages have
3   been recognized as a key indicator of abusive head
4   injury for more than 30 years?
5              MR. CONNELLY:  Form and foundation.
6              THE WITNESS:  I would state that it's obvious
7   from the literature that it was.
8   BY MS. PATANE:
9       Q.   Are there prospective and retrospective
10  clinical studies that have demonstrated that severe
11  retinal hemorrhages are strongly associated with
12  abusive head trauma?
13             MR. CONNELLY:  Form and foundation.
14             THE WITNESS:  I'm sure there are.
15  BY MS. PATANE:
16      Q.   Are you aware of any?
17      A.   Yeah.  I've read a lot of that literature.
18             And I'm not going to quote from the top of my
19  head because my memory is not as good as it used to be.
20             But I know there are many articles by Levin
21  and the like that -- that agree with that.
22             And even -- the guy who first originated the
23  term "shaken baby syndrome" was a British neurosurgeon
24  named Norman Guthkelch.
25             So he first described it; and years later,

1   he wrote an editorial saying that he didn't agree any
2   more with what he had first written.
3           And he was a very well-regarded person in his
4   field.
5       Q.   Okay.
6       A.   So he wrote that he didn't any longer agree
7   with that.
8       Q.   As far as -- so you do not agree with those
9   studies that have shown that severe retinal hemorrhages
10  are strongly associated with abusive head trauma?
11          MR. CONNELLY:  Form and foundation.
12          THE WITNESS:  That's correct.
13  BY MS. PATANE:
14      Q.   You're aware of them, and you disagree with
15  them?
16      A.   Yes.
17      Q.   Do you agree that approximately one-third of
18  all cases of abusive head trauma have mild to moderate
19  retinal hemorrhages?
20          MR. CONNELLY:  Form and foundation.
21          THE WITNESS:  I don't know if I would agree.
22  I'm -- I'm not aware of a statistic to that
23  degree or to that specificity.
24  BY MS. PATANE:
25      Q.   And in general, the number and severity of

1  retinal hemorrhages correlates with the severity of
2  neurological injury.  Do you agree with that?
3          MR. CONNELLY:  Form and foundation.
4          THE WITNESS:  No, not necessarily.  I don't
5  believe that.
6  BY MS. PATANE:
7     Q.  Do you agree that retinal hemorrhages are
8  found infrequently in neurologically normal patients
9  and are most frequently identified at autopsy in cases
10 of fatal abusive head trauma?
11         MR. CONNELLY:  Form and foundation.
12         THE WITNESS:  I don't agree with that.
13 BY MS. PATANE:
14    Q.  Do you agree that retinal hemorrhages in
15 abusive head trauma can vary in number, size, and
16 location within the retina, they can be bilateral or
17 unilateral, confined to the peripapillary area or
18 posterior pole or can extend to the ora serrata?
19         MR. CONNELLY:  Form and foundation.
20         THE WITNESS:  Well, that's the theory that
21 people in the ophthalmic community believe and just
22 about everyone in the pediatric community believe.
23 BY MS. PATANE:
24    Q.  And as part of the -- as part of that belief,
25 it's also believed that retinal hemorrhages can be in

1    Q.   Very good.
2         You were asked a number of questions today
3    about accidental head trauma or shaken baby syndrome,
4    and I want to follow up on a couple of those questions.
5         You mentioned in the exam that finished up
6    with Ms. Patane that back in 2019, you had testified in
7    some matters related to abusive head trauma; correct?
8    A.   Yes.
9    Q.   And at that time, you agreed that abusive head
10   trauma could cause retinal hemorrhages; correct?
11   A.   Correct.
12   Q.   And would you agree with me that the majority
13   of American medical society at that time also agreed
14   that abusive head trauma could lead to retinal
15   hemorrhages?
16        MR. CONNELLY:   Form and foundation.
17        THE WITNESS:   That's my understanding.
18   BY MS. ZANGERLE:
19   Q.   And would you agree that the majority of
20   American medical society continues to believe that
21   retinal hemorrhages are or can be due to abusive head
22   trauma?
23   A.   Correct.
24   Q.   So would you say that view and your opinion
25   that retinal hemorrhages are unlikely to result from

1  shaken baby syndrome or abusive head trauma is contrary
2  to the majority of medical societies in the United
3  States?
4           MR. CONNELLY:  Form and foundation.
5           THE WITNESS:  Apparently so.
6  BY MS. ZANGERLE:
7     Q.   So would you consider your opinions to be an
8  outlier to what the majority of major medical societies
9  believe are the cause of abusive head -- or retinal
10 hemorrhages leading to abusive -- strike.
11          Would you say that your opinions would be
12 considered an outlier to what the conclusions have been
13 by the majority of American medical societies relative
14 to retinal hemorrhages being due to abusive head
15 trauma?
16          MR. CONNELLY:  Form.  Foundation.
17          THE WITNESS:  Yeah, I would agree that I am an
18 outlier, from your description, but I would also posit
19 that most of that majority have never really looked
20 into possible alternative theories.
21          They just buy what their academies say without
22 questioning.
23 BY MS. ZANGERLE:
24    Q.   So you think that the American Academy of
25 Pediatrics is just buying into research that they don't

1  really know anything about?
2          MR. CONNELLY:  Form and foundation.
3          THE WITNESS:  I think they're part of a huge
4  lobby, which includes lawyers, judges, prosecutors, and
5  results in a lot of convictions, which should never
6  have held.
7          But, yeah, I definitely am a contrarian
8  compared with most people.
9  BY MS. ZANGERLE:
10     Q.  So would you agree with me that your opinion
11  regarding retinal hemorrhages not being related to
12  abusive head trauma would be inconsistent with the
13  majority of opinions in the scientific community?
14         MR. CONNELLY:  In the what community?
15         MS. ZANGERLE:  Scientific community.
16         MS. PATANE:  Scientific.
17         MR. CONNELLY:  Scientific.  Oh.
18         MS. ZANGERLE:  Yeah.
19         MR. CONNELLY:  Form and foundation.
20         THE WITNESS:  Did you say "abusive head
21  trauma" or "nonabusive head trauma"?
22  BY MS. ZANGERLE:
23     Q.  Abusive head trauma.
24     A.  Okay.  Thank you.
25         MR. CONNELLY:  Form and foundation.

1  THE WITNESS:  I think there are plenty of
2  people who believe the way I do, but they're in the
3  minority.
4  BY MS. ZANGERLE:
5      Q.   And one of the individuals that you cited to
6  today as the basis for your opinions is Randy Papetti;
7  correct?
8      A.   Correct.
9      Q.   He's not a doctor, is he?
10     A.   No.
11     Q.   In fact, he's an attorney?
12     A.   Yes, he is.
13     Q.   Practices here in Phoenix?
14     A.   Yes.
15     Q.   And Mr. Papetti's book is no longer in
16  circulation, is it?
17         MR. CONNELLY:  Form and foundation.
18         THE WITNESS:  I wouldn't know.
19 BY MS. ZANGERLE:
20     Q.   Do you own a copy of it?
21     A.   Do I own a copy?
22     Q.   Yes.
23     A.   Yes.
24     Q.   So do you know if it's something that you can
25 obtain from any book publisher or major surveyor of

1    THE WITNESS:  Right.  But you made a comment
2 about "every deposition"?
3 BY MS. ZANGERLE:
4    Q.   No, Doctor.
5         I asked you that since you've testified a lot,
6 you understand how this process works; right?
7    A.   Right.  But what did you say about "every" --
8         MR. CONNELLY:  She was talking about me, so
9 don't worry.
10 BY MS. ZANGERLE:
11   Q.   So let's talk some more about what the facts
12 are according to the American Academy of Ophthalmology.
13   A.   Yes, ma'am.
14   Q.   The American Academy of Ophthalmology in that
15 document, which you say that you read when it was
16 promulgated by that medical society, was that "retinal
17 hemorrhages have been recognized as a key indicator of
18 abusive head injury for more than 30 years."
19        Do you remember that conclusion?
20   A.   And that's --
21        MR. CONNELLY:  Form and foundation.
22        THE WITNESS:  And that's correct.
23 BY MS. ZANGERLE:
24   Q.   Okay.  You also remember that as the basis for
25 their findings in this medical guideline and statement

1   that it said "In 2 recent systematic reviews comprising
2   over 30 clinical studies and thousands of children, the
3   strong association of severe retinal hemorrhages with
4   abusive head trauma was confirmed."
5          Do you remember reading that too?
6      A.  Yes.
7          MR. CONNELLY:  Form and foundation.
8          THE WITNESS:  Yes, I do.
9          MR. CONNELLY:  And this is something you like
10  to do is rehash everything that's gone before, so...
11         THE WITNESS:  Right.
12         And I apologize if I am being argumentative.
13  I take back that.
14         But I agree with what the attorney just said.
15  BY MS. ZANGERLE:
16     Q.  So, Doctor, would you agree that the same
17  document said that "Direct or indirect trauma to the
18  eye may be caused by child physical abuse.  And the
19  most common manifestations are retinal hemorrhages,
20  seen in approximately 75 percent of children who are
21  victims of abusive head trauma"?
22     A.  Yes.  I recall that.
23     Q.  And that was what the relevant medical society
24  statement was as of 2018, based upon your understanding
25  of the literature?

1    A.   Yes.
2    Q.   And that same document provided guidance for
3 physicians in evaluating cases of abusive head trauma,
4 did it not?
5         MR. CONNELLY:  Form and foundation.
6         THE WITNESS:  Yes.
7 BY MS. ZANGERLE:
8    Q.   So let's talk about what you testified to
9 today about what you did when going to Banner Cardons
10 or other hospitals to conduct pediatric eye
11 examinations.
12        You said that you carried your own dilatation
13 drops?
14   A.   I did.
15   Q.   So are you permitted under the medical staff
16 to carry your own medication and dispense it and use it
17 in a pediatric patient in an inpatient setting --
18   A.   I --
19        MR. CONNELLY:  Form and found- --
20 BY MS. ZANGERLE:
21   Q.   -- without it having been dispensed from a
22 pharmacy?
23        MR. CONNELLY:  Form and foundation.
24        THE WITNESS:  I discussed it with the head of
25 pediatrics, and he was okay with that.