**GUST ROSENFELD, P.L.C.**
Kari B. Zangerle, No. 013164
Robert C. Stultz, No. 025781
kzangerle@gustlaw.com
rstultz@gustlaw.com
One East Washington Street, Suite 1600
Phoenix, Arizona  85004-2553
(602) 257-7422
Fax: (602) 254-4878

*Attorneys for Defendants Phoenix Children's Hospital; Dr. William S. Wood*
 *and Rachel Wood; Dr. Kathryn Coffman; Haley Dietzman and*
*Roald Dietzman; Zachary Dion; and Carey Lewis*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, an individual; Donald Sankey, Junior, an individual; S.Z.S., a minor, through his parents and guardians Honor Duvall and Donald Sankey,<br><br>Plaintiffs,<br><br>v.<br><br>Arizona Department Of Child Safety, a governmental entity; *et al.*,<br><br>Defendants. | Case No.:  21-CV-00167-PHX-ROS<br><br><br>**THE PCH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br>**(Oral Argument Requested)** |

Defendants Phoenix Children's Hospital, Dr. William S. Wood and spouse Rachel Wood, Dr. Kathryn Coffman, and Haley Dietzman and spouse Roald Dietzman ("PCH Defendants"), through counsel, move for summary judgment.

On February 21, 2019, S.Z.S., a 60-day old infant, presented to the Emergency Department at Phoenix Children's Hospital with his mother, Plaintiff Honor Duvall.

S.Z.S. presented with a constellation of injuries indicative of suspected non-accidental trauma (SNAT): a leg fracture, retinal hemorrhages, subdural hematomas, and bruising. These injuries were reported to the Arizona Department of Child Services, who initiated a Present Danger Plan.  S.Z.S. was discharged from PCH but required a subsequent hospitalization at PCH due to a concerning increase in the circumference of his head. During the second admission, S.Z.S. required neurosurgery for the placement of a subdural drain to drain the fluid collecting near his brain.

The providers at PCH who reported S.Z.S. to DCS during his first admission have not been named in this lawsuit or alleged to be at fault. The only PCH providers named – Dr. Coffman, Dr. Wood, and Ms. Dietzman – did not make the initial contact with DCS regarding S.Z.S.

Plaintiffs have asserted four causes of action relevant to this Motion: Claim Six against Dr. Coffman, alleging she engaged in a conspiracy with some of the State Defendants to deprive the Plaintiffs of their constitutional rights; Claim Eleven against Dr. Coffman, Dr. Wood, and Ms. Dietzman, alleging medical negligence under Arizona law; Claim Fifteen against the PCH Defendants, alleging intentional infliction of emotional distress under Arizona law; and Claim Sixteen, alleging PCH is vicariously liable for the negligence of its employees and agents.

As discussed in more detail in Section II below, Plaintiffs require expert witness testimony to prove their claims against the PCH Defendants. Yet, Plaintiffs failed to disclose a single expert witness to testify that the PCH Defendants breached the standard of care and that the alleged breach was a proximate cause of the purported injuries. Plaintiffs have failed to disclose a single expert witness to testify that the PCH Defendants acted unreasonably.

In addition to Plaintiffs lacking necessary expert witnesses, the PCH Defendants are immune from civil liability on the Arizona state law claims (Claims Eleven, Fifteen,

and Sixteen), pursuant to Arizona's mandatory child abuse reporting statute. *See* A.R.S. § 13-3620, *et seq*; Section II.C. below. Moreover, Plaintiffs have no evidence supporting Arizona's stringent standard of liability for an intentional infliction of emotional distress claim. *See* Section II.E. below.

For these reasons and those discussed in more detail below, the PCH Defendants request the Court enter summary judgment in their favor. This Motion is supported by the below Memorandum of Points and Authorities, and the concurrently filed Statement of Facts ("SOF").

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

   **A.      <u>Overview of the Medical Treatment.</u>**

On February 21, 2019, Plaintiff Honor Duvall brought S.Z.S. to the Emergency Department at Phoenix Children's Hospital, with a chief complaint of hematemesis (vomiting blood). (SOF, at ¶ 1.) Resident Kathleen Outcalt, M.D. and emergency medicine physician Anthony Pickett, M.D. evaluated S.Z.S., who was noted to be 60 days old and born with no complications. (SOF, at ¶ 2.) Bruising was identified around the diaper area, as well as conjunctival hemorrhage and hematemesis. (SOF, at ¶ 3.)

S.Z.S. received a skeletal survey, which includes X-Rays of the entire body. (SOF, at ¶ 4.) X-rays of the lower extremities revealed findings concerning for right and left tibial fractures.  (SOF, at ¶ 5.) The radiologist's impression included right and left tibial bucket handle metaphyseal fractures. (SOF, at ¶ 6.)

Based on the results of the skeletal survey, Dr. Outcalt contacted the Child Protection Team.  (SOF, at ¶ 7.)  S.Z.S. was admitted to Phoenix Children's Hospital for further work-up. On the same day of his presentation and admission, he received a CT of the head, which the radiologist reported as demonstrating "findings worrisome for extra-axial blood products of variable ages. Recommend MRI brain to exclude sequela

of repetitive trauma (SNAT)[*i.e.*, suspected non-accidental trauma]." (SOF, at ¶ 8.)

On February 21, 2019, social worker Marie McCormack performed a SNAT Initial Medical Assessment. (SOF, at ¶ 9.)  Plaintiff Duvall denied any known falls, drops, trauma, or car accidents that could have caused S.Z.S.'s injuries. (SOF, at ¶ 10.) After the assessment, Ms. McCormack reported the situation to the Arizona Department of Child Services (DCS).  (SOF, at ¶ 11.)

On February 22, 2019, pediatric ophthalmologist Defendant Brendan Cassidy, M.D. performed a consultation on S.Z.S. (SOF, at ¶ 12.) After examining S.Z.S., Dr. Cassidy noted that S.Z.S. had hemorrhages in both retinas that were "most consistent with abusive head trauma, could be related to a single massive crush injury to the skull, massive single acceleration/deceleration injury, or a repetitive acceleration/deceleration injury." (SOF, at ¶ 13.) That same day, S.Z.S. underwent an MRI of the brain, which showed bilateral frontal and parietal extra-axial fluid collections most compatible with chronic bilateral hematomas, and left greater than right frontal convexity curvilinear foci of gradient echo hypointensity likely representing thrombosed cortical veins. (SOF, at ¶ 14.)

On February 22, 2022, DCS entered an initial Present Danger Plan. (SOF, at ¶ 15). Under the initial Present Danger Plan, S.Z.S. could remain in the home, and his parents had unlimited supervised contact. *Id*.  DCS subsequently made changes to the Present Danger Plan.

On February 23, 2022, S.Z.S. was discharged from PCH. (SOF, at ¶ 16.)  S.Z.S.'s parents were given instructions to follow up with primary care, neurosurgery, orthopedic surgery, and the Child Protection Team, a multi-disciplinary team that specializes in assessing and treating child abuse. *Id*.

On February 28, 2019, pediatric orthopedic surgeon Defendant William Wood, M.D. saw S.Z.S. for the first time at an initial visit in the clinic. (SOF, at ¶ 17.) This was

Dr. Wood's first interaction with S.Z.S.  Based on the imaging, Dr. Wood's assessment included a corner metaphyseal fracture of the right tibia with associated periosteal reaction. (SOF, at ¶ 18.) Dr. Wood explained to Plaintiff Duvall that these fractures in a child of S.Z.S.'s age are often due to non-accidental trauma. (SOF, at ¶ 19.)

On March 7, 2019, Defendant Haley Dietzman, FNP, saw S.Z.S. for the first time, at the Childhelp Center. Ms. Dietzman was a member of the Child Protection Team. (SOF, at ¶ 20.) Due to a 2 cm increase in circumference size of S.Z.S.'s head, Ms. Dietzman recommended they return to PCH's Emergency Department. (SOF, at ¶ 21.) S.Z.S.'s mother was reluctant to return and asked to speak with Defendant Kathryn Coffman, M.D.  (SOF, at ¶ 22.) Dr. Coffman agreed that S.Z.S. should receive further evaluation at PCH. (SOF, at ¶ 23.)

Later that same day, S.Z.S. was brought to PCH's Emergency Department. Fellow Geet Gandhi, D.O. and emergency medicine physician Benjamin Thompson, M.D. evaluated S.Z.S. (SOF, at ¶ 24.) They ordered a skeletal survey and an MRI. *Id*. Because an MRI could not be completed without sedation, S.Z.S. was admitted to the hospital. (SOF, at ¶ 25.)

Also on March 7, 2019, Richard Southard, M.D. reported the results of the skeletal survey follow up. (SOF, at ¶ 26.) Dr. Southard's impression included progression of healing of bucket handle fracture distal right tibia with residual periosteal reaction right tibial diaphysis. *Id*.

That same day, social worker Kara Kelly contacted the Arizona Child Abuse Hotline, because Plaintiff Duvall refused an ophthalmology eye exam for S.Z.S. (SOF, at ¶ 27.) Ms. Kelly noted that the family's behavior continued to escalate to the point of interfering in medical treatment and examination. *Id*. (SOF, at ¶ 28.)

The following day, on March 8, 2019, S.Z.S. underwent an MRI of the brain under anesthesia, which showed an increase in size of the left convexity subdural

collection – that is, an increase in the collection of fluid. (SOF, at ¶ 29.) This required S.Z.S. to undergo a surgical procedure to place a left-sided subdural drain. (SOF, at ¶ 30.) S.Z.S. had to be intubated for a period of time following the placement of the drain. (SOF, at ¶ 31.)

Also on March 8, 2019, Dr. Coffman saw S.Z.S. at PCH. (SOF, at ¶ 32.) Dr. Coffman noted that "[t]he presence of bilateral subdural hemorrhages, bilateral extensive retinal and vitreous hemorrhages, and classic metaphyseal fracture of the distal tibia is very concerning for inflicted injury." *Id*. Dr. Coffman further noted that the work up has included extensive bleeding evaluation and bone labs, which were normal. (SOF, at ¶ 33.)

For the next several days, S.Z.S. remained under the care of a team of providers, and the subdural drain remained in place to drain the fluid. (SOF, at ¶ 34.) On March 11, 2019, S.Z.S. was evaluated by a different ophthalmologist, Christopher Fecarotta, M.D. (SOF, at ¶ 35.) Like in the earlier evaluation at PCH, Dr. Fecarotta noted the presence of bilateral retinal hemorrhages. *Id*.

On March 13, 2019, Dr. Taryn Bragg, a pediatric neurosurgeon, clamped the subdural drain catheter. (SOF, at ¶ 36.) The next day, Dr. Bragg removed the subdural drain. (SOF, at ¶ 37.) On March 16, 2019, S.Z.S. was discharged from PCH. (SOF, at ¶ 38.)

**B.    The PCH Defendants Were Not Parties To The Juvenile Court Dependency Proceedings.**

On March 19, 2019, the Department of Child Safety filed a dependency action in the Juvenile Division of the Superior Court of Arizona, Maricopa County. (SOF, at ¶ 39.) The PCH Defendants were not parties to the dependency action. (SOF, at ¶ 40). The parties were DCS, Honor Duvall (mother), and Donald Ray Sankey (father). (SOF, at ¶ 41.) During the pendency proceedings, the PCH Defendants had no opportunity to

present expert witnesses supporting their care and treatment, to present other witnesses and evidence, or to cross examine witnesses. On November 12, 2019, the court denied DCS's Dependency Petition. (SOF, at ¶ 42).[1]

### C. Plaintiffs' Allegations Against the PCH Defendants.

Plaintiffs have alleged four causes of action against the PCH Defendants.[2]

#### 1. Claim Six

In Claim Six, Plaintiffs do not allege any claims of liability against PCH. Plaintiffs allege that Dr. Coffman conspired with Defendants Gualajara, Araiza, Lucero, and Duncan to violate Plaintiffs Honor Duvall's and Donald Sankey's right to freedom of association, under the First Amendment, and Due Process, under the Fourteenth Amendment of the U.S. Constitution, to not have S.Z.S. unlawfully seized and S.Z.S.'s right to be free from unlawful seizure, under the Fourth and Fourteenth Amendments. (Doc. 1 at ¶ 233.) Dr. Coffman purportedly violated these constitutional rights (1) "by providing Defendants Gualajara, Araiza, Lucero, and Duncan false, misleading, and/or unfounded information alleging that Honor and/or Donald had abused S.Z.S" and (2) "by refusing to discharge S.Z.S. to the custody of this [*sic*] lawful parents, and instead discharging him to the custody of a person who was neither a parent nor a legal guardian." (Doc. 1 at ¶ 233, 244.)

#### 2. Claim Eleven

In Claim Eleven, Plaintiffs allege medical negligence, under Arizona law. Plaintiffs allege that Dr. Wood, Dr. Coffman, and Ms. Dietzman had "a duty to provide

---

[1] Plaintiffs have attempted to argue that the court's ruling in the dependency proceeding is binding on PCH. Plaintiffs' argument fails, because, among other reasons, the PCH Defendants were not parties to those proceedings. *See Calpine Construction Finance Company v. Arizona Department of Revenue*, 221 Ariz. 244, 249, 211 P.3d 1228, 1233 (App.2009).

[2] Plaintiffs delayed the voluntary dismissal of certain PCH Defendants until September 20, 2023, despite the Court ordering they file the dismissals expeditiously in its order of June 6, 2023. (Doc. 287)

the minimum accepted standard of care in their treatment of S.Z.S." (Doc. 1 at ¶ 270.) Plaintiffs further allege that Dr. Wood, Dr. Coffman, and NP Dietzman "breached their duty and failed to provide the minimum accepted standard of care in their treatment of S.Z.S." (Doc. 1 at ¶ 271.)

### 3.     Claim Fifteen

In Claim Fifteen, Plaintiffs allege intentional infliction of emotional distress against PCH, Dr. Coffman, Dr. Wood, and Ms. Dietzman, under Arizona law. (Doc. 1 at ¶ 291 – 295.) The purported basis for the claim is the "making of false reports of abuse to DCS." *Id*.

### 4.     Claim Sixteen

Claim Sixteen is alleged against only PCH. (Doc. 1 at ¶ 296 – 300) Plaintiffs allege that PCH is liable for the purported negligence of its employees and agents. *Id*.

### D.     <u>Plaintiffs' Failure to Disclose Expert Witnesses Against the PCH Defendants.</u>

Plaintiffs have disclosed only one expert witness: Thomas W. Young, M.D., a forensic pathologist who is neither qualified nor disclosed to testify on standard of care against the PCH Defendants. (SOF, at ¶ 43.) In Dr. Young's Report, he does not reference Dr. Coffman, Dr. Wood, or Ms. Dietzman. Dr. Young does not attempt to offer any standard of care opinions with respect to the PCH Defendants. (SOF, at ¶ 44.)  Even if Dr. Young had attempted to offer standard of care opinions, he would have been unqualified to do so. *See* Section II.D., below. Dr. Young is of the opinion that S.Z.S.'s injuries were not due to child abuse. Dr. Young concludes his report with the following summary: "To boil it down to its simplest form, real child abuse is witnessed by someone. False child abuse is diagnosed by doctors." (SOF, at ¶ 45.)

Dr. Young's opinions are the subject of a *Daubert* motion concurrently filed by PCH, but this Motion for Summary Judgment is not dependent on the outcome of the

1    *Daubert* motion.

2    **E.     The PCH Defendants' Expert Witnesses.**

3    The PCH Defendants disclosed ten expert witnesses to testify on their behalf.

4    The following is a list of the experts and a brief overview of their opinions:

5    **1.     Steven Frick, M.D. (pediatric orthopedic surgery)**

6    Dr. Frick is a board certified orthopedic surgeon. He is Professor and Vice

7    Chairman of Orthopedic Surgery at Stanford University School of Medicine, as well as

8    the Chief of Pediatric Orthopedic Surgery at the Lucile Packard Children's Hospital.

9    (SOF, at ¶ 46.) Dr. Frick will testify that Dr. Wood complied with the standard of care.

10   (SOF, at ¶ 47.) Dr. Frick will testify that the only plausible cause of S.Z.S.'s right distal

11   tibia medial metaphyseal corner fracture was non-accidental trauma. (SOF, at ¶ 48.) Dr.

12   Frick will testify that the standard of care would require Dr. Wood, or another

13   orthopedist, to report the injury to authorities. (SOF, at ¶ 49.)

14   **2.     Joseph Grubenhoff, M.D. (pediatric emergency medicine)**

15   Dr. Grubenhoff is board certified by the American Board of Pediatrics with

16   subspecialty certification in Pediatric Emergency Medicine. (SOF, at ¶ 50.) He is an

17   Associate Professor of Pediatrics and Emergency Medicine (by courtesy) at the

18   University of Colorado and serves as a Core Faculty member in the Pediatric Residency

19   Program and Pediatric Emergency Medicine Fellowship Program. (SOF, at ¶ 51.) He

20   also serves as the Medical Director of Diagnostic Safety at Children's Hospital

21   Colorado, a Level 1 Pediatric Trauma Center. (SOF, at ¶ 52.) Dr. Grubenhoff will testify

22   regarding the medical care S.Z.S. received at Phoenix Children's Hospital Emergency

23   Department. Dr. Grubenhoff will testify that based upon S.Z.S.'s presentation and

24   injuries, reporting of suspected child physical abuse would be required to authorities

25   under the standard of care and according to the PCH Policy Child Abuse and Neglect.

26   (SOF, at ¶ 53.)

### 3.    Jonathan Horton, M.D. (pediatric ophthalmology)

Dr. Horton is board certified in ophthalmology by the American Board of Ophthalmology. (SOF, at ¶ 54.) He is a Professor of Ophthalmology, Neurology, and Physiology at the University of California, San Francisco (UCSF), where he holds the William F. Hoyt endowed chair of Ophthalmology. (SOF, at ¶ 55.) He also serves as a Pediatric Ophthalmologist and Neuro-Ophthalmologist at the Benioff Children's Hospital, UCSF. (SOF, at ¶ 56.) Dr. Horton holds a Medical Degree from Harvard Medical School and a Ph.D. in Neurobiology from Harvard. (SOF, at ¶ 57.)

Dr. Horton will testify that the clinical evaluation completed on S.Z.S., including by ophthalmologist Dr. Brendan Cassidy, was professional, appropriate, and diligent. (SOF, at ¶ 58.) Dr. Horton will testify regarding the hemorrhages present in the retinas of both eyes. Dr. Horton disagrees with Plaintiffs' allegation that the injuries occurred during labor and delivery.[3] (SOF, at ¶ 59.) According to Dr. Horton, Plaintiffs' explanation is inconsistent with S.Z.S.'s condition at PCH. (SOF, at ¶ 60.) Any retinal hemorrhages that might have occurred during childbirth would have resolved by the time of Dr. Cassidy's examination two months later. (SOF, at ¶ 61.) Dr. Cassidy's examination showed findings consistent with an acute injury that occurred in close temporal proximity to S.Z.S.'s admission to PCH on February 21, 2019. (SOF, at ¶ 62.) Dr. Horton will testify that the injuries present at the time of that admission suggest non-accidental trauma as the most likely cause. (SOF, at ¶ 63.)

### 4.    Charles Maxfield, M.D. (pediatric radiology)

Dr. Maxfield is board certified by the American Board of Radiology in Diagnostic Radiology with subspecialty certification in Pediatric Radiology. (SOF, at ¶ 64.) He is a Professor of Radiology and Pediatrics at Duke University, where he also

---

[3]  Plaintiffs have disclosed no obstetrics expert to testify that S.Z.S.'s injuries were caused by the labor and delivery approximately 60 days before his presentation to PCH.

serves as the Chief of Pediatric Radiology and the Vice Chair of Education for the Department of Radiology. (SOF, at ¶ 65.) Dr. Maxfield will testify regarding the imaging related to S.Z.S.'s leg fractures. Dr. Maxfield concludes that he "would strongly favor non-accidental trauma in the differential diagnosis, and believe[s] without question there is a medical/radiographic basis for reporting the injury to the authorities." (SOF, at ¶ 66.)

### 5.    David Mirsky, M.D. (diagnostic radiology)

Dr. Mirsky is board certified in diagnostic radiology by the American Board of Radiology, with a subspecialty certification in Neuroradiology. (SOF, at ¶ 67.) Dr. Mirsky is an Associate Professor of Radiology at the University of Colorado. (SOF, at ¶ 68.) He also serves as a Pediatric Neuroradiologist at Children's Hospital Colorado, where he is the Director of the Pediatric Neuroradiology Fellowship programs, a designated faculty member in their Fetal Care Center, and an appointed member of the Medical Executive Board. (SOF, at ¶ 69.) Dr. Mirsky will testify regarding the MRI and CT imaging that S.Z.S. received, which Dr. Mirsky is of the opinion shows injuries consistent with trauma. (SOF, at ¶ 70.) According to Dr. Mirsky, "The imaging performed in the initial visit to Phoenix Children's Hospital provides foundation for considering abusive head trauma (non-accidental trauma) and reporting the child's injuries to the authorities given that no other credible explanation for the injuries." (SOF, at ¶ 71.)

### 6.    Corey Rood, M.D. (forensic pediatrics)

Dr. Rood is board certified by the American Board of Pediatrics in both General Pediatrics and the subspecialty of Child Abuse Pediatrics. (SOF, at ¶ 72.) Dr. Rood is an Associate Clinical Professor of Pediatrics within the School of Medicine and the Division Chief of the Child Abuse Pediatrics Division within the Department of Pediatrics at the University of California Irvine (UCI) in Orange County, California.

1   (SOF, at ¶ 73.) He also currently serves as the Medical Director of the Child Abuse

2   Services Team medical clinic in Orange, CA and the Medical Director of the Child

3   Abuse & Prevention Team at Miller Children's and Women's Hospital in Long Beach,

4   CA. (SOF, at ¶ 74.)

5          Dr. Rood will testify about the pediatric medical evaluations that S.Z.S. received

6   at PCH and his injuries. Dr. Rood concludes his report with the following overview:

> The constellation of injuries identified with this nearly 2-
> month-old infant, including the multiple areas of bruising,
> bilateral subconjunctival hemorrhages, bilateral diffuse
> multilayered retinal hemorrhages, bilateral multilocation
> subdural hemorrhages, soft palate healing oral injury, and
> healing right distal tibia classic metaphyseal fracture and
> possible left distal tibia classic metaphyseal fracture, is
> consistent with a medical diagnosis and etiology of inflicted
> trauma (child physical abuse) including abusive head trauma
> in this child with strong medical evidence that injuries
> happened on more than one occasion.

14  (SOF, at ¶ 75.) According to Dr. Rood, "A medical professional is mandated to report

15  suspected child maltreatment to the appropriate local authorities when they have a

16  reasonable concern…The consultation provided by the Child Protection Team and Dr.

17  Coffman were appropriate and meet best practice and standard of care for pediatrics."

18  (SOF, at ¶ 76.)

19          **7.    Lewis Phillip Rubin, M.D. (neonatology)**

20          Dr. Rubin is board certified by the American Board of Pediatrics with

21  subspecialty certification in Neonatal Perinatal Medicine. (SOF, at ¶ 77.) Dr. Rubin is a

22  Professor of Pediatrics in the Division of Neonatal-Perinatal Medicine at Georgetown

23  University, where he also serves as the Vice-Chair of Pediatric Research. (SOF, at ¶ 78.)

24  Dr. Rubin will testify that S.Z.S.'s injuries were not related to labor and delivery. Dr.

25  Rubin is of the opinion that "there is no basis for alleging that the child's injuries are a

26

result of infantile rickets." (SOF, at ¶ 79.) According to Dr. Rubin, "there is no other reasonable explanation for the child's constellation of signs and symptoms other than SNAT [suspected non-accidental trauma]." (SOF, at ¶ 80.) Dr. Rubin notes that he has cared for thousands of infants involved in difficult and traumatic deliveries, and he has never seen a child with bucket handle fractures caused from labor and delivery. (SOF, at ¶ 81.)

### 8.   Lisa Sansalone, M.S.N., R.N., C.P.N.P.-A.C. (NP trauma services)

Ms. Sansalone is an experienced acute care pediatric nurse practitioner. She is board certified as an acute care pediatric nurse practitioner through the Pediatric Nursing Certification Board. (SOF, at ¶ 82.) Ms. Sansalone will testify about the role of pediatric nurse practitioners in the care of patients who are suspected to have SNAT. Ms. Sansalone will testify that the pediatric nurse practitioner involved in S.Z.S.'s care at PCH complied with the standard of care. (SOF, at ¶ 83.)

### 9.   Sarah Ann Wagner, M.D. (obstetrics and gynecology)

Dr. Wagner is board certified by the American Board of Obstetrics and Gynecology, and is a fellow of the American College of Obstetricians and Gynecologists. (SOF, at ¶ 84.) Dr. Wagner will testify regarding the labor and delivery of S.Z.S. and that it did not cause the injuries with which S.Z.S. presented at PCH on February 21, 2019. Dr. Wagner will testify that the labor and delivery were managed appropriately. (SOF, at ¶ 85.) The management of the second stage in S.Z.S.'s labor and delivery is unrelated to the clinical presentation at PCH several months later. (SOF, at ¶ 86.) Moreover, "it can be said with certainty that there are no indications in the medical record that lead one to believe that the infant's bucket handle fracture is related to the mother's labor and delivery course." (SOF, at ¶ 87.)

**10.     Judy Walczak, R.N., C.P.N.P. (forensic nurse practitioner)**

Ms. Walczak is a forensic nurse practitioner who currently serves on the Child Advocacy and Protection Team at Children's Wisconsin, and served as a Pediatric Nurse Practitioner at the Waukesha C.A.R.E. program. (SOF, at ¶ 88.) Ms. Walczak is a Registered Nurse and Advanced Nurse Prescriber in Wisconsin, and she holds Pediatric Nurse Practitioner-PC certification from the Pediatric Nursing Certification Board. (SOF, at ¶ 89.)  Ms. Walczak will testify that Ms. Dietzman complied with the standard of care. (SOF, at ¶ 90.) According to Ms. Walczak, "Ms. Dietzman was within the standard of care to identify the child's injuries as being associated with SNAT and evaluate the child further for evidence of abuse." (SOF, at ¶ 91.)

In the face of these ten well-qualified and specialized expert witnesses, Plaintiffs have designated only Dr. Young – a former medical examiner/pathologist – to testify that he believes there could have been other causes for S.Z.S.'s constellation of injuries, although he does not offer any opinions, to a reasonable degree of medical probability, as to what he thinks actually caused the injuries. Moreover, Dr. Young does not offer any opinions that any of the PCH Defendants breached the standard of care (because he is unqualified to do so).

## II.     LEGAL ARGUMENT

### A.     Legal Standard

The court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The party moving for summary judgment has the burden of demonstrating the absence of a genuine issue of fact for trial. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir.2002)(*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the

pleadings and "set forth specific facts" that show a genuine issue for trial. *Id*.

**B.      Dr. Coffman Is Entitled To Summary Judgment On Claim Six.**

In Claim Six, Plaintiffs allege that Dr. Coffman conspired with certain State Defendants to violate their constitutional rights of familial association protected under the First, Fourth, and Fourteen Amendments of the United States Constitution. Claim Six is not alleged against PCH.

In order to prove a conspiracy between the State Defendants and Dr. Coffman, Plaintiffs must establish "an agreement or 'meeting of the minds' to violate constitutional rights." *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir.1989)(*quoting Fonda*, 707 F.2d at 438)). While each participant in the conspiracy need not know the exact details of the plan, they must at least share the common objective of the conspiracy. *Id*.

**1.      Plaintiffs Cannot Prove A Conspiracy Without First Proving, Through Expert Witness Testimony, That Dr. Coffman Acted Negligently.**

To prove a purported conspiracy, Plaintiffs must first prove that Dr. Coffman breached the standard of care.  Under Arizona law, licensed healthcare providers have an obligation to report to DCS if they reasonably believe a child is a victim of abuse. A.R.S. § 13-3620(A); *see also* Section II.C. below. Physicians complying with the standard of care and fulfilling their statutory obligation to report suspected child abuse cannot be held liable for a conspiracy for the very same actions.  Without evidence that Dr. Coffman was medically negligent in assessing suspected non-accidental trauma, Plaintiffs cannot prove that they conspired with others to deprive Plaintiffs of their constitutional rights. Put another way, if Dr. Coffman complied with the standard of care, by acting reasonably under the circumstances in suspecting non-accidental trauma, Plaintiffs' cannot prove a conspiracy to violate their constitutional rights involving Dr.

Coffman.

Dr. Coffman complied with the standard of care and reasonably assessed that S.Z.S. was a victim of suspected non-accidental trauma. (Doc. 130-1 at 61-65 and 259-265.) The evidence for this is unrebutted. PCH and Dr. Coffman have disclosed Dr. Corey Rood to testify regarding the medical care Dr. Coffman provided. At his deposition, Dr. Rood testified that Dr. Coffman complied with the standard of care:

> It's your opinion in this case that she [Dr. Coffman] complied with the medical care -- with the standard of care in her evaluation and consultation related to Swayde Sankey; correct?
>
> A. That's correct.
>
> …
>
> Q. If she believes that the child is potentially placed at risk by returning to that home environment, does the standard of care allow her to express that opinion to either law enforcement or to Child Protective Services or child DCS authorities about that opinion?
>
> A. Yes.
>
> Q. In fact, as a mandatory reporter, if she believes that the child is going to be returned potentially to an unsafe environment, does she have an obligation to speak up?
>
> MR. CONNELLY: Form and foundation.
>
> THE WITNESS: Yes. Yes.

(SOF, at ¶ 92.) Plaintiffs have presented no evidence that Dr. Coffman acted unreasonably. The only expert disclosed by Plaintiffs, Dr. Young, rendered no opinions with respect to the care and treatment provided by Dr. Coffman. (Doc. 145-1 at 7-9.) His report does not mention Dr. Coffman at all. *Id*. Similarly, at his deposition, Dr. Young

1   did not offer any opinions regarding Dr. Coffman.

2   Because Plaintiffs failed to disclose expert witnesses to testify that Dr. Coffman

3   breached the standard of care by acting unreasonably in suspecting non-accidental

4   trauma and discussing her medical findings with DCS, Dr. Coffman is entitled to

5   summary judgment on Claim Six.

6   **2.     There Is No Evidence Of A Conspiracy Involving Dr. Coffman.**

7   Even if Plaintiffs had disclosed experts to testify that Dr. Coffman breached the

8   standard of care, that would be insufficient to prove a conspiracy.  The failure to act

9   reasonably under the circumstances may provide a basis of a negligence claim, but it

10  falls woefully short of proving "an agreement or 'meeting of the minds' to violate

11  constitutional rights." *United Steelworkers of America*, 865 F.2d at 1540-41.

12  There is no evidence of a conspiracy based on race or monetary gain, as Plaintiffs

13  allege.  To the contrary, Jeffrey Duncan, the DCS Supervisor overseeing the

14  investigation, recently testified as follows:

15
16  Q. And there were some comments by counsel that the
    providers at PCH are handsomely paid to refer kids to DCS
    with allegations of child abuse.

17
18  Is it your opinion that PCH, in your experience working with
    them, has some kind of monetary bias in wanting to accuse
19  parents of child abuse so that they can earn money?

20  MR. CONNELLY: Form and foundation.

21  THE WITNESS: I've never seen anything like that or felt that
22  way, no.

23  BY MS. ZANGERLE:
    Q. So in your experience both working as a member of law
24  enforcement and with DCS, you didn't see anything in your
    dealing with providers at Phoenix Children's Hospital that led
25  you to believe that there was some nefarious reason why they
26

were referring children to DCS was for their own economic gain; correct?

      A. Correct.

…..

Q. In your dealings with PCH, did you ever see any of the providers that you thought were motivated by racial bias to make allegations of child abuse?

MR. CONNELLY: Foundation.

THE WITNESS: No.

BY MS. ZANGERLE:
Q. How many years did you work at DCS in investigations?

A. About six and a half.

Q. Never saw anything that you thought in your experience that would implicate PCH and its members discriminating against people because of their race in reporting child abuse?

MR. CONNELLY: Foundation.

THE WITNESS: No.

(SOF, at ¶ 93.) Mr. Duncan's testimony establishes that there was no conspiracy with the State Defendants based on race or monetary considerations, as Plaintiffs allege.

      Plaintiffs have insinuated in discovery that Dr. Coffman met with Greg McKay, the then Director of DCS, after which Mr. McKay purportedly directed DCS staff to file a petition of removal with the Court. At his deposition, Mr. McKay denied any such suggestion of collusion. Mr. McKay testified that he does not recall Dr. Coffman telling him any specifics about S.Z.S, and Dr. Coffman was "not a decision maker for this organization." (SOF, at ¶ 94.)

Without evidence of a conspiracy, Claim Six cannot survive, even if the Court were to determine that expert testimony is not required.   Accordingly, summary judgment should be entered in favor of Dr. Coffman.

**C.** **The PCH Defendants Have Immunity From Civil Liability On Plaintiffs' Arizona State Law Claims (Claims 11, 15, and 16).**

The PCH Defendants are immune from civil liability with respect to Plaintiffs' three Arizona state law claims: Claim 11 (medical negligence), Claim 15 (intentional infliction of emotional distress), and Claim 16 (PCH's vicarious liability). The PCH Defendants have civil immunity, pursuant to Arizona's child abuse mandatory reporting statute. *See* A.R.S. § 13-3620, *et seq.*

Arizona law imposes on certain persons an obligation to report suspected child abuse, and with that obligation comes immunity from civil liability:

> Any person who **reasonably believes** that a minor is or has been the victim of physical injury, abuse, child abuse, a reportable offense or neglect that appears to have been inflicted on the minor by other than accidental means or that is not explained by the available medical history as being accidental in nature or who reasonably believes there has been a denial or deprivation of necessary medical treatment or surgical care or nourishment with the intent to cause or allow the death of an infant who is protected under § 36-2281 **shall immediately report or cause reports to be made** of this information to a peace officer, **to the department of child safety** or to a tribal law enforcement or social services agency for any Indian minor who resides on an Indian reservation, except if the report concerns a person who does not have care, custody or control of the minor, the report shall be made to a peace officer only.

A.R.S. § 13-3620(A)(emphasis added). The statutory definition of "person" includes "[a]ny physician, physician's assistant, optometrist, dentist, osteopathic physician, chiropractor, podiatrist, behavioral health professional, nurse, psychologist, counselor or social worker who develops the reasonable belief in the course of treating a patient."

A.R.S. § 13-3620(A)(1). The Arizona Court of Appeals has held the "reasonable grounds" standard that triggers a mandatory reporting is a "low standard." *Ramsey v. Yavapai Family Advocacy Center*, 225 Ariz. 132, 138, 235 P.3d 285, 291 (App.2010). This low standard furthers the public policy "of encouraging people to report child abuse." *Ramsey*, 235 P.3d at 292 (*quoting L.A.R. v. Ludwig*, 170 Ariz. 24, 27, 821 P.2d 291, 294 (App.1991)).

A person who reports suspected child abuse, pursuant to this statute, is immunized from civil liability:

> A person who furnishes a report, information or records required or authorized under this section, or a person who participates in a judicial or administrative proceeding or investigation resulting from a report, information or records required or authorized under this section, is immune from any civil or criminal liability by reason of that action unless the person acted with malice or unless the person has been charged with or is suspected of abusing or neglecting the child or children in question.

A.R.S. § 13-3620(J). The courts "presume that a person acting pursuant to A.R.S. § 13-3620 acted in good faith and with proper motives." *Ramsey*, 235 P.3d at 292. Malice "mean[s] a wish to vex, annoy or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." A.R.S. § 1-215(20); *Ramsey*, 235 P.3d at 292.

Plaintiffs cannot prove malice to overcome the presumption that the PCH Defendants acted in good faith and with proper motives. Plaintiffs have not disclosed a single expert witness to testify that any of the PCH Defendants breached the standard of care by acting unreasonably, whereas the PCH Defendants have disclosed ten expert witnesses to support their care and treatment. *See* Sections I.D. and I.E. above. Plaintiffs cannot prove that the PCH Defendants acted unreasonably, let alone with a "wish to vex, annoy or injure" Plaintiffs, or with "an intent to do a wrongful act." *See* A.R.S. § 1-

215(20); *Ramsey*, 235 P.3d at 292.

The PCH Defendants are entitled to civil immunity, pursuant to A.R.S. § 13-3620. Accordingly, the PCH Defendants should be granted summary judgment on Claims 11, 15, and 16.

**D.**     **Dr. Coffman, Dr. Wood, and Ms. Dietzman Are Entitled To Summary Judgment On Claim 11 (Medical Negligence)**

Under Arizona law, Plaintiffs have asserted a claim for medical negligence against Dr. Coffman, Dr. Wood, and Ms. Dietzman. Pursuant to A.R.S. § 12-562(A), "A medical malpractice action shall not be brought against a licensed health care provider except upon the grounds set forth in A.R.S. § 12-561." That statute defines a "medical malpractice action," in part, as "an action for injury or death against a licensed health care provider based upon such provider's alleged negligence, misconduct, errors or omissions, or breach of contract in the rendering of health care, medical services, nursing services or other health-related services…." A.R.S. § 12-561(2). The statutory definition of a licensed health care provider includes a "person…licensed or certified by the state to provide health care, medical services, nursing services or other health-related services…." A.R.S. § 12-561(1)(a).

In a medical malpractice action, the plaintiff bears the burden of proving the following elements:

1.     The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.

2.     Such failure was a proximate cause of the injury.

A.R.S. § 12-563. To meet these burdens in medical malpractice cases, expert testimony is required to show that a healthcare provider was negligent, unless the negligence is so

grossly apparent that a layperson would have no difficulty in recognizing it. *Riedisser v. Nelson*, 111 Ariz. 542, 544, 534 P.2d 1052, 1054 (1975)(standard of care); *Gregg v. Nat'l Med. Health Care Svcs., Inc.*, 145 Ariz. 51, 54, 699 P.2d 925, 928 (App. 1985)(causation).

Arizona law prescribes the qualifications of an expert witness who may testify against a healthcare provide. For purposes of this case, the relevant qualifications are as follows:

1. If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty or claimed specialty as the party against whom or on whose behalf the testimony is offered. If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist who is board certified, the expert witness shall be a specialist who is board certified in that specialty or claimed specialty.

2. During the year immediately preceding the occurrence giving rise to the lawsuit, devoted a majority of the person's professional time to either or both of the following:

   (a) The active clinical practice of the same health profession as the defendant and, if the defendant is or claims to be a specialist, in the same specialty or claimed specialty.

   (b) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession as the defendant and, if the defendant is or claims to be a specialist, in an accredited health professional school or accredited residency or clinical research program in the same specialty or claimed specialty.

A.R.S. § 12-2604(A). Dr. Coffman is board certified in pediatrics by the American Board of Pediatrics. Dr. Wood specializes in pediatric orthopedics. Nurse Practitioner

Dietzman is a board certified family nurse practitioner.  Accordingly, the standard of care experts against each of these healthcare providers, respectively, would need to a board certified pediatrician, a pediatric orthopedist, and a board certified family nurse practitioner.

Plaintiffs admitted that expert testimony is required. In correspondence dated March 28, 2022, counsel for Plaintiffs wrote, "no one disputes that such expert testimony will be required here for the claims against your individually named clients." (Doc. 109-1 at 2.) Throughout these proceedings, Plaintiffs sought, and obtained, three extensions of the expert disclosure deadlines. Yet, the only expert Plaintiffs disclosed is Dr. Young, who is not a board certified pediatrician, a pediatric orthopedist, or a board certified family nurse practitioner.  Not only was Dr. Young not disclosed to testify on the standard of care with respect to Dr. Coffman, Dr. Wood, and Ms. Dietzman, he is not qualified to do so, nor did he even attempt to do so in his report.

This is not a case in which the alleged negligence is so grossly apparent that a layperson would have no difficulty in recognizing it. *Riedisser*, 534 P.2d at 1054.   The medical issues involved in this case implicate emergency medicine, pediatrics, pediatric orthopedics, pediatric ophthalmology, and neuroradiology, among others. Based on the PCH Defendants' expert disclosures alone, the purported negligence is not "grossly apparent" to a lay person. Common sense also dictates that given the constellation of injuries with which S.Z.S. presented, it would not be grossly apparent to a lay person what the standard of care required of a pediatrician (Dr. Coffman), a pediatric orthopedist (Dr. Wood), and a pediatric family nurse practitioner (Ms. Dietzman), and whether their acts breached the standard of care.

Arizona law requires Plaintiffs to prove their negligence claims against Dr. Coffman, Dr. Wood, and Ms. Dietzman with qualified expert witness testimony. Plaintiffs have none.  Therefore, Dr. Coffman, Dr. Wood, and Ms. Dietzman should be

1  granted summary judgment on Claim 11.

2  **E.      The PCH Defendants Are Entitled To Summary Judgment On Claim**
3  **15 (Intentional Infliction of Emotional Distress).**

4      Plaintiffs have asserted an Arizona law claim of intentional infliction of

5  emotional distress against PCH, Dr. Coffman, Dr. Wood, and Ms. Dietzman.  A claim

6  for intentional infliction of emotional distress requires proof of three elements: (1) the

7  conduct by the defendants must be "extreme and outrageous", (2) the defendants must

8  either intend to cause emotional distress or recklessly disregard the near certainty that

9  such distress will result from their conduct, and (3) severe emotional distress must

10  indeed occur as a result of defendants' conduct. *Citizen Publishing Company v. Miller*,

11  210 Ariz. 513, 516, 115 P.3d 107, 110 (2005). "Extreme and outrageous" is defined as

12  conduct "'so outrageous in character, and so extreme in degree, as to go beyond all

13  possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a

14  civilized community.'" *Christakis v. Deitsch*, 250 Ariz. 246, 250, 478 P.3d 241, 245

15  (App.2020)(*quoting Cluff v. Farmers Ins. Exch.*, 10 Ariz. App. 560, 562, 460 P.2d 666

16  668 (App. 1969)). Such conduct "must completely violate human dignity" and "strike to

17  the very core of one's being, threatening to shatter the frame upon which one's

18  emotional fabric is hung." *Id.* (*quoting Pankratz v. Willis*, 155 Ariz. 8, 15, 744 P.2d

19  1182, 1189 (App. 1987)).

20      Plaintiffs have not come close to presenting any evidence that would meet this

21  extraordinarily high burden. Plaintiffs have not even disclosed a medical expert to

22  testify that the PCH Defendants acted unreasonably, a much lower standard. If Plaintiffs

23  cannot prove the PCH Defendants acted unreasonably, it should go without saying that

24  they cannot prove the PCH Defendants' actions were "so outrageous in character, and so

25  extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

26  atrocious and utterly intolerable in a civilized community.'" *See Christakis*, 478 P.3d at

245. There is no evidence from which a jury could conclude that the PCH Defendants' actions "completely violate human dignity" and "strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *See Id.* Accordingly, the PCH Defendants should be granted summary judgment on Claim Fifteen.

### F. PCH Is Entitled To Summary Judgment On Claim Sixteen.

In Claim Sixteen, Plaintiffs allege that PCH is vicariously liable for the conduct of its employees and agents. As discussed above, summary judgment should be granted in favor of the individually named PCH personal – Dr. Coffman, Dr. Wood, and Ms. Dietzman. If the Court agrees and enters summary judgment on Claims Eleven and Fifteen, the Court should also grant summary judgment in favor of PCH on Claim Sixteen, as there is no basis for vicarious liability. *See Law v. Verde Valley Medical Center*, 217 Ariz. 92, 96, 170 P.3d 701, 705 (App.2007)(holding dismissal with prejudice of employed physicians relieved their employer of vicarious liability).

## III. CONCLUSION

For the reasons stated above, the Court should enter summary judgment in favor of the PCH Defendants.

DATED this 21st day of September, 2023.

**GUST ROSENFELD, P.L.C.**

By  /s/  Kari B. Zangerle
  Kari B. Zangerle
  Robert C. Stultz
  One East Washington Street, Suite 1600
  Phoenix, AZ  85004-2553
  *Attorneys for Defendants Phoenix*
  *Children's Hospital; Dr. William S. Wood*
  *and Rachel Wood; Dr. Kathryn Coffman;*
  *Haley Dietzman and Roald Dietzman;*
  *Zachary Dion; and Carey Lewis*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 21, 2023, I electronically filed the foregoing with the Clerk of Court, using the CM/ECF system, which will send notification of such filing to all parties, and will e-mail all notification of such filing to all non-CM/ECF system participants.

Thomas A. Connelly, Esq.
Robert T. Mills, Esq.
Sean A. Woods, Esq.
Mills & Woods Law PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ  85014
*Attorneys for Plaintiffs*

DeeAn Gillespie Strub, Esq.
Mark Shields, Esq.
Gillespie, Shields, Goldfarb Taylor
7319 North 16th Street
Phoenix, AZ  85020
*Attorneys for Plaintiffs*

Georgia A. Staton, Esq.
Ravi V. Patel, Esq.
Jones, Skelton & Hochuli, PLC
40 North Central Ave., Suite 2700
Phoenix, AZ  85004
*Attorneys for Defendants State of Arizona and ADOCS*

Cynthia Y. Patane, Esq.
Rachel L. Werner, Esq.
Gordon Rees Scully Mansukhani, LLP
One Renaissance Square
Two North Central Ave., #2200
Phoenix, AZ  85004
*Attorneys for Defendant Brendan Cassidy*

By  /s/  Melody Kern