**GUST ROSENFELD, P.L.C.**
Kari B. Zangerle, No. 013164
Robert C. Stultz, No. 025781
kzangerle@gustlaw.com
rstultz@gustlaw.com
One East Washington Street, Suite 1600
Phoenix, Arizona  85004-2553
(602) 257-7422
Fax: (602) 254-4878

*Attorneys for Defendants Phoenix Children's Hospital; Dr. William S. Wood*
*and Rachel Wood; Dr. Kathryn Coffman; Haley Dietzman and*
*Roald Dietzman; Zachary Dion; and Carey Lewis*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, an individual; Donald Sankey, Junior, an individual; S.Z.S., a minor, through his parents and guardians Honor Duvall and Donald Sankey,<br><br>Plaintiffs,<br><br>v.<br><br>Arizona Department Of Child Safety, a governmental entity; *et al.*,<br><br>Defendants. | Case No.:  21-CV-00167-PHX-ROS<br><br>**THE PCH DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

Defendants Phoenix Children's Hospital, Dr. William S. Wood and spouse Rachel Wood, Dr. Kathryn Coffman, and Haley Dietzman and spouse Roald Dietzman ("PCH Defendants"), through counsel, submit their Statement of Facts in support of the PCH Defendants' Motion for Summary Judgment.

1.     On February 21, 2019, Plaintiff Honor Duvall brought S.Z.S. to the Emergency Department at Phoenix Children's Hospital, with a chief complaint of hematemesis (vomiting blood). (Ex. 1 at PCH 1258-1259, 1265 cycn.)

2.      Resident Kathleen Outcalt, M.D. and emergency medicine physician Anthony Pickett, M.D. evaluated S.Z.S., who was noted to be 60 days old and born with no complications. *Id*.

3.     Bruising was identified around the diaper area, as well as conjunctival hemorrhage and hematemesis. *Id*.

4.     S.Z.S. received a skeletal survey, which includes X-Rays of the entire body. (Ex. 2 at PCH 1378-1379 cycn.)

5.     X-rays of the lower extremities revealed findings concerning for right and left tibial fractures. *Id*.

6.     The radiologist's impression included right and left tibial bucket handle metaphyseal fractures. *Id*.

7.     Based on the results of the skeletal survey, Dr. Outcalt contacted the Child Protection Team.  (Ex. 3 at PCH 1233 cycn.)

8.     On the same day of his presentation and admission to PCH, he received a CT of the head, which the radiologist reported as demonstrating "findings worrisome for extra-axial blood products of variable ages. Recommend MRI brain to exclude sequela of repetitive trauma (SNAT)[*i.e.*, suspected non-accidental trauma]." (Ex. 4 at PCH 1376-1377 cycn.)

9.     On February 21, 2019, social worker Marie McCormack performed a SNAT Initial Medical Assessment. (Ex. 5 at PCH 1355-1356 cycn.)

10.     Plaintiff Duvall denied any known falls, drops, trauma, or car accidents that could have caused S.Z.S.'s injuries. *Id*.

11.     After the assessment, Ms. McCormack reported the situation to the Arizona Department of Child Services (DCS). *Id.*

12.     On February 22, 2019, pediatric ophthalmologist Defendant Brendan Cassidy, M.D. performed a consultation on S.Z.S. (Ex. 6 at PCH 1281 cycn.)

13.     After examining S.Z.S., Dr. Cassidy noted that S.Z.S. had hemorrhages in both retinas that were "most consistent with abusive head trauma, could be related to a single massive crush injury to the skull, massive single acceleration/deceleration injury, or a repetitive acceleration/deceleration injury." *Id.*

14.     That same day, S.Z.S. underwent an MRI of the brain, which showed bilateral frontal and parietal extra-axial fluid collections most compatible with chronic bilateral hematomas, and left greater than right frontal convexity curvilinear foci of gradient echo hypointensity likely representing thrombosed cortical veins. (Ex. 7 at PCH 1372-1373 cycn.)

15.     On February 22, 2022, DCS entered an initial Present Danger Plan, under which S.Z.S. could remain in the home, and his parents had unlimited supervised contact. (Ex. 8 at AZDCS 000153-000154.)

16.     On February 23, 2022, S.Z.S. was discharged from PCH, and his parents were given instructions to follow up with primary care, neurosurgery, orthopedic surgery, and the Child Protection Team, a multi-disciplinary team that specializes in assessing and treating child abuse. (Ex. 9 at PCH 1234, 1240 cycn.)

17.     On February 28, 2019, pediatric orthopedic surgeon Defendant William Wood, M.D. saw S.Z.S. for the first time at an initial visit in the clinic. (Ex. 10 at PCH 1199, 1202 cycn.)

18.     Based on the imaging, Dr. Wood's assessment included a corner metaphyseal fracture of the right tibia with associated periosteal reaction. *Id.*

19.     Dr. Wood explained to Plaintiff Duvall that these fractures in a child of S.Z.S.'s age are often due to non-accidental trauma. *Id*.

20.     On March 7, 2019, Defendant Haley Dietzman, FNP, saw S.Z.S. for the first time, at the Childhelp Center. Ms. Dietzman was a member of the Child Protection Team. (Ex. 11 at PCH 1173-1174, 1177 cycn.)

21.     Due to a 2 cm increase in circumference size of S.Z.S.'s head, Ms. Dietzman recommended they return to PCH's Emergency Department. *Id*.

22.     S.Z.S.'s mother was reluctant to return and asked to speak with Defendant Kathryn Coffman, M.D. *Id*.

23.     Dr. Coffman agreed that S.Z.S. should receive further evaluation at PCH. *Id*.

24.     Later on March 7, 2019, S.Z.S. was brought to PCH's Emergency Department, where fellow Geet Gandhi, D.O. and emergency medicine physician Benjamin Thompson, M.D. evaluated S.Z.S. (Ex. 12 at PCH 251, 254-255 cycn.)

25.     They ordered a skeletal survey and an MRI. *Id*. Because an MRI could not be completed without sedation, S.Z.S. was admitted to the hospital. *Id*.

26.     Also on March 7, 2019, Richard Southard, M.D. reported the results of the skeletal survey follow up, and his impression included progression of healing of bucket handle fracture distal right tibia with residual periosteal reaction right tibial diaphysis. (Ex. 13 at PCH 528-529 cycn.)

27.     That same day, social worker Kara Kelly contacted the Arizona Child Abuse Hotline, because Plaintiff Duvall refused an ophthalmology eye exam for S.Z.S. (Ex. 14 at PCH 481-482 cycn.)

28.     Ms. Kelly noted that the family's behavior continued to escalate to the point of interfering in medical treatment and examination. *Id*.

29.   The following day, on March 8, 2019, S.Z.S. underwent an MRI of the brain under anesthesia, which showed an increase in size of the left convexity subdural collection. (Ex. 15 at PCH 526-527 cycn.)

30.   This required S.Z.S. to undergo a surgical procedure to place a left-sided subdural drain. (Ex. 16 at PCH 471 cycn.)

31.   S.Z.S. had to be intubated for a period of time following the placement of the drain. (Ex. 17 at PCH 475-476 cycn.)

32.   Also on March 8, 2019, Dr. Coffman saw S.Z.S. at PCH and noted that "[t]he presence of bilateral subdural hemorrhages, bilateral extensive retinal and vitreous hemorrhages, and classic metaphyseal fracture of the distal tibia is very concerning for inflicted injury." (Ex. 18 at PCH 432, 434-435 cycn.)

33.   Dr. Coffman further noted that the work up has included extensive bleeding evaluation and bone labs, which were normal. *Id.*

34.   For the next several days, S.Z.S. remained under the care of a team of providers, and the subdural drain remained in place to drain the fluid. (Ex. 19 at PCH 423-424 cycn.)

35.   On March 11, 2019, S.Z.S. was evaluated by a different ophthalmologist, Christopher Fecarotta, M.D., who noted the presence of bilateral retinal hemorrhages, like in the earlier evaluation at PCH. (Ex. 20 at PCH 275, 278-279 cycn.)

36.   On March 13, 2019, Dr. Taryn Bragg, a pediatric neurosurgeon, clamped the subdural drain catheter. (Ex. 21 at PCH 417-419 cycn.)

37.   The next day, Dr. Bragg removed the subdural drain. (Ex. 22 at PCH 414-416 cycn.)

38.   On March 16, 2019, S.Z.S. was discharged from PCH. (Ex. 23 at PCH 236 cycn.)

39.     On March 19, 2019, the Department of Child Safety filed a dependency action in the Juvenile Division of the Superior Court of Arizona, Maricopa County. (Doc. 145 at 3.)

40.     The PCH Defendants were not parties to the dependency action. *Id*.

41.     The parties were DCS, Honor Duvall (mother), and Donald Ray Sankey (father). *Id*.

42.     On November 12, 2019, the court denied DCS's Dependency Petition. *Id*.

43.     Plaintiffs have disclosed only one expert witness: Thomas W. Young, M.D., a forensic pathologist who is neither qualified nor disclosed to testify on standard of care against the PCH Defendants. (Doc. 145-1 at 7-9.)

44.     In Dr. Young's Report, he does not reference Dr. Coffman, Dr. Wood, or Ms. Dietzman. Dr. Young does not attempt to offer any standard of care opinions with respect to the PCH Defendants.  *Id*.

45.     Dr. Young concludes his report with the following summary: "To boil it down to its simplest form, real child abuse is witnessed by someone. False child abuse is diagnosed by doctors." (Doc. 145-1 at 9.)

46.     The PCH Defendants disclosed ten expert witnesses to testify on their behalf.  Steven Frick, M.D. (pediatric orthopedic surgery) is a board certified orthopedic surgeon. He is Professor and Vice Chairman of Orthopedic Surgery at Stanford University School of Medicine, as well as the Chief of Pediatric Orthopedic Surgery at the Lucile Packard Children's Hospital.  (Doc. 130-1 at 61.)

47.     Dr. Frick will testify that Dr. Wood complied with the standard of care. (Doc. 130-1 at 63.)

48.     Dr. Frick will testify that the only plausible cause of S.Z.S.'s right distal tibia medial metaphyseal corner fracture was non-accidental trauma. (Doc. 130-1 at 63-64.)

49.     Dr. Frick will testify that the standard of care would require Dr. Wood, or another orthopedist, to report the injury to authorities. *Id*.

50.     Joseph Grubenhoff, M.D. (pediatric emergency medicine) is board certified by the American Board of Pediatrics with subspecialty certification in Pediatric Emergency Medicine. (Doc. 130-1 at 101.)

51.     He is an Associate Professor of Pediatrics and Emergency Medicine (by courtesy) at the University of Colorado and serves as a Core Faculty member in the Pediatric Residency Program and Pediatric Emergency Medicine Fellowship Program. *Id*.

52.     He also serves as the Medical Director of Diagnostic Safety at Children's Hospital Colorado, a Level 1 Pediatric Trauma Center. *Id*.

53.     Dr. Grubenhoff will testify that based upon S.Z.S.'s presentation and injuries, reporting of suspected child physical abuse would be required to authorities under the standard of care and according to the PCH Policy Child Abuse and Neglect. (Doc. 130-1 at 106.)

54.     Jonathan Horton, M.D. (pediatric ophthalmology) is board certified in ophthalmology by the American Board of Ophthalmology. (Doc. 130-1 at 134.)

55.     He is a Professor of Ophthalmology, Neurology, and Physiology at the University of California, San Francisco (UCSF), where he holds the William F. Hoyt endowed chair of Ophthalmology. *Id*.

56.     He also serves as a Pediatric Ophthalmologist and Neuro-Ophthalmologist at the Benioff Children's Hospital, UCSF. *Id*.

57.     Dr. Horton holds a Medical Degree from Harvard Medical School and a Ph.D. in Neurobiology from Harvard. *Id*.

58.     Dr. Horton will testify that the clinical evaluation completed on S.Z.S., including by ophthalmologist Dr. Brendan Cassidy, was professional, appropriate, and

diligent. (Doc. 130-1 at 135.)

59.     Dr. Horton will testify regarding the hemorrhages present in the retinas of both eyes, and he disagrees with Plaintiffs' allegation that the injuries occurred during labor and delivery. (Doc. 130-1 at 136.)

60.     According to Dr. Horton, Plaintiffs' explanation is inconsistent with S.Z.S.'s condition at PCH. *Id*.

61.     Any retinal hemorrhages that might have occurred during childbirth would have resolved by the time of Dr. Cassidy's examination two months later. *Id*.

62.     Dr. Cassidy's examination showed findings consistent with an acute injury that occurred in close temporal proximity to S.Z.S.'s admission to PCH on February 21, 2019. *Id*.

63.     Dr. Horton will testify that the injuries present at the time of that admission suggest non-accidental trauma as the most likely cause. (Doc. 130-1 at 137.)

64.     Charles Maxfield, M.D. (pediatric radiology) is board certified by the American Board of Radiology in Diagnostic Radiology with subspecialty certification in Pediatric Radiology. (Doc. 130-1 at 202.)

65.      He is a Professor of Radiology and Pediatrics at Duke University, where he also serves as the Chief of Pediatric Radiology and the Vice Chair of Education for the Department of Radiology. *Id*.

66.     Dr. Maxfield will testify regarding the imaging related to S.Z.S.'s leg fractures, and he "would strongly favor non-accidental trauma in the differential diagnosis, and believe[s] without question there is a medical/radiographic basis for reporting the injury to the authorities." (Doc. 130-1 at 204.)

67.     David Mirsky, M.D. (diagnostic radiology) is board certified in diagnostic radiology by the American Board of Radiology, with a subspecialty certification in Neuroradiology. (Doc. 130-1 at 221.)

68.    Dr. Mirsky is an Associate Professor of Radiology at the University of Colorado. *Id*.

69.    He also serves as a Pediatric Neuroradiologist at Children's Hospital Colorado, where he is the Director of the Pediatric Neuroradiology Fellowship programs, a designated faculty member in their Fetal Care Center, and an appointed member of the Medical Executive Board. *Id*.

70.    Dr. Mirsky will testify regarding the MRI and CT imaging that S.Z.S. received, which Dr. Mirsky is of the opinion shows injuries consistent with trauma. (Doc. 130-1 at 223.)

71.    According to Dr. Mirsky, "The imaging performed in the initial visit to Phoenix Children's Hospital provides foundation for considering abusive head trauma (non-accidental trauma) and reporting the child's injuries to the authorities given that no other credible explanation for the injuries." *Id*.

72.    Corey Rood, M.D. (forensic pediatrics) is board certified by the American Board of Pediatrics in both General Pediatrics and the subspecialty of Child Abuse Pediatrics. (Doc. 130-1 at 259-260.)

73.    Dr. Rood is an Associate Clinical Professor of Pediatrics within the School of Medicine and the Division Chief of the Child Abuse Pediatrics Division within the Department of Pediatrics at the University of California Irvine (UCI) in Orange County, California. (Doc. 130-1 at 259.)

74.    He also currently serves as the Medical Director of the Child Abuse Services Team medical clinic in Orange, CA and the Medical Director of the Child Abuse & Prevention Team at Miller Children's and Women's Hospital in Long Beach, CA. *Id*.

75.    Dr. Rood concludes his report with the following overview:

The constellation of injuries identified with this nearly 2-month-old infant, including the multiple areas of bruising, bilateral subconjunctival hemorrhages, bilateral diffuse multilayered retinal hemorrhages, bilateral multilocation subdural hemorrhages, soft palate healing oral injury, and healing right distal tibia classic metaphyseal fracture and possible left distal tibia classic metaphyseal fracture, is consistent with a medical diagnosis and etiology of inflicted trauma (child physical abuse) including abusive head trauma in this child with strong medical evidence that injuries happened on more than one occasion.

(Doc. 130-1 at 264.)

76.    According to Dr. Rood, "A medical professional is mandated to report suspected child maltreatment to the appropriate local authorities when they have a reasonable concern…The consultation provided by the Child Protection Team and Dr. Coffman were appropriate and meet best practice and standard of care for pediatrics." (Doc. 130-1 at 264-265.)

77.    Lewis Phillip Rubin, M.D. (neonatology) is board certified by the American Board of Pediatrics with subspecialty certification in Neonatal Perinatal Medicine. (Doc. 130-1 at 290.)

78.    Dr. Rubin is a Professor of Pediatrics in the Division of Neonatal-Perinatal Medicine at Georgetown University, where he also serves as the Vice-Chair of Pediatric Research. *Id*.

79.    Dr. Rubin is of the opinion that "there is no basis for alleging that the child's injuries are a result of infantile rickets." *Id*.

80.    According to Dr. Rubin, "there is no other reasonable explanation for the child's constellation of signs and symptoms other than SNAT [suspected non-accidental trauma]." (Doc. 130-1 at 291.)

81.    Dr. Rubin notes that he has cared for thousands of infants involved in difficult and traumatic deliveries, and he has never seen a child with bucket handle fractures caused from labor and delivery. *Id*.

82.     Lisa Sansalone, M.S.N., R.N., C.P.N.P.-A.C. (NP trauma services) is an experienced acute care pediatric nurse practitioner. She is board certified as an acute care pediatric nurse practitioner through the Pediatric Nursing Certification Board. (Doc. 130-1 at 350.)

83.     Ms. Sansalone will testify that the pediatric nurse practitioner involved in S.Z.S.'s care at PCH complied with the standard of care. (Doc. 130-1 at 352.)

84.     Sarah Ann Wagner, M.D. (obstetrics and gynecology) is board certified by the American Board of Obstetrics and Gynecology, and is a fellow of the American College of Obstetricians and Gynecologists. (Doc. 130-1 at 361.)

85.     Dr. Wagner will testify that the labor and delivery were managed appropriately. (Doc. 130-1 at 362.)

86.     The management of the second stage in S.Z.S.'s labor and delivery is unrelated to the clinical presentation at PCH several months later. *Id*.

87.     Moreover, "it can be said with certainty that there are no indications in the medical record that lead one to believe that the infant's bucket handle fracture is related to the mother's labor and delivery course." *Id*.

88.     Judy Walczak, R.N., C.P.N.P. (forensic nurse practitioner) is a forensic nurse practitioner who currently serves on the Child Advocacy and Protection Team at Children's Wisconsin, and served as a Pediatric Nurse Practitioner at the Waukesha C.A.R.E. program. (Doc. 130-1 at 378.)

89.     Ms. Walczak is a Registered Nurse and Advanced Nurse Prescriber in Wisconsin, and she holds Pediatric Nurse Practitioner-PC certification from the Pediatric Nursing Certification Board. *Id*.

90.     Ms. Walczak will testify that Ms. Dietzman complied with the standard of care. (Doc. 130-1 at 379.)

91.     According to Ms. Walczak, "Ms. Dietzman was within the standard of care to identify the child's injuries as being associated with SNAT and evaluate the child further for evidence of abuse." (Doc. 130-1 at 381.)

92.     At his deposition, Dr. Rood testified that Dr. Coffman complied with the standard of care:

> It's your opinion in this case that she [Dr. Coffman] complied with the medical care -- with the standard of care in her evaluation and consultation related to Swayde Sankey; correct?
>
> A. That's correct.
>
> …
>
> Q. If she believes that the child is potentially placed at risk by returning to that home environment, does the standard of care allow her to express that opinion to either law enforcement or to Child Protective Services or child DCS authorities about that opinion?
>
> A. Yes.
>
> Q. In fact, as a mandatory reporter, if she believes that the child is going to be returned potentially to an unsafe environment, does she have an obligation to speak up?
>
> MR. CONNELLY: Form and foundation.
>
> THE WITNESS: Yes. Yes.

(*See* Ex. 24, at p. 104, ln. 25 – p. 105, ln. 24.)

93.     Jeffrey Duncan, the DCS Supervisor overseeing the investigation, testified as follows:

> Q. And there were some comments by counsel that the providers at PCH are handsomely paid to refer kids to DCS with allegations of child abuse.

**1**
**2**

Is it your opinion that PCH, in your experience working with them, has some kind of monetary bias in wanting to accuse parents of child abuse so that they can earn money?

**3**
**4**

MR. CONNELLY: Form and foundation.

**5**

THE WITNESS: I've never seen anything like that or felt that way, no.

**6**
**7**

BY MS. ZANGERLE:

**8**
**9**
**10**
**11**

Q. So in your experience both working as a member of law enforcement and with DCS, you didn't see anything in your dealing with providers at Phoenix Children's Hospital that led you to believe that there was some nefarious reason why they were referring children to DCS was for their own economic gain; correct?

**12**

     A. Correct.

**13**

…..

Q. In your dealings with PCH, did you ever see any of the providers that you thought were motivated by racial bias to make allegations of child abuse?

**14**
**15**
**16**

MR. CONNELLY: Foundation.

**17**

THE WITNESS: No.

**18**
**19**

BY MS. ZANGERLE:

**20**

Q. How many years did you work at DCS in investigations?

**21**

A. About six and a half.

**22**
**23**

Q. Never saw anything that you thought in your experience that would implicate PCH and its members discriminating against people because of their race in reporting child abuse?

**24**
**25**

MR. CONNELLY: Foundation.

**26**

THE WITNESS: No.

1 | (Ex. 25, at p. 298, lns. 5-22 and p. 300, lns. 4-18.)

2 |        94.     At his deposition, Greg McKay, the then Director of DCS, testified that he

3 | does not recall Dr. Coffman telling him any specifics about S.Z.S, and Dr. Coffman was

4 | "not a decision maker for this organization." (*See* Ex. 26, at p. 167, ln. 4-7 and p. 196,

5 | ln. 7-8.)

6 |        DATED this 21st day of September, 2023.

7 |                                        **GUST ROSENFELD, P.L.C.**

8 |

9 |                                        By  /s/ Kari B. Zangerle
                                              Kari B. Zangerle

10 |                                            Robert C. Stultz
                                              One East Washington Street, Suite 1600

11 |                                           Phoenix, AZ  85004-2553
                                              *Attorneys for Defendants Phoenix*

12 |                                           *Children's Hospital; Dr. William S. Wood*
                                              *and Rachel Wood; Dr. Kathryn Coffman;*

13 |                                           *Haley Dietzman and Roald Dietzman;*
                                              *Zachary Dion; and Carey Lewis*

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

1

## **<u>TABLE OF CONTENTS – EXHIBITS</u>**

2

Exhibit 1      ED/UC History and Physical - PCH 1258, 1259, 1265 cycn

3

4

Exhibit 2      Skeletal Survey – PCH 1378-1379 cycn

5

Exhibit 3      Telephone Communication Note – PCH 1233 cycn

6

Exhibit 4      02/21/2019 CT Report – PCH 1376-1377 cycn

7

Exhibit 5      SNAT – Initial Medical Assessment – PCH 1355-1356 cycn

8

9

Exhibit 6      Report of Consultation – PCH 1281 cycn

10

Exhibit 7      02/22/2019 MRI report – PCH 1372-1373 cycn

11

Exhibit 8      Present Danger Plan – AZDCS 000153-000154

12

Exhibit 9      Discharge Summary – PCH 1234, 1240 cycn

13

14

Exhibit 10    Office Visit Note – PCH 1199, 1202 cycn

15

Exhibit 11    Haley Dietzman, FNP Note – PCH 1173, 1174, 1177 cycn

16

Exhibit 12    ED/UC History and Physical – PCH 251, 254, 255 cycn

17

Exhibit 13    Dr. Southard Report – PCH 528-529 cycn

18

19

Exhibit 14    Social Work Progress Note – PCH 481-482 cycn

20

Exhibit 15    March 8, 2019 MRI Report – PCH 526-527 cycn

21

Exhibit 16    Operative Report – PCH 471 cycn

22

Exhibit 17    Dr. Katherine Davenport's Note – PCH 475-476 cycn

23

24

Exhibit 18    Dr. Kathryn Coffman's Note – PCH 432, 434, 435 cycn

25

Exhibit 19    Dr. Taryn Bragg's Note dated 03/11/2019 – PCH 423-424 cycn

26

Exhibit 20    Dr. Christopher Fecarotta's Note – PCH 275, 278, 279 cycn

1

Exhibit 21    Progress Note – PCH 417-419 cycn

2

Exhibit 22    Progress Note – PCH 414-416 cycn

3

Exhibit 23    Discharge Summary – PCH 236 cycn

4

5

Exhibit 24    Deposition Transcript – Corey Rood, MD, pp. 104-105

6

Exhibit 25    Deposition Transcript - Jeffery Duncan, pp. 298, 300

7

Exhibit 26    Deposition Transcript – Gregory McKay, pp. 167, 196

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

**CERTIFICATE OF SERVICE**

2

3
      I hereby certify that on September 21, 2023, I electronically filed the foregoing

4
with the Clerk of Court, using the CM/ECF system, which will send notification of such

5
filing to all parties, and will e-mail all notification of such filing to all non-CM/ECF

6
system participants.

7
Thomas A. Connelly, Esq.

8
Robert T. Mills, Esq.
Sean A. Woods, Esq.

9
Mills & Woods Law PLLC
5055 North 12th Street, Suite 101

10
Phoenix, AZ  85014

11
*Attorneys for Plaintiffs*

12
DeeAn Gillespie Strub, Esq.

13
Mark Shields, Esq.
Gillespie, Shields, Goldfarb Taylor

14
7319 North 16th Street
Phoenix, AZ  85020

15
*Attorneys for Plaintiffs*

16
Georgia A. Staton, Esq.

17
Ravi V. Patel, Esq.

18
Jones, Skelton & Hochuli, PLC
40 North Central Ave., Suite 2700

19
Phoenix, AZ  85004

20
*Attorneys for Defendants State of Arizona and ADOCS*

21
Cynthia Y. Patane, Esq.
Rachel L. Werner, Esq.

22
Gordon Rees Scully Mansukhani, LLP

23
One Renaissance Square
Two North Central Ave., #2200

24
Phoenix, AZ  85004

25
*Attorneys for Defendant Brendan Cassidy*

26
By  /s/ Melody Kern