**GUST ROSENFELD P.L.C.**
Kari B. Zangerle, No. 013164
Robert C. Stultz, No. 025781
kzangerle@gustlaw.com
rstultz@gustlaw.com
One East Washington Street, Suite 1600
Phoenix, Arizona 85004-2553
(602) 257-7422
Fax: (602) 254-4878

*Attorneys for Defendants Phoenix Children's Hospital; Dr. William S. Wood and Rachel Wood; Dr. Kathryn Coffman; Haley Dietzman and Roald Dietzman; Zachary Dion; and Carey Lewis*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Honor Duvall, an individual; Donald Sankey, Junior, an individual; S.Z.S., a minor, through his parents and guardians Honor Duvall and Donald Sankey,<br><br>Plaintiffs,<br><br>v.<br><br>Arizona Department Of Child Safety, a governmental entity; *et al.*,<br><br>Defendants. | Case No.: 21-CV-00167-PHX-ROS<br><br>**THE PCH DEFENDANTS'** ***DAUBERT*** **MOTION REGARDING PLAINTIFFS' EXPERT THOMAS YOUNG, M.D.**<br><br>**(Oral Argument and *Daubert* Hearing Requested)** |

Defendants Phoenix Children's Hospital, Dr. William S. Wood and spouse Rachel Wood, Dr. Kathryn Coffman, and Haley Dietzman and spouse Roald Dietzman ("PCH Defendants"), through counsel, move to preclude the opinions of Plaintiffs' expert, Thomas Young, M.D. Dr. Young's opinions are premised on his self-created "Inferential Test," which fails to meet the reliability criteria of Rule 702 and *Daubert v.*

*Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The PCH Defendants request a *Daubert* evidentiary hearing.

## I. BACKGROUND

On February 21, 2019, S.Z.S., a 60-day old infant, presented to the Emergency Department at Phoenix Children's Hospital with his mother, Plaintiff Honor Duvall. S.Z.S. presented with a constellation of injuries indicative of suspected non-accidental trauma (SNAT): a leg fracture (metaphyseal fracture), retinal hemorrhages, subdural hematomas, and bruising. S.Z.S.'s parents offered no explanation for the injuries, such as accidental trauma. The injuries were reported to the Arizona Department of Child Services, pursuant to Arizona's mandatory child abuse reporting statute. *See* A.R.S. § 13-3620, *et seq*. The well-established and generally accepted medical science supporting the causal connection between S.Z.S.'s injuries and non-accidental trauma, or child abuse, is discussed in more detail in Sections I.B.C., and D. below.

### A. Plaintiffs' Expert, Thomas Young, M.D.

Plaintiffs have disclosed one expert to testify against the PCH Defendants – Thomas Young, M.D. Dr. Young is a former medical examiner and now considers himself to be a forensic pathologist. Since completing his medical training in 1984, Dr. Young has never held hospital privileges to care for patients with neurological conditions. (*See* deposition of Thomas Young, M.D., at p. 125, lns. 7-13, attached as Exhibit 1.) Dr. Young has never been responsible for providing bedside care to newborns. (Ex. 1, at p. 127, lns. 2-5.)

Despite working for years as a medical examiner, which required him to determine causes of death, including homicide, for unwitnessed events, Dr. Young summarizes his opinions in this case as follows: "To boil it down to its simplest form, real child abuse is witnessed by someone. False child abuse is diagnosed by doctors. What I have just stated is valid deductively and exceedingly strong inductively." (Ex. 2,

1 Report of Dr. Young, at p. DUVALL_001768.) In reaching his opinions, Dr. Young
2 claims to follow what he calls the "Inferential Test (IT)":

> One can be reasonably certain if witness accounts of the past are consistent or not consistent with physical evidence in the present, but one cannot reliably surmise past events from physical evidence unless there is only one plausible explanation.

(Ex. 2, at DUVALL_001766.) In deposition testimony, Dr. Young admitted that he made up the Inferential Test, which he claims "turns out to be a theorem of deductive logic." (Ex. 1, at p. 210, lns. 14-19.) The Inferential Test cannot be found in logic literature (or any medical literature for that matter, other than his own book discussed below); instead, Dr. Young has posted his theorem on his website. (Ex. 1, at p. 210, ln. 20 – p. 211, ln, 4.)

Dr. Young discusses the Inferential Test in his book, *The Sherlock Effect.* (Ex. 1, at p. 211, ln. 5-10.) At his deposition, Dr. Young provided the background on the origins of his book:

> Q. What was your intention when you wrote this book?
>
> A. To disclose The Sherlock Effect.
>
> Q. And is The Sherlock Effect your individual thesis or hypothesis about how many forensic pathologists function?
>
> A. No.
>
> Q. Who developed The Sherlock Effect?
>
> A. Well, it would have to be Sherlock Holmes.
>
> Q. Well, I understand that, but is it a term of art that is utilized in forensic pathology?
>
> A. No.

> Q. So how is it that the term The Sherlock Effect -- strike. Did you coin that term for purposes of writing this book?
>
> A. The person I was consulting, the publicist, recommended that as a potential title, and I agreed.

(Ex. 1, at p. 36, ln. 12 – p. 37, ln. 6.) Dr. Young performed no clinical research in a medical setting for his book. (Ex. 1, at p. 83, ln. 24 – p. 84, ln. 11.)

Dr. Young applies the so-called Inferential Test in an attempt to call into question the cause of S.Z.S.'s metaphyseal fracture, retinal hemorrhages, and subdural hematomas. Dr. Young does not offer an opinion, to a reasonable degree of medical probability, on what caused S.Z.S.'s injuries. In short, as discussed more fully below, using his self-created Inferential Test, Dr. Young opines that because nobody confessed to abusing S.Z.S. or admitted to witnessing the child abuse, a diagnosis of probable child abuse cannot be made. Generally accepted medical science disagrees.

For S.Z.S.'s subdural hemorrhages, Dr. Young admits that subdural hemorrhages can be caused by abusive head trauma, and he has not formed an opinion, to a reasonable degree of medical certainty, as to the cause of S.Z.S.'s hemorrhages. (Ex. 1, at p. 242, lns. 8-12, 9-21.) Using his Inferential Test, Dr. Young attempts to call into question the medical literature establishing abusive head trauma as a cause of subdural hemorrhages:

> Q. Perpetrator confessions, clinical studies, and several other things. Are you familiar with any clinical research conducting on human beings that has shown that shaking a baby results in retinal hemorrhaging in 85 percent of the cases?
>
> A. To set up a situation where you are shaking babies and then seeing whether or not they get retinal hemorrhages, subdural hemorrhages and brain swelling would be unethical. You can't set up a situation where you're actually shaking babies to do that kind of thing. What has happened here is

that this is a backwardly-reasoned speculation. It's a notion. It's a theory. It's an idea.

(Ex. 1, at p. 304, ln. 24 – p. 305, ln. 14 (objections omitted)) Dr. Young testified that he believes it is possible S.Z.S.'s subdural hematomas could have been caused by childbirth, although he would not say it to a probability. (Ex. 1, at p. 295, ln. 25 – p. 296, ln. 21.) In his report, Dr. Young wrote, "Problems with head trauma during the delivery or hypoxia (lack of oxygen in the infant) made evident by the meconium staining of the amniotic fluid could have led to the subdural hemorrhages that enlarged and re-bled over time." (Ex. 2, at DUVALL_001767.) As discussed in Section II.B. below, abusive head trauma is well-established and generally accepted as a cause of subdural hemorrhages, and there is no support for Dr. Young's use of the "Inferential Test" to suggest that S.Z.S. could have been caused by childbirth and a subsequent "re-bleeding."

For S.Z.S.'s metaphyseal fracture, Dr. Young offers a medical theory that he "invented," which he calls "catch-up mineralization." (Ex. 1, at p. 177, lns. 23-24.) Dr. Young offered the following description at his deposition:

> Q. Can you tell me what catch-up mineralization is?
>
> A. Let's say, in this case, since there was a documented deficiency of Vitamin D in the mother, well, that can retard the incorporation of calcium and phosphate salts into the skeleton of the child, so what ends up having to happen is that once the child is out of the womb, there has to be catch up.
>
> It's kind of like -- well, I've used this example. Let's say it's COVID-19, and they're not able to be having any instruction in the classroom. Well, that occurred for a lot of students for about a year, so they don't learn as efficiently in that situation, and so when they get back in school, they have to catch up. They have to catch up with all the things that they missed out on. Well, the same way, the body in developing, if it was not able to mineralize optimally white in the fetus, they may have

> to catch up, to accelerate the changes, and sometimes these can be interpreted as fractures, especially if it's along the growth plate where a lot of the catch-up mineralization is taking place.

(*See* Ex 1, at p. 178, lns. 3-23.) As discussed in Section I.D. below, Dr. Young's catch-up mineralization theory is not supported in the medical literature and lacks evidence as applied to this case.

For S.Z.S.'s retinal hemorrhages, Dr. Young does not dispute S.Z.S. had retinal hemorrhage and does not offer an opinion on the cause of the hemorrhages:

> Q. Do you intend to testify at the time of trial whether or not retinal hemorrhages were present in Swayde Sankey on February 21st through February 23rd of 2019?
>
> A. Okay. I'm not disputing that retinal hemorrhages were found.
>
> Q. Are you going testify at the time of trial as to what you believe the cause of the retinal hemorrhages were?
>
> A. What the cause is could be many things. I'm not testifying as to the cause of retinal hemorrhaging. I'm testifying whether or not witness accounts of the past are consistent or not consistent with the physical evidence, including retinal hemorrhages.

(Ex. 1, at p. 174, lns. 6-20.) Dr. Young agrees that retinal hemorrhages can be caused by abusive head trauma, and he has not formed an opinion, to a reasonable degree of medical certainty, as to the cause of S.Z.S's retinal hemorrhages. (Ex. 1, at p. 242, lns. 4-7 and 13-15.)

Despite Dr. Young's testimony that he has no opinion on the cause of S.Z.S.'s retinal hemorrhages, to a reasonable degree of medical certainty, Plaintiffs intend to use Dr. Young's testimony to try to further a theory that S.Z.S.'s retinal hemorrhages could have been caused by childbirth:

> Q [by Mr. CONNELLY]. Is it plausible that Swayde from what you do know as far as fact-based things -- is it plausible that Swayde suffered a subdural hematoma in utero or during the birthing process or both which caused both the subdural hematomas that were noted at PCH and the retinal hemorrhaging that was noted by Dr. Cassidy?
>
> MS. ZANGERLE: Form and foundation.
>
> MS. PATANE: Form and foundation.
>
> A. Rather than saying plausible, which means seemingly probable -- I don't know how probable any one particular thing over another is. If you're going to ask me if it's possible, is it possible that these sorts of things could occur that you've mentioned, sure. It's possible. Even without trauma, it's possible.
>
> BY MR. CONNELLY:
> Q. Would that be something that is consistent with the parents' explanation of not knowing what caused the subdural hematoma or the retinal hemorrhages?
>
> A. Of course.

(Ex. 1, at p. 295, ln. 25 – p. 296, ln. 21.) In sum, Dr. Young bases his opinion on his self-created Inferential Test, whereby because the abuse was not witnessed or confessed to by the abuser, a medical diagnosis of suspected nonaccidental trauma purportedly is not possible.

**B.  The Science of Abusive Head Trauma**

The science of abusive head trauma is well-established, longstanding, and generally accepted within the medical community. In the journal *Pediatric Radiology*, multiple organizations published an article titled "Consensus Statement on Abusive Head Trauma in Infants and Young Children." (*See* Exhibit 3, "Consensus Statement on Abusive Head Trauma.") The participating

organizations were the Society for Pediatric Radiology, the European Society of Paediatric Radiology, the American Society of Pediatric Neuroradiology, the American Academy of Pediatrics, the American Professional Society on the Abuse of Children, the Swedish Paediatric Society, the Norwegian Pediatric Association, and the Japanese Pediatric Society.

In the Consensus Statement, the authors explain, "The diagnosis of AHT [Abusive Head Trauma] is a medical diagnosis made by a multidisciplinary team of pediatricians and pediatric subspecialty physicians, social workers and other professionals based on consideration of all the facts and evidence. AHT is a scientifically non-controversial medical diagnosis broadly recognized and managed throughout the world." (Ex. 3, at Med Lit 0030 GR.) The authors note that "[r]recently, denialism of child abuse has become a significant medical, legal and public health problem." (Ex. 3, at Med Lit 0031 GR.) Notwithstanding the recent denialism, "[i]n various forms, AHT has been in the modern medical literature for more than 60 years [34], 'with over 1,000 peer-reviewed clinical medical articles written by over 1,000 medical authors from more than 25 different countries.' [2]." (Ex. 3, at Med Lit 0032 GR.)

In the Consensus Statement, the authors explain that "[s]ubdural hematoma is the most commonly observed intracranial lesion (in up to 90%) in young infants with AHT…." (Ex. 3, at Med Lit 0034 GR.) The Consensus Statement addresses the "re-bleed" theory, which Plaintiffs have suggested in this case. The Consensus Statement describes the theory as "unsubstantiated," and explains that "asymptomatic birth-related subdural hematomas are relatively frequent and resolve in the overwhelming majority of infants within the first 4-6 postnatal weeks, and do not appear to rebleed." (Ex. 3, at Med Lit 0038 GR.)

The Consensus Statement further addresses the "experts" who have turned child abuse denial into a cottage industry:

> Ethical and professional norms of responsible expert testimony require that physicians be objective and neutral assessors and conveyors of medical information, which means that they weigh the scientific merit of their opinions and conclusions and "present testimony that reflects the generally accepted standard within the specialty or area of practice, including those standards held by a significant minority" [198,199]. Regrettably, not all medical experts' courtroom testimony falls within these ethical and professional boundaries. A few physicians, including those who do not treat or diagnose children as part of their medical practice, frequently proffer various speculative causation theories (described in prior sections) camouflaged as alternative or mimic diagnoses in child maltreatment cases. These medical witnesses run afoul of professional norms and standards and, when their arguments are repeated by the news media, create a grave public health risk by promulgating dangerous misinformation regarding safe infant and child care.

(Ex. 3, at Med Lit 0038-0039 GR.) In the area of child abuse and maltreatment, a cottage industry has arisen of medical "experts" offering opinions that are not grounded in scientific merit and transgress professional norms and standards.

### C.    The Science of Metaphyseal Fractures

Dr. Young's "mineralization catch-up" theory is not supported by medical research. In an article titled "The Etiology and Significant of Fractures in Infants and Young Children: A Critical Multidisciplinary Review," published in *Pediatric Radiology*, a peer-reviewed journal, the authors note that "Vitamin D level is a laboratory value and not a diagnosis of disease, and metabolic bone disease cannot be accurately diagnosed solely on the basis of a vitamin D level." (Ex. 4, at p. 593.) The authors discuss the lack of correlation between low vitamin D level and fractures:

> Further data have demonstrated no correlation between low vitamin D levels and the likelihood of either abusive or accidental fracture in children [39, 40]. These data establish that the prevalence of low

> vitamin D levels in children with fractures is the same as in populations of well babies with no fractures [41]. No study has demonstrated that low scrum vitamin D level without radiographic bone changes increases susceptibility to bone fractures.

(Ex. 4, at p. 594.) Metaphyseal fractures are "strongly associated" with child abuse and "have long been recognized as highly specific for child abuse." (Ex. 4, at p. 597.) The authors explain that "[w]hen highly specific fractures are identified, particularly without an appropriate traumatic explanation and in the absence of metabolic disease, child abuse can be diagnosed based upon well-founded, reproducible scientific studies [67, 72, 73]." (Ex. 4, at p. 596.)

The PCH Defendants have disclosed several medical experts from different specialties who will testify that S.Z.S.'s metaphyseal fracture was not caused by the birthing process or a so-called lack of Vitamin D/"mineralization catch up." Charles Maxfield, M.D. is board certified by the American Board of Radiology in Diagnostic Radiology with subspecialty certification in Pediatric Radiology. (Doc. 130-1 at 202.) He is a Professor of Radiology and Pediatrics at Duke University, where he also serves as the Chief of Pediatric Radiology and the Vice Chair of Education for the Department of Radiology. *Id.*

At his deposition, Dr. Maxfield testified that metaphyseal fractures are pathognomonic, or virtually diagnostic, for child abuse. (Ex. 5, at p. 36, lns. 11-15.) Dr. Maxfield further testified that low vitamin D levels would not explain S.Z.S.'s fracture:

> Q. And further in that same paragraph it states: "No study has demonstrated that low serum vitamin D levels without radiographic bone changes increases susceptibility to bone fractures." Did I read that correctly?
>
> A. You did.
>
> Q. And is that also consistent with your understanding of the literature in pediatric radiology?

> A. It is, and it's critically important, and I stated it a couple times during the deposition earlier.
>
> Q. Why is it critically important?
>
> A. Because there was some confusion about whether low vitamin D levels can predispose -- of either the mom or the baby can predispose the child to easy fractures from just mild forces. And what we know from multiple studies that this is referring to is that by the time that low vitamin D levels could possibly predispose to fractures, there were other obvious changes on the X-ray that you would see. I mentioned osteopenia and fraying of the metaphyses. And short of that, if you don't have – if you don't have that finding, we know that the bone is not weakened to the point of having easy fractures from just routine trauma or mild trauma.
>
> …
>
> In your review of this child's radiographic imaging that you reviewed, did you see any signs of radiographic bone changes?
>
> A. There were no signs of changes to suggest demineralization or fragility or rickets or anything.

(Ex. 5, p. 120, ln. 17 – p. 121, ln. 16, and lns. 21-25.) Dr. Maxfield will testify regarding the imaging related to S.Z.S.'s leg fractures. Dr. Maxfield concludes that he "would strongly favor non-accidental trauma in the differential diagnosis, and believe[s] without question there is a medical/radiographic basis for reporting the injury to the authorities." (Doc. 130-1 at 204.)

Lewis Rubin, M.D. is board certified by the American Board of Pediatrics with subspecialty certification in Neonatal Perinatal Medicine. (Doc. 130-1 at 290.) Dr. Rubin is a Professor of Pediatrics in the Division of Neonatal-Perinatal Medicine at Georgetown University, where he also serves as the Vice-Chair of Pediatric Research. *Id*. Dr. Rubin will testify that S.Z.S.'s injuries were not related to labor and delivery. Dr. Rubin is of the opinion that "there is no basis for alleging that the child's injuries are a

1 result of infantile rickets." *Id*. According to Dr. Rubin, "there is no other reasonable explanation for the child's constellation of signs and symptoms other than SNAT [suspected non-accidental trauma]." (Doc. 130-1 at 291.) Dr. Rubin notes that he has cared for thousands of infants involved in difficult and traumatic deliveries, and he has never seen a child with bucket handle fractures [i.e., metaphyseal fracture] caused from labor and delivery. *Id*.

Sarah Wagner, M.D. is board certified by the American Board of Obstetrics and Gynecology, and she is a fellow of the American College of Obstetricians and Gynecologists. (Doc. 130-1 at 361.) Dr. Wagner will testify regarding the labor and delivery of S.Z.S. and that it did not cause the injuries with which S.Z.S. presented at PCH on February 21, 2019. Dr. Wagner will testify that the labor and delivery were managed appropriately. (Doc. 130-1 at 362.) The management of the second stage in S.Z.S.'s labor and delivery is unrelated to the clinical presentation at PCH several months later. *Id*. Moreover, "it can be said with certainty that there are no indications in the medical record that lead one to believe that the infant's bucket handle fracture is related to the mother's labor and delivery course." *Id*.

In the face of these well qualified specialists, Plaintiffs merely put forward the speculative opinions of a former medical examiner who suggests that the fracture "may have been" caused by a Vitamin D deficiency theory that has no support in the medical literature.

### D.   The Science of Retinal Hemorrhages

The American Academy of Ophthalmology published an Information Statement on Abusive Head Trauma/Shaken Baby Syndrome. (*See* Ex. 6, Information Statement.) In the Information Statement, the Academy notes, "The most common ocular manifestation of shaking injury, present in approximately 85% of cases, are retinal hemorrhages." (Ex. 6, at p. 3.) According to the Academy, "Currently, there is abundant

1 evidence from multiple sources (perpetrator confessions, clinical studies, postmortem
2 studies, mechanical models, animal models and finite element analysis) that repetitive
3 acceleration-deceleration with or without head impact is injurious, and the primary
4 cause of retinal hemorrhages in victims of Shaken Baby Syndrome is vitreo-retinal
5 traction." (Ex. 6, at p. 4.)

6 The PCH Defendants have disclosed pediatric ophthalmologist Jonathan Horton, M.D., Ph.D. Dr. Horton is board certified in ophthalmology by the American Board of Ophthalmology. (Doc. 130-1 at 134.) He is a Professor of Ophthalmology, Neurology, and Physiology at the University of California, San Francisco (UCSF), where he holds the William F. Hoyt endowed chair of Ophthalmology. He also serves as a Pediatric Ophthalmologist and Neuro-Ophthalmologist at the Benioff Children's Hospital, UCSF. *Id*. Dr. Horton holds a Medical Degree from Harvard Medical School and a Ph.D. in Neurobiology from Harvard. *Id*.

Dr. Horton rebuts Plaintiffs' suggestion that the injuries occurred during labor and delivery. (Doc. 130-1 at 136.) According to Dr. Horton, Plaintiffs' explanation is inconsistent with S.Z.S.'s condition at PCH. *Id*. Any retinal hemorrhages that might have occurred during childbirth would have resolved by the time of Dr. Brendan Cassidy's examination at PCH two months after his birth. *Id*. Dr. Cassidy's examination showed findings consistent with an acute injury that occurred in close temporal proximity to S.Z.S.'s admission to PCH on February 21, 2019. *Id*. At his deposition, Dr. Horton testified that the retinal hemorrhages diagnosed at PCH could **not** have been caused by childbirth:

> Q. So in addition to that, the fact that -- of what Dr. Cassidy saw in his examination and what Dr. Fecarotta saw in his examination and what Dr. Rosenthal documented the resolution to be recommended in her examination, that sequence of events -- is that sequence of events inconsistent with retinal hemorrhages that occurred during birth?

> MR. CONNELLY: Form and foundation.
>
> THE WITNESS: Retinal hemorrhages that occur at birth are done in a week. So this child was born I believe on the 25th of December, 2018. By New Year's Day, it would be inconceivable that there would be any hemorrhages present.
>
> So the hemorrhages observed when Dr. Cassidy examined the child on the 22nd of February, 2019, all had to be de novo hemorrhages that would have occurred a few days before the child was admitted to the hospital.

(*See* Ex. 7, deposition of Dr. Horton, at p. 163, ln. 13 – p. 164, ln. 16.)

## II.    LEGAL ARGUMENT

The admissibility of expert testimony is regulated by Federal Rule of Evidence 702, which provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Plaintiffs bear the burden of demonstrating that the opinions of their experts meet the criteria of Rule 702 and *Daubert* by a preponderance of the evidence.  See *Daubert* 509 U.S. at 592, n. 10; *Lust by and Through Lust v. Merrell Dow Pharms, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

The trial court serves at the gatekeeper in assuring that the proposed expert testimony has a reliable basis in the knowledge and experience of the discipline.  See *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 149 (quoting *Daubert*, 509 U.S. 592). Determining the reliability of the expert testimony involves weighing the non-exclusive

factors identified in *Daubert*. *Id*. at ¶ 28. These factors include (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publications; (3) whether, in respect to a particular technique, there is a high "normal potential rate of error" and whether there are "standards controlling the techniques' operation," and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert* at 592-595; *Kumho Tire*, 520 US at 149-150.

The court is to determine whether the expert's reasoning or methodology underlying the testimony is scientifically valid or whether it is junk science and must be excluded. *Daubert,* 509 U.S. at 592-93. The court must "evaluate the methods, analysis and principles relied upon in reaching the opinion to ensure that the [expert's] opinion comports with applicable standards outside the courtroom and that it will have a reliable basis in knowledge and experience of [the] discipline." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997). "When an expert opinion is based on data, a methodology or studies that are simply inadequate to support the conclusion reached, *Daubert* and Rule 702 mandate the exclusion of the unreliable opinion testimony. *Amorgianos v Nat'l RR Passenger Co*, 303 F.3d 256, 266 (2nd Cir. 2002). Nothing in either *Daubert* or the Federal Rules of Evidence require a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *General Electric Company v. Joiner*, 522 U.S. 136, 146 (1997).

The linchpin of Dr. Young's opinions is his self-invented "Inferential Test." Using the Inferential Test, Dr. Young claims to offer other possible explanations for S.Z.S.'s injuries (none to a reasonable degree of medical certainty), because he believes that "unwitnessed" child abuse cannot lead to a diagnosis of suspected nonaccidental trauma. However, Dr. Young's Inferential Test, and thus his opinions about S.Z.S.'s injuries, do not satisfy the *Daubert* standard and should be precluded.

1    The Inferential Test has not and cannot be tested. It is not a scientific or medical theory. It is a purported theory of logic, based on the fictional Sherlock Holmes, applied to medical science. As discussed above, Dr. Young performed no clinical research in writing his book in which he espouses his opinions.

The Inferential Test has not been subject to peer review. Dr. Young admits that he submitted an article about the Inferential Test to a peer reviewed journal, *The Journal of Forensic Science*, but the article was rejected. (Ex. 1, at p. 50, ln. 23 – p. 52, ln. 3.) Dr. Young claims that his book *The Sherlock Effect* was "peer reviewed," but he does not know if the reviewers, who were selected by the publisher, were forensic pathologists or if they had any medical training at all. (Ex. 1, at p. 34, lns. 9-22.)

Because Dr. Young's Inferential Test is one purportedly based on logical reasoning and not testable, the rate of error is unknown. Moreover, it has no "standards controlling the techniques' operation."

Finally, Dr. Young's Inferential Test is not generally accepted in the medical community. Dr. Young's opinions, purportedly derived from the Inferential Test, is that a medical diagnosis of suspected child abuse cannot be made, unless it is witnessed. No professional medical society or peer reviewed literature supports Dr. Young's contention that real child abuse is witnessed by someone, whereas false child abuse is diagnosed by doctors. Sections I.B., C., and D. above provide an overview of the generally accepted medical science related to abusive head trauma and subdural hemorrhages, retinal hemorrhages, and metaphyseal fractures. The Inferential Test is nowhere to be found in medical science or logic literature, other than inside Dr. Young's own mind. And, as noted above, as a former medical examiner, Dr. Young's background is in pathology, not neonatology, radiology, obstetrics, ophthalmology, or any other field that works with or treats young infants.

## III.     CONCLUSION

Dr. Young created the "Inferential Test" to challenge the medical science behind abusive head trauma and other injuries highly indicative of child abuse. Dr. Young's Inferential Test is untestable, not reproducible, and not generally accepted in the medical community. Dr. Young is simply an outlier applying an unreliable methodology. His opinions fail to meet the standards of Rule 702 and *Daubert*. He should be precluded from testifying at trial.

DATED this 21st day of September, 2023.

**GUST ROSENFELD, P.L.C.**


By  /s/ Kari B. Zangerle
Kari B. Zangerle
Robert C. Stultz
One East Washington Street, Suite 1600
Phoenix, AZ  85004-2553
*Attorneys for Defendants Phoenix Children's Hospital; Dr. William S. Wood and Rachel Wood; Dr. Kathryn Coffman; Haley Dietzman and Roald Dietzman; Zachary Dion; and Carey Lewis*

## **TABLE OF CONTENTS – EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Deposition Transcript – Thomas Young, M.D., pp. 34, 36, 37, 50-52, 83-84, 125, 127, 174, 177, 210-211, 242, 295-296, 304-305 |
| Exhibit 2 | Dr. Thomas Young Report – DUVALL_001766-001768 |
| Exhibit 3 | "Consensus Statement on Abusive Head Trauma in Infants and Young Children" |
| Exhibit 4 | "The Etiology and Significant of Fractures in Infants and Young Children: A Critical Multidisciplinary Review," |
| Exhibit 5 | Deposition Transcript – Charles Maxfield, M.D., pp. 36, 120, 121 |
| Exhibit 6 | Information Statement on Abusive Head Trauma/Shaken Baby Syndrome |
| Exhibit 7 | Deposition Transcript – Jonathan Horton, M.D., pp. 163, 164 |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2023, I electronically filed the foregoing with the Clerk of Court, using the CM/ECF system, which will send notification of such filing to all parties, and will e-mail all notification of such filing to all non-CM/ECF system participants.

Thomas A. Connelly, Esq.
Robert T. Mills, Esq.
Sean A. Woods, Esq.
Mills & Woods Law PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

DeeAn Gillespie Strub, Esq.
Mark Shields, Esq.
Gillespie, Shields, Goldfarb Taylor
7319 North 16th Street
Phoenix, AZ 85020
*Attorneys for Plaintiffs*

Georgia A. Staton, Esq.
Ravi V. Patel, Esq.
Jones, Skelton & Hochuli, PLC
40 North Central Ave., Suite 2700
Phoenix, AZ 85004
*Attorneys for Defendants State of Arizona and ADOCS*

Cynthia Y. Patane, Esq.
Rachel L. Werner, Esq.
Gordon Rees Scully Mansukhani, LLP
One Renaissance Square
Two North Central Ave., #2200
Phoenix, AZ 85004
*Attorneys for Defendant Brendan Cassidy*

By /s/ Melody Kern