# EXHIBIT 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                    DISTRICT OF ARIZONA
 2
     Honor Duvall, an individual;
 3   Donald Sankey, Junior, an
     individual; S.Z.S., a minor,
 4   through his parents and
     guardians Honor Duvall and
 5   Donald Sankey,

 6                   Plaintiffs,        Case No.
     vs.                                21-CV-00167-PHX-ROS
 7
     Arizona Department of Child
 8   Safety, a governmental entity;
     State of Arizona, a
 9   governmental entity; Brenda
     Gualajara, individually and as
10   an employee with the State of
     Arizona Department of Child
11   Safety and John Doe Gualajara,
     her spouse, Fernando Araizo,
12   individually and as an employee
     with the State of Arizona
13   Department of Child Safety and
     Jane Doe Araizo, his spouse;
14   Alyssa Lucero, individually and
     as an employee with the State
15   of Arizona Department of Child
     Safety and John Doe Lucero, her
16   spouse; Jeffrey Duncan,
     individually and as an employee
17   with the State of Arizona
     Department of Child Safety and
18   Jane Doe Duncan, his spouse;
     Chantel Madson, individually
19   and as an employee with the
     State of Arizona Department of
20   Child Safety and John Doe
     Madson, her spouse; Phoenix
21   Children's Hospital, Inc., and
     Arizona corporation,
22   individually and as a services
     provider for the State of
23   Arizona Department of Child
     Safety; Brendan Cassidy,
24   individually and as a services
     provider for the State of
25   Arizona Department of Child
```

 1    Safety and Jane Doe Cassidy,
      his spouse; William S. Wood,
 2    individually and as a services
      provider for the State of
 3    Arizona Department of Child
      Safety and Jane Doe Wood, his
 4    spouse; Kathryn Coffman,
      individually and as a services
 5    provider for the State of
      Arizona Department of Child
 6    Safety and John Doe Coffman,
      her spouse; Hailey Dietzman,
 7    individually and as a services
      provider for the State of
 8    Arizona Department of Child
      Safety and John Doe Dietzman,
 9    her spouse; Zachary Dion,
      individually and as a services
10    provider for the State of
      Arizona Department of Child
11    Safety and Jane Doe Dion, his
      spouse; Carey Lewis,
12    individually and as a services
      provider for the State of
13    Arizona Department of Child
      Safety and John Doe Lewis, her
14    spouse; Gregory McKay, as
      former Director, Arizona
15    Department of Child Safety;
      Michael Faust, as Director,
16    Arizona Department of Child
      Safety; John and Jane Does 1-5;
17    and Black Entities 1-5,

18                    Defendants.

19        VIDEOTAPED DEPOSITION OF THOMAS W. YOUNG,

20    M.D., a Witness, taken on behalf of the

21    Defendants before Kelsey Robbins Schmalz, CSR

22    No. 1571, CCR No. 1148, RPR, pursuant to Notice on

23    the 4th day of November, 2022, at the offices of

24    Metropolitan Court Reporters, 11880 College

25    Boulevard, Suite 405, Overland Park, Kansas.

Deposition of Thomas W. Young, M.D.    Case 2:21-cv-00167-ROS   Document 315-1   Filed 09/21/23   Page 4 of 22     Page: 34

11/4/2022                                               Sankey/Duvall vs. Phoenix Children's Hospital

1   Francis Group. Did they seek you out to publish this

2   boric?

3               MR. CONNELLY: Form.

4       A.     No.

5   BY MS. ZANGERLE:

6       Q.     How did it come about that this book

7   was published? Did you send it to them for review?

8       A.     Yes.

9       Q.     And what is their review process other

10   than an editor? Is there physician review of this

11   document?

12       A.     There is peer review.

13       Q.     All right. Who were the peer

14   reviewers for your book?

15       A.     They're anonymous. That's the nature

16   of peer review. They don't tell you who the

17   reviewers are.

18       Q.     Are they forensic pathologists?

19       A.     I don't know.

20       Q.     Do you know if they had any medical

21   training at all?

22       A.     I don't know anything about them.

23       Q.     Okay. So from a medical perspective,

24   this book, The Sherlock Effect, talks about the role

25   of forensic pathologists, correct?

1   nonmedical sources.

2              MR. CONNELLY:   Form.

3       A.     I think that's fair.

4   BY MS. ZANGERLE:

5       Q.     And many of the citations or --

6   strike.

7              The majority of the citations in this

8   book are to articles in media about cases, correct?

9              MR. CONNELLY:   Form.

10      A.     Fair.

11  BY MS. ZANGERLE:

12      Q.     What was your intention when you wrote

13  this book?

14      A.     To disclose The Sherlock Effect.

15      Q.     And is The Sherlock Effect your

16  individual thesis or hypothesis about how many

17  forensic pathologists function?

18      A.     No.

19      Q.     Who developed The Sherlock Effect?

20      A.     Well, it would have to be Sherlock

21  Holmes.

22      Q.     Well, I understand that, but is it a

23  term of art that is utilized in forensic pathology?

24      A.     No.

25      Q.     So how is it that the term The

```
 1   Sherlock Effect -- strike.

 2                  Did you coin that term for purposes of

 3   writing this book?

 4        A.       The person I was consulting, the

 5   publicist, recommended that as a potential title, and

 6   I agreed.

 7        Q.       Okay.  And the subtitle of the book

 8   is, quote, How Forensic Doctors and Investigators

 9   Disastrously Reason Like the Great Detective, correct?

10        A.       Correct.

11        Q.       And you at the end of the book write

12   an apology to imprisoned victims of injustice?

13        A.       I do.

14        Q.       And in that apology, you admit that

15   there are probably people in jail today as a result

16   of The Sherlock Effect that you utilized when

17   functioning as a medical examiner?

18        A.       Correct.

19        Q.       How many people do you think are

20   wrongly imprisoned because of your testimony or your

21   work as a medical examiner?

22                  MR. CONNELLY:  Form.

23        A.       I can only guess.

24   BY MS. ZANGERLE:

25        Q.       Give me your best estimate, sir.
```

1        A.     The book is peer reviewed.

2        Q.     Many doctors -- I'm sorry.  Let me --

3  many doctors write books, but they also submit

4  medical articles about items that are included in

5  those books for publication in peer-reviewed

6  journals, correct?

7               MR. CONNELLY:  Form and foundation.

8        A.     I don't know what other doctors do.

9  BY MS. ZANGERLE:

10        Q.     So what book on forensic pathology

11  would you say is the text that you referred to

12  commonly when you were working as the chief medical

13  examiner?

14        A.     I don't know the answer to that.

15        Q.     It doesn't come off the top of your

16  head that there is a book that you would tell someone

17  that's doing a residency in pathology or training in

18  forensic pathology that they should have as a

19  reference guide?

20        A.     There have been books over the years

21  that have been recommended.  There's not any one

22  particular book.

23        Q.     Okay.  So you don't think anything

24  that you put in here about The Sherlock Effect could

25  have been submitted to a pathology journal for

Deposition of Thomas W. Young, M.D.
11/4/2022

Case 2:21-cv-00167-ROS   Document 315-1   Filed 09/21/23   Page 8 of 22

Page: 51
Sankey/Duvall vs. Phoenix Children's Hospital

1    evaluation in a shorter form?

2              MR. CONNELLY:   Form and foundation.

3         A.    Okay.   I've tried.

4    BY MS. ZANGERLE:

5         Q.    What journals?

6         A.    The Journal of Forensic Sciences.

7         Q.    Is that the professional journal for

8    your society?

9         A.    For the American Academy of Forensic

10   Sciences.

11        Q.    And when did you submit that?

12        A.    2007.

13        Q.    And what was the title of the article,

14   if you recall?

15        A.    Forensic Science and the Scientific

16   Method.

17        Q.    Do you still have a copy of it?

18        A.    At home.

19        Q.    Could you provide that?

20        A.    Well, it's on my website.

21        Q.    Thank you.

22        A.    If you go to HeartlandForensic.com,

23   you'll see the article on the website.

24        Q.    All right.   Thank you very much.   I

25   appreciate that.

1           So -- but it was not accepted,

2    correct?

3           A.    Correct.

4           Q.    Did they send it back to you and give

5    you recommendations that they thought could result in

6    it being accepted for publication?

7           A.    I don't recall what they said, but

8    they just flat out did not accept it.

9           Q.    You also make the statement that says,

10   quote, Forensic doctors are not interested in what I

11   have to say and have repeatedly blocked any

12   presentation, end quote.

13           Is that still accurate today?

14           A.    I think things have gotten better.

15   Recently in February, I presented a workshop, a

16   half-day workshop on forensic inference.

17           Q.    And where was that completed?

18           A.    This was the American Academy of

19   Forensic Sciences.  I presented it virtually because

20   they had it in Seattle and their COVID restrictions

21   were very stringent in Seattle.

22           Q.    Understood.  How many attendees?

23           A.    There were over a hundred.

24           Q.    And that was in 2021?

25           A.    2022 February.

1  1990 are dealing with murders and using DNA analysis

2  in evaluating whether or not the person that was

3  convicted could have committed the crime, correct?

4           A.      Partly correct.  Now, The Innocence

5  Project also is involved in people who are accused of

6  abusive head trauma.  They do a lot of cases with

7  that.  The only problem with those kinds of cases is

8  there is not a DNA thing that's readily applied to an

9  abusive head trauma case.

10          Q.      Let's talk about the science and the

11 circular reasoning that you think the American

12 Academy of Ophthalmology is relying upon.  Let's go

13 to the -- your look book and your Sherlock Effect.

14 You did not do a clinical research study or any type

15 of study before writing this book on your theory,

16 correct?

17          A.      A clinical study?

18          Q.      Any -- yeah.  I mean, a retrospective

19 review, anything.

20          A.      A retrospective review?

21          Q.      Doctor, have you ever done medical

22 research?

23          A.      Sure.

24          Q.      Have you submitted your medical

25 research to an institutional review board for

1    evaluation by a scientific review panel?

2         A.    Okay.  I haven't done that kind of

3    clinical -- that's clinical research done in a

4    medical setting.  I haven't done that.

5         Q.    Okay.  So that would mean that your

6    book on The Sherlock Effect on issues when evaluating

7    forensic science and conclusions related to manner of

8    death or abuse has not been submitted to IRB for

9    scientific evaluation?

10        A.    Of course not.  It's not that kind of

11   a situation.

12        Q.    So clinical research that is submitted

13   to an institutional review board, it goes through a

14   multilayer process.  First, it gets evaluated for the

15   scientific method and the epidemiology and the

16   statistics that are involved to determine if the

17   method in which they want to conduct the research is

18   going to be done in a scientifically valid process,

19   correct?

20        A.    I don't know.

21        Q.    You don't know?

22        A.    I don't know.

23        Q.    Because you're never done it?

24        A.    Right.

25        Q.    So how would you know if the clinical

1  to a patient for a neurological diagnosis?

2          A.      That's fair.  Well, we provided even

3  during residency bedside care and training in certain

4  procedures that may have been done on patients with

5  neurological diagnoses, such as doing bone marrow

6  aspirates and biopsies and those sorts of things.

7          Q.      After that training that was done in

8  1984, have you ever had privileges to care for

9  patients related to neurological conditions at a

10  hospital?

11          A.      No.

12          Q.      Same for neurosurgery?

13          A.      Correct.  I'm not a neurosurgeon.

14          Q.      Beyond doing some MOD shifts in the

15  emergency department while you were on active duty

16  with the United States Air Force from '85 to '88,

17  have you ever worked in an emergency department?

18          A.      No.

19          Q.      If you went to apply for privileges to

20  work in an emergency department today, do you believe

21  you would be able to get them?

22                  MR. CONNELLY:  Form and foundation.

23          A.      I wouldn't apply.

24  BY MS. ZANGERLE:

25          Q.      Not my question.  If you did apply to

1   BY MS. ZANGERLE:

2        Q.    Have you ever been responsible for

3   providing bedside care for newborns?

4        A.    I don't provide bedside care to

5   newborns.

6        Q.    Have you had any training in

7   endocrinology?

8        A.    Yes.

9        Q.    Tell me what that is, what training.

10       A.    Medical school in residency.

11       Q.    Beyond that, have you had any training

12  in demineralization or metabolic disorders?

13       A.    You mean formal training?

14       Q.    Yes.

15       A.    Formal training meaning what?

16       Q.    If you went in to try to obtain

17  privileged in endocrinology at a hospital, do you

18  believe that you would be able to obtain them now?

19            MR. CONNELLY:  Form and foundation.

20       A.    Okay.  You don't want to talk about

21  formal training?

22  BY MS. ZANGERLE:

23       Q.    I changed my question, sir.

24       A.    Okay.  So I just said that they would

25  not have -- no business granting privileges to a

1      Q.    Do you know if there was another

2   pediatric ophthalmologist that examined Swayde during

3   a second admission and diagnosed retinal hemorrhages

4   that were resolving?

5      A.    Okay.  I don't know.

6      Q.    Do you intend to testify at the time

7   of trial whether or not retinal hemorrhages were

8   present in Swayde Sankey on February 21st through

9   February 23rd of 2019?

10      A.    Okay.  I'm not disputing that retinal

11   hemorrhages were found.

12      Q.    Are you going testify at the time of

13   trial as to what you believe the cause of the retinal

14   hemorrhages were?

15      A.    What the cause is could be many

16   things.  I'm not testifying as to the cause of

17   retinal hemorrhaging.  I'm testifying whether or not

18   witness accounts of the past are consistent or not

19   consistent with the physical evidence, including

20   retinal hemorrhages.

21      Q.    One of the documents that you were

22   provided as part of your file in this case is the

23   report that was authored by Dr. Gabaeff; is that

24   correct?

25      A.    Yes.

1    A.    I'm not disputing retinal hemorrhages.

2    Q.    Okay.

3    A.    And I'm not disputing that there is a

4  chronic subdural hematoma.  I'm not disputing any of

5  that.

6    Q.    Are you disputing the fracture or

7  whether or not there was a fracture in the right leg?

8    A.    Okay.  There were changes that were

9  noted.  They're interpreted as being from trauma.

10  That's what they're doing.  I'm saying that there's

11  also another plausible explanation for them.

12    Q.    Okay.  And you believe that that's

13  because of normal development that may have occurred

14  while the baby was in utero?

15    A.    Not normal development.  Issues during

16  the development that led to what you might call

17  catch-up mineralization.

18    Q.    Do you know if anyone has ever

19  diagnosed the child as having catch-up mineralization

20  based upon evaluation of any medical studies or

21  physical exam?

22            MR. CONNELLY:  Form and foundation.

23    A.    Okay.  I'm the one that invented

24  catch-up mineralization.  That's my way of describing

25  it.  Nobody is going around describing catch-up

Deposition of Thomas 2Young9M.D7-ROS   Document 315-1   Filed 09/21/23   Page 16 of 22      Page: 210

11/4/2022                                                                Sankey/Duvall vs. Phoenix Children's Hospital

 1    testimony in the dependency proceeding for purposes

 2    of your opinions in this case?

 3           A.    Well, I'm looking at all of these

 4    items.  I'm looking at what was witnessed and what

 5    was discovered.

 6           Q.    Did you --

 7           A.    And putting that together.

 8           Q.    Did you rely on Dr. Gabaeff's

 9    testimony from the dependency proceeding for --

10           A.    No.

11           Q.    I want to go back to your report,

12    which is Exhibit No. 4.  Are you ready?

13           A.    Ready.

14           Q.    So the inferential test that you have

15    on Page 1 of the document, is that a term of art or a

16    term that you have developed?

17           A.    Well, I developed the term.  It turns

18    out to be a theorem of deductive logic.  The proof of

19    that is on my website.

20           Q.    Okay.  So if I were to look up the

21    inferential test, whether it be in logic literature

22    or anywhere, would I find it?

23           A.    I doubt it.  If you were to look it up

24    on my website, it would be there.

25           Q.    Okay.  Other than -- strike.

1              I just want to make that the

2    inferential test is a test that you developed, and is

3    that part of what's discussed in your book?

4              A.    Yes.

5              Q.    Very good.  All right.  I just wanted

6    to make sure, because it doesn't -- the title of the

7    book is the kind of Sherlock effect, essentially what

8    you are seeing in the inferential test?

9              A.    The inferential test is referenced

10   several times in The Sherlock Effect.

11             Q.    Okay.  Thank you.  You also are a

12   writer of fiction, correct?

13             A.    No.

14             Q.    I thought you had some other books

15   that were published.  Is The Sherlock Effect your

16   only book?

17             A.    Yes.

18             Q.    There must be another Young out there,

19   a Thomas Young that -- he writes aviation fiction,

20   and I thought maybe that might be you.

21             A.    Oh, yeah.  I think I do recall seeing

22   a Thomas Young writing fiction, aviation fiction.

23             Q.    Just whether --

24             A.    That's not me.

25             Q.    Okay.  Well, he seems to do quite

1    Q.    Have you ever spoken to the parents in

2    this case, Honor Duval or Donald Sankey?

3    A.    No.

4    Q.    Did you form an opinion as to the

5    cause of the retinal hemorrhages in Swayde Sankey

6    within a reasonable degree of medical certainty?

7    A.    No.

8    Q.    Did you form an opinion in this case

9    within a reasonable degree of medical certainty as to

10   the cause of the subdural hematomas or subdural

11   hemorrhages?

12   A.    No.

13   Q.    Do you agree that retinal hemorrhages

14   can be caused by abusive head trauma?

15   A.    Sure.

16   Q.    Can subdural hematomas or

17   hemorrhages -- I believe that we've been using those

18   terms interchangeably, so let me start over.

19         Can subdural hemorrhages or subdural

20   hematomas be caused by abusive head trauma?

21   A.    Sure.

22   Q.    And in this case, I believe what

23   you're saying is that you do not have an opinion as

24   to the cause definitively or within a reasonable

25   degree of medical certainty as to the retinal

1           A.      Well, the causes for retinal

2   hemorrhages in this sort of situation are complex.

3   If there is an expanding subdural hematoma that's

4   chronic, it can release a lot of enzymes that will

5   break down blood clotting factors and even platelets,

6   so a lot of times there is even a coagulopathy that

7   develops with the existence of a chronic subdural

8   hematoma.

9              In addition, it's causing pressure

10  inside that cranial vault and the drainage from the

11  retinas occurs right through the same cranial vault

12  that there is an expansion of pressure that's going

13  on, and so there may be a stagnation of blood flow

14  combined with a coagulopathy combined even

15  potentially with hypoxia that can lead to problems

16  with retinal hemorrhages.  There may be retinal

17  hemorrhages that occur and then they can resolve and

18  then reoccur and resolve, and, of course, with an

19  expanding chronic subdural hematoma, since the

20  sutures of the skull are not fused, then that

21  subdural hematoma with expanding pressure can cause

22  the head circumference and the shape and size of the

23  head to expand as well.

24  BY MR. CONNELLY:

25           Q.      Is it plausible that Swayde from what

1  you do know as far as fact-based things -- is it

2  plausible that Swayde suffered a subdural hematoma in

3  utero or during the birthing process or both which

4  caused both the subdural hematomas that were noted at

5  PCH and the retinal hemorrhaging that was noted by

6  Dr. Cassidy?

7              MS. ZANGERLE:  Form and foundation.

8              MS. PATANE:  Form and foundation.

9        A.      Rather than saying plausible, which

10  means seemingly probable -- I don't know how probable

11  any one particular thing over another is.  If you're

12  going to ask me if it's possible, is it possible that

13  these sorts of things could occur that you've

14  mentioned, sure.  It's possible.  Even without

15  trauma, it's possible.

16  BY MR. CONNELLY:

17        Q.      Would that be something that is

18  consistent with the parents' explanation of not

19  knowing what caused the subdural hematoma or the

20  retinal hemorrhages?

21        A.      Of course.

22              MS. ZANGERLE:  Form and foundation.

23              MR. PATEL:  Form and foundation.

24              MS. PATANE:  Join.

25        A.      How would a parent know what's going

```
 1                    MR. PATEL:  Join.

 2   BY MR. CONNELLY:

 3        Q.     Why not?

 4        A.     There is no shaking in the case.

 5                    MS. ZANGERLE:  Join.

 6        A.     There is no mention of shaking.  There

 7   is no observation of any shaking.  If there is any

 8   mention of shaking here, it's in the imaginations of

 9   doctors here who are diagnosing things that nobody

10   ever saw.  Okay.  There's no witness account of

11   anybody who is taking care of the child that the

12   child was shaken.  It's a speculation.

13   BY MR. CONNELLY:

14        Q.     Counsel showed you an article at

15   Exhibit 22 from the American Academy of

16   Ophthalmology.  This was the one where it purports to

17   show that shaking a baby results in retinal

18   hemorrhaging in 85 percent of the cases.  Do you

19   remember that?

20        A.     I do.

21        Q.     And it referenced clinical studies and

22   a bunch of other --

23        A.     And perpetrator confessions.

24        Q.     Perpetrator confessions, clinical

25   studies, and several other things.  Are you familiar
```

Deposition of Thomas W. Young, M.D.                Page: 305
Case 2:21-cv-00167-ROS   Document 315-1   Filed 09/21/23   Page 22 of 22
11/4/2022                                          Sankey/Duvall vs. Phoenix Children's Hospital

1   with any clinical research conducting on human beings

2   that has shown that shaking a baby results in retinal

3   hemorrhaging in 85 percent of the cases?

4                   MS. ZANGERLE:  Form and foundation.

5                   MR. PATEL:  Form and foundation.

6                   MS. PATANE:  Form and foundation.

7            A.     To set up a situation where you are

8   shaking babies and then seeing whether or not they

9   get retinal hemorrhages, subdural hemorrhages and

10  brain swelling would be unethical.  You can't set up

11  a situation where you're actually shaking babies to

12  do that kind of thing.  What has happened here is

13  that this is a backwardly-reasoned speculation.  It's

14  a notion.  It's a theory.  It's an idea.

15  BY MR. CONNELLY:

16           Q.     Let me ask you to look at Exhibit 22

17  real quickly if you can find it quickly.  It may be

18  in that stack on your right.

19           A.     Exhibit 22?

20           Q.     That's it.  Yeah.  And what I want to

21  ask you is if you look through this article, as far

22  as the ocular involvement, that's the paragraph we're

23  talking about.  Do you see anyplace in this article

24  where it identifies the clinical studies or the

25  postmortem studies or the mechanical models, animal