Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
GILLESPIE, SHIELDS & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Arizona Department of Child Safety, *et al.*, <br><br> Defendants. | Case No.: 21-cv-00167-ROS <br><br> **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Plaintiffs, by and through undersigned counsel, move for partial summary judgment to prevent Defendant Dr. Cassidy, and Defendants Dr. Coffman, Dr. Wood, Dietzman and Phoenix Children's Hospital ("PCH") (collectively, Coffman, Wood, Dietzman, and PCH are "PCH Defendants") (collectively, Cassidy and PCH Defendants are "Defendants") from attacking the state trial court's findings of no abuse. Plaintiffs also move for summary judgment on their conspiracy claim (Claim Six) against Defendants Cassidy, Coffman, Dietzman, and PCH,[1] and their claim of negligence as to Defendant Dr. Wood (Claim Eleven) based on the clear state of his plainly erroneous medical records. This motion is

---

[1] Plaintiffs voluntarily dismissed Claim Six against Defendant Wood. (Doc. 303; Doc. 307.)

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

supported by the following Memorandum of Points and Authorities and the Exhibits attached hereto.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    <u>INTRODUCTION</u>

This case is a modern medical tragedy – a loving and caring mother took her child to PCH for cold-like symptoms where overzealous child abuse advocates from PCH pressured the Arizona Department of Child Safety ("DCS") to have the child removed from the care and custody of the parents based on the PCH Child Protection Team's "suspicions" of abuse because the parents could not explain the "constellation" of medical conditions PCH doctors diagnosed via unconsented invasive testing, including conditions that were erroneously diagnosed and did not exist in fact. Rather than put pride aside and admit they were wrong, Defendants now want to relitigate the dependency trial and overturn the Juvenile Court's ruling that S.Z.S. was not abused and that neither parent failed to protect him from abuse. Contrary to Defendants' positions, they each played a pivotal role with the State in initiating and litigating the dependency action by pushing the State, through the Department of Child Safety ("DCS"), to take temporary custody of the child and file a dependency petition based on their biases and inaccurate findings and records.[2] At the dependency trial, the State did not call any of the involved DCS investigators or case managers as witnesses; rather, the State's case-in-chief was built almost entirely upon the testimony and records of Defendants. Simply put, without Defendants' critical participation, there would not have been a dependency proceeding and this child would not have been removed from the care and custody of his parents for nine of the most crucial months in his early childhood and attachment development.

---

[2] For any claims that proceed to trial, Plaintiffs will prove that the actions of Defendants Coffman and Dietzman, and the PCH CPT in general, did not conform to the Maricopa County Multidisciplinary Protocol for the Investigation of Child Abuse, first created and implemented in July 1995. **Ex. 46**. Defendant Coffman, for PCH, and State Defendant McKay, for the predecessor to DCS, were contributors to the 2013-2016 Revision of that protocol. *Id*. at 8-9.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## II.      BACKGROUND

### A.      Factual Background

Plaintiffs Donald Sankey, Jr., and Honor Duvall are both college educated. **Ex. 1** at 16:12-16; **Ex. 2** at 26:15-25, 30:16-20. S.Z.S. is the natural child of Donald, a college and high school sports coach, security officer, and small business owner, and Honor, a LMSW (i.e., Licensed Master of Social Work) who worked in the prisons in Arizona and with troubled children as a case manager/therapist at a psychiatric residential treatment facility before moving to Arizona. **Ex. 1** at 17:20-21, 20:15-24; 29:17-30:2, 31:20-24; **Ex. 2** at 26-27, 30-31, 41-42. The family is of African American ancestry. Although S.Z.S. is their first-born child, he was conceived only after deliberate and persistent attempts to get pregnant following a miscarriage nearly a year earlier. *See* **Ex. 1** at 334-340. S.Z.S.'s birth was traumatic: first in the sense that all natural vaginal birth is traumatic, *see* **Ex. 28** at 43:3-18, and, second, in the fact that Honor labored down for six hours while the child's head was in the birth canal resulting in (i) the child being born with a sharply distorted skull (i.e., a "conehead"), and (ii) the presence of meconium (i.e., sticky, thick, dark green stool) in the amniotic fluid – an indicator of stressful or traumatic birth, **Ex. 49**.

During early February 2019, both Donald and Honor were sick with viral infections. **Ex. 1** at 227:3-8, 11-15; **Ex. 2** at 77; **Ex. 3** at BPD000008. On 21 February 2019, 60 days after he was born, Honor and Donald grew concerned that their son caught their illness because he was a little fussy, not eating as much, a bit lethargic, and had a brown hued spit up. **Ex. 1** at 243:1-25, 244, 245:1-19; **Ex. 2** at 79, 84; **Ex. 3** at BPD7-8. The family pediatrician recommended the parents take S.Z.S. to Phoenix Children's Hospital ("PCH") because her office could not see him until after the weekend and were concerned about a possible bleeding disorder. **Ex.2** at 87-89.

That afternoon, Honor took her son to the PCH emergency department ("ED"). The ED nurse was the first to examine S.Z.S. She observed that S.Z.S.'s "skin color appears normal for child's ethnic group", thus not mistaking S.Z.S.'s Mongolian spots for bruises,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

which happens if care is not taken in busy clinical settings to recognize the distinction;[3] however, the young, Caucasian ED resident physician on duty, Kathleen Outcalt, was not as observant (or knowledgeable) and recorded that S.Z.S. had bruising "underneath left axilla on left lateral rib cage and on lower lumbar spine" and "on BL buttock and lower lumbar area".[4] *Compare* **Ex. 4** at PCH 1272 cycn *with* **Ex. 5** at PCH 1259 cycn. Blood tests were run from blood drawn in the ED which showed numerous abnormal results, including an elevated white blood-cell count ("WBC COUNT") – a widely recognized sign of infection.[5] **Ex. 4** at PCH 1358 cycn–1360 cycn. However, resident Outcalt recorded the blood test results as being "normal." Ostensibly due to his having "[u]nexplained bruising with normal labs," the PCH ED submitted S.Z.S. to a full body skeletal survey, without parental consent, and contacted the PCH Child Protection Team ("CPT") per a PCH algorithm in use at the time. **Ex. 5** at PCH 1262 cycn; **Ex. 8** at Clinical Pathway 4 GR. The skeletal survey was (incorrectly) interpreted as showing the presence of "[r]ight and left tibial bucket handle metaphyseal fractures", which resident Outcalt also (mis)interpreted and recorded as "BL buckethandle fx of tibia". **Ex. 5** at PCH 1264 cycn.

Having been informed of these purported results, and without examining S.Z.S. herself, a young, Caucasian CPT nurse practitioner, Defendant Haley Dietzman, "had to beg" the ED or trauma floor doctors to admit S.Z.S. as a patient so that a battery of additional "SNAT" testing could be run to label S.Z.S. a victim of Suspected Non-Accidental Trauma ("SNAT"), i.e., an abused child. **Ex. 9**. Dietzman later complained in disbelief to the CPT Chief, Dr. Kirsch, that she "had to beg [the ED and/or trauma floor doctors] to admit" S.Z.S. to the hospital for comprehensive SNAT testing. *Id.* It is a reasonable inference from the

---

[3] *See* **Ex. 6** at 72:22-73:5; *see also* **Ex. 7** at 231 (Mongolian spots are "sometimes [] confused with bruises, especially if they present over atypical sites. This leads to a mistaken diagnosis of child abuse ….").

[4] The axilla is an anatomical region under the shoulder joint where the arm connects to the shoulder. www.ncbi.nlm.nih.gov, last visited 24 September 2023. "BL" as used in that record means "bilateral".

[5] *See* https://www.mayoclinic.org/symptoms/high-white-blood-cell-count/basics/definition/sym-20050611, last visited 24 September 2023.

4

evidence that begging was needed because the ED and/or trauma floor doctors, who were not members of the PCH CPT, did not believe S.Z.S. needed to be admitted under an abuse diagnosis. Indeed, these non-CPT doctors were telling the family that test results were normal or not worrisome for abuse and that they did not suspect abuse. **Ex. 10**. Yet, at approximately 10:00 p.m. that night, a PCH CPT social worker called both the Buckeye Police Department and the DCS abuse hotline to make a report of suspected abuse. **Ex. 3** at BPD000003. At approximately 9:17 p.m. that evening, a CT scan of the head found "blood products" in the child's head; the age of that fluid collection could not be determined. **Ex. 11** at 25:12-23; **Ex. 12**. It could have possibly been "blood products" collecting in the head since birth since brain bleeds are common in newborns. **Ex. 13 at DUVALL_1767; Ex. 14** at 1. It should be noted that PCH has a contract with DCS to be the single source for assisting DCS in child abuse investigations. **Ex. 51** at AZDCS01079, 081. According to Dr. Coffman, the meter starts running under that contract once PCH calls the DCS hotline with a case of suspected abuse. **Ex. 28** at 114:11-14, 119:11-13.[6]

During the late evening of 21 February 2019, and into the pre-dawn hours of 22 February 2019, both the Buckeye Police Department ("BPD") and DCS, responding to PCH CPT's hotline call, arrived at PCH and started concurrent child abuse investigations. **Ex. 3** at BPD000003; **Ex. 15** at AZDCS012360. Dr. Patrick Hangge, a PCH trauma floor doctor, spoke with BPD and DCS at 3:35 a.m. on the 22nd of September and told them that a blood disorder had not been ruled out as a cause of the purported tibial fractures, and that a blood disorder or braking too hard in a car could explain the subdural hematoma seen on the CT of the head. **Ex. 15** at AZDCS012371-372. Dr. Hangge told BPD that the lab results were "abnormal" and that "we don't have a lot of answers at this time." **Ex. 3** at BPD000006.

Later, on 22 February 2019, DCS acted, not by taking temporary custody of S.Z.S., but by placing him and his parents under a Present Danger Plan ("PDP"), where the parents

---

[6] It should further be noted that PCH Defendants vigorously resisted disclosing financial information related to its services under the DCS contract during discovery in this case, and in fact, never disclosed that relevant information.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

retain legal custody, and allowing the child to remain in the family home and the parents to have unlimited contact with their son but only with the designated safety monitor present. **Ex. 16**. Later that day, without legal authority or parental consent to do so, DCS authorized Defendant Dietzman, the PCH CPT nurse practitioner, to conduct a forensic medical examination of S.Z.S., *after* it had already been performed. **Ex. 15** at AZDCS012373. Also that day, after CPT nurse practitioner Dietzman talked with DCS OCWI investigator Alyssa Lucero about S.Z.S., Lucero changed the PDP to the prohibit any contact between the parents and S.Z.S.[7] **Ex. 16** at PCH Emails 0059 GR; **Ex. 24** at 2.

Late in the morning or early afternoon on 22 February 2019, Defendant Cassidy, a pediatric ophthalmologist who frequently consults for the CPT when there is a suspicion of abusive head trauma, arrived at PCH to examine S.Z.S.'s eyes. **Ex. 17** at 108:3-5, 7-9, 13-17; **Ex. 18** at 62:7-10, 62:20-63:1; 64:6-9, 64:11-65:2, 66:9-11, 19-21, 66:23-67:19, 68:3-11, 17-25, 69:3-8. Dr. Cassidy performs consultations for PCH CPT only on cases where child abuse is suspected – once PCH CPT pages him, he knows he will be examining an "abused child." *Id*. Dr. Cassidy was in S.Z.S.'s room for 90 seconds, during which he examined the outside of S.Z.S.'s eyes and then his retinas using a device but without the child's pupils being fully dilated, as the standard of care requires. **Ex. 17** at 96:3-12; 118:2-4; 120:15-17; **Ex. 19** at 4. Also, following his examination, and as part of those 90 seconds he was in the child's room, Dr. Cassidy reluctantly and brusquely discussed his purported findings with the family. **Ex. 2** at 121. He purports to have found extensive bleeding in all layers and quadrants of the child's retinas. **Ex. 20**. In his words, the child's retinas "were painted with blood" and shaking was the cause. **Ex. 17** at 44:24-25, 49:6-16, 50:1-6, 16-21; *but see* **Ex. 13** at DUVALL_001767. Dr. Cassidy testified at trial that the only other time he had seen as much blood in a child's retinas was when he examined a child who had fallen to the ground from a seventh story window. **Ex. 17** at 49:20-23. On cross-examination, he refused to concede that S.Z.S. had no other physical findings consistent with falling from a

---

[7] Mother Honor Duvall was allowed to breastfeed the child two times a day under the revised PDP. Ex. 24 at 2.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

seventh story window, *id.* at 85:6-11, though he later admitted at deposition that "birthing" was another example of a "massive crush injury" to the head that could case retinal bleeds, **Ex. 18** at 180:14-23.[8] Although a retinal camera was available at PCH at the time Dr. Cassidy examined S.Z.S., and despite knowing a DCS and criminal investigation were underway, he did not photograph S.Z.S.'s retinas to document and verify what he purportedly saw and preserve that evidence. **Ex. 18** at 178:7-13, 16-17, 23-25; 180:8-10; *see also* **Ex. 22** at DUVALL_000057 (Juvenile Court noting that nothing was done to verify Dr. Cassidy's purported observations).

As noted above, without legal authority to do so because the parents retained legal custody and the right to direct their child's medical care, Defendant Dietzman conducted a forensic medical examination of S.Z.S and determined that S.Z.S. was abused. **Ex. 23**; **Ex. 15** at AZDCS012371. The next day, S.Z.S. was discharged under a PDP to the custody of his maternal great grandmother. **Ex. 24**. PCH CPT personnel expressed their dismay that despite "push[ing]" DCS as hard as they could, the DCS investigator did not take temporary custody of the child or amend the PDP to prevent the parents from seeing their child. **Ex. 25**. PCH CPT Unit Chief Kirsch stated, "we can escalate to OCWI [DCS's Office of Child Welfare Investigation] supervisor if needed." ***Id.*** This is in contradiction to PCH witnesses' careful deposition testimony that they are only to diagnose and treat suspected victims of abuse and do not have a role to play in removal or related child safety decisions. ***E.g.***, **Ex. 6** at 155:19-25; 156:8-10, 13-25; 157:2-3, 5-12, 20-23.

On 25 February 2019, two days after his discharge from PCH, S.Z.S. was examined by Dr. Warren Heller, a licensed ophthalmologist with over 45 years' experience, including

---

[8] A 2016 study conducted at Stanford University School of Medicine (the "Stanford Study") concluded that 20.3%[8] of children are born with retinal/optic nerve hemorrhaging, 71% of which involved hemorrhaging in multiple layers of the retina, and 35% in all 4 quadrants, which can take up to 58 days to resolve completely. **Ex. 52**. (S.Z.S. was just shy of his 2-month birthday when he was first seen at PCH.) The Stanford Study concluded that hemorrhages in the eyes "are common among newborns…often involve multiple areas and layers of the retina…." and that "[v]aginal delivery was associated with a significantly increased risk" of such hemorrhaging. *Id.* at 2. Babies' retinas are not examined at birth or any other time as a routine matter.

with children, to get a second opinion to Dr. Cassidy's examination. **Ex. 26** at 29:5-6. Dr. Heller, like Dr. Cassidy, used an ophthalmoscope to examine S.Z.S. retinas and his examination revealed nothing alarming about S.Z.S.'s retinas or eyes. *Id*. at 33:4, 33:25-34:5; Ex. 27. Dr. Heller reported that all aspects of the child's retinas were "WNL", meaning "Within Normal Limits". *Id*. He did not find any retinal bleeding and nothing to indicate S.Z.S. had been abused. *Id.* At trial, Dr. Cassidy was dismissive of Dr. Heller and his findings; for instance, he testified that Dr. Heller's use of "WNL" meant "We Never Looked." **Ex. 17** at 53:18, 20-24; 55:19-20, 23-25. When given the opportunity to graciously rehabilitate his lack of professionalism toward Dr. Heller, Dr. Cassidy doubled down on his contempt for Dr. Heller and his examination of the child. **Ex. 17** at 84:13-18, 84:24-85:5. His own PCH CPT colleague, Dr. Coffman, later confirmed what even lay persons know – that WNL in medical records means "Within Normal Limits." **Ex. 28** at 112:11-16; **Ex. 22** at DUVALL_000053.

S.Z.S. was also seen by his pediatrician on the 25th, who referred him to Valley Radiology to obtain images and a second opinion regarding S.Z.S.'s purported tibial fractures. Dr. Galvez-Trevino, a pediatric radiologist at Valley Radiology, did not find the bilateral bucket handle tibial fractures diagnosed by PCH. **Ex. 29**. Rather, he found the left tibia was normal, with no fractures or dislocation; and, as to the right tibia, he identified only a "possible" fracture and recommended a bone scan to confirm whether the density found on the radiograph was a fracture or a radiological artifact. *Id.*

On 27 February 2019, the PCH CPT meet with the DCS investigators and Det. Skaggs to discuss the S.Z.S. case. **Ex. 47**; **Ex. 25** at PCH Emails 0060 GR. PCH CPT was keen to express their concerns and to influence DCS to prevent the parents from having contact with the child, such as more restrictive safety plans or removal of the child from his parents' custody. **Ex. 16**.

Dr. Galvez-Trevino's findings were, in essence if not completely, corroborated by Dr. Wood on 28 February 2019, when S.Z.S. had a consultation set up by the PCH CPT. **Ex. 30**. Dr. Wood confirmed that S.Z.S. did not have a left tibia fracture, and, although he

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

diagnosed a right tibia fracture, he ordered a bone scan to confirm that diagnosis because the radiograph results were not definitive. *Id.* at PCH 1202 cycn; **Ex. 31** at 16:23-24, 93:11-24, 242:12-25; **Ex. 10** at AZDCS000681; **Ex. 32**. PCH never performed the bone scan to confirm a right tibia fracture. The lack of that bone scan was an issue for the State at the dependency trial. **Ex. 31** at 280:4-12; 280:19-281:14; **Ex. 41** at 155:8-22, 155:24-156:4; **Ex. 50**. Additionally, Dr. Wood's records make it clear he was not careful in recording his observations. His records were replete with errors; for example, inaccurately stating that S.Z.S. was in a splint, was in pain, given pain medication, and had shrunk almost 11 inches since birth. **Ex. 33** at 84:4-6; 86:8-12, 17-20; 107:21-25; 108:1-22; **Ex. 31** at 244:3-245:22, 246:2-17, 249:12-250:7, 253:18-254:15. These are among the reasons the Juvenile Court found Dr. Wood and his records to lack credibility. **Ex. 22** at DUVALL_000054.

On 7 March 2019, S.Z.S. had a follow up appointment with the PCH CPT at Childhelp Children's Center of Arizona, which is staffed with DCS and PCH CPT personnel, to confirm the earlier SNAT findings. **Ex. 34** at PCH 1173 cycn. At this time, Dietzman recognized that the "bruising" identified on S.Z.S.'s body in February, which were material to PCH's earlier SNAT diagnosis (and which led to the accusations of abuse), were in fact Mongolian spots; that is, non-traumatic birth marks contraindicative of abuse. *Id.* at PCH 1176 cycn-1177 cycn. Dietzman found no other issues with S.Z.S. and it was not until Mother expressed concern that S.Z.S. head circumference was increasing that Dietzman became concerned. *Id.* at PCH 1174 cycn, PCH 1177 cycn. Mother was ordered by Dr. Coffman and Dietzman to take S.Z.S back to PCH even though the family wanted to take him to Banner Cardon's Children's Hospital, another respected pediatric hospital in the valley. *Id.*; **Ex. 35** at 178:25-179:9. Coffman escalated the matter to DCS administrators who forced the case manager, over her objections, to "escort" the family to PCH and only PCH or remove S.Z.S. from their custody. **Ex. 35** at 178:5-18, 178:25-179:9, 179:19-24. S.Z.S. was readmitted to PCH that same day. **Ex. 36**.

The next day, 8 March 2019, S.Z.S. underwent a medical procedure to place a drain in his head to remove the excess fluid around his brain. **Ex. 37**. Upon completion of the

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

9

procedure, S.Z.S. went into respiratory distress and was subsequently admitted to the pediatric intensive care unit where he remained until shortly before discharge 12 days later. **Ex. 37** at PCH 0407 cycn. Also on 8 March 2019, DCS investigator Lucero filed a second *ex parte* application for an order allowing DCS to take temporary custody of S.Z.S., though DCS did not act on that order at that time, partly because nothing in their investigation thus far pointed to the parents as abusers.[9] **Ex. 38**; **Ex. 35** at 199:1-8. While S.Z.S. was still hospitalized, Dr. Coffman learned that someone at DCS told the family to sue PCH. **Ex. 40**. On 14 March 2019, Dr. Coffman emailed DCS Director Greg McKay, with whom she had a long-standing relationship, about the potential of a lawsuit to inform him that she was notifying PCH Risk Management of that possibility. *Id*. She also told McKay that it was probably best that she resigns her consulting position with DCS that McKay had hired her into shortly after he became Director. *Id*. Around that same time, Dr. Coffman unsuccessfully tried to influence the DCS OCWI investigating supervisor, Jeff Duncan, to remove the child. **Ex. 21** at AZDCS017828. When that failed, she called Director McKay to discuss the case one-on-one. Following that conversation, Director McKay ordered the DCS team investigating this case, i.e., State Defendants Duncan and Lucero and their superior, Kimberly Pender, over that team's better collective judgment at that time, to take temporary custody of S.Z.S. and file a dependency petition. **Ex. 41** at 130:6-25; 131:1-2, 14-25; 133:1-13; **Ex. 35** at 224:12-225:2; **Ex. 42** at 63:2-64:22; 78:19-79:2, 92:23-93:6; **Ex. 21** at AZDCS017828. The DCS investigators felt frustrated by McKay's order and believed it was inappropriate and unjust to remove S.Z.S. from his family. **Ex. 21** at AZDCS017828; **Ex. 35** at 224:12-225:2.

---

[9] DCS had applied for and obtained an *ex parte* order of removal on 27 February 2019, allowing the Department to take temporary custody of the child. **Ex. 39**. However, DCS never acted on that order and never took temporary custody pursuant to that order because the investigators, Lucero and her supervisor Duncan, determined further investigation was necessary to determine what exactly was the cause of the child's medical conditions. **Ex. 42** at 63:2-64:22.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

S.Z.S. was taken into temporary custody on 16 March 2019, immediately upon his second discharge from PCH, and a dependency petition was filed on 19 March 2019. **Ex. 43**; **Ex. 44**. Defendants Cassidy, Coffman, and Wood, along with their PCH colleague Dr. Ronecker, were the only witnesses in the dependency trial regarding the issue of abuse and their sole purpose was to prove that S.Z.S. had been abused by his parents. The case was prosecuted by the Attorney General's Office on behalf of the State and DCS. **Ex. 44** at 1. The assistant attorney general handling the trial worked closely with PCH, through its general counsel, to prepare the State's case for trial. **Ex. 50**. He also worked with Defendant Cassidy, and it's a reasonable inference that he did so with Drs. Wood and Coffman, as well. **Ex. 17** at 87:9-20, 88:1-3. During those trial preparations, the failure to conduct the bone scan Dr. Wood ordered to confirm the right tibia fracture became a problem and area of concern for the prosecution. **Ex. 50**. As discussed below, the State's evidence of abuse was lacking in substance and credibility. **Ex. 22**. The dependency petition was dismissed with a finding that S.Z.S. was not abused. *Id*.

## B.    State Juvenile Court Dependency Proceedings

On 19 March 2019, DCS filed a dependency action in the Juvenile Division of the Superior Court of Arizona, Maricopa County, seeking a court determination that S.Z.S. was abused by his parents, or that they failed to protect him from abuse, and, therefore, seeking to have the child adjudicated a dependent child due to abuse pursuant to the provisions of A.R.S. § 8-201(15). **Ex. 44** at DUVALL_000027; **Ex. 22** at DUVALL_000051. Due to the severity of the purported medical conditions reported by Defendants and the parents' inability to explain the cause of those medical conditions, DCS sought to permanently sever the parents' rights to their son. **Ex. 45** at AZDCS000460, 465.

The dependency petition was contested at trial spanning four days – August 15, 16, 22, and 27, 2019, with testimony from twelve witnesses and more than 2,000 pages of exhibits admitted into evidence. **Ex. 22** at DUVALL_000052. The State's *only* witnesses to prove S.Z.S. was abused were PCH doctors: Brendan Cassidy, Kathryn Coffman, William Wood, all Defendants here, as well as Dr. Jennifer Ronecker, a pediatric neurosurgeon at

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

11

PCH, and Det. Skaggs, the Buckeye Police Department detective who declined to prosecute the parents for abuse following her investigation. *Id*. at DUVALL_000052-53. The State did not present testimony from any of the DCS investigators or case managers – probably because they were all disgruntled at having their work and decision-making second guessed and usurped by PCH and DCS management, *see* **Ex. 41** at 130:6-25; 131:1-2, 14-25; 133:1-13; **Ex. 35** at 224:12-225:2; **Ex. 21** at AZDCS017828 – or service providers, such as parent aides, who worked on the matter. Rather, it relied completely and solely on PCH doctors for its case-in-chief.

On 12 November 2019, the Juvenile Court judge applied the applicable preponderance of the evidence standard – not the heightened burdens of clear and convincing or beyond a reasonable doubt – and made the following factual and credibility findings:

> On first look, this case appeared to be a case in which the child suffered abuse based on reported injuries. However, **the medical records from PCH contain significant errors. Moreover, the Court found many of the [PCH CPT] witnesses to lack credibility**….

*     *     *

> The Court makes the following findings based on the Court's assessment of the credibility and review of the testimony and exhibits.

*     *     *

> Dr. Brendan Cassidy, a Pediatric Ophthalmologist, examined the child at PCH on February 22, 2019. He testified that he was contacted by PCH to examine the child because of a concern about child abuse. The examination by Dr. Cassidy took about 90 seconds and consisted of viewing the eyes through a device and an exterior examination – he conducted no other assessment of the interior of the eyes. Dr. Cassidy testified that although the child was able to follow large objects, the child had significant hemorrhaging over the optic nerve on both eyes. He testified that the back of the eyes were "painted with blood." He further testified that there was bruising on the white surfaces of the eyes and visible swelling and bruising around both eyes. … Dr. Cassidy's examples of such a trauma included a crushing head injury such as a truck rolling over the head, falling from 30 feet or higher, a crash into a wall at a high rate of speed, or a repetitive acceleration and deceleration injury. Dr. Cassidy opined that the child's injuries were from abusive head trauma, slamming a child against a hard object or throttling or shaking a child violently. Dr. Cassidy noted that a lot of children with bleeding of this level do not survive but the blood would likely dissipate within a few weeks. As part of his testimony, Dr. Cassidy dismissed the examination and report of another doctor,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Dr. Heller, which was done on February 25, 2019 and had significantly different findings.

**The Court found credibility issues with Dr. Cassidy's testimony.**

*First*, Dr. Cassidy was dismissive of the examination of Dr. Heller. In Dr. Heller's records, it states "WNL" in multiple places. Dr. [Cassidy] testified that the acronym in the records meant "We Never Looked." Dr. Coffman testified that WNL means "Within Normal Limits" and that she had never heard of it meaning anything else.

*Second*, multiple witnesses testified that the child was not in any apparent distress or discomfort. The only sign of injury was minor petechiae on the chest. Yet, Dr. Cassidy testified that the trauma necessary for the child's injuries would include a crushing head injury such as a truck rolling over the head, falling from 30 feet or higher, a crash into a wall at a high rate of speed, or a repetitive acceleration and deceleration injury. **This simply was not credible.**

*Third*, Dr. Cassidy testified to the swelling and bruising around the eye area of the child, referred to as the eye mask area. The Court viewed the photos, admitted into evidence, which were taken upon admission at PCH. The Court was unable to see any visible swelling or bruising. Dr. Coffman also testified she did not see bruising and swelling in the photos – only a possible dark area that could have been bruising.

*Fourth*, Dr. Cassidy testified that a lot of children with bleeding of this level do not survive. The testimony established that this child is doing well and meeting all his milestones.

*Finally*, Dr. Heller credibly testified that there was nothing alarming about his examination of the child's eyes, just a few days later, and he testified there was no reason to suspect abuse.

Dr. William Wood also treated the child at PCH. Dr. Wood testified that the child had a right tibia fracture that most likely was caused by a torque injury but he acknowledged other possible causes. Dr. Wood's records indicate the child was placed in a splint, the child was given oral pain medication, and there was a history of pain and swelling. **None of these notations were accurate**. Dr. Wood attributed the errors to a scribe and template errors. **Nonetheless, the errors raise concern about the treatment of the child based on inaccurate records, as well as the opinions formed by those who reviewed the records in this case.** Dr. Wood testified the child was not in distress. He conducted a physical examination, moving the arms and legs around, and the child was in no distress or pain. The child had normal movement of all extremities. Dr. Wood admitted under cross examination that an acute fracture usually causes pain and a child would most likely exhibit discomfort upon touching the area. **Moreover, Dr. Wood testified that absence of pain contradicts the fracture being a new fracture.**

. . . Mother took the child to Dr. Warren Heller for a second opinion. He examined the child on February 25, 2019, and he found nothing alarming in his examination of the child – all within normal limits – and he had no reason to suspect abuse. Dr. Heller was not aware of the prior diagnosis from Dr. Cassidy or the prior hospitalization. However, he testified that the prior hospitalization and diagnosis from Dr. Cassidy would not impact what he saw. **Dr. Heller had no bias in this case and no reason to suspect abuse going into the examination, and he very clearly and credibly testified that he did not see the retinal bleeding that Dr. Cassidy reported seeing**.

Dr. Kathryn Coffman, who works with the Child Protection Team, testified about her contact with the family on March 7, 2019 for a recheck of the child and her subsequent review of the case... **Dr. Coffman testified of her impressions of the injuries to the child based on the medical records**. Dr. Coffman opined the injuries were likely from inflicted trauma (i.e., not accidental). However, **Dr. Coffman reviewed records that the evidence established had several errors**.

Dr. Jennifer Ronecker, a pediatric neurosurgeon at PCH, … testified about a drain that was placed in March of 2019 to relieve increasing intracranial pressure. She reviewed the child's records and MRIs, and she **testified that it is hard to date any blood on a brain scan**. … Finally, she testified that she could not opine on the causation for what was seen on the MRI or the causation of the need for the drain.

\*     \*     \*

Michael Caldwell worked with the parents as a parent aide in this case. … He **credibly testified that the child looks fondly to his parents, the child is very attached to his father, and the child has no hesitation with the parents**.

Maternal Grandmother also testified. She is registered nurse and testified about her concerns with the care at PCH. **The Court found her to be a credible witness** who was only concerned with trying to determine what, if anything, was wrong with the child.

**Finally, both parents testified and both were credible**. Father testified that he was sick that week, then his wife got sick, and then his child was sluggish and may have been sick as well. He further testified that he never abused his child and never shook his child, and he does not believe his wife harmed or abused the child. …

Mother testified to the events that led her to take the child to PCH. … The [State] tried to show Mother lacked credibility based on her failure to tell Dr. Heller that the child had previously been in the hospital. Mother explained, and the Court believes, that she was looking for answers as to what happened to her child and did not want the prior events and diagnosis from PCH to impact the opinion she was getting from Dr. Heller.

The parents clearly love this child. They dote on him. **Mother and Father were concerned about the health of their child and sought**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

14

**appropriate medical care**, first by consulting with the pediatrician and then by taking him to PCH. …

The parents have stable employment and housing. There is no history of illegal substance abuse and no history of mental illness. **These are patient, caring parents. The Court found them credible, and Detective Skaggs also testified that she found the parents credible.**

Based upon its consideration of the evidence, **the Court finds that the [State] failed to prove by a preponderance of the evidence that the child was abused or that either parent failed to protect the child from abuse.** PCH diagnosed the following injuries which led the hospital staff to suspect abuse: unexplained bruising, retinal hemorrhages in both eyes, subdural hemorrhages, a fracture of the right tibia, and oral lesion.

As to the bruising, **all parties agree the child had Mongolian spots, rather than bruising.** …The other area was the bruising on the chest, which Dr. Coffman identified as minor petechiae on the chest. The photographs showed a slight discoloration on the chest. **No records indicated and no witness testified that minor petechiae on the chest is an indicator of abuse.**

**The credible testimony failed to establish retinal hemorrhages in both eyes.** Dr. Cassidy was the only doctor to observe the severe retinal hemorrhaging to which Dr. Cassidy testified and noted in the records. **No tests were done to verify this diagnosis.** …

**As to the subdural hemorrhages, the testimony established that it is not possible to date the blood seen on the scans.** Moreover, **there are various possible reasons for subdural hemorrhages, including a traumatic birth that led to the child's head being cone shaped after birth.** In addition, the child experienced further issues of cranial pressure a few weeks after being removed from the care of the parents.

**There was conflicting testimony regarding the tibia fracture.** The child showed no pain or discomfort and Dr. Wood testified a fracture usually causes pain or tenderness. The child exhibited neither, and the child had no issues with range of motion.

The oral lesion was credibly explained, with supporting images admitted as evidence, as likely being caused by the child's hands in his mouth.

In addition to the concerns related to the diagnosis, **the criminal investigation was closed with no arrests or charges.** Moreover, the child is now healthy and meeting his milestones. With significant abuse, including retinal hemorrhages that Dr. Cassidy testified a lot of children would not survive, some lingering issues would be expected. This child has none.

\*      \*      \*

IT IS ORDERED denying a finding of Dependency.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

15

IT IS FURTHER ORDRED dismissing this matter and returning the child to the legal custody of Mother and Father.

**Ex. 22** (all italics and bold emphasis added; indented paragraphs in original, left-aligned paragraphs created from preceding indented paragraphs to improve readability). The Juvenile Court indicated that its ruling "is intended to be a final order of the Court", i.e., a final judgment, and advised the parties of their appeal rights. *Id.* at DUVALL_000058. Upon reading the Juvenile Court's Ruling, DCS OCWI investigations supervisor Duncan remarked to DCS OCWI investigator Lucero, "Looks like the Judge saw the same things we did on this case." **Ex. 21** at AZDCS017815. The State did not appeal the Juvenile Court's final judgment.

## III.  <u>STANDARD OF REVIEW</u>

Rule 56 provides that a moving party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "[T]he court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor." *Puentes v. City of San Mateo*, No. C 11-02511 SI, 2011 WL 4005383, at *2 (N.D. Cal. Sept 8, 2011), *aff'd*, 481 F. App'x 348 (9th Cir. 2012) (internal citations omitted). "Summary judgment will not lie if the dispute about a fact is 'genuine,' i.e., if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The trial court must inquire if "the evidence…is so one-sided that one party must prevail as a matter of law" and "should not act other than with caution in granting summary judgment." *Id.* at 242-43, 106 S.Ct. at 2507, 91 L.Ed. 2d 202.

In addition, the "[p]arty seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1   of material fact." *Celotex Corp. v. Catrette*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed. 2d 265

2   (1986); Fed.R.Civ.P. 56(a).

3   **IV.   ARGUMENT**

4       A.   **The Juvenile Court's Factual Findings and Final Judgment Following a Trial in Which Defendants Coffman, Wood, and Cassidy Were Indispensable to the Prosecution Cannot Be Challenged in This Matter.**

6           Defendants want to introduce evidence through their own records and

7   testimony, as well as that of their lay witnesses and 11 expert witnesses, that S.Z.S. was

8   abused by his parents, or that they failed to protect him from abuse by his maternal

9   grandmother. In essence, Defendants seek to overturn the Juvenile Court's factual findings

10  and clear final judgment that the medical records and testimony of Defendants Cassidy,

11  Coffman, and Wood "failed to prove by a preponderance of the evidence that the child was

12  abused or that either parent failed to protect the child from abuse." To allow such evidence

13  would be to allow an impermissible collateral attack on the Juvenile Court's final judgment.

14  Federal law views such attacks as an impermissible *de facto* appeal from a state court

15  judgment. Defendants' desire to re-litigate whether S.Z.S. was abused and related issues

16  and claims (or defenses) are precluded by the *Rooker-Feldman* doctrine, issue preclusion,

17  and/or claim preclusion, any one of which is a sufficient basis upon which to grant summary

18  judgment to Plaintiffs on that issue or defense.

19          As noted below, for issue or claim preclusion there must be some privity between

20  the parties in the two concerned actions. "Whether by way of res judicata or collateral

21  estoppel, the preclusive effect of a judgment is limited to the parties and person in privity

22  with the parties." *Winkleman*, 229 P.3d at 257 (citations omitted). Privity is determined by

23  the 'relationship of the parties to the action and commonality of their interests. *Hall v. Lalli*,

24  194 Ariz. 54, 57, 977 P.2d 776, 779 (1999). "Finding privity between a party and a non-

25  party requires both a substantial identity of interests and 'working or functional relationship'

26  … in which the interests of the non-party are presented and protected by the party in the

27  litigation." *Id.*

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

As discussed throughout and in § IV.A.2 below, Defendants here worked closely with DCS and the State in their efforts to have the Juvenile Court find that S.Z.S. was a victim of abuse via SBS/AHT.[10] Indeed, Defendants were indispensable to, and intimately and intricately involved with, the State's case. PCH made the initial report to DCS to begin the process of S.Z.S. being removed from the custody of his parents based on Defendants' suspicions of abuse. Defendants were the primary testifying witnesses for the State,[11] and their erroneous medical records were admitted to substantiate their allegations of abuse. Defendants' interests were aligned with the State (and DCS) to have S.Z.S. found dependent based on their suspicions of abuse. It cannot credibly be disputed that Defendants played a crucial role in the dependency action and had an invested interest in ensuring the evidence proved the child was abused and thus dependent. As such, Defendants' (and their 11 experts' opinions) that S.Z.S. was abused are nothing more than an impermissible collateral attack on an issue already judicially and factually determined. Defendants should be precluded from presenting any defense based on the theory or argument that S.Z.S. was a victim of abuse via SBS/AHT or any other mechanism for which there is a lack of credible evidence.

### 1. The *Rooker-Feldman* Doctrine precludes Defendants from pursuing a *de facto* appeal of the Juvenile Court's Judgment.

The *Rooker-Feldman* doctrine derives from two Supreme Court decisions, *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923), and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983). First in *Rooker* and later in *Feldman*, the Supreme Court held that federal district courts cannot review state court decisions in an appellate capacity. The Ninth Circuit Court of Appeals has stated that *Rooker-Feldman* "prevents federal courts from second-guessing

---

[10] SBS/AHT is a controversial diagnosis that is not based on reliable medical science. *See* Plaintiffs' *Daubert* Motion, filed contemporaneously herewith. As detailed in that motion, many courts disallow expert opinion testimony that injuries at issues were caused by SBS/AHT, and many prior criminal convictions based on SBS/AHT testimony are being overturned.

[11] Defendants Dr. Coffman, Dr. Wood, and Dr. Cassidy all testified for the State, along with Dr. Ronecker, another PCH doctor but who is not a Defendant here. Those were the only witnesses called by the State in its case-in-chief at the dependency trial on the issue of abuse.

state court decisions by barring the lower federal courts from hearing *de facto* appeals from state-court judgments." *Bianchi v. Rylaarsdam*, 334 F.3d 895, 898 (9th Cir. 2003). "It is a *de facto* appeal under *Rooker-Feldman* when [a party] in federal district court complains of a legal wrong allegedly committed by the state court and seeks relief from the judgment of that court." *Noel v. Hall*, 341 F.3d 1148, 1163 (9th Cir. 2004). A claim or defense asserted in a federal court action is considered an appeal of a state court decision if arguments, *i.e.*, that S.Z.S was a victim of abuse via SBS/AHT, "raised in the federal court action are 'inextricably intertwined' with [a] state court's decision." *Reusser v. Wachovia Bank, M.A.*, 525 F.3d 855 (9th Cir. 2008) (*citing Bianchi*, 334 F.3d at 898).

Here, "the district court is in essence being called upon to review the state court decision[,]" that S.Z.S. was not abused, that his parents did not fail to protect him from abuse, and that PCH's medical records were replete with material errors, among other findings in the Juvenile Court judgment. Defendants want this Court to allow evidence, including the biased, flawed testimony of 11 retained experts, on matters finally and conclusively decided by the Juvenile Court so that they can make the prejudicial argument to the jury that S.Z.S. was abused by his parents in hopes of avoiding responsibility for their myopia and mistakes. Simply put, federal law does not allow it and Defendants cannot relitigate those issues here.[12]

### 2. __This Court must give preclusive effect to the Juvenile Court's judgment.__

A federal court "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) citing *Allen v. McCurry*, 449 U.S. 90, 96 (1980) ("…Congress has specifically required all federal courts

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

---

[12] There can be no credible denial that the only reason Defendants retained these 11 highly credentialed and handsomely compensated "experts" was to upend the Juvenile Court's final judgment that the child was not abused in order to escape their liability for the claims asserted here and the harm caused to this family.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1  to give preclusive effect to state-court judgments whenever the courts of the State from

2  which the judgments emerged would do so."); *see also* 28 U.S.C. § 1738.

3  The judicially created doctrine of claim preclusion, or *res judicata*, "bars all grounds

4  for recovery which could have been asserted, whether they were or not, in a prior suit

5  between the same parties on the same cause of action." *Costantini v. Trans World Airlines*,

6  681 F.2d 1199, 1201 (9th Cir. 1982) (internal quotations and citations omitted). Federal

7  courts must look to state law to determine the preclusive effect of a state court judgment.

8  *See Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). In

9  Arizona, *res judicata* will preclude a claim when a former judgment on the merits was

10  rendered by a court of competent jurisdiction and the matter now in issue between the parties

11  was, or might have been, determined in the former action. *Hall v. Lalli*, 977 P.2d 776, 779

12  (Ariz. 1999). Arizona follows the "same evidence test" in which "the plaintiff is precluded

13  from subsequently maintaining a second action based upon the same transaction, if the

14  evidence needed to sustain the second action would have sustained the first action." *Pettit*

15  *v. Pettit*, 189 P.3d 1102, 1105 (Ariz. Ct. App. 2008) (internal citation omitted).

16  The doctrine of collateral estoppel, or issue preclusion, bars a party from relitigating

17  an issue identical to previously litigated to a determination on the merits in another action.

18  *State ex rel. Winkleman v. Ariz. Navigable Stream Adjudication Comm'n,* 229 P.3d 242,

19  256 (Ariz. Ct. App. 2010). "The elements necessary to invoke collateral estoppel are: the

20  issue is actually litigated in the previous proceeding, there is a full and fair opportunity to

21  litigate the issue, resolution of such issue is essential to the decision, there is a valid and

22  final decision on the merits, and there is a common identity of the parties." *Id.*

23      a.  **Defendants are collaterally estopped from relitigating the**
24  **issue of abuse.**

25  Collateral estoppel, or issue preclusion, applies when: (1) the issue or fact to be

26  litigated was actually litigated in a prior action; (2) a final judgment was entered; (3) the

27  party against whom the doctrine is to be invoked had an opportunity to litigate the matter

28  and did litigate it; and (4) such issue or fact was essential to the prior judgment. *Chaney*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

*Building Co. v. City of Tucson*, 148 Ariz. 571, 716 P.2d 28, 30 1986). There can be no genuine dispute that the issue of abuse was litigated in the dependency proceeding, a final judgment was entered finding that abuse did not occur, and that whether abuse occurred (and the fact that it did not) was essential to the Juvenile Court judgment. Thus, the first, second, and fourth elements are satisfied. Under the unique facts of this case, given the close relationship of Defendants to the State, through DCS, the outsized influence Defendants exercised over DCS, and their conspiring, the third element is also satisfied.

Defendants Cassidy, Coffman, and Wood, along with their PCH colleague Dr. Ronecker, were the only witnesses in the dependency action regarding the issue of abuse and their sole purpose was to prove that S.Z.S. had been abused by his parents. Those witnesses were not prevented from testifying about any of their observations or opinions on the issue of abuse. Indeed, the evidence shows that PCH, through its general counsel, and Drs. Cassidy and Wood worked closely with the assistant attorney general prosecuting the dependency for DCS. Ex. Defendant Wood worked closely with the prosecuting attorneys in preparing for his testimony. It is a reasonable inference that Defendants Coffman and Cassidy did, as well. In fact, Defendant Coffman had enough input in the matter to cause the State, through DCS, to take temporary custody of S.Z.S. and file the dependency petition in the first place – steps that the DCS investigators themselves were hesitant to do at the time because of the conflicting evidence of abuse but were ordered to do by the Director only after Dr. Coffman intervened. Simply put, Defendants not only had an opportunity to litigate the issue of abuse but were the driving force behind it being brought to court and litigated. The third element is thus also satisfied.

**b.**   **The Juvenile Court's judgment also has res judicata effect here.**

To determine the preclusive, or *res judicata*, effect of the state juvenile court litigation, this Court must look to the law of the State of Arizona. *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir.1997). For claim preclusion to attach under Arizona law, there must be (1) a final judgment on the merits, (2) common identity of the parties and the

capacity in which they appeared, (3) common identity of the subject matter and (4) common identity of the cause of action. *Hall*, 952 P.2d at 750. Here, all elements of claim preclusion are satisfied.

The first element is clearly satisfied by the Juvenile Court's judgment.

The Arizona Supreme Court has explained that common identity, or privity, requires a "substantial identify of interests" and a "working or functional relationship … in which the interests of the non-party are presented and protected by the party in the litigation. *Hall*, 977 P.2d at 779 (internal citations and quotation marks omitted). DCS is a government agency of the State of Arizona. Although Defendants were not parties named in the caption of the dependency proceeding, the evidence demonstrates both a "substantial identity of interests" and a "working or functional relationship" between Defendants and the State, i.e., DCS, in the dependency proceeding. Again, Defendants were the drivers behind both the initiation of the dependency proceeding and the State's case-in-chief at trial. The interests of Defendants and the State (i.e., DCS) in proving up abuse were aligned, and Defendants' interests were presented and protected by the State (i.e., DCS), a party in the state court litigation. Thus, the second element is satisfied.

For these same reasons, and because this action and the dependency action both concern and rest upon the actions of Defendants vis-à-vis Plaintiffs, the third element is satisfied. *See, e.g. Beseder, Inc. v. Osten Art, Inc.*, No. CV 05-00031-PHX-NVW, 2006 WL 2730769 (D. Ariz. Sept. 25, 2006) (finding the third element of claim preclusion satisfied where the same conduct was the subject matter of both state court counterclaims and a cause of action before the district court).

For the fourth element, to test whether the two lawsuits present the same cause of action, Arizona follows the "same evidence test" in which "the plaintiff is precluded from subsequently maintaining a second action based upon the same transaction, if the evidence needed to sustain the second action would have sustained the first action." *Pettit*, 189 P.3d at 1105 (internal citation omitted). The same evidence test is to be interpreted liberally. *See Phoenix Newspapers, Inc. V. Dep't of Corr.*, 934 P.2d 801, 805 (Ariz. Ct. App. 1985)

(holding that a plaintiff may avoid preclusion "merely by posturing the same claim as new legal theory"). However, the doctrine of *res judicata* bars any claims that could have been determined in a prior action. *See Hall*, 977 P.2d at 779. The principles should apply equally as well here to the defense by Defendants that the child was abused. To that end, there can be no genuine dispute that the defense that S.Z.S. was abused was determined in the juvenile court. And, the same evidence needed to sustain that defense here – that is, testimony of the treating physicians – was presented in the dependency action. Thus, the fourth element is satisfied.

All the elements of claim preclusion being satisfied, Plaintiffs are entitled to summary judgment on the defense of abuse. Consequently, testimony about abuse, including the bought and paid for opinions of Defendants' 11 experts, is irrelevant and would be highly prejudicial.

To summarize, a Maricopa County Superior Court entered a judgment dismissing the dependency petition asserting claims of abuse, specifically finding that: (1) S.Z.S. was not abused; (2) his parents did not fail to protect him from abuse; (3) the PCH medical records, including Dr. Wood's, contained significant and prejudicial errors; (4) the child had Mongolian spots, not unexplained bruises; (5) Dr. Cassidy was not credible; (6) the credible testimony failed to prove the child had retinal hemorrhages in both eyes; (7) the minor petechiae on the child's chest, which was identified as a bruise in the PCH medical records, in not an indicator of abuse; (8) it is not possible to date the blood seen on the scans of the child's head; (9) there are non-abusive causes for the blood seen on the scans of the child's head; (10) the evidence of tibia fractures is conflicting and does not establish that the child's right tibia was actually fractured; and, (11) the oral lesion was credibly established as being caused by non-abusive causes. Based on these findings, contained within a final state-court judgment, Defendants are precluded – on the basis of *Rooker-Feldman*, issue preclusion, and/or claim preclusion – from raising the issues here in an attempt to re-litigate the Juvenile Court's judgment.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**B.**  **There is No Genuine Dispute of Material Facts Showing That Defendants Conspired with DCS to Remove S.Z.S. From the Care and Custody of His Parents.**

Liability for conspiracy in a § 1983 case exists when there is an agreement to achieve the goal of violating the plaintiffs' constitutional rights. *Crowe v. Cty. of San Diego*, 608 F.3d 406 440 (9th Cir. 2010). Evidence of an agreement to conspire can be inferred by the defendants' actions when their acts would have been unlikely to occur without the agreement. *Id.*; *Kunik v. Racine Cty*, 946 F.2d 1574, 1580-81 (7th Cir. 1991). Thus, circumstantial evidence, including the actions of the Defendants, can support the requisite meeting of the minds for conspiracy in a § 1983 matter. *Crowe*, 608 F.3d at 440. Defendants' activity must be "inextricably intertwined" with those of the state. *Burnette v. Humane Society of Ventura County*, 294 F. 3d 13205, 1211 (9th Cir. 2020). "[S]ubstantial cooperation" between the private actor[s] and the State must be shown. *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996). Defendants become state actors "by conspiring with a state office or by engaging in a joint activity with state officials" and "by becoming so closely related to the State that the person's actions can be said to be those of the State itself." *Price v. State of Hawaii*, 939 F.2d 702, 708-09 (9th Cir. 1991) cert. denied 503 U.S. 938 (1992).

Here, Defendant Coffman and PCH, particularly though Coffman and Dietzman, exercised extraordinary pressure over DCS to have S.Z.S. removed from the care and custody of his parents based on Coffman's and the PCH CPT's "suspicion" of abuse. Defendants and DCS shared a common purported objective to "protect" S.Z.S., which Coffman, Dietzman, and PCH overly and overtly influenced DCS to do by aggressively seeking S.Z.S.'s removal and filing of a dependency petition. This occurred most flagrantly when Coffman ignored – nay, rejected – Mr. Duncan's investigative decision to await further evidence before deciding to remove S.Z.S. or not, and went over Mr. Duncan's head to take her removal and petition demands directly to the top of the DCS hierarchy, to Director McKay, who then ordered his subordinates to take temporary custody and file a dependency petition. Under this set of facts, it is rightly said that DCS's actions in taking

temporary custody and filing the dependency petition before they were done with their investigation was "inextricably intertwined" with Defendants' actions in seeking utilization of the child protection apparatus based on their own "suspicions" of abuse.

Furthermore, in acting as they did, Defendants, particularly Coffman, Dietzman, and PCH, stepped out of their limited role as medical professionals to occupy the role belonging to DCS and its personnel.  To say it another way, Defendants each played a pivotal role with the State and DCS in having S.Z.S. removed from the care and custody of his family and in initiating and litigating the dependency action. Discussed below are other actions Defendants took in furtherance of an agreement with DCS, even if only tacit, to violate Plaintiffs' constitution right to due process by not adequately investigating allegations of abuse before taking temporary custody and filing a dependency petition.

*First*, resident Outcalt mistakenly described S.Z.S.'s Mongolian spots as bruises and misinterpreted abnormal blood test results as "normal", and then submitted S.Z.S. to a full body skeletal survey, without parental consent, based on "unexplained bruising with normal labs". These mistakes where then compounded when PCH incorrectly interpreted the skeletal survey as showing the presence of bilateral tibial bucket handle fractures. This, in turn, resulted in PCH CPT nurse practitioner Dietzman "beg[ging]" the ED or trauma floor doctors to admit S.Z.S. as a patient so a battery of additional SNAT testing could be run to further label S.Z.S. a victim of "suspected non-accidental trauma", i.e., abuse. A PCH CPT social worker then called both the Buckeye Police Department and DCS abuse hotline to make a report of suspected abuse. A concurrent criminal child abuse investigation was thus initiated.

*Second*, without legal authority or consent of the parents to do so, DCS authorized PCH, specifically Defendant Dietzman, to conduct a forensic medical examination of S.Z.S. to attempt to further substantiate PCH CPT's suspicion of abuse.

*Third*, PCH CPT then called Defendant Cassidy to conduct a forensic examination of the retinas of a child – S.Z.S. – who Cassidy knew just by virtue of CPT contacting him, was a suspected victim of SBS/AHT. Finding retinal hemorrhaging was a key component

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

of CPT's SNAT diagnosis because the dogma in the pediatric child abuse universe is that retinal hemorrhaging is nearly always diagnostic of SBS/AHT. Not surprisingly, Cassidy claims to have observed S.Z.S.'s retinas being "painted with blood" – a condition only he saw and did not document by using the available retinal camera to photograph S.Z.S.'s retinas. As the Juvenile Court noted, Dr. Cassidy's description of the retinas being "painted with blood" was not verified; and his theory of causation of the child falling from a seventh story window or being involved in a high-speed vehicle collision or the like, was not consistent with the child's otherwise unremarkable physical condition, both at PCH and at the time of trial.

*Fourth*, PCH Defendants expressed their dismay that despite "push[ing] as hard as they could with DCS, the Investigator did not remove S.Z.S. from his parents' custody or amend the PDP to prevent the parents from seeing S.Z.S. PCH CPT Unit Chief Kirsh informed CPT members that "we can escalate [the issue of removal] to [DCS] OCWI's supervisor if needed."

*Fifth*, after the parents obtained a second opinion that S.Z.S. did not have bilateral bucket handle fractures, Dr. Wood confirmed that S.Z.S. did not have a left tibia fracture; and, although he diagnosed a right tibia fracture, he simultaneously ordered a bone scan to confirm that diagnosis since the radiograph results were not definitive. PCH never performed the bone scan and DCS never pushed for it to be done – that is, not until mid July 2019, right before trial and the assistant attorney general prosecuting the case was desperate for solid evidence of a fracture.

*Sixth*, when it was discovered at S.Z.S.'s follow-up appointment with PCH CPT at Child Help on 7 March 2019 that his head circumference was rapidly increasing, Defendants Coffman and Dietzman prevailed upon DCS to force the parents to re-admit the child to PCH to have fluids drained from his head. DCS had not yet taken temporary custody of S.Z.S., thus the parents retained medical decision-making rights. Despite the parents' desire to take the child to Banner Cardon's Children's Hospital, DCS, at the fervent urging and

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

intervention of Coffman and Dietzman, threatened to immediately remove S.Z.S. from their custody if they did not take him to PCH. They took him to PCH, escorted by DCS.

*Seventh*, as noted above in this section and elsewhere in this motion, DCS obtained two *ex parte* court order's authorizing taking the child into temporary custody. However, DCS investigators Lucero and Duncan, who had obtained those removal orders, did not act on those orders at their own volition either time because they were continuing to seek evidence in their investigation to support allegations of abuse. It was not until Dr. Coffman contacted her long-time friend and child abuse colleague, Director McKay, to discuss S.Z.S. and his case, that Director McKay ordered his investigators, over their better collective judgment at the time, to take custody of S.Z.S. and file a dependency petition.[13]

*Eighth*, Defendants Cassidy, Coffman, and Wood testified at the dependency trial to the complete exclusion of any DCS personnel involved in this case. Neither DCS investigator, Mr. Duncan and Ms. Lucero, testified at the dependency trial. The Juvenile Court found that there was no credible evidence of abuse, the dependency petition was dismissed, and after nine long months of very limited visitations with their son, S.Z.S. was returned to the care and custody of his parents, Plaintiffs Donald Sankey and Honor Duvall.

To summarize, PCH Defendants played a crucial, pivotal role in the genesis and prosecution of the dependency case in state court. Without PCH's inaccurate records and collusion with DCS, there would not have been a dependency proceeding. As explained above: (1) based on their own mistakes and inaccurate records, PCH notified the police and DCS that S.Z.S. was a suspected victim of abuse, (2) PCH ran additional tests in order to gather evidence and verify that abuse occurred, (3) PCH pushed to have DCS remove the child or to have DCS change the Present Danger Plan to one more restrictive to the parents, (4) PCH Defendant Coffman used her influence with DCS Director McKay to force the OCWI investigators to file a Dependency Petition, (5) PCH CPT meet with DCS in formal

---

[13] Notably, former Director McKay called off at least two scheduled depositions in this matter essentially on the eve of those depositions. Plaintiffs and State Defendants then settled the claims against State Defendants at mediation, and Mr. McKay then appeared for deposition after the settlement had been reached. (Doc. 287; Doc. 292.)

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

CPT meetings to discuss and strategize about the S.Z.S. case; and (6) PCH Defendants presented testimony to the Juvenile Court to substantiate that S.Z.S. was a victim of abuse. Additionally, PCH's general counsel and the assistant attorney general prosecuting the dependency collaborated on issues in the dependency proceeding. Simply put, without the Defendants' "inextricably intertwined" interference with DCS and its investigation, there likely would not have been a dependency proceeding and S.Z.S. would not have been removed from the care and custody of his parents for nine of the most crucial months of his early childhood and development.

C.   **There Can Be No Genuine Dispute that Dr. Wood's Records Are Plainly Inaccurate as a Result of His Negligence Entitling Plaintiffs to Summary Judgment on the Issue of His Liability for Negligence.**

There is no genuine dispute that Dr. Wood's records are wildly inaccurate and contain materially false information about S.Z.S.'s medical condition. Those errors are so elemental and contrary to S.Z.S.'s known and documented condition that Dr. Wood's negligence is plain and apparent to any observer, entitling Plaintiffs to summary judgment on the issue of Dr. Wood's liability for negligence.

"Ordinarily, expert medical testimony is required to establish proximate cause and make out a prima facie case of medical malpractice unless a causal relationship is readily apparent to the trier of fact." *Gregg v. Nat'l Med. Health Care Servs., Inc.*, 145 Ariz. 51, 54 (App. 1985). The exception to the ordinary rule applies when "negligence is so grossly apparent that a layman would have no difficulty in recognizing it." *Peacock v. Samaritan Health Serv.*, 159 Ariz. 123, 126 (App. 1988) (quotation and citation omitted). In other words, expert testimony is unnecessary to prove professional negligence "when the act or omission comes within the realm of common knowledge." *Revels v. Pohle*, 101 Ariz. 208, 210 (1966); *see also, e.g., Riedisser v. Nelson*, 111 Ariz. 542, 544 (1975) (expert testimony not necessary when the negligence is so apparent that a layperson would have no difficulty in recognizing it).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Moreover, *res ipsa loquitur,* a rule of circumstantial evidence, allows Plaintiffs to present the issue of negligence to a jury when the alleged injury would not normally occur in the absence of negligence. *Schneider v. City of Phoenix*, 9 Ariz. App. 356, 359 (1969); *Lowery v. Montgomery Kone, Inc.*, 202 Ariz. 190, 192, ¶ 6 (App. 2002). In Arizona, the doctrine permits a trier of fact to draw an inference of negligence when (i) the injury is "of a kind that ordinarily does not occur in the absence of negligence"; (ii) the injury is caused by an agency or instrumentality subject to the control of the defendant"; and (iii) the plaintiff is not "in a position to show the particular circumstances that caused the offending agency or instrumentality to operate to her injury." *Lowrey*, 202 Ariz. at 192, ¶ 7.

Dr. Wood himself admitted at trial and during his deposition that his records contained inaccurate and false information about S.Z.S., about the child's condition.

Additionally, the Juvenile Court made specific findings about errors in Dr. Wood's records including the fact that the records inaccurately stated that S.Z.S. was in pain, was put in a splint, and was administered pain medication while in Dr. Wood's care. Among other errors, Dr. Wood's records incorrectly stated that S.Z.S. shrank from 21 inches at birth to 9.05 inches at two-months old, that his current BMI was 99.05%, and that his ideal body weight would give him a BMI of 215%. Regardless of the reason for the numerous inaccuracies in Dr. Wood's records, there is no genuine dispute – Dr. Wood's records are inaccurate, contain false information regarding S.Z.S., and prejudiced subsequent readers of his records. Plaintiffs should be granted summary judgment must be granted on this issue.

## V.   **CONCLUSION**

Partial summary judgment as requested herein should be granted in Plaintiffs' favor as there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" on the issues and claims discussed herein. Fed.R.Civ.P. 56. As to Claim Six and Claim Eleven, partial summary judgment as to liability should be granted and a trial as to those claims set for damages only. For all the reasons stated above, the Court should enter partial summary judgments in favor of Plaintiffs as requested herein. ///

**RESPECTFULLY SUMBITTED** this 27th day of September 2023.

**MILLS + WOODS LAW PLLC**

By  /s/ Thomas A. Connelly
      Thomas A. Connelly
      Robert T. Mills
      Sean A. Woods
      5055 North 12th Street, Suite 101
      Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
      DeeAn Gillespie Strub
      7319 North 16th Street
      Phoenix, AZ 85020

      *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of September 2023, I electronically transmitted the foregoing document to be filed electronically with the Clerk of the Court using the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

  /s/ Thomas A. Connelly

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556