EXHIBIT 17

Reporter's Transcript of Recorded Proceedings

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| IN THE MATTER OF: | ) |
| DEPARTMENT OF CHILD SAFETY, | ) |
| vs. | ) No. JD37152 |
| HONOR DUVALL and DONALD SANKEY, | ) |

TRANSCRIPTION OF ELECTRONICALLY RECORDED PROCEEDINGS
HEARING, DAY 1, AUGUST 15, 2019

TRANSCRIBED BY:
Lori L. Thielmann, CR, RPR
Certified Reporter
Certificate No. 50877

PREPARED FOR:
Georgia Staton

(Original)

2

I N D E X

Page

BRENDAN CASSIDY, M.D.

    DIRECT EXAMINATION BY MR. BARRY               31

    CROSS-EXAMINATION MS. HARTMAN                 66

    CROSS-EXAMINATION BY MR. ZURBRIGGEN           71

    CROSS-EXAMINATION BY MS. GILLESPIE STRUB    109

    REDIRECT EXAMINATION BY MR. BARRY            133

44

1    we describe where hemorrhage could be located within the
2    back of the eye, it could be under the retina, it could be
3    within the retina, and it could be in front of the retina.
4    And in Swayde's case at that point he had quite a bit of
5    blood in all three areas --
6        Q.   So -- so we have -- you laid out a number of
7    concerns or -- with regard to his eye exam.
8             The next line talks about, These hemorrhages
9    are merely confluent and go from the posterior pole all the
10   way to the ora serrata in both eyes.  Is that -- is that
11   what you just explained?
12       A.   No.
13       Q.   Okay.  Explain what that is?
14       A.   So the first point I was making was that there was
15   quite a bit of blood in the back of his eyes in all the
16   different spaces you could have blood back there, under the
17   retina, in the retina, and in front of the retina.  They
18   have different characteristics, different textures,
19   different appearance.  It's important in understanding the
20   different diseases that could get you blood in those
21   different layers.
22            In addition to being in the different layers
23   from front to back, we also -- within that tissue, I also
24   commenting that essentially the whole back of his eye was
25   painted with blood.  When I say merely confluent meaning

49

1   Q.   To the best of your knowledge, did you see any
2   evidence of any skull impact or crush injuries?
3   A.   Not significant.  Okay.  He had some bruising,
4   some swelling around his eyes but nothing that was
5   significant on the exam for that.
6   Q.   So based on that, did that lead you to an opinion
7   of -- as to what -- did you -- were you able to narrow it
8   down to what you believe the causation of these -- these --
9   the diagnosis that you gave?
10  A.   Yes.
11  Q.   And what is that?
12  A.   It's called abusive head trauma.
13  Q.   What is that?
14  A.   It's either an impact or non-impact head trauma,
15  either slamming a child against a hard object or throttling
16  a child, shaking them violently will cause this.
17  Q.   Okay.  When you say throttling a child, is that --
18  is that kind of related to what you stated here, massive
19  single acceleration/deceleration?
20  A.   It would be multiple.  Massive single head is --
21  the only times I've seen it is when a child fell from a
22  seventh story window, fell to the ground, and had findings
23  similar to Swayde.  Seeing kids fall off a Squaw Peak,
24  30-foot falls from a cliff, had some of the findings in the
25  back of their eyes.

50

1    Q.   Okay.  But you also mentioned repetitive
2  acceleration/deceleration.
3    A.   Right.
4    Q.   Would that be more in line?
5    A.   So that's more the throttling or the shaking
6  version, yes.
7    Q.   Okay.  Doctor, just as a follow-up to that, why do
8  you think that this repetitive acceleration/deceleration is
9  the larger cause, as opposed to what we mentioned or
10  bleeding sort of diseases and that sort of thing.  Why do
11  you think that?
12    A.   Well, I guess I'd have to interpret your question.
13  In terms of ▮▮▮▮▮ diagnosis are you referring to --
14    Q.   Yeah --
15    A.   -- or in terms of age too?
16    Q.   -- so you just gave an opinion.  What you've
17  testified to is you've narrowed it down to this -- and I'm
18  -- correct me if I'm wrong, this repetitive
19  acceleration/deceleration?
20    A.   Right.  Of the laundry list of things that could
21  have caused his findings --
22    Q.   Yes.
23    A.   -- basically the others all have been ruled out.
24  There would have been a history in a 2-month old.  He was
25  celebrating his second month birthday at the time.  He

1   personally?
2   A.   I know him very well, yes.
3   Q.   How?
4   A.   I actually worked with him for the past 25 years.
5   We worked on a series of managed care organizations back in
6   the day many, many years ago. And [indiscernible] in terms
7   of patients going back and forth.
8   Q.   Do you know if Dr. Heller works with children a
9   lot or is --
10  A.   He does some children's work, but he's not a
11  pediatric ophthalmologist. If I had pediatric eye care to
12  go submit somebody [indiscernible] colleagues in the field.
13  Q.   Okay. I think one of the things with Dr. Heller
14  as well, I think there's an indication that he -- he didn't
15  dilate Swayde's eyes [indiscernible]?
16  A.   There's really no documentation in Dr. Heller's
17  report. As I read to you from my consult, I gave you a
18  description of what I saw on Dr. Heller's report. You have
19  the history of no prior surgical or hospitalizations. You
20  have the history of bruising of both eyes with crying. And
21  then we have a series of lines that are followed by the
22  letters W-N-L multiple times.
23  Q.   And what does W-N-L mean to you?
24  A.   We never looked.
25  Q.   Okay. Doctor, did you also get a chance to review

55

1   cutting my opinion in half.  He basically said Dr. Cassidy
2   suggested that Swayde had had a massive trauma
3   acceleration/deceleration head trauma, abusive head trauma
4   and didn't go on to indicate that I had some concern for
5   any other diseases that may have caused it.  So kind of
6   basically -- painting me as if -- as if I was laser focused
7   on one diagnosis going in, which is not my job or my -- my
8   role.  So I thought that was inappropriate not to comment
9   on my findings.
10              Later on in his statements, he did go on to
11  say that my findings were -- were at odds with Dr. Heller's
12  findings, which they were, but my findings has a list of
13  what I saw including the subconjunctival hemorrhage and the
14  retinal hemorrhaging that we described.
15              In the description of the underlying forces
16  that could have caused it, Dr. Heller's report simply says
17  that there's a statement from the parents of
18  subconjunctival hemorrhage, but there's no actual
19  description of the hemorrhage.  Everything is listed as we
20  never looked, and at the very end he gives a summary that
21  the child has subconjunctival hemorrhages without any -- he
22  has no indication that there actually are during the body
23  of his work.  And he says there's no retinal hemorrhaging,
24  but again, there's no indication that he actually --
25  actually looked.

1   supervisor or were your peers?
2       A.   No.  We invited him to work with us in a managed
3   care plan we were taking care of.
4       Q.   Oh.  He's a good doctor?
5       A.   He's a good guy.
6       Q.   Competent?
7       A.   Relatively confident.
8       Q.   No competent?
9       A.   Oh, I apologize.  Again, I wouldn't send patients
10  to him.  I've taken care of a number of patients that have
11  been seen by him, but again, I wouldn't have reason to send
12  him a patient.
13      Q.   Okay.  And when you said WNL to you means we never
14  looked, were you being facetious or serious?
15      A.   No, I'm being serious.
16      Q.   Okay.  You're aware that WNL in medical terms
17  means within normal limits?
18      A.   It can.
19      Q.   You know that most of the time that's what it
20  means?
21      A.   When you see a chart that's spattered the entire
22  way through with WNL it implies that there's no details on
23  the examination.  So you can't tell.
24      Q.   Is it -- do you have a -- do you believe that he
25  didn't mean within normal limits for all of those issues?

85

1   A.   I believe so; that's correct.
2   Q.   Okay.  Do you find it unfathomable that it --
3   those things wouldn't have been within normal limits, that
4   he marked WNL?
5   A.   Yes, I do.
6   Q.   Okay.  You would agree that at least, from what
7   you're able to see, Swayde, on the outside of his body,
8   that his appearance would be inconsistent with a fall from
9   a seven-story building or some severe shaking or some
10  severe car accident; correct?
11  A.   No.  I've seen some pretty significant injuries
12  where, again, the portion that I can see looks relatively
13  okay.
14  Q.   And --
15  A.   Seen gunshot wounds, for example, to the skull and
16  the face looks absolutely fine.
17  Q.   All right.  But you see a hole; correct?
18  A.   Again, I'm looking in this section --
19  Q.   I'm just saying there's a hole --
20  A.   -- bullet wound comes in through here I don't
21  necessarily see it until we pull the curtain back.
22  Q.   But you're aware if the kid has a gunshot wound to
23  the head there's probably blood in the hole; correct?
24  A.   If they hit him.
25  Q.   Pardon me?

96

1  testimony, that it wasn't done because the pupils were more
2  reactive than normal?
3     A.   Right.  They were a little larger than normal so
4  maybe a drop got on board.  I don't know.  But, again, they
5  were still reactive so probably not effective dilating
6  drops.
7     Q.   And you didn't ask the nurses whether they did or
8  did not dilate?
9     A.   I don't recall.  It's not marked in the sheet.
10    Q.   Okay.  And so -- but the standard of care is
11 typically to dilate?
12    A.   Sure.
13    Q.   Okay.  And so when you measured the pupils, you
14 indicated that a normal pupil is 2 to 3 millimeters?
15    A.   Correct.  In that age group, yeah.
16    Q.   And then his was a little bit on the larger side
17 of 4?
18    A.   Correct.
19    Q.   Okay.  In your report you indicated that his
20 pupils were 2 to 4 millimeters, correct?
21    A.   4 to 2, I believe --
22    Q.   Okay.
23    A.   -- the statement was.
24    Q.   All right.  Is there a difference between 2 to 4
25 and 4 to 2?

100

1    kind of blood disorder assessment or labs done?
2         A.    Yes.
3         Q.    Okay.  And you believe that PCH did those?
4         A.    I do.
5         Q.    Okay.  And you believe that there was none of
6    that?
7         A.    Correct.
8         Q.    In other words, your only -- in your mind your
9    only left with this was some kind of a head trauma?
10        A.    Right.  At this point, yes.
11        Q.    Okay.
12        A.    At the time I did the exam, all the studies hadn't
13   been completed.  So that's why I left that list.
14        Q.    Okay.  And so you would agree that you cannot tell
15   -- to the extent that something did happen to the child,
16   you would agree that at least you don't know who did that;
17   correct?
18        A.    I have absolutely no idea.
19        Q.    You don't know what happened necessarily?
20        A.    That's correct.
21        Q.    And you don't know exactly when it happened?
22        A.    That's correct.
23        Q.    Roughly you would guesstimate minus three to minus
24   ten days-ish?
25        A.    That's a best decent guess, yes.

1   And my response is X, Y, or Z, depending on whether I'm
2   going north or south at that time.
3       Q.   Okay.  And so is there -- what types of cases
4   would you receive a text for?
5       A.   Only for kids that have brain injuries.  I used to
6   spend about 120 hours a week working and doing all consults
7   and in about 2007, I learned to say the word no.  So I've
8   cut it down to only doing consults in the hospital that are
9   related to brain injuries.  So I've cut it down, limited my
10  life a little bit.
11      Q.   All right.  So you're only looking at some kind of
12  a traumatic event -- impact event to the head?
13      A.   Well, not necessarily.  Some -- the combination is
14  almost typically a change -- a change in mental status and
15  there's blood within the brain.  So it's either a direct
16  trauma or a concern for a trauma would be the general
17  category.  And it's almost always under age 4;
18  occasionally, they'll give me a 5-year-old if it's like a
19  very small child or a debilitated child.  But essentially
20  smaller children with that little grouping.
21              MR. ZURBRIGGEN:  All right.  I don't have
22  anything further, Judge.  Thank you.  Thank you, Doctor.
23              THE WITNESS:  Thank you.
24              THE COURT:  Thank you.  Ms. Gillespie, how
25  much do you have, because I wonder if I need to take a

118

1    A.   -- a portion of the PCH record, I did read that.
2    Q.   Okay.  And I think you also clarified that the
3    exam you did of Swayde was 90 seconds; correct?
4    A.   Roughly.
5    Q.   And if the mother and the -- you recall the mother
6    and the grandmother being in the room; correct?
7    A.   Mother was in the room during the exam.  I believe
8    the grandmother came in either as I was doing it or just
9    afterwards.  I can't remember for sure.
10   Q.   And if the mother does -- if the mother does not
11   recall you speaking to her prior to the exam, would you
12   dispute that?
13   A.   I can't tell you whether it would have been prior
14   to or after.  I do have mother interviewed so that would
15   indicate that I did speak with the mother.
16   Q.   And you don't recall if it was before or after you
17   did the exam?
18   A.   I can't tell you for sure.
19   Q.   Okay.  If she recalls that you came in with a
20   backpack and used something to help open up Swayde's
21   eyelids, would that be correct?
22   A.   Either my fingers or a small instrument, yes.
23   Q.   Okay.  If she recalls that there was no dilation,
24   you indicated you didn't dilate; is that correct?
25   A.   Well, I didn't use my external drops, as I

119

1   testifying earlier, that I'd been chastised for using my
2   own drops.
3       Q.   All right.  And you didn't see in any of the PCH
4   records where they actually affirmed that they had dilated
5   at a certain time prior to you getting there; is that
6   right?
7       A.   I didn't look over the medication application
8   list, the nursing log, during my review of the records.  So
9   of the 500 pages, that was not a portion that I reviewed.
10  That would probably be another 100 or 150 pages would be my
11  guess, and that would be outside the purview of reviewing
12  for this case.
13      Q.   Okay.  And if mother recalls that after you did
14  the exam, would you have began to pack up your stuff in
15  your backpack to leave?
16      A.   Rather than leave my equipment, yes.
17      Q.   Okay.  If she recalls that you came in, did the
18  90-second review of Swayde's eyes, and was packing up to
19  go, then you -- then she asked you some questions, would
20  she be inaccurate if that's her recollection?
21      A.   Sounds appropriate.
22      Q.   Okay.  So if she's the one that initiated the
23  conversation with you, you didn't ask her for any
24  background; is that correct?
25      A.   No.

120

1     Q.   Okay.
2     A.   That's not correct. That was your question,
3 right --
4     Q.   Right.
5     A.   -- [indiscernible].
6     Q.   Right.
7     A.   And my answer is no, that was not correct.
8     Q.   Okay.
9     A.   If the parent is sleeping in the room -- again, I
10 don't remember at this point whether mom was asleep, for
11 example, I won't disturb the parent. I'm just there to
12 examine their eyes. If there's a parent available, awake,
13 that I can converse with, I'll talk to them about it. But,
14 again, I'm there to examine the child.
15     Q.   Understood. And you did examine the child,
16 90 seconds?
17     A.   Correct. And I can't tell you -- I did speak with
18 mom, but I can't tell you whether it was prior to or
19 afterwards. If the mother was awake, I would have
20 initiated a conversation, unless she was engaged in a
21 conversation with someone else in the room, another
22 professional in the room, for example.
23     Q.   Okay.
24     A.   I would introduce myself, give them my name, in
25 this case gave me phone number.

123

1   A.   -- coming in --
2   Q.   Yeah.
3   A.   -- I remember examining the baby and the
4   orientation of the room.  I can't give any other specifics
5   about [indiscernible] other than what's written.
6   Q.   And because you're a doctor and you review medical
7   records a lot, you're familiar that the acronym SNAT stands
8   for suggestive of non-accidental trauma; correct?
9   A.   Usually we say suspicion as opposed to --
10  Q.   Oh, suspicion.  Suspicion of non-accidental
11  trauma.
12  A.   Right.
13  Q.   And you would have read that in the charts, if
14  those chart would have been available in the PCH records,
15  before you came in; correct?
16  A.   If that had already been printed out or dictated,
17  yes.
18  Q.   Okay. And when you were trained in the 90s or --
19  and before, you were trained in child abuse that retinal
20  hemorrhaging is a key indicator of child abuse; correct?
21  A.   No.  No.
22  Q.   What were you trained about as an indicator as it
23  relates to the eyes of child abuse?
24  A.   Okay.  So, again, this is a really common fallacy,
25  and we keep flipping back to generalizing about retinal

131

1   to see that; correct?
2       A.   No, that's not correct.  But I don't appreciate
3   your verbiage.
4       Q.   Okay.
5       A.   Would you like an elucidation or just -- no.
6       Q.   And from what you saw, how long would it take for
7   what you documented to dissipate?
8       A.   Typically it's a matter of weeks.  Again, there's
9   a big variable range.  It can go away within a few weeks.
10  I've seen it never go away.  The great majority of it will
11  go away.  I've seen where it just congeals into a ball and
12  you have to have a retina surgeon go in and do what's
13  called a vitrectomy to remove the blood clot from the eyes.
14  So it's anywhere from relatively soon to a matter of weeks
15  to never going away other than surgical [indiscernible]
16  child died and [indiscernible] next time I saw the findings
17  it was on a forensic's slide.
18      Q.   And you don't know whether Dr. Heller looked at
19  the back of the eye or not, do you?
20      A.   His indication is that he looked at every section
21  of the eye.  But it -- there's no indication of any
22  findings whatsoever, including the area [indiscernible]
23  diagnosis.  So I don't know what portions he actually did.
24      Q.   Okay.  So he may have seen something different
25  than you saw.  That's fair, isn't it?

SANKEY 000722                    CONFIDENTIAL

1  A.  It's fair to say that he didn't see what was
2  there.  I wouldn't give you 100 percent certainly that the
3  findings that I've got written here were what there two
4  days prior to Dr. Heller.  The chances that it went down to
5  zero for Dr. Heller and then bounced back up two weeks
6  later for Dr. Fecarotta, pretty close to zero.
7  Q.  Well, Dr. Fecarotta only saw very mild -- when he
8  saw the child just two weeks later, it was very mild,
9  wasn't it?
10  A.  Right.  Two weeks after my examination he saw the
11  child.  So that's correct.
12  Q.  And how often do you see a child with what you say
13  you viewed with absolutely no complications or lasting
14  effect?
15  A.  I'd have to round off the number but maybe
16  50 percent of the time.  I'd say about 50 percent of the
17  kids will have either some scar tissue that remains or the
18  traumatic brain injury lead them to have what's called
19  cortical visual impairment [indiscernible] nerve damage.
20  Almost all of them, as I mentioned in the earlier
21  testimony, will have astigmatism, near sightedness are
22  common factors that will be long-term features of the
23  original injury.
24  Q.  So you're saying that almost all kids have a
25  lasting effect from what you viewed and reported on in your

TRANSCRIPTION OF ELECTRONICALLY RECORDED PROCEEDING
Reporter's Transcript of Recorded Proceedings

161

1          BE IT KNOWN that the foregoing audio
2    recording was transcribed by me, Lori L. Thielmann, a
3    Certified Reporter; that the 161 pages contained herein
4    are a true and correct transcript of the recording, all
5    done to the best of my skill and ability.
6          I FURTHER CERTIFY that I am in no way
7    related to any of the parties hereto, nor am I in any way
8    interested in the outcome hereof.
9          DATED this 22nd day of March, 2021.
10
11
12                              /s/  Lori L. Thielmann
13                              LORI L. THIELMANN, CR RPR
                                Certified Reporter
14                              Certificate No. 50877
15
16
17
18
19
20
21
22
23
24
25