EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

HONOR DUVALL, et al.,        )
        Plaintiffs,         )
           vs.               )  Case No.
                           ) 21-CV-00167-PHX-ROS
ARIZONA DEPARTMENT OF CHILD  )
SAFETY, et al.,              )
        Defendants.         )
_____)

### DEPOSITION OF BRENDAN CASSIDY, M.D.

Phoenix, Arizona
October 5, 2022
10:20 a.m.

Prepared by:                      CARRIE REPORTING, LLC
MICHAELA H. DAVIS                 Certified Reporters
Registered Professional Reporter  2415 E. Camelback Road
Certified Realtime Reporter       Suite 700
Certified Realtime Captioner      Phoenix, AZ 85016
Certified LiveNote Reporter       (480) 429-7573
AZ CR No.  #50574
carrie@carriereporting.com

(COPY)

```
                                      Phoenix, Arizona
                                      October 5, 2022
                                      10:20 a.m.


            BRENDAN CASSIDY, M.D., called as a witness
herein, having been first duly sworn, was examined and
testified as follows:
                            * * *
                    E X A M I N A T I O N
BY MR. CONNELLY:
    Q.    Good morning, Dr. Cassidy.  I apologize for the
delay in getting started this morning.
          Would you please state your name for the
record.
    A.    Brendan Cassidy.
    Q.    And common spelling on both of those names
there?  Just so she gets it right.
    A.    I apologize.  I'm hard of hearing, so I'm
watching your mouth.  Common spelling?
    Q.    Both your names -- common spelling for both your
names?
    A.    There is no common spelling for Brendan.
B-R-E-N-D-A-N.  And the last name is C-A-S-S-I-D-Y.
    Q.    All right.  Very good.
          And you understand why you're here today?
    A.    I do.
```

1          MS. PATANE:  Form.
2          MS. ZANGERLE:  Form and foundation.
3          MR. PATEL:  Join.
4          THE WITNESS:  Those words never came out of
5  my mouth, no.
6  BY MR. CONNELLY:
7      Q.   And is it true that when you're asked to do an
8  emergency consultation, it's in the context of a case
9  where PCH has determined that this is a case of suspected
10 nonaccidental trauma?
11         MS. PATANE:  Form and foundation.
12         MR. PATEL:  Join.
13         MS. ZANGERLE:  Join.
14         THE WITNESS:  No.  I think the -- to better
15 characterize it, again, I started in 1994, and through
16 about 2007 or 2008, so for 13, 14 years, I saw all manner
17 of consults as I initially told you about trauma surgeries
18 and that type of thing, children with abscesses and tumors
19 and you name it, so I would see all forms of consults.
20         But by about 2007 and 2008, interdigitated
21 with your questions about my family life and prior
22 marriages, I chose to start slowing down on the number of
23 consults that I would accept and chose just to do the ones
24 where it was a potential for a child having been abused;
25 not that they were identified as a child abuse case, but

1  there was a possibility for it.
2  BY MR. CONNELLY:
3      Q.   And when did you do that narrow focusing?
4      A.   I'd say about 2007, 2008.  Roughly the time I
5  was finishing a divorce.
6      Q.   So when PCH reaches out to you for a
7  consultation, you're not obligated to do the consultation,
8  and you can say "yes" or "no" to PCH about the particular
9  consultation; right?
10     A.   Zero obligation.
11     Q.   So you can decline any consultation you want to
12 decline?
13     A.   Absolutely.
14     Q.   And so since around 2007 or so, it's been your
15 practice, if I'm understanding you correctly, to decline
16 most consultations and to focus more on consultations
17 where there is a suspicion of abuse?
18          MS. PATANE:  Form.
19          MR. PATEL:  Join.
20          THE WITNESS:  The way I would put it is I
21 used to work about 110 hours a week, was working through
22 my second marriage and had growing children who I love and
23 adore, as does their mother.
24 BY MR. CONNELLY:
25     Q.   As should all parents.

1  A.   It got to the point with me working too many
2 hours and accepting too many consults, spending too much
3 time in the hospital, that it was really detracting from
4 growing the children properly.  And so I learned to say no
5 and cut out the consults that I thought just about anybody
6 could handle in terms of pediatric ophthalmologists, and I
7 cut it down to the ones where the children needed a voice
8 if they had a significant injury; somebody could say, yes,
9 there's signs of abuse, or, no, there aren't signs of
10 abuse.
11  Q.   Okay.  So I appreciate the longer answer.
12       It's fair to say that around that time,
13 2007, 2008, you deliberately chose to focus on accepting
14 consultations where there may have been abuse as the
15 causative agent of whatever medical condition might exist
16 with the child?
17  A.   That's correct.  I went from dozens of hospital
18 visits per week down to a handful of hospital visits a
19 week.
20  Q.   And part of the reason for doing that is because
21 you felt that these children needed a voice and an
22 advocate?
23  A.   I felt that my children needed a father present,
24 and to maximize that, I felt that these children, if they
25 had significant findings, had somebody that could

1 elucidate those findings and understand what they might
2 represent.
3     Q.    And so when you get a consultation, what
4 information do you get before you decide whether or not
5 you're going to accept the request for a consultation?
6         What information does PCH give you about the
7 patient before you can determine whether or not you're
8 going to take the consultation?
9         MS. PATANE:  Form.
10         MR. PATEL:  Join.
11         THE WITNESS:  PCH doesn't give me any
12 information that influences my decision to see the patient
13 or not.
14 BY MR. CONNELLY:
15     Q.    Well, you just said that you deliberately began
16 cutting out consultations -- or let me say it another way.
17         You deliberately began to choose
18 consultations where there was a suspicion of abuse as
19 being the causative agent for the medical conditions that
20 were being observed.  You must receive some information at
21 the time of the request for consultation in order to make
22 that determination of whether this is a consultation you
23 want to take or not.
24         So what information do you receive at the
25 time of the request for a consultation?

1     MS. PATANE:  Form.
2     THE WITNESS:  So at the time, 2007 or '-8
3  roughly, if I got a consult saying we have a child with a
4  cellulitis, orbital cellulitis, a child that has had a
5  direct eye trauma, child with increased intracranial
6  pressure that we need monitoring, has a severe eye
7  infection, genetic diseases, double vision, you name it,
8  again, premature children that need examinations.  At that
9  point, I cut all of those consults out and only accepted
10 the ones where the suspicion was that there was a
11 possibility of abuse.
12 BY MR. CONNELLY:
13     Q.    Okay.
14     A.    So that was in 2007 or '-8.  And subsequent to
15 me telling the consulting doctors -- and, again, this was
16 from 11 different facilities at the time -- after telling
17 them "no" multiple times that I wouldn't be available for
18 other forms of consult, there was no winnowing process
19 from then on.  Again, I was still working out of multiple
20 hospitals but just taking the cases that were potential
21 cases for abuse, and I saw those patients when I was
22 available.
23     Q.    So if I understand your testimony correctly,
24 because I don't -- I want to make sure I understand it,
25 and I don't want to misunderstand it.

1            And so what happened was in the 2007, 2008
2    time frame, you would get a request for a consultation,
3    and based on the information you received, you -- you
4    would be able to tell whether or not it was an
5    abuse-related consultation; right?
6       A.   Correct.  From 1999 -- 1994 through that time
7    period, it was all-comers.  And then about 2007, 2008, I
8    winnowed it down to just the ones that were potential
9    abuse.
10      Q.   Right.  And you were able to tell, though, at
11   that time before -- and if you'll just bear with me, I
12   think we'll get to where we're both on the same page.
13   Because what I hear you saying right now is that now you
14   don't have to do any winnowing because the hospitals know
15   that you're not going to do a consultation unless it's
16   abuse related.  Is that fair?
17              MS. PATANE:  Form.
18              MR. PATEL:  Join.
19              THE WITNESS:  In almost a hundred percent.
20   Occasionally, they will still text me and call me and
21   plead with me to see somebody, but yes, it's a great
22   majority.
23   BY MR. CONNELLY:
24      Q.   All right.  So -- but even today when they ask
25   you to do a consultation -- let me step back for a second.

1          As is it stands and -- I don't want to say
2    "today."  Let's go back to 2019.
3          So by 2019, because of what you were telling
4    the hospitals in 2007 and 2008, in that time frame, when
5    they were asking you to do all manner of consultations and
6    you went back to them and said "no" on this one, "no" on
7    that one, "yes" on this one because there may be some
8    abuse, "no" on these because there's no abuse, they got
9    the message and started primarily sending you consultation
10   requests that dealt only with abuse, for the most part?
11      A.   For the most part.  And then there was one
12   subsection where, again, I was still working at Banner at
13   that time, 2019, '18, where I would participate in
14   emergency call for Banner, and I would take care of
15   all-comers to the emergency room for the Banner
16   facilities.
17      Q.   Okay.  So by 2019, PCH, for instance, understood
18   that as far as emergency consults go, you were only
19   interested in those that had a suspicion of abuse; right?
20   Is that fair?
21      A.   Potential for abuse or suspicion.  And, again,
22   with the caveat of potential ophthalmic findings which
23   basically puts it age 4 and younger.  So it wouldn't be
24   like they consult me on an 8-year-old that had been
25   sexually abused or a 12-year-old, et cetera.

1   *Q.*   Right. Okay. Fair enough. I understand that.
2   Sure.
3           So PCH then understood by 2019 that as far
4   as the emergency consultations you were willing to do,
5   they were for children zero to 4 where there was a
6   potential that any eye injuries might have been a result
7   of abuse?
8   *A.*   Correct.
9   *Q.*   So then when PCH sent you a consult request in
10  2019, and particularly in this case if you can recall,
11  what information did you get from PCH at the time of the
12  request for a consultation?
13  *A.*   I don't recall the specifics of this request.
14  All I can tell you is just looking over my notes, on the
15  day that I saw Swayde in the hospital, I was in the
16  outpatient surgery facility doing surgeries.  And as I
17  review the PCH notes, it suggests that they ordered eye
18  drops to start at 10:45 in the morning, so that implies
19  that they had contacted me in the operating room that
20  morning and asked me if I could see the child, and I said,
21  yes, I'm supposed to be finishing surgery around, you
22  know, 12, 12:30, and if you'd start the droops at noon for
23  me, please, so that way I can do the examination early
24  afternoon when I finish surgery since I'm on the campus.
25  *Q.*   You said "in reviewing your notes."  What notes

1        MR. PATEL:  Join.
2        MS. ZANGERLE:  Join.
3        THE WITNESS:  That's why I indicated on my
4   dictation to share with other readers that's what I saw.
5   BY MR. CONNELLY:
6       Q.   Are you able to take photographs of the inside
7   of an eye when you perform an eye exam?
8       A.   Not in my office.  I don't have a camera like
9   that.
10      Q.   Do they have one at PCH?
11      A.   They do.
12      Q.   Did anybody take the time to take a photograph
13  of the inside of S████'s eyes?
14       MS. PATANE:  Form, foundation.
15       MS. ZANGERLE:  Join.
16       THE WITNESS:  I don't believe he's ever had
17  a retinal photograph.
18       MR. PATEL:  Form, foundation.
19       THE COURT REPORTER:  Doctor, please pause
20  for just a beat before you answer so they can get their
21  objections in.
22  BY MR. CONNELLY:
23      Q.   Is that something that you could have asked to
24  have been done at the time?
25      A.   No.  The camera is in a different department,

| | |
|---|---|
| 1 | MS. PATANE: Form, foundation. |
| 2 | MR. PATEL: Join. |
| 3 | MS. ZANGERLE: Join. |
| 4 | THE WITNESS: Again, I'm not sure that the |
| 5 | camera was being let out of the operating room at that |
| 6 | time, so I can't tell you for sure. |
| 7 | BY MR. CONNELLY: |
| 8 | Q. The camera was present inside the hospital at |
| 9 | PCH in 2019; right? |
| 10 | A. Yes. |
| 11 | MS. ZANGERLE: Form and foundation. |
| 12 | MR. PATEL: Join. |
| 13 | BY MR. CONNELLY: |
| 14 | Q. Beyond -- besides abusive head trauma, the other |
| 15 | mechanisms that you note -- the single massive crush |
| 16 | injury at trial, you described that as a truck rolling |
| 17 | over someone's head; right? |
| 18 | A. That would be one example. |
| 19 | MS. PATANE: Form. |
| 20 | BY MR. CONNELLY: |
| 21 | Q. What are the other examples of massive crush |
| 22 | injuries? |
| 23 | A. Birthing. |
| 24 | Q. I'm sorry? |
| 25 | A. Birthing. |

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573   carrie@carriereporting.com

```
1  STATE OF ARIZONA    )
                       ) ss.
2  COUNTY OF MARICOPA  )

3

4          BE IT KNOWN that the foregoing proceedings were
   taken by me, MICHAELA HERMAN DAVIS, a Certified Reporter,
5  in and for the County of Maricopa, State of Arizona; that
   the witness before testifying was duly sworn to testify to
6  the whole truth; that the questions propounded to the
   witness and the answers of the witness thereto were taken
7  down by me in shorthand and thereafter reduced to
   typewriting under my direction; that the foregoing pages
8  are a true and correct transcript of all proceedings had,
   all done to the best of my skill and ability.
9
           I CERTIFY that I am in no way related to any of
10 the parties hereto, nor am I in any way interested in the
   outcome hereof.
11
                [X] Review and signature was requested.
12              [ ] Review and signature was not requested.
                [ ] Review and signature was waived.
13

14         I FURTHER CERTIFY that I have complied with the
   ethical obligations set forth in ACJA 7-206(F)(3) and
15 ACJA 7-206(J)(1)(g)(1) and (2). Dated at Phoenix, Arizona,
   this 27th day of October, 2022.
16

17

18
   _____
19         Michaela H. Davis, RPR, CRR, CRC, CLR
                   Arizona CR No. 50574
20

21
           I CERTIFY that Carrie Reporting, LLC, has
22 complied with the ethical obligations set forth in
   ACJA 7-206.  Dated at Phoenix, Arizona, this _____ day of
23 _____, 2022.

24
   _____
25              Carrie Reporting, LLC
                Arizona RRF No. R1064
```

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573   carrie@carriereporting.com