EXHIBIT 19

**SONORAN DESERT VISION CONSULTING**
Todd A. Lefkowitz, MD, FAAO
DIPLOMATE, AMERICAN BOARD OF OPHTHALMOLOGY

# Preliminary Expert Opinion Affidavit pursuant to A.R.S. § 12-2603

*Duvall, et al. v. Arizona Dept. of Child Safety, et al.*, 21-cv-00167-PHX-DWL

I, Todd A. Lefkowitz, MD, am a licensed physician certified by the American Board of Ophthalmology. I am a physician licensed to practice Medicine in all its branches in Arizona, New York, Nevada, Utah, Washington State and Idaho. I currently practice in the area of Medicine applicable in this case. I am familiar with the standard of care for medical practice that currently relates to issues of care and treatment of patients such as Duvall/Sankey. I am familiar with the standard of care in this case by virtue of my training, education, and experience of 40 years in the same field or related healthcare fields as the physicians who treated Duvall/Sankey. I can fairly evaluate the quality of care that was provided to Duvall/Sankey. Attached is a copy of my curriculum vitae.

I have practiced Ophthalmology in the USA since 1981. I graduated from New York University School of Medicine (1977) and did my Ophthalmology residency at Georgetown University (1978-1981). I was certified by the American Board of Ophthalmology in 1982. I am a practicing physician and surgeon, and perform most types of eye surgery.

I am a medical expert witness in Ophthalmology and have worked as such in many different jurisdictions in the USA. I was a physician member of the Arizona Medical Board from 2007-2010, and reviewed Ophthalmology cases for the Board for 7 years prior to that. I have also worked as a hospitalist, and in that capacity oversaw the treatment of many pediatric and adult patients who had experienced head trauma.

I have served as a medical expert witness in the area of Ophthalmology, including but not limited to how it pertains to the SBS/AHT controversy. I am familiar with the ophthalmology issues as they pertain to the medico-legal diagnosis of Shaken Baby Syndrome (SBS), now often referred to as Abusive Head Trauma (AHT).

RECORDS REVIEWED:

1. Records of Dr. Brendan Cassidy
2. Records of Dr. Elyssa Rosenthal
3. Records of Dr. Fecarotta
4. Records of Dr. Warren Heller
5. Duvall Juvenile Court Ruling
6. Duvall Birth and Labor Records
7. Duvall Newborn Assessment

GENERAL CHRONOLOGY OF EVENTS:

███████████████: Patient was born via vaginal delivery after 6.2 hours of active labor; exam described as normal; however, meconium was present in the amniotic fluid indicating some stress in the delivery process.

February 21, 2019: Mother calls Patient's pediatrician because Patient is not eating, is lethargic, and is discharging brownish mucous from his mouth; pediatrician advises Mother to take child to Phoenix Children's Hospital.

February 21, 2019: Mother and Maternal Grandmother, a RN, take Patient to Phoenix Children's Hospital emergency room; Patient is examined by ER doctors and staff, none of whom suspect abuse.

February 22, 2019: Patient is seen by Dr. Brendan Cassidy at Phoenix Children's Hospital. Dr. Cassidy's exam mentions mild hemorrhage overlying the optic nerve in both eyes and marked hemorrhage of all 3 layers subretinal intraretinal and preretinal in both eyes confluent and going from posterior pole to the ora serrata in both eyes, there is mild overlying vitreous hemorrhage in several areas in both eyes; Dr. Cassity feels this is most consistent with abusive head trauma and could be related to a massive crush injury to the skull, massive single acceleration/deceleration injury, or repetitive acceleration/deceleration injury; careful attention should be given to the possibility of an underlying bleeding disorder or severe health compromise such as sepsis or leukemia; a 6 to 8-week reevaluation is recommended.

February 25, 2019: Patient is seen by Dr. Warren Heller; Dr. Heller reports no retinal abnormalities.

March 7, 2019: Mother brings Patient to Phoenix Children's Hospital because she notices his head circumference is increasing; Patient is seen by Dr. Christopher Fecarrotta who notes bilateral retinal hemorrhages and suggests 1 to 2-week ophthalmology follow-up.

March 22, 2019; Patient is seen by Dr. Peters at Phoenix Children's Hospital; she notes that the bilateral retinal hemorrhages are resolved. She recommends a 2-month follow-up.

DISCUSSION:

The retina is light-sensitive tissue in the back of the eye responsible for generation of vision. It is considered brain tissue and is part of the central nervous system. The retinal fibers are joined at the optic nerve, which transmits the visual stimuli received by the eye back to the occipital cortex, where it is ultimately interpreted. The optic nerve is surrounded by a tiny sheath, which contains the same meningeal layers as those enveloping the brain itself. The retinal structures, especially in infancy, are very small in scale. An infant's entire retina is a bit bigger than a postage stamp. Although comprised of several layers, the retina is a very thin piece of tissue, less than half a millimeter thick. The retina's contiguous layers are thus separated from one another by mere microns. The retina is fed blood through the central retinal artery and its branches as well as from blood vessels in the choroid adjoining the retina. There are capillaries throughout the retina, which are extremely small. The retinal vessels are microscopic, sensitive, and very vulnerable to abrupt changes in intracranial pressure, which the Patient displayed. This is not controversial outside the child abuse context.

The classical understanding of pediatric ophthalmologists and pediatricians is that the combination of retinal hemorrhaging, subdural hematoma and brain edema are highly suggestive of nonaccidental trauma. Even though this triad can be seen in the presence of infection, cerebral venous sinus thrombosis, blood dyscrasias, and other causes, the pediatric lobby invariably attributes the triad to abusive or nonaccidental head trauma or, as it was formally known, shaken baby syndrome. The literature is now quite clear that retinal hemorrhages in infancy and young childhood are found in a wide variety of traumatic and non-traumatic settings, such as external hydrocephalus, aneurysms, vascular malformations, certain fatal infections, venous thrombosis, natural child birth, caesarian child birth if accompanied by hypoxic injury, in the context of reperfusion and venous stasis, spikes in intracranial pressure, and a whole list of other rarer natural conditions and combinations of conditions. See Natalie Callaway, et al., *Retinal and Optic Nerve Hemorrhages in the Newborn Infant: One-Year Results of the Newborn Eye Screen Test (NEST) Study*, (2016), 123 *Ophthalmology* 1043 (finding bilateral, multi-layered retinal hemorrhages extending to all four retinal quadrants in a significant percentage of normal vaginal deliveries, including in many instances of hemorrhages that reflected optic nerve involvement). The rough equation that once prevailed of intracranial hemorrhage + retinal hemorrhage = presumptive SBS/AHT is not scientifically validated or otherwise reliable. See *M. Mattheij et al.,*

*Retinal Haemorrhages in a University Hospital: Not Always Abusive Head Trauma, (2017), 117 Acta Paediatrica Neurol. Belg. 515, 521* ("Clinicians should also know that there is no pathognomonic size, distribution, or location of RH seen only in AHT."); *Mark J. Shuman, Severe Retinal Hemorrhages with Retinoschisis in Infants Are Not Pathognomonic for Abusive Head Trauma, (2017), 62 J. Forensic Sci 807* ("The finding of severe retinal hemorrhages cannot be used to determine how, or even if, a traumatic event occurred.").

It is also important to keep in mind that while Dr. Cassidy is finding such relevance in the fact that the hemorrhage is seen in all three layers, the retina is extremely thin – less than half a millimeter thick. The layers are somewhat contiguous and separated by microns.

**In all cases, a complete dilated retinal exam must be performed in order to establish the extent of the hemorrhaging in the retina. This cannot be quickly performed in the absence of a dilated exam.**


CONCLUSION:

The record of Dr. Cassidy's eye exam on February 22, 2019 does not indicate that dilating drops were used. His description of hemorrhages out to the ora serrata begs disbelief since that far peripheral retina would not be visible in the undilated state.

Dr. Brendan Cassidy fell below the standard of care in failing to perform and a dilated retinal exam in this newborn in whom nonaccidental trauma was suspected, particularly when he was brought in to conduct this exam as part of the child protection team at PCH where his opinion was a material consideration in the determination to seize the Patient from the care and custody of his parents, without a warrant or exigent circumstances, which I understand to be a basis for Plaintiffs' claims against Dr. Cassidy.

I hold these opinions to be of the highest medical probability. I reserve the right to amend this report should any further information become available to me.

_____
Todd A. Lefkowitz MD, FACS, FAAO, diplomate ABO
Sonoran Desert Vision Consulting
December 8, 2021