EXHIBIT 31

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Honor Duvall, et al.,          )
                               )
              Plaintiffs,      )
                               )
v.                             )   No. 21-CV-00167-PHX-ROS
                               )
Arizona Dept. Of Child         )
Safety, et al.,                )
                               )
              Defendants.      )
_____)

DEPOSITION OF WILLIAM WOOD, M.D.

Phoenix, Arizona
November 18, 2022
10:22 a.m.

Prepared for:
(Certified Copy)

Prepared by:                          CARRIE REPORTING, LLC
CINDY MAHONEY                         Certified Reporters
Registered Professional Reporter      2415 E. Camelback Road
Registered Merit Reporter             Suite 700
AZ CR No. 50680                       Phoenix, AZ  85016
carrie@carriereporting.com            (480) 429-7573

6

```
 1                      Phoenix, Arizona
 2                      November 18, 2022
 3                         10:22 a.m.
 4
 5              (The document was marked as Exhibit 68 for
 6    identification.)
 7
 8                      WILLIAM WOOD, M.D.,
 9         the witness herein, being first duly sworn,
10              was examined and testified as follows:
11
12                         EXAMINATION
13   BY MR. CONNELLY:
14      Q.   Good morning, Doctor.  Thank you for being here
15   today.
16      A.   Morning.
17      Q.   The oath you just took is the same oath that you
18   took back in August of 2019 at the trial in this matter.
19   You understand that?
20      A.   Yes.
21              MS. ZANGERLE:  Form.
22   BY MR. CONNELLY:
23      Q.   And when you gave that testimony, you were under
24   oath; you were telling the truth in your responses?
25      A.   Yes.
```

1  specifically now at the time that the report was received
2  or shortly after it was generated.
3      A.   Not that I recall.
4      Q.   So is recently the first time that you reviewed
5  the results of the genetic testing?
6      A.   It was probably -- I can't be sure of the exact
7  date, but a number of years ago at this point.
8      Q.   If you had reviewed the results of all the labs
9  that you ordered, would you have made a note that would
10 have been maintained somewhere on the PCH record system?
11              MS. ZANGERLE:  Foundation.
12              THE WITNESS:  Potentially.
13              MR. PATEL:  Join.
14              THE WITNESS:  Potentially, if it was
15 relevant.
16 BY MR. CONNELLY:
17     Q.   Well, you ordered the tests; right?
18     A.   Which tests are you referring to?
19     Q.   I'm referring to any of the tests that you ordered
20 on February 28 of 2019.  Do you recall which tests you
21 ordered on February 28 of 2019?
22     A.   Yes.
23     Q.   What tests did you order on February 28 of 2019?
24     A.   I ordered a bone scan.  I ordered a genetic
25 consultation and an endocrinology consultation.  And I

1   any rib fractures; right?
2      A.   The infant did not have any rib fractures.  That's
3   correct.
4      Q.   He didn't have a distal humerus transphyseal --
5   how do you say that word?
6      A.   Physeal.
7      Q.   Physeal.
8           Didn't have any distal humerus transphyseal
9   separation; right?
10     A.   That's true.
11     Q.   He didn't have multiple fractures; right?
12          MS. ZANGERLE:  Form.
13          THE WITNESS:  That was questionable.
14          MR. PATEL:  Join.
15          MS. WERNER:  Join.
16  BY MR. CONNELLY:
17     Q.   It was questionable, and it was never determined
18  definitively one way or the other whether there was a
19  fracture on the left tibia; right?
20     A.   That's correct.
21     Q.   Part of the reason you ordered a bone scan was to
22  determine whether or not there was a fracture on the left
23  tibia; right?
24     A.   To corroborate it, yes.
25     Q.   To corroborate it.

1   Q.   I didn't ask who the note was designed for --
2            MS. ZANGERLE:  Tom, let him finish his
3   answer, please.
4            MR. CONNELLY:  He's not answering the
5   questions, Kari.
6            MS. ZANGERLE:  You don't like the answer.
7            MR. CONNELLY:  Because the answer doesn't
8   answer the question.  It's a simple yes-or-no question.
9   BY MR. CONNELLY:
10   Q.   Let me rephrase the question, because maybe you
11   didn't understand it.
12            From what you just said, your -- this
13   language is placed in here either by you or Mr. Walker to
14   communicate to the person conducting the scan the reason
15   for the scan.  Is that what you're saying?
16   A.   Yes.
17   Q.   Okay.  And is it true that you're telling the
18   person conducting the exam that the reason you're asking
19   for the exam is to confirm fractures?
20   A.   Yes.
21   Q.   Okay.  And you're asking for the bone scan to
22   confirm an apparent fracture on the right distal tibia and
23   to determine whether or not there was a fracture on the
24   left distal tibia; right?
25   A.   Yes.

244

1           THE WITNESS:  No.
2    BY MR. CONNELLY:
3       Q.   On 1196, you see the body measurements there?
4       A.   Yes.
5       Q.   And they're the same as we saw at the end-of-visit
6    summary.
7            Do you see the ideal body weight:
8    2.44 kilograms?  Ideal body weight percent -- 215 percent
9    body fat.
10           Is it possible for anybody to have
11   215 percent body fat?
12           MS. ZANGERLE:  Foundation.
13           MR. PATEL:  Join.
14           MS. WERNER:  Join.
15           THE WITNESS:  I'm not -- not that -- not to
16   my knowledge.
17   BY MR. CONNELLY:
18      Q.   Do you see in the height that according to this
19   record, ▓▓▓▓ was in the greater or -- or less than one
20   percentile in height?
21      A.   Yes, I see that.
22      Q.   Do you think that's correct?
23      A.   I'm not sure.  I don't recall his height.
24      Q.   All right.  Based on all your experience as a
25   pediatric orthopedic, have you ever seen a two-month-old

1   child that's less than one percentile in height?
2        A.   Sure.
3        Q.   Okay.  Who's not premature?
4        A.   I don't know.  I'd have to go back and look at all
5   the records of the less than one percentiles I've seen.
6        Q.   Have you ever known it in your experience for a
7   child born 21 inches to shrink in height down to
8   9.05 inches?
9        A.   No.
10              MS. ZANGERLE:  Form and foundation.
11              MR. PATEL:  Join.
12              MS. WERNER:  Join.
13  BY MR. CONNELLY:
14       Q.   Have you ever known it in your experience for a
15  two-month-old child to ever reduce -- have a significant
16  reduction in height?
17              MS. ZANGERLE:  Form and foundation.
18              MR. PATEL:  Join.
19              MS. WERNER:  Join.
20              THE WITNESS:  Height -- height of an infant
21  is not my expertise, but I don't think so.  Not to my
22  recollection.
23  BY MR. CONNELLY:
24       Q.   Do you know whether ▮▮▮▮▮'s head circumference
25  was measured during this visit?

246

1  A. I don't know.
2  Q. Do you see that the body mass index recorded here
3  is 99.05 kilograms?
4  A. Yes.
5  Q. And do you see that the last BMI is
6  17.47 kilograms?
7  A. Yes.
8  Q. Do you believe such a rapid increase in body mass
9  index is normal?
10           MS. ZANGERLE: Form and foundation.
11           MR. PATEL: Join.
12           MS. WERNER: Join.
13           THE WITNESS: No.
14 BY MR. CONNELLY:
15  Q. Do you think that the body mass index of 99.05 is
16 incorrect?
17  A. Appears so, yes.
18  Q. The next page, under outpatient medication
19 profile, it says, Patient currently takes medications as of
20 2/28/19 at 15:03, documented in structured notes.
21      Do you see that?
22  A. Yes.
23  Q. Where are the structured notes?
24  A. I believe that's referring to other notes and
25 records of the patient.

1  has come to see me.
2     Q.  Okay.  In other words, my question -- or another
3  question would be: Is that what the parents told you, that
4  they were there for a bilateral tibia fracture?
5     A.  We -- the parents told me they were there to
6  follow up from a fracture.  I don't recall if they used the
7  phrase "bilateral."
8     Q.  Okay.  The HPI section, is the language in this
9  section language that is typed in contemporaneously during
10 the visit?
11    A.  No.  It's a template.
12    Q.  Okay.  So this is the section that we saw earlier
13 where you said it was an error to keep some of this
14 incorrect language in here; right?
15    A.  That's correct.
16    Q.  Okay.  And so what you say here that was an error
17 is that the patient presents with pain and swelling
18 consistent with a fracture; right?
19    A.  Yes.
20    Q.  Because he didn't have any pain or swelling;
21 right?
22    A.  Correct.
23    Q.  And it's an error to say that the patient was seen
24 at a medical facility and placed in a splint; right?
25    A.  He was seen at a medical facility, but the portion

1   about placing in a splint, yes, was an error.
2       Q.   And it's also an error, the next sentence where it
3   says, The pain was severe, sharp, located over the
4   bilateral lower leg, which have been well controlled with
5   splint and oral pain medication?
6            That whole sentence is incorrect; right?
7       A.   That's true.
8       Q.   What about where it says, Denies -- how do you say
9   that next word?
10      A.   Paresthesias.
11      Q.   [Reading] Denies paresthesias, motor loss, or
12  associated symptoms.
13           Was that something that you asked the parent
14  about and they denied, or was that template language that
15  shouldn't be there?
16      A.   That's template language, although I'm sure we
17  discussed any associated symptoms the child might have had.
18      Q.   What is paraesthesias?
19      A.   Paraesthesias.  Sensation -- abnormal sensations
20  or manifestations of abnormal sensations.
21      Q.   Okay.  Clearly, the child can't tell you whether
22  he's got any abnormal sensations.  So what would be some
23  manifestations that a parent might observe if the child is
24  having abnormal sensations?
25      A.   If you touch a child's extremity and in -- in a

253

1     A.    Yes.
2     Q.    Where it says, Home medications, this section is
3  populated by SCM.
4           You testified at trial that SCM is a software
5  program in relation to these records; right?
6     A.    Yes.
7     Q.    And so I believe it was your testimony that the
8  information in these sections populated by SCM is general
9  template information provided by the software system;
10 right?
11          MS. ZANGERLE:  Form and foundation.
12          THE WITNESS:  Are you talking about this
13 medication section?
14 BY MR. CONNELLY:
15    Q.    Yeah.
16    A.    As I said, typically it populates that based on
17 the patient's medical record.
18    Q.    All right.  The body measurements, these are the
19 same body measurements that we've seen in the two other
20 parts of the record that we looked at.  It.
21          Notes here again that the weight is
22 215 percent of ideal body weight and that -- and you didn't
23 strike any of that out; right?
24    A.    Can you clarify what you mean?
25    Q.    You didn't remove it from the report or do

254

1  anything to confirm whether it was accurate; right?
2      A.   I didn't remove it from the report.  That's true.
3      Q.   Did you do anything to confirm whether it was
4  accurate?
5      A.   The body measurements?  Is that what you're
6  referring to?
7      Q.   Yeah.  Particularly the weight.
8      A.   No.
9      Q.   And then you didn't do anything to confirm the
10 height of 9.1 inches either, did you?
11     A.   Not in this case, no.
12     Q.   All right.  And down in the physical exam, you
13 noted that his -- ▮▮▮▮'s general appearance was normal
14 with no apparent distress and that he was alert; correct?
15     A.   Yes.
16     Q.   Neurological exam, you noted that he was awake,
17 alert, and oriented, that his motor exam was normal, and
18 that he had normal movement of all extremities; correct?
19     A.   Yes.
20     Q.   And in order to test his normal movement of all
21 extremities, you moved his legs around; correct?
22     A.   For -- in regards to range of motion, yes.  And
23 also observed him moving his extremities as far as the
24 motor exam is concerned.
25     Q.   And he was moving his extremities independently on

1    A.    From the initial hospitalization?
2    Q.    Yes.
3    A.    Not that I recall.
4    Q.    Do you know whether your order of a bone scan was
5 communicated to the Department of Child Safety?
6    A.    I don't know specifically that, no.
7    Q.    Did you ever inform anyone at DCS that you had
8 ordered a bone scan?
9              MS. ZANGERLE:  Form and foundation.
10             MR. PATEL:  Join.
11             MS. WERNER:  Join.
12             THE WITNESS:  Not directly, no.
13 BY MR. CONNELLY:
14   Q.    Okay.  When you say "not directly," did you inform
15 them somehow indirectly?
16   A.    It's my understanding that in these type of cases
17 they are privy to all my records, but I didn't have any
18 direct conversations with them.
19   Q.    Okay.  Do you recall having a telephone
20 conversation with Assistant Attorney General Bill Barry
21 about the bone scan?
22   A.    It could be later on in preparation for my first
23 testimony.  It sounds familiar, the name.  I can't tell you
24 specifically without looking at my first testimony of the
25 nomenclature of who those individuals were.

281

1    Q.   What do you remember about that conversation?
2    A.   Nothing different than we have discussed thus far
3　 about the bone scan.
4    Q.   So when you say, "Nothing different than what we
5　 have discussed so far," so by that am I to understand that
6　 you told the assistant attorney general that you were
7　 ordering a bone scan back in February to confirm or rule
8　 out the fractures and that you didn't think one was
9　 necessary any longer in July because it was too remote from
10　 the date of injury?
11            MS. ZANGERLE:  Form and foundation.
12            MR. PATEL:  Join.
13            MS. WERNER:  Join.
14            THE WITNESS:  Yes.
15   BY MR. CONNELLY:
16   Q.   You say up here on July 9 to Ms. Dietzman that, I
17   agree that bone scan this remote from the suspected injury
18   date would be of low utility and -- and would -- thus I
19   would not recommend it at this point.  Right?
20   A.   Yes.
21   Q.   When Ms. Dietzman says that you had seen him for
22   follow-up for the CM -- is that CML or CMI?  What does it
23   say on your -- I can't tell on mine.
24            MS. ZANGERLE:  CML.
25   ///

283

1              (The document was marked as Exhibit 78 for
2    identification.)
3    BY MR. CONNELLY:
4        Q.   Doctor, you've been handed an article from Royal
5    College of Radiologists, clinical radiology study from
6    2005.
7              First of all, reading the -- this is a study
8    by Kemp, which is one of the authors that you cite in your
9    PowerPoint presentation.  Are you aware of this study?
10       A.   Not specifically on first glance.
11       Q.   Okay.  So if I tell you that the study says at
12   page 724 that as far back as the 1980s bone scans were
13   recommended in child abuse cases, would that ring any bells
14   with you?
15       A.   No.
16       Q.   All right.  If I told you that at page 727 Kemp
17   suggests that tentative results should be repeated because
18   more often than not a possible fracture is actually not a
19   fracture, does that ring any bells?
20             MS. ZANGERLE:  Form and foundation.
21             MR. PATEL:  Join.
22             MS. WERNER:  Join.
23             THE WITNESS:  No.
24   BY MR. CONNELLY:
25       Q.   If I told you also at page 727 Kemp says that one

289

1    A.   I believe that's what they're referring to, yes,
2  without reading the article.
3    Q.   Do you know any of these authors?
4    A.   No.
5    Q.   And at the top of the first page, in two separate
6  columns, there is what I'll call the summary of the paper.
7  And from -- this was something that appeared in the
8  seminars of nuclear medicine in October of 1993.
9           In the second column, in the summary, there's
10 a sentence that begins, The importance of.
11          [Reading] The importance of bone scintigraphy
12 is its complementary nature in defining and characterizing
13 the extent and severity of trauma from child abuse.
14          Do you see that?
15          MS. ZANGERLE:  Form and foundation.
16          MR. PATEL:  Join.
17          MS. WERNER:  Join.
18          THE WITNESS:  Yes.
19 BY MR. CONNELLY:
20   Q.   So my take on this article is that it is
21 suggesting that a bone scan should be part of detecting
22 whether or not there are actually fractures present in
23 cases of suspected abuse.  Do you disagree with that notion
24 as a general principle regarding bone scans?
25          MS. ZANGERLE:  Form and foundation.

290

1           MR. PATEL: Join.

2           MS. WERNER: Join.

3           THE WITNESS: Are you asking me about this
4 specific article?

5 BY MR. CONNELLY:

6   Q. No. I'm asking you about the proposition that I
7 just postulated: that a bone scan is part of or should be
8 part of best practices in cases of fractures where abuse is
9 the suspected mechanism.

10           MS. ZANGERLE: Form and foundation.

11           MR. PATEL: Form and foundation.

12           MS. WERNER: Join.

13           THE WITNESS: I would say it's a
14 complementary test, just as this article describes.

15           MR. CONNELLY: Okay. With that, Doctor, I
16 thank you. I'm not going to ask you any more questions. I
17 don't intend to ask you any more questions. Let me put it
18 that way.

19           MR. PATEL: Nothing.

20           MS. ZANGERLE: I have a couple questions.

21

22                   EXAMINATION

23 BY MS. ZANGERLE:

24   Q. Dr. Wood, you were shown Exhibit Number 79 today,
25 which is an article. Primary author is David Ayoub. And

```
 1   STATE OF ARIZONA    )
                         ) ss.
 2   COUNTY OF MARICOPA  )

 3              BE IT KNOWN that the foregoing proceedings
     were taken before me, CINDY MAHONEY, a Certified Reporter,
 4   in and for the County of Maricopa, State of Arizona; that
     the witness, before testifying, was duly sworn to testify
 5   to the whole truth; that the questions propounded to the
     witness and the answers of the witness thereto were taken
 6   down by me in shorthand and thereafter reduced to
     typewriting under my direction; that the witness will read
 7   and sign said deposition; that the foregoing pages are a
     true and correct transcript of all proceedings had, all
 8   done to the best of my skill and ability.
                I CERTIFY that I am in no way related to
 9   any of the parties hereto; nor am I in any way
     interested in the outcome hereof.
10              I FURTHER CERTIFY that I have complied with the
     ethical obligations set forth in ACJA 7-206(F)(3) and
11   ACJA 7-206(J)(1)(g)(1) and (2).

12
     Cindy Mahoney                                          50680
13   _____           _____
     Certified Reporter                              CR Number
14
          [signature: Cindy Mahoney]
15
     _____           _____
16   Certified Reporter (Signature)                    Date

17
                I CERTIFY that this Registered Reporting Firm has
18   complied with the ethical obligations set forth in ACJA
     7-206(J)(1)(g)(1) and (2).
19
20   Carrie Reporting, LLC                                 R1064
     _____           _____
21   Registered Reporting Firm                       RRF Number

22
          [signature: Batel Pakanaew]
23
     _____           _____
24   Registered Reporting Firm                           Date
     (Signature)
25
```