EXHIBIT 33

Reporter's Transcript of Recorded Proceedings

```
            IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

                  IN AND FOR THE COUNTY OF MARICOPA



                                        )
   IN THE MATTER OF:                    )
                                        )
   DEPARTMENT OF CHILD SAFETY,          )
                                        )
   vs.                                  )No. JD37152
                                        )
   HONOR DUVALL and DONALD              )
   SANKEY,                              )
                                        )




         TRANSCRIPTION OF ELECTRONICALLY RECORDED PROCEEDINGS
                   HEARING, DAY 2, AUGUST 16, 2019




   TRANSCRIBED BY:
   Lori L. Thielmann, CR, RPR
   Certified Reporter
   Certificate No. 50877

   PREPARED FOR:
   Georgia Staton

   (Original)
```

1    Q.   Okay.  In there, where it says HPI, what does that
2 stand for to the best of what your understanding is?
3    A.   History of present illness.
4    Q.   In there it talks about a splint.  Is it your
5 understanding there was ever a splint on this child?
6    A.   No, I don't believe so.
7    Q.   Okay.  Any other -- if there was any other
8 inaccuracies in the HPI section, would that have any real
9 bearing on your examination or opinion as to the diagnosis
10 and treatment of Swayde?
11    A.   No.  So --
12    Q.   Go ahead.
13    A.   I'm happy to elaborate.  We use scribes to help us
14 with dictation of notes realtime in the clinics and
15 there's, you know, some generic templating of phrases,
16 especially in the first line or two of the HPI section,
17 which often can be applied to the facts as we see, and I
18 review those notes after they're completed before signing
19 off, but in this one, there was a bit of an oversight.  A
20 few of those words in the first sentence or two of the HPI,
21 I don't believe are accurate.
22    Q.   Did that have any bearing on your initial
23 examination -- I guess, let me ask you.  Did it set you on
24 a course of kind of feeling a little biased towards any
25 type of diagnosis or treatment plan?

1    A.   No, I don't believe so.

2    Q.   Okay.  And finally, Doctor, with regard to the
3 skeletal exam that you reviewed and the radiology -- and
4 the diagnostic tests from Valley Radiology, did -- were
5 those -- were both -- were all of those diagnostic tests
6 consistent?  Were there any deviations?  Do they basically
7 show the same thing?

8    A.   Yes.  I would say they showed the same thing.

9         MR. BARRY:  Your Honor, no further questions.

10        THE COURT:  All right.  Thank you.  Ms.
11 Hartman?

12                   CROSS-EXAMINATION

13 BY MS. HARTMAN:

14   Q.   Dr. Woods, you were asked some questions regarding
15 the State of the fractures and just for our benefit, in
16 terms of a child and their bone density and structure, is
17 it difficult to fracture a baby's bones, is it harder to
18 fracture's an adult's bones?  Can you kind of just give us
19 a breakdown of that quickly.

20   A.   Well, in general, children's bones are growing
21 rapidly and that can predispose them to fracture more
22 readily with similar forces as opposed to an adult, I guess
23 is what you're asking.

24   Q.   Okay.  So once we are fully grown, our bones are
25 at their strongest, would you say?

1    A.   As a general statement, I think that's fair to
2  say.  They're stronger, yeah.
3    Q.   Okay.  And, yeah, just to be clear on the medical
4  records, you know, it indicates that --
5              MS. HARTMAN:  This is Bates stamp 1373, your
6  Honor.
7  BY MS. HARTMAN:
8    Q.   It was well controlled with splint and oral pain
9  medications.  So I know Mr. Barry asked you about the
10 splint and you said from your recollection he didn't have a
11 splint.
12   A.   Correct.
13   Q.   Okay.  And what does a splint look like?  Could
14 you describe it to us?
15   A.   Generally, it's a padding combined with a plaster
16 or fiberglass coating to immobilize the extremity or limb.
17   Q.   Okay.  And then is the part about the oral pain
18 medications, do you recall if he was on pain medications?
19   A.   Not that I recall, he -- not that I recall he was
20 not, no.
21   Q.   So was this a situation where your scribe maybe
22 copied and pasted something incorrectly, or could just you
23 clarify that for the Court?
24   A.   Yeah, not a copy and paste, but it's a template
25 that we use to import relative data that's often similar

1  standard walking and they can't describe when they're in
2  pain, you know, verbally with words or things like that so
3  it's more in an inference.
4      Q.  And upon -- if this child had a fresh fracture on
5  the right lower extremity and it was just a day or two old,
6  upon physical examination, a physician on touching that
7  area, the child would demonstrate discomfort, wouldn't it?
8      A.  Most likely, yes.  Although, again, it's sometimes
9  difficult to tell in a two-month-old.
10     Q.  Okay.  But isn't part of an initial exam,
11 particularly if there is concern about fractures, doing
12 what you did in your evaluation on February 28th, checking
13 out the range and manipulating gently the limbs of the
14 child.
15     A.  If there was a question as to whether or not there
16 was a fracture, yes.
17     Q.  Okay.  And an absence of pain would contraindicate
18 a new fracture, wouldn't it?
19     A.  In general, I would say that's a fair statement,
20 yes.
21     Q.  Okay.  Let's get back to your records, Dr. Woods.
22 In your records in the HPA section in Bates No. 1373, when
23 it notes on the third line down that the pain was severe,
24 sharp, located over the bilateral lower leg, you're
25 indicating that didn't apply to the child you observed?

108

1   A.   That's true.
2   Q.   And when it went onto say, it's been
3   well-controlled with splint and oral pain medications, that
4   also did not apply to the child you observed?
5   A.   That's true.
6   Q.   Okay.  And in the bottom section of that page when
7   it says drug, A-C-E-T-A-M-I-N-O-P-H-E-N.  That's a pain
8   medication, isn't it?
9   A.   Yes.
10  Q.   160 milligrams backslash five milliliters, that
11  also was not something that was prescribed to this child.
12  Isn't that correct?
13  A.   I would have to go back and look at the record of
14  what was prescribed.  I didn't to my knowledge prescribe
15  that to him, no.
16  Q.   Okay.  And if it would have said an instruction,
17  orally every four hours as-needed, moderate pain or a pain
18  score 4 to 7 to severe pain; that -- to your knowledge,
19  from what you saw of this child, that didn't apply to
20  child; correct?
21  A.   As far as him needing that, I would agree, yes,
22  that he would not need that, uh-huh.
23  Q.   Okay.  Now, mother was referred to you by PCH, by
24  Phoenix Children's Hospital, because I think as you
25  indicated there was a concern of nonaccidental trauma;

181

1          BE IT KNOWN that the foregoing audio
2  recording was transcribed by me, Lori L. Thielmann, a
3  Certified Reporter; that the 181 pages contained herein
4  are a true and correct transcript of the recording, all
5  done to the best of my skill and ability.
6          I FURTHER CERTIFY that I am in no way
7  related to any of the parties hereto, nor am I in any way
8  interested in the outcome hereof.
9          DATED this 22nd day of March, 2021.

12                          /s/  Lori L. Thielmann
13                          LORI L. THIELMANN, CR RPR
                            Certified Reporter
14                          Certificate No. 50877