# EXHIBIT 42

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                        DISTRICT OF ARIZONA
 3
     Honor Duvall, et al.,              )
 4                                      )
             Plaintiffs,                )
 5                                      )
     v.                                 )  No. 21-CV-00167-ROS
 6                                      )
     Arizona Department of Child        )
 7   Safety, et al.,                    )
                                        )
 8           Defendants.                )
                                        )
 9   _____)
10
11
12                  DEPOSITION OF KIMBERLY PENDER
13
                          Phoenix, Arizona
14                         April 14, 2023
                             9:29 a.m.
15
16
17
18
19
20   CERTIFIED COPY
21
22   Reported by:                         CARRIE REPORTING, LLC
     CARRIE A. CARIATI                    Certified Reporters
23   Registered Professional Reporter     2415 East Camelback Road
     Certified Realtime Reporter          Suite 700
24   Certified LiveNote Reporter          Phoenix, AZ 85016
     Arizona CR No. 50355                 (480)429-7573
25   carrie@carriereporting.com
```

1     *A.*     I don't remember that either, no.
2     *Q.*     Did you yourself ever reach a determination
3 about whether temporary custody should be taken and a
4 petition filed?
5     *A.*     In our staffings it may be we got to that point.
6 I don't remember the specific content of our conversation.
7     *Q.*     And you don't have to give me the specific
8 content, but do you remember conversations where there was
9 a discussion and maybe some back-and-forth and some
10 disagreement about what should be done in regards to
11 temporary custody?
12         MR. PATEL:  Form and foundation.
13         THE WITNESS:  With Duncan and Lucero, they
14 talked about -- I remember discussions about safety
15 planning, and I remember discussions about the
16 court-authorized removal.
17 BY MR. CONNELLY:
18     *Q.*     The court-authorized removal, meaning the taking
19 of temporary custody?
20     *A.*     Yes.
21     *Q.*     And what do you remember about those
22 discussions?
23     *A.*     I remember different stages of it with -- you
24 know, in the beginning with the planning of the child
25 staying in the home with responsible adult. I remember

1 extending things to get more information.
2     *Q.*    "Things" being the Present Danger Plan?
3     *A.*    The plan -- yes, the plan, to get more
4 information, and then the court-authorized removal being
5 submitted. I don't know when it was -- like, date and
6 time it was served. I remember them requesting a
7 court-authorized removal.
8     *Q.*    Before they requested the court-authorized
9 removal, there had been some discussion about whether or
10 not a request for court-authorized removal should be made,
11 right?
12            MR. PATEL: Form and foundation.
13            THE WITNESS: Yes, I believe so.
14 BY MR. CONNELLY:
15     *Q.*    And that was a staffing that would have occurred
16 between you and Duncan and Lucero as well, right?
17     *A.*    Yes.
18     *Q.*    What was the discussion at that time amongst the
19 three of you?
20     *A.*    I know we had talked about getting the CAR, the
21 court-authorized removal, but continuing to gather
22 information throughout the process.
23     *Q.*    Do you recall whether there was some
24 disagreement between the three of you about whether
25 court-authorized removal should be sought at that time or

```
 1  BY MR. CONNELLY:
 2      Q.   Rare, but they sometimes happened?
 3              MR. PATEL:  Form and foundation.
 4              THE WITNESS:  I would guess that they
 5  sometimes happened.
 6  BY MR. CONNELLY:
 7      Q.   Has it ever happened in your experience as an
 8  OCWI regional manager?
 9      A.   I have sought the chief in other cases.
10      Q.   But not in this case?
11      A.   No.
12      Q.   So do you recall specifically what Duncan was
13  saying he wanted to do in relation to removal?
14      A.   I don't recall specifics, no, or what direction
15  he was requesting.
16      Q.   Do you recall specifics or what direction Lucero
17  was requesting?
18      A.   No.
19      Q.   Is it your recollection that as a result of that
20  staffing, you made a decision about whether or not it
21  should be sought?
22              MR. PATEL:  Form.
23  BY MR. CONNELLY:
24      Q.   "It" being removal.
25      A.   My understanding of the conversation was that we
```

```
 1  all agreed to get a court-authorized removal and continue
 2  to get information.
 3       Q.   And would it surprise you to learn that
 4  Mr. Duncan and Ms. Lucero have a different recollection of
 5  that whole decision-making process?
 6              MR. PATEL:  Form and foundation.
 7              THE WITNESS:  That is surprising to me,
 8  yes.
 9  BY MR. CONNELLY:
10       Q.   Do DCS cases ever go as high up as the governor
11  or the governor's office for input?
12              MR. PATEL:  Form and foundation.
13  BY MR. CONNELLY:
14       Q.   That you are aware of.
15       A.   Not that I am aware of.  I would imagine people
16  reach out from anywhere and everywhere, but I don't think
17  they have ever gone for a decision.
18       Q.   I mean from within the Department.  Does it ever
19  go from within the Department up to that level?
20              MR. PATEL:  Same objection.
21              THE WITNESS:  Not that I am ever aware of.
22  Sorry.
23  BY MR. CONNELLY:
24       Q.   As a regional manager in 2019, did you have any
25  budgetary responsibilities?
```

1  *A.*  Yes.
2  *Q.*  That means that temporary custody had been taken
3  before the date of this filing, right?
4  *A.*  Yes.
5  *Q.*  Do you know whether the removal order was served
6  at the time the child was discharged from PCH from the
7  second hospitalization?
8  *A.*  I would imagine that's when it was served.  I
9  don't know the specific date the child was discharged.
10  *Q.*  Do you recall specifically that that was a
11  determination that had been made with you and Duncan and
12  Lucero to serve this removal order at that time, or had
13  you guys not made that determination and then it was
14  served because Mr. Duncan had been ordered to serve it by
15  the director?
16            MR. PATEL:  Form.
17            THE WITNESS:  I don't remember a
18  conversation of me saying you need to serve XYZ.  I
19  remember us talking about, we are coming down to that time
20  frame of we have to make a decision, and we need to
21  prepared based on the information we have.
22  BY MR. CONNELLY:
23  *Q.*  So I want to make sure I understand what you
24  just said.  Okay?
25            If I understand correctly what you just

1  said is that when you and Duncan and Lucero had the
2  staffing about serving this removal order, the three of
3  you together did not come to a decision on exactly if or
4  when to serve it; is that correct?
5                 MR. PATEL:  Form and foundation.
6                 THE WITNESS:  Yes, correct.
7                 MR. CONNELLY:  You want to take a lunch
8  break now?  Should we take half an hour, is that enough,
9  or do you need a little more time?
10                MR. PATEL:  That's fine.
11                MS. PATANE:  I am just going to stay in
12 here.
13                (Recess ensued from 12:11 p.m. until
14 1:03 p.m.)
15 BY MR. CONNELLY:
16     Q.   We left off talking about the temporary custody
17 order or the court-authorized removal.
18                Do you know whether an application for a
19 court-ordered removal had been filed in February, like
20 around the 28th or so of February?
21     A.   I believe there were two filed.
22     Q.   There were two, right?
23     A.   I believe so.
24     Q.   There was one filed before what we looked at as
25 Exhibit 27.  Okay.