Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
GILLESPIE, SHIELDS & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Arizona Department of Child Safety, *et al.*, <br> Defendants. | Case No.: 21-cv-00167-ROS <br><br> **PLAINTIFFS' OMNIBUS *DAUBERT* MOTION AS TO ELEVEN EXPERTS RETAINED BY PCH DEFENDANTS AND DEFENDANT CASSSIDY** <br><br> **(Hon. Roslyn O. Silver)** <br><br> **(Oral Argument and Daubert Hearing Requested)** |

Plaintiffs, by and through undersigned counsel, request this Court to prohibit Defendants Phoenix Children's Hospital, Katheryn Coffman, William Wood, and Hailey Dietzman (collectively, "PCH" or "PCH Defendants") and Defendant Brendan Cassidy (collectively with PCH, "Defendants") from offering at trial, expert testimony from their combined eleven retained testifying experts that is unreliable, false, or both. Defendants' experts' intended testimony, at least to the extent those experts intend to opine that S.Z.S.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

was a victim of abuse via Shaken Baby Syndrome/Abusive Head Trauma ("SBS/AHT"), does not satisfy the reliability standards of Fed.R.Evid. 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As such, those experts' testimony in at least that regard is inadmissible as a matter of law and must be precluded. This Motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  OVERVIEW

This is a simple and tragic case – one which has arisen because of Defendants' staunch refusal to accept responsibility for their wrongful actions in overstepping their limited role as medical consultants in a child abuse investigation to effectively overrule and run roughshod over the Department of Child Safety ("DCS") Office of Child Welfare Investigations ("OCWI") personnel investigating the case – the professionals whose role it was to conduct a child abuse investigation and then determine whether the child's safety was at risk such that he needed to be removed from the care and custody of his parents, as is more fully discussed in Plaintiffs' Motion for Partial Summary Judgment (Doc. 319).[1] In effect, Defendants took on DCS's role themselves. They embarked on this misguided course of action because they are fierce adherents to and believers of the Shaken Baby Syndrome, now usually referred to in pediatric circles as Abusive Head Trauma as a way of distancing the syndrome from its inherent, unavoidable, unprovable, and non-scientifically supported causation elements. While Defendants claim, and will continue to claim, that SBS/AHT is widely accepted medical science, that simply is not true. While SBS/AHT is widely accepted in the so-called mainstream pediatric medical community, it is not so much accepted in the broader medical and scientific community outside of pediatrics, which now

---

[1] To the fullest extent possible, exhibit citations herein will be to exhibits already in the docket as part of Plaintiffs' motion for partial summary judgment (Doc. 319). If citation to an exhibit that is not an exhibit to Doc. 319 is necessary, that exhibit will be attached to this motion.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

has its own cottage industry in child abuse pediatrics – witness the modern proliferation of "Child Protection Teams" in children's hospitals nationwide. Nor is SBS/AHT widely accepted as being based on sound science by the scientific disciplines implicated by the syndrome, such as biomechanics, for instance, which is why court after court across the nation (and worldwide) preclude expert opinion testimony about shaking, i.e., SBS/AHT, as the cause of subdural hematomas, retinal hemorrhages, and transient or brief changes in mental state, such as lethargy, particularly when those conditions occur in concert in a non-ambulatory child, such as S.Z.S. without there being obvious causation, like falling from great heights, being crushed by a great weight or involved in a high-speed vehicle accident, or being violently thrown against a wall striking one's head.

When S.Z.S. was brought to PCH by his mother out of her concern for his health and well-being in February 2019 because he was a little fussy, lethargic, not eating as much as usual, with a bruise-like spot above his diaper line that mother did not recognize, and having brown or pink hued spit up, he was misdiagnosed by a young, inexperienced resident doctor as having "unexplained bruises" over many areas of his body. *Compare* (Doc. 319-4 at PCH1272 cycn) *and* (Doc. 319-5 at PCH 1259 cycn). The parents believed their son's symptoms were largely caused by a cold-like virus they had passed between each other, reasonably believing it had passed to their son.[2] (Doc. 319-3 at BPD000008). When mother could not otherwise explain his symptoms or how her son received those "bruises" (because they were actually Mongolian spots,[3] not bruises), the PCH child abuse protocol apparatus sprung into gear. The child was subjected to skeletal surveys and CT scans of his head, all without parental consent, misdiagnosed with bilateral tibial fractures, and found to have

---

[2] Indeed, the child had lab results consistent with a viral infection. (Doc. 319-4 at 1358-1360 cycn).

[3] Mongolian spots are a kind of birthmark in which collections of melanocytes in the layers of the skin produce different coloring on the skin; they can appear weeks after birth and are common among person of African descent. (Doc. 319-7 at 231.)

undatable collections of blood or fluids in his head. (Doc. 319-5 at PCH 1264 cycn; Doc. 319-12). When the parents did not have an explanation for how their 2-month-old son had sustained bilateral tibial fractures and brain bleeds, Defendants quickly jumped to the conclusion that the child was a "shaken baby." (Doc. 319-23.) Defendant Cassidy, a pediatric ophthalmologist and self-described warrior for AHT victims, (Doc. 319-17 at 108:3-5, 7-9, 13-17; Doc.319-18 at 62:7-10, 62:20-63:1; 64:6-9, 64:11-65:2, 66:9-11, 19-21, 66:23-67:19, 68:3-11, 17-25, 69:3-8), was then brought in by the PCH Child Protection Team ("CPT") to solidify the shaken baby diagnosis, if only he could round out the dogmatic triad (or "constellation of findings", as PCH likes to say) with findings of retinal hemorrhages.[4] Sure enough, Dr. Cassidy found that the child's retinas were "painted with blood." (Doc. 319-20 *but see* Doc. 319-13 at DUVALL_001767; Doc. 319-19 at 4.) Of course, the parents could not explain that finding either, which only made it more obvious to Defendants that these parents were hiding the fact that they were abusing their son. (Doc. 319-25). Thus, according to Defendants, the child was in grave danger vis-à-vis his parents. *Id*. PCH CPT then made a report of suspected abuse to the Buckeye Police Department and DCS abuse hotline, which sparked criminal child abuse investigations by each agency.

In mid-March 2019, almost four weeks after he first presented to the PCH emergency department, DCS's investigation was ongoing and the child remained in the legal custody of his parents, although the parents' contact with the child was limited and subject to being supervised by the maternal great grandmother as a safety monitor.[5] (Doc.

---

[4] The classically recognized SBS/AHT "triad" consists of (1) subdural hemorrhaging, (2) retinal hemorrhaging, and (3) a change in consciousness or swelling in the head. *See* **Ex. 1** at 2-14 (amicus brief of concerned scientists); **Ex.2** at 9-13 (amicus brief Center for Integrity of Forensic Sciences); **Ex. 3** at DUVALL_4607-4610, 4612, 4614. (ABA Article re SBS).
[5] The BPD criminal investigation was also ongoing at that time; however, it was soon concluded without a criminal referral to the county prosecutors and without any criminal charges leveled against the parents (or the maternal grandmother who was also identified as a potential perpetrator of the suspected abuse). (Doc. 319-3 at BPD000020).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

319-24). However, this was insufficient and unsatisfactory to the PCH CPT, particularly PCH Defendants Coffman and Dietzman. After Coffman's attempt at that time to influence the DCS OCWI investigating supervisor Jeff Duncan failed to result in his agreement to take temporary custody of the child, completely prohibit the parents' contact with the child, and file a dependency petition, Coffman took her complaints and desires to the head of DCS, then Director Greg McKay. (Doc. 319-40). Coffman and McKay had a long-standing relationship as colleagues in the child abuse investigations community and soon after he was elevated from his position in OCWI to DCS Director in February 2015, he hired Coffman as politically appointed child abuse consultant at DCS. *Id*. Only a day few days, at most, after Coffman contacted him by email and phone about S.Z.S., McKay ordered his OCWI investigation team, i.e., Duncan and Lucero, to remove S.Z.S. from the legal custody of his parents by taking temporary custody of the child and to file a dependency petition. (Doc. 319-41 at 130:6-25; 131:1-2, 14-25; 133:1-13; **Ex. 35** at 224:12-225:2; **Ex. 42** at 63:2-64:22; 78:19-79:2, 92:23-93:6; **Ex. 21** at AZDCS017828). That is then what the DCS investigators did in mid-March 2019, even though they were hesitant to do so because they considered their abuse investigation to be ongoing. *Id*.

In August 2019, a dependency trial was held over four days based on Defendants' "suspicions" that S.Z.S. was a victim of abuse at the hands of his parents. (Doc. 319-22 at DUVALL_000051). Defendants Cassidy, Coffman, and Wood all testified for the State (i.e., DCS). The juvenile court found the evidence of abuse so lacking that the State could not even satisfy the low bar of proof by a preponderance of the evidence. *Id*. at DUVALL_000052, DUVALL_000057. The juvenile court expressly found that Defendant Cassidy was not a credible witness and made a special note of the fact that his observation of the child's retinas being "painted with blood" was not verified by any other credible evidence. *Id*. at DUVALL_000053. Rather, the juvenile court found, the credible and unbiased evidence showed that the child's retinas were not painted with blood and that he

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

had not been injured or abused in any of the ways Dr. Cassidy hypothesized as potential causes for what he purported to see on examining the child. *Id*. at DUVALL_000053-54. The juvenile court also found that PCH's medical records, including those of Dr. Wood, the pediatric orthopedic surgeon, were riddled with material errors and false information which prejudiced readers of those records, including Dr. Coffman, towards also finding abuse where it did not exist. *Id*. at DUVALL_000054-55. The juvenile court thus expressly found that S.Z.S. was not a victim of abuse, dismissed the dependency petition, and immediately returned the child to the care and custody of his parents. *Id*. at DUVALL_000057-8.

During the investigation process kicked off by PCH's report of suspected abuse to the DCS abuse hotline, right around the time that Defendants, particularly Dr. Coffman, were exerting their greatest amount of pressure on DCS to take temporary custody of the child, file a dependency petition, and prevent the parents from having any contract with the child, all of which was against the measured investigative approach being employed by the DCS investigators, Dr. Coffman heard that someone at DCS had allegedly told S.Z.S.'s parents that they should sue PCH. (Doc. 319-40.) That was foreshadowing at its best – the present lawsuit soon followed the dismissal of the dependency proceeding as a direct response to Defendants' lawlessness. Not having any humility or the ability for self-reflection to see where they might have gotten it wrong, coupled with the grace to admit they were wrong and seek a settlement of the claims against them, Defendants instead have retained eleven highly credentialed experts to, in effect, overrule the factual findings and final judgment of the juvenile court. Defendants' lineup of eleven heavyweight experts, all of them from pediatrics and most of them child abuse practitioners, intend to prove via their opinions, based on their review of the flawed PCH medical records, and without ever having examined S.Z.S. themselves, that S.Z.S. was a victim of abuse via shaking, that is, SBS/AHT. The problem is that their opinions in that regard do not meet the reliability criteria of Rule 702 and/or *Daubert*.

6

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## II.   DEFENDANTS' RETAINED EXPERTS

Defendants' experts not only relied on PCH's flawed medical records, which the juvenile court found to "contain significant errors," but they also intend to opine about the controversial "diagnosis" of SBS/AHT, which, at best, is based on faulty medical science, but more accurately, is based on junk science. Their reports are also replete with speculation and qualifiers, such as, "suspicious", "most likely", "suggest", "probable", "highly specific for", "nearly", "strongly favor", or the like. Defendants' experts' anticipated testimony is briefly summarized by Defendants and their experts as follows:[6]

### A.   PCH Defendants' Experts

1.   Steven Frick, M.D.

Dr. Frick is an orthopedic surgeon at a children's hospital who "routinely evaluate[s] children for suspected non-accidental trauma (SNAT)."  Dr. Frick's testimony will include "that the only plausible cause of S.Z.S.'s [purported] right distal tibia medial metaphyseal corner fracture was non-accidental trauma." (Doc. 146 at 10:9-11; *see also* Doc. 130-1 at 64 ("The findings on the right leg alone would place SNAT in my differential diagnosis due to the child being non-ambulatory….and absent a history of trauma, non-accidental trauma is the only plausible and reported cause for this type of injury.").)

2.   Joseph Grubenhoff, M.D.

---

[6] In addition to their opinions on liability, several of Defendants' experts offer opinions on the credibility of Plaintiffs' experts. Such testimony is not permissible expert testimony and should be precluded at trial as a matter of law. *See United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973) cert. denied 416 U.S. 959 (1974) ("Competency is for the judge, not the jury. Credibility, however, is for the jury – the jury is the lie detector in the courtroom."); *United States v. Awkard*, 597 F.2d 667, 669-70 (9th Cir. 1979) (Rule 608 limits opinion testimony on witness credibility to character for truthfulness, all other opinions on credibility are for the jury); *State v. Moran*, 151 Ariz. 378, 382 (1986) ("We see no reason to risk influencing the jury's credibility determination by allowing expert opinion on a witness's believability….Rule 702 precludes admission.").

7

Dr. Grubenhoff, M.D., is a pediatrician practicing in pediatric emergency medicine at a children's hospital who lectures on child physical abuse and has cared for purported child victims of suspected non-accidental trauma. He is expected to testify "that based upon S.Z.S' presentation of injuries, reporting of suspected child physical abuse would be required to authorities under the standard of care and according to the PCH Policy Child Abuse and Neglect."  (Doc. 146 at 10:24-26; Doc. 130-1 at 101, 106.)

3.    Jonathan Horton, M.D.

Dr. Horton, a pediatric ophthalmologist at a children's hospital, will testify "that the injuries present at the time of [S.Z.S.'s February 2019] admission [to PCH] suggest non-accidental trauma as the most likely cause." (Doc. 146 at 11:2-3, 20-21; *see also* Doc. 130-1 at 137 ("…the injuries present at the time of the initial admission to PCH on 02/21/2019 suggest non-accidental trauma as the most likely cause.").)

4.    Charles Maxfield, M.D.

Dr. Maxfield, a pediatric radiologist at Duke University who is expected to testify that "[b]ucket handle-type metaphyseal fractures are highly specific for, and nearly pathognomonic of, intentionally inflicted child abuse" and that he "would strongly favor non-accidental trauma in the differential diagnosis…." (Doc. 146 at 12:7-8; Doc. 130-1 at 204.)

5.    David Mirsky, M.D.

Dr. Mirsky is a pediatric neuroradiologist at a children's hospital experienced in "reviewing imaging for pediatric non-accidental neurotrauma" who will testify that in his opinion the CT and MRI taken of S.Z.S.'s head "shows injuries consistent with trauma" and "provides foundation for considering abusive head trauma (non-accidental trauma)" "given no other credible explanation for the injuries". (Doc. 146 at 12:19-20, 22, 24; Doc. 130-1 at 233.)

6.    Corey Rood, M.D.

8

Dr. Rood is a forensic pediatrician board certified in Child Abuse Pediatrics who heads up the Child Abuse Pediatrics Division at a children's hospital, the Child Abuse Services Team at a medical clinic, and the Child Abuse & Prevention Team at a women's hospital. Dr. Rood is expected to testify that the child's "constellation of injuries" are collectively "most consistent with a medical diagnosis of abusive head trauma" via "high velocity acceleration-deceleration trauma" such as "violent shaking trauma". He is expected to go a step further to opine that the "injuries happened on more than one occasion." (Doc. 146 at 13:2-10; Doc. 130-1 at 263-265.)

7.     Lewis Phillip Rubin, M.D.

Dr. Rubin is a pediatric neonatal-perinatal physician who will testify that "there is no other reasonable explanation for the child's constellation of signs and symptoms other than SNAT [suspected non-accidental trauma]." (Doc 146 at 3, 14:8-10; Doc. 130-1 at 291.)

8.     Lisa Sansalone, M.S.N., R.N., C.P.N.P.-A.C

Ms. Sansalone is an acute care pediatric nurse practitioner who will testify "it was appropriate for the pediatric trauma team to note the constellation of injuries was 'highly suggestive of inflicted trauma" but that the "pediatric trauma team does not make a definitive diagnosis of non-accidental trauma" and that is it of that team "or any consultants/providers, to determine who inflicted the harm. The pediatric trauma team does not fulfill an investigative role", that "is the role of law enforcement and state child protection workers." (Doc. 146 at 14:15; Doc. 130-1 at 352.)

9.     Sarah Ann Wagner, M.D.

Dr. Wagner is an obstetrician/gynecologist at a teaching hospital. She will testify that "laboring down may increase risk of infection [and] hemorrhage" but that "there are no indications in the medical record that lead one to believe that the infant's bucket handle

9

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

fracture is related to the mother's labor and delivery."[7] (Doc. 146 at 14:22-23; Doc. 130-1 at 362.)

        10.    Judy Walczak, R.N., C.P.N.P.

Ms. Walczak is a forensic nurse practitioner on the Child Advocacy and Protection Team at a children's hospital and a member of the American Professional Society on the Abuse of Children who will testify that "[i]t is not the responsibility of the Forensic NP to identify the perpetrator of violence, but only to evaluate whether the injuries presented could be the result of SNAT", and that Dietzman was correct to "identify the child's injuries as being associated with SNAT…." (Doc. 146 at 15:8-9; Doc. 130-1 at 378, 381.

## B.    **Defendant Cassidy's Expert**

        1.    Alan Levin, M.D.

Dr. Levin is a pediatric ophthalmologist certified in child abuse pediatrics who served on the executive committee of the Section on Child Abuse and Neglect of the American Academy of Pediatrics and has received an award for his contributions in the field of child abuse from an honorary industry society organization strictly focused on child abuse. Dr. Levin will testify that he "believes that the child's retinal hemorrhages are the result of abusive head trauma, most likely associated with repetitive acceleration-deceleration." (Doc. 310-9 at 7 of 8, ¶ 7 (last paragraph of report).

## III.    FAULTY "MEDICAL" SCIENCE

Contrary to popular belief, medical science is not settled. Medical professionals and researchers constantly learn more about the human body, leading to changes in diagnoses and treatment for medical conditions, and shifts in medical thinking. The natural consequence of scientific and medical progress is evidence once thought to be credible may be proven inaccurate and unreliable over time. Shaken Baby Syndrome ("SBS") is a prime

---

[7] Plaintiffs do not assert, and have never asserted, that the child's purported right tibial fracture, assuming one existed, which it did not, was caused during or related to mother's labor and delivery.

example of "medical science" that has proven flawed over time. *See, e.g.,* **Ex. 1** (Amicus Brief to the U.S. Supreme Court by 16 current and retired forensic scientists, forensic pathologists, medical examiners, pediatric radiologists, pediatric neurologists, pediatric pathologists, emergency medicine physicians, biomechanical engineers, and others); **Ex. 2** at §§ I, II (Amicus Brief to the U.S. Supreme Court by The Center for Integrity in Forensic Sciences); **Ex. 3** at DUVALL_004614 (ABA article noting that "[s]haking is an unlikely mechanism for the injuries often attributed to it."). SBS is now considered to be devoid of scientific merit by the same doctor who pioneered the diagnosis in the 1970's. *See, e.g.*, Josep Shapiro, *Rethinking Shaken Baby Syndrome*, NPR (June 29, 2011), https://www.npr.org/2011/06/29/137471992/rethinking-shaken-baby-syndrome. Given the lack of scientific support for the specific mechanism of shaking, pediatricians are now encouraged to use the term "Abusive Head Trauma" ("AHT") in place of "Shaken Baby Syndrome" because the new term is more expansive and does not require physicians to identify a precise mechanism of injury.

### A.   <u>Background</u>

Beginning in the 1970's, some physicians began advancing a hypothesis that, if an infant or young child became very ill or died without an obvious reason why, and the baby had a certain "triad" of findings – typically, (1) blood in the subdural area around the brain (subdural hemorrhage); (2) microscopic bleeding within the retina (retinal hemorrhage); and (3) encephalopathy (damage of the brain itself sometimes accompanied by comatose state or some change in affect, such as lethargy) and/or cerebral edema (brain swelling) – that *might* mean the baby had been violently shaken. *See* A. Norman Guthekelch, 2 BRITISH MED. JOURNAL 430 (1971, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1796151/; John Caffey, *On the Theory and Practice of Shaking Infants*, 124 AM. J. DIS. CHILD 161 (1972). They soon named this constellation of symptoms "Shaken Baby Syndrome." Those advocating the hypothesis claimed that the constellation of physical findings is virtually

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

11

unique to violent shaking alone or with impact. *See, e.g.*, Letter to the Editor, Chadwick, *et al.*, *Shaken Baby Syndrome: A Forensic Pediatric Response*, 101 PEDIATRICS 321 (1998).

Because in the last century child abuse was largely under-recognized and all-too-frequently ignored, a few physicians, particularly of the pediatric variety, began a campaign with the laudable goal to educate other doctors to recognize and report child abuse and to educate parents about the dangers of mistreating children. Even though the data was "circumstantial" and "manifestly incomplete," these well-intentioned doctors reasoned that a nationwide educational campaign to prevent the jerking, jolting and whiplash of infants was warranted. *See, e.g.*, John Caffey, *The Whiplash Shaken Infant Syndrome: Manual Shaking by the Extremities with Whiplash-Induced Intracranial and Intraocular Bleedings, Linked with Residual Permanent Brain Damage and Mental Retardation*, 54 PEDIATRICS 396, 403 (1974); A. Norman Guthkelch, *Problems of Retino-Dural Hemorrhage with Minimal External Injury*, 12 HOUS. J. OF HEALTH LAW & POL'Y 201 (2012). At the time, these doctors never envisioned, and did not advocate, criminal prosecutions based on these findings. *Id.* at 203. Nonetheless, the SBS hypothesis gradually hardened into accepted medical wisdom, even though it lacked a solid scientific foundation. *Id.* at 207; Mark Donohoe, *Evidence-based Medicine and Shaken Baby Syndrome Part I: Literature Review, 1966-1998*, 24 AM. J. FORENSIC MED. PATHOLOGY 239, 241 (2003); Deborah Tuerkheimer, *Flawed Convictions: "Shaken Baby Syndrome" and the Inertia of Injustice* (Oxford Univ. Press 2014).

Over time, the beliefs of medical doctors surrounding these findings have changed considerably. *See State v. Edmunds,* 746 N.W. 2d 590, 596 (2008) ("[A] significant and legitimate debate in the medical community has developed in the past ten years over whether infants can be fatally injured through shaking alone, whether an infant may suffer head trauma and yet experience a lucid interval prior to death, and whether other causes may mimic the symptoms traditionally viewed as indicating shaken baby or shaken impact

12

syndrome."). Many experts have come to realize that children previously thought to have been shaken may have also or instead suffered some kind of impact injury. *See, e.g.*, Ann-Christine Duhaime, *et al.*, *The Shaken Baby Syndrome: A Clinical, Pathological, and Biomechanical Study*, 66 J. NEUROSURG. 409 (1987) ("Although shaking may, in fact, be part of the process, it is more likely that such infants suffer blunt impact…"); Derek A. Bruce and Robert A. Zimmerman, *Shaken Impact Syndrome*, 18 PEDIATRIC ANNALS 482, 492-4 (1989) (the authors concluded severe acute brain trauma cannot be produced by shaking alone and that the mechanism of injury is more appropriately described as "shaking impact"). Given the lack of scientific support for the specific mechanism of shaking, pediatricians are now encouraged to no longer use the term "Shaken Baby Syndrome" (SBS); the preferred term (and the one used in this case) is "Abusive Head Trauma" (AHT), because that term is more expansive and does not require the physician to identify a precise mechanism of injury. This name change is a marketing move, recommended by the pediatric medical lobby because of the legal difficulties with SBS; it does not reflect a substantive change or advance in medical science.

Many terms are used either to describe the alleged mechanism of injury or interchangeably with AHT, including, but not limited to "acceleration-deceleration injury," "non-accidental injury," "non-accidental trauma," and "inflicted head trauma." *E.g.*, Brian Forbes, *Child Abuse: Anatomy and Pathogenesis of Retinal Hemorrhages After Abusive Head Trauma*. Up To Date, Evelyn A. Paysse & Daniel M. Lindberg (Eds.) UpToDate, Waltham, MA (Accessed on September 7, 2015); Sandeep Narang, *A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome*, 11 HOUS. J. HEALTH L. & POL'Y 505 (2011). Until recently, the leading physicians in the child abuse protection community staunchly argued that shaking or other abuse could be reliably and confidently diagnosed on the existence of the three findings of the triad. Chadwick, *et al.*, *supra,* Peter G. Richards, *et al.*, *Shaken Baby Syndrome,* 91 ARCH. DIS. CHILD 205 (2005) ("The triad of encephalopathy,

13

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

subdural hemorrhages, and retinal hemorrhages as an indicator of head injury that has stood the test of time.").

Now, leaders in the field of pediatrics claim that no responsible physician would diagnose abuse based on this "triad."  The new American Academy of Pediatrics ("AAP") position paper, revised in 2009, backs off the certainty of the AHT diagnosis, now asserting instead that "the mechanisms and resultant injuries of accidental and abusive head injury overlap." Christian, *et. al.*, *supra* at 1410.  As Dr. Bob Sege, director of Family and Child Advocacy at Boston Medical Center and a member of the AAP Committee on Child Abuse and Neglect, recently told NPR, "[t]he real straw man argument is the idea that diagnosing abusive head trauma relies solely on those three injuries…." https://www.npr.org/sections/health-shots/2015/07/29/427449852/doctors-devise-a-better-way-to-diagnose-shaken-baby-syndrome. Dr. Carole Jenny, a longtime child abuse pediatrician and SBS-hypothesis  advocate, and former Brown University Pediatrics professor, now teaches that "the triad is a myth." Carole Jenny, *Presentation on The Mechanics: Distinguishing AHT/SBS from Accidents and Other Medical Conditions*, slide 33, 2011 New York City Abusive Head Trauma/Shaken Baby Syndrome Training Conference (Sept. 23, 2011).

There is now widespread, if not universal, agreement that the presence of the triad alone – or its individual components alone or in any combination – is not enough to diagnose abuse. Findley, *et. al.*, *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right.* 12 HOUS. J. HEALTH L. & POL'Y 209, 213 (2012); Tuerkheimer, *supra* at 10-11. But the doctors in this case, including Defendants' experts, did not just make their diagnosis based on this disfavored set of findings; they went a step further.  They diagnosed S.Z.S. with Abusive Head Trauma based on only two of the three signs previously (but no longer) thought to be diagnostic of abuse – subdural hemorrhages and retinal hemorrhages (the child did not have encephalopathy or any loss of consciousness).  These findings

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

are nonspecific, associated with a variety of mechanisms, and certainly not pathognomonic (i.e., exclusively diagnostic) of abuse. Contrary to the standard set forth by *Daubert* for the admission of medical causation testimony, these doctors utterly discounted or failed to account for the myriad alternative explanations for S.Z.S.'s medical findings; some even offered inaccurate medical opinion and *ipse dixit*, presented as fact, to support the AHT diagnosis. Because these opinions are unreliable and do not comport with the *Daubert* standard, they should be excluded.

### B.    Cognitive and Confirmation Bias

Cognitive bias is now widely recognized as a serious threat to the accuracy and reliability of forensic science across many disciplines (just as it is recognized as a potential source of significant error in all academic scientific research and testing). *See* Saul M. Kassin, *et al.*, *The Forensic Confirmation Bias: Problems, Perspectives, and Proposed Solutions*, 2 J. APPLIED RSCH. MEMORY & COGNIT. 42 (2013); D. Michael Risinger, *et al.*, *The Daubert/Kumho Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion*, 90 CALIF. L. REV. 1, 8 (2002). The National Academy of Sciences ("NAS") puts it bluntly: "The findings of forensic science experts are vulnerable to cognitive and contextual bias." NAS REPORT, *supra*, at 8 n.8. "These biases," the NAS explained, "are not the result of character flaws; instead, they are common features of decision making, and they cannot be willed away." *Id*. at 22.

Cognitive bias refers to the wide range of cognitive shortcuts or inclinations that can serve us well in most contexts but can lead us astray in disastrous ways in others. The cognitive biases that are widely addressed in the forensic science and criminal justice literature include confirmation bias, hindsight bias, outcome bias, motivated reasoning, groupthink, role effects, cognitive dissonance, anchoring effects, availability bias (or heuristic)) – and others. *See* Keith A. Findley & Michael A. Scott, *The Multiple Dimensions of Tunnel Vision in Criminal Cases*, 2006 WIS. L. REV. 291, 307-22 (2006); Silvia Mamede,

15

*et al.*, *Effect of Availability Bias and Reflective Reasoning on Diagnostic Accuracy Among Internal Medicine Residents*, 304 JAMA 1198, (2010); Risinger, *et al.*, *supra*, at 12-21. All of these can affect a physician, both because education does nothing to eliminate human cognitive biases, and because doctors like those at PCH and those retained as experts here, often work closely with and are allied with DCS, child protection agencies, and law enforcement agencies.

While cognitive biases are ubiquitous – no one can claim to have eliminated them all effectively – in this case PCH Defendants, who are child abuse specialists or specially involved by the Child Protection Team in cases of suspected abuse, testimony and records reveal numerous instances of pronounced biases, and no attempt to manage or contain those biases, which together make their opinions unreliable.

Confirmation bias is the natural tendency, by all people, to seek, render, and interpret evidence or information in ways that confirm or support pre-existing conclusions. Psychological research has demonstrated that confirmation bias will lead a person to readily accept any information or inferences that support their preexisting beliefs, and to ignore, marginalize, or undervalue disconfirming evidence. Findly & Scott, *supra*, at 309-16.

> When people are led by circumstances to expect some fact or condition (as people commonly are) they tend to perceive that fact or condition in informationally ambiguous situations. This can lead to error biased in the direction of expectation. When what a person expects to see is the result of the person's own generation of hypotheses, theories, or scenarios about what must be the case, the personal investment in those hypotheses will reinforce the tendency to perceive or overvalue confirming information. Similarly, when such hypotheses are provided by a person of superior status in a team effort, or when self-worth and role-success contribute to emotional investment, the confirmation bias can be amplified, so that even the most obvious and unambiguous "disconfirming" information may remain undiscovered, or be dismissed.

*Id.* at 308-09 (footnotes omitted.).

Confirmation bias is present in this case. PCH CPT doctors and nurses in training and practice are naturally accustomed to focusing on abuse, including AHT. These

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

16

recognized and prevalent biases suggest that the CPT doctors and nurses, like the Defendants, have a natural tendency to think readily of abuse in cases where medical signs might fit, and then to look for and interpret data in ways that is consistent with finding abuse. PCH's records and doctors' testimony in this case reveal powerful signs of such biases, which would have compromised the reliability of their opinions.

## IV.    ARGUMENT

### A.    Defendants' Experts' Anticipated Opinion Testimony Regarding SBS/AHT is Unreliable.

The purpose of expert testimony at trial is to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Due to the danger of an expert's testimony improperly influencing the jury, the Court is charged with the duty as a gatekeeper with respect to admissibility of expert testimony. *In re Appollo Group Inc. Sec. Litig*, 527 F. Supp.2d 957, 962 (D. Ariz. 2007). Expert opinion evidence is admissible only if it is reliable, which requires the Court to assess whether the "reasons or methodology underlying the testimony is scientifically valid." *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589, 592-93 (1993).

To determine whether proffered medical expert testimony is reliable, the Court should look at the following non-exclusive factors: (1) whether the method or technique has been tested; (2) whether the method or technique has been subjected to peer review and publication; (3) the potential or known rate of error; and (4) whether the method or technique is generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The adversary committee notes to Rule 702 provide illustrations of additional factors that might be relevant in some cases, including "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion," and "whether the expert has adequately accounted for obvious alternative explanations." Fed.R.Evid. 702, advisory committee's note (2000 amends.). As a result, expert testimony

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

17

may be excluded if does not "fit" the facts of the case well enough, that is, when "a large analytical leap must be made between the facts and the opinion." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

The Court's role in conducting a *Daubert* reliability analysis of proposed expert testimony is to ensure that the experts' opinions are based on scientifically valid methods and principles. To be admissible, "it is critical that an expert's analysis be reliable at every step." *Amorigianos v. Amtrak*, 303 F. 3d 256, 267 (2ⁿᵈ Cir. 2002). Thus, "*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig*, 35 F. 3d 717, 745 (3ʳᵈ Cir. 1994) (emphasis in original). "Whenever a court rejects expert testimony because it is based on faulty methodology or reasoning, it follows implicitly that the expert's conclusions are not to be credited." *Claar v. Burlington N. Ry. Co.*, 29 F.3d 499, 501 (9ᵗʰ Cir. 1994).

There is no evidence whatsoever (beyond Defendants' and their experts' beliefs, which are obviously not "evidence") that S.Z.S. was abused. *See* (Doc. 319-13 at 2) ("No physician can validly claim to know whether or not the physical findings in an infant are from child abuse."). No one ever witnessed S.Z.S. being abused, or even mistreated, by his parents. *See id.* at 4 ("…real child abuse is witnessed by someone. False child abuse is diagnosed by doctors."). There is no family history of domestic violence, drug or alcohol abuse, criminal activity, or prior DCS involvement. Yet, Cassidy and PCH Defendants and their experts claim that S.Z.S.'s injuries were caused by abuse – specifically, SBS/AHT. *See id.* at 4 ("…real child abuse is witnessed by someone. False child abuse is diagnosed by doctors."). The conclusion that S.Z.S.'s medical findings must have been caused by abuse and only abuse in the form of shaking (i.e., rapid acceleration and deceleration) is based on faulty scientific principles and lacks sufficient facts and data to be reliable or helpful to the jury. *See, e.g.*, **Ex. 4** (Matshes and Papetti, *Law, Child Abuse, and the Retina*, Nov. 2018); *see also*, **Ex. 7** (PCH Defendants' expert testifies that S.Z.S. could have sustained SDH and RH at birth that persisted for 2 months). Moreover, whether the

18

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1   child was abused is not a fact at issue in the claims against these Defendants, and, if it is, it

2   has already been adjudicated by a fact finder that he was <u>not</u> abused. (Doc. 319-31 at

3   DUVALL_000057.) Here, Defendants' 11 experts relied upon the improper application of

4   an outdated hypothesis to reach their opinions that S.Z.S. was abused.  Their testimony in

5   that regard is inadmissible.

> ### 1.   Defendants and their experts performed a differential etiology in this case, rather than a differential diagnosis.

8   Defendants (and their experts) claim to have performed a "differential diagnosis"

9   on S.Z.S. to reach the conclusion that S.Z.S. was abused.  They did not, in fact, do so.  A

10  "differential diagnosis" is "the determination of which one of two or more diseases or

11  conditions a patient is suffering from;" it is determined by "systematically comparing and

12  contrasting their clinical findings." *Dorland's Illustrated Medical Dictionary* 490 (29th ed.

13  2000).  This definition focuses on the diagnosis and treatment of disease, not on the legal

14  determination of the cause or etiology of the disease.  In this case, the "diagnosis" of

15  Abusive Head Trauma is not, in fact, a differential diagnosis, but rather, a differential

16  etiology.  The term "differential etiology" is used "to describe the investigation and

17  reasoning that leads to the determination of external causation, sometimes more specifically

18  described by the witness or court as a process of identifying external causes by a process

19  of elimination." *McClain,* 401 F.3d at 1252 (citing Mary Sue Henifin, *et al.*, *Reference*

20  *Guide on Medical Testimony,* in *Reference Manual on Scientific Evidence* 439, 481 (Fed.

21  Jud. Ctr., 2d ed. 2000)).

22  Courts are unwilling to conflate differential diagnoses with determinations about

23  etiology.  "It is too easy to gloss over these two definitions and conclude that they amount

24  to a distinction without a difference…. The distinction is more than semantic; it involves an

25  important difference." *Bowers v. Norfolk S. Corp.,* 537 F. Supp. 2d 1343, 1360 (M.D. Ga.

26  2007), *aff'd,* 300 F. App'x 700 (11th Cir. 2008).  In *Bowers*, the court explained that "[t]he

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

19

differential diagnosis method has an inherent reliability; the differential etiology method does not." *Id.* at 1361.  The court there noted, for example, that when *diagnosing* a patient for *treatment* purposes, the doctor has special incentives that provide assurances of accuracy: misdiagnosis can lead to catastrophic failure for the patient, even death, from failure to prescribe the correct treatment. And that error can in turn lead to medical malpractice liability. *Id.* at 1361. In contrast, when a physician opines that a child's brain injuries were caused by abuse, she is not *diagnosing* the patient for *treatment* purposes. The diagnosis is brain injury, and it is that injury that is treated. There is no medical *treatment* for abuse.

Here, the determinations about etiology (i.e., causation) were made for legal action, *i.e.* dependency, not treatment. The medical treatment of a head injury does not change based on how it was sustained. Whether an injury was inflicted or accidentally sustained has no bearing on the way a patient is treated medically.  There is no surgical technique, treatment, or medication that is prescribed based on the intent of an alleged abuser.  If, for example, a patient has bleeding within the protective coverings of the brain, that blood can cause damage and may require surgery. This does not change based on whether the blood is there because of accident, abuse, or some other medical cause, whether known, unknown, or the subject of ongoing medical research and debate.

This reality has other implications that additionally undermine the reliability of the differential etiology of abuse.  Experience can be a valuable part of any expert's expertise if it is the sort of experience from which the expert can learn.  The true differential diagnosis – diagnosing a patient's medical illness or condition for purposes of prescribing treatment – at least has the potential for enabling the doctor to learn by experience and, hence improving reliability.  If the doctor misdiagnoses an illness or condition, the treatment will likely fail, and the doctor will adjust the treatment accordingly.  But, because there is no treatment for abuse, judgments about causation (i.e., etiology) do not offer similar opportunities for feedback and learning, and hence for ensuring experience-based reliability.  Medical

20

professionals have recognized this challenge even in the context of true diagnosis.  Drs. Eta S. Berner & Mark L. Graber, for example, have observed that, where feedback is absent or minimal, overconfidence by the physician can be a significant source of diagnostic error: "[F]eedback that is delayed or absent may not be recognized for what it is, and the perception that 'misdiagnosis is not a big problem' remains unchallenged. That is, in the absence of information that the diagnosis is wrong, it is assumed to be correct…." Eta S. Berner & Mark L. Graber, *Overconfidence as a Cause of Diagnostic Error in Medicine,* 121 Am. J. Med. (5 Suppl.) S2 (2008).  And, Dr. Gordon Schiff has explained how the absence of feedback can undermine reliability, even in the true diagnosis context:

> An open-loop system (also called a 'nonfeedback controlled' system) is one that makes decisions based solely on preprogrammed criteria and the preexisting model of the system. This approach does not use feedback to calibrate its output or determine if the desired goal is achieved. … *[Such a system] cannot engage in learning*.

Gordon D. Schiff, *Minimizing Diagnostic Error: The importance of Follow-up and Feedback,* 121 Amer. J. Med. S38 (2008) (emphasis added).

Again, because opining about the etiology of a child's head (or eye) injuries – an opinion that entails legal conclusions about not only what some external actor did, but also what that person's mental state was (abuse typically requires intent or recklessness) – provides no feedback mechanism, the entire enterprise is rendered unreliable.  Without the feedback required to "engage in learning," the purported expert's opinions based on clinical judgment amount to nothing more than *ipse dixit* – which *Daubert* and its progeny specifically prohibit.[8] *See Gen. Elec. Co. v. Joiner,* 118 S. Ct. 512, 519 (1997) ("Nothing

---

[8] *Ipse dixit* is a "Latin term that translates to 'he himself said it.' In legal contexts, it refers to an assertion or statement made by an individual based solely on their own authority, without any supporting evidence or proof." https://www.law.cornell.edu/wex/ipse_dixit#:~:text=Ipse%20dixit%20is%20a%20Latin,any%20supporting%20evidence%20or%20proof, last visited 19 September 2023. Also defined as "an assertion made but not proved." https://www.merriam-webster.com/dictionary/ipse%20dixit, last visited 19 September 2023.

21

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.).

Legal scholars have long observed that scientific expert testimony creates tensions with the legal system, and "the problems are most salient when scientists are called upon to offer opinions on causation." Margaret A. Berger & Lawrence M. Solan, *The Uneasy Relationship Between Science and Law: An Essay and Introduction*, 73 BROOK. L. REV. 847, 849 (2008).  Dr. Douglas Weed, an epidemiologist with the National Cancer Institute, has explained why causal claims are much less reliable than other types of medical assessments:

> [T]he causal claim itself – that this type of virus caused that sort of cancer – does not have this same sort of connection back to some unique event that can be documented, verified, and directly observed. The causal claim is a scientific hypothesis and we cannot ever know if it is true in the same sense as the existence of the virus, the cancer, and its author. The hypothesis can be well supported or not by the available evidence. It can be more or less certain, more or less proven, but it cannot ever be true. The reason is remarkably straightforward. Causation cannot be seen. Causation cannot be proven. And the evidence for causation always underdetermines our capacity to choose between the causal hypothesis of interest and its various alternatives.

Douglas L. Weed, *Truth, Epidemiology, and General Causation,* 73 BROOK. L. REV. 943, 949 (2008).

None of this means that the differential etiology method has *no* merit; but it does mean "that courts, when dealing with matters of reliability [under *Daubert*], should consider opinions based on the differential etiology method with more caution.  It also means that courts should not conflate [differential etiology with differential diagnosis]." *Bowers, supra,* at 1361.  Courts must not allow witnesses to avoid reliability analysis by simply claiming to have performed a differential diagnosis.

> [S]imply claiming that an expert used the "differential diagnosis" method is not some incantation that opens the *Daubert* gate to allow an expert's opinions to be admitted at trial. Indeed, it can easily amount to nothing more than medico-legal sophistry used in an attempt to avoid the Court's reliability analysis.

22

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

*Id.* at 1360.

In S.Z.S.'s case, the determinations of etiology are especially unreliable, because doctors were required to, and did, speculate about events that may never have occurred and for which there is no objective evidence. And that's exactly what Defendants and their experts have done here. Taking *Bowers* as an example again, that court declined to allow a doctor to testify that the vibration to which the plaintiff was exposed while working on a train caused his back injury. *Bowers* at 1355. No one disputed, however, that Mr. Bowers was, in fact, exposed to the vibrations attendant to riding on a train in the course of his employment. In *McClain*, the court declined to allow a doctor to speculate about the relationship between the dietary supplement Metabolife and the plaintiffs' medical conditions. But no one disputed that the plaintiffs experienced strokes and heart attacks and that they did, in fact, take Metabolife. Here, Defendants propose to introduce testimony that not only improperly speculates about the causal relationship between an event and a particular set of medical findings, but *they do so with no evidence of the event itself*. It is as if the plaintiffs in the *Paoli* case were asking the court to allow testimony that PCB exposure was the cause of the plaintiffs' injuries without proving the plaintiffs had any exposure whatsoever to PCBs.

Here, Defendants are asking this Court to allow their expert witnesses, without objective evidence or scientific support, to speculate as to every element of its abuse defense. This speculation is not based on any reliable scientific methodology. *Daubert* prohibits such testimony.

## 2.   Testimony about causation should not be permitted as it lacks "fit."

In addition to requiring reliability, *Daubert* requires that expert testimony must assist the trier of fact. *Daubert* explains that, "'[f]it' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. *Daubert* at 591. "[E]ven if an expert's proposed testimony constitutes scientific knowledge,

23

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case. Paoli* at 743. Defendants' testimony in the dependency trial, and their experts' opinions and anticipated testimony here, is that S.Z.S.'s injuries were not the result of a known medical condition; rather, according to Defendants and their experts, the only, or most likely, explanation for his medical findings was abuse of the violent shaking variety. This conclusion is based on the differential etiology method discussed above; it speculates about the possible actions of the parents without reliable data (i.e., evidence) and, as such, is so far removed from the known medical facts and data that it does not assist the trier of fact.

While challenges to "fit" may initially appear to be similar to challenging an expert's ultimate opinion, challenges to "fit" are actually an important part of the admissibility calculus. *Paoli* at 746. Even strong proponents of the SBS/AHT diagnosis admit that making such diagnoses are difficult because of a lack of both objective tests and "gold standard" diagnostic criteria. *See, e.g.,* Hymel, *et. al.*, *Derivation of a Clinical Prediction Rule for Pediatric Abusive Head Trauma*, 14 PEDIATRIC CRITICAL CARE MEDICINE 210 (2013) ("Evidence based screening tools for abusive head trauma do not exist … [T]here is no gold standard for AHT diagnosis."); Shalea J. Piteau, *et al.*, *Clinical and Radiographic Characteristics Associated with Abusive and Nonabusive Head Trauma: A Systematic Review*, 130 PEDIATRICS 315, 321 (2012); Sabine A. Maguire, *et al.*, *Estimating the Probability of Abusive Head Trauma: A Pooled Analysis*, 128 PEDIATRICS e550, e558 (2011). Given the uncertainties, the lack of data, the lack of objective criteria, and the possible alternatives, the doctors/experts in this case drew a conclusion that was so far removed from the facts that it lacks fit and should be excluded.

**B.** **Testimony Regarding the Diagnosis of S.Z.S.'s Medical Findings is Unreliable and Inadmissible Because a Differential Diagnosis was Not Properly Performed in This Case**

If this Court is inclined to find that the doctors here conducted a differential diagnosis, rather than a differential etiology, in coming to the conclusions about abuse,

24

testimony about causation is still unreliable because the differential diagnosis method used was improper, and experts rest their opinions on unreliable beliefs and *ipse dixit*, rather than a reliable methodology.

Evidence of scientific knowledge is relevant only if the "reasoning or methodology properly can be applied to the facts in issue." *Schudel v. Gen. Elec. Co.*, 120 F.3d 991, 996 (9th Cir. 1997). In other words, there must be a logical nexus between the scientific studies on which the expert relies, and the conclusion reached in the particular case: "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also McClain*, 401 F.3d at 1252 (noting that a prerequisite to reliable cause-and-effect testimony is that "medical science understands the physiological process by which a particular disease or syndrome develops") (quoting *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999)).

Accordingly, before expert testimony establishing medical causation may be admitted, *Daubert* requires that the medical expert be able to conclude that the alleged cause is the cause in fact – here, not merely that abuse *can* cause the injuries like those suffered by S.Z.S, but that abuse *actually* caused the clinical findings that led to S.Z.S.'s medical diagnosis. To testify that a particular cause was *the* cause of S.Z.S.'s injuries, *Daubert* requires that Defendants' experts conduct a proper "differential diagnosis." *See, e.g., Clausen*, 339 F.3d at 1057. The case law defines a proper differential diagnosis as a scientific process of elimination whereby the possible causes of a condition or injury are identified and then, if possible, ruled out one-by-one until *the* cause is determined. *Id.*; *accord Hendrix*, 609 F.3d at 1195. The process of ruling out potential alternative causes must rely on scientific methods and procedures and must not be "mere subjective beliefs or unsupported speculation." *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

25

Defendants and their expert witness, who rely on Defendants' records, did not conduct a proper differential diagnosis. The diagnosis itself, as well as statements arising from incorrect differential diagnosis methodology, is inadmissible for at least the following reasons:

1.     **The practice of diagnosing SBS/AHT based on the presence of subdural hemorrhages and retinal hemorrhages has never been validated by the relevant scientific communities.**

Much of the research surrounding SBS/AHT has relied on the combination of what is sometimes called a "triad" of findings or a "constellation of injuries," consisting of subdural hemorrhage, retinal hemorrhage, and brain swelling or encephalopathy.  Contrary to what Defendants and their experts claim, this is still a controversial diagnosis.  Indeed, even staunch SBS/AHT advocates concede that "controversy remains" in part because "there is no single or simple test to determine the accuracy of the diagnosis." Christian, *supra*, at 1410.  Very little data exists about the accuracy of diagnoses based on the "triad" or a "constellation of injuries."  However, there is no data about the reliability of diagnosing SBS/AHT based only on the presence of subdural hemorrhages and retinal hemorrhages and there is no known error rate for such a diagnosis.  Both findings are nonspecific for abuse and associated with a wide range of traumatic and non-traumatic causes.

Although a lack of consensus about the reliability of a medical diagnosis is not per se fatal to admissibility of causation testimony based on that diagnosis, such lack of consensus is a factor that weighs heavily against admissibility. To reiterate, under *Daubert*: "Law lags science; it does not lead it." *Hendrix*, 609 F.3d at 1203 (quoting *Rider*, 295 F.3d at 1202 (quoting *Rosen*, 78 F.3d at 319)). The debate about SBS/AHT is particularly controversial – and the diagnosis is definitely not generally accepted – in cases such as this one where there is no objective evidence of abuse, yet medical experts entrenched in the old dogma continue to claim they can diagnose abuse from the triad (or, in this case, two of the three triad findings: subdural hematoma and retinal hemorrhage) alone. *See, e.g.*, Findley,

*et al.*, *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right*, 12 HOUS. J. HEALTH LAW & POL'Y 209, 216 (2012) ("We now know … it is no longer valid to reason backwards from the triad to a diagnosis of trauma or abuse."); Tuerkheimer*, supra*, at 10-11 ("As a categorical matter, the science of SBS can no longer support a finding of proof beyond a reasonable doubt in triad-only cases"); Goudge, *Inquiry Into Pediatric Forensic Pathology in Ontario - Report*, at 528 (2008) ("[T]he predominant view is no longer that the triad on its own is diagnostic of SBS."); Crown Prosecution Service, *Non-Accidental Head Injury Cases (NAHI, formerly referred to as Shaken Baby Syndrome) -- Prosecution Approach* (Mar. 24, 2011) ("it is unlikely that a charge for a homicide . . . could be justified where the only evidence available is the triad of pathological features"). The diagnosis of AHT in this case is further inadmissible for the following reasons.

### a. <u>S.Z.S.'s medical findings are nonspecific and the other possible causes of these findings were not reliably considered by Defendants or their experts</u>

Today, as a result of improved imaging techniques and subsequent research, the list of diseases and conditions known to cause the same findings previously attributed to abuse alone (including shaking, shaking plus impact, and blunt trauma) is long and growing. *See, e.g.,* Findley, *supra* at 33 ("By 2006, it was widely recognized by supporters of the [SBS] hypothesis that there are many 'mimics' of [SBS], including accidental causes and a variety of illnesses and medical conditions, ranging from birth trauma to childhood stroke."); Waney Squier, *The "Shaken Baby" Syndrome: Pathology and Mechanisms,* ACTA NEUROPATHOL. 1, 3 (2011) ("The differential diagnosis of a baby with the triad is wide...").

In this case, subdural hemorrhages and retinal hemorrhages were attributed to abuse and only abuse. This does not reflect a valid methodology. Experts, including prominent child abuse pediatricians, have long recognized that subdural hemorrhages have many different causes. *See, e.g.*, Hymel, *et al.*, *Intracranial Hemorrhage and Rebleeding in*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

27

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

*Suspected Victims of Abusive Head Trauma: Addressing the Forensic Controversies*, 7 CHILD MALTREATMENT 329, 332 (2002) ("Subdural hemorrhages have been linked etiologically to accidental trauma; inflicted trauma; medical or surgical interventions; prenatal, perinatal, and pregnancy-related conditions; birth trauma; metabolic diseases; congenital malformations; genetic diseases; oncologic diseases; autoimmune disorders; clotting disorders; infectious diseases; the effects of poisons, toxins or drugs; and other miscellaneous conditions.")

In other words, we now know that many other medical conditions and non-abusive events can cause the medical findings seen in S.Z.S.'s. The doctors here failed to conduct a proper differential diagnosis when they "ruled out" innocent causes without specific testing, reasoning, or citation. *See, e.g.*, (Doc 319-52 (26% of children born through normal, non-traumatic vaginal birth has retinal hemorrhages, including as extensive as S.Z.S.'s and that can persist for up to two months); Doc. 319-14 (subdural hematomas are common in children born via normal vaginal delivery)).

**b.      SBS/AHT is a diagnosis for criminal prosecution, not for medical treatment (or protection of civil rights)**

AHT has never been just a medical diagnosis. Instead, it is a diagnosis used primarily for prosecution (criminally or dependencies), not treatment. Even the name signals its broader function. "Of the several hundred syndromes in the medical literature, almost all are named either after their discoverer (e.g., Adie's Syndrome) or for a prominent clinical feature (*e.g.,* Stiff Man Syndrome)." Guthkelch, *Problems of Infant Retino-Subdural Hemorrhage with Minimal External Injury*, 12 HOUS. J. HEALTH L. & POL'Y 201 (2012). SBS/AHT, by contrast, is a name that focuses on the alleged cause of certain clinical findings. *Id.* Tightly tethering the concept of abuse to a constellation of findings has always been a focus of child abuse advocates. That focus persists even now that it is well accepted that there are many other causes of these findings.

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

For example, the Committee on Child Abuse and Neglect of the American Academy of Pediatrics has long been dominated by staunch SBS/AHT advocates. In 2001, that Committee issued a policy statement that not only endorsed SBS but said that a presumption of abuse should exist whenever a child presented younger than 1-year-old with intracranial injury and retinal hemorrhages, as was purportedly the case with S.Z.S. *Shaken Baby Syndrome: Rotational Cranial Injuries--Technical Report*, PEDIATRICS Vol. 108, No. 1 (July 2001). By 2009, however, the shaking hypothesis had become controversial. Yet, instead of significantly revisiting the SBS hypothesis in light of the controversy over the supposedly supporting science (the AAP did soften its presumption of abuse), the Committee issued another policy statement suggesting that physicians stop using the term Shaken Baby Syndrome – ***and instead use the term Abusive Head Trauma.*** Christian, *supra*. The AAP made this name change not to reflect scientific discoveries more accurately, but rather to help prosecutors continue to use SBS/AHT to obtain criminal convictions despite the mounting criticism of the scientific underpinnings: "Legal challenges to the term 'shaken baby syndrome' can distract from the ***more important questions of accountability of the perpetrator*** and/or the safety of the victim." *Id.* emphasis added; *but see* Randy Papetti, *et al*., *Outside the Echo Chamber: A Response to the "Consensus Statement on Abusive Head Trauma in Infants and Young Children*, 59 Santa Clara L. Rev. 299 (2019) (critical look at the AAP's 2018 Consensus Statement on AHT), available at https://digitalcommons.law.scu.edu/lawreview/vol59/iss2/1, attached here as **Ex. 5**.

A *Daubert* analysis includes the examination of whether an expert's opinions are based on the field in which he or she practices or developed for the purposes of in-court testimony. Here, the opinions of Defendants' expert witnesses fall into the latter category. A determination of abuse generally does not affect the medical treatment given in a particular case. It is important primarily as a legal determination, not a medical one.

29

SBS/AHT is and always has been a diagnosis that is not primarily medical or scientific, but instead one that seeks to intertwine medicine with law and child protection policy. That intertwining may be understandable, but the tendency for the unproven hypothesis to be shaped and perpetuated by forces other than objective science is undeniable and cannot be ignored in determining whether the diagnosis is sufficiently reliable to be admitted in a court of law.  Further, in this case, while the diagnosis was based on some of the principles of SBS/AHT, it deviates from them because S.Z.S. exhibited only two of the commonly cited three findings, and, arguably, only one, that being SDH, because Dr. Cassidy was the only one to see the extensive RH he described, he did not document the eyes photographically even though the capability to do so was available at PCH, and he was found to not be a credible witness. Even if this Court were inclined to admit "classic" SBS/AHT opinion testimony, this diagnosis does not comport with those beliefs, and is thus far outside the mainstream of medical knowledge.

### c.   Abuse cannot reliably be "ruled in" as a cause of S.Z.S.'s medical conditions.

The first step in a proper differential diagnosis is for the expert to compile a "comprehensive" list of causes that are each *capable* of explaining the clinical findings. *Hendrix*, 609 F.3d at 1195; *Clausen*, 339 F.3d at 1057. Importantly, for each such potential cause the expert "rules in" at this stage, that cause "must actually be capable of causing the injury.'" *Hendrix*, 609 F.3d at 1195 (quoting *McClain,* 401 F.3d at 1253) (excluding potential cause "ruled in" by expert because it had not yet been established to be a potential cause of the injuries in question); *see also Hall,* 947 F. Supp at 1413 ("Testimony regarding specific causation in a given patient is irrelevant unless general causation is established."). "Expert testimony that rules in a potential cause that is *not* so capable is unreliable." *Clausen*, 339 F.3d at 1058 (emphasis added). No one has offered any explanation of what,

in fact, happened to S.Z.S., beyond the Defendants' claim of some unspecified "abuse" or "non-accidental trauma."

There is no evidence about any act or omission on the parents' part that led to S.Z.S.'s medical findings. If subdural hemorrhages and retinal hemorrhages could *only* be caused by abuse, it might be reasonable to assume that some abuse occurred in this case. Abuse, however, is only one of a great many causes of those two findings and here, no evidence "rules in" abuse. In this case, any differential diagnosis based upon a potential cause that has not been reliably "ruled in" is, for *Daubert* purposes, flawed and inadmissible.

### 2. Defendants and their experts did not comprehensively identify and consider alternative causes.

It is also improper under *Daubert* and the differential diagnosis method for an expert to start with one possible cause and deem it to be the cause-in-fact without first comprehensively identifying other potential causes and ruling them out. *Hendrix*, 609 F.3d at 1195; *Clausen*, 339 F.3d at 1057; *Leestma*, *supra*, at 16 ("it is inappropriate to select one mechanism only and ignore the rest of the potential causes").

Even those who today still advocate for the SBS/AHT hypothesis recognize that it must be treated as "rule out" diagnosis – i.e., it is SBS/AHT only if *all other potential causes* are thoroughly identified, explored, and can confidently be ruled out. That did not occur here. While Defendants and their experts ostensibly rule out some commonly recognized conditions that can cause SDH or RH, they did not, and cannot, rule out that both were caused at birth, as is common, and persisted for the first two months of the child's life, which is also supported by published research. *See* (Doc. 319-14; Doc. 319-52).

When S.Z.S. was initially brought into PCH, the doctors failed to follow the proper differential diagnosis methodology when they ignored S.Z.S.'s medical history and witness accounts. S.Z.S.'s family repeatedly asked that PCH's "trauma team" and CPT, including Defendant Coffman, conduct other testing to identify or rule out causes for S.Z.S.'s injuries,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

other than suspected abuse, but they refused to do so because it was not their job. (Doc. 319-10; Doc. 319-3). S.Z.S.'s maternal grandmother, Dawn Duvall, a nurse herself, was concerned about S.Z.S.'s abnormal labs, *i.e.*, abnormal white blood count, elevated liver enzymes and factor 8, and was concerned something was wrong with his blood and that the parents would not abuse their child. *Id*. PCH was hyper-focused on abuse, they did not do a proper differential diagnosis.

### 3. **Defendants' experts have not identified any scientifically valid, reliable way to "rule out" all other causes in a case like this.**

The final step of a proper differential analysis is for the expert to apply the facts of the case to each potential cause in order to form a reliable opinion about the actual cause of the patient's symptoms. *Hendrix*, 609 F.3d. at 1197; *Clausen*, 339 F.3d at 1058. An "expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures[,] and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Clausen*, 339 F.3d at 1058 (internal quotations omitted). If the experts cannot reliably and to the relevant standard of proof exclude all other causes except for one, the expert's testimony must be excluded.

No expert in this matter can establish how a reliable differential diagnosis can be done to establish SBS/AHT as the definitive cause of S.Z.S.'s condition in a case like this, where there are no other signs of violent repetitive shaking; for instance, no loss of consciousness, no neck injuries, no skull fractures or contusions on the head, no patterned bruising on the rib cage or arms where a strong grip would be necessary to shake the child and not drop him. No one knows the error rate in the diagnosis of SBS/AHT cases, although errors have indisputably been made, as a long list of overturned convictions attest.

In 2015, THE WASHINGTON POST reported that 16 convictions in SBS/AHT cases have been overturned since 2001 and identified 200 more in which charges were dropped or defendants were found not guilty. Debbie Cenziper, *Shaken Science: A Disputed*

32

*Diagnosis Imprisons Parents*, WASHINGTON POST, March 20, 2015 (available at: https://www.washingtonpost.com/graphics/investigations/shaken-baby-syndrome/).    That same year, prosecutors in Middlesex County, MA, dismissed charges against childcare provider Aisling McCarthy when medical examiners reconsidered their opinions regarding a child's death; Ms. McCarthy's case was the second case in Middlesex County in 2015 in which medical examiners corrected a misdiagnosis of AHT, concluding after additional investigation that medical conditions, rather than abuse, caused the findings. Peter Schworm, *et al*., *In Stunning Reversal, Nanny's Murder Case Dropped*, BOSTON GLOBE, August 31, 2015 (available at:   https://www3.bostonglobe.com/metro/2015/08/31/state-medical-examiner-office-changes-finding-finds-homicide-infant-death/yQSNRpNQwWw5Ha29Bhqs4H/igraphic.html?p1=Article_Graphic_More ).

In October 2019, Newsweek reported that the Mississippi Court of Appeals reversed Joshua Clark's second-degree murder conviction based on new evidence that the medical diagnosis used to convict him, shaken baby syndrome, was discredited. Hunter Moyler, *Convicted Murderer's Sentence Reversed After Lawyer Argues Shaken Baby Syndrome Isn't Real*, Newsweek 90, October 30, 2019 (available at: https://www.newsweek.com/shaken-baby-syndrome-conviction-overturned-1468749 ).

Just this month, on 13 September 2023, a New Jersey appellate court affirmed the lower court judge "who declared shaken baby syndrome 'junk science,' a ruling that bared prosecutors from bringing it up in the Middlesex County cases of two fathers who challenged their child abuse indictments." Dana Diflippo, *Appeals Court Agrees Shaken Baby Syndrome is 'Junk Science' In Some Cases*, NEW JERSEY MONITOR, September 13, 2023 (available at: https://newjerseymonitor.com/2023/09/13/appeals-court-agrees-shaken-baby-syndrome-is-junk-science-in-some-cases/); *State v. Nieve, et al.*, Superior Court of New Jersey Appellate Division, Docket No. A-2069-21 and A-2936-21, Opinion attached here as **Ex. 6.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

No literature provides clarity, or serves as consensus, as to how a reliable differential diagnosis can be done in a case like this or what the rate of error would be in making such a diagnosis. Defendants' experts' methodology does not satisfy the *Daubert* requirements.

### 4. <u>No expert may provide testimony in this case that is incorrect, misleading, or demonstrably false.</u>

Even if the court denies this motion to broadly exclude Defendants' proffered expert testimony on SBS/AHT, it should, at a minimum, exclude those portions that are demonstrably false, such as their reliance on bruising that was later determined to be Mongolian spots, or that the child had bilateral tibial fractures. Even more so, they should not be able to rely on the PCH records presented at the dependency trial, which the court found to contain significant errors.

## V.   <u>CONCLUSION</u>

It would be wrong to allow Defendants' experts to come to trial and guess, or speculate, or opine about the SBS/AHT hypotheses when it is not scientifically validated and cannot reliably establish under the facts of this case that S.Z.S.'s medical conditions were caused by abuse. Plaintiffs ask that Defendants' experts' medical causation testimony speculating about the actions of the parents and not based on medical and scientific facts be excluded from trial. Further, Plaintiffs request that unsubstantiated medical opinions be excluded from trial.

Specifically, Plaintiffs request that:

1.    Defendants' experts be prohibited from speculating about the etiology of S.Z.S.'s medical findings;

2.    Defendants' experts be prohibited from testifying to conclusions they reached through the improper and unreliable application of the differential diagnosis method;

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

34

3.     Defendants' experts be prohibited from offering, false, misleading, or otherwise unreliable opinion evidence to the jury; and,

4.     Defendants' experts be prohibited from relying on false and erroneous PCH medical records.

5.     The Court conduct a Daubert hearing if deemed necessary.

**RESPECTFULLY SUBMITTED** this 28th day of September 2023.

**MILLS + WOODS LAW PLLC**

By___/s/ Thomas A. Connelly_____
Thomas A. Connelly
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of September 2023, I electronically transmitted the foregoing document to be filed electronically with the Clerk of the Court using the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

_/s/  Thomas A. Connelly_____

35