# EXHIBIT 3

March 25, 2015     ARTICLES

# What Child Welfare Attorneys Need to Know about Shaken Baby Syndrome

By Katherine Judson

Share:

    

Shaken baby syndrome (SBS), now more commonly called abusive head trauma (AHT), is a frightening diagnosis, evoking scenes of an angry parent or caregiver violently shaking a baby back and forth, causing serious brain damage. It is a devastating abuse charge against a parent in family court. While it is indisputable that some children are abused, and some abuse results in head injuries, that is not the general understanding of the term "abusive head trauma." Instead, the term is typically applied to cases in which subdural hematoma, retinal hemorrhage, and cerebral edema are present, either separately or in some combination, with or without other injuries, and with or

without external findings. This diagnosis is often incorrect because there are no standard diagnostic criteria, the medical findings are nonspecific, and the mechanism is unknown. It is necessary to seek a medical second opinion and consult with experts, particularly if the child has a history of illness or ongoing health problems, or the caregiver reports a possible alternative, like a fall or other accident.

Incorrect allegations of child abuse based on medical misdiagnosis harm children in two ways. First, if the diagnosis is incorrect, the real causes of a child's symptoms may be masked or ignored, leading to delayed care for other medical issues. If, for example, a metabolic disorder is mistaken for child abuse, the child will not receive proper care for the underlying disorder, potentially leading to more serious harm or a progression of the disease. Second, if the allegations are false, the child is wrongly deprived of a loving parent or caregiver (and so, potentially, are other children, like siblings or other family members). It is crucial, therefore, to carefully examine claims of child abuse based solely or largely on medical opinion.

### What Findings Does the Child Have, and What Do They Mean?

Allegations based solely or largely on medical diagnoses are problematic because diagnoses of all kinds can be incorrect. A 2012 article published in the *Journal of the American Medical Association* (*JAMA*) stated that "[c]ases of delayed, missed, and incorrect diagnoses are common, with an

incidence in the range of 10% to 20%." Mark L. Graber et al., "Bringing Diagnosis into the Quality and Safety Equations," 308 *JAMA* 1211, 1211 (2012). No standardized diagnostic criteria for child abuse exist, and there are no objective medical tests to determine abusive causation. As a result, diagnoses are based on a combination of medical findings and patient history. Medical findings themselves can be misidentified. For example, in one notable case, the improper administration of a CT scan caused physicians to believe an infant had a fracture where none existed. *See* Valari Hyatt, "Painful Memories Persist for Parents," *Pekin Daily Times*, Oct. 17, 2012; Valari Hyatt, "Spreading the Word: Family Speaks Out about Unfounded Abuse Claims," *Pekin Daily Times*, Mar. 19, 2011. Patient history can be elusive and is often subject to opinions about whether the interviewee is being truthful, rather than objective fact. In a fairly common SBS/AHT scenario, a caregiver brings an ailing child to the hospital. Medical personnel find subdural hematoma, retinal hemorrhage, and cerebral edema. The caregiver reports an accident, like a fall, or simply claims to not know what is wrong with the child. This might then be characterized as an "inconsistent history," and used later to solidify a case for abuse. Statements like these could certainly be lies. But they might instead be entirely true.

### Illnesses and Other Nontraumatic Causes
The subdural hematoma, retinal hemorrhage, and cerebral edema often associated with SBS/AHT can be caused by a number of illnesses and natural causes. The alternative causes of these medical findings are diverse and complex. They include congenital malformations, childhood stroke,

coagulopathies, metabolic disorders, infectious disease, vasculitis, autoimmune conditions, cancers, poisons and toxins, complications from medical and surgical procedures, birth injuries, and genetic conditions. *See, e.g.*, Andrew P. Sirotnak, "Medical Disorders that Mimic Abusive Head Trauma," *in Abusive Head Trauma in Infants and Children: A Medical, Legal, and Forensic Reference* 191 (Lori Frasier et al. eds., 2006). While many conditions that mimic these findings have been identified, some certainly remain unknown, and some are extremely rare and require extensive and unusual testing, increasing the possibility that they might be missed in a routine work-up. In one case, an infant suffered repeated incidents of subdural bleeding and retinal hemorrhages over a period of years during which abuse was investigated but ruled out; all routine blood tests were normal, as were other, more complicated tests. Marc De Leeuw et al., "Delta-Storage Pool Disease as a Mimic of Abusive Head Trauma in a 7-Month-Old Baby: A Case Report," 20 *J. Forensic Leg. Med.* 520 (2013). Eventually, researchers discovered a rare disease using platelet aggregation and electron microscopy—testing that is rarely done. Unsurprisingly, parents whose children have undiagnosed illnesses cannot tell a doctor or social worker "what happened."

## Accidents

The constellation of findings associated with SBS/AHT has been seen in accidents of widely varying apparent severity; these findings have multiple mechanisms. Similar findings have been seen in falls from toys, falls down stairs, falls from playground equipment, and falls from furniture. *See* Scott

Denton & Darinka Mileusnic, "Delayed Sudden Death in an Infant Following an Accidental Fall: A Case Report with Review of the Literature," 24 *Am. J. Forensic Med. & Pathology* 371 (2003); Patrick E. Lantz & Daniel E. Couture, "Fatal Acute Intracranial Injury, Subdural Hematoma, and Retinal Hemorrhages Caused by Stairway Fall," 56 *J. Forensic Sci.* 1648 (2011); John Plunkett, "Fatal Pediatric Head Injuries Caused by Short-Distance Falls," 22 *Am. J. Forensic Med. & Pathology* 1 (2001). Crush injuries have been known to cause similar findings, including a report of an infant who was crushed when his mother fell while carrying him in a carrier on the front of her body, a toddler who was crushed when a television fell on top of him, and an infant who was crushed when an older child fell on him as he was lying on the floor. *See* P.E. Lantz et al., "Perimacular Retinal Folds from Childhood Head Trauma," 328 *BMJ* 754 (2004); Gregg T. Leuder et al., "Perimacular Retinal Folds Simulating Nonaccidental Injury in an Infant," 124 *Archives Ophthalmology* 1782 (2006); Patrick Watts & Ebube Obi, "Retinal Folds and Retinoschisis in Accidental and Non-Accidental Head Injury," 22 *Eye* 1514 (2008). Closed head injuries and fractures occur in stair falls, crib falls, falls from shopping carts, falls from infant seats, and falls from infant carriers. *See* Richard A. Greenberg et al., "Infant Carrier-Related Falls: An Unrecognized Danger," 25 *Pediatric Emergency Care* 66 (2009); Elaine S. Yeh, "Injuries Associated with Cribs, Playpens, and Bassinets among Young Children in the US, 1990–2008," 127 *Pediatrics* 479 (2011); Ashley E. Zielinski et al., "Stair-Related Injuries to Young Children Treated in US Emergency Departments, 1999–2008," 129 *Pediatrics* 721 (2012); "Baby Seats Recalled for Repair by

[Bumbo International Due to Fall Hazard](#)," *Consumer Product Safety Commission* (Aug. 15, 2012); "Falls from Shopping Carts Cause Serious Head Injuries to Children," *Consumer Product Safety Commission* (last visited Mar. 16, 2015).

==It can be very difficult, if not impossible, to tell whether an injury was inflicted or accidental by looking at the injuries alone.== Lawyers must be cautious when facing a claim that certain injuries *could not* have been caused by accident, especially when a parent or caregiver describes exactly that. It is crucial to examine the medical record closely and consult with appropriate experts, which may include physicians and engineers. Accidents are not always benign and abuse is not always fatal; ==simply because an injury is serious does not mean that it was inflicted.==

### Determinations about Possible Perpetrators

Sometimes the claim is made that certain injuries must have been inflicted with intent to injure or kill and that a child suffering from them would be immediately or almost immediately comatose, so the person with the child at the time of collapse can readily be identified as the perpetrator. Science and medicine do not support such an unequivocal claim.

The time between an injurious event and collapse is often called a "lucid interval." When the medical findings are the result of disease and not trauma, the term "lucid interval" is largely meaningless, because there is no single causative

event. In cases like this, disease onset may be sudden and severe, or it may evolve over time, perhaps appearing better or worse at times, possibly culminating in collapse.

In accident and abuse cases, where trauma is the cause of the neurological findings, the lucid interval phenomenon is well-documented, and symptoms vary between individuals. Lucid intervals can be short or lengthy. Some patients experience severe symptoms right away, others do not. Some studies show intervals of 72 hours or more between injury and symptoms in cases that were serious enough to result in death. *See, e.g.*, M.G. Gilliland, "Interval Duration Between Injury and Severe Symptoms in Nonaccidental Head Trauma in Infants and Young Children," 43 *J. Forensic Sci.* 723 (1998). Even concerned caregivers who are closely watching for symptoms of brain injury following a fall may not see them. In fact, the signs and symptoms of brain injury can be so subtle that children with them present as lucid even to experienced health care providers. In one notable case, an injured child was under medical supervision for over 12 hours following her head injury but before her collapse, during which time she was evaluated and treated by physicians, none of whom recognized the seriousness of her situation. During this time, she was described as "fussy" and "clingy" but was awake and interactive; none of her doctors or nurses recognized her grave head injury. Robert W. Huntington, "Symptoms Following Head Injury," 23 *Am. J. Forensic Med. Pathology* 105 (2002).

### Violent Shaking as a Mechanism of Injury

Shaking is an unlikely mechanism for the injuries often attributed to it. Biomechanical studies using models, laboratory animals, and computer simulations consistently show that shaking, even violent shaking of an infant by an adult, is an unlikely mechanism for the injuries often attributed to it, particularly when there is no external injury. The biomechanical research also makes it clear that, while violent shaking cannot be good for a child, the requisite forces would produce serious and obvious injury to the neck and cervical spine long before producing any brain injuries, but such neck injuries are rarely, if ever, seen. Shaking has not been corroborated or scientifically well-supported as a cause of subdural hematoma, retinal hemorrhage, and cerebral edema. It is important to remember that all of the concerns outlined above apply regardless of whether the claimed mechanism is shaking, impact, or blunt force trauma, or when no mechanism is named at all, or when the claim is simply that the findings are "abuse" or "nonaccidental."

## Conclusion

SBS/AHT diagnoses are complicated, fraught with errors, and rest on an uncertain foundation. When faced with an abuse case that rests entirely or largely on a medical diagnosis, it is crucial to:

> *1* understand the basis for the diagnosis and recognize that medical findings often attributed to abuse can have many other causes;

2   understand that medical diagnoses of all kinds can be incorrect and that diseases and accidents can be mistaken for abuse;

3   recognize that it is usually not possible to tell, from medical findings alone, whether a particular injury is the result of abuse or accident; and

4   recognize that diagnoses of abuse based on ambiguous or uncertain medical findings require second opinions.

Given the complicated nature of SBS/AHT allegations, the related scientific ambiguity, and the irreversible damage a false accusation can inflict on a family, it is vitally important for practitioners for all parties to carefully examine the medical evidence in a case of alleged SBS/AHT.

**Keywords:** litigation, children's rights, shaken baby syndrome, abusive head trauma, child abuse, medical misdiagnosis, false accusations

Copyright © 2018, American Bar Association. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or downloaded or stored in an electronic database or

retrieval system without the express written consent of the American Bar Association. The views expressed in this article are those of the author(s) and do not necessarily reflect the positions or policies of the American Bar Association, the Section of Litigation, this committee, or the employer(s) of the author(s).



## Authors



**Katherine Judson** - **March 25, 2015**

American Bar Association

/content/aba-cms-dotorg/en/groups/litigation/committees/childrens-rights/articles/2015/what-child-welfare-attys-need-to-know-shaken-baby-syndrome

DUVALL_004616