Thomas A. Connelly (AZ Bar #019430
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
GILLESPIE, SHIELDS & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| Honor Duvall, *et al.*, | Case No.: 21-cv-00167-ROS |
|---|---|
| Plaintiffs, | |
| v. | **RESPONSE IN OPPOSITION TO DEFENDANT DR. CASSIDY'S *DAUBERT* MOTION REGARDING DR. TODD A. LEFKOWITZ, M.D**. |
| Arizona Department of Child Safety, *et al.*, | |
| Defendants. | |

Plaintiffs, by and through undersigned counsel, hereby respond in opposition to *Defendant Dr. Cassidy's Daubert Motion regarding Dr. Todd A. Lefkowitz, M.D.* (Doc. 311). This Response is based on the following Memorandum of Points and Authorities.

<u>**MEMORANDUM OF POINTS AND AUTHORITY**</u>

**I.    <u>OVERVIEW</u>**

This is a simple case – one which has arisen because of the Defendants' relentless refusal to accept responsibility for their wrongful actions in overstepping their limited role as medical doctors in pursuit of the PCH Child Protection Team's goal of advocating for suspected child abuse victims, as is more fully discussed in Plaintiffs' Motion for Partial

Summary Judgment (Doc. 319) and Plaintiffs' Omnibus *Daubert* Motion as to Eleven Experts Retained by PCH Defendants and Defendant Cassidy (Doc. 321.)[1]

Plaintiff Honor Duvall, a loving and caring mother, took her 2-month-old son to PCH for cold-like symptoms where overzealous child abuse advocates from PCH pressured the Arizona Department of Child Safety ("DCS") to have S.Z.S. removed from the care and custody of his parents based on the PCH Child Protection Team's ("CPT") "suspicion" that the parents abused the child because they could not explain a "constellation" of medical conditions PCH doctors diagnosed, erroneously in several instances – such as diagnosing innocuous Mongolian spots as "unexplained bruising" and diagnosing a fracture of the child's right tibia when there was none. When Honor could not otherwise explain S.Z.S.'s symptoms or how her son received those "bruises", the PCH child abuse protocol apparatus sprung into gear. S.Z.S. was subjected to skeletal surveys and CT scans of his head, all without knowing, informed parental consent, misdiagnosed with bilateral tibial fractures, and found to have undatable collections of blood or fluids in his head. (Doc. 319-5 at PCH 1264 cycn; Doc. 319-12.)[2] When the parents did not have an explanation for how their 2-month-old son had sustained bilateral tibial fractures and brain bleeds, PCH

---

[1] Shaken Baby Syndrome/Abusive Head Trauma ("SBS/AHT") is not the only area of so-called pediatric medicine in which the pediatrician-driven child abuse system has jumped off the rails. *See* Maxine Eichner, Bad Medicine: Parents, the State, and the Charge of "Medical Child Abuse", 50 U.C. Davis L. Rev. 205, 205-06 (2016) ("This article demonstrates that the broad definition of [medical child abuse] developed by physicians and adopted within the child protection system violates the constitutional rights of parents…the loose diagnostic standards constructed to 'diagnosis' MCA rest on both flawed science and flawed medical standards. In short, the MCA theory developed by physicians and enforced by child protection officials is bad constitutional doctrine, bad law, bad science, and bad medicine."), available at https://lawreview.law.ucdavis.edu/issues/50/1/Articles/50-1_Eichner.pdf, last visited October 16, 2023, attached for convenience as **Exhibit 1**.

[2] To the fullest extent possible, exhibit citations herein will be to exhibits already in the docket as part of Plaintiffs' Motion for Partial Summary Judgment (Doc. 319) or Plaintiffs' Omnibus *Daubert* Motion as to Eleven Experts Retained by PCH Defendants and Defendant Cassidy (Doc. 322). If citation to an exhibit that is not an exhibit to Doc. 319 or Doc. 322, is necessary, that exhibit will be attached to this Response.

Defendants quickly jumped to the conclusion that the child was a "shaken baby." (Doc. 319-23.)

Defendant Cassidy, a pediatric ophthalmologist and self-described warrior for abusive head trauma ("AHT") victims, (Doc. 319-17 at 108:3-5, 7-9, 13-17; Doc. 319-18 at 62:7-10, 62:20-63:1, 64:6-9, 64:11-65:2, 66:9-11, 66:19-21, 66:23-67:19, 68:3-11, 68:17-25, 69:3-8), was brought in by the PCH CPT to solidify the shaken baby diagnosis by rounding out the dogmatic triad (or "constellation of findings," as PCH likes to say) with findings of bilateral retinal hemorrhages.[3] Dr. Cassidy performs consultations for PCH CPT exclusively on cases where child abuse is suspected. When PCH CPT pages or texts him, he knows he will be examining an "abused child." *Id.* On 22 February 2019, PCH CPT texted Dr. Cassidy to examine S.Z.S., which he did for less than 90 seconds later that day. During those 90 seconds he spent in the child's hospital room, Dr. Cassidy examined the outside of S.Z.S.'s eyes, examined both retinas (using an ophthalmoscope but without the child's pupils being fully dilated, as the standard of care requires), and reported his findings to the family present in the room. (Doc. 319-17 at 96:3-12, 118:2-4, 120:15-17; Doc. 319-4 at 4.)  Dr. Cassidy purports that S.Z.S. had extensive bleeding in all layers and quadrants of his retinas. (Doc. 319-20.) In his words, he found the child's retinas were "painted with blood" and shaking was the cause. (Doc. 319-17 at 44:24-25, 49:6-16, 50:1-6, 16-21); *but see* (Doc. 319-27 (Dr. Heller's examination of S.Z.S.'s retinas reports all aspects of the retinas "WNL", within normal limits); *see also* (Doc. 319-13 at 2 ("[Dr. Cassidy] was under the impression that he could accurately guess what happened to [S.Z.S.] from an examination of his retinas. … Dr. Cassidy didn't understand the absurdity of his declaration. … His statements don't even make sense with the lack of evidence of trauma in the hospital photographs.")); *see also* (Doc. 319-22 at DUVALL_000053 ("The

---

[3] The classic recognized SBS/AHT "triad" consists of (1) subdural hemorrhaging, (2) retinal hemorrhaging, and (3) a change in consciousness or swelling of the head.  (Doc. 321-1 at 2-14 (amicus brief of concerned scientists); Doc. 321-2 at 9-13 (amicus brief Center of Integrity of Forensic Sciences); Doc. 321-3 at DUVALL_4607-4610, 4612, 4614 (ABA article re: SBS).

Court found credibility issues with Dr. Cassidy's testimony."). Dr. Cassidy testified at the dependency trial that the only other time he had seen as much blood in a child's retinas was when he examined a child who had fallen to the ground from a seventh story window. (Doc. 319-17 at 49:20-23). On cross-examination, Dr. Cassidy refused to concede that S.Z.S. had no other physical findings consistent with falling from a seventh story window, (*id.* at 85:6-11), though he later admitted at deposition that "birthing" was another example of "massive crush injury" to the head that could cause retinal bleeds.  (Doc. 319-18 at 180:14-23.)[4] Although a retinal camera was available at PCH at the time Dr. Cassidy examined S.Z.S., and despite knowing a DCS and criminal investigation were underway, Dr. Cassidy did not photograph the child's retinas to document and verify what he purportedly saw and to preserve that evidence. (Doc. 319-18 at 178:7-13, 16-17, 23-25; 180:8-10); *see also* (Doc. 319-22 at DUVALL_000057 ("The credible testimony failed to establish retinal hemorrhages in both eyes. Dr. Cassidy was the only doctor to observe the severe retinal hemorrhaging to which [he] testified and [is] noted in the records. No tests were done to verify this diagnosis.").)

Defendants, including Dr. Cassidy, embarked on this misguided course of action to have S.Z.S. removed from his parents because they are fierce adherents to and believers of the Shaken Baby Syndrome ("SBS"), now referred to as Abusive Head Trauma ("AHT"). Defendants, including Dr. Cassidy, continue to claim that SBS/AHT is widely accepted in the pediatric medical community; however, it is not so much accepted in the broader medical and scientific community outside of pediatrics, which now has its own cottage

---

[4] A 2016 study conducted at Stanford University School of Medicine (the "Stanford Study") concluded that 20.3% of children are born with retinal/optic nerve hemorrhaging, 71% of which involved hemorrhaging in multiple layers of the retina, and 35% in all 4 quadrants, which can take up to 58 days to resolve completely. (Doc. 319-52) (S.Z.S. was just shy of his 2-month birthday when he was first seen at PCH.) The Stanford Study concluded that hemorrhages in the eyes "are common among newborns…often involve multiple areas and layers of the retina…." and that "[v]aginal delivery was associated with a significantly increased risk" of such hemorrhaging. (*Id*. at 2.) Babies' retinas are not examined at birth or any other time as a routine matter.

4

industry in child abuse pediatrics – witness the modern proliferation of "Child Protection Teams" in children's hospitals nationwide and a new pediatric subspecialty in child abuse. SBS/AHT is *not* widely accepted as being based on sound science by the scientific disciplines implicated by the syndrome, such as biomechanics, for instance, which is why courts across the nation (and worldwide) preclude expert opinion testimony about shaking, i.e., SBS/AHT as the cause of subdural hematomas, retinal hemorrhages, and transient or brief changes in mental state, such as lethargy, particularly when those conditions occurred in concert in a non-ambulatory child, such as S.Z.S., without there being obvious causation, like falling from great heights or being crushed by a great weight or involved in a high-speed vehicle accident, or being violently thrown against a wall and striking one's head.

Plaintiffs retained Dr. Todd Lefkowitz as a standard of care expert against Dr. Cassidy. Dr. Lefkowitz has been an ophthalmologist for over 40 years and is a diplomate with American Board of Ophthalmology. **Exhibit 2**. He has treated pediatric patients at Cardon's Children's Hospital. **Exhibit 3** at 14:8-12. He has been retained as an expert witness involving SBS/AHT cases and given deposition testimony in such cases. *Id*. at 16:7-10, 17-18, 22). Dr. Lefkowitz has never failed to qualify as an expert witness in any court. *Id*. at 27:6-8. He was retained as a standard of care witness here, not a causation expert. *Id*. at **5**:22:8-10, 33:10-12. His standard of care opinion was formed strictly on a medical basis and on a very simple tenet of pediatric medical practice. *Id*. at 42:18-20. His discussion of SBS/AHT is secondary to his primary opinion that,

> Dr. Brendan Cassidy fell below the standard of care in failing to perform [] a dilated retinal exam in this newborn in whom nonaccidental trauma was suspected, particularly when he was brought in to conduct this exam as part of the child protection team at PCH where his opinion was a material consideration in the determination to seize the Patient from the care and custody of his parents, without a warrant or exigent circumstances, which I understand to be a basis for Plaintiffs' claims against Dr. Cassidy.

(Doc. 319-19 at 4.)

## II. LEGAL ARGUMENT

Defendant Cassidy asks this Court to conduct a hearing to determine whether Dr. Lefkowitz's SBS/AHT opinions are "proper and reliable" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and FRE 702. (Doc 311 at 5:12-26, 6:1-3). Notably, Defendant Cassidy is not seeking to prohibit Dr. Lefkowitz from testifying that he fell below the standard of care regarding dilation. Specifically, Dr. Cassidy argues that Dr. Lefkowitz's opinion that SBS/AHT is not a valid medical diagnosis and that there is no significant relationship between retinal hemorrhages and SBS/AHT are not generally accepted by the "scientific" community. (Doc 311 at 6:4-9, and passim). Defendant Cassidy essentially argues that since Dr. Lefkowitz is not a proponent of SBS/AHT, his opinions are "junk science" and should be precluded. However, Dr. Cassidy fails to offer any evidence within the *applicable scientific communities*, including, for instance, biomechanics, supporting his argument. *See State v. Nieve, et al.*, Nos. A-2069-21, A-2936-21, 2023 WL 5947996, at *1 (N.J. Super. Ct. App. Div. Sept. 13, 2023) (affirming the trial court's finding that "expert testimony of shaking-only SBS/AHT was not scientifically reliable" and holding that, "[w]here the underlying theory integrates multiple scientific disciplines, as here, the proponent must establish crossdisciplinary validation to establish reliability."). Indeed, a close reading of his Motion demonstrates that Dr. Cassidy applies a very narrow definition of "scientific community", that being only the "medical societies" of pediatricians and pediatric ophthalmologists who are the only real proponents of SBS/AHT today. *See* (Doc. 322 at 10:19-17:5); *see also* Findley, *et al.*, *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right*, 12 HOUS. J. HEALTH L. & POL'Y 209, 213 (2012) (discussing the widespread agreement that subdural hematomas and retinal hemorrhaging, even with brain swelling, are not enough to diagnose abuse); *see also Nieve, et al.*, 2023 WL 5947996, *1 ("The evidence supports the finding that there is *a real dispute in the larger medical and scientific community* about the validity of shaking only SBS/AHT theory, *despite its seeming acceptance in the pediatric medical community*.") (emphasis added).

6

Defendant Cassidy does not make and has not shown any substantive critiques to any of Dr. Lefkowitz's SBS/AHT opinions sufficient to warrant a *Daubert* hearing. Any purported flaws in Dr. Lefkowitz's SBS/AHT opinions are precisely what cross-examination is for and should go to the weight, not the admissibility, of his expected testimony.

**A.   Defendant Cassidy Has Failed to Demonstrate the Need for a *Daubert* Hearing.**

The purpose of expert testimony at trial is to "help the trier of fact to understand the evidence or to determine a fact in issue." FRE 702. The Supreme Court in *Daubert* "held that the Federal Rules of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony is not only relevant but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). "The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). The Court's role is to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 596). The trial court has broad discretion to decide how to test an expert's reliability as well as relevance, based on the circumstance of the particular case. *Primiano*, 598 F.3d at 564; *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

The rejection of expert testimony *is the exception rather than the rule*. FRE 702, Advisory Committee's Note. (emphasis added). The standard for admissibility is "satisfied where expert testimony advances the trier of fact's understanding to any degree." *Abarca v. Franklin Cnty. Water Dist.*, 761 F.Supp.2d 1007, 1029-30 (E.D. Cal. 2011) (citations omitted). "The threshold for qualification is low for purposes of admissibility; minimal

7

foundation of knowledge, skill, and experience suffices." *PixArt Imaging, Inc. V. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. C 10-00544 JW, 2011 WL 5417090 at *4 (N.D. Cal. Oct. 27, 2011) (citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004)).

The Court has "broad latitude when it decides how to determine reliability." *Kumho*, 526 U.S. at 142. This includes if and when the Court "decide[s] whether or when special briefing or other proceedings are needed to investigate reliability." *Id*. at 152. Thus, the Court is not required to conduct a *Daubert* hearing to evaluate the admissibility of expert opinion testimony. *See, e.g.*, *United States v. Hoang*, 285 F. App'x 133, 136 (5th Cir. 2008) ("No separate hearing is necessary."); *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138 (9th Cir. 2002) ("District courts are not required to hold a *Daubert* hearing before ruling on the admissibility of [expert testimony].").

Here, Defendant Cassidy mounts numerous attacks on Dr. Lefkowitz's opinions, including the following: (1) he is an outlier and the majority of the members of relevant scientific community reject his opinions; (2) Dr. Lefkowitz's testimony does not meet the standards for admissibility; (3) Dr. Lefkowitz disputes Dr. Cassidy's findings of retinal hemorrhages and that the findings are consistent with AHT; (4) Dr. Lefkowitz believes AHT is not a valid medical diagnosis; and (5) his opinions are "junk science." (Doc. 311 at 4:6-5:13). Dr. Lefkowitz is testifying primarily about the standard of care regarding the use of dilating drops before conducting retinal examinations. (Doc. 319-19 at 2.) The opinions he offered regarding SBS/AHT are more so in rebuttal to Defendants' experts. *See* **Exhibit 4** (Dr. Lefkowitz's Supplemental Expert Report). "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness' testimony, not to admissibility." *Abarca*, 761 F.Supp.2d at 1028. The trial court is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F. 3d at 969 (emphasis added). Passing the threshold of admissibility merely requires that the expert's testimony have "a reliable basis in knowledge and experience of relevant discipline." *Messick v. Novarits Pharmaceuticals*

8

*Corp.*, 747 F. 3d 1193, 1194 (9th Cir. 2014) (quotations omitted). With 40 years' experience, including examination children, Dr. Lefkowitz meets the qualifications and knowledge admissibility criteria.

The *Daubert* task is not to "decid[e] whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury. *Alaska Rent-A-Car*, 738 F.3d 969-70. Impeachment alone is not a proper basis for exclusion. *Id.* at 969. An expert's opinion is always assailable through cross-examination. *Daubert*, 509 U.S. at 596. Ultimately, the purpose of the Court's assessment is to exclude speculative or unreliable testimony to ensure accurate, unbiased decision-making by the trier of fact. As noted above, it is truer that Dr. Cassidy's views of SBS/AHT as causation for S.Z.S.'s retinal hemorrhages – if any were actually present when he examined S.Z.S. – are the outlier views, not Dr. Lefkowitz's views.

Defendant Cassidy has failed to demonstrate that a *Daubert* hearing is warranted. "To trigger a Daubert inquiry, an expert's testimony, or its 'factual basis, data, principles, methods, or their application,' must be 'called sufficiently into question.'" *Rodriguez v. Riddel Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001) (quoting *Kumho Tire Co.*, 526 U.S. at 149). Defendant Cassidy has not challenged the qualifications of Dr. Lefkowitz or the relevance of his testimony regarding the standard of care. Instead, without the burden of citation to any authority, he argues an exaggerated (and incorrect) claim that Dr. Lefkowitz's opinions about SBS/AHT are not accepted by his limited definition of the relevant scientific community, which are only the "medical societies" that cling to the SBS/AHT diagnosis.[5] (Doc. 311 at 6:11-12). Moreover, Defendant Cassidy is attempting to use a *Daubert* hearing to make an end run around the juvenile court's findings that S.Z.S

---

[5] Plaintiffs' Omnibus *Daubert* Motion as to Eleven Experts Retained by PCH Defendants and Defendant Cassidy (Doc. 321) more fully briefs the faulty science behind SBS/AHT discussed at the top of § II here. Specifically, the practice of diagnosing SBS/AHT based on the presence of retinal hemorrhages has never been validated by the *relevant* scientific community. (Doc. 321 at 26)

9

was not abused and that Dr. Cassidy's opinions as presented at the dependency trial were not credible. This is not the appropriate basis for conducting a *Daubert* hearing.

### B. Dr. Lefkowitz is Qualified to Opine as to the Standard of Care.

Dr. Lefkowitz is qualified to opine that Dr. Cassidy fell below the standard of care for failing to administer diluting drops before examining S.Z.S. He has over 40 years of experience as an ophthalmologist, including examining children, and has never been disqualified as an expert witness. He has even testified in SBS/AHT cases. However, he now believes, along with the broader relevant scientific and medical community, that SBS/AHT is no longer a valid medical diagnosis or theory of causation. Whether or not he believes SBS/AHT is no longer valid does not affect his opinion on the applicable standard of care. This is subject to cross examination and goes to the weight and credibility rather than admissibility.

### III. CONCLUSION

In actuality, the views of Dr. Cassidy, a pediatric ophthalmologist and self-avowed crusader for purported victims of SBS/AHT, that retinal hemorrhaging is diagnostic of abuse via shaking are outlier views, except, of course, within the insulated pediatric medical community. While Dr. Lefkowitz may have agreed at deposition that his more evolved views on SBS/AHT are not shared by the "medical societies" that cling to the SBS/AHT diagnosis, that narrow definition of "scientific community" advocated by Defendant Cassidy is not the scientific community by which Dr. Lefkowitz's opinions are to be evaluated. The broader, appropriate, scientific community is skeptical, at best, about an SBS/AHT diagnosis. That broader, appropriate scientific community hold the same or similar views about SBS/AHT articulated by Dr. Lefkowitz, in which case he is an outlier with a large cohort.

To the extent any testimony is allowed about whether S.Z.S. was abused – which none should be because it has already been judicially determined that there was no abuse – Dr. Lefkowitz's views are in line with the relevant scientific community and should be allowed. The better course, however, would be to not allow any expert testimony that the

child was a victim of abuse, and to particularly disallow any expert testimony that shaking or SBS/AHT was the manner of abuse. Furthermore, since Defendant Cassidy does not move to exclude Dr. Lefkowitz's opinion that Dr. Cassidy fell below the standard of care regarding dilation, that testimony should be allowed. For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant Dr. Cassidy's *Daubert* Motion regarding Dr. Todd A. Lefkowitz, M.D.  The Motion is without merit on its face and should be denied.

**RESPECTFULLY SUBMITTED** this 19th day of October 2023.

**MILLS + WOODS LAW, PLLC**

By   */s/ Thomas A. Connelly*
     Thomas A. Connelly
     Robert T. Mills
     Sean A. Woods
     5055 North 12th Street, Suite 101
     Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of October 2023, I electronically transmitted the foregoing document to be filed electronically with the Clerk of the Court using the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

   */s/*

11