# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Honor Duvall, et al.,

Plaintiffs,

vs. No. 21-CV-00167-ROS

Arizona Department of Child Safety,

Defendants.

VIDEOCONFERENCE DEPOSITION OF HEATHER GOSNELL, MD

Goodyear, Arizona
November 1, 2022
11:33 a.m.

PREPARED FOR:
(CERTIFIED COPY)

Reported by:
SABRINA S. STERENFELD
Registered Professional Reporter
Arizona CR NO. 51002

CARRIE REPORTING, LLC
Certified Reporters
2415 East Camelback Road
Suite 700
Phoenix, AZ 85016
(480)429-7573

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573

[Page 2]

INDEX

| WITNESS | ON PAGE |
|---|---|
| HEATHER GOSNELL, MD | |
| Examination by MR. CONNELLY | 5 |
| Examination by MS. ZANGERLE | 154 |
| Examination by MS. PATANE | 222 |
| Examination by MR. PATEL | 223 |
| Examination by MR. CONNELLY | 225 |
| Examination by MS. ZANGERLE | 244 |

* * *

EXHIBITS

| EXHIBITS | DESCRIPTION | MARKED ON PAGE |
|---|---|---|
| No. 50 | DVP00037 KW - DVP00040 KW | 50 |
| No. 51 | DVP00035 KW - DVP00036 KW | 62 |
| No. 52 | DVP00028 KW - DVP00031 KW | 64 |
| No. 53 | DVP00288 KW | 77 |
| No. 54 | DVP00022 KW - DVP00045 KW | 89 |
| No. 55 | DVP00018 KW - DVP00021 KW | 117 |
| No. 56 | DVP00015 KW - DVP00017 KW | 125 |
| No. 57 | DVP00011 KW - DVP00014 KW | 133 |
| No. 58 | DVP00005 KW | 134 |
| No. 59 | DVP00006 KW - DVP00010 KW | 141 |

[Page 3]

VIDEOCONFERENCE DEPOSITION OF HEATHER GOSNELL, MD was taken on November 1, 2022, commencing at 11:33 a.m. on Zoom Videoconference, before SABRINA S. STERENFELD, CR, RPR, Phoenix, Arizona, a Certified Reporter in the State of Arizona.

COUNSEL APPEARING:

For the Plaintiffs:
MILLS + WOODS LAW, PLLC
By: Thomas A. Connelly, Esq.
5055 North 12 Street, Suite 101
Phoenix, Arizona 85014
(480) 999.4556
Docket@millsandwoods.com

For the Defendant Department of Child Safety:
JONES, SKELTON & HOCHULI
By: Ravi Patel, Esq.
40 N. Central Avenue
Phoenix, Arizona 85004
(602) 263-1700
Rpatel@jshfirm.com

For the Defendant Phoenix Children's Hospital:
GUST ROSENFELD, P.L.C.
By: Kari B. Zangerle, Esq.
One East Washington Street, Suite 1600
Phoenix, Arizona 85004
(602) 254.4878
Kzangerle@gustlaw.com

For the Defendant Brendan Cassidy, M.D.:
KENT & WITTEKIND, P.C.
By: Cynthia Patane, Esq.
909 East Missouri Avenue,
Phoenix, Arizona 85014
(602) 528-0185
Cpatane@kwlaw-az.com

[Page 4]

Also present:
Alaina Raetz, Phoenix Children's Hospital
Cary Hall, Phoenix Children's Hospital

[Page 37]

BY MR. CONNELLY:
Q. Can you answer that question?
MR. PATEL: Same objection.
MS. PATANE: Join.
MS. ZANGERLE: Join.
THE WITNESS: When I saw the child after the trauma had occurred, he had already had an evaluation in the emergency department. He was hospitalized.
BY MR. CONNELLY:
Q. And it was PCH who diagnosed the suspicion of abuse; right?
MS. ZANGERLE: Form.
MS. PATANE: Form.
MR. PATEL: Join.
THE WITNESS: Yes, the child was seen at PCH.
BY MR. CONNELLY:
Q. You yourself never made any diagnosis of suspicion of abuse, did you?
MS. PATANE: Form.
MR. PATEL: Join.
THE WITNESS: I'm not sure what you mean by that question.
BY MR. CONNELLY:
Q. Well, you never noted in any records that you

[Page 38]

had a suspicion that the child had been abused; correct?
A. No, that's not correct.
Q. Okay. Where in your records did you note that you had a suspicion that the child was abused?
A. Well, on February 25th I wrote, "concern for NAT," and then there was some questions and things and then further evaluation was done, and then once all reports were back from the specialist, the information became more clear.
Q. All right. Well, we'll go through your February 25th records in a bit.
Prior to the time that the child was admitted to PCH, did you -- how many -- had you met both parents before February of 2019?
A. Yes.
Q. Do you recall how many times you had met both parents?
A. I can tell you. It was a few times. According to my notes, father was only in once, but I think that may have just not been noted on other visits. But I feel like I met them both a few times before February.
Q. You think it was more likely that father and mother were both present for each visit in your office?
MR. PATEL: Objection. Form. Foundation.
MS. PATANE: Form.

[Page 39]

MS. ZANGERLE: Join.
MS. PATANE: Join.
THE WITNESS: It's possible. Sometimes the default just says mother, but sometimes it is both parents.
BY MR. CONNELLY:
Q. So your records aren't always accurate on that score?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Form and foundation.
MR. PATEL: Join.
THE WITNESS: I think most of the time it is, but there are some that may not have that accurate information.
BY MR. CONNELLY:
Q. Is there other information that might be autopopulated that is not accurate in your records?
MS. PATANE: Form and foundation.
MS. ZANGERLE: Join.
MR. PATEL: Join.
THE WITNESS: Yes, that's possible.
BY MR. CONNELLY:
Q. What kind of information would that be?
MS. PATANE: Form and foundation.
MS. ZANGERLE: Join.

[Page 40]

MR. PATEL: Join.
THE WITNESS: Well, some things are generated -- like, visit to visit, it carries over. So sometimes if the family history changes or the social history or the past medical history, sometimes those may not always be updated because it carries over from the last visit.
And then some things in the physical exam autopopulated, so some things may not have been changed appropriately to reflect the current status.
BY MR. CONNELLY:
Q. Well, let's talk for a minute about the initial visit when you have a newborn patient.
What do you generally do in examining the newborn patient at the initial visit?
A. It's a full head-to-toe exam.
Q. So you take the child's weight; right?
A. Yes, the height, weight and the head circumference.
Q. Do you generally have access or have you received the records from the birth?
A. It depends on which hospital they are born at.
Q. What if they were born at Banner Estrella hospital, would you have those records on the initial visit?

[Page 237]

A. Yes. Okay.
Q. You stated that you leave it to the police to determine who, if anyone, caused abuse; right?
A. I guess I should say the authorities, not just the police.
Q. Okay. So the authorities, DCS, the police, and the courts. That's who you leave it to to determine whether or not there was abuse -- or who caused abuse; right?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Join.
THE WITNESS: Yeah.
BY MR. CONNELLY:
Q. And that's who you leave it to to determine whether or not there was actually any abuse; right?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Join.
THE WITNESS: No, I wouldn't say that.
BY MR. CONNELLY:
Q. You think doctors can determine whether or not a child was abused just simply based on conditions that they observe?
A. Yes.
MS. ZANGERLE: Form and foundation.
MR. PATEL: Join.

[Page 238]

BY MR. CONNELLY:
Q. What role do you believe the courts play in the determination of abuse?
MS. PATANE: Form and foundation.
MR. PATEL: Join.
MS. ZANGERLE: Join.
THE WITNESS: The perpetrator.
BY MR. CONNELLY:
Q. And do you understand that the courts also play a role in determining whether or not abuse actually occurred?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Form and foundation.
MR. PATEL: Join.
THE WITNESS: Yes.
BY MR. CONNELLY:
Q. You understand that when an agency like DCS comes along or the State files charges of abuse that they have a burden to prove that abuse actually occurred; right?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Form and foundation.
MR. PATEL: Form.
THE WITNESS: Yes.

[Page 239]

BY MR. CONNELLY:
Q. Are you aware that in this case the Court found that there was no abuse?
MR. PATEL: Form and foundation.
MS. ZANGERLE: Form and foundation.
MS. PATANE: Form and foundation.
THE WITNESS: No, I wasn't aware.
BY MR. CONNELLY:
Q. Were you aware that in this case the Court found that Dr. Cassidy, the pediatric ophthalmologist, was not a credible witness?
MS. ZANGERLE: Form.
MR. PATEL: Form.
MS. PATANE: Form and foundation.
MS. ZANGERLE: I'll just ask Counsel to correct that it was not this case. It was another proceeding in state court.
MR. CONNELLY: All right. Let me rephrase the question.
BY MR. CONNELLY:
Q. Were you aware that at the court in the juvenile dependency proceedings from which this case originated found that Dr. Cassidy, the pediatric ophthalmologist at PCH, was not a credible witness?
MS. ZANGERLE: Form and foundation.

[Page 240]

MS. PATANE: Form and foundation.
THE WITNESS: I was not aware of that.
BY MR. CONNELLY:
Q. Were you aware that in the juvenile dependency case from which this case originates, the Court found that Dr. Wood's records, the pediatric orthopedic, was riddled with errors?
MS. ZANGERLE: Form and foundation.
MR. PATEL: Form and foundation.
MS. PATANE: Join.
THE WITNESS: I was not aware.
BY MR. CONNELLY:
Q. Were you aware that the Buckeye Police Department was investigating this case -- or I should say the -- yeah, in this case they were investigating whether or not the parents have abused the child. Were you aware of that?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Join.
MR. PATEL: Join.
THE WITNESS: I knew the police got called, but I don't know to what extent. I didn't have any information from the police department.
BY MR. CONNELLY:
Q. Okay. Did anyone from the Buckeye Police

[Page 241]

Department ever contact you?
A. No.
Q. Okay. So you're not aware then that the Buckeye Police Department did not file criminal charges against the parents for abuse; right?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Form and foundation.
MR. PATEL: Form.
THE WITNESS: No.
BY MR. CONNELLY:
Q. And the State did not file criminal charges against the parents for abuse, did you know that?
MR. PATEL: Form and foundation.
MS. ZANGERLE: Form and foundation.
MS. PATANE: Join.
THE WITNESS: No.
BY MR. CONNELLY:
Q. I'm sorry, what was your answer?
A. No.
Q. Is it possible for a child to have a subdural hematoma without the parents knowing the cause and it also not being abuse?
MR. PATEL: Form and foundation.
MS. ZANGERLE: Form and foundation.
MS. PATANE: Join.

[Page 242]

THE WITNESS: Probably. I don't know that. It's not really my expertise.
BY MR. CONNELLY:
Q. Is it possible for a child to have a retinal hemorrhage without the parents knowing the cause and the cause not being abuse?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Form and foundation.
THE WITNESS: That would be exceedingly rare.
BY MR. CONNELLY:
Q. But it could happen?
MS. PATANE: Form. Foundation.
MS. ZANGERLE: Join.
MR. PATEL: Join.
THE WITNESS: I think there's some very rare, other causes for retinal hemorrhages, but most common would be abuse.
BY MR. CONNELLY:
Q. Retinal hemorrhages can also be caused by increasing intracranial pressure as a result of subdural hematomas; right?
MR. PATEL: Form.
MS. ZANGERLE: Form and foundation.
MS. PATANE: Form and foundation.

[Page 243]

THE WITNESS: I don't know that.
BY MR. CONNELLY:
Q. Dr. Wood in his records does not say definitively that there was a fracture, does he?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Join.
MR. PATEL: Join.
THE WITNESS: I thought that he did. I would have to look at it again. Would you like me to do that?
BY MR. CONNELLY:
Q. Go ahead and point me to where you're looking and exactly what he says.
A. I'm looking at February 28th record. The server is locked up. So he says it does appear to him there's a corner metaphyseal fracture of the right tibia.
Q. Says it appears that way; right?
A. Yes.
MS. ZANGERLE: Form and foundation.
MR. PATEL: Join.
BY MR. CONNELLY:
Q. And he dates it as a fracture occurring on or about February 19th; right?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Join.

[Page 244]

MR. PATEL: Join.
THE WITNESS: I didn't see that he specifically said the date.
BY MR. CONNELLY:
Q. Well, let's assume that PCH record says that the fracture occurred on or about February 19th. You agree with me that if that were the case, the child would have been in pain or discomfort when you examined him on February 25th?
MS. ZANGERLE: Form and foundation.
MS. PATANE: Join.
THE WITNESS: No, I said not necessarily.
MR. CONNELLY: All right. Thank you, Doctor. I don't have anything else.
MS. ZANGERLE: Dr. Gosnell, just two questions in follow-up from plaintiff's counsel.

FURTHER EXAMINATION

BY MS. ZANGERLE:
Q. He's asked you a lot of questions about other potential causes for the constellation of injuries that this child had when you examined him in your office.
As you sit here today, do you think there is another explanation for this child's injuries that existed in 2019 other than nonaccidental trauma?