**GUST ROSENFELD  P.L.C.**
Kari B. Zangerle, No. 013164
Robert C. Stultz, No. 025781
kzangerle@gustlaw.com
rstultz@gustlaw.com
One East Washington Street, Suite 1600
Phoenix, Arizona  85004-2553
(602) 257-7422
Fax: (602) 254-4878

*Attorneys for Defendants Phoenix Children's Hospital; Dr. William S. Wood
 and Rachel Wood; Dr. Kathryn Coffman; Haley Dietzman and
Roald Dietzman; Zachary Dion; and Carey Lewis*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, an individual; Donald Sankey, Junior, an individual; S.Z.S., a minor, through his parents and guardians Honor Duvall and Donald Sankey,<br><br>Plaintiffs,<br><br>v.<br><br>Arizona Department Of Child Safety, a governmental entity, *et al.*,<br><br>Defendants. | Case No.:  21-CV-00167-PHX-ROS<br><br>**THE PCH DEFENDANTS' RESPONSE TO PLAINTIFFS' OMNIBUS *DAUBERT* MOTION AS TO ELEVEN EXPERTS RETAINED BY PCH DEFENDANTS AND DEFENDANT CASSIDY**<br><br>**(Oral Argument Requested)** |

Defendants  Phoenix  Children's  Hospital,  Dr.  William  S.  Wood  and  spouse Rachel Wood; Dr. Kathryn Coffman; and Haley Dietzman and spouse Roald Dietzman ("PCH Defendants"), through counsel, respond to Plaintiffs' Omnibus *Daubert* Motion as to Eleven Experts Retained by PCH Defendants and Defendant Cassidy. (Doc 321.)

On February 21, 2019, S.Z.S., a 60-day old infant, presented to the Emergency Department at Phoenix Children's Hospital with his mother, Plaintiff Honor Duvall. S.Z.S. presented with a constellation of injuries indicative of suspected non-accidental trauma (SNAT): a leg fracture (metaphyseal fracture), retinal hemorrhages, subdural hematomas, and bruising. S.Z.S.'s parents offered no explanation for the injuries, such as accidental trauma. The injuries were reported to the Arizona Department of Child Services, pursuant to Arizona's mandatory child abuse reporting statute. *See* A.R.S. § 13-3620, *et seq.* The well-established and generally accepted medical science supports the causal connection between S.Z.S.'s injuries and non-accidental trauma (i.e., child abuse).

S.Z.S. presented to PCH with subdural hematomas, bilateral retinal hemorrhages, a metaphyseal fracture, and bruising. During the two PCH hospital admissions, Plaintiffs provided no explanation, such as accidental trauma, for S.Z.S.'s injuries. The lack of explanation has extended into this litigation. Plaintiffs have not disclosed a single expert witness to testify, to a reasonable degree of medical probability, what caused S.Z.S.'s injuries.

Given Plaintiffs' absence of evidence to explain S.Z.S.'s injuries, Plaintiffs want to exclude the PCH Defendants' ten highly qualified experts. Each of the PCH Defendants' experts, from the perspective of their respective medical specialties, will testify that non-accidental trauma (i.e., abuse) was reasonable to suspect and report to DCS, and/or that non-accidental trauma (i.e., abuse) was the most likely cause of S.Z.S.'s injuries.

With no evidence or generally accepted medical science to explain away S.Z.S.'s injuries, Plaintiffs are making an unfounded attempt to exclude the PCH Defendants' experts. Plaintiffs do not argue that the PCH Defendants' experts are unqualified to testify as expert witnesses. Rather, Plaintiffs argue that the experts employed a

"differential etiology" instead of a "differential diagnosis," which, according to Plaintiffs, should be excluded because the experts purportedly did not rule out all other possible causes of the injuries before concluding they were likely caused by abuse. Plaintiffs contend this renders the experts' opinions unreliable. As discussed in more detail below, Plaintiffs argument is based on misstatements of the evidence, medical science, and applicable law.

Secondarily, Plaintiffs argue that the PCH Defendants' experts relied on inaccurate medical records, somehow rendering their opinions unreliable. While the PCH Defendants dispute that the medical records were unreliable, any such questions about the accuracy of the medical records on which the experts relied goes to the weight of their testimony, not its admissibility.

While the PCH Defendants believe that there is sufficient basis in this Response and the record evidence to find that each of the PCH Defendants' experts satisfy the *Daubert* standard, if the Court contemplates excluding any portion of the experts' opinions, the PCH Defendants request an evidentiary hearing.

## I.   THE JUVENILE PROCEEDING: WHO PARTICIPATED AND WHAT THE COURT DECIDED

Throughout this case, Plaintiffs have made misstatements about the Juvenile Court's ruling (e.g., in questioning at depositions). Plaintiffs' *Daubert* Motion is no exception. In the Motion, Plaintiffs inaccurately claim, "The juvenile court thus expressly found that S.Z.S. was not a victim of abuse…." (Doc. 321, p. 6, lns. 6-7.) That is not true. The Juvenile Court found "that the Department [i.e., DCS] did not meet its burden of proof in this case and the evidence fails to establish that there is a dependency as to either parent." (Doc. 319-22, at DUVALL_000052). The Juvenile Court did not make an affirmative finding of no abuse. In fact, the juvenile court concluded, "Dr. Steven Gabaeff is an expert hired by the parents. He testified that based on his review of

1  the records that there was no abuse in this case. The Court did not find his testimony
2  credible."

3      The PCH Defendants were not parties to, and had no control over, the
4  dependency action in the Juvenile Court. In Plaintiffs' Motion for Summary Judgment,
5  they state, without any factual support, that "PCH, through its general counsel, and Drs.
6  Cassidy and Wood worked closely with the assistant attorney general prosecuting the
7  dependency for DCS." (Doc. 319, p. 21, lns. 12-14.) This is an inaccurate allegation.
8  The State brought and prosecuted the dependency action. The State controlled who was
9  called, or not called, as witnesses. The State decided trial strategy.  As can be seen by
10 the evidence presented in this case, had the PCH Defendants been parties to, and had
11 control over, the prosecution of the dependency action, the evidence and trial strategy
12 would have been different.

13     The Juvenile Court's findings have no bearing on the issues in Plaintiffs' *Daubert*
14 Motion. The PCH Defendants were not parties to the Juvenile Court proceedings. The
15 PCH Defendants have access to evidence that was not presented in the Juvenile Court
16 proceedings.

17 **II.     THE PCH DEFENDANTS' EXPERTS**

18     The PCH Defendants disclosed ten expert witnesses to testify on their behalf.
19 The following is a list of the experts and a brief overview of their opinions:

20          **1.     Steven Frick, M.D. (pediatric orthopedic surgery)**

21     Dr. Frick is a board-certified orthopedic surgeon. He is Professor and Vice
22 Chairman of Orthopedic Surgery at Stanford University School of Medicine, as well as
23 the Chief of Pediatric Orthopedic Surgery at the Lucile Packard Children's Hospital.
24 (Doc. 130-1 at 61.) In his initial report, Dr. Frick opined that Dr. Wood complied with
25 the standard of care. (Doc. 130-1 at 63.) Dr. Frick will testify that the only plausible
26 cause of S.Z.S.'s right distal tibia medial metaphyseal corner fracture was non-

accidental trauma. (Doc. 130-1 at 63-64.) Dr. Frick will testify that the standard of care would require Dr. Wood, or another orthopedist, to report the injury to authorities. (*Id*.)

### 2.    Joseph Grubenhoff, M.D. (pediatric emergency medicine)

Dr. Grubenhoff is board certified by the American Board of Pediatrics with subspecialty certification in Pediatric Emergency Medicine. (Doc. 130-1 at 101.) He is an Associate Professor of Pediatrics and Emergency Medicine (by courtesy) at the University of Colorado and serves as a Core Faculty member in the Pediatric Residency Program and Pediatric Emergency Medicine Fellowship Program. (*Id*.) He also serves as the Medical Director of Diagnostic Safety at Children's Hospital Colorado, a Level 1 Pediatric Trauma Center. (*Id*.) Dr. Grubenhoff will testify regarding the medical care S.Z.S. received at Phoenix Children's Hospital Emergency Department. Dr. Grubenhoff will testify that based upon S.Z.S.'s presentation and injuries, it was reasonable to suspect abuse and it would be required to report to authorities under the standard of care and according to the PCH Policy Child Abuse and Neglect. (Doc. 130-1 at 106.)

### 3.    Jonathan Horton, M.D. (pediatric ophthalmology)

Dr. Horton is board certified in ophthalmology by the American Board of Ophthalmology. (Doc. 130-1 at 134.) He is a Professor of Ophthalmology, Neurology, and Physiology at the University of California, San Francisco (UCSF), where he holds the William F. Hoyt endowed chair of Ophthalmology. (*Id*.) He also serves as a Pediatric Ophthalmologist and Neuro-Ophthalmologist at the Benioff Children's Hospital, UCSF. (*Id*.) Dr. Horton holds a Medical Degree from Harvard Medical School and a Ph.D. in Neurobiology from Harvard. (*Id*.)

Dr. Horton will testify that the clinical evaluation completed on S.Z.S., including by ophthalmologist Dr. Brendan Cassidy, was professional, appropriate, and diligent. (Doc. 130-1 at 135.) In his initial report, Dr. Horton opined regarding the hemorrhages present in the retinas of both eyes. Dr. Horton disagrees with Plaintiffs' allegation that

the injuries occurred during labor and delivery.[1] (Doc. 130-1 at 136.) According to Dr. Horton, Plaintiffs' explanation is inconsistent with S.Z.S.'s condition at PCH. (*Id*.)  Any retinal hemorrhages that might have occurred during childbirth would have resolved by the time of Dr. Cassidy's examination two months later. (*Id*.) Dr. Cassidy's examination showed findings consistent with an acute injury that occurred in close temporal proximity to S.Z.S.'s admission to PCH on February 21, 2019. (*Id*.) Dr. Horton will testify that the injuries present at the time of that admission suggest non-accidental trauma as the most likely cause. (Doc. 130-1 at 137.)

On January 4, 2023, Dr. Horton prepared a supplemental report. (**Ex. 1.**) In the supplemental report, Dr. Horton stated that "no medical organization denies the reality of abusive head trauma in children and that rejection of this association [by Plaintiffs' experts] reflects an opinion not held by any physician who follows the standard of care in pediatric medicine." (**Ex. 1,** at Horton 0071 GR.) According to Dr. Horton, the extent and features of S.Z.S.'s ocular hemorrhages were highly consistent with a diagnosis of non-accidental trauma. (**Ex. 1,** at Horton 0072 GR.)

### 4. Charles Maxfield, M.D. (pediatric radiology)

Dr. Maxfield is board certified by the American Board of Radiology in Diagnostic Radiology with subspecialty certification in Pediatric Radiology. (Doc. 130-1 at 202.) He is a Professor of Radiology and Pediatrics at Duke University, where he also serves as the Chief of Pediatric Radiology and the Vice Chair of Education for the Department of Radiology. (*Id*.) Dr. Maxfield will testify regarding the imaging related to S.Z.S.'s leg fractures. Dr. Maxfield concludes that he "would strongly favor non-accidental trauma in the differential diagnosis, and believe[s] without question there is a medical/radiographic basis for reporting the injury to the authorities." (Doc. 130-1 at

---

[1]  Plaintiffs have disclosed no obstetrics expert to testify that S.Z.S.'s injuries were caused by the labor and delivery approximately 60 days before his presentation to PCH.

204.)

### 5.  David Mirsky, M.D. (diagnostic radiology)

Dr. Mirsky is board certified in diagnostic radiology by the American Board of Radiology, with a subspecialty certification in Neuroradiology. (Doc. 130-1 at 221.) Dr. Mirsky is an Associate Professor of Radiology at the University of Colorado. (*Id*.) He also serves as a Pediatric Neuroradiologist at Children's Hospital Colorado, where he is the Director of the Pediatric Neuroradiology Fellowship programs, a designated faculty member in their Fetal Care Center, and an appointed member of the Medical Executive Board. (*Id*.) Dr. Mirsky will testify regarding the MRI and CT imaging that S.Z.S. received, which Dr. Mirsky is of the opinion shows injuries consistent with trauma. (Doc. 130-1 at 223.) According to Dr. Mirsky, "The imaging performed in the initial visit to Phoenix Children's Hospital provides foundation for considering abusive head trauma (non-accidental trauma) and reporting the child's injuries to the authorities given that no other credible explanation for the injuries." (*Id*.)

### 6.  Corey Rood, M.D. (forensic pediatrics)

Dr. Rood is board certified by the American Board of Pediatrics in both General Pediatrics and the subspecialty of Child Abuse Pediatrics. (Doc. 130-1 at 259-260.) Dr. Rood is an Associate Clinical Professor of Pediatrics within the School of Medicine and the Division Chief of the Child Abuse Pediatrics Division within the Department of Pediatrics at the University of California Irvine (UCI) in Orange County, California. (Doc. 130-1 at 259.) He also currently serves as the Medical Director of the Child Abuse Services Team medical clinic in Orange, CA and the Medical Director of the Child Abuse & Prevention Team at Miller Children's and Women's Hospital in Long Beach, CA. (*Id*.)

Dr. Rood will testify about the pediatric medical evaluations that S.Z.S. received at PCH and his injuries. Dr. Rood concludes his report with the following overview:

> The constellation of injuries identified with this nearly 2-month-old infant, including the multiple areas of bruising, bilateral subconjunctival hemorrhages, bilateral diffuse multilayered retinal hemorrhages, bilateral multilocation subdural hemorrhages, soft palate healing oral injury, and healing right distal tibia classic metaphyseal fracture and possible left distal tibia classic metaphyseal fracture, is consistent with a medical diagnosis and etiology of inflicted trauma (child physical abuse) including abusive head trauma in this child with strong medical evidence that injuries happened on more than one occasion.

(Doc. 130-1 at 264.) According to Dr. Rood, "A medical professional is mandated to report suspected child maltreatment to the appropriate local authorities when they have a reasonable concern…The consultation provided by the Child Protection Team and Dr. Coffman were appropriate and meet best practice and standard of care for pediatrics." (Doc. 130-1 at 264-265.)

In a supplemental report dated January 19, 2023, Dr. Rood offered rebuttal opinions to Plaintiffs' expert Dr. Thomas Young. (**Ex. 2.**) Dr. Rood rebuts the very foundation of Dr. Young's opinions, including Dr. Young's opinion that child abuse must be witnessed.  (**Ex. 2**, at Rood 0100 GR.) Dr. Rood concludes that S.Z.S.'s injuries were not related to birth trauma. (**Ex. 2**, at Rood 0099 GR.)

### 7.     Lewis Phillip Rubin, M.D. (neonatology)

Dr. Rubin is board certified by the American Board of Pediatrics with subspecialty certification in Neonatal Perinatal Medicine. (Doc. 130-1 at 290.) Dr. Rubin is a Professor of Pediatrics in the Division of Neonatal-Perinatal Medicine at Georgetown University, where he also serves as the Vice-Chair of Pediatric Research. (*Id*.) Dr. Rubin will testify that S.Z.S.'s injuries were not related to labor and delivery. Dr. Rubin is of the opinion that "there is no basis for alleging that the child's injuries are a result of infantile rickets." (*Id*.) After a detailed discussion of S.Z.S.'s labor and delivery, "there is no other reasonable explanation for the child's constellation of signs

and symptoms other than SNAT [suspected non-accidental trauma]." (Doc. 130-1 at 291.) Dr. Rubin notes that he has cared for thousands of infants involved in difficult and traumatic deliveries, and he has never seen a child with bucket handle fractures caused from labor and delivery. (*Id*.)

### 8.    Lisa Sansalone, M.S.N., R.N., C.P.N.P.-A.C. (NP trauma services)

Ms. Sansalone is an experienced acute care pediatric nurse practitioner. She is board certified as an acute care pediatric nurse practitioner through the Pediatric Nursing Certification Board. (Doc. 130-1 at 350.) Ms. Sansalone will testify about the role of pediatric nurse practitioners in the care of patients who are suspected to have SNAT. Ms. Sansalone will testify that the pediatric nurse practitioner involved in S.Z.S.'s care at PCH complied with the standard of care. (Doc. 130-1 at 352.) In her report, Ms. Sansalone noted that she "reviewed the infant's birth records and available pediatric clinic records. There is nothing which suggests a traumatic birth, either during the initial newborn period/admission or in the follow-up visits with the pediatrician." *Id*. According to Ms. Sansalone, "[t]he communication and clinical decision making by Nurse Practitioners Lewis and Dion were appropriate and done with the best interests of the infant given the paucity of history, which failed to correlate with clinical and radiographic findings, which was obtained from a multidisciplinary team of specialists." *Id*.

### 9.    Sarah Ann Wagner, M.D. (obstetrics and gynecology)

Dr. Wagner is board certified by the American Board of Obstetrics and Gynecology, and is a fellow of the American College of Obstetricians and Gynecologists. (Doc. 130-1 at 361.) In her initial report, Dr. Wagner stated that the labor and delivery of S.Z.S. and that it did not cause the injuries with which S.Z.S. presented at PCH on February 21, 2019. Dr. Wagner will testify that the labor and delivery were

managed appropriately. (Doc. 130-1 at 362.) The management of the second stage in S.Z.S.'s labor and delivery is unrelated to the clinical presentation at PCH several months later. (*Id*.) Moreover, "it can be said with certainty that there are no indications in the medical record that lead one to believe that the infant's bucket handle fracture is related to the mother's labor and delivery course." (*Id*.)

In a supplemental report dated January 24, 2023, Dr. Wagner updated her report with rebuttal opinions addressing Plaintiffs argument, which was unsupported by expert witness testimony, that S.Z.S.'s presentation at PCH could be related to his birth. (*See* **Ex. 3**.) Dr. Wagner opined, "The absence of abnormal labor or operative delivery indicates the likelihood of a subdural hemorrhage caused by labor is exceedingly low. It is clear that the management of the second stage in this patient's course is unrelated to the clinical presentation of their infant several months later." (*See* **Ex. 3**, at Wagner 0017 GR.) After a discussion of the American College of Obstetric and Gynecology guidelines and medical literature, Dr. Wagner concluded, "it is my expert opinion that the clinical course of [S.Z.S.] was completely unrelated to the management and delivery of Ms. Duvall's pregnancy." (*See* **Ex. 3**, at Wagner 0018 GR.)

### 10.   Judy Walczak, R.N., C.P.N.P. (forensic nurse practitioner)

Ms. Walczak is a forensic nurse practitioner who currently serves on the Child Advocacy and Protection Team at Children's Wisconsin, and served as a Pediatric Nurse Practitioner at the Waukesha C.A.R.E. program. (Doc. 130-1 at 378.) Ms. Walczak is a Registered Nurse and Advanced Nurse Prescriber in Wisconsin, and she holds Pediatric Nurse Practitioner-PC certification from the Pediatric Nursing Certification Board. (*Id*.) Ms. Walczak will testify that Ms. Dietzman complied with the standard of care. (Doc. 130-1 at 379.) According to Ms. Walczak, "Ms. Dietzman was within the standard of care to identify the child's injuries as being associated with SNAT and evaluate the child further for evidence of abuse." (Doc. 130-1 at 381.)

### III.    THE MEDICAL SCIENCE AND S.Z.S.'S INJURIES

The science of abusive head trauma is well-established, longstanding, and generally accepted within the medical community. In April 2020, the American Academy of Pediatrics ("AAP") published a policy statement titled "Abusive Head Trauma in Infants and Children." (*See* **Ex. 4**.) In the policy statement, the AAP noted that it had adopted, in 2009, the current term Abuse Head Trauma ("AHT"), over earlier nomenclature, such as whiplash shaken infant syndrome, shaken impact syndrome, inflicted childhood neurotrauma, and shaken baby syndrome. (**Ex. 4**, at p. 2.) The change in nomenclature was "in recognition of the fact that inflicted head injury of children can involve a variety of biomechanical forces, including shaking." *Id*. According to the policy statement, "The AAP continues to affirm the dangers and harms of shaking infants, continues to embrace the 'shaken baby syndrome' diagnosis as a valid subset of the AHT diagnosis, and encourages pediatric practitioners to educate community stakeholders when necessary." (**Ex. 4**, at p. 2.) The AAP notes that the debate of Abusive Head Trauma "is a philosophical one, not a scientific one." (**Ex. 4**, at p. 9.)

Medical science substantiates the causal connection between shaking (acceleration-deceleration forces) and AHT. Some early biomechanical models raised concerns about whether shaking alone generates enough force to induce a variety of infant brain injuries; however, subsequent studies have shown the limitation of those early models and have validated shaking alone as a mechanism for inducing infant brain injuries. (**Ex. 4**, at p. 6-7.) Similarly, clinical studies "continue to emphasize the importance of shaking as an injurious mechanism in many cases of AHT." (**Ex. 4**, at p. 7.)

In 2018 in the journal *Pediatric Radiology*, multiple organizations published an article titled "Consensus Statement on Abusive Head Trauma in Infants and Young

1   Children." (*See* Doc. 315-3.) The participating organizations were the Society for
2   Pediatric Radiology, the European Society of Paediatric Radiology, the American
3   Society of Pediatric Neuroradiology, the American Academy of Pediatrics, the American
4   Professional Society on the Abuse of Children, the Swedish Paediatric Society, the
5   Norwegian Pediatric Association, and the Japanese Pediatric Society.

6        In the Consensus Statement, the authors explain, "The diagnosis of AHT is a
7   medical diagnosis made by a multidisciplinary team of pediatricians and pediatric
8   subspecialty physicians, social workers and other professionals based on consideration
9   of all the facts and evidence. AHT is a scientifically non-controversial medical
10  diagnosis broadly recognized and managed throughout the world." (Doc. 315-3, at Med
11  Lit 0030 GR.) The authors note that "[r]recently, denialism of child abuse has become a
12  significant medical, legal and public health problem." (Doc. 315-3, at Med Lit 0031
13  GR.) Notwithstanding the recent denialism, "[i]n various forms, AHT has been in the
14  modern medical literature for more than 60 years [34], 'with over 1,000 peer-reviewed
15  clinical medical articles written by over 1,000 medical authors from more than 25
16  different countries.' [2]." (Doc. 315-3, at Med Lit 0032 GR.)

17       In the Consensus Statement, the authors explain that "[s]ubdural hematoma is the
18  most commonly observed intracranial lesion (in up to 90%) in young infants with
19  AHT…." (Doc. 315-3, at Med Lit 0034 GR.) Although Plaintiffs' expert Thomas Young,
20  M.D. does not offer an opinion, to a reasonable degree if medical certainty, as to the
21  cause of S.Z.S.'s subdural hematomas, he suggests that subdural hematomas can occur
22  during childbirth and then "re-bleed" months later. (Doc. 310, at p. 5.) The Consensus
23  Statement addresses the "re-bleed" theory, describing it as "unsubstantiated." In the
24  Consensus Statement, the authors explain that "asymptomatic birth-related subdural
25  hematomas are relatively frequent and resolve in the overwhelming majority of infants
26  within the first 4-6 postnatal weeks, and do not appear to rebleed." (Doc. 315-3, at Med

Lit 0038 GR.)

S.Z.S. also suffered from bilateral retinal hemorrhages, which are closely associated with AHT.   The American Academy of Ophthalmology published an Information Statement on Abusive Head Trauma/Shaken Baby Syndrome. (*See* Doc. 315-6.) In the Information Statement, the Academy notes, "The most common ocular manifestation of shaking injury, present in approximately 85% of cases, are retinal hemorrhages." (Doc. 315-6, at p. 3.) According to the Academy, "Currently, there is abundant evidence from multiple sources (perpetrator confessions, clinical studies, postmortem studies, mechanical models, animal models and finite element analysis) that repetitive acceleration-deceleration with or without head impact is injurious, and the primary cause of retinal hemorrhages in victims of Shaken Baby Syndrome is vitreo-retinal traction." (Doc. 315-6, at p. 4.)

The PCH Defendants have disclosed pediatric ophthalmologist Jonathan Horton, M.D., Ph.D. Dr. Horton is board certified in ophthalmology by the American Board of Ophthalmology. (Doc. 130-1 at 134.) He is a Professor of Ophthalmology, Neurology, and Physiology at the University of California, San Francisco (UCSF), where he holds the William F. Hoyt endowed chair of Ophthalmology. He also serves as a Pediatric Ophthalmologist and Neuro-Ophthalmologist at the Benioff Children's Hospital, UCSF. *Id*. Dr. Horton holds a Medical Degree from Harvard Medical School and a Ph.D. in Neurobiology from Harvard. *Id*.

Dr. Horton rebuts Plaintiffs' suggestion that the injuries occurred during labor and delivery. (Doc. 130-1 at 136.) According to Dr. Horton, Plaintiffs' explanation is inconsistent with S.Z.S.'s condition at PCH. *Id*.   Any retinal hemorrhages that might have occurred during childbirth would have resolved by the time of Dr. Brendan Cassidy's examination at PCH two months after his birth. *Id*. Dr. Cassidy's examination showed findings consistent with an acute injury that occurred in close temporal

proximity to S.Z.S.'s admission to PCH on February 21, 2019. *Id*. At his deposition, Dr. Horton testified that the retinal hemorrhages diagnosed at PCH could **not** have been caused by childbirth:

> Q**.** So in addition to that, the fact that -- of what Dr. Cassidy saw in his examination and what Dr. Fecarotta saw in his examination and what Dr. Rosenthal documented the resolution to be recommended in her examination, that sequence of events -- is that sequence of events inconsistent with retinal hemorrhages that occurred during birth?
>
> MR. CONNELLY: Form and foundation.
>
> THE WITNESS: Retinal hemorrhages that occur at birth are done in a week. So this child was born I believe on the 25th of December, 2018. By New Year's Day, it would be inconceivable that there would be any hemorrhages present. So the hemorrhages observed when Dr. Cassidy examined the child on the 22nd of February, 2019, all had to be de novo hemorrhages that would have occurred a few days before the child was admitted to the hospital.

(Doc 315-7, p. 163, ln. 13 – p. 164, ln. 16.)

S.Z.S. also suffered a metaphyseal fracture, also known as a bucket handle fracture, in his leg. In an article titled "The Etiology and Significant of Fractures in Infants and Young Children: A Critical Multidisciplinary Review," published in *Pediatric Radiology*, the authors state that metaphyseal fractures are "strongly associated" with child abuse and "have long been recognized as highly specific for child abuse." (Doc. 315-4, at p. 597.) The authors explain that "[w]hen highly specific fractures are identified, particularly without an appropriate traumatic explanation and in the absence of metabolic disease, child abuse can be diagnosed based upon well-founded, reproducible scientific studies [67, 72, 73]." (Doc. 315-4, at p. 596.)

Plaintiffs have argued, without evidentiary support, that S.Z.S.'s metaphyseal fracture could have been caused during the birthing process or by a so-called Vitamin-D

deficiency. Plaintiffs have produced no witness to testify that S.Z.S.'s metaphyseal fractured was caused by the birthing process. Plaintiffs' expert Thomas Young, M.D. does not offer a medical diagnosis, to a reasonable degree of medical certainty, as to the cause of S.Z.S.'s metaphyseal fracture. Instead, Dr. Young argues that S.Z.S.'s mother's purported Vitamin-D deficiency could have resulted in a "mineralization catch-up" process, which can be interpreted as a fracture on a radiograph. (Doc. 315, at p. 5-6.)

Dr. Young's "mineralization catch-up" theory is not supported by medical research. In the previously referenced article "The Etiology and Significant of Fractures in Infants and Young Children: A Critical Multidisciplinary Review," the authors note that "Vitamin D level is a laboratory value and not a diagnosis of disease, and metabolic bone disease cannot be accurately diagnosed solely on the basis of a vitamin D level." (Ex. 4, at p. 593.) The authors discuss the lack of correlation between low vitamin D level and fractures:

> Further data have demonstrated no correlation between low vitamin D levels and the likelihood of either abusive or accidental fracture in children [39, 40]. These data establish that the prevalence of low vitamin D levels in children with fractures is the same as in populations of well babies with no fractures [41]. No study has demonstrated that low scrum vitamin D level without radiographic bone changes increases susceptibility to bone fractures.

(Doc. 315-4, at p. 594.) Plaintiffs' explanations for the metaphyseal fracture are not supported by expert witness testimony or medical science.

In contrast to Plaintiffs' lack of evidence, the PCH Defendants have disclosed several medical experts from different specialties who will testify, to a reasonable degree of medical certainty, that S.Z.S.'s metaphyseal fracture was not caused by the birthing process or a so-called lack of Vitamin D/"mineralization catch up." Charles Maxfield, M.D. is board certified by the American Board of Radiology in Diagnostic

Radiology with subspecialty certification in Pediatric Radiology. (Doc. 130-1 at 202.) He is a Professor of Radiology and Pediatrics at Duke University, where he also serves as the Chief of Pediatric Radiology and the Vice Chair of Education for the Department of Radiology. *Id*.

At his deposition, Dr. Maxfield testified that metaphyseal fractures are pathognomonic, or virtually diagnostic, for child abuse. (Doc. 315-5, at p. 36, lns. 11-15.) Dr. Maxfield further testified that low vitamin D levels would not explain S.Z.S.'s fracture:

> Q. And further in that same paragraph it states: "No study has demonstrated that low serum vitamin D levels without radiographic bone changes increases susceptibility to bone fractures." Did I read that correctly?
>
> A. You did.
>
> Q. And is that also consistent with your understanding of the literature in pediatric radiology?
>
> A. It is, and it's critically important, and I stated it a couple times during the deposition earlier.
>
> Q. Why is it critically important?
>
> A. Because there was some confusion about whether low vitamin D levels can predispose -- of either the mom or the baby can predispose the child to easy fractures from just mild forces. And what we know from multiple studies that this is referring to is that by the time that low vitamin D levels could possibly predispose to fractures, there were other obvious changes on the X-ray that you would see. I mentioned osteopenia and fraying of the metaphyses. And short of that, if you don't have – if you don't have that finding, we know that the bone is not weakened to the point of having easy fractures from just routine trauma or mild trauma.
>
> …

Q. In your review of this child's radiographic imaging that you reviewed, did you see any signs of radiographic bone changes?

A. There were no signs of changes to suggest demineralization or fragility or rickets or anything.

(Doc. 315-5, p. 120, ln. 17 – p. 121, ln. 16, and lns. 21-25.) Dr. Maxfield will testify regarding the imaging related to S.Z.S.'s leg fractures. Dr. Maxfield concludes that he "would strongly favor non-accidental trauma in the differential diagnosis, and believe[s] without question there is a medical/radiographic basis for reporting the injury to the authorities." (Doc. 130-1 at 204.) Similarly, as discussed in Section II., *supra*, Lewis Rubin, M.D. and Sarah Wagner, M.D. will testify that S.Z.S.'s fracture was not caused by the labor and delivery.

## IV.   LEGAL ARGUMENT

The admissibility of expert testimony is regulated by Federal Rule of Evidence 702, which provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)   the testimony is based on sufficient facts or data;
(c)   the testimony is the product of reliable principles and methods; and
(d)   the expert has reliably applied the principles and methods to the facts of the case.

The trial court serves at the gatekeeper in assuring that the proposed expert testimony has a reliable basis in the knowledge and experience of the discipline.  See *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 149 (quoting *Daubert*, 509 U.S. 592).  Determining the reliability of the expert testimony involves weighing the non-exclusive factors identified in *Daubert*.  *Id*. at ¶ 28.  These factors include (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publications; (3) whether, in respect to a particular technique, there is a high

"normal potential rate of error" and whether there are "standards controlling the techniques' operation," and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert* at 592-595; *Kumho Tire*, 520 US at 149-150.

The court is to determine whether the expert's reasoning or methodology underlying the testimony is scientifically valid or whether it is junk science and must be excluded. *Daubert,* 509 U.S. at 592-93. The court must "evaluate the methods, analysis and principles relied upon in reaching the opinion to ensure that the [expert's] opinion comports with applicable standards outside the courtroom and that it will have a reliable basis in knowledge and experience of [the] discipline." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997).

### A. Abusive Head Trauma Is Not An Outdated, Unreliable Medical Diagnosis.

Without discussing the specifics of any expert's opinions, Plaintiffs argue that the PCH Defendants' experts should be excluded from testifying on AHT. Plaintiffs contend that AHT, as a medical diagnosis, is unreliable and does not satisfy the *Daubert* standard. Plaintiffs go so far as to call AHT an "outdated hypothesis." (Doc. 321, at p. 19.) As discussed in Section III above, Plaintiffs' position is based on an inaccurate statement of the generally accepted medical science. AHT has been and continues to be generally accepted in the medical community. In April 2020, the American Academy of Pediatrics published their policy statement reaffirming AHT as a valid and important medical diagnosis. (**Ex. 4**, at p. 2.) *See also* the Consensus Statement, discussed in Section III, *supra.*

Plaintiffs argue that there is no evidence that S.Z.S. was abused. In making this argument, Plaintiffs are relying on the opinions of their causation expert Thomas Young, M.D. Plaintiffs quote Dr. Young's opinion that "real child abuse is witnessed by

someone. False child abuse is diagnosed by doctors." (Doc. 321, at p. 18.) Dr. Young's opinion is not generally accepted and defies logic and common sense, especially from a former medical examiner who determined causes of death when there were no witnesses or confessions. Dr. Young's opinions are the subject of The PCH Defendants' *Daubert* Motion. (Doc. 315.) *See also* Dr. Rood's supplemental report, rebutting Dr. Young's opinions. (**Ex. 2.**)

**B.     Plaintiffs' "Differential Etiology" Argument Is Legally and Factually Inaccurate.**

Plaintiffs next argue that the PCH Defendants' experts performed a "differential etiology," instead of a differential diagnosis, and that the purported differential etiologies are unreliable because the PCH Defendants' experts did not consider and rule out all possible causes of the injuries, other than abuse. Plaintiffs' argument fails for several reasons: (1) the PCH Defendants' experts did not perform a differential etiology; (2) Plaintiffs' argument relies on federal law and fails to consider applicable Arizona law; and (3) Plaintiffs misstate the federal law referencing differential etiology and misapply the law to the facts of this case.

**1.     The PCH Defendants' Experts Did Not Perform Differential Etiologies.**

The PCH Defendants and their experts performed differential diagnoses, and not "differential etiologies," in forming their opinions. Plaintiffs acknowledge that the PCH Defendants' experts do not claim to be performing differential etiologies. However, Plaintiffs contend that when a healthcare provider looks to external causes of a person's symptoms or injuries, they are no longer performing a differential diagnosis for the purpose of arriving at a medical diagnosis but rather a forensic function for legal purposes. According to Plaintiffs, a determination of abuse is not a medical diagnosis because it is a determination of external causation. Numerous professional medical

1    societies reject Plaintiffs argument. As discussed above, the Society for Pediatric
2    Radiology, the European Society of Paediatric Radiology, the American Society of
3    Pediatric Neuroradiology, the American Academy of Pediatrics, the American
4    Professional Society on the Abuse of Children, the Swedish Paediatric Society, the
5    Norwegian Pediatric Association, and the Japanese Pediatric Society all recognize and
6    consider abusive head trauma, of which "shaken baby syndrome" is a subset, as a valid
7    medical diagnosis, and they describe it as a "non-controversial medical diagnosis."
8    (Doc. 315-3, at Med Lit 0030 GR.)

9        Healthcare providers often consider external causes of a patient's medical
10   condition. For example, suppose a patient presents to a hospital with complaints of
11   severe back pain. Several medical conditions could cause severe back pain, including,
12   but not limited to, an infection, pulled muscle, tumor, or trauma. The cause of the back
13   pain can affect the medical treatment. Back pain caused by an infection will have a
14   different treatment plan than back pain caused by a traumatic injury herniating a spinal
15   disc. If a healthcare provider considers an external source (i.e., trauma), that does not
16   render what the healthcare provider has done as something other than a medical
17   diagnosis. This is no less true if the patient's back pain was caused by trauma inflicted
18   by a drunk driver. The healthcare provider's medical diagnosis may have legal
19   implications in the prosecution of the drunk driver, but it was still a medical diagnosis
20   for purposes of treating the patient. The same applies to healthcare providers caring for
21   injured infants and children.

22       Plaintiffs argue a determination of external cause is less reliable because it is not
23   intended for medical treatment, and therefore, there are less serious consequences for a
24   misdiagnosis. According to Plaintiffs, the potentially deadly consequences of a missed
25   medical diagnosis make a differential diagnosis more reliable than a differential
26   etiology formed for legal purposes. This is not true for suspected child abuse. It does not

take a significant stretch of thought to recognize that failure to diagnose suspected child abuse can result in fatal injuries, if the child is permitted to return unsupervised to the care givers who caused the injuries. A recent article in the *New York Times* illustrates this point. (*See* **Ex. 5.**) An abused child was returned to his parents by the juvenile court, and the child died the next day. The child's death is being investigated as a homicide. Failure to recognize abuse and take action to protect a child can result in grievous injury or death.

It should be noted that experts retained for purposes of litigation are always reviewing cases retrospectively and not for purposes of rendering medical treatment. Retained experts are not the plaintiff's treating healthcare provider. Plaintiffs' argument that expert witnesses' causation opinions formed for purposes of litigation are unreliable because they are not rendered for purposes of providing medical treatment would disqualify nearly every medical expert witness.

The two key cases Plaintiffs rely on for their differential etiology argument demonstrate the inapplicability of the concept to this case. *McClain v. Metabolife Inter., Inc.*, 401 F.3d 1233 (11th Cir. 2005), was a toxic tort case. In *McClain*, the court noted that toxic tort cases usually fall into one of two categories: first, cases in which the medical community generally recognizes the toxicity of the drug or chemical at issue, and second, those in which the medical community does not generally recognize the agent as both toxic and causing the injury alleged by the plaintiff. 401 F.3d at 1239. The *McClain* case fell into the latter category, where the medical community did not generally recognize the toxicity of the chemical. *Id*. When the medical community recognizes that the agent causes the type of harm alleged by the plaintiff, "[t]he court need not undertake an extensive *Daubert* analysis on the general toxicity question." *Id*. Because the agent at issue in *McClain* was not generally recognized to cause the injury alleged by the plaintiff, the court undertook an extensive *Daubert* analysis.

This case is distinguishable from *McClain.* First, it is not a toxic tort cases, where there is a question about whether exposure to an agent years earlier caused a disease process. Second, unlike in *McClain*, abusive head trauma, and the acceleration/deceleration forces associated with shaking a baby, are generally recognized as causing subdural hematomas and retinal hemorrhages. *See* Section III, *supra*. Considering the general acceptance of abusive head trauma in the medical community, this Court need not perform an extensive *Daubert* analysis on the reliability of the question of whether abusive head trauma is associated with subdural hematomas and retinal hemorrhages. *See McClain*, 401 F.3d at 1239.

Plaintiffs also rely on *Bowers v. Norfolk Southern Corp.*, 537 F.Supp.2d 1343 (M.D. Ga. 2007). In *Bowers*, an orthopedist who performed an "independent" medical examination of plaintiff, at the plaintiff's request, opined that a vibrating locomotive seat caused a permanent aggravation of the plaintiff's underlying degenerative neck and back condition during a five-hour train trip. 537 F.Supp.2d at 1353. The court found that the expert's opinions were not generally accepted and were not peer reviewed or based on peer reviewed literature. 537 F.Supp.2d at 1353. The case at bar is distinguishable. As discussed above and below, the PCH Defendants' experts offer opinions that are generally accepted in the medical community (unlike Plaintiffs' expert) and are supported by a large body of peer reviewed literature (unlike Plaintiffs' expert).

Plaintiffs also argue that the PCH Defendants' experts' causation opinions lack "fit," under *Daubert*. The case Plaintiffs rely on states "the standard is not that high" to establish "fit." *In re Paoli R.R. Yard PCB Litigation*, 35 F.S. 717, 745 (3rd Cir. 1994). Plaintiffs' argument has no factual basis. The types of injuries S.Z.S. sustained (e.g., subdural hematomas, retinal hemorrhages, and metaphyseal fracture) are recognized in the medical literature as causally related to non-accidental trauma. *See* Section III, *supra*.

2.    **Applicable Arizona Law Renders Plaintiffs' Differential Etiology Argument Irrelevant.**

The gravamen of Plaintiffs' differential etiology argument is that the PCH Defendants' experts must consider all possible causes of the injuries and rule out all causes except child abuse, for their opinions to be sufficiently reliable to satisfy *Dabuert*. Plaintiffs' argument is based on a misstatement of the law (more on that in the next section) and on a failure to consider applicable Arizona law.

Plaintiffs have pled Arizona medical negligence and intentional infliction of emotion distress claims. Arizona law applies to these claims, and based on Arizona law, an expert need not definitively rule out all possible causes of a child's injuries in a case involving suspected non-accidental trauma.

Arizona law imposes on healthcare providers an obligation to report suspected child abuse:

> Any person who **reasonably believes** that a minor is or has been the victim of physical injury, abuse, child abuse, a reportable offense or neglect that appears to have been inflicted on the minor by other than accidental means or that is not explained by the available medical history as being accidental in nature or who reasonably believes there has been a denial or deprivation of necessary medical treatment or surgical care or nourishment with the intent to cause or allow the death of an infant who is protected under § 36-2281 **shall immediately report or cause reports to be made** of this information to a peace officer, **to the department of child safety** or to a tribal law enforcement or social services agency for any Indian minor who resides on an Indian reservation, except if the report concerns a person who does not have care, custody or control of the minor, the report shall be made to a peace officer only.

A.R.S. § 13-3620(A)(emphasis added). The statutory definition of "person" includes "[a]ny physician, physician's assistant, optometrist, dentist, osteopathic physician, chiropractor, podiatrist, behavioral health professional, nurse, psychologist, counselor or

social worker who develops the reasonable belief in the course of treating a patient."
A.R.S. § 13-3620(A)(1). The Arizona Court of Appeals has held the "reasonable
grounds" standard that triggers a mandatory reporting is a "low standard." *Ramsey v.*
*Yavapai Family Advocacy Center*, 225 Ariz. 132, 138, 235 P.3d 285, 291 (App.2010).
This low standard furthers the public policy "of encouraging people to report child
abuse." *Ramsey*, 235 P.3d at 292 (*quoting L.A.R. v. Ludwig*, 170 Ariz. 24, 27, 821 P.2d
291, 294 (App.1991)).

Arizona law does not require a mandated reporter to rule out all other possible
causes before forming a reasonable belief.  The Arizona statute requires reporting of
suspected child abuse when the healthcare provider "reasonably believes" abuse has
occurred, which the Arizona Court of Appeals has described as a "low bar," for the
obvious purpose of protecting minors. Plaintiffs have not disclosed an expert to testify
that any of the PCH Defendants breached the standard of care by reporting S.Z.S.'s
suspected abuse to DCS, and Plaintiffs have not disclosed an expert to testify that a
healthcare provider must exclude all possible causes, except abuse, before Arizona's
mandatory reporting obligations arise.

Arizona law could not be clearer: if a healthcare provider "reasonably believes" a
child has been abused, the healthcare provider has a statutory duty to report the
suspected abuse. A healthcare provider need not definitively rule out all other possible
causes of a child's injuries before reporting suspected abuse. Therefore, in a case such
as this, where the issues hinge on the diagnosis and reporting of suspected non-
accidental trauma, an expert witness need not definitely rule out all possible causes of a
child's injuries before reliably testifying that a child suffered non-accidental trauma
(i.e., abuse) that required reporting by the treating healthcare providers.

Arizona also permits exerts testifying on behalf of defendants in a medical
negligence action to testify on possible causes of injuries. In *Benkendorf v. Advanced*

1   *Cardiac Specialists Chartered*, 228 Ariz. 528, 532, 269 P.3d 704, 708 (App. 2012), the

2   Court of Appeals of Arizona held that an expert witness called by the defense to testify

3   about causation may testify about possible causes of the plaintiff's injuries. In other

4   words, defense experts do not need to satisfy the more stringent "reasonable degree of

5   medical probability" standard in testifying about the possible cause of a plaintiff's

6   injuries.   The PCH Defendants' experts are offering their opinions to a reasonable

7   degree of medical probability, which exceeds the minimum standard. There is no basis

8   for finding that the PCH Defendants experts must consider and definitively rule out all

9   possible causes, except one, when defense experts are permitted to testify as to possible

10  causes of an injury.

11               **3.      Plaintiffs Misstate The Differential Etiology Case Law.**

12          The previous sections have shown that the PCH Defendants do not rely on a

13  differential etiology analysis and a differential etiology, as articulated by Plaintiffs, is

14  contrary to the applicable Arizona law. Nonetheless, Plaintiffs misstate the differential

15  etiology case law. According to Plaintiffs, a differential etiology requires an expert

16  conclusively to rule out all possible causes of an injury, except one. But that is not the

17  law.

18          In reversing the district court's exclusion of an expert witness, the Eighth Circuit

19  Court of Appeals held as follows:

20               In the instant case, the district court found that Johnson's
21               experts did not efficaciously "rule out" the other plausible
                 sources of C. sak. However, we have consistently ruled that
22               experts are not required to rule out all possible causes when
                 performing the differential etiology analysis. *Lauzon,* 270
23               F.3d at 693; *In re Prempro Prods. Liab. Litig.,* 586 F.3d 547,
                 566–67 (8th Cir.2009) (rejecting the argument that expert
24               testimony on the cause of *564 plaintiff's breast cancer must
                 be excluded because the cause of breast cancer is generally
25               unknown and because the plaintiff had known risk factors).
26               And, a differential expert opinion can be reliable even "with

- 25 -

> less than full information." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 759 (3d Cir.1994). Instead, such considerations go to the weight to be given the testimony by the factfinder, not its admissibility. *In re Prempro,* 586 F.3d at 566.

*Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 563-64 (8th Cir. 2014). Similarly, the Ninth Circuit Court of Appeals does not require the ruling out of all possible causes of an injury for an expert's opinion to reliable:

> Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out **or determining which of those that cannot be excluded is the most likely**.

*Clausen v. M/V NEW CARISSA*, 339 F.3d 1049. 1057 (9th Cir. 2003)(*quoting Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262(4th Cir.1999))(emphasis added). The *Clausen* court uses the terms differential diagnosis and differential etiology interchangeably, but the point remains – ruling out all possible causes except one is not required for an expert's opinions to be reliable under *Daubert*.

In discussing both differential etiology and differential diagnosis, Plaintiffs argue that the PCH Defendants' experts did not rule in or rule out alternate potential causes of S.Z.S.'s injuries. Plaintiffs' arguments are factually inaccurate. Those factually lacking arguments are discussed in the next section.

/ / / /

**C.      The PCH Defendants Properly Performed A Differential Diagnosis In Their Analyses.**

In anticipation that the Court will reject their "differential etiology" argument, Plaintiffs next contend that if the Court determines the PCH Defendants' experts performed differential diagnoses, the methodology they used was unreliable because they purportedly did not consider and rule out other possible causes of S.Z.S.'s injuries. Plaintiffs contend that the PCH Defendants' experts did not make a comprehensive list and consider all possible diagnoses. Other than birth injury as a possible cause of subdural hematomas and retinal hemorrhages, Plaintiffs do not state any possible causes of S.Z.S.' injuries that they believe were not considered. Moreover, as previously stated, Plaintiffs have not disclosed an expert to testify to reasonable degree of certainty as to the cause of S.Z.S.'s injuries.

Plaintiffs' argument is factually inaccurate. All of the PCH Defendants' causation experts address other possible causes of S.Z.S.'s injuries (e.g., child birth, infantile rickets) applicable to their medical specialty, and they all conclude that suspected non-accidental trauma is the only plausible and most likely cause of the constellation of injuries. *See* Section II, *supra.* Plaintiffs chose not to depose seven of the ten experts. As a result, Plaintiffs may not fully grasp their disclosed opinions, but that is due to a trial preparation decision Plaintiffs made.

The PCH Defendants' experts' opinions regarding the probable cause of S.Z.S.'s injuries and the reasonableness for suspecting non-accidental trauma are supported by S.Z.S.'s treating pediatrician at the time, Heather Gosnell, M.D., who was not employed by PCH:

> BY MS. ZANGERLE:
> Q. And when you were involved in caring for Swayde during the year 2019, you noted in your medical record that you had some concerns that this baby had been involved in nonaccidental trauma; fair?

1      MR. CONNELLY: Form. Foundation.

2      THE WITNESS: Yes.

3
       BY MS. ZANGERLE:
4      Q. And that was based upon your training as a pediatrician
       and the information that you reviewed based upon a variety of
5      specialists as well as information you took during your
6      examination and discussions with family?

7      MR. CONNELLY: Form. Foundation.

8
       THE WITNESS: Yes.
9

10     BY MS. ZANGERLE:
       Q. As you sit here today, do you still hold the opinion that --
11     based upon the information that you reviewed, that this child
       had been -- was a potential victim of SNAT?
12

13     MR. CONNELLY: Form. Foundation.

14     THE WITNESS: Yes.

15
       BY MS. ZANGERLE:
16     Q. And I'm asking you that as the child's treating pediatrician.
       Based upon the materials you reviewed from the various
17     examinations during your care and treatment, you formed an
18     opinion that it was reasonable to investigate the possibility of
       nonaccidental trauma for this child's various medical
19     conditions?

20     A. Yes.

21  (*See* **Ex. 6,** at p. 157, ln. 22 – p. 158, ln. 25.) S.Z.S.'s treating pediatrician believed that

22  S.Z.S. potentially had been abused.

23        The PCH Defendants' experts' opinions regarding the cause of the subdural

24  hematomas are supported by the testimony of fact witness Taryn Bragg, M.D., the

25  neurosurgeon who performed the surgery to place a drain, after S.Z.S.'s subdural

26  hematoma on the left side increased in size after the first PCH hospital admission. Dr.

1   Bragg is a former employee of PCH. Her medical care was not called into the question

2   in this case. Plaintiffs have not disputed the necessity of the neurosurgery that Dr.

3   Bragg performed or the manner in which she performed it. In her deposition, Dr. Bragg

4   testified that S.Z.S.'s subdural hematomas were inconsistent with subdural hematomas

5   from child birth:

6            BY MR. STULTZ:

7            Q. Dr. Bragg, you testified today that you have treated
           patients who experienced subdural hematomas via childbirth.

8            Do you recall that?

9            A. Yes.

10

11            Q. Approximately how many -- throughout your career,
           approximately how many such patients have you treated who

12            developed subdural hematomas as a result of childbirth?

13            A. None. I mean, none in the sense of ongoing subdurals.

14            Q. I'm going to get there. But just your -- through the course
           of your practice, approximately how many patients have you

15            treated who developed subdural hematomas as a result of

16            childbirth?

17            A. Probably a couple hundred.

18            Q. And in any of those other cases where -- or strike that. In

19            any of those cases where you provided treatment to a child
           who developed subdural hematomas as a result of childbirth,

20            did any of them go on to develop enlarging hematomas that

21            required a placement of a subdural drain?

22            A. No.

23            Q. In the patients you've treated who developed subdural

24            hematomas during childbirth, was the blood in a different
           location than the blood that Swayde had with his subdural

25            hematomas?

26

MR. CONNELLY: Form and foundation.

THE WITNESS: Yes.

Q. BY MR. STULTZ: And so for the patients that you treated who developed subdural hematomas as a result of childbirth, where was the blood located?

MR. CONNELLY: Form and foundation.

THE WITNESS: Typically, along the tentorium and in the posterior fossa.

Q. BY MR. STULTZ: And is that a different location than where the blood was located with Swayde?

A. Yes.

Q. Where was the blood located with Swayde as seen on the imaging?

A. On the top of the head --

THE COURT REPORTER: I'm sorry. I didn't hear that. On the top of the head?

THE WITNESS: And the biparietal and bifrontal region, along the convexity.

(*See* **Ex. 7,** at p. 172, ln. 16 – p. 174, ln. 13.)

With respect to the retinal hemorrhages, the PCH Defendants have disclosed pediatric ophthalmologist Jonathan Horton, M.D., Ph.D., who will testify, in part, that S.Z.S.'s retinal hemhorrages were likely case by AHT and not the birthing process. *See* Section II.3., *supra*. At his deposition, Dr. Horton testified that the retinal hemorrhages diagnosed at PCH could **not** have been caused by childbirth:

Q. So in addition to that, the fact that -- of what Dr. Cassidy saw in his examination and what Dr. Fecarotta saw in his examination and what Dr. Rosenthal documented the

resolution to be recommended in her examination, that sequence of events -- is that sequence of events inconsistent with retinal hemorrhages that occurred during birth?

MR. CONNELLY: Form and foundation.

THE WITNESS: Retinal hemorrhages that occur at birth are done in a week. So this child was born I believe on the 25th of December, 2018. By New Year's Day, it would be inconceivable that there would be any hemorrhages present.

So the hemorrhages observed when Dr. Cassidy examined the child on the 22nd of February, 2019, all had to be de novo hemorrhages that would have occurred a few days before the child was admitted to the hospital.

(Doc 315-7, at p. 163, ln. 13 – p. 164, ln. 16.)  Dr. Horton's opinion that the retinal hemorrhages seen at PCH were not present from birth is not controversial. In fact, Plaintiffs' pediatric ophthalmology standard of care expert, Todd Lefkowitz, M.D., agrees:

Q.   So by that point in time, when Dr. Cassidy performed his evaluation, any retinal hemorrhages that were present when Swayde Sankey was born would have been resolved --

MR. CONNELLY:  Form and foun- --

BY MS. PATANE:

Q.   -- correct?

MR. CONNELLY:  Form and foundation.

THE WITNESS:  Well, I would agree about that.

(*See* **Ex. 8,** at p. 62, ln. 20 – p. 63, ln. 4.)

The issue in this case is not that the PCH Defendants' experts have no method for "ruling out" alternate causes of S.Z.S.'s injuries, but there was no evidence to "rule in"

such causes. A lack of evidence supporting alternate causes of the injuries does not mean there is no method for ruling out alternate causes. The PCH Defendants' experts who are offering causation opinions considered alternate causes, but no alternate cause was probable or could explain the constellation of S.Z.S.'s injuries.

**D.    The PCH Defendants' Experts Should Be Permitted To Rely On The PCH Medical Records.**

In the final section of their Motion, Plaintiffs argue that the PCH Defendants' experts should not be permitted to rely on portions or all of the PCH medical records, due to purported inaccuracies in the records. No medical record is perfect. Plaintiffs have not shown which part of the medical record, via citation, is inaccurate and which expert relied on that specific portion of the records. The underdevelopment of Plaintiffs' argument makes responding a difficult task. Regardless, any inaccuracies in the PCH records, to the extent that the PCH Defendants' experts relied on those portions of the records, go to the weight of the evidence, not its admissibility. "Ultimately, a party's disagreement with the sources upon which the expert bases his or her conclusions goes to weight of the evidence and not admissibility." *Skinner v. Tuscan, Inc.* 2020 WL 5946897 (D. Ariz. Oct. 7, 2020).

**V.    CONCLUSION**

Forgoing a scalpel, Plaintiffs opted for a butcher knife to argue that each of the PCH Defendants' ten expert witnesses, from different medical disciplines, should be excluded from testifying for the same reasons. For the reasons discussed above, the PCH Defendants' experts more than exceed the *Daubert* standard for reliability. The PCH Defendants request that the Court deny Plaintiffs' Motion. Alternatively, the PCH Defendants request an evidentiary hearing.

/ / / /

DATED this 19th day of October, 2023.

**GUST ROSENFELD, P.L.C.**


By   /s/ Kari B. Zangerle
       Kari B. Zangerle
       Robert C. Stultz
       One East Washington Street, Suite 1600
       Phoenix, AZ  85004-2553
       *Attorneys for Defendants Phoenix*
       *Children's Hospital; Dr. William S. Wood*
       *and Rachel Wood; Dr. Kathryn Coffman;*
       *Haley Dietzman and Roald Dietzman;*
       *Zachary Dion; and Carey Lewis*

1

## <u>TABLE OF CONTENTS – EXHIBITS</u>

2

3    Exhibit 1      Dr. Jonathan Horton Report – Horton 0067-0072 GR

4    Exhibit 2      Dr. Corey Rood Report – Rood 0098-0101 GR

5    Exhibit 3      Dr. Sarah Wagner Report – Wagner 0016-0019 GR

6    Exhibit 4      "Abusive Head Trauma in Infants and Children"

7
     Exhibit 5      "New York Baby Who Was Killed Was Returned to Parents Despite
8
9                   History of Abuse"

10   Exhibit 6      Deposition Transcript – Heather Gosnell, M.D., pp. 157, 158

11   Exhibit 7      Deposition Transcript – Taryn Bragg, M.D., pp. 172, 173, 174

12
     Exhibit 8      Deposition Transcript – Todd Lefkowitz, M.D., pp. 62, 63
13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2023, I electronically filed the foregoing with the Clerk of Court, using the CM/ECF system, which will send notification of such filing to all parties, and will e-mail all notification of such filing to all non-CM/ECF system participants.

Thomas A. Connelly, Esq.
Robert T. Mills, Esq.
Sean A. Woods, Esq.
Mills & Woods Law PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

DeeAn Gillespie Strub, Esq.
Mark Shields, Esq.
Gillespie, Shields, Goldfarb Taylor
7319 North 16th Street
Phoenix, AZ 85020
*Attorneys for Plaintiffs*

Georgia A. Staton, Esq.
Ravi V. Patel, Esq.
Stephanie D. Baldwin, Esq.
Jones, Skelton & Hochuli, PLC
40 North Central Ave., Suite 2700
Phoenix, AZ 85004
*Attorneys for State Defendants*

Cynthia Y. Patane, Esq.
Rachel L. Werner, Esq.
Gordon & Rees Scully Mansukhani, LLP
One Renaissance Square
Two North Central Ave., #2200
Phoenix, AZ 85004
*Attorneys for Defendant Brendan Cassidy*

By /s/ Melody Kern