# EXHIBIT 1

UNIVERSITY OF CALIFORNIA, SANFRANCISCO

BERKELEY   •   DAVIS   •   IRVINE   •   LOS ANGELES   •   RIVERSIDE   •   SAN DIEGO   •   SAN FRANCISCO  SANTA BARBARA   •   SANTA CRUZ

Jonathan C. Horton MD PhD
**NEURO-OPHTHALMOLOGY**
**PEDIATRIC OPHTHALMOLOGY**
Vision Care and Research Unit
8 Koret Way, Room U-516
San Francisco, CA 94143-0644
TEL (415) 476-7176
FAX (415) 476-8309

4 January 2023

## SUPPLEMENTAL DECLARATION OF Jonathan C. Horton MD, PhD

I am a Professor of Ophthalmology, Neurology and Physiology at the University of California San Francisco (UCSF) where I hold the William F. Hoyt endowed chair in Ophthalmology.  I also serve as a Pediatric Ophthalmologist and Neuro-Ophthalmologist at the Benioff Children's Hospital, UCSF.  I earned my medical degree at the Harvard Medical School, where I also obtained a PhD in Neurobiology.  I completed my internship in Medicine and a year of residency training in Neurology at the Massachusetts General Hospital, followed by a residency in Ophthalmology at Georgetown University.  Fellowship training in Pediatric Ophthalmology and Neuro-ophthalmology was received at UCSF.  My CV reflects various honors, awards and grants that I have received over more than 30 years.  I am active in professional organizations such as the American Academy of Ophthalmology and the North American Neuro-Ophthalmology Society.  My approximately 175 career publications are outlined in my CV.  I am board certified in Ophthalmology by the American Board of Ophthalmology.  I devote approximately 60% of my time to clinical practice, while the remainder is dedicated to teaching, academic, and research activities.  During my career I have cared for many children with suspected non-accidental trauma.  Approximately 6 times per year I am called upon to examine a child for evidence of potential non-accidental trauma.  I have testified in the following matters in the last five years:

Horton 0067 GR

Gonzalez vs. Aronowitz

Fogelman vs. Martin

Korzekwa vs. Encore Karaoke

Cory vs. City and County of San Francisco

The following material has been provided to me for review:

- Deposition transcript of Honor Duval taken January 14, 2022, with exhibits 22-31.
- Deposition transcript of Donald Sankey, Jr. taken January 12, 2022, with exhibits 1-21.
- Plaintiff's complaint
- Photographs of Swayde Sankey from the deposition of Plaintiff Donald Sankey
- Preliminary expert Opinion of Dr. Todd A. Lefkowitz MD, FACS, FAAO
- Medical Literature: Rooks, V.J. et al., Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants. Am. J. Neuroradiology, 29:1082-89, 2008.
- Medical Literature: Gabaeff, S.C., Challenging the Pathophysiologic Connection between Subdural Hematoma, Retinal Hemorrhage and Shaken Baby Syndrome. West. J. Emerg. Med., 12:144-158, 2011.
- Medical Literature: Christian, C.W. and Levin, A.V., The Eye Examination in the Evaluation of Child Abuse. Pediatrics, 142:e20181411, 2018.
- Callaway, N.F., Retinal and Optic Nerve Hemorrhages in the Newborn Infant. Ophthalmology, 123:1043-1052, 2016.
- Photographs of Swayde Sankey from Phoenix Children's Hospital; admission dates: February 22, 2019 and March 7, 2019
- Phoenix Children's Hospital 2-21-2019 & 3-7-2019 admissions and PCMG out-patient visits (PCH 001-1476cycn)
- Desert Valley Pediatrics Records (DVP 00001cycn-00091cycn)
- Eye Doctors of Arizona Records (000001-000004)
- Phoenix Children's Hospital Child Abuse & Neglect Policy
- Deposition Transcript of Todd A. Lefkowitz MD taken November 14, 2022.
- Deposition Transcript of Thomas W. Young MD taken November 4, 2022.

This additional declaration is a supplement to the statement that I prepared on 22 September 2022 regarding this case. My purpose is to address statements made by Dr. Todd Lefkowitz and Dr. Thomas Young in their depositions of November 2022.

An ophthalmologist, Dr. Brendan Cassidy, performed an examination of Swayde Sankey on 02/22/2019. In his deposition of November 20, 2022 Dr. Todd Lefkowitz impugned Dr. Cassidy's

examination by stating that eyedrops were not used to dilate the pupils.  This issue is important because if the pupils are not dilated, the retina cannot be examined adequately.  During the deposition Dr. Lefkowitz was shown a notation in the nursing record that administration of eye drops was "Completed 2/22/2019 at 12:10".  He replied, "that language in a nursing record or other-than-doctor record is meaningless" (page 41).  If called upon to testify, I will state that notations by hospital nursing staff that document the administration of medications are meaningful and reliable in clinical medicine.

When asked why he believed the baby's eyes were not dilated, Dr. Lefkowitz replied "Well, it's based on my never seeing an indication from Cassidy himself that he dilated the patient". Phoenix Children's Hospital protocol requires that nurses administer dilating drops (page 44).  Dr. Lefkowitz testified that he was not aware of that protocol, but it would not change his opinion, concluding, "To me, again, orders/protocols have no relevance in the real world" (page 47).  If called upon to testify, I will state that the Phoenix Children's Hospital records document that eye drops were administered by a nurse prior to Dr. Cassidy's examination of the child and that Dr. Lefkowitz's denial of this fact is obfuscatory.

Dr. Lefkowitz was asked "when Dr. Cassidy performed his evaluation, any retinal hemorrhages that were present when Swayde Sankey was born would have been resolved" (page 58)?  He replied, "Well, I would agree about that" (page 59).  On this point, Dr. Lefkowitz is correct.  It undercuts the plaintiff's contention that the retinal hemorrhages were acquired during birth, rather than later from abusive head trauma.

Dr. Lefkowitz was asked "Do you agree that there's a significant relation between retinal hemorrhages and abusive head trauma".  He replied, "No, I wouldn't" (page 63).  If called upon to testify, I will state that this viewpoint is contradicted by an vast body of evidence in the peer-reviewed ophthalmological literature.

4

Dr. Lefkowitz was asked "did you form an opinion in 2018 that abusive head trauma was not a valid medical diagnosis". He replied, "Correct" (page 72). However, he later confirmed that in 2019 he testified as an expert witness in a fatal child abuse case that hemorrhages in the eye were most consistent with abusive head trauma" (page 123). He explained these diametrically opposite positions by remarking "I don't agree with what I said back then" (page 125). Dr. Lefkowitz was asked, "So in 2019, when you said that abuse head trauma was most consistent with extensive retinal hemorrhages, wouldn't it have been reasonable for another physician to believe the same thing". Dr. Lefkowitz replied "I can't answer that. I'm not clairvoyant" (page 143). If called upon to testify, I will state that Dr. Lefkowitz has contradicted his own testimony and has provided conflicting medicolegal opinions.

Dr. Lefkowitz was asked "Would you say that your opinions would be considered an outlier to what the conclusions have been by the majority of American medical societies relative to retinal hemorrhages being due to abusive head trauma". Dr. Lefkowitz replied, "Yeah, I would agree that I am an outlier . . . " (page 164). If called upon to testify, I will state that Dr. Lefkowitz is indeed an outlier, who holds views that are frankly eccentric regarding the standard of care in pediatric ophthalmology for evaluation of children who are suspected of being victims of abusive head trauma.

In his deposition on November 4, 2022 Dr. Thomas A. Young discussed his book titled, "The Sherlock Effect". It outlines how forensic doctors following the logic and methods of Sherlock Holmes often come to incorrect conclusions. Dr. Young was asked "you admit that there are probably people in jail today as a result of The Sherlock Effect that you utilized when functioning as a medical examiner" He replied, "Correct" (page 37). Yet, Dr. Young has made no effort to exonerate the individuals that he believes his testimony helped wrongly convict.

5

Dr. Young was asked, "Do you believe that shaken baby syndrome is a valid medical concept". He replied "No" (page 72). Dr. Young was asked, "Are there any professional organizations that you are aware of that dispute that abusive head trauma in infants and children is not a valid scientific concept". He replied, "I'm not aware of any professional organizations that said that" (page 73). If called upon to testify, I will state that no medical organization denies the reality of abusive head trauma in children and that rejection of this association reflects an opinion not held by any physician who follows the standard of care in pediatric medicine.

Dr. Young was asked "Do you believe that this baby had any injuries when he presented to Phoenix Children's Hospital on February 21st and was seen in the emergency department by Dr. Pickett". He replied "Okay. There was no evidence of injury". He was asked again, "So you don't believe that there were any injuries to the brain". He replied, "No evidence of injury in this case, including the brain" (page 106). If called upon to testify, I will state that there exists abundant evidence of brain, skeletal, and ocular injuries documented by the physicians at Phoenix Children's Hospital through their physical examinations and radiological studies.

Dr. Young was asked "Did you form an opinion as to the cause of the retinal hemorrhages in Swayde Sankey within a reasonable degree of medical certainty". He replied "No". He was then asked, "Did you form an opinion in this case within a reasonable degree of medical certainty as to the cause of the subdural hematomas or subdural hemorrhages"? He replied, "No". He was then asked, "Do you agree that retinal hemorrhages can be caused by abusive head trauma". He replied, "Sure" (Page 243). In providing this testimony, Dr. Young contradicted his earlier denial in the same deposition (page 72) that shaken baby syndrome is a valid concept. He also conceded that he has no opinion regarding the cause of this child's injuries.

The depositions by Dr. Lefkowitz and Dr. Young both reflect physicians who harbor unconventional viewpoints, deny the facts at issue in this case, contradict their own testimony, and

6

disregard scientific evidence. Both individuals acknowledge that they are outliers who hold contrarian opinions about standard principles of medical care and patient management in the field of pediatrics.

Based upon my training and experience, the injuries present at the time of the initial admission to Phoenix Children's Hospital on 02/21/2019 point to non-accidental trauma as the likely cause. In particular, the extent and features of the ocular hemorrhages were highly consistent with this diagnosis. Moreover, the child had cutaneous bruising, subdural hematomas, and tibial fractures, which are all typical features of child abuse. I am prepared to clarify and refute the misinformation contained in the testimony provided by Dr. Lefkowitz and Dr. Young in their depositions.

I reserve the right to update my opinions based upon the review of additional discovery.

Sincerely,

Jonathan C. Horton MD PhD
*William F. Hoyt Professor*
Professor of Ophthalmology,
Neurology and Physiology