# EXHIBIT 4

FROM THE AMERICAN ACADEMY OF PEDIATRICS | POLICY
STATEMENT | APRIL 01 2020

# Abusive Head Trauma in Infants and Children FREE

Sandeep K. Narang, MD, JD, FAAP ✉ ; Amanda Fingarson, DO, FAAP;
James Lukefahr, MD, FAAP; COUNCIL ON CHILD ABUSE AND NEGLECT;
Andrew P. Sirotnak, MD, FAAP; Emalee G. Flaherty, MD, FAAP;
CAPT Amy R. Gavril, MD, MSCI, FAAP; Amanda Bird Hoffert Gilmartin, MD, FAAP;
Suzanne B. Haney, MD, FAAP; Sheila M. Idzerda, MD, FAAP;
Antoinette Laskey, MD, MPH, MBA, FAAP; Lori A. Legano, MD, FAAP;
Stephen A. Messner, MD, FAAP; Bethany Mohr, MD, FAAP;
Rebecca L. Moles, MD, FAAP; Shalon Nienow, MD, FAAP;
Vincent J. Palusci, MD, MS, FAAP

Address correspondence to Sandeep K. Narang, MD, JD. E-mail:
sanarang@luriechildrens.org

**POTENTIAL CONFLICT OF INTEREST:** Drs Narang, Fingarson, and Lukefahr have
served as paid expert witnesses/consultants in cases of abusive head trauma in
infants and children.

**FINANCIAL DISCLOSURE:** The authors have indicated they have no financial
relationships relevant to this article to disclose.

*Pediatrics* (2020) 145 (4): e20200203.

https://doi.org/10.1542/peds.2020-0203

### Connected Content

This is a revision to: Abusive Head Trauma in Infants and Children

Abusive head trauma (AHT) remains a significant cause of
morbidity and mortality in the pediatric population, especially in
young infants. In the past decade, advancements in research
have refined medical understanding of the epidemiological,
clinical, biomechanical, and pathologic factors comprising the
diagnosis, thereby enhancing clinical detection of a challenging
diagnostic entity. Failure to recognize AHT and respond
appropriately at any step in the process, from medical diagnosis
to child protection and legal decision-making, can place children
at risk. The American Academy of Pediatrics revises the 2009
policy statement on AHT to incorporate the growing body of

Case 2:21-cv-00167-ROS   Document 333-4   Filed 10/19/23   Page 3 of 28

knowledge on the topic. Although this statement incorporates some of that growing body of knowledge, it is not a comprehensive exposition of the science. This statement aims to provide pediatric practitioners with general guidance on a complex subject. The Academy recommends that pediatric practitioners remain vigilant for the signs and symptoms of AHT, conduct thorough medical evaluations, consult with pediatric medical subspecialists when necessary, and embrace the challenges and need for strong advocacy on the subject.

**Subjects:** Child Abuse and Neglect

**Topics:** craniocerebral trauma, principles of law and justice, tremor

# History

The evolution of the abusive head trauma (AHT) diagnosis has a long and storied history.[1–3] Earlier nomenclature included whiplash shaken infant syndrome, shaken impact syndrome, inflicted childhood neurotrauma, and shaken baby syndrome. The current term, AHT, was adopted by the American Academy of Pediatrics (AAP) in 2009 in recognition of the fact that inflicted head injury of children can involve a variety of biomechanical forces, including shaking. That change in terminology (from shaken baby syndrome), however, was misinterpreted by some in the legal and medical communities as an indication of some doubt in or invalidation of the diagnosis and the mechanism of shaking as a cause of injury. The AAP continues to affirm the dangers and harms of shaking infants, continues to embrace the "shaken baby syndrome" diagnosis as a valid subset of the AHT diagnosis, and encourages pediatric practitioners to educate community stakeholders when necessary.

## Presentation and Evaluation

AHT has an estimated incidence of 32 to 38 cases per 100 000 children per year in the first year of life and is fatal in nearly one-quarter of cases.[4,5] AHT presents with a wide spectrum of signs and symptoms. The clinical manifestations of AHT can be subtle (such as vomiting and fussiness) and are often missed. Sheets et al[6] found that more than one-quarter of children with severe physical abuse had previous sentinel injuries missed by physicians, and over 80% of those sentinel injuries were bruises. Bruising in infants should alert the physician to the possibility of abuse. Particular attention should be given to "TEN-4" bruising (bruising of the torso, ears, and neck in children younger than 4 years or any bruising in an infant younger than 4 months).[7] Oral injuries in infants, such as frenulum tears, may also accompany or precede AHT and should prompt consideration of abuse.[8] Thus, it is crucial for the pediatric practitioner to maintain high vigilance for subtle findings that can indicate AHT and perform a careful evaluation as dictated by the clinical presentation.

AHT is on the differential of common presenting complaints of infants and young children, such as fussiness, vomiting, or altered mental status. Medical diseases that can mimic the findings commonly seen in AHT are increasingly recognized, and screening is performed when indicated. A comprehensive medical evaluation, including a thorough skin examination, skeletal survey, head imaging, and a timely ophthalmology consultation, remains the cornerstone of AHT assessments.[9] As with all medical diagnoses, caregiver histories are important, and careful documentation of the reported history is needed.

Children with suspected intracranial injury should have a cranial computed tomography and/or MRI scan.[9,10] MRI of the spine should also be considered to assess for ligamentous injuries or spinal subdural hemorrhage.[10,11] Cranial ultrasonography is diagnostically insensitive for detecting AHT and should not be considered a sufficient diagnostic neuroimaging modality in

Case 2:21-cv-00567-RJS   Document 333-4   Filed 10/19/23   Page 5 of 28

cases of suspected AHT.[10] Although many cases of AHT do not demonstrate osseous injury, a complete skeletal survey should be performed in children younger than 2 years with concerns for AHT because occult fractures can occur in up to 42% of cases.[4] It is important that skeletal surveys conform to established guidelines of multiple views of the axial and appendicular skeleton.[10] A skeletal survey should be performed by technicians and read by radiologists who are experienced in these specialized imaging studies; otherwise, findings can be missed or misread, which can place both the pediatric practitioner at medicolegal risk and the patient at risk for further physical harm. Limited imaging, such as "babygrams," diminishes the diagnostic sensitivity of skeletal findings.[10]

Pediatric practitioners often find it helpful to consult a subspecialist in the field of child abuse pediatrics to ensure that the medical evaluation has been complete and that the diagnosis is accurate. Subspecialists in radiology, ophthalmology, neurosurgery, neurology, general pediatric surgery, and other fields should also be consulted when necessary to ensure a complete and accurate evaluation.

## Diagnosis and Outcomes

Advancements in technology, research, and clinical experience have improved our current understanding of the etiologies, clinical features, and outcomes of AHT. Several recent systematic reviews have assisted in identifying clinical features more suggestive of abusive than accidental injury.[11]-[13] Features such as apnea, retinal hemorrhages, and "TEN-4" bruising are much more common in abusive than accidental injury.[7,12] Additionally, advancements in our clinical understanding of retinal hemorrhages have revealed that certain patterns of retinal hemorrhages (specifically too numerous to count in one or both eyes, present in all layers of the retina, and extending into the

retinal periphery) are far more common in AHT than in accidental head injury.[13] Finally, traumatic retinoschisis (blood accumulating in the macula beneath the internal limiting membrane or deeper retinal layers, with or without surrounding circumlinear paramacular retinal folds) is highly suggestive of abusive trauma.[14]

Although there is not a particular pattern of cranial injury unique to AHT, certain findings, such as a subdural hemorrhage in certain locations (multiple, along the convexities, or interhemispheric), cerebral ischemia, cerebral edema, and skull fractures (co-occurring with intracranial injury), are more common in AHT than in accidental injury.[11] Additionally, recent studies have revealed spinal subdural hemorrhage to be more common in children with abusive (versus accidental) head trauma.[15]

Short falls (often defined as less than 1.5 m, or 5 ft)[16] continue to be a common historical explanation for injuries often seen in AHT. Although a few isolated case reports have identified the potential mortality of some short-fall events, numerous lines of clinical research have clarified the extreme rarity of short falls as a cause of severe neurologic injury or death in young infants. In a comprehensive review of short-fall literature, the estimated mortality rate of short falls affecting infants and young children is <0.48 deaths per 1 million young children per year.[16] Because short falls may be proffered in courts as a likely medical explanation for the findings commonly seen in AHT,[17] pediatric practitioners should be prepared to educate multidisciplinary colleagues on the relative improbability of serious injuries or death as a result of short falls.

Clinical prediction tools have been developed to determine the probability of AHT given specific combinations of physical examination and clinical, laboratory, and radiographic findings.[18,19] Additionally, early work using serum biomarkers to

11/3/22, 8:42 AM
Case 2:21-cv-00657-ROS   Document 333-4   Filed 10/19/23   Page 7 of 28
Abusive Head Trauma in Infants and Children | Pediatrics | American Academy of Pediatrics

identify acute intracranial hemorrhage has shown promise in identifying infants with nonspecific clinical symptoms who warrant neuroimaging.[20] Although these diagnostic advancements show significant promise, their application to current-day pediatric practice is premature.

It is important for pediatric practitioners to recognize the significant morbidity and mortality that accompany AHT. Secondary brain injury from hypoxia, ischemia, and metabolic or inflammatory cascades contribute to poor outcomes.[21,22] Almost 70% of survivors of AHT have some degree of lasting neurologic impairment, including static encephalopathy, intellectual disability, cerebral palsy, cortical blindness, seizure disorders, behavior problems, and learning disabilities.[23,24] Endocrine dysfunction is common in survivors of AHT and may manifest years after injury.[25] Survivors of AHT should be referred at hospital discharge to medical homes where pediatricians can provide ongoing follow-up and prompt referral to pediatric medical subspecialists when indicated.[25]

## Biomechanics

The biomechanics of AHT is a complex topic. For obvious ethical reasons, scientific studies of the topic depend on the development and use of biofidelic models, either physical or computer generated. Throughout decades of clinical and laboratory research on infant head trauma, a number of biomechanical models have been used to assess the impact of various force parameters on the infant head and spine. Some early biomechanical models raised concerns about the ability of shaking events alone to generate sufficient forces to induce a variety of infant brain injuries, inferring that impact was a necessary prerequisite to induce infant head injury.[26] However, subsequent studies have highlighted the biofidelic limitations of

that earlier work and have validated shaking alone as a mechanism for inducing infant brain injury.[27,28]

Additionally, in clinical studies, researchers continue to emphasize the importance of shaking as an injurious mechanism in many cases of AHT. In a study examining 112 cases of perpetrator admissions to AHT in court, shaking was a commonly reported mechanism of injury, with the shaking being described as violent in 100% of cases and being separate, repetitive incidents in 55% of the cases (with a mean repetitive incidence of 10 times).[29]

Some authors have postulated that evidence of significant cervical spine injury was a necessary finding before infant brain injury could be attributed to exclusive shaking events.[30] Although improvements in radiologic imaging have led to increased detection rates of ligamentous and other cervical spine injury in AHT cases, the biomechanical literature does not support the contention that bony, soft-tissue, or spinal cord injury must always be present in cases of AHT.[30]

All biomechanical models, whether physical or computer generated, have limitations and fall short of a precise representation of the complex pathophysiology of the human infant.[31] Clinicians and researchers acknowledge that although precise mechanisms for all abusive injuries remain incompletely understood, sound evidence-based literature supports the conclusion that both inflicted rotational and contact forces to the head can cause brain injury, intracranial hemorrhage, spinal hemorrhage and/or injury, and retinal hemorrhage.[31] Biomechanical research forms an important adjunct to the growing body of knowledge on pediatric traumatic brain injury. However, pediatric practitioners may need to educate multidisciplinary partners on the benefits and limitations of biomechanical literature in AHT.

Case 2:21-cv-00617-ROS   Document 338-4   Filed 10/19/23   Page 9 of 28

# Prevention

Prevention strategies to curtail the incidence of AHT have been developed and researched, and some states have mandated "shaken baby syndrome" education for parents of all newborn infants. Some hospital-based programs have shown success in some settings. Dias et al[32] demonstrated a decrease in AHT in a region of New York using written and video content about the dangers of shaking in addition to asking parents to voluntarily sign a commitment statement acknowledging and affirming receipt and understanding of the information. Their findings were replicated in another part of New York, but larger implementation across the state of Pennsylvania failed to demonstrate a reduction in AHT.[33,34] The Period of PURPLE Crying is a multifaceted program that aims to educate parents about infant sleeping, crying, and soothing behaviors. It involves an in-hospital postpartum implementation phase in which, in addition to the written and DVD education that parents receive, there is later education from public health nurses and annual community education. This program revealed a decrease in AHT incidence after implementation in British Columbia, but implementation in the state of North Carolina did not demonstrate a decrease in the incidence of AHT.[35,36]

Although it has been difficult to consistently demonstrate a decrease in AHT rates with educational interventions, some prevention programs have found other worthwhile results, including parental reports of improved understanding of infant crying, parental reports of improved emotional self-regulation, and an increase in parental knowledge of AHT.[37] Similarly, although the Nurse-Family Partnership, an in-home visitation program, has not demonstrated an effect on AHT rates specifically, the program has demonstrated a long-term decrease in child maltreatment and may be a useful approach in addressing AHT.[38] Providing economic support for families may

Case 2:21-cv-00467-RGS  Document 383-4  Filed 03/19/23  Page 10 of 28

be another prevention approach. Studies evaluating the impact of paid family leave and the earned income tax credit in California have demonstrated a reduction in AHT rates, although further research about generalizability is needed.[39,40] The AAP supports prevention efforts aimed at reducing the frequency of AHT and has called for continued research in this area.

## Legal Impact

Few pediatric diagnoses have engendered as much debate in medicolegal circles as AHT. Because the diagnosis may result in children being removed from their homes and adults being imprisoned for their actions, the existence of a debate is understandable. However, the debate is a philosophical one, not a scientific one.

The debate arises from the legal requirement of physicians to subsequently express in court their degree of certainty of the AHT diagnosis (ie, to a "reasonable medical certainty"). Some authors have clarified that "reasonable medical certainty" is a pro forma legal expression required of physicians to assure courts that the opinions expressed are reasonable and nonspeculative.[41] Pediatric practitioners should understand that legal burdens of proof (ie, beyond a reasonable doubt) are not required for the diagnosis. Diagnosing AHT requires the same meticulousness, thoughtfulness, and comprehensiveness as any other medical diagnosis, no more and no less.

Because civil and criminal justice systems are often involved in cases of AHT, debates related to mechanism and causation of injury often are transferred to the courtroom. On occasion, a pediatric practitioner may be called on to testify in AHT hearings. The court may allow extraneous or pseudoscientific theories to be considered as explanations for findings of AHT, and a pediatrician who is called to testify should be sufficiently versed in these extraneous theories and in the scientific literature

girding the AHT diagnosis so that he or she can present responsible, ethical testimony to the court.[17] In preparing for testimony, reviewing the literature with a child abuse pediatrician can be helpful.

The term "shaken baby syndrome" has become synonymous in public discourse with AHT in all its forms.[42] The term is sometimes used inaccurately to describe infants with impact injury alone or with multiple mechanisms of head and brain injury and is focused on a specific mechanism of injury rather than the abusive event that was perpetrated against a helpless victim. Legal challenges to the term "shaken baby syndrome" can distract from the more important questions of accountability of the perpetrator and/or the safety of the victim. The pediatric practitioner should be prepared to "use the term 'abusive head trauma' rather than a term that implies a single injury mechanism, such as shaken baby syndrome, in their diagnosis and medical communications."[43]

## The Role of the Pediatrician

The diagnosis of child abuse has enormous social, psychological, and legal implications for families. The role of the pediatric practitioner is not to apportion blame or investigate potential criminal activity but to identify the medical problem, evaluate and treat the child's injuries, and offer honest medical information to parents, families, investigators, and attorneys and/or judges. When child protective services or law enforcement are involved in an investigation, the pediatric practitioner is often called on to interpret and communicate medical information for nonmedical professionals in an understandable manner that accurately reflects the medical data.

Pediatricians are mandated reporters, which means they are required to report suspected abuse and neglect to state child

protective services, regardless of whether a definitive diagnosis of maltreatment has been made. As mandated reporters of suspected child abuse and neglect, pediatric practitioners carry the burden of recognizing and responding to medical manifestations of AHT. The diagnosis is sometimes obvious but can be missed by practitioners, particularly when infants present with subtle signs and symptoms.[4] Additionally, pediatric practitioners do not always report injuries that are highly suspicious for abuse to child welfare agencies, putting children at further risk for injury.[44,45] To protect infants who are abused and prevent future severe neurologic injury, pediatric practitioners must remain vigilant for the possibility of AHT in infants who present with both subtle and overt neurologic symptoms and take seriously the ethical and legal mandates to report suspected child abuse to child protective agencies for investigation.

As with any other diagnosis, pediatric practitioners have a responsibility to formulate a thorough differential diagnosis when presented with a patient with findings suggestive of AHT and to consider the possibility of abuse early in that process, with the understanding that a final medical diagnosis of AHT is made only after consideration of all the available clinical data.

On some occasions, the diagnosis is apparent early in the course of the evaluation because some infants and children have injuries to multiple organ systems that could only be the result of inflicted trauma. On other occasions, the diagnosis is less certain. In these less certain circumstances, the pediatric practitioner should carefully balance, both in verbal expression and written documentation, the need for child protection with ongoing medical evaluations. Pediatric practitioners should be cautious to not overstate the significance of particular medical findings, yet they should still effectively communicate the need for child safety when indicated. Because verbal and written

Case 2:21-cv-00467-ROS Document 383-4 Filed 10/19/23 Page 13 of 28

communications with collaborative investigative agencies can be challenging, early consultation with a child abuse pediatrician may be prudent.

Providing a medical home for survivors of AHT is an important role for pediatricians because both short- and long-term complications can occur. Frequent monitoring and prompt referral to subspecialists when needed are key to achieving the best possible outcomes.

Finally, pediatric practitioners can work to prevent AHT by supporting prevention efforts in their clinical practices. Pediatric practitioners may help prevent AHT by carefully assessing for psychosocial risk factors often associated with abuse,[46] by providing anticipatory guidance to new parents about the dangers of shaking and impact, by providing methods for dealing with the frustration of a crying infant, and by providing access to prevention resources and supports. They can also stress the importance of leaving a young infant or toddler in the care of adults whom the parents trust will not harm their child and has been educated on the topic of AHT. Lastly, pediatric practitioners can work to advance evidence-based prevention efforts through research.

## Recommendations

The AAP recommends the following:

1. Pediatric practitioners should remain vigilant for the signs, symptoms, and head injury patterns associated with AHT.
2. Pediatric practitioners should perform a thorough and objective medical evaluation of infants and children who present to medical care with signs and symptoms of potential AHT. Consultants in radiology, ophthalmology, neurosurgery, general pediatric surgery, and other subspecialties are

11/3/22, 8:42 AM
Case 2:21-cv-00467-RQS Document 383-4 Filed 10/19/23 Page 14 of 28
Abusive Head Trauma in Infants and Children | Pediatrics | American Academy of Pediatrics

important partners in the medical evaluation and can assist in interpreting data and reaching a diagnosis.

3. Pediatric practitioners should consider consulting a subspecialist in the field of child abuse pediatrics to ensure that the medical evaluation of the patient has been complete and that the diagnosis is accurate.

4. Pediatric practitioners should continue to use the term "abusive head trauma" rather than a term that implies a single injury mechanism, such as shaken baby syndrome, in their diagnosis and medical communications.

5. Pediatric practitioners should report cases to child protective services when there is reasonable suspicion or reasonable cause to believe AHT has occurred and be prepared to educate investigative agencies on the medical information that forms the basis of the suspicion.

6. Pediatric practices should provide medical homes for survivors of AHT or refer them to medical homes to help achieve optimal rehabilitation and long-term monitoring for complications.

7. Pediatric practitioners who are called on to interact with legal and child protective agencies should be versed in the science underpinning AHT and be prepared to educate these stakeholders on both supported and unsupported theories of causation commonly proffered in court.

8. Pediatric practitioners should educate parents and caregivers about safe approaches to soothing an infant and coping with crying infants and about the dangers of shaking an infant, striking an infant, or impacting an infant's head against a surface.

Drs Narang, Fingarson, and Lukefahr were equally responsible for conceptualizing, writing, and revising the manuscript and considering input from all reviewers and the Board of Directors; and all authors approved the final manuscript as submitted.

Case 2:21-cv-00467-ROS Document 383-4 Filed 10/19/23 Page 15 of 28

**FUNDING:** No external funding.

Policy statements from the American Academy of Pediatrics benefit from expertise and resources of liaisons and internal (AAP) and external reviewers. However, policy statements from the American Academy of Pediatrics may not reflect the views of the liaisons or the organizations or government agencies that they represent.

The guidance in this statement does not indicate an exclusive course of treatment or serve as a standard of medical care. Variations, taking into account individual circumstances, may be appropriate.

All policy statements from the American Academy of Pediatrics automatically expire 5 years after publication unless reaffirmed, revised, or retired at or before that time.

This document is copyrighted and is property of the American Academy of Pediatrics and its Board of Directors. All authors have filed conflict of interest statements with the American Academy of Pediatrics. Any conflicts have been resolved through a process approved by the Board of Directors. The American Academy of Pediatrics has neither solicited nor accepted any commercial involvement in the development of the content of this publication.

AAP      American Academy of Pediatrics

AHT      abusive head trauma

# Competing Interests

**POTENTIAL CONFLICT OF INTEREST:** Drs Narang, Fingarson, and Lukefahr have served as paid expert witnesses/consultants in cases of abusive head trauma in infants and children.

**FINANCIAL DISCLOSURE:** The authors have indicated they have no financial relationships relevant to this article to disclose.

# References

1   Al-Holou WN, O'Hara EA, Cohen-Gadol AA, Maher CO. Nonaccidental head injury in children. Historical vignette. *J Neurosurg Pediatr*. 2009;3(6):474–483

 Google Scholar      Crossref        PubMed

2   Caffey J. Multiple fractures in the long bones of infants suffering from chronic subdural hematoma. *Am J Roentgenol Radium Ther*. 1946;56(2):163–173

 Google Scholar     PubMed

3   Guthkelch AN. Infantile subdural haematoma and its relationship to whiplash injuries. *Br Med J*. 1971;2(5759):430–431

 Google Scholar      Crossref        PubMed

4   Jenny C, Hymel KP, Ritzen A, Reinert SE, Hay TC. Analysis of missed cases of abusive head trauma [published correction appears in JAMA. 1999;282(1):29]. *JAMA*. 1999;281(7):621–626

 Google Scholar      Crossref        PubMed

5   Shanahan ME, Zolotor AJ, Parrish JW, Barr RG, Runyan DK. National, regional, and state abusive head trauma: application of the CDC algorithm. *Pediatrics*. 2013;132(6). Available at: www.pediatrics.org/cgi/content/full/132/6/e1546

 Google Scholar

6   Sheets LK, Leach ME, Koszewski IJ, Lessmeier AM, Nugent M, Simpson P. Sentinel injuries in infants evaluated for child physical abuse. *Pediatrics*. 2013;131(4):701–707

 Google Scholar      Crossref        PubMed

7  Pierce MC, Kaczor K, Aldridge S, O'Flynn J, Lorenz DJ. Bruising characteristics discriminating physical child abuse from accidental trauma [published correction appears in Pediatrics. 2010;125(4):861]. *Pediatrics*. 2010;125(1):67–74

Google Scholar      Crossref        PubMed

8  Dorfman MV, Metz JB, Feldman KW, Farris R, Lindberg DM; ExSTRA Investigators. Oral injuries and occult harm in children evaluated for abuse. *Arch Dis Child*. 2018;103(8):747–752

Google Scholar      Crossref        PubMed

9  Christian CW; Committee on Child Abuse and Neglect, American Academy of Pediatrics. The evaluation of suspected child physical abuse [published correction appears in Pediatrics. 2015;136(3):583]. *Pediatrics*. 2015;135(5). Available at:  www.pediatrics.org/cgi/content/full/135/5/e1337

Google Scholar

10  Section on Radiology; American Academy of Pediatrics. Diagnostic imaging of child abuse. *Pediatrics*. 2009;123(5):1430–1435

Crossref        PubMed

11  Piteau SJ, Ward MG, Barrowman NJ, Plint AC. Clinical and radiographic characteristics associated with abusive and nonabusive head trauma: a systematic review. *Pediatrics*. 2012;130(2):315–323

Google Scholar      Crossref        PubMed

12  Maguire S, Pickerd N, Farewell D, Mann M, Tempest V, Kemp AM. Which clinical features distinguish inflicted from non-inflicted brain injury? A systematic review. *Arch Dis Child*. 2009;94(11):860–867

Google Scholar      Crossref        PubMed

13  Maguire SA, Watts PO, Shaw AD, et al. Retinal haemorrhages and related findings in abusive and non-abusive head trauma: a systematic review. *Eye (Lond)*. 2013;27(1):28–36

Google Scholar      Crossref        PubMed

14  American Academy of Ophthalmology Quality of Care Secretariat; Hoskins Center for Quality Eye Care. Abusive

Head Trauma/Shaken Baby Syndrome. San Francisco, CA: American Academy of Ophthalmology; 2015. Available at: https://www.aao.org/clinical-statement/abusive-head-traumashaken-baby-syndrome. Accessed September 24, 2019

15   Choudhary AK, Bradford RK, Dias MS, Moore GJ, Boal DK. Spinal subdural hemorrhage in abusive head trauma: a retrospective study. *Radiology*. 2012;262(1):216–223

 Google Scholar        Crossref        PubMed

16   Chadwick DL, Bertocci G, Castillo E, et al. Annual risk of death resulting from short falls among young children: less than 1 in 1 million. *Pediatrics*. 2008;121(6):1213–1224

 Google Scholar        Crossref        PubMed

17   Leventhal JM, Edwards GA. Flawed theories to explain child physical abuse: what are the medical-legal consequences? *JAMA*. 2017;318(14):1317–1318

 Google Scholar        Crossref        PubMed

18   Hymel KP, Willson DF, Boos SC, et al; Pediatric Brain Injury Research Network (PediBIRN) Investigators. Derivation of a clinical prediction rule for pediatric abusive head trauma. *Pediatr Crit Care Med*. 2013;14(2):210–220

 Google Scholar        Crossref        PubMed

19   Maguire SA, Kemp AM, Lumb RC, Farewell DM. Estimating the probability of abusive head trauma: a pooled analysis. *Pediatrics*. 2011;128(3). Available at: www.pediatrics.org/cgi/content/full/128/3/e550

 Google Scholar

20   Berger RP, Pak BJ, Kolesnikova MD, et al. Derivation and validation of a serum biomarker panel to identify infants with acute intracranial hemorrhage. *JAMA Pediatr*. 2017;171(6):e170429

 Google Scholar        Crossref        PubMed

21   Ichord RN, Naim M, Pollock AN, Nance ML, Margulies SS, Christian CW. Hypoxic-ischemic injury complicates inflicted and accidental traumatic brain injury in young children: the role of diffusion-weighted imaging. *J Neurotrauma*. 2007;24(1):106–118

 Google Scholar        Crossref        PubMed

22  Bayir H, Kochanek PM, Kagan VE. Oxidative stress in immature brain after traumatic brain injury. *Dev Neurosci*. 2006;28(4–5):420–431

 Google Scholar      PubMed

23  Barlow KM, Thomson E, Johnson D, Minns RA. Late neurologic and cognitive sequelae of inflicted traumatic brain injury in infancy. *Pediatrics*. 2005;116(2). Available at:  www.pediatrics.org/cgi/content/full/116/2/e174

 Google Scholar

24  Fanconi M, Lips U. Shaken baby syndrome in Switzerland: results of a prospective follow-up study, 2002-2007. *Eur J Pediatr*. 2010;169(8):1023–1028

 Google Scholar      Crossref        PubMed

25  Flaherty E, Legano L, Idzerda S; Council on Child Abuse and Neglect. Ongoing pediatric health care for the child who has been maltreated. *Pediatrics*. 2019;143(4):e20190284

 Google Scholar      Crossref        PubMed

26  Duhaime AC, Gennarelli TA, Thibault LE, Bruce DA, Margulies SS, Wiser R. The shaken baby syndrome. A clinical, pathological, and biomechanical study. *J Neurosurg*. 1987;66(3):409–415

 Google Scholar      Crossref        PubMed

27  Cory CZ, Jones BM. Can shaking alone cause fatal brain injury? A biomechanical assessment of the Duhaime shaken baby syndrome model. *Med Sci Law*. 2003;43(4):317–333

 Google Scholar      Crossref        PubMed

28  Finnie JW, Blumbergs PC, Manavis J, et al. Neuropathological changes in a lamb model of non-accidental head injury (the shaken baby syndrome). *J Clin Neurosci*. 2012;19(8):1159–1164

 Google Scholar      Crossref        PubMed

29  Adamsbaum C, Grabar S, Mejean N, Rey-Salmon C. Abusive head trauma: judicial admissions highlight violent and repetitive shaking. *Pediatrics*. 2010;126(3):546–555

 Google Scholar      Crossref        PubMed

30  Margulies S, Prange M, Myers B, et al. Shaken baby syndrome: a flawed biomechanical analysis [Comment Letter]. *Forensic Sci Int*. 2006;164(2–3):278–279

 Google Scholar     PubMed

31  Pierce MC, Bertocci G. Injury biomechanics and child abuse. *Annu Rev Biomed Eng*. 2008;10:85–106

 Google Scholar     Crossref

32  Dias MS, Smith K, DeGuehery K, Mazur P, Li V, Shaffer ML. Preventing abusive head trauma among infants and young children: a hospital-based, parent education program. *Pediatrics*. 2005;115(4). Available at:  www.pediatrics.org/cgi/content/full/115/4/e470

 Google Scholar

33  Altman RL, Canter J, Patrick PA, Daley N, Butt NK, Brand DA. Parent education by maternity nurses and prevention of abusive head trauma. *Pediatrics*. 2011;128(5). Available at:  www.pediatrics.org/cgi/content/full/128/5/e1164

 Google Scholar

34  Dias MS, Rottmund CM, Cappos KM, et al. Association of a postnatal parent education program for abusive head trauma with subsequent pediatric abusive head trauma hospitalization rates. *JAMA Pediatr*. 2017;171(3):223–229

 Google Scholar     Crossref     PubMed

35  Barr RG, Barr M, Rajabali F, et al. Eight-year outcome of implementation of abusive head trauma prevention. *Child Abuse Negl*. 2018;84:106–114

 Google Scholar     Crossref     PubMed

36  Zolotor AJ, Runyan DK, Shanahan M, et al. Effectiveness of a statewide abusive head trauma prevention program in North Carolina. *JAMA Pediatr*. 2015;169(12):1126–1131

 Google Scholar     Crossref     PubMed

37  Lopes NRL, Williams LCA. Pediatric abusive head trauma prevention initiatives: a literature review. *Trauma Violence Abuse*. 2018;19(5):555–566

 Google Scholar     Crossref     PubMed

38   Eckenrode J, Campa MI, Morris PA, et al. The prevention of child maltreatment through the nurse family partnership program: mediating effects in a long-term follow-up study. *Child Maltreat*. 2017;22(2):92–99

  Google Scholar      Crossref      PubMed

39   Klevens J, Luo F, Xu L, Peterson C, Latzman NE. Paid family leave's effect on hospital admissions for pediatric abusive head trauma. *Inj Prev*. 2016;22(6):442–445

  Google Scholar      Crossref      PubMed

40   Klevens J, Schmidt B, Luo F, Xu L, Ports KA, Lee RD. Effect of the earned income tax credit on hospital admissions for pediatric abusive head trauma, 1995-2013. *Public Health Rep*. 2017;132(4):505–511

  Google Scholar      Crossref      PubMed

41   Narang SK. The unreasonableness of 'reasonable medical certainty'. *Child Abuse Negl*. 2015;50:232–233

  Google Scholar      Crossref      PubMed

42   Lazoritz S, Baldwin S, Kini N. The whiplash shaken infant syndrome: has Caffey's syndrome changed or have we changed his syndrome? *Child Abuse Negl*. 1997;21(10):1009–1014

  Google Scholar      Crossref      PubMed

43   Christian CW, Block R; Committee on Child Abuse and Neglect; American Academy of Pediatrics. Abusive head trauma in infants and children. *Pediatrics*. 2009;123(5):1409–1411

  Google Scholar      Crossref      PubMed

44   Jones R, Flaherty EG, Binns HJ, et al; Child Abuse Reporting Experience Study Research Group. Clinicians' description of factors influencing their reporting of suspected child abuse: report of the Child Abuse Reporting Experience Study Research Group. *Pediatrics*. 2008;122(2):259–266

  Google Scholar      Crossref      PubMed

45   Flaherty EG, Sege RD, Griffith J, et al; PROS network; NMAPedsNet. From suspicion of physical child abuse to reporting: primary care clinician decision-making. *Pediatrics*. 2008;122(3):611–619

Google Scholar    Crossref    PubMed

46  Pierce MC, Kaczor K, Acker D, et al. History, injury, and psychosocial risk factor commonalities among cases of fatal and near-fatal physical child abuse. *Child Abuse Negl*. 2017;69:263–277

Google Scholar    Crossref    PubMed

## Lead Authors

Sandeep K. Narang, MD, JD, FAAP

Amanda Fingarson, DO, FAAP

James Lukefahr, MD, FAAP

# Council on Child Abuse and Neglect Executive Committee, 2017–2019

Andrew P. Sirotnak, MD, FAAP, Chairperson

Emalee G. Flaherty, MD, FAAP, Immediate Past Chairperson

CAPT Amy R. Gavril, MD, MSCI, FAAP

Amanda Bird Hoffert Gilmartin, MD, FAAP

Suzanne B. Haney, MD, FAAP, Chairperson-Elect

Sheila M. Idzerda, MD, FAAP

Antoinette Laskey, MD, MPH, MBA, FAAP

Lori A. Legano, MD, FAAP

Stephen A. Messner, MD, FAAP

Bethany Mohr, MD, FAAP

Rebecca L. Moles, MD, FAAP

Shalon Nienow, MD, FAAP

Vincent J. Palusci, MD, MS, FAAP

## Liaisons

Heather Forkey, MD, FAAP, *Council on Foster Care, Adoption, and Kinship Care*

Beverly Fortson, PhD, *Centers for Disease Control and Prevention*

Brooks Keeshin, MD, FAAP, *American Academy of Child and Adolescent Psychiatry*

Anish Raj, MD, *American Academy of Pediatrics Section on Pediatric Trainees*

Elaine Stedt, MSW, *Administration for Children, Youth and Families, Children's Bureau, Office on Child Abuse and Neglect*

## Staff

Tammy Piazza Hurley

Copyright © 2020 by the American Academy of Pediatrics

# Comments

4 Comments

## RE: inaccurate data

February 14 2021 | Joel C. Siebold

NA

This article cites Adamsbaum, Grabar, Mejean and Rey-Salmon (29), as "a study examining 112 cases of perpetrator admissions to AHT in court."
This does not appear to be accurate. The cited article (29) 'Abusive Head Trauma: Judicial Admissions Highlight Violent and Repetitive Shaking', states the following:

Case 2:21-cv-00467-ROS Document 383-4 Filed 10/19/23 Page 24 of 28
Abusive Head Trauma in Infants and Children | Pediatrics | American Academy of Pediatrics

"We compared 29 cases in which a perpetrator confessed to violence toward the child with 83 cases in which there was no confession."

That would be 118 cases of suspected AHT but is not 118 confessions.

Submitted on February 14 2021

## RE: mistake correction

January 17 2021 | Joel C. Siebold

N/A

"In a study examining 112 cases of perpetrator admissions to AHT in court, shaking was a commonly reported mechanism of injury, with the shaking being described as violent in 100% of cases and being separate, repetitive incidents in 55% of the cases (with a mean repetitive incidence of 10 times).29"

The article you cite (29) is actually a study that examines 29 confessions and 83 non-confessions. A confession, also, does not necessarily make the confessor a perpetrator; there have been an overwhelming number of well documented cases of false or coerced confessions, as well as confessions that are part of plea deals allowing the accused to avoid longer prison sentences.

Scientific research should not have a one-sided agenda, therefore I believe it would behoove scientific researchers such as yourselves to correct this mistake and address the surrounding circumstances influencing the data used to influence the opinions that you express in this journal.

Submitted on January 17 2021

## RE: Data Fabrication

December 1 2020 | Joel C. Siebold

11/3/22, 8:42 AM
Case 2:21-cv-00467-ROS Document 383-4 Filed 10/19/23 Page 25 of 28
Abusive Head Trauma in Infants and Children | Pediatrics | American Academy of Pediatrics

N/A

In this article you write:

"In a study examining 112 cases of perpetrator admissions to AHT in court, shaking was a commonly reported mechanism of injury, with the shaking being described as violent in 100% of cases and being separate, repetitive incidents in 55% of the cases (with a mean repetitive incidence of 10 times)."

Citing the article:

(Adamsbaum C, Grabar S, Mejean N, Rey-Salmon C. Abusive head trauma: judicial admissions highlight violent and repetitive shaking. Pediatrics. 2010;126(3):546–555)

However, the method of this study described in the cited article, is as follows:

"In this retrospective observational study we examined forensic evidence from 112 cases referred for AHT over a 7-year period. We compared 29 cases in which a perpetrator confessed to violence toward the child with 83 cases in which there was no confession."

It is erroneous to claim the study examines 112 cases of perpetrator admissions to AHT, when in 83 of those cases, there were no admissions of guilt. The article does not say whether those 83 cases involved a suspect pleading not guilty or if there were no suspects at all. Either way, you are fabricating 83 confessed "perpetrators", that simply do not exist.

The hypocrisy, of course, is that you use this fabricated data to help support your position on the debate over whether or not AHT can be medically diagnosed. This debate that you claim, "is a philosophical one, not a scientific one."

Case 2:21-cv-00467-ROS Document 383-4 Filed 10/19/23 Page 26 of 28

Submitted on December 01 2020

# RE: AHT; a criminal allegation not a medical diagnosis.

November 11 2020 | Joel C. Siebold

N/A

Sandeep K. Narang, Amanda Fingarson, James Lukefahr and COUNCIL ON CHILD ABUSE AND NEGLECT

In this article you write:

"Additionally, in clinical studies, researchers continue to emphasize the importance of shaking as an injurious mechanism in many cases of AHT. In a study examining 112 cases of perpetrator admissions to AHT in court, shaking was a commonly reported mechanism of injury, with the shaking being described as violent in 100% of cases and being separate, repetitive incidents in 55% of the cases (with a mean repetitive incidence of 10 times).29"

Citing the article:

29. Adamsbaum C, Graber S, Mejean N, Rey-Salmon C. Abusive head trauma:
Judicial admissions highlight violent and repetitive shaking. Pediatrics. 2010:126(3):546-555

The article you cite however states the following:

"In this retrospective observational study we examined forensic evidence from 112 cases referred for AHT over a 7-year period. We compared 29 cases in which a perpetrator confessed to violence toward the child with 83 cases in which there was no confession."

It studies 29 confessions of suspected AHT, not 112. This also does not take into account that all of those

11/3/22, 8:42 AM
Case 2:21-cv-00467-ROS  Document 383-4  Filed 10/19/23  Page 27 of 28
Abusive Head Trauma in Infants and Children | Pediatrics | American Academy of Pediatrics

confessions took place in police custody or in court. It is highly likely that at least some were coerced by police interrogation or part of a plea deal to avoid the possibility of a much harsher punishment. There was no confession in 83 of those cases, and other explanations for the injuries were given. The testimony of those 83 people who deny hurting a child cannot simply be ignored when studying AHT, and you certainly can't claim in a scientific journal that they confessed, when they did not.

You later write that debate over AHT "is a philosophical one, not a scientific one." Yet, you are not even honest about the "science" you say can "diagnose" AHT. As a father who has been falsely accused of abuse based on the dishonesty of Dr Barbara Knox and Amanda Palm PA at the American Family Children's Hospital in Madison Wisconsin, I am deeply troubled by this. Child Abuse Pediatricians who are paid expert witnesses will now use the flawed science and dishonest discussion you present within this article to help destroy families and imprison innocent people.

Through my own research and speaking with other families, I have found that what happened to my family is far from an isolated instance. There seems to be a level of dishonesty, for whatever reasons, that is accepted within the field of Child Abuse Pediatrics. I witnessed first hand the manipulation of evidence, deceptive interrogation tactics, misquotes and statements taken out of context, and the flat out lies CAPs use to pin abuse on people, where none has taken place.

I am pleading with you to change this; not just the flaws in this particular article, but the dishonest nature of Child Abuse Pediatrics in general.

Thank you

Joel Siebold

Submitted on November 11 2020