Thomas A. Connelly (AZ Bar #019430
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**Mills + Woods Law, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**Gillespie, Shields & Taylor**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>Arizona Department of Child Safety, *et al.*,<br><br>    Defendants. | Case No.: 21-cv-00167-ROS<br><br>**RESPONSE IN OPPOSITION TO PCH DEFENDANTS'** ***DAUBERT*** **MOTION REGARDING PLAINTIFFS' EXPERT THOMAS YOUNG, M.D.** |

Plaintiffs, by and through undersigned counsel, hereby respond in opposition to *PCH Defendants* (Phoenix Children's Hospital, Dr. William S. Wood and spouse Rachel Wood, Dr. Kathryn Coffman, and Haley Dietzman and spouse Ronald Dietzman) *Daubert Motion Regarding Plaintiffs' Expert Thomas Young, M.D.* (Doc 315). This Response is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. OVERVIEW

This case has arisen because of the PCH Defendants' staunch refusal to accept responsibility for their wrongful actions in overstepping their limited role as medical

doctors in pursuit of the PCH Child Protection Team's goal of advocating for suspected child abuse victims, as is more fully discussed in Plaintiffs' Motion for Partial Summary Judgment (Doc. 319) and Plaintiffs' Omnibus *Daubert* Motion as to Eleven Experts Retained by PCH Defendants and Defendant Cassidy (Doc. 322.)[1]

PCH Defendants took on the role of Department of Child Safety ("DCS") Office of Child Welfare Investigations ("OCWI") personnel investigating the case and making removal and placement decisions. PCH Defendants embarked on this misguided course of action because they are fierce adherents to and believers of Shaken Baby Syndrome ("SBS"), now usually referred to in the pediatric circles as Abusive Head Trauma ("AHT") as a way of distancing the syndrome from its inherent, unavoidable, unprovable, and non-scientifically supported causation elements. While Defendants claim and will continue to claim, that SBS/AHT is widely accepted medical science, that simply is not true. While SBS/AHT is widely accepted in the so-called mainstream pediatric medical community, it is not widely accepted in the broader relevant medical and scientific communities outside of pediatrics, which now has its own cottage industry in child abuse pediatrics – witness the modern proliferation of "Child Protection Teams" in children's hospital nationwide. Nor is SBS/AHT widely recognized as being based on sound science by the scientific disciplines implicated by the syndrome, such as biomechanics, for instance, which is why courts across the nation (and worldwide) preclude expert opinion testimony about shaking, *i.e.*, SBS/AHT, as the cause of subdural hematomas, retinal

---

[1] Shaken Baby Syndrome/Abusive Head Trauma ("SBS/AHT") is not the only area of so-called pediatric medicine in which the pediatrician-driven child abuse system has jumped off the rails. *See* Maxine Eichner, Bad Medicine: Parents, the State, and the Charge of "Medical Child Abuse", 50 U.C. Davis L. Rev. 205, 205-06 (2016), https://lawreview.law.ucdavis.edu/issues/50/1/Articles/50-1_Eichner.pdf, ("This article demonstrates that the broad definition of [medical child abuse] developed by physicians and adopted within the child protection system violates the constitutional rights of parents…the loose diagnostic standards constructed to 'diagnosis' MCA rest on both flawed science and flawed medical standards. In short, the MCA theory developed by physicians and enforced by child protection officials is bad constitutional doctrine, bad law, bad science, and bad medicine."), attached for convenience as **Exhibit 1**.

hemorrhages, and transient or brief changes in mental state, such as lethargy, particularly when those conditions occur in concert in a non-ambulatory child, such as S.Z.S, without there being obvious causation, like falling from great height, being cursed by great weight or involved in a high-speed vehicle accident, or being violently thrown against a wall striking one's head. Rather, SBS/AHT is a prime example of "junk science." *See State v. Nieve, et al.*, Nos. A-2069-21, A-2936-21, 2023 WL 5947996, at *16 (N.J. Super. Ct. App. Div. Sept. 13, 2023) (affirming the trial court's findings that "no study has ever validated the hypothesis that shaking a child can cause the triad of symptoms associated with [SBS/]AHT, and likened the theory to junk science given the lack of testing" and that "[SBS/]AHT is a flawed diagnosis because it originates from a theory based upon speculation and extrapolation instead of being anchored in facts developed through reliable testing.") (internal quotation marks omitted). Although widely accepted by the pediatric medical community, especially among child abuse pediatricians, SBS/AHT is now considered devoid of scientific merit and subject to serious doubt in the broader relevant medical and scientific communities. *See* (Doc. 322 at 10:19-17:5); *see also* Findley, *et al.*, *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right*, 12 Hous. J. Health L. & Pol'y 209, 213 (2012) (discussing the widespread agreement that subdural hematomas and retinal hemorrhaging, even with brain swelling, are not enough to diagnose abuse); *see also Nieve, et al.*, 2023 WL 5947996, *1 ("The evidence supports the finding that there is *a real dispute in the larger medical and scientific community* about the validity of shaking only SBS/AHT theory, *despite its seeming acceptance in the pediatric medical community*.") (emphasis added).

PCH CPT terrorized this family with accusations of abuse via SBS/AHT when there were no physical, family, mental health, domestic violence, drug/alcohol, poverty, prior DCS involvement, or any other findings or reasons to label these parents as abusers. Recently, an impeccably credentialed and recognized founder of "child abuse pediatrics," Dr. Eli Newberger, M.D., called into question the efficacy and usefulness of child abuse pediatrics and teams like the PCH CPT:

3

> Newberger is board-certified in pediatrics with a sub-specialty in child abuse, but his reasons for not getting the board certification in "child abuse pediatrics" should make all of us pause. Not only was he a founding father of the field, but he was in the room when the specialty was being created. Newberger disagreed with the consensus of the other doctors who wanted to call the field "child abuse pediatrics." Newberger wanted a field called "forensic pediatrics" that would take a multi-disciplinary approach to child abuse to avoid the false diagnoses of abuse that are plaguing the nation. Newberger refused to take the board-certification test for the new field of "child abuse pediatrics" because he knew it would devolve into what we are seeing today: untrained, incurious, authoritarian know-nothings who terrorize families with their ignorance.
>
> "I object for the following reasons," Newberger said. "If we were to call this 'child abuse pediatrics' what it would result in would be a small field of people who would be assigned the task in hospitals of thumbs up or down, is this child abuse or not? And that was an overly-simple technical function and further, it couldn't be based on any body of science which would justify creating a new specialty with this name."
>
> Newberger had a better idea for how the field should be created. "I argued it would be far better to call this specialty – taking cognizance of the fields of forensic psychiatry, forensic psychiatry [sic], and forensic pathology – to call this 'forensic pediatrics' which would have as its foundation child development, family development, behavioral science as it manifests in relationships, and in violence in relationships, biodynamics in regard to the transmission of various vectors and forces and flames and the like that impelled injury, which would be understood in those frames."

Megan Fox, *Founding Father of 'Child Abuse Pediatrics' Call Johns Hopkins All Children's Defendants 'Conspirators" in Unlawful Acts*, PJ MEDIA (Oct. 15, 2023, 11:10 PM), https://pjmedia.com/news-and-politics/megan-fox/2023/10/15/founding-father-of-child-abuse-pediatrics-calls-johns-hopkins-all-childrens-defendants-conspirators-in-unlawful-acts-n1735266, attached for convenience as **Exhibit 2**.

    **A.**    <u>**SBS/AHT Has Proven Flawed Over Time**</u>

The natural consequence of scientific and medical progress is that evidence once thought to be credible may be proven inaccurate and unreliable over time. The Shaken Baby Syndrome is a prime example of "medical science" that has been proven flawed over

4

time. *See, e.g.,* Doc. 322-1 (Amicus Brief to the U.S. Supreme Court by 16 current and retired forensic scientists, forensic pathologists, medical examiners, pediatric radiologists, pediatric neurologists, pediatric pathologists, emergency medicine physicians, biomechanical engineers, and others); Doc. 322-2 at §§ I, II (Amicus Brief to the U.S. Supreme Court by The Center for Integrity in Forensic Sciences); Doc. 322-3 at DUVALL_004614 (ABA article noting that "[s]haking is an unlikely mechanism for the injuries often attributed to it.").[2] SBS is now considered to be devoid of scientific merit by the same doctor who pioneered the diagnosis in the 1970's. *See, e.g.*, Josep Shapiro, *Rethinking Shaken Baby Syndrome*, NPR (June 29, 2011), https://www.npr.org/2011/06/29/137471992/rethinking-shaken-baby-syndrome. Given the lack of scientific support for the specific mechanism of shaking, pediatricians are now encouraged to use the term "Abusive Head Trauma" ("AHT") in place of "Shaken Baby Syndrome" because the new term is more expansive and does not require physicians to identify a precise mechanism of injury.

**B.     Shaken Baby Syndrome Renamed by the Pediatrics Lobby as Abusive Head Trauma to Hide the Flaws in the Diagnosis**

Beginning in the 1970's, some physicians began advancing a hypothesis that, if an infant or young child became very ill or died without an obvious reason why, and the baby had a certain "triad" of findings – typically, (1) blood in the subdural area around the brain (subdural hemorrhage); (2) microscopic bleeding within the retina (retinal hemorrhage); and (3) encephalopathy (damage of the brain itself sometimes accompanied by comatose state or some change in affect, such as lethargy) and/or cerebral edema (brain swelling) – that *might* mean the baby had been violently shaken. *See* A. Norman Guthekelch, 2 BRITISH MED. JOURNAL 430 (1971,

---

[2] To the fullest extent possible, exhibit citations herein will be to exhibits already in the docket as part of Plaintiffs' Motion for Partial Summary Judgment (Doc. 319) or Plaintiffs' Omnibus *Daubert* Motion as to Eleven Experts Retained by PCH Defendants and Defendant Cassidy (Doc 322). If citation to an exhibit that is not an exhibit to Docs. 319 or 322, is necessary, that exhibit will be attached to this Response.

5

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1796151/; John Caffey, *On the Theory and Practice of Shaking Infants*, 124 AM. J. DIS. CHILD 161 (1972). They soon named this constellation of symptoms "Shaken Baby Syndrome." Those advocating the hypothesis claimed that the constellation of physical findings is virtually unique to violent shaking alone or with impact. *See, e.g.*, Letter to the Editor, Chadwick, *et al.*, *Shaken Baby Syndrome: A Forensic Pediatric Response*, 101 PEDIATRICS 321 (1998).

Because in the last century child abuse was largely under-recognized and all-too-frequently ignored, a few physicians, particularly of the pediatric variety, began a campaign with the laudable goal to educate other doctors to recognize and report child abuse and to educate parents about the dangers of mistreating children. Even though the data was "circumstantial" and "manifestly incomplete," these well-intentioned doctors reasoned that a nationwide educational campaign to prevent the jerking, jolting and whiplash of infants was warranted. *See, e.g.*, John Caffey, *The Whiplash Shaken Infant Syndrome: Manual Shaking by the Extremities with Whiplash-Induced Intracranial and Intraocular Bleedings, Linked with Residual Permanent Brain Damage and Mental Retardation*, 54 PEDIATRICS 396, 403 (1974); A. Norman Guthkelch, *Problems of Retino-Dural Hemorrhage with Minimal External Injury,* 12 HOUS. J. OF HEALTH LAW & POL'Y 201 (2012). At the time, these doctors never envisioned, and did not advocate, criminal prosecutions based on these findings. *Id.* at 203. Nonetheless, the SBS hypothesis gradually hardened into accepted medical wisdom, even though it lacked a solid scientific foundation. *Id.* at 207; Mark Donohoe, *Evidence-based Medicine and Shaken Baby Syndrome Part I: Literature Review, 1966-1998*, 24 AM. J. FORENSIC MED. PATHOLOGY 239, 241 (2003); Deborah Tuerkheimer, *Flawed Convictions: "Shaken Baby Syndrome" and the Inertia of Injustice* (Oxford Univ. Press 2014).

Over time, the beliefs of medical doctors surrounding these findings have changed considerably. *See State v. Edmunds,* 746 N.W. 2d 590, 596 (2008) ("[A] significant and legitimate debate in the medical community has developed in the past ten years over whether infants can be fatally injured through shaking alone, whether an infant may suffer

head trauma and yet experience a lucid interval prior to death, and whether other causes may mimic the symptoms traditionally viewed as indicating shaken baby or shaken impact syndrome."). Many experts have come to realize that children previously thought to have been shaken may have also or instead suffered some kind of impact injury. *See, e.g.*, Ann-Christine Duhaime, *et al.*, *The Shaken Baby Syndrome: A Clinical, Pathological, and Biomechanical Study*, 66 J. NEUROSURG. 409 (1987) ("Although shaking may, in fact, be part of the process, it is more likely that such infants suffer blunt impact…"); Derek A. Bruce and Robert A. Zimmerman, *Shaken Impact Syndrome*, 18 PEDIATRIC ANNALS 482, 492-4 (1989) (the authors concluded severe acute brain trauma cannot be produced by shaking alone and that the mechanism of injury is more appropriately described as "shaking impact"). Given the lack of scientific support for the specific mechanism of shaking, pediatricians are now encouraged to no longer use the term "Shaken Baby Syndrome" (SBS); the preferred term (and the one used in this case) is "Abusive Head Trauma" (AHT), because that term is more expansive and does not require the physician to identify a precise mechanism of injury. This name change is a marketing move, recommended by the pediatric medical lobby because of the legal difficulties with SBS; it does not reflect a substantive change or advance in medical science.

Many terms are used either to describe the alleged mechanism of injury or interchangeably with AHT, including, but not limited to "acceleration-deceleration injury," "non-accidental injury," "non-accidental trauma," and "inflicted head trauma." *E.g.*, Brian Forbes, *Child Abuse: Anatomy and Pathogenesis of Retinal Hemorrhages After Abusive Head Trauma*. Up To Date, Evelyn A. Paysse & Daniel M. Lindberg (Eds.) UpToDate, Waltham, MA (Accessed on September 7, 2015); Sandeep Narang, *A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome*, 11 HOUS. J. HEALTH L. & POL'Y 505 (2011). Until recently, the leading physicians in the child abuse protection community staunchly argued that shaking or other abuse could be reliably and confidently diagnosed on the existence of the three findings of the triad. Chadwick, *et al*., *supra,* Peter G. Richards, *et al*., *Shaken Baby Syndrome,* 91 ARCH. DIS. CHILD 205 (2005) ("The triad

7

of encephalopathy, subdural hemorrhages, and retinal hemorrhages as an indicator of head injury that has stood the test of time.").

Now, leaders in the field of pediatrics claim that no responsible physician would diagnose abuse based on this "triad." The new American Academy of Pediatrics ("AAP") position paper, revised in 2009, backs off the certainty of the AHT diagnosis, now asserting instead that "the mechanisms and resultant injuries of accidental and abusive head injury overlap." Christian, *et. al.*, *supra* at 1410. As Dr. Bob Sege, director of Family and Child Advocacy at Boston Medical Center and a member of the AAP Committee on Child Abuse and Neglect, recently told NPR, "[t]he real straw man argument is the idea that diagnosing abusive head trauma relies solely on those three injuries…."https://www.npr.org/sections/health-shots/2015/07/29/427449852/doctors-devise-a-better-way-to-diagnose-shaken-baby-syndrome. Dr. Carole Jenny, a longtime child abuse pediatrician and SBS-hypothesis advocate, and former Brown University Pediatrics professor, now teaches that "the triad is a myth." Carole Jenny, *Presentation on The Mechanics: Distinguishing AHT/SBS from Accidents and Other Medical Conditions*, slide 33, 2011 New York City Abusive Head Trauma/Shaken Baby Syndrome Training Conference (Sept. 23, 2011).

There is now widespread, if not universal, agreement that the presence of the triad alone – or its individual components alone or in any combination – is not enough to diagnose abuse. Findley, *et. al.*, *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right.* 12 HOUS. J. HEALTH L. & POL'Y 209, 213 (2012); Tuerkheimer, *supra* at 10-11. But the doctors in this case, including Defendants' experts, did not just make their diagnosis based on this disfavored set of findings; they went a step further. They diagnosed S.Z.S. with Abusive Head Trauma based on only two of the three signs previously (but no longer) thought to be diagnostic of abuse – subdural hemorrhages and retinal hemorrhages (the child did not have encephalopathy or any loss of consciousness). These findings are nonspecific, associated with a variety of mechanisms, and certainly not pathognomonic (i.e., exclusively diagnostic) of abuse. Contrary to the standard set forth

8

by *Daubert* for the admission of medical causation testimony, these doctors utterly discounted or failed to account for the myriad alternative explanations for S.Z.S.'s medical findings; some even offered inaccurate medical opinion and *ipse dixit*, presented as fact, to support the AHT diagnosis.

### C. S.Z.S.'s Medical History at PCH

On 21 February 2019, 60 days after S.Z.S. was born, his mother took him to the PCH emergency department ("ED") at the recommendation of his primary care doctor after first calling the PCP. At PCH, S.Z.S. was first evaluated by ED nurse, Leah Kaufman, who observed that S.Z.S.'s "skin color appears normal for the child's ethnic group", thus not mistaking his Mongolian spots for bruises. However, she erroneous noted that S.Z.S.'s chief complaint was hematemesis (vomiting of blood) which was not the case. The young Caucasian ED resident physician on duty, Kathleen Outcalt, was not as observant (or knowledgeable) as the ED nurse and recorded that S.Z.S. had bruising in several areas of his body and torso. *Compare* Doc 319-4 at PCH 1272 cycn *with* 319-5 at PCH 1259. Blood tests were run from blood drawn in the ED which showed numerous abnormal results, including an elevated white blood-cell count ("WBC COUNT") – a widely recognized sign of infection. Doc. 319-4 at PCH 1358 cycn-1360 cycn. However, resident Outcalt recorded his blood test results as being "normal." Ostensibly due to his having "[u]nexplained bruising with normal labs," the PCH ED submitted S.Z.S. to a full body skeletal survey, without knowing and informed parental consent, and contacted the PCH Child Protection Team ("CPT") per a PCH algorithm in use at the time. Doc. 319-5 at PCH 1262 cycn; Doc. 319-8 at Clinical Pathway 4 GR. The skeletal survey was (incorrectly) interpreted as showing the presence of "[r]ight and left tibial bucket handle metaphyseal fractures," which resident Outcalt also (mis)interpreted and recorded as "BL buckethandle fx of tibia." *Id*. at PCH 1264 cync.

Having been informed of these purported results, and without examining S.Z.S. herself, a young, Caucasian CPT nurse practitioner, Defendant Haley Dietzman, "had to beg" the ED or trauma floor doctors to admit S.Z.S. as a patient so that a battery of

9

additional "SNAT" testing could be run to label S.Z.S. a victim of Suspected Non-Accidental Trauma ("SNAT"), i.e., an abused child. Doc. 319-9. It is a reasonable inference from the evidence that begging was needed because the ED and/or trauma floor doctors, who were not members of the PCH CPT, did not believe S.Z.S. needed to be admitted under an abuse diagnosis. Indeed, these non-CPT doctors were telling the family that test results were normal or not worrisome for abuse and that they did not suspect abuse. Doc. 319-10. Yet, at approximately 10:00 p.m. that night, a PCH CPT social worker called both the Buckeye Police Department and the DCS abuse hotline to make a report of suspected abuse. Doc. 391-3 at BPD000003. At approximately 9:17 p.m. that evening, a CT scan of the head found "blood products" in the child's head; the age of that fluid collection could not be determined. Doc. 319-11 at 25:12-23; 319-12. It could have possibly been "blood products" collecting in the head since birth since brain bleeds are common in newborns. Doc. 319-13 at DUVALL_1767**; Doc.** 319-14 at 1.

During the late evening of 21 February 2019, and into the pre-dawn hours of 22 February 2019, both the Buckeye Police Department ("BPD") and DCS, responding to PCH CPT's hotline call, arrived at PCH and started concurrent child abuse investigations. Doc. 319-3 at BPD000003; Doc. 319-15 at AZDCS012360. Dr. Patrick Hangge, a PCH trauma floor doctor, spoke with BPD and DCS at 3:35 a.m. on the 22nd of September and told them that a blood disorder had not been ruled out as a cause of the purported tibial fractures, and that a blood disorder or braking too hard in a car could explain the subdural hematoma seen on the CT scan of the head. Doc. 319-15 at AZDCS012371-372. Dr. Hangge also stated the CT did not show a skull fracture and the child had no visible outside trauma. *Id.* Dr. Hangge told BPD that the lab results were "abnormal" and that "we don't have a lot of answers at this time." Doc 319-3 at BPD000006.

Later, on 22 February 2019, without legal authority or knowing and informed parental consent to do so, DCS authorized Defendant Dietzman, the PCH CPT nurse practitioner, to conduct a forensic medical examination of S.Z.S., *after* it had already been performed. Doc. 319-15 at AZDCS012373.

10

Late in the morning or early afternoon on 22 February 2019, Defendant Cassidy, a pediatric ophthalmologist who frequently consults for the PCH CPT on cases of suspected SBS/AHT, arrived at PCH to examine S.Z.S.'s eyes. Doc. 319-17 at 108:3-5, 7-9, 13-17; Doc. 319-18 at 62:7-10, 62:20-63:1; 64:6-9, 64:11-65:2, 66:9-11, 19-21, 66:23-67:19, 68:3-11, 17-25, 69:3-8. Dr. Cassidy performs consultations for PCH CPT only on cases where child abuse is suspected – once PCH CPT pages him, he knows he will be examining an "abused child." *Id.* Dr. Cassidy was in S.Z.S.'s room for 90 seconds, during which he examined the outside of S.Z.S.'s eyes and then his retinas using a device but without the child's pupils being fully dilated, as the standard of care requires. Doc. 319-17 at 96:3-12, 118:2-4, 120:15-17; Doc. 319-19 at 4. Dr. Cassidy purports to have found extensive bleeding in all layers and quadrants of the child's retinas. Doc. 319-20. In his words, the child's retinas "were painted with blood" and shaking was the cause. Doc. 319-17 at 44:24-25, 49:6-16, 50:1-6, 16-21.[3] Although a retinal camera was available at PCH at the time Dr. Cassidy examined S.Z.S., and despite knowing a DCS and criminal investigation were underway, he did not photograph S.Z.S.'s retinas to document and verify what he purportedly saw and preserve that evidence. Doc. 319-18 at 178:7-13, 16-17, 23-25; 180:8-10; *see also* 319-22 at DUVALL_000057 (Juvenile Court noting that nothing was done to verify Dr. Cassidy's purported observations). The next day, S.Z.S. was discharged under a PDP to the custody of his maternal great grandmother. Doc. 319-24.

On 25 February 2019, two days after his discharge from PCH, S.Z.S. was examined by Dr. Warren Heller, a licensed ophthalmologist with over 45 years' experience, including with children, to get a second opinion to Dr. Cassidy's examination. Doc. 319-

---

[3] A 2016 study conducted at Stanford University School of Medicine (the "Stanford Study") concluded that 20.3%[3] of children are born with retinal/optic nerve hemorrhaging, 71% of which involved hemorrhaging in multiple layers of the retina, and 35% in all 4 quadrants, which can take up to 58 days to resolve completely. Doc. 319-52. (S.Z.S. was just shy of his 2-month birthday when he was first seen at PCH.) The Stanford Study concluded that hemorrhages in the eyes "are common among newborns…often involve multiple areas and layers of the retina…." and that "[v]aginal delivery was associated with a significantly increased risk" of such hemorrhaging. *Id.* at 2. Babies' retinas are not examined at birth or any other time as a routine matter.

11

26 at 29:5-6. Dr. Heller, like Dr. Cassidy, used an ophthalmoscope to examine S.Z.S. retinas and his examination revealed nothing alarming about S.Z.S.'s retinas or eyes. *Id*. at 33:4, 33:25-34:5; 319-27. Dr. Heller reported that all aspects of the child's retinas were "WNL", meaning "Within Normal Limits". *Id*. He did not find any retinal bleeding and nothing to indicate S.Z.S. had been abused. *Id*.

S.Z.S. was also seen by his PCP on the 25th, who referred him to Valley Radiology to obtain images and a second opinion regarding S.Z.S.'s purported tibial fractures. Dr. Galvez-Trevino, a pediatric radiologist at Valley Radiology, did not find the bilateral bucket handle tibial fractures diagnosed by PCH. Doc. 319-29. Rather, he found the left tibia was normal, with no fractures or dislocation; and, as to the right tibia, he identified results consistent with a "possible" fracture and recommended a bone scan to confirm whether the density found on the radiograph was a fracture or a radiological artifact. *Id.*

Dr. Galvez-Trevino's findings were, in essence if not completely, corroborated by Dr. Wood on 28 February 2019, when S.Z.S. had a consultation set up by the PCH CPT. Doc. 319-30. Dr. Wood confirmed that S.Z.S. did not have a left tibia fracture, and, although he diagnosed a right tibia fracture, he too ordered a bone scan to confirm that diagnosis because the radiograph results were not definitive. *Id***.** at PCH 1202 cycn; Doc. 319-31 at 16:23-24, 93:11-24, 242:12-25; Doc. 319-10 at AZDCS000681; Doc. 319-32. PCH never performed the bone scan to confirm a right tibia fracture. Additionally, Dr. Wood's records were replete with errors; for example, inaccurately stating that S.Z.S. was in a splint, was in pain, given pain medication, and had shrunk almost 11 inches since birth. Doc. 319-33 at 84:4-6, 86:8-12, 17-20, 107:21-25, 108:1-22; Doc. 319-31at 244:3-245:22, 246:2-17, 249:12-250:7, 253:18-254:15. These are among the reasons the Juvenile Court found Dr. Wood and his records to lack credibility. Doc. 319-22 at DUVALL_000054.

On 7 March 2019, S.Z.S. had a follow up appointment with the PCH CPT at Childhelp Children's Center of Arizona, which is staffed with DCS and PCH CPT personnel, to confirm the earlier SNAT findings. Doc. 319-34 at PCH 1173 cycn. At this

time, Dietzman recognized that the "unexplained bruising" identified on S.Z.S.'s body in February, which were material to PCH's earlier SNAT diagnosis (and which led to the accusations of abuse), were in fact Mongolian spots; that is, non-traumatic birth marks contraindicative of abuse. *Id*. at PCH 1176 cycn-1177 cycn. Deitzman found no other issues with S.Z.S. and it was not until Mother expressed concern that S.Z.S. head circumference was increasing that Dietzman became concerned. *Id*. at PCH 1174 cycn, PCH 1177 cycn. Mother was ordered by Dr. Coffman and Dietzman to take S.Z.S back to PCH even though the family wanted to take him to Banner Cardon's Children's Hospital, another respected children's hospital in the valley. *Id*.; Doc. 319-35 at 178:25-179:9. Coffman escalated the matter to DCS administrators who forced the case manager, over her objections, to "escort" the family to PCH and only PCH or remove S.Z.S. from their custody. Doc. 319-35 at 178:5-18, 178:25-179:9, 179:19-24. S.Z.S. was readmitted to PCH that same day. Doc. 319-36.

The next day, 8 March 2019, S.Z.S. underwent a medical procedure to place a drain in his head to remove the excess fluid around his brain. Doc. 319-37. Upon completion of the procedure, S.Z.S. went into respiratory distress and was subsequently admitted to the pediatric intensive care unit where he remained until shortly before discharge 12 days later. *Id.* at PCH 0407 cycn.

D. **Plaintiffs' Expert Thomas W. Young, MD, FAAFS, FASCP, FCAP**

Thomas W. Young, M.D., is a diplomate with the National Board of Medical Examiners, American Board of Pathology, Anatomic and Clinical Pathology and Forensic Pathology. **Exhibit 3**. Beginning in 1994, Dr. Young has testified in over 463 cases. **Exhibit 4** at 11:3-8. As a medical examiner in the States of Missouri, Georgia, and West Virginia throughout his career, Dr. Young participated in child fatality review committees and was involved with issues involving fatal child abuse. *Id.* at 25:21-25; **Ex. 3** at 2-3. Dr. Young has been retained by Plaintiffs to opine on causation of abuse. Specifically, Dr. Young will testify that "*an expression of suspicion is uncertain. A suspicion* [of non-accidental trauma] *is a guess that may in the end be unfounded*", and "[n]o physician can

13

validly claim to know whether or not the physical findings in an infant are from child abuse." **Exhibit 5** at DUVALL_001766-67 (emphasis in original); **Ex. 4** at 212:3-16. Dr. Young calls into question Defendants' diagnosis and suspicions of child abuse regarding S.Z.S. *See generally*, **Ex. 5**. Dr. Young has been through many *Daubert* challenges and only one in nearly 500 time has his testimony been excluded on *Daubert* grounds. **Ex. 4** at 181:5-13.[4]

### E. PCH Defendants Ten Retained Experts

PCH Defendants' lineup of ten heavyweight experts, all of them from pediatrics and most of them child abuse practitioners, not only relied on PCH's flawed medical records which the juvenile court found to "contain significant errors," and without ever having examined S.Z.S., but intend to opine about controversial "diagnosis" of SBS/AHT, which at best, is based on faulty medical science, but more accurately, is based on "junk science." *See Nieve, et al.*, 2023 WL 5947996, at *16 (affirming the trial court's findings that "no study has ever validated the hypothesis that shaking a child can cause the triad of symptoms associated with [SBS/]AHT, and likened the theory to junk science given the lack of testing" and that "[SBS/]AHT is a flawed diagnosis because it originates from a theory based upon speculation and extrapolation instead of being anchored in facts developed through reliable testing.") (internal quotation marks omitted). Their reports are also replete with speculation and qualifiers, such as, "suspicious", "most likely", "suggest", "probable", "highly specific for", "nearly", strongly favor", or the like. PCH Defendants retained experts to, in effect, overrule the factual findings and final judgment of the juvenile court that S.Z.S. was not abused.  The problem is that their opinions in that regard do not meet the reliability criteria of Rule 702 and/or *Daubert*.

---

[4] Dr. Young's testimony was excluded one other time, but he does not know why or, apparently, if it was the result of a *Daubert* challenge. *See* **Ex. 4** at 181:18-182:4.

14

## II. ARGUMENT

PCH Defendants are asking this Court to conduct a hearing to determine whether Dr. Young's opinions are "proper and reliable" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and FRE 702. (Doc 315).

PCH Defendants argue that since Dr. Young is not an adherent or advocate of the controversial SBS/AHT diagnosis that his opinions are unreliable. Specifically, PCH Defendants mock Dr. Young's opinion that a medical diagnosis of suspected child abuse cannot be made unless the abuse is witnessed by someone, whereas false child abuse is diagnosed by doctors who are looking at a child's present medical condition and trying to surmise past events in the absence of any corroborating witness testimony. Any alleged flaws in Dr. Young's opinions are precisely the role of cross-examination and should go to the weight and not the admissibility of his testimony.

### A. PCH Defendants Have Failed to Demonstrate the Need for a *Daubert* Hearing

The purpose of expert testimony at trial is to "help the trier of fact to understand the evidence or to determine a fact in issue." FRE 702. The Supreme Court in *Daubert* "held that the Federal Rules of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony is not only relevant but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). "The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II"). The Court's role is to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 596). The Court has broad discretion to decide how to test an expert's reliability as well as relevance, based on the circumstances of the particular

case. *Primiano*, 598 F.3d at 564; *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)

The rejection of expert testimony *is the exception rather than the rule*. FRE 702, Advisory Committee's Note (emphasis added). The standard is "satisfied where expert testimony advances the trier of fact's understanding to any degree." *Abarca v. Franklin Cnty. Water Dist.*, 761 F.Supp.2d 1007, 1029-30 (E.D. Cal. 2011) (citations omitted, emphasis added). "The threshold for qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and experience suffices." *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. C 10-00544 JW, 2011 WL 5417090 at *4 (N.D. Cal. Oct. 27, 2011) (citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004)).

The Court has "broad latitude when it decides how to determine reliability." *Khumo* at 142. This includes if and when this Court "decide[s] whether or when special briefing or other proceedings are needed to investigate reliability." *Id.* at 152. Thus, the Court is not required to conduct a *Daubert* hearing to evaluate the admissibility of expert opinion testimony. *See, e.g.*, *United States v. Hoang*, 285 F. App'x 133, 136 (5th Cir. 2008) ("No separate hearing is necessary."); *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138 (9th Cir. 2002) ("District courts are not required to hold a *Daubert* hearing before ruling on the admissibility of [expert testimony].").

Here, PCH Defendants mount seven attacks on Dr. Young's opinions: (1) his opinions are premised on his self-created "inferential test"; (2) his claim that real child abuse is witnessed by someone and false child abuse is diagnosed by doctors; (3) they take issue with his book *The Sherlock Effect*, which debunks SBS/AHT; (4) Dr. Young calls into question AHT as the cause of subdural hemorrhages; (5) his view that S.Z.S.'s subdural hematomas could have been caused at birth or before birth; (6) that S.Z.S.'s metaphyseal fracture could be what he calls "catch-up mineralization" following birth; and (7) he cannot state to a reasonable degree of medical certainty the cause of S.Z.S. retinal hemorrhages but opines that retinal hemorrhages could be caused by childbirth.

16

(Doc. 315). Dr. young is a causation expert. But since he is a non-believer of SBS/AHT, his opinions are not reliable according to PCH Defendants.

"Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness' testimony, not to admissibility." *Abarca*, 761 F.Supp.2d at 1028. The trial court is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F. 3d at 969 (emphasis added). Passing the threshold of admissibility merely requires that the expert's testimony have "a reliable basis in knowledge and experience of relevant discipline." *Messick v. Novarits Pharmaceuticals Corp.*, 747 F. 3d 1193, 1194 (9th Cir. 2014) (quotations omitted). Here, Dr. Young is a very experienced forensic pathologist serving as the medical examiner for the State of Kansas for many years. He knows a thing or two about child abuse because he has seen a case or two of suspected victims of child abuse. Moreover, his views that subdural hematomas and retinal hemorrhages can and do occur at birth are not fantasy – documented studies performed at respected medical institutions confirm that both conditions can and do occur at birth. *See* Doc. 319-14 (study conducted at the University of North Carolina Health Care found 26% of asymptomatic newborns delivered vaginally to have subdural hemorrhages); Doc. 319-52 (study conducted at Stanford University School of Medicine found 20.3% of asymptomatic newborns delivered vaginally with retinal hemorrhages, 71% of which involved multiple layers of the retina, with 35% involving all four quadrants, and some of which persisted for nearly two months after birth). Dr. Young's views are not speculative or unreliable simply because PCH Defendants do not like them or do not agree with them.

The *Daubert* task is not to "decid[e] whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury. *Alaska Rent-A-Car*, 738 F.3d 969-70. Impeachment alone is not a proper basis for exclusion. *Id.* at 969. An expert's opinion is always assailable through cross-examination. *Daubert*, 509 U.S. at 596. Ultimately, the purpose of the Court's assessment is to exclude speculative or unreliable testimony to ensure accurate, unbiased decision-making by the trier of fact.

17

PCH Defendants have failed to demonstrate that a *Daubert* hearing is warranted. PCH Defendants' misbelief that Dr. Young's opinions about SBS/AHT are not accepted by the relevant scientific community[5] as PCH Defendants narrowly define that community does not require exclusion here. PCH Defendants are attempting to use a *Daubert* hearing to make an end run around the juvenile court's findings that S.Z.S. was not abused. This is not appropriate for *Daubert*.

### B.     Dr. Young is Qualified to Opine on Causation of Abuse

Dr. Young is sufficiently qualified, experienced, and knowledgeable to opine about causation and child abuse. Specifically, Dr. Young has performed thousands of autopsies, including in cases where child abuse was suspected. He has faced many *Daubert* challenges over the course of his long and successful career, but only one time has he been excluded as a testifying expert under *Daubert*. He has participated in child fatality review committees and was involved with issues involving fatal child abuse. He knows about that of which is prepared to testify in this case.

PCH Defendants continue to argue that their ten experts are more qualified because of their experience with SBS/AHT and that their opinions are valid – this type of argument goes merely to weight and credibility rather than admissibility.

### III.    CONCLUSION

Despite PCH Defendants' handwringing to the contrary, Dr. Young's opinions are not unreliable and, unlike PCH Defendants' experts' opinions regarding SBS/AHT, Dr. Young's views are actually based on sound logic and verifiable science. The narrow definition of the relevant scientific community advocated by PCH Defendants – that being the pediatric medical societies – do not constitute the proper scientific communities by which to judge Dr. Young's opinions. The broader, appropriate, scientific community is

---

[5] Plaintiffs' Omnibus Daubert Motion as to Eleven Experts Retained by PCH Defendants and Defendant Cassidy fully briefs the faulty science behind SBS/AHT. (Doc. 321). Specifically, the practice of diagnosing SBS/AHT based on the presence of retinal hemorrhages has never been validated by relevant scientific community. (*Id.* at 26)

18

skeptical, at best, about an SBS/AHT diagnosis. That broader, appropriate scientific community hold the same or similar views about SBS/AHT articulated by Dr. Young.

To the extent any testimony is allowed about whether S.Z.S. was abused – which none should be because it has already been judicially determined that there was no abuse – Dr. Young's views are in line with the relevant scientific community and should be allowed. The better course, however, would be to not allow any expert testimony that the child was a victim of abuse, and to particularly disallow any expert testimony that shaking or SBS/AHT was the manner of abuse. For all the foregoing reasons, Plaintiffs respectfully request that the Court deny PCH Defendants' *Daubert* Motion regarding Dr. Young. The Motion is without merit on its face and should be denied.

**RESPECTFULLY SUBMITTED** this 19th day of October 2023.

**MILLS + WOODS LAW, PLLC**

By   */s/ Thomas A. Connelly*
    Thomas A. Connelly
    Robert T. Mills
    Sean A. Woods
    5055 North 12th Street, Suite 101
    Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October 2023, I electronically transmitted the foregoing document to be filed electronically with the Clerk of the Court using the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

   */s/ Thomas A. Connelly*