# EXHIBIT 4

Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Sandra T. Daussin (AZ Bar #037274)
GILLESPIE, SHIELDS & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>Arizona Department of Child Safety, *et al.*,<br>        Defendants. | Case No.: 21-cv-00167-ROS<br><br>**PLAINTIFFS' TWELFTH SUPPLEMENTAL DISCLOSURES PURSUANT TO FRCP(A)(2)(B)** |

Plaintiffs, through counsel undersigned, hereby make the following Twelfth Supplemental Disclosure Statement pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). Plaintiffs' supplemental disclosures are based upon information that is presently reasonably available to Plaintiffs. As discovery is ongoing, Plaintiffs have not completed their investigation into additional facts, documents, witnesses, or experts which may further support their Complaint. As a result, Plaintiffs reserve the right to present witnesses, documents, experts, and evidence in addition to that which is disclosed herein.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

Moreover, Plaintiffs recognize their continuing obligation under Federal Rule of Civil Procedure 26(e)(1) and (2) to supplement these disclosures at appropriate intervals and will do so in a timely manner as Plaintiffs become aware of and/or receive additional relevant information during the course of discovery in this case. These disclosures do not constitute waiver of any work product protection and are without prejudice to any other issue or argument.

## DISCLOSURES

**I.    Individuals who may have discoverable information relevant to disputed facts alleged with particularity in the pleadings.**

Attached in **Appendix A** is Plaintiffs' list of individuals who may have discoverable information relevant to disputed facts alleged with particularity in the pleadings.

*See* **Appendix A: Initial Individual Disclosures**

**II.    Description by category and location of documents, data, compilations, and tangible things in possession, custody or control of Plaintiffs which may be used to support claims.**

Attached in **Appendix B** are disclosures which describe the documents, data compilations, and tangible things in Plaintiffs' possession or that Plaintiffs' reasonably believe exist in the possession, custody, and control of Defendants and third-party witnesses that may be relevant to disputed facts alleged with particularity in the pleadings. Plaintiffs believe that most or all of these documents are in Defendant's custody and control. If any information is in the custody or control of third-parties, Plaintiffs will request that information from relevant third-parties. Discovery is only getting underway, and Plaintiffs expect to identify through discovery additional categories of relevant documents likely to support Plaintiffs' claims. Pursuant to Federal Rule of Civil Procedure 26(a)(1)(B), Plaintiffs contemplate using the following categories of documents to support their claims:

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

*See* **Appendix B: Initial Document Disclosures**

## III.    DAMAGES

S.Z.S. was deprived of critical bonding time with his parents for more than one-third of his young life at the time of the unwarranted and unnecessary removal from his parents. His parents were deprived of critical bonding time with their first born, beloved son, for nine months of his young life. This depravation occurred because on 22 February 2019, the State of Arizona, through the Department of Child Safety (DCS), in cooperation and conspiring with Phoenix Children's Hospital (PCH), unlawfully and unconstitutionally seized S.Z.S. from the loving and competent care of his Mother and Father. Before seizing S.Z.S., DCS did not seek nor obtain approval from a neutral magistrate. At the time DCS seized S.Z.S., there were no exigent circumstances. Based on the information DCS possessed at the time it seized S.Z.S., **and given the glaring errors in PCH's medical records**, no reasonable person could determine that he was in imminent danger of immediate harm. **DCS did not perform a complete and thorough investigation and made PCH an arm of the State when DCS deferred its investigation to PCH. PCH failed to perform diagnostic procedures that could rule out PCH's finding of suspected abuse and had inadequate policies and procedures to protect families from false allegations of suspected abuse and did not have or follow policies regarding conflicts of interest regarding second opinions, medical reviews, and more.**

**DCS continued to ignore State and Federal Law when its director became personally involved with the case and ordered the investigators to take temporary custody of S.Z.S. and file a Dependency Petition despite the investigators' reluctance to do so; DCS also failed to create a case plan for the duration of the case**. During the subsequent dependency court proceedings, agents of DCS and (counsel for DCS) deceived the court by presenting information that they knew, or reasonably should have known, was false. The actions of the agents of DCS and PCH in seizing S.Z.S., and subsequent actions, violated the constitutional rights of all Plaintiffs and also were in violation of

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

3

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Arizona state law.

As a result of the actions and omissions of Defendants, Plaintiffs suffered permanent and devastating distress and loss. We may never know the full extent of the damage caused to S.Z.S had there not been an unconstitutional seizure and removal from his family. Moreover, the relationship that this close and loving family could have had with S.Z.S. had he not been removed from their care during a critical bonding stage of life has been impaired. **These acts also forced the family to incur the costs of relocation twice**.

Due to the acts and omissions to act of these Defendants, Plaintiffs will ask the jury in this matter to award Plaintiffs an amount sufficient to ensure that Plaintiffs are compensated for the extreme pain and suffering visited upon them, the loss of familial relationships, hedonistic damages, and any and all other damages that may be appropriate based on the course of recovery. Plaintiffs are in the process of quantifying, to the extent they can be quantified, and will supplement this section accordingly. This will include providing evidence and testimony, via both fact and expert witnesses, on the impact of an unwarranted, unlawful removal of S.Z.S. on this family.

Further, at the trial of this matter, Plaintiffs will request an award of punitive damages as the conduct of Defendants evinces reckless disregard for Plaintiff's civil rights. Such damages will be sought in an amount sufficient to deter Defendants from acting in such a manner in the future.

Finally, Plaintiffs request both pre- and post-judgment interest and incurred costs, including all attorneys' fees and court costs pursuant to 42 U.S.C. §1988 and as otherwise authorized by any other statute or law. Plaintiffs expressly reserve the right to supplement as additional documents and information becomes available.

## IV.   INSURANCE AGREEMENTS

4

Plaintiffs do not have direct knowledge of any such insurance agreements but expect that each of the Defendants carry insurance agreements under which an insurance business may be liable to satisfy all or part of a possible judgment in this action.

**DATED** this 28th day of May 2023.

MILLS + WOODS LAW PLLC

By____/s/ Thomas A. Connelly____
    Thomas A. Connelly
    Robert T. Mills
    Sean A. Woods
    5055 North 12th Street, Suite 101
    Phoenix, AZ 85014

GILLESPIE, SHIELDS & TAYLOR
    DeeAn Gillespie Strub
    Sandra T. Daussin
    7319 North 16th Street
    Phoenix, AZ 85020

*Attorneys for Plaintiffs*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**APPENDIX A**

**I.     Individuals who may have discoverable information relevant to disputed facts alleged with particularity in the pleadings.**

1)  Name:              Honor Duvall
    Relationship:      *Plaintiff*, mother of *Plaintiff* S.Z.S., a minor child
    Counsel:           Thomas A. Connelly, Mills + Woods Law PLLC
    Address:           5055 N 12th Street, Phoenix, Arizona 85014
    Telephone:         (480) 999-4556

    **Honor Duvall is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings**.

2)  Name:              Donald Sankey, Jr.
    Relationship:      *Plaintiff*, father of *Plaintiff* S.Z.S., a minor child
    Counsel:           Thomas A. Connelly, Mills + Woods Law PLLC
    Address:           5055 N 12th Street, Phoenix, Arizona 85014
    Telephone:         (480) 999-4556

    **Donald Sankey is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

3)  Name:              Dawn Duvall
    Relationship:      Maternal grandmother of S.Z.S., a minor child
    Counsel:           Thomas A. Connelly, Mills + Woods Law PLLC
    Address:           5055 N 12th Street, Phoenix, Arizona 85014
    Telephone:         (480) 999-4556

    **Dawn Duvall is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

4)  Name:              Margaret Good
    Relationship:      Maternal great grandmother of S.Z.S., a minor child
    Counsel:           Thomas A. Connelly, Mills + Woods Law PLLC
    Address:           5055 N 12th Street, Phoenix, Arizona 85014
    Telephone:         (480) 999-4556

    **Margaret Good is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings**

5)  Name:              Gordon Gooley
    Relationship:      Family friend
    Counsel:           Thomas A. Connelly, Mills + Woods Law PLLC
    Address:           5055 N 12th Street, Phoenix, Arizona 85014

Telephone: (480) 999-4556

**Gordon Gooley is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

6) Name: Brenda Gualajara
Title: Case worker
Organization: Arizona Department of Child Safety
Counsel: Georgia A. Staton, Jones, Skelton & Hochuli, PLC
Address: 40 N. Central Ave., Ste. 2700, Phoenix, AZ 85004
Telephone: (602) 263-1700

**Brenda Gualajara is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings**

7) Name: Fernando Araiza
Title: Case worker
Organization: Arizona Department of Child Safety
Counsel: Georgia A. Staton, Jones, Skelton & Hochuli, PLC
Address: 40 N. Central Ave., Ste. 2700, Phoenix, AZ 85004
Telephone: (602) 263-1700

**Fernando Araiza is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

8) Name: Alyssa Lucero (and spouse Nicholas Costello)
Title: Case worker
Organization: Arizona Department of Child Safety
Counsel: Georgia A. Staton, Jones, Skelton & Hochuli, PLC
Address: 40 N. Central Ave., Ste. 2700, Phoenix, AZ 85004
Telephone: (602) 263-1700

**Alyssa Lucero is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

9) Name: Jeffrey Duncan (and spouse Jerryl James)
Title: Case worker
Organization: Arizona Department of Child Safety
Counsel: Georgia A. Staton, Jones, Skelton & Hochuli, PLC
Address: 40 N. Central Ave., Ste. 2700, Phoenix, AZ 85004
Telephone: (602) 263-1700

**Jeffrey Duncan is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings**

10) Name: Chantel Madson (and spouse Timothy Madson)
Title: Case worker
Organization: Arizona Department of Child Safety
Counsel: Georgia A. Staton, Jones, Skelton & Hochuli, PLC
Address: 40 N. Central Ave., Ste. 2700, Phoenix, AZ 85004

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Telephone:              (602) 263-1700

**Chantel Madson is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

11)  Name:                 Gregory McKay
     Title:                Former Director
     Organization:         Arizona Department of Child Safety
     Counsel:              Georgia A. Staton, Jones, Skelton & Hochuli, PLC
     Address:              40 N. Central Ave., Ste. 2700, Phoenix, AZ 85004
     Telephone:            (602) 263-1700

**Gregory McKay is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings. He is also expected to testify regarding the policies, procedures, and laws of DCS and the State of Arizona concerning DCS and its relationship with its affiliates, service providers and others. He is also expected to testify regarding his personal involvement in the juvenile dependency and his interactions with PCH and Dr. Kathryn Coffman.**

12)  Name:                 Michael Faust
     Title:                Director
     Organization:         Arizona Department of Child Safety
     Counsel:              Georgia A. Staton, Jones, Skelton & Hochuli, PLC
     Address:              40 N. Central Ave., Ste. 2700, Phoenix, AZ 85004
     Telephone:            (602) 263-1700

**Michael Faust is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

13)  Name:                 Dr. Brendan Cassidy
     Title:                Pediatric ophthalmologist
     Counsel:              Cynthia Y. Patane, Kent & Wittekind, P.C.
     Address:              111 W. Monroe St., Ste. 1000, Phoenix, AZ 85003
     Telephone:            (602) 528-0185

**Dr. Brendan Cassidy is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

14)  Name:                 Phoenix Children's Hospital
     Counsel:              Kari B. Zangerle, Campbell Yost Clare & Norell
     Address:              3101 N. Central Ave., Ste. 1200, Phoenix, AZ 85012
     Telephone:            (602) 452-6624

**Phoenix Children's Hospital personnel are expected to testify regarding all relevant facts and circumstances for which they have knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

15) Name:                Dr. William S. Wood
    Title:               Pediatric orthopedic
    Organization:        Phoenix Children's Hospital
    Counsel:             Kari B. Zangerle, Campbell Yost Clare & Norell
    Address:             3101 N. Central Ave., Ste. 1200, Phoenix, AZ 85012
    Telephone:           (602) 452-6624

**Dr. William Wood is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings including his compensation and PCH policy and procedures for medial records accuracy.**

16) Name:                Dr. Kathryn Coffman
    Title:               Child Abuse Specialist
    Organization:        Phoenix Children's Hospital
    Counsel:             Kari B. Zangerle, Campbell Yost Clare & Norell
    Address:             3101 N. Central Ave., Ste. 1200, Phoenix, AZ 85012
    Telephone:           (602) 452-6624

**Dr. Kathryn Coffman is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings. She is also expected to testify regarding her relationship with PCH, DCS and her dual employment with both, the training she received from both and what safeguards, if any, were put in place to avoid a conflict of interest between her employment with both agencies.**

17) Name:                Hailey Dietzman, NP
    Title:               Nurse practitioner, child trauma team
    Organization:        Phoenix Children's Hospital
    Counsel:             Kari B. Zangerle, Campbell Yost Clare & Norell
    Address:             3101 N. Central Ave., Ste. 1200, Phoenix, AZ 85012
    Telephone:           (602) 452-6624

**Haley Dietzman is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings as well as the PCH "pathway" and procedures for analyzing potential abuse.**

18) Name:                Zachary Dion, PNP
    Title:               Pediatric nurse practitioner
    Organization:        Phoenix Children's Hospital
    Counsel:             Kari B. Zangerle, Campbell Yost Clare & Norell
    Address:             3101 N. Central Ave., Ste. 1200, Phoenix, AZ 85012
    Telephone:           (602) 452-6624

**Zachary Dion is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings as well as his interactions with DCS personnel, other PCH personnel and providers, and the family of S.Z.S.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

19) Name:          Carey Lewis, CPNP
    Title:         Certified pediatric nurse practitioner
    Organization:  Phoenix Children's Hospital
    Counsel:       Kari B. Zangerle, Campbell Yost Clare & Norell
    Address:       3101 N. Central Ave., Ste. 1200, Phoenix, AZ 85012
    Telephone:     (602) 452-6624

    **Carey Lewis is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings as well as her interactions and observation with/or DCS personnel, other PCH personnel and providers, and the family of S.Z.S.**

20) Name:          Dr. Warren Heller
    Title:         Pediatric ophthalmologist
    Organization:  Eye Doctors of Arizona
    Counsel:       Unknown
    Address:       515 W. Buckeye Rd., Ste. 104, Phoenix, AZ 85003
    Telephone:     (602) 257-8280

    **Dr. Warren Heller is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

21) Name:          Marcia Bluth
    Title:         Social worker
    Organization:  Phoenix Children's Hospital
    Counsel:       Unknown
    Address:       1919 E. Thomas Rd., Phoenix, AZ 85016
    Telephone:     (602) 933-1000

    **Marcia Bluth is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings as well as her interactions and observations with/of DCS personnel, other PCH personnel and providers, and the family of S.Z.S.**

22) Name:          Unknown
    Title:         Social worker
    Organization:  Phoenix Children's Hospital
    Counsel:       Unknown
    Address:       1919 E. Thomas Rd., Phoenix, AZ 85016
    Telephone:     (602) 933-1000

    **Unknown Social Worker is expected to testify regarding all relevant facts and circumstances for which (s)he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings**

23) Name:          Donald Tilley
    Title:         Case worker
    Organization:  Arizona Department of Child Safety
    Counsel:       Unknown
    Address:       3003 N. Central Ave., Phoenix, AZ 85012
    Telephone:     (602) 255-2500

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**Donald Tilley is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

24)  Name:              Det. Tamela Skaggs
     Title:             Detective
     Organization:      Buckeye Police Department
     Counsel:           Unknown
     Address:           21699 W. Yuma Rd., #104, Buckeye, AZ 85326
     Telephone:         (623) 349-6400

**Honor Duvall is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings as well as her interactions with PCH personnel, DCS personnel, and the family of S.Z.S.**

25)  Name:              Dr. Patrick Hangee
     Title:             Trauma doctor
     Organization:      Phoenix Children's Hospital
     Counsel:           Unknown
     Address:           1919 E. Thomas Rd., Phoenix, AZ 85016
     Telephone:         (602) 933-1000

**Dr. Patrick Hangee is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings as well as his compensation with PCH.**

26)  Name:              Representative
     Title:             Unknown
     Organization:      Desert Valley Pediatrics
     Counsel:           Unknown
     Address:           700 N. Estrella Pkwy, Ste. 110, Goodyear, AZ 85338
     Telephone:         (623) 877-7337

**Representative is expected to testify regarding all relevant facts and circumstances for which (s)he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

27)  Name:              Representative
     Title:             Unknown
     Organization:      Child Help Children's Center of Arizona
     Counsel:           Nicholas A. Bender, Sanders & Parks, PC
     Address:           2120 N. Central Ave., #130, Phoenix, AZ 85004
     Telephone:         (602) 271-4500

**Representative is expected to testify regarding all relevant facts and circumstances for which (s)he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

28)  Name:              Dr. Jennifer Ronecker
     Title:             Pediatric neurosurgeon

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

| | | |
|---|---|---|
| Organization: | Phoenix Children's Hospital |
| Counsel: | Unknown |
| Address: | 1919 E. Thomas Rd., Phoenix, AZ 85016 |
| Telephone: | (602) 933-1000 |

**Dr. Jennifer Ronecker is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

29) Name:      Michael Caldwell
      Title:         Parent aide
      Organization:   Department of Child Safety
      Counsel:      Unknown
      Address:      3003 N. Central Ave., Phoenix, AZ 85012
      Telephone:    (602) 255-2500

**Michael Caldwell is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings and the policies and procedures for parent-aide reports and closures.**

30) All witnesses identified by Defendants.

31) Name:      Jordan R. Oland
      Title:         MD
      Organization:   Banner Estrella Medical Center
      Counsel:      Unknown
      Address:      9201 W. Thomas Rd., Phoenix, AZ 85037
      Telephone:    Unknown

**Dr. Jordan R. Oland is expected to testify regarding all relevant facts and circumstances for which she has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

32) Name:      Florian T. Walter
      Title:         DO
      Organization:   Banner Estrella Medical Center
      Counsel:      Unknown
      Address:      9201 W. Thomas Rd., Phoenix, AZ 85037
      Telephone:    Unknown

**Dr. Florian T. Walter is expected to testify regarding all relevant facts and circumstances for which he has knowledge as well as those covered in any deposition in this matter or trial testimony in the dependency proceedings.**

33) Name:      Todd A. Lefkowitz
      Title:         MD, FAAO, Diplomate American Board of Ophthalmogy
      Organization:   Sonoran Desert Vision Consulting
      Counsel:      Mills & Woods Law, PLLC
      Address:      5055 N. 12th St., Ste. 101, Phoenix, AZ 85014
      Telephone:    480-999-4556

**Dr. Todd A. Lefkowitz is expected to testify regarding his expert opinions and reports, including his supplemental report, and his qualifications. He is also expected to testify regarding the medical opinions and literature contained in any of his reports, as well as the medical opinions and literature disclosed by Defendants.**

34) Name:                 Thomas W. Young
     Title:                  MD, FAAFS, FASCP, FCAP
     Organization:    Heartland Forensic
     Address:          12717 Oakmont Dr., Kansas City, MO 64145
     Telephone:      (816) 941-2896

**Dr. Thomas W. Young is expected to testify regarding his expert opinions and reports, including his rebuttal and supplemental reports, and his qualifications. He is also expected to testify regarding the medical opinions and literature contained in any or which inform the basis of his reports, as well as the medical opinions and literature disclosed by Defendants.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

13

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## APPENDIX B

**II.    Description by category and location of documents, data, compilations, and tangible things in possession, custody or control of Plaintiffs which may be used to support claims.**

1) Arizona Department of Child Safety, Case Event Summaries (redacted)

2) Arizona Department of Child Safety, Incident Reports (redacted)

3) Arizona Department of Child Safety, Child Care Referral records (redacted)

4) Arizona Department of Child Safety, Case Notes (redacted)

5) Arizona Department of Child Safety, Desktop Guide to Service

6) Arizona Department of Child Safety, Case Build records

7) Arizona Department of Child Safety, Supervisory Case Progress Reviews (redacted)

8) Arizona Department of Child Safety, Contract with PCH

9) Arizona Department of Child Safety, Safety Plans, Case Transfer records (redacted)

10) Arizona Department of Child Safety, Assessment and Plans

11) Arizona Department of Child Safety Policies and Procedures

12) Arizona Department of Child Safety Training Manuals

13) Arizona Department of Child Safety Financial Records

14) Phoenix Children's Hospital intake records

15) Phoenix Children's Hospital medical records

16) Phoenix Children's Hospital child trauma team records, policies and procedures, training records, etc.

17) Phoenix Children's Hospital financial records

18) Buckeye Police Department police report and records

19) Applicable insurance contracts for all Defendants

20) Eye Doctors of Arizona medical records

21) Desert Valley Pediatrics medical records

14

22) Child Help Children's Center of Arizona medical records

23) Licensing, training, litigation, and personnel records for all Defendants

24) Exculpatory documents and records in the possession, custody, control of Plaintiffs

25) Complaint, briefs, filings, judgment in dependency proceedings, In re: S.Z.S., Maricopa County Superior Court, Case No. JD37152

26) Trial transcripts in dependency proceedings **and all deposition transcripts from this case**.

27) Banner Estrella Medical Center medical records

28) Birth photos

29) Photos taken contemporaneously with DCS/PCH involvement

30) All records produced by Defendants

31) Documents produced by Plaintiffs contemporaneously with service of responses to State Defendants' first set of written discovery requests, on 13 September 2021, labeled DUVALL_000001 – DUVALL_001219; BPD000001 – BDP000042; PCH 0001 cycn – PCH 1476 cycn.

32) Preliminary Expert Opinion Affidavit pursuant to A.R.S. § 12-2603, by Todd A. Lefkowitz, MD, FAAO, Diplomate, American Board of Ophthalmology, labeled DUVALL_001220 – DUVALL_001223.

33) Professional journal articles, labeled DUVALL_001224 – DUVALL_001246.

34) Documents produced by Plaintiffs contemporaneously with service of responses to State Defendants' second requests for production on 8 March 2022 labeled DUVALL_001247 – DUVALL_001524.

35) Documents produced by Plaintiffs contemporaneously with service of their fourth supplemental disclosure statement on 28 March 2022 labeled DUVALL_001525 – DUVALL_001579.

36) Documents produced by Plaintiffs contemporaneously with service of their fifth supplemental disclosure statement on 26 April 2022 labeled DUVALL_001580 – DUVALL_001765.

37) Documents produced by Plaintiffs contemporaneously with service of their sixth supplemental disclosure statement on 15 July 2022 labeled DUVALL_001766 – DUVALL_001779.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

38) Documents produced by Plaintiffs contemporaneously with service of their Seventh Supplemental Disclosures on 17 November 2022 labeled DUVALL 001780 – DUVALL 002708.

39) Documents produced by Plaintiffs contemporaneously with service of their Eighth Supplemental Disclosures on 17 January 2023 labeled DUVALL_002709 tf – DUVALL 002881 tf.

40) Documents produced by Plaintiffs contemporaneously with service of their Ninth Supplemental Disclosures on 17 January 2023 labeled DUVALL_002882 – DUVALL 003707.

41) Documents produced by Plaintiffs contemporaneously with service of their Tenth Supplemental Disclosures on 13 February 2023 labeled DUVALL_003708 – DUVALL 004145.

42) Documents produced by Plaintiffs contemporaneously with service of their Eleventh Supplemental Disclosures on 24 May 2023 labeled DUVALL_004146 – DUVALL 005872.

43) **Documents produced by Plaintiffs contemporaneously with service of their Twelfth Supplemental Disclosures on 26 May 2023, consisting of the rebuttal and/or supplemental reports of Dr. Lefkowitz and Dr. Young.**

Note: Plaintiffs may use at trial any witness, expert, or item of evidence disclosed by any party to this action subject to and without waiving any trial objections Plaintiffs may have regarding the same. This notice is to advise all parties that Plaintiffs will not duplicate other parties' disclosures but may at the time of trial rely upon evidence, witnesses, experts, and opinions of experts as if fully disclosed by Plaintiffs without the necessity of duplicating other parties' disclosure statements and attachments thereto; this includes any witness, expert, expert opinions, or items of evidence which are subsequently de-listed by the party initially disclosing the same.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

16

1

2

**CERTIFICATE OF SERVICE**

3

I hereby certify that on 28th May 2023 I caused the foregoing document to be

4

served on counsel of record via email.

5

6

Georgia A. Staton
Ravi V. Patel

7

JONES SKELTON & HOCHULI, P.L.C.
40 N. Central Ave., Ste. 2700

8

Phoenix, AZ 85004
gstaton@jshfirm.com

9

rpatel@jshfirm.com
*Attorneys for State Defendants*

10

Cynthia Patane

11

Rachel Werner
GORDON & REES

12

2 N. Central  Ave., Ste. 2200
Phoenix, AZ 85004

13

cpatane@grsm.com
gwerner@grsm.com

14

*Attorneys for Defendant Brendan Cassidy*

15

Kari B. Zangerle
Robert Stultz

16

GUST ROSENFELD PLC
One East Washington St., Ste. 1600

17

Phoenix, AZ 85004
kzangerle@gustlaw.com

18

rstultz@gustlaw.com
*Attorneys for PCH Defendants*

19

20

_____ */s/ Thomas A. Connelly* _____

21

22

23

24

25

26

27

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

THOMAS W. YOUNG, MD, FAAFS, FASCP, FCAP

BOARD CERTIFIED FORENSIC PATHOLOGIST

12717 OAKMONT DRIVE
KANSAS CITY, MO 64145
TELEPHONE: (816) 941-2896
FAX: (816) 255-2126
CELL: (816) 803-4079
E-MAIL: TYOUNG532@KC.RR.COM
WEBSITE: WWW.HEARTLANDFORENSIC.COM

March 30, 2023

Thomas Connelly, Esq.
Mills + Woods Law PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014

Re: Response to Corey J. Rood updated report, dated January 19, 2023

Dear Mr. Connelly:

In accordance with your request, I offer my response to Dr. Rood's report.

Dr. Rood offers his "concerns" about the contents of my report and deposition testimony. What he offers consists of serial informal logical fallacies, with one fallacy following another throughout the entire report. What I offer in my response is a detailed description of those fallacies.

Out of all fallacies further described, the most significant fallacy in his report is a fallacy of unwarranted assumptions known as begging the question (*petitio principii*). Begging the question, also known as arguing in a circle, assumes the point to be proved: the same or nearly the same item concluded in an argument is already assumed in a premise. The structure of such arguments is logically valid, often using valid logical argument forms like *modus ponens* (MP) or *modus tollens* (MT), making them seem useful to the hearer, but when one offers in a premise a belief that is the same or nearly the same as what is concluded, the argument becomes neither persuasive nor reliable for truth.

Consider the first sentence of the first paragraph of Dr. Rood's report in the valid argument form of MP (P; if P, then Q; therefore, Q):

P: "It concerns me that Dr. Young doesn't appear to recognize that as a licensed physician he is a mandated reported [*sic*] of suspected child maltreatment in the states where he holds licensure."
If P, then Q: If Dr. Young doesn't appear to recognize that as a licensed physician he is a mandated reporter of suspected child maltreatment, then "Dr. Young's lack of knowledge of mandated reporter requirements and clear lack of having made any reports within or without his work as a forensic pathologist undermine his opinions regarding child maltreatment diagnosis and recognition."
Therefore, Q: "Dr. Young's lack of knowledge…undermine[s] his opinions…"

Dr. Rood assumes that I lack knowledge in his first premise because I don't "appear to recognize" something. He then concludes that I lack knowledge, concluding what he already

assumed. This is arguing in a circle.

The conclusion of a circular argument often takes on the form, "consistent with [belief]." Dr. Rood offers a belief as a premise — that I don't appear to recognize mandated reporting requirements — then concludes that I lack knowledge, something consistent with what he already believes. This is a belief consistent with a belief. Unlike a "fact" — something observed that exists outside of one's head, independent of one's thoughts — a "belief" is something not observed that only resides inside of one's head, completely dependent on one's thoughts. Dr. Roods assumption — that I didn't appear to recognize something — is not a fact. It resides in Dr. Roods head, something unobserved, completely dependent on his imagination.

Consider as a metaphor a dog chasing his tail. The dog moves in a circle because he his chasing something that is part of his body: when he attempts to grasp his tail, his tail moves, exceeding his grasp. This causes a dog to spin in a circle. Similar to a dog chasing his tail, the circular arguer chases something that is part of his body — what resides inside his head — and ignores what is outside of his body — what anyone could observe if they were looking. Unlike a hunting dog that spots observable prey to be be retrieved, a dog chasing his tail provides nothing useful.

Circular arguers like Dr. Rood develop a huge blind spot: they become so preoccupied with their beliefs that they fail to recognize something that should be obvious to anyone who is observing. Also, the more strongly the belief is held, the more emotionally charged the response to anyone who disagrees with that belief. Circular arguers are nearly impossible to persuade because they are not susceptible to facts: anything outside what they believe is condemned and discounted. Large numbers of circular arguers are dangerous as they maintain beliefs based on beliefs year after year. Beliefs based on facts are useful and even potentially reliable, but beliefs based on beliefs are useless and circular.

What should have been obvious to Dr. Rood or to anyone else is what I wrote in the next to last paragraph in page one of my report:

> Physicians have a responsibility to make sure vulnerable infants are safe, so "every attempt" to "ensure the safety of this child" is appropriate.  There is also nothing wrong with being highly concerned or even suspicious, *as long as it is recognized that an expression of suspicion is uncertain.*  A suspicion is a guess that may in the end be unfounded.

That responsibility physicians have to make sure vulnerable infants are safe includes mandatory reporting. What I wrote is clear, but Dr. Rood chooses to ignore what I wrote or to interpret it in an unfair and biased way. His beliefs impair his ability to observe and draw conclusions fairly and impartially.

What follows in my report is word for word what Dr. Rood wrote in his report. Inserted in brackets by each of Dr. Rood's statements or portions thereof are the words, "belief" or "fact." Recognize that what are identified as beliefs are undischarged and unwarranted

assumptions — beliefs that are circular and not substantiated by any offer of logical proof or factual predicate. Following each of Dr. Rood's paragraphs written in a larger font, I offer comments in a smaller font about the issues and fallacies I identify.

I have been asked to respond to the expert opinion letter by Dr. Thomas Young dated 3/24/22 and his deposition performed on 11/4/22 [fact]. Please refer to my initial opinion letter which is unchanged by Dr. Young's opinions and deposition [fact]. After review of his opinions and responses to deposition, I have the following opinions and concerns [fact].

Comment: No one can or should reasonably dispute these facts. They are evident to anyone reading his report — unlike what he offers later as beliefs.

It concerns me that Dr. Young doesn't appear to recognize that as a licensed physician he is a mandated reported of suspected child maltreatment in the states where he holds licensure [belief]. Dr. Young's lack of knowledge of mandated reporter requirements and clear lack of having made any reports within or without his work as a forensic pathologist undermine his opinions regarding child maltreatment diagnosis and recognition [belief]. It is gravely concerning to me that neither his medical training nor his medical work in the military taught him the basics surrounding mandated reporting [belief]. His response to mandated reporting inquiry as "Well I will admit that there is a whole lot out there that I'm not aware of" [first part of sentence a belief, but the quotation is a fact] is an inadequate excuse for a physician with decades of experience working with various hospitals and medical examiner offices [belief].

Comment: Dr. Rood has never met me, nor does he know me. He assumes what I know and do not know. He doesn't know what I learned in my medical training or in the military. He cites as a quotation something I said in deposition and often say: there is a "whole lot out there that I'm not aware of." The same could be said about Dr. Rood, yet he chooses to apply my statement as a straw man fallacy — an attack on a misrepresentation of my deposition testimony. My response in deposition does not indicate a lack of knowledge about mandatory reporting but instead my lack of knowledge about specific Arizona law.

Dr. Rood repeatedly comments about his "concerns." Why should his "concerns" hold any importance or relevance in an argument? "Concerns" is an emotional term implying a fixation on his beliefs: how what he believes should be as important to everyone else as it is to him. He becomes concerned when someone like me disagrees with his assumptions.

Dr. Young is unaware of any medical organizations that refute Abusive Head Trauma as a legitimate medical condition and diagnosis [fact]. His excuse that

3

these academies and professional colleges with their hundreds of thousands of collective members, each individually educated and trained, are somehow trapped in a network of biased conclusions and "circular logic" is illogical and unfounded [belief]. The very core of medical training teaches medical students, residents, and fellows to approach medical history taking and diagnostics with a broad, unbiased lens [belief], and to create a comprehensive differential diagnosis to explain the patient's medical malady [belief]. The American Board of Pediatrics, the board that oversees board certification testing for all general pediatrics and pediatric subspecialty physicians, includes in the board specifications for the Child Abuse Pediatrics board certification test education and training on internal and external biases [fact] and understanding and including the comprehensive diagnostic list of medical diagnoses that mimic abuse [belief]. It can easily be concluded that medical school, residency, and fellowship graduates today receive far more dedicated education and training on biases, discrimination, the scientific method, research basics, and quality improvement than ever before [belief], and much has evolved to expand and improve on the education of these topics since the 1970s and 1980s [belief].

Comments: Much of what the doctor offers in this paragraph is not factual. Medical organizations are not "academies and professional colleges" — institutes of higher learning that offer degrees or credentials. Although medical organizations may sponsor continuing medical education courses, their focus is mostly political. These organizations support the needs of their members and even lobby congressional and state legislatures on their behalf. Part of that includes supporting members who testify in court. What comes out of of these organizations is hardly anything "cutting edge;" instead, they promote and sustain conventional thinking, where basic principles and procedures are agreed upon.

Physicians in training are not "individually educated and trained." They sit in classrooms, take examinations and standardized tests, and participate with other students and doctors in the care of patients. There is little to no time in the medical school curriculum for instruction in critical thinking and logic. There are vast amounts of information that need to be learned to get to the next level. In post-graduate medicine, patient care consumes most of the time of young doctors, leaving little time to consider "dedicated education and training on biases, discrimination, the scientific method, research basics, and quality improvement." This has not improved since the 1970s and 1980s; arguably, there is more pressure and less time for students to get through a standard curriculum that has expanded since the 70s and 80s, one devoid of training in critical thinking skills.

Dr. Rood believes medical students, residents, and fellows are taught "to approach medical history taking and diagnostics with a broad, unbiased lens," further stating "it can be easily concluded" there is dedicated education and training on biases — "the very core of medical education," he claims. Contrary to what the doctor claims, this is not "easily concluded" from anything factual, although it might be easy for him to imagine. Physicians in training

are not taught to recognize circular arguments. Much of the medical literature —
particularly the literature for child abuse and maltreatment where circular arguments
abound — demonstrate the consequences of this lack of training. Even Dr. Rood does not
recognize that he does not understand circular argumentation. He believes I claim doctors
are "somehow trapped in a network of biased conclusions." There is no such trap, anymore
than a dog is trapped in his tail chasing. We may not recognize our own biases, but the
treatment and cure to arguing in a circle is to recognize when one does it and to stop doing
it. This requires some education, none of which currently exists as a standard in medical
school, residency or fellowship training.

Dr. Rood also imagines medical students are taught how to create "comprehensive
differential diagnoses to explain the patient's malady." This is not true. The human mind is
not capable of constructing comprehensive differential diagnoses. When considering what
is wrong with a patient, we typically select the first alternative that comes in mind
consistent with the signs and symptoms — the bias of satisficing. We may consider a few
other possibilities but the possibilities we select are limited by our limited imaginations —
the bias of availability. If the first alternative doesn't work out, we select an alternative that
differs little from the first alternative — the bias of anchoring. In the end, we go with our
best guess, treat according to it, and consider a limited number of other possibilities if the
treatment doesn't work or if further testing discloses something surprising.

I accept that there may be items on pediatric and child abuse pediatric board examinations
that cover bias — including "internal and external bias" — so I identified that as factual.
Regardless of what may be on any examination, the specialty of child abuse pediatrics has
adopted in its own name an indicator of horrible bias. Child abuse is a negative
presumption — nearly the worst kind of presumption anyone can make about someone.
Assuming the worst in people and accepting that negative presumption as the diagnosis
when a few other possibilities have been seemingly "ruled out" is a horrible wound to inflict
on anyone. Child abuse pediatrics is the only medical specialty I am aware of having a
negative presumption as part of its name.

It concerns me that Dr. Young draws what he deems to be conclusive opinions
rendered from "experience" while also maintaining significant inexperience
with clinical work with living patients and inexperience with scientific research
including a lack of understanding of the scientific method, prospective
research, retrospective research, or successful application with any Institutional
Review Board (IRB) [belief]. A complete paucity of ethical, IRB approved
research, whether clinical, pathological, or pharmacological, calls into question
Dr. Young's ability to render any opinion about research and scientific evidence
[belief]. He has gathered no empirical data nor drawn any research-based
scientific conclusions to support his opinions, and clearly has not read and
processed the overwhelming quantity of ethical, IRB approved research on the

medical and clinical specialty of pediatrics, childhood development, or child abuse pediatrics [belief].

Comment: Dr. Rood has little to no understanding of my career path and how I came to do what I do, yet he chooses through what he imagines to fill in the blanks left from my CV and deposition testimony. A lack of experience with IRB-approved research becomes a straw man, providing him a reason to call into question my opinions in the Swayde Sankey case, an issue that has nothing to do with IRB-approved research. This may seem clever, but it is not persuasive.

Dr. Rood calls into question my experience, but what about his experience? He claims in his first report to have "extensive experience in evaluating children for evidence of maltreatment including physical abuse, sexual abuse, neglect, medical child abuse, and exploitation & trafficking." Has he ever seen the maltreatment, physical abuse, sexual abuse, neglect, medical child abuse, exploitation & trafficking of any child? If he ever saw these events take place, wouldn't he have written that in his report as part of his qualifications? Or maybe even been arrested as a perpetrator or an accomplice? How is he able to diagnose something he has rarely — if ever — seen? Doesn't this paucity of experience allow me to call into question his opinions as a doctor who diagnoses child abuse?

At least that kind of experience of actually seeing abuse take place — if he were to have it — would be based on something factual rather than imagined.

I disagree with the following misconception put forward by Dr. Young. He denies that Neuroradiologists can identify torn bridging veins on brain magnetic resonance imaging (MRI) without having any specific training or experience in radiology himself, let alone training in the greater complexities of magnetic resonance imaging, which was developed after his years of residency training [belief]. Magnetic resonance imaging has multiple modalities that can identify venous and arterial clots, aneurysms, hemorrhages, and ruptured vasculature including bridging veins [fact]. A pediatric neuroradiologist can more clearly explain the specific findings on brain MRI that indicate ruptured vasculature including modalities such as susceptibility weighted imaging, diffusion weighted imaging, and flair [fact].

Comments: Dr. Rood imagines I have no awareness of Magnetic Resonance Venography (MRV) and Angiography (MRA). There is no telling where he "learned" about my imagined denial. Dr. Rood offers disagreement with my "misconception" as a straw man: physicians never performed these studies on Swayde Sankey and they do not have any relevance in his case.

Pediatric neuroradiologists can explain specific findings to all of us, but they can't describe the past events that led to the findings. To do that, any physician would have to listen to

eyewitnesses and consider if those accounts of past events are consistent or not consistent with what they observe in the present.

Although Dr. Young appears to disagree that this young infant's (Swayde Sankey) medical findings are injuries [belief], he can put forth no plausible medical explanation to explain their existence [fact]. He also appears to minimize or dismiss medical findings corroborated by multiple subspecialty physicians as factually present [belief]. Furthermore, Dr. Young does not know the basic difference between Vitamin D insufficiency and deficiency, how a classic metaphyseal lesion (fracture) is caused or its basic medical mimics, nor does he know the basic medical pathology of osteogenesis imperfecta, Rickets, Menkes, or other pathologies on the broader diagnostic differential of bone fragility [belief]. Dr. Young's complete lack of knowledge regarding these medical diagnoses in living patients is strong evidence of his lack of expertise in pediatrics, primary care medicine, and child abuse pediatrics [belief].

Comments: Early in the paragraph, Dr. Rood uses the words, "appears to," tipping his hand that he is imagining things. Later in the paragraph, Dr. Rood dispenses with "appears to" and categorically states what I know and don't know, all indicating my supposed "complete lack of knowledge" as he provides imagined "strong evidence of his lack of expertise." These are conclusions following assumptions: begging the question.

Notice also the emotionally-charged hyperbole: "complete lack of knowledge," "strong evidence," "minimize or dismiss," "does not know the basic difference." Circular arguers like Dr. Rood resort to hyperbole to strengthen their arguments in their imaginations.

Review of infant Swayde Sankey's head circumference growth chart is simple for any medical provider who is trained in pediatrics and has any experience practicing pediatrics to recognize that something changed drastically with Swayde's head circumference between 1 month and 2 months of age [fact mixed with belief]. Swayde's head circumference jumped drastically from the 25th percentile to the 90th percentile in that 1-month timespan, crossing two growth lines [fact]. This is neither physiologically nor developmentally normal [fact] and is highly concerning for new pathology at that time that caused his abnormal head growth [belief]. In Swayde, this pathologic change is NOT from his birth nor related to any birth trauma, including any potential, yet unfounded, birth-related subdural hemorrhage [belief]. A foundational prospective research publication that Dr. Young has evidently failed to read and take into consideration is that of Rooks et al. (2008) in the *American Journal of Neuroradiology* titled "Prevalence and Evolution of Intracranial Hemorrhage in

Asymptomatic Term Infants" [belief]. These medical and scientific researchers set up an IRB-approved, prospective research study to examine 100 full term newborns for the presence of birth-related subdural hemorrhages [fact]. Newborns were evenly representative of males and females, 78% were born via vaginal delivery and 22% via cesarean section [fact]. Of the newborns delivered vaginally, 80% were spontaneous deliveries, 12% required vacuum assist, and 8% required forceps [fact]. Newborns prospectively had magnetic resonance imaging done of their brains following birth [fact]. All newborns were healthy without any concerns on initial newborn examination and without any medical complications from delivery [fact]. These researchers found that 46% of these newborns had small, thin (3mm or less) subdural hemorrhages all located over the posterior occipital lobes and only 23% had any infratentorial hemorrhage [fact]. All these term newborns were entirely asymptomatic and had normal newborn exams [fact]. Following discharge from the newborn nursery, these infants were followed long term with repeat magnetic resonance imaging of their brains [fact]. MRIs showed that 90% of these small, thin subdural hemorrhages had resolved by 4 weeks (1 month) of life and 100% had resolved completely by 3 months of life [fact]. None of the infants had symptoms, including macrocephaly, from these benign birth-related posterior subdural hemorrhages and none of these infants went on to develop chronic subdural hemorrhages nor hydrocephalus from these benign hemorrhages [fact]. These infants represent normal resolution of birth-related subdural hemorrhages [fact]. These infants do not represent Swayde Sankey because his larger, symptomatic subdural hemorrhages, macrocephaly, and additional injuries were not related to birth trauma [belief].

Comments: Rooks' population-based study provides factual data, but applying that data to an individual case like Swayde Sankey's is committing the ecological fallacy: data derived from a population cannot be compared to an individual because it is not known where Swayde Sankey falls on the "bell curve," whether or not Sankey's case is unusual or even an outlier. Also, the specific past events going on with Swayde Sankey are not addressed in a study like Rooks' who uses in his study population infants without all the problems that Swayde Sankey had.

Dr. Young's "catch-up mineralization" theory for the explanation for Swayde's right distal tibia findings is physiologically and scientifically untrue and therefore completely lacks scientific support [belief]. In addition, Dr. Young states that a medical diagnosis is at best an "educated guess" and not a certain conclusion [fact]. This is factually incorrect in many cases that can be

scientifically proven including the diagnosis of death with brain death exams, cancer with biopsy for pathologic diagnosis, fracture with radiographic imaging, appendicitis and other internal organ pathology with surgery, and many, many more medical diagnoses [belief]. The majority of medical diagnoses can be proven to near certainty with definitive, objective findings [belief].

Comments: Although the words, "catch-up mineralization," are my words, the concept is not foreign nor imaginary. The concept of the body of a developing infant correcting the effects of a past metabolic insult is supported in peer-reviewed medical literature (see attachments to this report); however, circular arguing physicians like Dr. Rood don't recognize literature that doesn't support the abusive trauma they already imagine.

Notice also the "scientifically proven" diagnoses he mentions — brain death examinations, biopsy-demonstrated cancers, fractures, appendicitis and other problems diagnosed at surgery, and "many, many more medical diagnoses" — are all issues occurring in the present. Diagnoses of child abuse or abusive head trauma are diagnoses of complex past events not accessible to the observations of any physician. Child abuse and abusive head trauma not witnessed by anyone are only imagined by doctors.

A medical diagnosis may be an "educated guess," but the strength of that educated guess — strength meaning high likelihood for truth — ramps way up if the disease appears right before the doctor's eyes. Child abuse is not like that.

This being said, of utmost concern is Dr. Young's perseveration that child maltreatment cannot exist unless someone, specifically a verbal individual, witnesses the abusive event and can provide witness testimony [belief]. When pressed on whether a non-verbal infant alone with an adult caregiver could be abused and the adult caregiver then goes on to deny the maltreatment, Dr. Young opines that the injuries resulting from such maltreatment could not be concluded by an expert medical provider as abusive injury due only to the lack of witness testimony or confession [belief]. This is logically absurd especially from a forensic pathologist who has a historical practice of determining manner of death as suicide or homicide even without a confession by the deceased, the murderer, or a living witness to the event [belief]. Dr. Young's written opinion states, "One can be reasonably certain if witness accounts of the past are consistent or not consistent with physical evidence in the present, but one cannot reliably surmise past events from physical evidence **unless there is only one plausible explanation for that evidence**." [fact] This is the precise work of the physician, and even more so for the child abuse pediatrician [belief]. We form a differential diagnosis that lists the most likely medical causes

(explanations) for the current medical findings, both individually and collectively [fact]. We then work diligently with the entire medical team of specialists to rule out or rule in the likely diagnoses from the differential [fact]. Dr. Young's speculation that multidisciplinary hospital medical teams first form a conclusion of abuse and then use bias to get all team members to make the diagnosis fit, without having actually worked in such a setting, is not only wholly inaccurate but frankly insults the medical education, training, and expertise of medical professionals across the disciplines [belief]. In the case of Swayde Sankey, the individual medical findings are each a result of trauma, as all other plausible causes were thoroughly ruled out [belief]. Swayde's numerous individual injuries that each are the result of trauma **collectively conclude only one plausible explanation for their cause**, child physical abuse including abusive head trauma [belief]. This is a medical diagnosis that is scientifically based on reliable, objective medical findings, without circular logic, and accurately describes all of Swayde's medical findings even without a confession or a verbal witness [belief]. There is no other medical explanation that accurately explains these medical findings in this infant [belief].

Comments: Dr. Rood begins the final paragraph of his report with abusive *ad hominem.* "Perseveration" is a sign of a malfunctioning brain in a patient who repeats the same words endlessly. It is highly insulting for one physician to apply this term to another.

Dr. Rood finally mentions the Inferential Test (IT) and even quotes it; still, he doesn't understand it. Since no one can surmise past events from physical evidence reliably, according to the IT, there has to be some record of the past to know what happened. This record can include not only eyewitnesses but also other forms of anamnestic evidence (a fancy term for recorded memory evidence), like video or audio recordings. The popularity of CCTV speaks to the strength of such evidence.

Circular arguers like Dr. Rood refuse to come to terms with that reality. He strenuously believes he and members of a multidisciplinary hospital team (as a medical examiner, I have participated in such teams, contrary to what Dr. Rood believes about me) can **collectively conclude only one plausible explanation for their cause**. He believes this so strenuously that he uses a bold font to write it.

Unfortunately for Dr. Rood, he doesn't understand the logic for the "if and only if exception to affirming the consequent" at the end of the IT.

Unlike manner of death determinations like homicide, suicide, natural or accident — terms that offer an only plausible explanation after a thorough consideration of all witness and physical evidence — diagnoses like child abuse and abusive head trauma wrap complex past events into one term. These diagnoses of criminal behaviors include both *mens rea* and *actus reus*: the perpetrator first forms an intent to abuse, then performs the physical act.

That turns an only plausible explanation into a set of complex (more than one) past events — items not reliably surmised from physical evidence alone.

In truth, past events are much, much more complex than two simple items. They involve events that transpire over split seconds with each event dependent on the event that happened a moment before. This is incredibly complex — so complex that we cannot rely on our own imaginations to determine them. We require memory evidence that can be compared to physical evidence for consistency or inconsistency. Comparing witnessed or recorded past events to physical evidence is comparing facts observed by others to facts observed by doctors — both sets of facts are independent of our minds and imaginations.

In spite of the complexity of past events occurring outside of hospital and clinic walls, physicians and other multidisciplinary team members ensconced within those walls believe they can use the techniques of modern diagnostic medicine — a history, physical examination, imaging, laboratory tests, etc. — to put everything together in their imaginations, to "rule out" items, finally to reach an only plausible explanation. They rely on the circular arguments of many others like them published in medical literature to define their paradigm — one that includes what they can "rule in" or "rule out." They believe what they do is so strong that parents who claim they did nothing abusive to their child — like Swayde Sankey's parents — are labeled "liars" and "criminals." Such is the arrogance of a vast array of medical doctors, social workers, and others who don't know what they don't know.

Respectfully submitted,

Thomas W. Young, MD

THOMAS W. YOUNG, MD, FAAFS, FASCP, FCAP
BOARD CERTIFIED FORENSIC PATHOLOGIST

12717 OAKMONT DRIVE
KANSAS CITY, MO 64145
TELEPHONE: (816) 941-2896
FAX: (816) 255-2126
CELL: (816) 803-4079
E-MAIL: TYOUNG532@KC.RR.COM
WEBSITE: WWW.HEARTLANDFORENSIC.COM

May 26, 2023

Thomas A. Connelly, Esq.
Mills + Woods Law PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014

Re: Supplemental Report, Duvall vs. Arizona Dept. of Child Safety, et al

Dear Mr. Connelly:

Since the time of my deposition on November 4, 2022, I have been provided with and/or identified the following materials that support my views and opinions as stated in my opinions dated April 25, 2022 and March 30, 2023, and as testified to at my deposition, including my opinion that SBS/AHT are not founded on verifiable scientific evidence, and that the vast majority of literature relied upon by adherents of SBS/AHT theory is based on circular reasoning. I have also been provided with the following materials from Defendants' experts. I am prepared to testify about these materials and all my opinions at the trial of this matter.

Articles:

1. Nonaccidental Head Injury in Infants – The "Shaken-Baby Syndrome" by Ann-Christine Duhaime, M.D., Cindy W. Christian, M.D., Lucy Balian Rorke, M.D., and Robert A. Zimmerman, M.D.

2. Abusive head trauma: evidence, obfuscation, and informed management by Ann-Christine Duhaime, M.D., and Cindy W. Christian, M.D.

3. Feasibility and Accuracy of Fast MRI Versus CT for Traumatic Brain Injury in Young Children by Daniel M. Lindberg, MD, Nicholas V. Stence, MD, Joseph A. Grubenhoff, MD, MSCS, Terri Lewis, PhD, David M. Mirsky, MD, Angie L. Miller, MD, Brent R. O'Neill, MD, Kathleen Grice, BA, Peter M. Mourani, MD, Desmond K. Runyan, MD, DrPH

4. The "New Science" of Abusive Head Trauma by Daniel M. Lindberg, MD, Howard Dubowitz, MD, Randell C. Alexander, and Robert M. Reece

5. Validation of the Pittsburgh Infant Brain Injury Score for Abusive Head Trauma by Rachel Pardes Berger, MD, MPH, Janet Fromkin, MD, Bruce Herman, MD, Mary Clyde Pierce, MD, Richard A. Saladino, MD, Lynda Flom, MD, Elizabeth C. Tyler-Kabara, MD, Tom McGinn, MD, Rudolph Richichi, PhD, Patrick M. Kochanek, MD, MCCM

6. Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants by V.J. Rooks, J.P. Eaton, L. Ruess, G.W. Petermann, J. Keck-Wherley, and R.C. Pedersen

7. The etiology and significance of fractures in infants and young children: a critical multidisciplinary review by Sabah Servaes & Stephen D. Brown & Arabinda K. Choudhary & Cindy W. Christian & Stephen L. Done & Laura L. Hayes & Michael A. Levine & Joëlle A. Moreno &Vincent J. Palusci & Richard M. Shore & Thomas L. Slovis

8. Validation of a Clinical Decision to Rule to Predict Abuse in Young Children Based on Bruising Characteristics by Mary Clyde Pierce, MD, Kim Kaczor, MS, Douglas J. Lorenz, PhD, Gina Bertocci, PhD, Amanda K. Fingarson, DO, Kathi Makoroff, MD, Med, Rachel P. Berger, MD, MPH, Berkeley Bennet, MD, MS, Julia Magana, MD, Shannon Staley, MD, Veena Ramaiah, MD, Kristine Fortine, MD, Melissa Currie, MD, Bruce E. Herman, MD, Sandra Herr, MD, Kent P. Hymel, MD, Carole Jenny, MD, MBA, Karen Sheehan, MD, MPH, Noel Zuckerbraun, MD, MPH, Sheila Hickey, MSW, MJ, Gariel Meyers, MSM, and John M. Leventhal, MD

9. Repository Copy of Consensus statement on abusive head trauma in infants and young children by Choudhary, A.K., Servaes, S., Slovis, T.L. et al

10. The creation of non-disease: an assault on the diagnosis of child abuse by Thomas L. Slovis, Peter J. Strouse, Brian D. Coley, and Cynthia K. Rigsby

11. Challenging the Pathophysiologic Connection between Subdural Hematoma, Retinal Hemorrhage, and Shaken Baby Syndrome by Gabaeff SC

12. Reply to Gabaeff by Christopher Greeley

13. Rebuttal to Greeley by Gabaeff

14. Retinal and Optic Nerve Hemorrhages in the Newborn Infant: One-year Results of the Newborn Eye Screen Test (NEST) Study by Natalia F. Callaway, MD, MS, Cassie A. Ludwig, BS, Mark S. Blumenkranz, MD, Jennifer Michelle Jones, RN, Douglar R. Fredrick, MD, and Darius M. Moshfeghi, MD

15. The Eye Examination in the Evaluation of Child Abuse by Cindy W. Christian, MD, FAAP and Alex V. Levin, Md, MHSs, FAAO, FRCSC, FAAP

16. Education paper Retinal haemorrhages in abusive head trauma in children by David S. I. Taylor

17. Debunking Fringe Beliefs in Child Abuse Imaging: AJR Expert Panel Narrative Review by Cory M. Pfeifer, MD, MBA, MPH, M. Katherine Henry, MSCE, Marguerite M. Care, MD, Cindy W. Christian, MD, Sabah, Servaes, MD, Sarah S. Milla, MD, and Peter J. Strouse, MD

18. Consensus statement on abusive head trauma in infants and young children by Arabinda Kumar Choudhary, Sabah Servaes, Thomas L. Slovis, Vincent J. Palusci, Gary L. Hedlund, Sandeep K. Narang, Joelle Anne Morena, Mark S. Dias, Cindy W. Christian, Marvin D.

Nelson Jr, V. Michelle Silvera, Susan Palasis, Maria Raissaki, Andrea Rossi, and Amaka C. Offiah

19. *Evolving forensic controversies in child abuse imaging* by Cory M. Pfeifer

20. *Diagnostic Imaging of Child Abuse* edited by Paul K. Kleinman. Chapter 13. *Evidence-based radiology and child abuse* by Christopher S. Greeley

21. *Child Abuse and Neglect Diagnosis Treatment, and Evidence* by Carole Jenny. Chapter 29. *Bruises and Skin Lesions* by Tara L. Harris, MD, and Emalee G. Flaherty, MD

22. *Child abuse sceptic gave evidence as an expert witness in 500 cases* by Frances Gibb

23. *From vaccines to child abuse* by Bruce Rushton

24. *An Anti-Vaxxer's New Crusade* by David Armstrong

25. *Doctors Defending Convicted Child Abuser "Exceed the Limits of Credulity" Judge Rules* by David Armstrong

26. *The Supreme Court Screws Up the Science: There is No Abusive Head Trauma/Shaken Baby Syndrome "Scientific" Controversy* by Joelle Anne Moreno and Brian Holmgren

27. *Ensuring Appropriate Expert Testimony for Cases Involving the "Shaken Baby"* by Daniel M. Albert, MD, MS, June Weisberger Blanchard, JD, and Barbara L. Knox, MD

28. *Ethical Issues in Imaging Nonaccidental Injury: Child Abuse* by Patrick D. Barnes, M.D.

29. *Abusive Head Trauma: A Review of the Evidence Base* by Christopher Spencer Greeley

30. *Flawed Theories to Explain Child Physical Abuse What Are the Medical-Legal Consequences?* By John M. Leventhal, MD and George A. Edwards, MD

31. *Examining Shaken Baby Syndrome Convictions in Light of New Medical Scientific Research* by Keith Findley, Patrick Barnes, David Moran, and Carrie Sperling

Reports:

1. Dr. Horton Updated Report 1/4/23

2. Dr. Rood Updated Report 1/19/23

3. Dr. Wagner Updated Report 1/24/23

4. Dr. Rood's Report 9/22/23

5. Dr. Rood's Updated Report 1/19/23

6. Dr. Frick Updated Report 9/20/22

7. Dr. Maxfield Report 9/22/22

8. Dr. Walczak Report

9. Dr. Levin Report 9/21/22

Notes:

1. Horton's Notes

2. Grubenhoff's Notes

Other:

1. Child Maltreatment Clinical Pathway Phoenix Children's Hospital

Case Law:

1. Opinion by Bender, P.J.E., In re M.R., 247 A.3d 1113 (Pa. Super. Ct. 2021), 2021 Pa. Super. 30 Decided Mar 1, 2021

2. In re LA.-RA. W., 2021 PA. Super. 227 (Pa. Cmmw. Ct 2021)

3. Cavazos v. Smith, 565 U.S. 1 132 S.Ct. 2, 181 L.Ed.2d 311

4. Claar v. Burlington Norther R. Co., 29 F.3d 499, 63 USLW 2096, 39 Fed. R. Evid. Serv. 911

5. Com. V. Epps, 474 Mass. 743, 53 N.E.3d 1247

6. Del Prete v. Thompson, 10 F. Supp. 3d 907

7. Ex parte Henderson, 384 S.W. 3d 833

8. General Elec. Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508

9. In re Yohan K., 2013 IL App (1st) 123472, 993 N.E. 2d 877, 373 Ill.Dec. 318

10. People v. Bailey, 144 A.D. 3d 1562, 41 N.Y.S. 3d 625

11. People v Bailey, 47 Misc.3d 355, 999 N.Y.S.2d 713, 2014 N.Y. Slip Op. 24418

12. People v. Thomas, 22 N.Y.3d 629, 8 N.E. 3d 308, 985 N.Y.S.2d 193, 2014 N.Y. Slip. Op. 01208

13. Siharath v. Sandoz Pharmaceuticals Corp., 131 F.Supp.2d 1347, 58 Fed. R. Evid. Serv. 244

14. State v. Edmunds, 308 Wis.2d 374, 746 N.W.2d 590, 2008 WI App 33

Respectfully submitted,

Thomas W. Young, MD

4

**SONORAN DESERT VISION CONSULTING**

Todd A. Lefkowitz, MD, FAAO
DIPLOMATE, AMERICAN BOARD OF OPHTHALMOLOGY


## SUPPLEMENTAL EXPERT REPORT

*Duvall, et al. v. Arizona Dept. of Child Safety, et al.*, 21-cv-00167-PHX-DWL


I, Todd A. Lefkowitz, MD, am a licensed physician certified by the American Board of Ophthalmology.  I am a physician licensed to practice Medicine in all its branches in Arizona, New York, Nevada, Utah, Washington State and Idaho.  I currently practice in the area of Medicine applicable in this case.  I am familiar with the standard of care for medical practice that currently relates to issues of care and treatment of patients such as Duvall/Sankey.  I am familiar with the standard of care in this case by virtue of my training, education, and experience of 40 years in the same field or related healthcare fields as the physicians who treated Duvall/Sankey.  I can fairly evaluate the quality of care that was provided to Duvall/Sankey.

Since the time of my deposition on November 14, 2022, I have been provided with and/or identified the following articles and legal case opinions that support my views and opinions as stated in my opinion dated December 8, 2021 and/or as testified to at my deposition, including my opinion that SBS/AHT are not founded on verifiable scientific evidence, and that the vast majority of literature relied upon by adherents of SBS/AHT theory is based on circular reasoning. I have also been provided with the following opinions and notes from defendants' experts. I am prepared to testify about these materials and supplemental opinion at the trial of this matter.


**ARTICLES:**

1. Nonaccidental Head Injury in Infants – The "Shaken-Baby Syndrome" by Ann-Christine Duhaime, M.D., Cindy W. Christian, M.D., Lucy Balian Rorke, M.D., and Robert A. Zimmerman, M.D.

2. Abusive head trauma: evidence, obfuscation, and informed management by Ann-Christine Duhaime, M.D., and Cindy W. Christian, M.D.

3. Feasibility and Accuracy of Fast MRI Versus CT for Traumatic Brain Injury in Young Children by Daniel M. Lindberg, MD, Nicholas V. Stence, MD, Joseph A. Grubenhoff, MD, MSCS, Terri Lewis, PhD, David M. Mirsky, MD, Angie L. Miller, MD, Brent R. O'Neill, MD, Kathleen Grice, BA, Peter M. Mourani, MD, Desmond K. Runyan, MD, DrPH

4. The "New Science" of Abusive Head Trauma by Daniel M. Lindberg, MD, Howard Dubowitz, MD, Randell C. Alexander, and Robert M. Reece

5. Validation of the Pittsburgh Infant Brain Injury Score for Abusive Head Trauma by Rachel Pardes Berger, MD, MPH, Janet Fromkin, MD, Bruce Herman, MD, Mary Clyde Pierce, MD, Richard A. Saladino, MD, Lynda Flom, MD, Elizabeth C. Tyler-Kabara, MD, Tom McGinn, MD, Rudolph Richichi, PhD, Patrick M. Kochanek, MD, MCCM

6. Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants by V.J. Rooks, J.P. Eaton, L. Ruess, G.W. Petermann, J. Keck-Wherley, and R.C. Pedersen

7. The etiology and significance of fractures in infants and young children: a critical multidisciplinary review by Sabah Servaes & Stephen D. Brown & Arabinda K. Choudhary & Cindy W. Christian & Stephen L. Done & Laura L. Hayes & Michael A. Levine & Joëlle A. Moreno &Vincent J. Palusci & Richard M. Shore & Thomas L. Slovis

8. Validation of a Clinical Decision to Rule to Predict Abuse in Young Children Based on Bruising Characteristics by Mary Clyde Pierce, MD, Kim Kaczor, MS, Douglas J. Lorenz, PhD, Gina Bertocci, PhD, Amanda K. Fingarson, DO, Kathi Makoroff, MD, Med, Rachel P. Berger, MD, MPH, Berkeley Bennet, MD, MS, Julia Magana, MD, Shannon Staley, MD, Veena Ramaiah, MD, Kristine Fortine, MD, Melissa Currie, MD, Bruce E. Herman, MD, Sandra Herr, MD, Kent P. Hymel, MD, Carole Jenny, MD, MBA, Karen Sheehan, MD, MPH, Noel Zuckerbraun, MD, MPH, Sheila Hickey, MSW, MJ, Gariel Meyers, MSM, and John M. Leventhal, MD

9. Repository Copy of Consensus statement on abusive head trauma in infants and young children by Choudhary, A.K., Servaes, S., Slovis, T.L. et al

10. The creation of non-disease: an assault on the diagnosis of child abuse by Thomas L. Slovis, Peter J. Strouse, Brian D. Coley, and Cynthia K. Rigsby

11. Challenging the Pathophysiologic Connection between Subdural Hematoma, Retinal Hemorrhage, and Shaken Baby Syndrome by Gabaeff SC

12. Reply to Gabaeff by Christopher Greeley

13. Rebuttal to Greeley by Gabaeff

14. Retinal and Optic Nerve Hemorrhages in the Newborn Infant: One-year Results of the Newborn Eye Screen Test (NEST) Study by Natalia F. Callaway, MD, MS, Cassie A. Ludwig, BS, Mark S. Blumenkranz, MD, Jennifer Michelle Jones, RN, Douglar R. Fredrick, MD, and Darius M. Moshfeghi, MD

15. The Eye Examination in the Evaluation of Child Abuse by Cindy W. Christian, MD, FAAP and Alex V. Levin, Md, MHSs, FAAO, FRCSC, FAAP

16. Education paper Retinal haemorrhages in abusive head trauma in children by David S. I. Taylor

17. Debunking Fringe Beliefs in Child Abuse Imaging: AJR Expert Panel Narrative Review by Cory M. Pfeifer, MD, MBA, MPH, M. Katherine Henry, MSCE, Marguerite M. Care, MD, Cindy W. Christian, MD, Sabah, Servaes, MD, Sarah S. Milla, MD, and Peter J. Strouse, MD

18. Consensus statement on abusive head trauma in infants and young children by Arabinda Kumar Choudhary, Sabah Servaes, Thomas L. Slovis, Vincent J. Palusci, Gary L. Hedlund, Sandeep K. Narang, Joelle Anne Morena, Mark S. Dias, Cindy W. Christian, Marvin D. Nelson Jr, V. Michelle Silvera, Susan Palasis, Maria Raissaki, Andrea Rossi, and Amaka C. Offiah


**REPORTS:**

1. Dr. Levin Report 9/21/22
2. Dr. Horton Updated Report 1/4/23
3. Dr. Rood Report 9/22/23
4. Dr. Rood Updated Report 1/19/23
5. Dr. Wagner Updated Report 1/24/23


**NOTES:**

1. Dr. Horton's Notes
2. Dr. Grubenhoff's Notes


**CASE LAW:**

1. Opinion by Bender, P.J.E., In re M.R., 247 A.3d 1113 (Pa. Super. Ct. 2021), 2021 Pa. Super. 30, Decided Mar 1, 2021
2. In re LA.-RA. W., 2021 PA. Super. 227 (Pa. Cmmw. Ct 2021)
3. Cavazos v. Smith, 565 U.S. 1 132 S.Ct. 2, 181 L.Ed.2d 311
4. Claar v. Burlington Norther R. Co., 29 F.3d 499, 63 USLW 2096, 39 Fed. R. Evid. Serv. 911
5. Com. V. Epps, 474 Mass. 743, 53 N.E.3d 1247
6. Del Prete v. Thompson, 10 F. Supp. 3d 907
7. Ex parte Henderson, 384 S.W. 3d 833
8. General Elec. Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508
9. In re Yohan K., 2013 IL App (1st) 123472, 993 N.E. 2d 877 373 Ill.Dec. 318
10. People v. Bailey, 144 A.D. 3d 1562, 41 N.Y.S. 3d 625

11. People v Bailey, 47 Misc.3d 355, 999 N.Y.S.2d 713, 2014 N.Y. Slip Op. 24418
12. People v. Thomas, 22 N.Y.3d 629, 8 N.E. 3d 308, 985 N.Y.S.2d 193, 2014 N.Y. Slip. Op. 01208
13. Siharath v. Sandoz Pharmaceuticals Corp, 131 F.Supp.2d 1347, 58 Fed. R. Evid. Serv. 244
14. State v. Edmunds, 308 Wis.2d 374, 746 N.W.2d 590, 2008 WI App 33

**DISCUSSION:**

1.RETINAL STRUCTURES

The retina is light-sensitive tissue in the back of the eye responsible for generation of vision.  It is considered brain tissue and is part of the central nervous system. The retinal fibers are joined at the optic nerve, which transmits the visual stimuli received by the eye back to the occipital cortex, where it is ultimately interpreted.  The optic nerve is surrounded by a tiny sheath, which contains the same meningeal layers as those enveloping the brain itself.

The retinal structures, especially in infancy, are very small in scale.  An infant's entire retina is a bit bigger than a postage stamp.  Although comprised of several layers, the retina is a very thin piece of tissue, less than half a millimeter thick.  The retina's contiguous layers are thus separated from one another by mere microns.

The retina is fed blood through the central retinal artery and its branches as well as from blood vessels in the choroid adjoining the retina.  There are capillaries throughout the retina, which are extremely small.

2. THE BELIEFS ABOUT SHAKEN BABY SYNDROME AND RETINAL HEMORRHAGES

For many years, pediatric physicians and ophthalmologists, as well as many other physicians, were taught that retinal hemorrhages in childhood nearly always meant child abuse.  This belief came to be a key part of the medico-legal diagnosis usually referred to as Shaken Baby Syndrome (now often referred to as Abusive Head Trauma).

The belief that retinal hemorrhages pointed so heavily to SBS stemmed from the hypothesis—often taught at the time as established fact—that such hemorrhages reflect injury to the retinae as a result of something called vitreo-retinal traction.  The vitreo-retinal traction theory posited that during violent shaking there is friction and tugging between the retina and the vitreous, leading to hemorrhage and, in many instances, other retinal injury, such as macular folds or a condition referred to as retinoschisis.

The vitreo-retinal traction theory and the belief that retinal hemorrhage almost always means abuse, especially if widespread and in multiple retinal layers, was by far the dominant understanding in the medical community as of the time of Swayde's hospitalization in February 2019.  Some knowledgeable physicians did raise concerns that the belief was not yet validated. See *Andrea C. Tongue, Editorial, The Ophthalmologist's Role in Diagnosing Child Abuse, (1991)*, 98 *Ophthalmology* 1009 ("Although it is possible that certain types of retinal hemorrhages and retinoschisis are a sign of shaken baby syndrome, to date there is no evidence that clearly establishes that retinal hemorrhages, be they intraretinal, subretinal, or subhyaloid, are indicative of nonaccidental trauma.").

Over the years, many physicians and other researchers began to question the beliefs about SBS. These challenges undermined confidence in the classic SBS beliefs, including the beliefs about the potential dangers of short falls and retinal hemorrhages.  This progression is alluded to in the Superior Court's order the matter of *State v. Cocogni*, CR2000-004812, and presented in greater detail in *Randy Papetti, et al., Outside the Echo Chamber:  A Response to the Consensus Statement on Abusive Head Trauma in Infants and Young Children (2019), 59 Santa Clara L Rev 299.*

As pertains to retinal hemorrhages and the other findings (such as folds and retinoschisis) that were so closely attributed to abuse, several efforts to prove through pathologic investigation that they were traceable to vitreo-retinal traction failed. See M. Vaughn Emerson et al., *Ocular Autopsy and Histopathological Features of Child Abuse*, (2007), 14 OPHTHALMOLOGY 1384; Craig Munger et al., *Ocular and Associated Neuropathologic Observations in Suspected Whiplash Shaken Infant Syndrome*, (1993), 14 AM. J. FORENSIC MED. PATH. 193, 199. The neuropathology literature came to advise that retinal hemorrhages and the other retinal findings likely did not reflect trauma to the eye from vitreo-retinal traction, but instead, in most instances, oozing from retinal vessels from intracranial or intravenous pressure changes and other factors. See *Jan Leestma, Forensic Neuropathology* (3d ed. 2014); *J. Douglas Cameron and M. Vaughn Emerson, Ophthalmic Pathologic Findings in Infantile Traumatic Brain Injury, in Essential Forensic Neuropathology* (*Juan Troncoso et al. eds. 2010)*, 213-14.

Several researchers endeavored to test the beliefs about SBS and retinal hemorrhages through experiments with neonate animals.  These efforts all failed to validate that even very violent and repetitive acceleration or shaking will lead to the retinal findings thought by many to be a natural consequence of such forces.  For example, one study used machinery to repetitively shake piglets, for both short and extended period.  The study, which involved 50 piglets, reported "no ocular injury" in any piglet.  See *Brittany Coats et al., Cyclic Head Rotations Produce Modest Brain Injury in Infant Piglets*, (2017), 34 *J. Neurotrauma* 235. In fact, in all these piglet and lamb studies, involving dozens of animals, not even one violently accelerated or shaken animal had

retinoschisis, macular folds, or the severe or extensive retinal hemorrhaging supposedly so characteristic of SBS/AHT.

Biomechanical testing has repeatedly confirmed that shaking produces acceleration-deceleration forces well below those present in short falls.  See *Papetti et al. (2019)*.  Nor does the literature involving cases of witnessed shaking support the belief that retinal hemorrhages are a predictable consequence of shaking. For example, a recent study examined 36 children who were witnessed being shaken or where caretakers voluntarily admitted at the hospital that they had shaken the children. The study reported: "*No infant subject to shaking* with or without blunt force trauma and without any possibly predisposing factors *had any of the findings regarded as highly specific for AHT.  Our findings imply that SDH or RH have low sensitivity for AHT, entailing a risk for false negatives if these features are believed to have a high negative predictive value.*" See *Ingemar Thiblin et al., Medical Findings and Symptoms in Infants Exposed to Witnessed or Admitted Abusive Shaking:  A Nationwide Registry Study, (Oct. 13, 2020)*, PLoS ONE 1.

One early understanding that supported the vitreo-retinal traction theory was that retinal hemorrhages are found in purported SBS/AHT cases in which there is no neuroimaging evidence of intracranial bleeding, brain swelling, or any severe systemic dysfunction, such as extreme infection, metabolic collapse, or a coagulopathy.  Such cases where abuse was suspected, retinal hemorrhages were present, but there was no evidence of intracranial injury or other systemic dysfunction, would tend to support the notion that the retinal hemorrhages are a distinct traumatic injury to the eye.

However, subsequent studies have confirmed that it is "exceedingly rare" for retinal hemorrhaging to occur in the context of trauma, absent intracranial hemorrhaging or other abnormal neuroimaging.  Mary V. Greiner et al., *Dedicated Retinal Examination in Children Evaluated for Physical Abuse without Radiologically Identified Traumatic Brain Injury*, (2013), 163 *J. Pediatr*. 527, 529 (2013); Li et al., *Retinal Hemorrhages in Low-Risk Children Evaluated for Physical Abuse*, (2011), 165 Arch. Pediatr. Adolesc. Med. 913 (0 of 141 infants and children evaluated for child abuse and without evidence of altered mental status, abnormal neuroimaging, or non-linear skull fracture had retinal hemorrhages); J. Thackeray et al., *Yield of Retinal Examination in Suspected Physical Abuse with Normal Neuroimaging*, (2010) 125 Pediatrics e1066 (extensive retinal hemorrhage found in only 2 of 282 children evaluated for potential abuse without neuroimaging evidence of brain injury, and both children showed evidence of head or face injury and/or altered mental status). If retinal hemorrhages in purported SBS/AHT cases are traumatic injuries caused by forces acting on the eye as a result of shaking or comparable forces, as opposed to a secondary consequence of altered intracranial or venous pathology from whatever source, then one would expect to see them in purportedly shaken or abused children who do not also have intracranial hemorrhage, raised intracranial pressure, or

some significant systemic dysfunction.  But numerous studies now make clear that such cases are almost non-existent.  This collection of data, too, undermines the traditional understanding.

In his deposition, Dr. Cassidy testified that young children with the combination of retinal hemorrhages, intracranial hemorrhage, and an altered mental state, such as fussiness, are overwhelmingly SBS/AHT victims.  The studies usually relied upon by professionals with admitted interest in child abuse pediatrics, and particularly AHT as Dr. Cassidy admits, merely show that young children with these characteristics historically have been very likely to have been classified as abused.  Moreover, professionals dedicated to rooting out AHT like Dr. Cassidy overlook the controversy surrounding these studies and statistics.

The shaking hypothesis and the belief that shaking is an effective means of causing subdural and retinal hemorrhages became well-accepted in pediatric medicine before being scientifically or clinically validated. When a more dedicated effort began to validate the hypotheses, several clinical/observational studies appeared to do just that. These studies showed a very high percentage of SBS/AHT cases had retinal hemorrhages, while retinal hemorrhages were virtually nonexistent in accidental trauma cases, unless the cases involved extreme trauma such as an automobile wreck or multi-story fall.  In most of the studies, 50-100% of the purported SBS/AHT victims had retinal hemorrhages, but only 0-5% of the infants classified as accidental trauma victims had such hemorrhages. These studies appeared to cement the belief that retinal hemorrhages, at least when combined with intracranial hemorrhage, are, in most circumstances, nearly *per se* proof of child abuse. Here are examples of how strong that belief became. See *Kenneth W. Reichert et al., Neurologic Sequalae of Shaken Baby Syndrome, in The Shaken Baby Syndrome:  A Multidisciplinary Approach (2001)* ("The presence of retinal hemorrhage is virtually diagnostic of the violently shaken infant in the absence of severe accidental trauma."); *Alex V. Levin, 3 Ocular Manifestations of Child Abuse, (1990), 3 Ophthalmol. Clin. N. Am. 249, 256* ("It is difficult to answer the question whether trauma other than that resulting from deliberate abuse can cause retinal hemorrhage in infants."); *Rob Parrish, U.S. Dep't of Justice, Battered Child Syndrome: Investigating Physical Abuse and Homicide (2002)* ("According to all credible studies in the past several years, retinal hemorrhages in infants is, for all practical purposes, conclusive evidence of shaken baby syndrome in the absence of a good explanation. Good explanations include: [(1) a severe auto accident where the baby's head is impacted or the baby was thrown about wildly without restraint, or (2) a fall from several stories onto a hard surface].").

However, it is well-documented that these studies used flawed circular logic. As several researchers in a variety of disciplines have shown, the physicians who diagnosed the cases in the studies used the presence of intracranial hemorrhage and retinal hemorrhage as primary criteria for diagnosing SBS/AHT and then reported that, based on their study, SBS/AHT victims overwhelmingly have intracranial hemorrhage and retinal hemorrhage while accidental trauma victims do not. The documented problem is that the studies would find a strong correlation between intracranial hemorrhage/retinal hemorrhage and SBS/AHT was a self-fulfilling prophecy.  One cannot validate a hypothesis based on a study that uses a classification system that *assumes* the association the researchers are supposedly testing.

The circularity of the SBS/AHT literature with respect to retinal hemorrhages that appears to form the basis for Dr. Cassidy's and Dr. Levin's opinions is now widely acknowledged. See Papetti et al. (2019). Once it became clear that the early SBS and retinal hemorrhage studies had serious methodological flaws, researchers (nearly all of whom were believers in the SBS/AHT hypotheses) attempted to address the circularity concern by doing systematic reviews or other meta-analyses that rolled up all or a portion of these underlying studies and then ran regression and other statistical analyses on the data.  The idea was that by aggregating data, and perhaps not using the worst of the studies, the circularity problem could be eliminated or mitigated.  These papers, like the papers they rely upon, report strong associations between retinal hemorrhages, especially "severe" or "extensive" retinal hemorrhages, and SBS/AHT.  But these studies are not scientifically reliable.

These papers as often referred to as "prospective" studies, but, as any reasonable medical professional must acknowledge, most of them are not prospective studies.  Most are either retrospective studies or meta-analyses/systematic reviews that roll up data from several underlying studies and calculate statistics from that data.  For example, the Bhardwaj (2010) paper that is often cited is not itself a prospective study, but instead is a systematic review of selected prior studies. One cannot resolve a rampant circularity problem by taking a series of flawed, circular studies and aggregating them.

This seems rather elemental. In 2016, the Swedish Agency for Health Technology Assessment and Assessment of Social Services produced a report (the "Swedish Report") on SBS. The Swedish Report, which was produced by the only independent scientific body ever to evaluate the evidence base for SBS, found the systematic reviews that proponents like Dr. Cassidy and Dr. Levin often reference, including the Bhardwaj (2010) paper, to be of "low quality" and to reflect a "high risk of bias."  Swedish Report at 31 ("All the systematic reviews were assessed to be of low quality (high risk of bias)."). In a companion paper, the authors of the Swedish Report explained that, because these systematic reviews use circular reasoning, the "[s]ensitivity, specificity, and predictive values" they reflect "incorrect conclusions" and "incorrect calculations of incidence." *Niels Lynoe et al., Insufficient Evidence for 'Shaken Baby Syndrome' – a Systematic Review, (2017), 106 Acta Paediatrica 1021*. To reiterate, both the Swedish Report and the companion paper by its authors specifically grade the Bhardwaj (2010) paper as "low quality" and having a "high risk of bias." Other papers, too, criticize the Bhardwaj (2010) study as circular and thus methodologically flawed.  See *Marc de Leeuw et al., The Optic Nerve Sheath Hemorrhage Is a Non-Specific Finding in Cases of Suspected Child Abuse, (2015), 36 J. Forensic Legal Med. 43* ("Furthermore, the overwhelming presence of ONSH [optic nerve sheath hemorrhage] in AHT cases in other studies [citing Bhardwaj (2010)] is often the result of patient selection bias, resulting in circular reasoning about the significance of ONSH in an infant death.").

The Bhardwaj (2010) paper itself concluded that most of the SBS/AHT literature on retinal hemorrhages is circular, specifically finding that 16 of the 20 studies it reviewed suffered from that flaw. *See* Bhardwaj at 985 ("Several weaknesses were identified in the included studies….This also meant that there was the potential for circular logic in all but 4 studies because [intra-ocular hemorrhages] are often used clinically as a diagnostic sign of abuse.").  However, as

others have noted, even the four studies that the Bhardwaj study found to be the best designed also suffer from circularity. *Keith Findley et al., Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence:  Getting It Right, (2012), 12 Hous. J. Health L. & Pol'y, 209* (noting that the Bhardwaj study found 16 of the 20 studies it reviewed to be circular when, in fact, all 20 studies were circular).


**There Is No Basis for Inferring Abuse from Swayde's Retinae**

The literature is now quite clear that retinal hemorrhages in infancy and young childhood are found in a wide variety of traumatic and non-traumatic settings, such as external hydrocephalus, aneurysms, vascular malformations, certain fatal infections, venous thrombosis, natural child birth, caesarian child birth if accompanied by hypoxic injury, in the context of reperfusion and venous stasis, spikes in intracranial pressure, and a whole list of other rarer natural conditions and combinations of conditions. The rough equation that once prevailed of intracranial hemorrhage + retinal hemorrhage = presumptive SBS/AHT is not scientifically validated or otherwise reliable.

I understand that Dr. Cassidy's and Dr. Levin's positions are that their expertise can distinguish between retinal hemorrhages evidencing abuse and retinal hemorrhages that may have other explanations. There is nothing, however, in the scientific literature or the training of an ophthalmologist that permits that distinction to be made in cases like this.  See *M. Mattheij et al., Retinal Haemorrhages in a University Hospital:  Not Always Abusive Head Trauma, (2017), 117 Acta Paediatrica Neurol. Belg. 515* (study concluded:  "The majority of children in all groups [AHT, suspect for AHT, and non-suspect] showed 'too numerous to count (>20) RH…. Results showed no difference between the groups concerning the location, distribution or size of the RH."); *id*. at 521 ("Clinicians should also know that there is no pathognomonic size, distribution, or location of RH seen only in AHT."); *Mark J. Shuman, Severe Retinal Hemorrhages with Retinoschisis in Infants Are Not Pathognomonic for Abusive Head Trauma, (2017), 62 J. Forensic Sci 807* ("The finding of severe retinal hemorrhages cannot be used to determine how, or even if, a traumatic event occurred.").

It has been known for many decades that a wide range of conditions or events (both natural and traumatic) that lead to systemic dysfunction, especially those affecting blood oxygen or venous pressure, can cause vulnerability in the retinal vessels.  See *Frank B. Walsh et al., 3 CLINICAL NEURO-OPHTHALMOLOGY 2348 (1969)* ("The walls of the small venules in the retina are relatively fragile and may be ruptured by any mechanism that causes an acute rise in venous pressure."); *John B. Hickam and Regina Frayser, Studies of the Retinal Circulation in Man:  Observations on Vessel Diameter, Arteriovenous Oxygen Difference, and Mean Circulation Time, (1966), 33 Circulation 302* ("Systemic disorders often cause pathological changes in the optic fundus."). The retinal

vessels are microscopic, sensitive, and very vulnerable to hypoxia, congestion, reperfusion, and to abrupt changes in intracranial pressure, venous pressure, and metabolic factors. This is not controversial outside the child abuse context.

Even in the field of child abuse pediatrics, where it is still generally claimed that widespread retinal hemorrhages are often specific for abuse, there is recognition that: "Although the abusive traumatic event is the primary etiology of the RH, *factors such as hypoxia, anemia, reperfusion, autonomic vascular dysregulation, significant shifts in sodium balance, coagulopathy, and intracranial pressure elevation may modulate the appearance of RHs.*" *Cindy Christian, Alex V. Levin, et al., The Eye Examination in the Evaluation of Child Abuse, (2018), 142 PEDIATRICS e20181411*.

In sum, it is much more likely and consistent with the scientifically reliable medical evidence that Colten's retinal hemorrhaging was a secondary result of a number of internal factors acting in combination rather than a tearing of such vessels as a result of shaking or similar forces. This would appear especially true given the absence of traumatic retinoschisis.

I disagree with Dr. Cassidy that the differential diagnosis for retinal hemorrhages like these are limited to sepsis, leukemia, or massive traumatic events like motor vehicle accidents, multi-story falls, single massive crush, massive single acceleration/deceleration injury, or a repetitive acceleration/deceleration injury, as in SBS/AHT. The forces involved in even very abusive shaking are not comparable to those in motor vehicle accidents or multi-story falls and "abuse" is neither a pathologic nor biomechanical concept. Dr. Cassidy's differential does not reflect the actual state of the literature.

Beyond the fact that there is uncertainty and controversy regarding the pathophysiology of retinal hemorrhages in purported SBS/AHT cases, it is clear that the literature undermines the notion that extreme mechanical trauma, sepsis, or coagulopathy are necessary to cause widespread, multilayered retinal hemorrhages. See Nobuhiko Aoki, *Hemorrhage Caused by Minor Occipital Impact Witnessed by an ICU Nurse: A Case Report*, (2020), 4 *J. Pediatr. Neurol. Neurosci*. 47 (reporting on a child with a relatively minor head injury who developed bilateral, multilayered retinal hemorrhages while hospitalized); Natalie Callaway et al., *Retinal and Optic Nerve Hemorrhages in the Newborn Infant: One-Year Results of the Newborn Eye Screen Test (NEST) S*tudy, (2016), 123 *Ophthalmology* 1043 (finding bilateral, multi-layered retinal hemorrhages extending to all four retinal quadrants in a significant percentage of normal vaginal deliveries, including in many instances hemorrhages that reflected optic nerve involvement); E. Eris et al., *Retinal Haemorrhage Rates and Resolution Time of Retinal Haemorrhage in Newborns After Hypothermic Treatment for Hypoxic-Ischemic Encephalopathy*,(2020), 27 ARCH. DE PÉDIATRIE 29 (children delivered via planned caesarians but with hypoxic-ischemic brain damage: study results--79% of the infants with severe hypoxic-ischemic encephalopathy had retinal hemorrhages and the RHs in 90% of them "were widespread"); Shuman, *supra* (infant who died after ruptured vascular malformation had "bilateral optic nerve sheath hemorrhages and extensive bilateral retinal hemorrhages and retinal folds"); Joshua D. Levinson et al., *Diffuse*

*Bilateral Retinal Hemorrhages in an Infant with a Coagulopathy and Prolonged Cardiopulmonary Resuscitation*, (2016), 20 J AAPOS 166 (infant found unconscious with myocardial infarction had extensive multilayered retinal hemorrhages from posterior pole to the ora serrata; autopsy also revealed bilateral hemorrhage along optic nerves); Marcus C Salvatori and Patrick E. Lantz, *Retinal Haemorrhages Associated with Fatal Paediatric Infections*, (2015), 55 MED. SCI. LAW 122; Othon J. Mena et al., *Ocular Findings in Raised Intracranial Pressure:  A Case of Terson Syndrome in a 7-Month-Old Child*, (2011), 32 AM. J. FORENSIC MED. PATH. 55 (2011) (retinal hemorrhages extending to the ora serrata and in multiple layers after an aneurysm); Anne Stray-Pedersen et al., *An Infant with Subdural Hematoma and Retinal Hemorrhages:  Does von Willebrand Disease Explain the Findings?*, (2011), 7 J. FORENSIC SCI. MED. PATHOL. 37.

It is also important to keep in mind that while Dr. Cassidy is finding such relevance in the fact that the hemorrhage extends into multiple retinal layers, the retina is extremely thin—less than a half a millimeter thick.  The layers are somewhat contiguous and separated by microns.  Similarly, he finds it relevant that the hemorrhages extend towards the ora serrata. But again, this is an incredibly nuanced finding—the spread that Dr. Cassidy finds significant is only perhaps a centimeter. That many pediatric physicians and child abuse specialists still believe in such a hypothesis does not change the reality that the hypothesis has not been adequately validated and appears to be very questionable.

**CONCLUSIONS:**

In conclusion, Dr. Cassidy's report and reasoning as testified about is consistent with his understanding that severe retinal hemorrhages equals abuse, absent major trauma equivalent to falling off a cliff, being run over by a truck, sepsis, or a tiny handful of other exceptions.  His report and reasoning are not consistent with the state of scientific understanding and are highly controversial outside the field of child abuse pediatrics.

A more recent re-evaluation of the aspects of the science behind SBS/AHT has led to re-examination of the classical thought on head trauma and its sequelae in the brain and eyes. Dogmatic Statements from the AAO and AAP lack foundation in scientific evidence.

_____

Todd A. Lefkowitz MD, FACS, FAAO, diplomate ABO
Sonoran Desert Vision Consulting
May 25, 2023