**GUST ROSENFELD  P.L.C.**
Kari B. Zangerle, No. 013164
Robert C. Stultz, No. 025781
kzangerle@gustlaw.com
rstultz@gustlaw.com
One East Washington Street, Suite 1600
Phoenix, Arizona  85004-2553
(602) 257-7422
Fax: (602) 254-4878

*Attorneys for Defendants Phoenix Children's Hospital; Dr. William S. Wood and Rachel Wood; Dr. Kathryn Coffman; Haley Dietzman and Roald Dietzman; Zachary Dion; and Carey Lewis*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Honor Duvall, an individual; Donald Sankey, Junior, an individual; S.Z.S., a minor, through his parents and guardians Honor Duvall and Donald Sankey,<br><br>Plaintiffs,<br><br>v.<br><br>Arizona Department Of Child Safety, a governmental entity; *et al.*,<br><br>Defendants. | Case No.:  21-CV-00167-PHX-ROS<br><br>**THE PCH DEFENDANTS' REPLY IN SUPPORT OF *DAUBERT* MOTION REGARDING PLAINTIFFS' EXPERT THOMAS YOUNG, M.D.**<br><br>**(Oral Argument and *Daubert* Hearing Requested)** |

Defendants Phoenix Children's Hospital, Dr. William S. Wood and spouse Rachel Wood, Dr. Kathryn Coffman, and Haley Dietzman and spouse Roald Dietzman ("PCH Defendants"), through counsel, submit their Reply in Support of the PCH Defendants' *Daubert* Motion Regarding Plaintiffs' Expert Thomas Young, M.D. (Doc 315.)

Plaintiffs' Response to the PCH Defendants' *Daubert* Motion misses the mark. Plaintiffs' expert Thomas Young, M.D. premises his opinions on his self-created "Inferential Test," an unscientific "theorem of deductive logic," that is untestable and not generally recognized in the medical community. In their Response, Plaintiffs offer no substantive defense of Dr. Young's "Inferential Test," because there is none. As the linchpin of Dr. Young's opinions, when the unreliable "Inferential Test" is removed, the house of cards crumbles. Dr. Young should be precluded from testifying.

The PCH Defendants request a *Daubert* evidentiary hearing.

I.  **DR. YOUNG'S "INFERENTIAL TEST" IS NOT RELIABLE.**

Plaintiffs do not defend Dr. Young's methodology. Dr. Young opines that "real child abuse is witnessed by someone. False child abuse is diagnosed by doctors. What I have just stated is valid deductively and exceedingly strong inductively." (Doc. 315, at p. 2.) In reaching his opinions, Dr. Young claims to follow what he calls the "Inferential Test (IT)":

> One can be reasonably certain if witness accounts of the past are consistent or not consistent with physical evidence in the present, but one cannot reliably surmise past events from physical evidence unless there is only one plausible explanation.

(Doc. 315, at p. 3.) In deposition testimony, Dr. Young admitted that he made up the Inferential Test, which he claims "turns out to be a theorem of deductive logic." (Doc. 315, at p. 3.) The Inferential Test cannot be found in logic literature (or any medical literature for that matter, other than his own book); instead, Dr. Young has posted his theorem on his website. (Doc. 315, at p. 3.)

The unreliable "Inferential Test" is the linchpin of Dr. Young's opinions. As discussed in the PCH Defendants' *Daubert* Motion, Dr. Young does not offer an opinion, to a reasonable degree of medical probability, as to what caused S.Z.S.'s

1  injuries. He instead opines that they could have been caused by childbirth or his
2  unproven catch-up mineralization theory. In their Response, Plaintiffs provide no
3  defense of Dr. Young's catch-up mineralization theory. The PCH Defendants discuss the
4  theory in their *Daubert* Motion (Doc. 315, at p. 9-12).

5  Using his self-created "Inferential Test," Dr. Young believes that suspected child
6  abuse cannot be identified, if there is no witness, unless abuse is the <u>only</u> plausible
7  explanation. Medical opinions, whether in the context of treating a patient or in
8  litigation, often cannot be stated to 100 percent certainty. This is why Dr. Young asserts,
9  using his "Inferential Test," that "real child abuse is witnessed by someone." Yet,
10 pediatric healthcare providers who care for abused children (something Dr. Young has
11 never done) must regularly diagnose unwitnessed suspected child abuse.

12 Nowhere in the extensive literature on child abuse is it generally accepted that
13 abuse must be witnessed. The PCH Defendants' pediatric forensic child abuse expert,
14 Dr. Corey Rood, in his supplemental report, addressed Dr. Young's outlier opinions:

> This being said, of utmost concern is Dr. Young's perseveration that child maltreatment cannot exist unless someone, specifically a verbal individual, witnesses the abusive event and can provide witness testimony. When pressed on whether a non-verbal infant alone with an adult caregiver could be abused and the adult caregiver then goes on to deny the maltreatment, Dr. Young opines that the injuries resulting from such maltreatment could not be concluded by an expert medical provider as abusive injury due only to the lack of witness testimony or confession. This is logically absurd especially from a forensic pathologist who has a historical practice of determining manner of death as suicide or homicide even without a confession by the deceased, the murderer, or a living witness to the event. Dr. Young's written opinion states, "One can be reasonably certain if witness accounts of the past are consistent or not consistent with physical evidence in the present, but one cannot reliably surmise past events from physical evidence **unless there is only one plausible explanation for that evidence**." This is the precise work of the physician, and even more so for the child abuse pediatrician. … In the case of [S.Z.S.], the individual medical findings are each a

> result of trauma, as all other plausible causes were thoroughly ruled out. [S.Z.S.'s] numerous individual injuries that each are the result of trauma **collectively conclude only one plausible explanation for their cause**, child physical abuse including abusive head trauma. This is a medical diagnosis that is scientifically based on reliable, objective medical findings, without circular logic, and accurately describes all of [S.Z.S.'s] medical findings even without a confession or a verbal witness. There is no other medical explanation that accurately explains these medical findings in this infant.

(*See* Doc. 333-2, at p. 4.) Plaintiffs did not disclose a pediatric forensic child abuse expert, or any other expert who provides care to children, to rebut Dr. Rood's opinions or to support Dr. Young's reliance on his "Inferential Test" or his opinion that "real child abuse is witnessed."

In Plaintiffs' Response, they do not mention the "Inferential Test" until Page 16, and they never offer a substantive defense of it. There is no defense of the "Inferential Test." Dr. Young made it up; it is not generally accepted; it is not peer reviewed; and it is not testable. (Doc. 315, at p. 15-16.)

The trial court serves at the gatekeeper in assuring that the proposed expert testimony has a reliable basis in the knowledge and experience of the discipline. See *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 149 (quoting *Daubert*, 509 U.S. 592). "When an expert opinion is based on data, a methodology or studies that are simply inadequate to support the conclusion reached, *Daubert* and Rule 702 mandate the exclusion of the unreliable opinion testimony. *Amorgianos v Nat'l RR Passenger Co*, 303 F.3d 256, 266 (2nd Cir. 2002). "Under the regime of *Daubert* ... a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1316-17 (11th Cir. 1999)(quoting *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996)).

Plaintiffs' citation to *State v. Nieves*, Nos. A-2069-21, A-2936-21, 2023 WL 5947996 (N.J. Super. Ct. App. Div. Sept. 13, 2023), is misplaced. *Nieves* is a Superior Court of New Jersey, Appellate Division, case. The applicable standard in *Nieves* was Frye, not Daubert. *Nieves,* 2023 WL 5947996 at ¶ 17. The *Nieves* Court was applying New Jersey law in a criminal matter.

Plaintiffs argue that the deficiencies in Dr. Young's opinions go to credibility, not admissibility. According to Plaintiffs, because Dr. Young is a medical doctor with experience as a forensic medical examiner, he should be permitted to testify. Plaintiffs are asking the Court to rubber stamp Dr. Young's opinions and not test the reliability of his methodology. As discussed previously, Dr. Young's opinions are untestable, not peer reviewed, and not generally accepted within the medical community. Moreover, Dr. Young's opinions contradict what is generally accepted and the subject of thousands of peer reviewed articles. Plaintiffs offer no substantive defense of Dr. Young's opinions premised on his "Inferential Test," because there is no defense.

## II. PLAINTIFFS' RED HERRING ARGUMENTS

Throughout Plaintiffs' Response, they make a number of red herring arguments. While these arguments are not relevant to the issue of the reliability of Dr. Young's opinions based on his self-created "Inferential Test," the arguments need a brief rebuttal.

### A. Irrelevant Factual Issues

Plaintiffs focus on factual issues that are irrelevant to the resolution of the PCH Defendants' *Daubert* Motion. To provide a few examples, Plaintiffs refer to resident physician Kathleen Outcalt, M.D. and Defendant Haley Dietzman, N.P. as Caucasian. Plaintiffs never state why this information is relevant, but they appear to hope the Court will draw an inference that racial discrimination played a role in S.Z.S.'s care. Plaintiffs neglect to inform the Court that Anthony Pickett, M.D., the PCH Emergency Department physician who personally provided care to S.Z.S. and supervised resident

Dr. Outcalt, is African American:

[By Ms. Zangerle:]  How do you identify racially?

A.  African American.

Q.  And you and Dr. Outcalt were the two people with initial care and treatment of this child when he came to Phoenix Children's Hospital?

A.  Yes.

Q.  And the two of you are the individuals that made the decision based on discussion for the Child Protection Team to be consulted, were you not?

A.  Yes.

Q.  How do you feel about there being allegations that suggest that either Dr. Outcalt or yourself put this kid in the system because of race?

MR. CONNELLY: Form and foundation.

THE WITNESS:  The two emotions are anger and pain. It's hurtful, honestly, to think that any care I provide would be racially biased or motivated. In addition, I'm very sensitive to all of that, and the residents that work with me, we have discussions about how that's not appropriate. So it's -- to me, it's just disappointing and hurtful that this allegation is coming up.

BY MS. ZANGERLE:
Q.  Did race play any part in your provision of care or supervision of Dr. Outcalt's care of Swayde Sankey?

A.  Absolutely not.

(**Exhibit 1**, at p. 153, ln. 8 – p. 154, ln. 8.) There is no evidence that the care S.Z.S. received at PCH was affected by his race, yet Plaintiffs keep referring to certain providers as Caucasian, without any explanation why.

1   Without disclosing any witnesses to testify as to the cause of S.Z.S.'s numerous
2 injuries, to a reasonable degree of medical probability, Plaintiffs continue to argue that
3 they could have been caused by childbirth. Plaintiffs' position ignores the deposition
4 testimony of S.Z.S.'s pediatrician Heather Gosnell, M.D., who was not employed by
5 PCH and is not a party to this case:

> BY MS. ZANGERLE:
> Q. And when you were involved in caring for Swayde during the year 2019, you noted in your medical record that you had some concerns that this baby had been involved in nonaccidental trauma; fair?
>
> MR. CONNELLY: Form. Foundation.
>
> THE WITNESS: Yes.
>
> BY MS. ZANGERLE:
> Q. And that was based upon your training as a pediatrician and the information that you reviewed based upon a variety of specialists as well as information you took during your examination and discussions with family?
>
> MR. CONNELLY: Form. Foundation.
>
> THE WITNESS: Yes.
>
> BY MS. ZANGERLE:
> Q. As you sit here today, do you still hold the opinion that -- based upon the information that you reviewed, that this child had been -- was a potential victim of SNAT?
>
> MR. CONNELLY: Form. Foundation.
>
> THE WITNESS: Yes.
>
> BY MS. ZANGERLE:
> Q. And I'm asking you that as the child's treating pediatrician. Based upon the materials you reviewed from the various examinations during your care and treatment, you formed an opinion that it was reasonable to investigate the possibility of

> nonaccidental trauma for this child's various medical conditions?
>
> A. Yes.

(Doc. 333, at p. 27-28.) Similarly, Plaintiffs' pediatric ophthalmology standard of care expert, Todd Lefkowitz, M.D., testified that any retinal hemorrhages from birth would have resolved before the PCH hospital admissions:

> Q. So by that point in time, when Dr. Cassidy performed his evaluation, any retinal hemorrhages that were present when Swayde Sankey was born would have been resolved --
>
> MR. CONNELLY: Form and foun- --
>
> BY MS. PATANE:
>
> Q. -- correct?
>
> MR. CONNELLY: Form and foundation.
>
> THE WITNESS: Well, I would agree about that.

(Doc. 333, at p. 31.) Despite Dr. Lefkowitz' testimony, Plaintiffs continue to argue the contrary, that somehow S.Z.S.'s retinal hemorrhages could have been caused by childbirth.

In Plaintiffs' Response, they discuss Dr. Warren Heller, an ophthalmologist not affiliated with PCH who saw S.Z.S. after the first admission at PCH. Plaintiffs argue that Dr. Heller's examination "revealed nothing alarming about S.Z.S.'s retinas or eyes." (Doc. 335, at p. 12.) Plaintiffs' own pediatric ophthalmology expert, Dr. Lefkowitz, discredited Dr. Heller:

> Q. Did you see in your review of the records from Dr. Heller's visit with this baby that he documented performing a slit lamp exam?
>
> MR. CONNELLY: Form. Foundation.

THE WITNESS: Yeah, I saw that, and I don't believe it.

And I know Dr. Heller personally. And it wouldn't surprise me that he just ignored -- that he used the template. And basically it's the template that applies to adult exams.

Now, if it were me, and I was using the – the sheet for the progress note, I would have crossed out things like "slit lamp."

I just would have mentioned an assessment of the vision, what the eye muscle situation was, and then the dilated fundus exam.

But Dr. Heller is kind of old, and I – I think he's way beyond the time he should be in his practice, so I would ignore any information from his practice.

And I think that most of my colleagues in the Valley would say the same thing.

BY MS. PATANE:
Q. And is that the case, then, for anything from his practice from 2019?

A. Mm-hmm.

MR. CONNELLY: Form. Foundation.

BY MS. PATANE:
Q. Is that a "yes"?

A. Yes.

(**Exhibit 2**, at p. 52, ln. 20 – p. 53, ln. 24.) S.Z.S. was seen by two pediatric ophthalmologists at PCH who observed retinal hemorrhages (Dr. Cassidy, and Dr. Fecoratta, whose care is not at issue this case).

None of the factual issues raised by Plaintiffs address the ultimate issue in the PCH Defendants' *Daubert* Motion: are Dr. Young's "Inferential Test" and the opinions that flow from it based on a reliable methodology? They are not.

/ / / /

### B.   Abusive Head Trauma

Plaintiffs use most of their Response to discuss the science of abusive head trauma, without discussing the reliability of Dr. Young's opinions based on his Inferential Test. The science of abusive head trauma is well-established and generally accepted within the medical community. The PCH Defendants' *Daubert* Motion discussed the "Consent Statement on Abusive Head Trauma in Infants and Young Children," published in *Pediatric Radiology*, with participating organizations including the Society for Pediatric Radiology, the European Society of Paediatric Radiology, the American Society of Pediatric Neuroradiology, the American Academy of Pediatrics, the American Professional Society on the Abuse of Children, the Swedish Paediatric Society, the Norwegian Pediatric Association, and the Japanese Pediatric Society. (Doc. 315, at p. 7-8.)

In April 2020, the American Academy of Pediatrics ("AAP") published a policy statement titled "Abusive Head Trauma in Infants and Children." (Doc. 333, at p. 11.) In the policy statement, the AAP noted that it had adopted, in 2009, the current term Abusive Head Trauma ("AHT"), over earlier nomenclature, such as whiplash shaken infant syndrome, shaken impact syndrome, inflicted childhood neurotrauma, and shaken baby syndrome. (*Id*.) The change in nomenclature was "in recognition of the fact that inflicted head injury of children can involve a variety of biomechanical forces, including shaking." *Id*. According to the policy statement, "The AAP continues to affirm the dangers and harms of shaking infants, continues to embrace the 'shaken baby syndrome' diagnosis as a valid subset of the AHT diagnosis, and encourages pediatric practitioners to educate community stakeholders when necessary." (*Id*.) The AAP notes that the debate of Abusive Head Trauma "is a philosophical one, not a scientific one." (*Id*.)

Medical science substantiates the causal connection between shaking (acceleration-deceleration forces) and AHT. Some early biomechanical models raised concerns about whether shaking alone generates enough force to induce a variety of infant brain injuries; however, subsequent studies have shown the limitation of those early models and have validated shaking alone as a mechanism for inducing infant brain injuries. (Doc. 333, at p. 11.) Similarly, clinical studies "continue to emphasize the importance of shaking as an injurious mechanism in many cases of AHT." (*Id.*)

## III. CONCLUSION

Dr. Young's opinions transcend credibility issues and are so lacking in reliability that preclusion is the appropriate remedy. Dr. Young's Inferential Test is untestable, not reproducible, and not generally accepted in the medical community. Dr. Young is simply an outlier applying an unreliable methodology. His opinions fail to meet the standards of Rule 702 and *Daubert*. He should be precluded from testifying at trial.

DATED this 26th day of October, 2023.

**GUST ROSENFELD, P.L.C.**

By /s/ Kari B. Zangerle
Kari B. Zangerle
Robert C. Stultz
One East Washington Street, Suite 1600
Phoenix, AZ  85004-2553
*Attorneys for Defendants Phoenix Children's Hospital; Dr. William S. Wood and Rachel Wood; Dr. Kathryn Coffman; Haley Dietzman and Roald Dietzman; Zachary Dion; and Carey Lewis*

## TABLE OF CONTENTS – EXHIBITS

Exhibit 1        Deposition Transcript – Anthony J. Pickett, M.D., pp. 153-154

Exhibit 2        Deposition Transcript – Todd Allen Lefkowitz, M.D., pp. 52-53

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2023, I electronically filed the foregoing with the Clerk of Court, using the CM/ECF system, which will send notification of such filing to all parties, and will e-mail all notification of such filing to all non-CM/ECF system participants.

Thomas A. Connelly, Esq.
Robert T. Mills, Esq.
Sean A. Woods, Esq.
Mills & Woods Law PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

DeeAn Gillespie Strub, Esq.
Mark Shields, Esq.
Gillespie, Shields, Goldfarb Taylor
7319 North 16th Street
Phoenix, AZ 85020
*Attorneys for Plaintiffs*

Georgia A. Staton, Esq.
Ravi V. Patel, Esq.
Jones, Skelton & Hochuli, PLC
40 North Central Ave., Suite 2700
Phoenix, AZ 85004
*Attorneys for Defendants State of Arizona and ADOCS*

Cynthia Y. Patane, Esq.
Rachel L. Werner, Esq.
Gordon Rees Scully Mansukhani, LLP
One Renaissance Square
Two North Central Ave., #2200
Phoenix, AZ 85004
*Attorneys for Defendant Brendan Cassidy*

By /s/ Melody Kern