EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| HONOR DUVALL, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARIZONA DEPARTMENT OF CHILD SAFETY, et al., <br><br> Defendants. | Case No. <br> 21-CV-00167-PHX-ROS |

### DEPOSITION OF BRENDAN CASSIDY, M.D.

Phoenix, Arizona
October 5, 2022
10:20 a.m.

Prepared by:
MICHAELA H. DAVIS
Registered Professional Reporter
Certified Realtime Reporter
Certified Realtime Captioner
Certified LiveNote Reporter
AZ CR No.  #50574
carrie@carriereporting.com

(COPY)

CARRIE REPORTING, LLC
Certified Reporters
2415 E. Camelback Road
Suite 700
Phoenix, AZ 85016
(480) 429-7573

41

1 joined in '94 or '95 --
2   A.   Through present. Never drew a salary.
3   Q.   Never drew a salary from PCH?
4   A.   Never drew a salary, correct.
5   Q.   Okay. But you were on the staff, and as a
6 member of the staff, were you ever called to do an
7 emergency consult --
8           MS. PATANE: Form.
9           THE WITNESS: Yes.
10 BY MR. CONNELLY:
11  Q.   -- for a child at PCH?
12          MS. PATANE: Form.
13          MR. PATEL: Join.
14          THE WITNESS: Ever? Yes, absolutely.
15 BY MR. CONNELLY:
16  Q.   Okay. And were you called to do that in the
17 period between 1994 or '95, whenever it was that you
18 joined the staff, up through -- up through 1999, if you
19 can remember?
20  A.   From '94 to '99?
21  Q.   Yeah.
22  A.   Yes. Absolutely. Saw hundreds if not thousands
23 of patients, inpatients then.
24  Q.   And then if I understood what you said, in 1999,
25 somewhere between 1999 and 2001, PCH put out a contract

42

1 for emergency care to -- as far as ophthalmology goes, to
2 the Arizona Pediatric Eye Specialists; right?
3          MS. PATANE: Form.
4          MS. ZANGERLE: Form and foundation.
5          MR. PATEL: Join.
6 BY MR. CONNELLY:
7   Q.   Do I have it correct so far?
8   A.   I think that's a reasonable expression of it.
9   Q.   All right. And then during that time, from
10 1999 -- or between 1999 and 2001, you don't know exactly
11 when, until 2017 or 2018, this emergency care contract was
12 in place, as far as your understanding; right?
13         MS. ZANGERLE: Form and foundation.
14         MS. PATANE: Form.
15         MR. PATEL: Join.
16         THE WITNESS: That's my understanding, yes.
17 BY MR. CONNELLY:
18  Q.   And then during that time then, during the time
19 that this contract for emergency care was in place, you
20 were not part of the Arizona Pediatric Eye Specialists
21 group that had this contract; right?
22  A.   That's correct.
23  Q.   And so in that time that the contract was in
24 place, were you called upon to examine a child on an
25 emergency basis where there were allegations of abuse?

43

1          MS. ZANGERLE: Form and foundation.
2          MS. PATANE: Join.
3          MR. PATEL: Join.
4          THE WITNESS: During that time period, from
5 1999 to present? Or through 2019?
6 BY MR. CONNELLY:
7   Q.   '18, yeah.
8   A.   If we take that -- let's say it's an 18-year
9 chunk, I would have seen many hundreds if not thousands of
10 children in emergent and urgent situations that were
11 inpatient at Phoenix Children's Hospital.
12  Q.   Okay. But specifically in relation to part of a
13 team that was investigating abuse, would you have done it
14 during that time in that -- in that situation?
15         MS. PATANE: Form.
16         MS. ZANGERLE: Form and foundation.
17         MR. PATEL: Join.
18         THE WITNESS: So, again, I wasn't a member
19 of a team, but I would be contacted by trauma or forensics
20 or, again, if we loosely label it "the team," I would be
21 contacted from 1999 through 2017 to do possible abusive
22 head trauma or shaken baby -- at the time, that was the
23 label being used in the early portion of that time
24 frame -- to evaluate children for the potential for eye
25 problems in that setting. And, again, that would have

44

1 been hundreds if not thousands of children over those
2 years.
3 BY MR. CONNELLY:
4   Q.   And so then when this contract ended, if I
5 understand your testimony correctly, the doctors that were
6 part of Arizona Pediatric Eye Specialists then
7 transitioned into being employees of PCH?
8          MS. ZANGERLE: Foundation, form.
9          MS. PATANE: Join.
10         MR. PATEL: Join.
11         THE WITNESS: That's my understanding, yes.
12 BY MR. CONNELLY:
13  Q.   And then in 2019 -- and let me go back for a
14 second.
15         You said that between 1999 and 2018, this
16 18-year period we are talking about when the Arizona
17 Pediatric Eye Specialist contract was in place, that you
18 would get called upon to do an examination on an emergency
19 basis for children where there were suspicions for abuse.
20         In those cases, how were you compensated?
21         MS. ZANGERLE: Form and foundation.
22         THE WITNESS: Typically --
23         MR. PATEL: Join.
24         THE WITNESS: -- my compensation was paying
25 for my gas to go to Phoenix Children's Hospital which is

45

1 typically about 30- to 60-minute drive and return to my
2 home. If I was located at my work, it would be anywhere
3 from a one-hour drive to 15-minute drive, depending on
4 what year and what location I was at.
5      So my compensation was a negative
6 compensation in addition to all the time that I spent
7 reviewing cases and being deposed those dozen of times
8 that we talked about at the beginning of our conversation.
9 So it would be a negative compensation from a financial
10 standpoint, if that's what you're looking for.
11 BY MR. CONNELLY:
12    Q.   So you didn't get paid for your time doing the
13 examination?
14    A.   Occasionally I'd get reimbursed by an insurance
15 company that would submit a bill to the insurance company
16 for the examination, and sometimes we'd get paid, but the
17 great majority would not.
18      I would instruct my billing staff to strike
19 the bill to the families because these were tough
20 situations, so typically I'd ask them to cancel a bill
21 that was otherwise due by a family.
22    Q.   So all the thousands of consultations that you
23 undertook on an emergency basis at the request of PCH,
24 it's your testimony that you weren't compensated for that
25 other than for your gas?

46

1    A.   No, I was not compensated for my gas. I'm
2 saying it was a negative compensation. My time and energy
3 and gas were expenses. Compensation was breathing the air
4 that I breathe during that time frame. I wasn't
5 reimbursed by the hospital, I wasn't reimbursed by the
6 parents, and sometimes I was reimbursed by the insurance
7 company for doing the exam, but obviously it didn't cover
8 my time, gas, or energy. It was done just to do the
9 examination.
10    Q.   Just out of the kindness of your heart?
11    A.   There's probably other motives there as well.
12    Q.   What are the other motives?
13    A.   Being able to help these children getting an
14 evaluation done.
15    Q.   In the case of Swayde Sankey, did you receive
16 any compensation for that examination?
17    A.   Same compensation we discussed. I was able to
18 spend some --
19    Q.   It's a simple question. Yes or no. Did you get
20 compensated for the examination of Swayde Sankey?
21      MS. PATANE: Form.
22      MS. ZANGERLE: Form and foundation.
23      MS. PATANE: Please don't talk over
24 Dr. Cassidy. Please let him finish his answer.
25      MR. CONNELLY: I don't have to if it's

47

1 nonresponsive.
2      MS. PATANE: No, you're not allowed to talk
3 over him and interrupt him.
4 BY MR. CONNELLY:
5    Q.   The question is: Did you receive any
6 compensation for the examination that you performed on
7 Swayde Sankey?
8    A.   I received approximately zero dollars.
9    Q.   Okay. Thank you.
10      Are you currently on the staff at PCH?
11    A.   Yes, I am.
12    Q.   Have you ever participated in any Child
13 Protection Team staff meetings at PCH?
14      MS. PATANE: Form.
15      THE WITNESS: I don't know about the title
16 of it, but I remember going to a meeting many years ago
17 that would have been parallel to your question. I just
18 don't remember what patient, but it was many years ago.
19 Probably 15 years ago.
20 BY MR. CONNELLY:
21    Q.   So as far as Swayde Sankey goes, did you
22 participate in any team meetings at PCH in regards to the
23 Swayde Sankey case?
24    A.   Not that I recall, no.
25    Q.   Is it a requirement of your contract in order to

48

1 maintain your privileges at PCH to do these emergency
2 consultations?
3      MS. PATANE: Form and foundation.
4      MR. PATEL: Join.
5      THE WITNESS: I believe I explained to
6 you --
7      MS. ZANGERLE: Form and foundation.
8      THE WITNESS: I believe I explained to you
9 that I don't have a contract with Phoenix Children's
10 Hospital, so the question is moot.
11 BY MR. CONNELLY:
12    Q.   Well, you have a medical staff contract you said
13 you sign every two years or so; right?
14    A.   The membership contract, yes.
15      MS. PATANE: Form and foundation.
16      MR. PATEL: Join.
17      MS. ZANGERLE: Form and foundation.
18      THE COURT REPORTER: Doctor, you need to
19 pause just a little before you answer.
20 BY MR. CONNELLY:
21    Q.   And does the medical staff contract require that
22 you do emergency consults in order to comply with the
23 terms of that contract?
24    A.   No.
25      MS. PATANE: Form.