1  Thomas A. Connelly (AZ Bar #019430)
   Robert T. Mills (AZ Bar #018853)
2  Sean A. Woods (AZ Bar #028930)
   MILLS + WOODS LAW PLLC
3  5055 North 12th Street, Suite 101
   Phoenix, Arizona 85014
4  Telephone 480.999.4556
   docket@millsandwoods.com
5
   DeeAn Gillespie Strub (AZ Bar #009987)
6  Jenny D. Jansch (AZ Bar #024431)
   GILLESPIE, SHIELDS & TAYLOR
7  7319 North 16th Street
   Phoenix, Arizona 85020
8  Telephone: (602) 870-9700
   Fax: (602) 870-9783
9  mailroom@gillaw.com

10 *Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Honor Duvall, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>Arizona Dept. of Child Safety, *et al.*,<br><br>　　　　　Defendants. | Case No.: 21-cv-00167-ROS<br><br>**NOTICE OF ERRATA**<br><br>(Hon. Roslyn O. Silver) |

NOTICE IS HEREBY GIVEN that the version of (Doc. 319-13), the expert report of Dr. Young, filed on September 28, 2023, as Exhibit 13 to Plaintiff's Motion for Partial Summary Judgment (Doc. 319), did not contain the Bates labels with which the report was disclosed. Attached here is the Bates labeled version of the report which should be used to replace the version filed at (Doc. 319-13).

///

///

///

**RESPECTFULLY SUBMITTED** this 3rd day of November 2023.

        **MILLS + WOODS LAW PLLC**

By   */s/ Thomas A. Connelly*
      Thomas A. Connelly
      Robert T. Mills
      Sean A. Woods
      5055 North 12th Street, Suite 101
      Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
      DeeAn Gillespie Strub
      Jenny D. Jansch
      7319 North 16th Street
      Phoenix, AZ 85020

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November 2023, I electronically transmitted the foregoing document to be filed electronically with the Clerk of the Court using the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

  */s/   Danielle Cole*

# EXHIBIT 13

Previously filed without Bates labels as (Doc. 319-13) and should replace (Doc. 319-13).

Thomas W. Young, MD, FAAFS, FASCP, FCAP
Board Certified Forensic Pathologist

12717 Oakmont Drive
Kansas City, MO 64145
Telephone: (816) 941-2896
Fax: (816) 255-2126
Cell: (816) 803-4079
E-mail: tyoung532@kc.rr.com
Website: www.heartlandforensic.com

March 24, 2022

DeeAn Gillespie Strub, Esq.
Gillespie Shields & Associates PC
7319 N 16th St Suite 100
Phoenix, AZ 85020

Re: Duvall v. Arizona Department of Child Safety, et al

Dear Ms. Gillespie Strub:

In accordance with your request for a another opinion, I viewed multiple records, including the Complaint, the Ruling Dismissing Dependency Action, multiple photographs of the baby at birth and in the hospital, multiple transcripts of testimony from witnesses and medical experts, reports from Todd Lefkowitz, MD, and Steven Gabaeff, MD, medical records, multiple items labeled "miscellaneous documents," and imaging from the hospital.

The following items include both my observations and my opinions made to a reasonable degree of medical certainty. My reasonably certain opinions follow the Inferential Test (IT), to wit:

> One can be reasonably certain if witness accounts of the past are consistent or not consistent with physical evidence in the present, but one cannot reliably surmise past events from physical evidence unless there is only one plausible explanation for that evidence.

Although this statement should be self-evident, a discussion of the logic supporting it is attached to this report.

Following their evaluation of Swayde Zakai Sankey, physicians in the emergency department expressed concern over the following "constellation of findings: Bilateral chronic SDH [subdural hemorrhages], intramural granulation tissue, bilateral distal tibia bucket handle fractures, R tibial diaphysis periosteal reaction, and bruising in a non-ambulatory child." These findings were "highly concerning for inflicted trauma." Although the parents of the infant were "adamant that inflicted trauma is not a possibility," the doctors insisted "every attempt should be made to ensure the safety of this child while the investigation continues."

Physicians have a responsibility to make sure vulnerable infants are safe, so "every attempt" to "ensure the safety of this child" is appropriate. There is also nothing wrong with being highly concerned or even suspicious, *as long as it is recognized that an expression of suspicion is uncertain.* A suspicion is a guess that may in the end be unfounded.

No physician can validly claim to know whether or not the physical findings in an infant are

from child abuse. Child abuse involves complex — or more than one — past events. First there needs to be an abusive intent. Then that intent has to lead to abusive behavior. The intent and the behavior have to fit seamlessly into what happened before the intent and what happened after the behavior. No doctor can *know* if such complex events certainly occurred in the past from examining a child in the present. They can only *guess* or be suspicious.

What happened to Swayde Sankey is complicated. Each of the conditions of great concern to the Emergency Department physicians — chronic subdural hematomas, fractures in the distal tibias, periosteal reactions in long bones, retinal hemorrhages, and even areas of bruising and bleeding — may have many causes other than abusive trauma. A fetus and infant undergoes many complex changes during the harrowing journey of development. Many developments have poorly understood antecedents. Consider that "chronic" subdural hemorrhages in nearly-two-month-old infant Swayde — "chronic" meaning long-lasting" — may go all the way back to his birth or even before. Problems with head trauma during the delivery or hypoxia (lack of oxygen in the infant) made evident by the meconium staining of the amnionic fluid could have led to the subdural hemorrhages that enlarged and re-bled over time. Such rebleeding hemorrhages may also produce fibrin degradation products and fibrin-degrading enzymes that can lead to other bleeding issues in the infant, including retinal hemorrhages and easy bruising. Also, a host of antecedent issues may impair fetal nutrition or movement of the fetus in the womb, leading to delays in bone hardening and consequent easy fracturing. A doctor who glibly diagnoses child abuse fails to recognize the vast complexity of what can go on in a developing fetus or infant.

But as complex as fetal and infant development may be, even more complex are potentially hypervariable past events. Trying to correctly guess complex past events that can take on variable outcomes over split seconds is like trying to guess correctly each letter, number, or special character in an exceedingly long computer password. This is why "one cannot reliably surmise past events from physical evidence." To do so would be to guess correctly something exceedingly complicated, and that is not possible.

Ophthalmologist Brendan P. Cassidy was under the impression that he could accurately guess what happened to Swayde from an examination of his retinas. The doctor declared from his examination that abusive head trauma "could be related to a single massive crush injury to the skull, massive single acceleration/deceleration injury, or a repetitive acceleration/deceleration injury." Dr. Cassidy didn't understand the absurdity of his declaration. He would not know whether any of these scenarios made any sense with what anyone actually saw. His statements don't even make sense with the lack of evidence of trauma in the hospital photographs.

What about what would be likely? Shouldn't we consider the likelihood of abuse in the interest of protecting children? Many doctors believe that the unwitnessed abuse they diagnose is likely because they diagnose it repeatedly without challenge. Over many years, criminal courts have trusted the doctors, so doctors reinforced by that trust repeatedly diagnose child abuse, entering into a cycle of repeated confirmation bias, all the while failing to recognize the absurdity of offering complex past event diagnoses like "abusive

head trauma" and "child abuse." They rely on confessions as confirmation without recognizing the numerous instances where confessions have been falsely offered.

In their zeal to protect children, the Department of Child Safety accepted the faulty notions of doctors like Dr. Cassidy, not recognizing that even though doctors may diagnose effectively what goes on with their patients in the present, they cannot determine the complex succession of events of the past. DCS could have learned what happened in the past if they had, with an open mind, compared witness accounts of the past to the physical evidence outcome. DCS could have performed an investigation easily and quickly without removing Swayde from the custody of his parents. All that would have been needed would be to ask two questions:
- Did anyone see anyone else do anything abusive to the infant?
- If there was witnessed abuse, did the physical evidence outcome "make sense" with what was witnessed?

In Swayde's case, there was no witnessed abuse, so there would be no valid reason to conclude or even diagnose child abuse. No one saw anything remotely resembling abuse.

Even though the development of a fetus and infant is exceedingly complicated and even though a succession of past events that has never occurred before or will ever occur again is complicated, investigation of a case of suspected child abuse is simple. It involves finding out what witnesses saw and comparing what was seen with the physical evidence outcome.

To boil it down to its simplest form, real child abuse is witnessed by someone. False child abuse is diagnosed by doctors. What I have just stated is valid deductively and exceedingly strong inductively.

Respectfully submitted,

*Thomas W. Young*

Thomas W. Young, MD