**GUST ROSENFELD  P.L.C.**
Kari B. Zangerle, No. 013164
Robert C. Stultz, No. 025781
kzangerle@gustlaw.com
rstultz@gustlaw.com
One East Washington Street, Suite 1600
Phoenix, Arizona  85004-2553
(602) 257-7422
Fax: (602) 254-4878

*Attorneys for Defendants Phoenix Children's Hospital; Dr. William S. Wood*
*and Rachel Wood; Dr. Kathryn Coffman; Haley Dietzman and*
*Roald Dietzman; Zachary Dion; and Carey Lewis*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, an individual; Donald Sankey, Junior, an individual; S.Z.S., a minor, through his parents and guardians Honor Duvall and Donald Sankey,<br><br>Plaintiffs,<br><br>v.<br><br>Arizona Department Of Child Safety, a governmental entity; *et al.*,<br><br>Defendants. | Case No.:  21-CV-00167-PHX-ROS<br><br>**THE PCH DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

Defendants  Phoenix  Children's  Hospital,  Dr.  William S.  Wood  and  spouse
Rachel Wood, Dr. Kathryn Coffman, and Haley Dietzman and spouse Roald Dietzman
("PCH Defendants"), through counsel, submit their Response to Plaintiffs' Motion for
Partial Summary Judgment. (Doc. 319).

At this late stage of briefing, the general contours of this case are familiar. In February 2019, S.Z.S., only 60 days old, presented to Phoenix Children's Hospital with a constellation of injuries generally recognized and accepted as indicative of suspected child abuse: subdural hematomas, bilateral retinal hemorrhages, and a metaphyseal fracture. S.Z.S.'s parents provided no explanation for S.Z.S.'s injuries. In this litigation, Plaintiffs have not disclosed an expert witness to testify that any of the PCH Defendants fell below standard of care or the cause of S.Z.S.'s injuries, to a reasonable degree of medical probability. In contrast, the PCH Defendants have disclosed ten expert witnesses to testify, from their respective medical specialties, that the most likely cause of S.Z.S.'s injuries was abuse; it was reasonable for the PCH Defendants to suspect child abuse; and as mandatory reporters, the suspected abuse had to be reported to DCS.

Plaintiffs move for summary judgment on one issue and two claims. First, Plaintiffs argue that the factual findings and judgment of the State juvenile court should be binding in this case. Plaintiffs' argument fails, because the PCH Defendants were not parties to the State court proceedings. Moreover, the issues were different, and the State, not the PCH Defendants, directed the trial strategy and presentation of evidence. Plaintiffs' request for summary judgment on this issue should be denied.

Second, Plaintiff's move for summary judgment on the civil conspiracy claim. In doing so, Plaintiffs attempt to expand the claim to include Dr. Coffman, PCH, and Haley Dietzman, FNP. However, Plaintiffs pled the civil conspiracy claim against only Dr. Coffman, Dr. Wood, and an unidentified social worker. Plaintiffs later dropped the claim against Dr. Wood and the unidentified social worker. This Court previously ruled that Plaintiff did not assert a conspiracy claim against PCH. (Doc. 278, at p. 3, lns. 20-21.) There is no evidence supporting the claim against Dr. Coffman, and therefore, summary judgment should be denied.

1    Third, Plaintiffs move for summary judgment on the medical negligence claim

2  against Dr. Wood, on the basis that his medical records purportedly contained

3  inaccuracies. Plaintiffs' argument fails for several reasons. First, Plaintiffs fail to take

4  into account the higher burden of proof requiring malice, pursuant to A.R.S. § 13-

5  3620(J). Second, Plaintiffs do not have the required expert witness to testify that Dr.

6  Wood breached the standard of care, and the allegations against Dr. Wood do not fit

7  within the narrow exception in which an expert witness is not required. Third, there is

8  no evidence that the purported inaccuracies in Dr. Wood's medical records were

9  reviewed and relied on by other providers, or in any way impacted S.Z.S.'s medical

10  care. Plaintiffs' request for summary judgment should be denied.

11    This Response is supported by the below Memorandum of Points and Authorities

12  and the entire Court record.

13             **MEMORANDUM OF POINTS AND AUTHORITIES**

14  **I.    BACKGROUND**

15    On February 21, 2019, Plaintiff Honor Duvall brought S.Z.S. to the Emergency

16  Department at Phoenix Children's Hospital, with a chief complaint of hematemesis

17  (vomiting blood). (Doc. 314, at ¶ 1.) Resident Kathleen Outcalt, M.D. and emergency

18  medicine physician Anthony Pickett, M.D. evaluated S.Z.S., who was noted to be 60

19  days old and born with no complications. (Doc. 314, at ¶ 2.) Bruising was identified

20  around the diaper area and chest, as well as conjunctival hemorrhage in his eyes and

21  hematemesis (vomiting blood). (Doc. 314, at ¶ 3.)

22    S.Z.S. received a skeletal survey, which includes X-rays of the entire body. (Doc.

23  314, at ¶ 4.) X-rays of the lower extremities revealed a right tibial fracture and a concern

24  for a left tibial fracture.  (Doc. 314, at ¶ 5.) The radiologist's impression included right

25  and left tibial bucket handle metaphyseal fractures. (Doc. 314, at ¶ 6.)

26

Based on the results of the skeletal survey, Dr. Outcalt contacted the Child Protection Team.   (Doc. 314, at ¶ 7.)   S.Z.S. was admitted to Phoenix Children's Hospital for further work-up. On the same day of his presentation and admission, he received a CT of the head, which the radiologist reported as demonstrating "findings worrisome for extra-axial blood products of variable ages. Recommend MRI brain to exclude sequela of repetitive trauma (SNAT)[*i.e.*, suspected non-accidental trauma]." (Doc. 314, at ¶ 8.)

On February 21, 2019, social worker Marie McCormack performed a SNAT Initial Medical Assessment. (Doc. 314, at ¶ 9.)  Plaintiff Duvall denied any known falls, drops, trauma, or car accidents that could have caused S.Z.S.'s injuries. (Doc. 314, at ¶ 10.) After the assessment, Ms. McCormack reported the situation to the Arizona Department of Child Services (DCS).  (Doc. 314, at ¶ 11.)

On February 22, 2019, pediatric ophthalmologist Defendant Brendan Cassidy, M.D. performed a consultation on S.Z.S. (Doc. 314, at ¶ 12.) After examining S.Z.S., Dr. Cassidy noted that S.Z.S. had hemorrhages in both retinas that were "most consistent with abusive head trauma, could be related to a single massive crush injury to the skull, massive single acceleration/deceleration injury, or a repetitive acceleration/deceleration injury." (Doc. 314, at ¶ 13.) That same day, S.Z.S. underwent an MRI of the brain, which showed bilateral frontal and parietal extra-axial fluid collections most compatible with chronic bilateral hematomas, and left greater than right frontal convexity curvilinear foci of gradient echo hypointensity likely representing thrombosed cortical veins (bleeds of varying dates in his brain). (Doc. 314, at ¶ 14.)

On February 22, 2019, DCS entered an initial Present Danger Plan. (Doc. 314, at ¶ 15). Under the initial Present Danger Plan, S.Z.S. could remain in the home, and his parents had unlimited supervised contact. *Id*.  DCS subsequently made changes to the

Present Danger Plan.

On February 23, 2019, S.Z.S. was discharged from PCH. (Doc. 314, at ¶ 16.)  On February 28, 2019, pediatric orthopedic surgeon Defendant William Wood, M.D. saw S.Z.S. for the first time at an initial visit in the clinic. (Doc. 314, at ¶ 17.) This was Dr. Wood's only interaction with S.Z.S.  Based on the imaging, Dr. Wood's assessment included a corner metaphyseal fracture of the right tibia with associated periosteal reaction. (Doc. 314, at ¶ 18.) Dr. Wood explained to Plaintiff Duvall that these fractures in a child of S.Z.S.'s age are often due to non-accidental trauma. (Doc. 314, at ¶ 19).

On March 7, 2019, Defendant Haley Dietzman, FNP saw S.Z.S. at the Childhelp Center. Ms. Dietzman was a member of the Child Protection Team. (Doc. 314, at ¶ 20.) Due to a 2 cm increase in circumference size of S.Z.S.'s head, Ms. Dietzman recommended they return to PCH's Emergency Department. (Doc. 314, at ¶ 21.) S.Z.S.'s mother was reluctant to return and asked to speak with Defendant Kathryn Coffman, M.D.  (Doc. 314, at ¶ 22.) Dr. Coffman agreed that S.Z.S. should receive further evaluation at PCH. (Doc. 314, at ¶ 23.)

Later that same day, S.Z.S. was brought to PCH's Emergency Department. Fellow Geet Gandhi, D.O. and emergency medicine physician Benjamin Thompson, M.D. evaluated S.Z.S. (Doc. 314, at ¶ 24.) They ordered a skeletal survey and an MRI. *Id*. S.Z.S. was admitted to the Intensive Care Unit. (Doc. 314, at ¶ 25.)

Also on March 7, 2019, Richard Southard, M.D. reported the results of the skeletal survey follow up. (Doc. 314, at ¶ 26.) Dr. Southard's impression included progression of healing of bucket handle fracture distal right tibia with residual periosteal reaction right tibial diaphysis. *Id*.

That same day, social worker Kara Kelly contacted the Arizona Child Abuse Hotline, because Plaintiff Duvall refused an ophthalmology eye exam for S.Z.S. (Doc. 314, at ¶ 27.) Ms. Kelly noted that the family's behavior continued to escalate to the

1  point of interfering in medical treatment and examination. (Doc. 314, at ¶ 28.)

2  The following day, on March 8, 2019, S.Z.S. underwent an MRI of the brain

3  under anesthesia, which showed an increase in size of the left convexity subdural

4  collection – that is, an increase in the collection of fluid. (Doc. 314, at ¶ 29.) This

5  required S.Z.S. to undergo a surgical procedure to place a left-sided subdural drain.

6  (Doc. 314, at ¶ 30.)

7  Also on March 8, 2019, Dr. Coffman saw S.Z.S. at PCH. (Doc. 314, at ¶ 32.) Dr.

8  Coffman noted that "[t]he presence of bilateral subdural hemorrhages, bilateral

9  extensive retinal and vitreous hemorrhages, and classic metaphyseal fracture of the

10  distal tibia is very concerning for inflicted injury." *Id*. Dr. Coffman further noted that the

11  work up has included extensive bleeding evaluation and bone labs, which were normal.

12  (Doc. 314, at ¶ 33.)

13  For the next several days, S.Z.S. remained under the care of a team of providers,

14  and the subdural drain remained in place to drain the fluid. (Doc. 314, at ¶ 34.) On

15  March 11, 2019, S.Z.S. was evaluated by a different ophthalmologist, Christopher

16  Fecarotta, M.D. (Doc. 314, at ¶ 35.) Like in the earlier evaluation at PCH, Dr. Fecarotta

17  noted the presence of bilateral retinal hemorrhages. *Id*.

18  On March 13, 2019, Dr. Taryn Bragg, a pediatric neurosurgeon, clamped the

19  subdural drain catheter. (Doc. 314, at ¶ 36.) The next day, Dr. Bragg removed the

20  subdural drain. (Doc. 314, at ¶ 37.) At her deposition, Dr. Bragg testified that S.Z.S.'s

21  subdural hematomas were inconsistent with subdural hematomas from childbirth. (Doc.

22  333-7.) On March 16, 2019, S.Z.S. was discharged from PCH. (Doc. 314, at ¶ 38.)

23  ## II.    RESPONSE TO PLAINTIFFS' BACKGROUND SECTION.

24  Throughout Plaintiffs' Background section, they cite to and discuss facts that are

25  irrelevant to the issues presented in their Motion and lack foundation. Plaintiffs discuss

26  their educational background, work history, and race. None of these facts are relevant to

the issues presented in Plaintiffs' Motion. Plaintiffs have half-heartedly injected race into the case, by referring to themselves as African American and several of the providers as Caucasian. Plaintiffs have not argued that the care S.Z.S. received was in any way affected by race. In fact, Dr. Pickett, the PCH Emergency Room physician who first treated S.Z.S. and suspected non-accidental trauma, is African American and has denied that race played any role in the care provided by him or his resident Kathleen Outcalt, M.D. (Doc. 341, at p. 5-6.)

Plaintiffs state that Donald Sankey and Honor Duvall had viral infections in early February 2019, and S.Z.S. had a high White Blood Cell count. This also is irrelevant, lacks foundation, and does not explain the constellation of S.Z.S.'s injuries. Plaintiffs do not have an expert to testify S.Z.S. had an illness to explain his condition.

Plaintiffs argue that doctors not on the Child Protection Team (CPT) told S.Z.S.'s family that the test results were normal or not worrisome for abuse, and that they did not suspect abuse. (Doc. 319, at p. 5, lns. 3-4.) For the purported evidence, Plaintiffs cite to an inadmissible hearsay timeline written by Plaintiff Honor Duvall. (Doc. 319-10.) The medical records do not support Plaintiffs' argument. For example, Dr. Pickett, discussed above, was not on the CPT, and he suspected abuse.

Plaintiffs state that S.Z.S.'s birth was traumatic. (Doc. 319, at p. 3, lns. 11-16.) Plaintiffs cite to testimony from Defendant Kathryn Coffman, M.D. from the State juvenile court proceedings. Dr. Coffman's testimony was offered in general, and she is not an obstetrician and was not present for S.Z.S.'s birth. Notably, Plaintiffs ignore the testimony of Jordan Oland, M.D., the obstetrician who delivered S.Z.S.:

> Q.   Typically, babies that have had some type of injury to their brain that is sufficient to cause an injury, it will be reflected in changes in their assessment at the time of birth, which can be reflected in their Apgar scores?
>
> A.   Yes.

1    Q.   And this baby had normal Apgar scores?

2    A.   Yes.

3
4    Q.   You saw the head, which was marked as Exhibit No. 8, I
     believe. When you see those newborn pictures of [S.Z.S],
5    does that cause you any concern about an abnormal shape of
     the head?
6
7    A.   No.

8    Q.   Babies, in their skull, their fontanels are open, are they
     not?
9
10   A.   Correct.

11   Q.   And that allows the skull to mold, and during the labor
     process, to allow for a baby to fit through the vagina and
12   cervix; correct?

13   A.   Yes.
14
15   Q.   And that is a normal process that occurs as part of labor
     and delivery, that that head can take a different shape in order
16   to allow descent of the baby?

17   A.   Yes.
18
19   Q.   And even though a baby may present, as exhibited in
     Exhibit No. 8, with what some people might refer to as
20   having a little bit of coning or -- I think "caput" is the medical
     term; correct?
21
22   A.   Yes.

23   Q.   That doesn't indicate that there's an injury to the brain?

24   A.   Caput is normal.
25
     Q.   And so you see that in most vaginal deliveries?
26

A.   Yes.

(**Exhibit 1**, at p. 125, ln. 1 – p. 126, ln. 11.) Moreover, Dr. Oland testified that the presence of thin meconium (a bowel movement by the fetus) is normal and, specifically in the case of S.Z.S., the meconium was not associated with any trauma. (**Ex. 1**, at p. 49, ln. 22 – p. 50, ln. 20; p. 110, ln 20 – p. 111, ln. 8.)

The PCH Defendants disclosed Dr. Sarah Wagner, a board certified obstetrician and a fellow of the American College of Obstetricians and Gynecologists. (Doc. 130-1 at 361.) In her initial report, Dr. Wagner stated that the labor and delivery of S.Z.S. did not cause S.Z.S.'s injuries present at PCH on February 21, 2019. Dr. Wagner will testify that the labor and delivery were managed appropriately. (Doc. 130-1 at 362.) The management of the second stage in S.Z.S.'s labor and delivery is unrelated to the clinical presentation at PCH several months later. (*Id*.) In a supplemental report dated January 24, 2023, Dr. Wagner opined, "The absence of abnormal labor or operative delivery indicates the likelihood of a subdural hemorrhage caused by labor is exceedingly low. It is clear that the management of the second stage in this patient's course is unrelated to the clinical presentation of their infant several months later." (Doc. 333, at p. 10, lns. 6-16.) In short, S.Z.S.'s delivery was not traumatic or a cause of his injuries.

Plaintiffs contend that their pediatrician recommended the parents take S.Z.S. to PCH to evaluate a possible bleeding disorder. (Doc. 310, at p. 3, lns. 21-24.) Plaintiffs cited Exhibit 2 for that statement, but the cited exhibit does not support their contention. They also fail to acknowledge that the pediatrician, Dr. Heather Gosnell, suspected abuse:

> BY MS. ZANGERLE:
> Q.  And when you were involved in caring for Swayde during the year 2019, you noted in your medical record that you had some concerns that this baby had been involved in nonaccidental trauma; fair?

1        MR. CONNELLY: Form. Foundation.

2        THE WITNESS: Yes.

3

4        BY MS. ZANGERLE:
        Q.  And that was based upon your training as a pediatrician
5        and the information that you reviewed based upon a variety of
        specialists as well as information you took during your
6        examination and discussions with family?

7        MR. CONNELLY: Form. Foundation.

8        THE WITNESS: Yes.

9

10       BY MS. ZANGERLE:
        Q.  As you sit here today, do you still hold the opinion that --
11      based upon the information that you reviewed, that this child
        had been -- was a potential victim of SNAT?
12

13       MR. CONNELLY: Form. Foundation.

14       THE WITNESS: Yes.

15

16       BY MS. ZANGERLE:
        Q. And I'm asking you that as the child's treating pediatrician.
17      Based upon the materials you reviewed from the various
        examinations during your care and treatment, you formed an
18      opinion that it was reasonable to investigate the possibility of
        nonaccidental trauma for this child's various medical
19      conditions?

20       A.  Yes.

21
  (Doc. 333, at p. 27-28.) S.Z.S.'s pediatrician suspected that he had been abused and
22
  further investigation was reasonable.
23
       Plaintiffs allege that Defendant Haley Dietzman, FNP performed a forensic
24
  examination of S.Z.S. without his parents' consent. Ms. Dietzman's examination was
25
  covered by the consent in the Conditions of Admission signed by S.Z.S.'s mother.
26
  (**Exhibit 2**, at PCH 1206 – 1207 cycn; **Exhibit 3**, deposition testimony of Ms.

Dietzman, at p. 144, ln. 24 – p. 145, ln. 10.) Not only is Plaintiffs' allegation not true, it is irrelevant to the issues before the Court. Plaintiffs also have disclosed no expert witness to testify that Ms. Dietzman did not comply with the standard of care, including with consent issues.

With respect to S.Z.S.'s bilateral retinal hemorrhages, Plaintiffs question pediatric ophthalmologist Dr. Brendan Cassidy's diagnosis of bilateral retinal hemorrhages. To do so, Plaintiffs rely on Dr. Warren Heller, an ophthalmologist not affiliated with PCH who saw S.Z.S. after the first admission at PCH. Plaintiffs argue that Dr. Heller's examination "revealed nothing alarming about S.Z.S.'s retinas or eyes" and all aspects of his eyes were within normal limits. (Doc. 319, at p. 8, lns. 1-5.) Plaintiffs' own pediatric ophthalmology expert, Dr. Todd Lefkowitz, discredited Dr. Heller:

> Q.  Did you see in your review of the records from Dr. Heller's visit with this baby that he documented performing a slit lamp exam?
>
> MR. CONNELLY:  Form.  Foundation.
> THE WITNESS:  Yeah, I saw that, and I don't believe it.
>
> And I know Dr. Heller personally.  And it wouldn't surprise me that he just ignored -- that he used the template. And basically it's the template that applies to adult exams.
>
> Now, if it were me, and I was using the – the sheet for the progress note, I would have crossed out things like "slit lamp."
>
> I just would have mentioned an assessment of the vision, what the eye muscle situation was, and then the dilated fundus exam.
>
> But Dr. Heller is kind of old, and I – I think he's way beyond the time he should be in his practice, so I would ignore any information from his practice.

1    And I think that most of my colleagues in the Valley
2    would say the same thing.

3    BY MS. PATANE:
     Q.   And is that the case, then, for anything from his practice
4    from 2019?

5    A.   Mm-hmm.

6
7    MR. CONNELLY:  Form.  Foundation.

8    BY MS. PATANE:
     Q.   Is that a "yes"?
9
10   A.   Yes.

11   (Doc. 341, at p. 8-9.) S.Z.S. was seen by two pediatric ophthalmologists at PCH who

12   observed retinal hemorrhages (Dr. Cassidy, and Dr. Fecoratta, whose care is not at issue

13   this case), *supra*.

14   The PCH Defendants disclosed Dr. Jonathan Horton, a board-certified

15   ophthalmologist, who will testify that Dr. Cassidy complied with the standard of care

16   and that S.Z.S.'s retinal hemorrhages, observed by two pediatric ophthalmologists at

17   PCH in 2019, could not have been caused by childbirth. (Doc. 130-1 at 134.) Dr. Horton

18   is a Professor of Ophthalmology, Neurology, and Physiology at the University of

19   California, San Francisco (UCSF), where he holds the William F. Hoyt endowed chair

20   of Ophthalmology. (*Id*.) He also serves as a Pediatric Ophthalmologist and Neuro-

21   Ophthalmologist at the Benioff Children's Hospital, UCSF. (*Id*.) Dr. Horton holds a

22   Medical Degree from Harvard Medical School and a Ph.D. in Neurobiology from

23   Harvard. (*Id*.)

24   Dr. Horton will testify that S.Z.S.'s clinical evaluation, including by

25   ophthalmologist Dr. Cassidy, was professional, appropriate, and diligent. (Doc. 130-1 at

26   135.) In his initial report, Dr. Horton opined regarding the hemorrhages present in the

1   retinas of both eyes. Dr. Horton disagrees with Plaintiffs' allegation that the injuries
2   occurred during labor and delivery.[1] (Doc. 130-1 at 136.) According to Dr. Horton,
3   Plaintiffs' explanation is inconsistent with S.Z.S.'s condition at PCH. (*Id*.)  Any retinal
4   hemorrhages that might have occurred during childbirth would have resolved by the
5   time of Dr. Cassidy's examination two months later. (*Id*.) Dr. Cassidy's examination
6   showed findings consistent with an acute injury that occurred in close temporal
7   proximity to S.Z.S.'s admission to PCH on February 21, 2019. (*Id*.) Dr. Horton will
8   testify that the injuries present at the time of that admission suggest non-accidental
9   trauma as the most likely cause. (Doc. 130-1 at 137.)

10    On January 4, 2023, Dr. Horton prepared a supplemental report. (Doc. 333, at p.
11  6, lns. 9-15) In the supplemental report, Dr. Horton opined that the extent and features
12  of S.Z.S.'s ocular hemorrhages were highly consistent with a diagnosis of non-
13  accidental trauma. (*Id*.)

14    With respect to S.Z.S.'s metaphyseal fracture, Plaintiffs attempt to call the
15  diagnosis into question by arguing that the initial skeletal survey was misinterpreted and
16  that a subsequent X-ray, from Valley Radiology, showed no left fracture and a
17  "possible" right fracture. Note that the right and left in the Valley Radiology report were
18  mixed up, as reflected in the difference between the radiology report findings and
19  Plaintiffs' description of the findings. Moreover, the Valley Radiology report indicated
20  that the left radiographs were of "limited" value due to the child's movement and
21  recommended repeated radiographs, which were done at PCH. (Doc. 319-29.) Plaintiffs
22  have failed to disclose a radiology expert to testify on the imaging or S.Z.S.'s injuries.

23    The PCH Defendants disclosed Dr. Charles Maxfield, who is board certified by
24  the American Board of Radiology in Diagnostic Radiology with subspecialty

25

26  [1]  Plaintiffs have disclosed no obstetrics expert to testify that S.Z.S.'s injuries were caused by
     the labor and delivery approximately 60 days before his presentation to PCH.

certification in Pediatric Radiology. (Doc. 130-1 at 202.) He is a Professor of Radiology and Pediatrics at Duke University, where he also serves as the Chief of Pediatric Radiology and the Vice Chair of Education for the Department of Radiology. (*Id.*)

At his deposition, Dr. Maxfield testified that metaphyseal fractures are pathognomonic, or virtually diagnostic, for child abuse. (Doc. 315-5, at p. 36, lns. 11-15.) Dr. Maxfield also testified that S.Z.S. unequivocally had a right metaphyseal fracture, and it was reasonable to suspect a left metaphyseal fracture:

> Q. And, Doctor, you've written about this in your report, but in your review of the two skeletal surveys from PCH and the imaging from Valley Radiology, did you observe on the imaging a metaphyseal fracture in this child?
>
> A. Yes.
>
> Q. Is there any doubt in your mind that all three sets of imaging show a metaphyseal fracture?
>
> A. All three studies unequivocally show a metaphyseal fracture of the distal right tibia. I believe a fracture may have been questioned on the left on the first study, which I think is reasonable, but I think it didn't pan out, and I think probably there was not a fracture on the left side.
>
> Q. On the right side it's unequivocal that there's a metaphyseal fracture?
>
> A. Unequivocal, yes.

(**Exhibit 4**, at p. 123, lns. 7-23.) Plaintiffs failed to disclose a witness to testify, to a reasonable degree of medical probability, as to the cause of S.Z.S.'s right metaphyseal fracture, which is pathognomonic for child abuse.

Plaintiffs also argue that a bone scan should have been performed to confirm the right metaphyseal fracture. Dr. Maxfield disputes this point. He testified that bone scans are no longer performed for metaphyseal fractures, because bone scans are not as good

1   as X-rays in detecting metaphyseal fractures. (**Ex. 4**, at p. 34, lns. 1-18.) In S.Z.S.'s care,

2   a bone scan would have played no role, due to the definite metaphyseal fracture. (**Ex. 4**,

3   at p. 35, lns. 10-21.)

4       Plaintiffs contend that there were inaccuracies in Dr. Wood's medical record.

5   These allegations are irrelevant. There is no evidence that any other provider reviewed

6   and relied on the purported inaccuracies, or that S.Z.S.'s care was impacted in any way

7   by the inaccuracies. Moreover, as discussed below, the standard of care does not require

8   100 percent accuracy in medical records. Plaintiffs have failed to disclose an expert to

9   testify that Dr. Wood breached the standard of care, whereas the PCH Defendants have

10  disclosed Dr. Steven Frick to testify that Dr. Wood complied with the standard of care.

11  *See* Section III.c. below.

12      Plaintiffs make several false claims about Dr. Coffman. For example, citing

13  Exhibit 21, Plaintiffs claim that Dr. Coffman tried to influence Jeff Duncan, the DCS

14  OCWI investigating supervisor, to remove S.Z.S. (Doc. 319, at p. 10, lns. 12-14.)

15  Exhibit 21, upon which Plaintiffs rely, makes no reference to Dr. Coffman. (Doc. 319-

16  21.)   Plaintiffs then contend that Dr. Coffman intervened with DCS Director Greg

17  McKay. (Doc. 319, at p. 10, lns. 14-22.) At his deposition, Mr. McKay denied any such

18  suggestion of collusion regarding S.Z.S. Mr. McKay testified that he does not recall Dr.

19  Coffman telling him any specifics about S.Z.S, and Dr. Coffman was "not a decision

20  maker for this organization." (Doc. 314, at ¶ 94.) Similarly, Dr. Coffman testified that

21  she would not have suggested DCS take custody of S.Z.S. and file a dependency

22  petition, as that was not her role. (**Exhibit 5**, at p. 227, lns. 14-22.)

23      Plaintiffs reference the Buckeye Police Department investigation and no criminal

24  prosecution related to S.Z.S.'s injuries. This is irrelevant to the issues in the case at bar.

25  The burden of proof in a criminal matter is higher than a civil case. Moreover, the issues

26  are different. As discussed below and in the PCH Defendants' other filings, the PCH

Defendants are mandated reporters for suspected abuse. They are obligated to make a report when there is a reasonable basis to believe a child has been abused. That is a much lower standard than seeking and obtaining a criminal conviction, which is beyond the scope of healthcare providers.

The PCH Defendants were not parties to, and had no control over, the dependency action in the State juvenile court. DCS's Dependency Petition and Petition for Paternity and/or Child Support, filed by the Attorney General's office, lists the parties as DCS, S.Z.S., Honor Nacole Duvall, and Donald Ray Sankey, Jr. (Doc. 319-44, at p. 1-3.) In Plaintiffs' Motion for Partial Summary Judgment, they state, without any factual support, that "PCH, through its general counsel, and Drs. Cassidy and Wood worked closely with the assistant attorney general prosecuting the dependency for DCS." (Doc. 319, at p. 21, lns. 12-14.) This is inaccurate. *See* Section III.A.3. below. The State brought and prosecuted the dependency action. The State controlled who was called, or not called, as witnesses. The State decided trial strategy. Plaintiffs engage in irrelevant and inadmissible speculation as to why the State did not call certain witnesses in the State juvenile court (e.g., Doc. 310, at p. 12). As can be seen by the evidence presented in this case, had the PCH Defendants been parties to, and had control over, the prosecution of the dependency action, the evidence and trial strategy would have been different.

In the Motion, Plaintiffs inaccurately claim the State juvenile court found S.Z.S. was not abused (Doc. 319, at p. 11, lns. 13-14.) That is not true. The State juvenile court found "that the Department [i.e., DCS] did not meet its burden of proof in this case and the evidence fails to establish that there is a dependency as to either parent." (Doc. 319-22, at DUVALL_000052). The State juvenile court ruled that DCS had not met its burden of proof. The State juvenile court did not make an affirmative finding of no abuse. In fact, the juvenile court concluded, "Dr. Steven Gabaeff is an expert hired by

1  the parents. He testified that based on his review of the records that there was no abuse

2  in this case. The Court did not find his testimony credible."

3  **III.    LEGAL ARGUMENT**

4          Summary judgment is "appropriate when 'there is no genuine dispute as to any

5  material fact and the movant is entitled to judgment as a matter of law.'" *Mayes v.*

6  *WinCo Holdings, Inc.*, 846 F.3d 1274, 1277 (9th Cir.2017)(quoting Fed. R. Civ. P.

7  56(a)). The Court must accept the nonmoving party's evidence as true. *Id.* Inferences

8  must be drawn in the light most favorable to the nonmoving party. *Id*.

9          **A.    The Juvenile Court's Factual Findings and Judgment Are Not**

10         **Binding In This Case.**

11         Without any expert witnesses to testify, to a reasonable degree of medical

12  probability, as to the cause of S.Z.S.'s constellation of injuries, the centerpiece of

13  Plaintiffs' strategy is to try to impose the State juvenile court's judgment on this Court.

14  In doing so, Plaintiffs rely on three failing arguments: the *Rooker-Feldman* Doctrine,

15  claim preclusion, and issue preclusion. Plaintiffs' request for summary judgment on this

16  issue should be denied.

17                  **1.    The Rooker-Feldman Doctrine Is Inapplicable.**

18         The *Rooker-Feldman* Doctrine is inapplicable in this case. It is a jurisdictional

19  doctrine intended to bar improper de facto appeals, by plaintiffs, from state court

20  judgments. The PCH Defendants were not parties to the State juvenile court proceedings

21  and have not sought relief in this Court from the State court's ruling. The PCH

22  Defendants simply have defended the claims brought by Plaintiffs.

23         The Ninth Circuit has held "*Rooker-Feldman* prohibits a federal district court

24  from exercising subject matter jurisdiction over a suit that is a de facto appeal from a

25  state court judgment." *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1139 (9th

26  Cir.2004)(citing *Bianchi v. Rlaarsdam*, 334 F.3d 895, 898 (9th Cir.2003)). The doctrine

is a jurisdictional prohibition, when a plaintiff seeks a de facto appeal of a state court judgment. In determining whether an action is a de facto appeal, the district courts "pay close attention to the *relief* sought by the federal-court plaintiff." *Cooper v. Ramos*, 704 F.3d 772, 777-78 (9th Cir.2012)(quoting *Bianchi*, 334 F.3d at 900). An action is a de facto appeal when the federal-court plaintiff complains of a legal wrong allegedly committed by the state court and seeks relief from the state court judgment. *Id*.

Plaintiffs' reliance on the *Rooker-Feldman* Doctrine is misplaced. It is a jurisdictional doctrine intended to bar plaintiffs from seeking de facto appeals from State court judgments and rulings. As discussed in the previous Section, the PCH Defendants were not parties to the State court juvenile proceedings. There is nothing for the PCH Defendants to appeal, as the judgment in the juvenile proceedings was not applicable to them. Moreover, the PCH Defendants are not the plaintiffs in the case at bar, and the PCH Defendants have requested no relief with respect to the State court juvenile proceedings. The PCH Defendants simply have asserted defenses against the claims brought by Plaintiffs in this case. The *Rooker-Feldman* Doctrine has no application to the PCH Defendants' defense.

### 2.   Claim Preclusion Does Not Apply.

Claim preclusion is not applicable. The claims in the State juvenile action were different than the claims in this case, meaning there is no "identity of claims," a required elements for claim preclusion. Moreover, the State was the party to the juvenile proceedings, not the PCH Defendants. Accordingly, there is no identity or privity between the parties, another required element for claim preclusion.

In civil litigation, claim preclusion "means that 'a final judgment on the merits in a prior suit involving the same parties or their privies bars a second suit based on the same claim.'" *Cocchia v. Testa Trustee of Karen M. Testa Separate Property Trust*, 536 P.3d 273, 279 (App.2023)(quoting *Lawrence T. v. Dep't of Child Safety*, 246 Ariz. 260,

261 ¶ 8 (App. 2019)). For claim preclusion to apply, Plaintiffs must prove "(1) an identity of claims in the suit in which a judgment was entered and the current litigation, (2) a final judgment on the merits in the previous litigation, and (3) identity or privity between parties in the two suits." *Id*.

Arizona and federal courts apply different tests for the identity of claims element. Under Arizona law, for an action to be barred, it must be based on the same cause of action asserted in the prior proceeding. *Phoenix Newspapers, Inc. v. Dep.t' of Corrections*, 934 F.2d 801, 804 (App.1997)(citing *Chaney Bldg. Co. v. City of Tucson*, 148 Ariz. 571, 573, 716 P.2d 28, 30 (1986); *Nienstedt v. Wetzel*, 133 Ariz. 348, 355, 651 P.2d 876, 883 (App.1982)). Arizona applies a restrictive test. *Id*. "If no additional evidence is needed to prevail in the second action than that needed in the first, then the second action is barred." *Id*. This "transactional test" is intended to prevent a plaintiff from reviving "essentially the same cause of action under a new legal theory." *Phoenix Newspapers*, 934 F.2d at 805.

Under federal law, the courts consider four factors for the identity of claims element: (1) whether the rights or interests established by the prior judgment would be destroyed or impaired by prosecution of the second action, (2) whether substantially the same evidence is presented in the two actions, (3) whether the two suits involve infringement of the same right, and (4) whether the two suits arise out of the same transactional nucleus of facts. *GP Vincent II v. Estate of Beard*, 68 F.4th 508, 515 (9th Cir.2023).

Claim preclusion is inapplicable. There is no identity of claims, whether applying the Arizona or federal test. Plaintiffs have asserted claims for civil conspiracy against Dr. Coffman; medical negligence against Dr. Coffman, Dr. Wood, and Ms. Dietzman; and intentional infliction of emotional distress against PCH, Dr. Coffman, Dr. Wood, and Ms. Dietzman. Each of those claims require evidence that was not necessary in the

dependency action. Under Arizona law, no identity of claims exists. *Phoenix Newspapers*, 934 F.2d at 804.

There also is no identity of claims applying the federal test. *See GP Vincent II*, 68 F.4th at 515. The outcome of this case will have no bearing on S.Z.S.'s custody, which was at issue in the juvenile court dependency action. Moreover, as discussed above and in the PCH Defendants' other recent filings, the evidence presented in this case differs from the evidence presented in the juvenile court dependency action, as is to be expected considering the different claims (e.g., whether a conspiracy involving Dr. Coffman occurred, whether there was medical negligence, etc.). The juvenile court dependency action and the case at bar do not involve the same rights. In the juvenile court, S.Z.S.'s custody was at issue. Here, it is not. Moreover, in the juvenile court, the PCH Defendants' civil liability was not at issue, whereas here it is. Finally, the juvenile court dependency action and this case do not arise out of the same transactional nucleus of facts. While there is some overlap with respect to S.Z.S.'s injuries and their cause, the facts here are whether there was a reasonable basis to suspect abuse, whether the providers had a duty to report the suspected abuse, whether there was medical negligence, and whether there was a conspiracy involving Dr. Coffman. None of these facts were necessary for the dependency action.

Claim preclusion also does not apply because there is no identity or privity between the parties in the two suits. As discussed above, the PCH Defendants were not parties to the juvenile court proceedings, and they were not in privity with the State. The State controlled the trial strategy. The State controlled who to call as witnesses, and who not to call. The State decided whether to call expert witnesses. The State decided what evidence to present, what arguments to make, and how to present the case to the court. Because there is no identity of claims, or identity or privity of parties, claim preclusion does not apply. Plaintiffs' request for summary judgment on this issue should be denied.

### 3. <u>**Issue Preclusion Does Not Apply**</u>.

Issue preclusion is inapplicable. The issues in the State juvenile court were different than the issues before this Court, and thus were not litigated in the State court. Moreover, the PCH Defendants were not parties to and did not have a fair and full opportunity to litigate the issues in the State juvenile court.

Issue preclusion is a judicial doctrine intended to prevent a party from relitigating issues of fact or law. *Cocchia*, 536 P.3d at 279 (quoting *Legacy Found. Action Fund v. Citizens Clean Elections Comm'n*, 254 Ariz. 485, __ ¶ 24 (2023)). A party asserting issue preclusion must satisfy four requirements: "(1) the issue at stake is the same in both proceedings; (2) the issue was actually litigated and determined in a valid and final judgment issued by a tribunal with competent jurisdiction; (3) the opposing party had a full and fair opportunity to litigate the issue and actually did so; and (4) the issue was essential to the judgment." *Id.*

Plaintiffs cannot satisfy the elements for issue preclusion. First, the issues at stake are not the same in both proceedings. As discussed above, in the dependency action, S.Z.S.'s custody was at sake, and the PCH Defendants' civil liability was not. Here, the PCH Defendants' civil liability is at issue, and S.Z.S.'s custody is not. The issues at stake in this case (e.g., civil conspiracy, medical negligence, the reasonable basis for reporting suspected child abuse) were not litigated and determined in the juvenile court dependency action.

The PCH Defendants did not have a full and fair opportunity to litigate the issues and did not actually do so. In arguing the contrary, Plaintiffs contend that Drs. Coffman and Wood were called by DCS as witnesses to testify at the trial. Being called as a witness by an actual party to litigation does not mean the witness had a full and fair opportunity to litigate the issues. Plaintiffs further argue that "PCH, through its general counsel, and Drs. Cassidy and Wood worked closely with the assistant attorney general

prosecuting the dependency for DCS." (Doc. 319, at p. 21, lns. 12-14.) That statement is followed by "Ex," but there is no exhibit referenced or evidence cited to support this allegation. It is not true. Although not cited in their argument on claim preclusion, Plaintiffs attached as Exhibit 50 an email exchange between an Assistant Attorney General for the State and an Associate General Counsel for PCH, in which the PCH attorney responded to a request from a governmental authority for information about a bone scan. (Doc. 319-50.) Responding to a request for information does not equate to a full and fair opportunity to litigate issues.

Plaintiffs descend into further irrelevancy and speculation by claiming that Drs. Wood and Coffman worked closely with the State's prosecuting attorneys. (Doc. 319, at p. 21, lns. 14-16.) Plaintiffs make the untenable leap that Dr. Coffman and Dr. Wood being called, by the State, as witnesses in the dependency action means the PCH Defendants had a full and fair opportunity to litigate the issues. Similarly, Plaintiffs make the unsubstantiated argument that Dr. Coffman caused the dependency petition to be filed. As discussed above, Mr. McKay, the DCS Director, denied those allegations. (Doc. 314, at ¶ 94.)

The PCH Defendants were not parties to the juvenile court dependency action and did not control the presentation of evidence. The PCH Defendants did not decide whom to call as witnesses, how to present the evidence, or what arguments to make. The PCH Defendants did not have a full and fair opportunity to litigate the issues, and in any event, the issues were different. Plaintiffs' request for summary judgment based on issue preclusion should be denied.

**B.    Plaintiffs Are Not Entitled To Summary Judgment On The Conspiracy Claim.**

In moving for summary judgment on Claim Six (conspiracy), Plaintiffs impermissibly attempt to extend the conspiracy claim to PCH and Ms. Dietzman,

despite a prior ruling by this Court. In an Order dated May 10, 2023, the Court stated, "As PCH argues, there is no conspiracy claim asserted against PCH." (Doc. 278, at p. 3, lns. 20-21.) In Claim Six, Plaintiffs alleged conspiracy against Dr. Coffman, Dr. Wood, and an unidentified social worker. (Doc. 1, at ¶ 230-235.) Plaintiffs subsequently dismissed the claim against Dr. Wood and the unidentified social worker. (Doc. 307.) Plaintiffs have no evidence of a conspiracy for the only party for which the claim remains pending – Dr. Coffman.

In order to prove a conspiracy between the State Defendants and Dr. Coffman, Plaintiffs must establish "an agreement or 'meeting of the minds' to violate constitutional rights." *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir.1989)(*quoting Fonda*, 707 F.2d at 438)). While each participant in the conspiracy need not know the exact details of the plan, they must at least share the common objective of the conspiracy. *Id*.

In their Motion for Partial Summary Judgment, Plaintiffs provide eight bases for the purported conspiracy. Of the eight arguments, only the last three apply to Dr. Coffman. The others address the purported conduct of individuals not included in the conspiracy claim (e.g., PCH, Ms. Dietzman, and Dr. Outcalt, who is not even a party to the case).

Each of the actions Plaintiffs contend purportedly taken by Dr. Coffman in furtherance of the alleged conspiracy are factually inaccurate and/or do not establish a conspiracy. First, Plaintiffs argue at the March 7, 2019 visit at Child Help, Dr. Coffman forced DCS to require S.Z.S.'s parents to return to PCH, instead of Banner Cardon's Children's Hospital, for further evaluation of an increased head circumference. This is not true. Dr. Coffman testified that she thought S.Z.S. should be seen at PCH, for continuity of care, because he had already been seen there, and his recent medical records were at PCH. (**Ex. 5**, at p. 97, ln. 22 – p. 98, ln. 5; p. 196, ln. 5-23.) Dr. Coffman

1   made no threats. *Id*. When S.Z.S. returned to PCH, he required neurosurgery.

2          Second, Plaintiffs argue that DCS Director Mr. McKay did not order his
3   investigators to take custody of S.Z.S. and file the dependency petition, until after he
4   was contacted by Dr. Coffman.  As discussed above, both Dr. Coffman and Mr. McKay
5   deny these allegations.  As Mr. McKay testified, Dr. Coffman was not a decision maker
6   for DCS.

7          Third, Plaintiffs argue that Defendants Cassidy, Coffman, and Wood testified at
8   the dependency trial to the exclusion of any DCS personnel. This is not evidence of a
9   conspiracy by Dr. Coffman. She had no control over what evidence the State presented
10  at trial.

11         The PCH Defendants have moved for summary judgment on Claim Six alleged
12  against Dr. Coffman. (*See* Doc. 312, at p. 15-19.) As discussed in the PCH Defendants'
13  Motion for Summary Judgment, Plaintiffs have not disclosed an expert to testify that Dr.
14  Coffman breached the standard of care, whereas the PCH Defendants disclosed Dr.
15  Corey Rood, who opines that Dr. Coffman complied with the standard of care. (Doc.
16  312, at p. 15, ln. 15 – p. 17, ln. 5.) If Plaintiffs cannot even prove that Dr. Coffman
17  breached the standard of care by acting unreasonably, they cannot prove she conspired
18  to deprive S.Z.S. and his parents of constitutional rights through the very same conduct
19  that complied with the applicable standard of care.

20         The evidence shows that any actions Dr. Coffman took regarding S.Z.S. were
21  motivated by concern for his wellbeing, and there is no evidence of a common objective
22  to deprive S.Z.S. or his parents of constitutional rights. Plaintiffs' request for summary
23  judgment on Claim Six should be denied.

24

25

26  / / / /

**C.**    **Plaintiffs Are Not Entitled to Summary Judgment On The Medical Negligence Claim Against Dr. Wood.**

Plaintiffs move for summary judgment on the medical negligence claim against Dr. Wood without an expert witness, as required by Arizona law, without causation evidence to support their claim, and without evidence to meet the elevated evidentiary burden under the Arizona immunity statute. Plaintiffs are not entitled to summary judgment for several reasons. First, there is no evidence supporting the higher burden of proof, pursuant to A.R.S. § 13-3620(J). Second, Plaintiffs lack an expert witness to testify that Dr. Wood breached the standard of care, as required by Arizona law. Third, there is no evidence that any purported errors in Dr. Wood's medical record were relied on by other and caused an injury to Plaintiffs.

Arizona law imposes on certain persons an obligation to report suspected child abuse, and with that obligation comes immunity from civil liability:

> Any person who **reasonably believes** that a minor is or has been the victim of physical injury, abuse, child abuse, a reportable offense or neglect that appears to have been inflicted on the minor by other than accidental means or that is not explained by the available medical history as being accidental in nature or who reasonably believes there has been a denial or deprivation of necessary medical treatment or surgical care or nourishment with the intent to cause or allow the death of an infant who is protected under § 36-2281 **shall immediately report or cause reports to be made** of this information to a peace officer, **to the department of child safety** or to a tribal law enforcement or social services agency for any Indian minor who resides on an Indian reservation, except if the report concerns a person who does not have care, custody or control of the minor, the report shall be made to a peace officer only.

A.R.S. § 13-3620(A)(emphasis added). The statutory definition of "person" includes "[a]ny physician, physician's assistant, optometrist, dentist, osteopathic physician, chiropractor, podiatrist, behavioral health professional, nurse, psychologist, counselor or

1  social worker who develops the reasonable belief in the course of treating a patient."

2  A.R.S. § 13-3620(A)(1). The Arizona Court of Appeals has held the "reasonable

3  grounds" standard that triggers a mandatory reporting is a "low standard." *Ramsey v.*

4  *Yavapai Family Advocacy Center*, 225 Ariz. 132, 138, 235 P.3d 285, 291 (App.2010).

5  This low standard furthers the public policy "of encouraging people to report child

6  abuse." *Ramsey*, 235 P.3d at 292 (*quoting L.A.R. v. Ludwig*, 170 Ariz. 24, 27, 821 P.2d

7  291, 294 (App.1991)).

8      A person who reports suspected child abuse, pursuant to this statute, is

9  immunized from civil liability:

10         **A person who furnishes a report, information or records**
           required or authorized under this section, **or a person who**
11         **participates in a judicial or administrative proceeding or**
           **investigation resulting from a report, information or**
12         **records** required or authorized under this section, **is immune**
13         from any civil or criminal liability by reason of that action
           **unless the person acted with malice** or unless the person has
14         been charged with or is suspected of abusing or neglecting the
           child or children in question.
15

16  A.R.S. § 13-3620(J)(emphasis added). The courts "presume that a person acting

17  pursuant to A.R.S. § 13-3620 acted in good faith and with proper motives." *Ramsey*, 235

18  P.3d at 292. Malice "mean[s] a wish to vex, annoy or injure another person, or an intent

19  to do a wrongful act, established either by proof or presumption of law." A.R.S. § 1-

20  215(20); *Ramsey*, 235 P.3d at 292.

21      Plaintiffs must prove that Dr. Wood acted with malice. Plaintiffs have no such

22  evidence. Even if there are inaccuracies in the medical records, *arguendo*, Plaintiffs

23  must prove that the inaccuracies are the result of Dr. Wood's "wish to vex, annoy or

24  injure [S.Z.S.], or an intent to do a wrongful act." *See Ramsey*, 235 P.3d at 292. There is

25  no such evidence.

26

In a medical malpractice action, the plaintiff bears the burden of proving the healthcare provider breached the standard of care and the breach was a proximate cause of the injury. A.R.S. § 12-563.  To meet these burdens in medical malpractice cases, expert testimony is required to show that a healthcare provider was negligent, unless the negligence is so grossly apparent that a layperson would have no difficulty in recognizing it. *Riedisser v. Nelson*, 111 Ariz. 542, 544, 534 P.2d 1052, 1054 (1975)(standard of care); *Gregg v. Nat'l Med. Health Care Svcs., Inc.*, 145 Ariz. 51, 54, 699 P.2d 925, 928 (App. 1985)(causation).

Plaintiffs contend that purported errors in Dr. Wood's medical records fall within the narrow exception in which expert testimony is not required. Plaintiffs contend that errors in the medical record are so grossly negligence that a lay person would have no difficulty in recognizing it. It defies credulity to argue that an error in a medical record constitutes a breach of the standard of care. A 100 percent accuracy rate for medical records is not the standard. Plaintiffs will argue that there was more than one inaccuracy. That begs the question, at what point do inaccuracies in a medical record cross the line and become a breach of the standard of care? A lay person is not in a position to know that information, and therefore expert testimony is required. Because expert testimony is required on this issue, and Plaintiffs have no standard of care expert, Plaintiffs are not entitled to summary judgment on the medical negligence claim.

The PCH Defendants have disclosed Dr. Steven Frick, a board certified orthopedic surgeon, to testify that Dr. Wood complied with the standard of care. Dr. Frick is Professor and Vice Chairman of Orthopedic Surgery at Stanford University School of Medicine, as well as the Chief of Pediatric Orthopedic Surgery at the Lucile Packard Children's Hospital.  (Doc. 130-1 at 61.) Dr. Frick will testify that Dr. Wood complied with the standard of care. (Doc. 130-1 at 63.) Dr. Frick will testify that the only plausible cause of S.Z.S.'s right distal tibia medial metaphyseal corner fracture was

non-accidental trauma. (Doc. 130-1 at 63-64.) Dr. Frick will testify that the standard of care would require Dr. Wood, or another orthopedist, to report the injury to authorities. (*Id.*)

A breach of the standard of care is insufficient to establish liability. A plaintiff also must prove that the breach was a proximate cause of the injury. At the time Dr. Wood saw S.Z.S. for a single office visit, DCS already was involved and a Present Danger Plan was in place. There is no evidence that any other provider reviewed Dr. Wood's record, relied on a purported error, and as a result, caused an injury to S.Z.S. Not a single person has testified that any purported inaccuracy in Dr. Wood's medical record caused an extension or change to the Present Danger Plan or caused DCS to file the Dependency Petition.

Plaintiffs mention *res ipsa loquitor* but fail to argue how it applies in this case. It has not been pled or disclosed as a legal theory. Plaintiffs would need to prove these elements: (1) the injury must be of a kind that usually does not occur without negligence, (2) the injury must be caused by an instrumentality within the defendant's exclusive control, and (3) the plaintiff must be unable to show the specific circumstances that caused the instrumentality to effect the injury. *Sanchez v. Tucson Orthopaedic Institute, P.C.*, 202 P.3d 502, 504 (App.2008). As discussed above, there is no evidence of any injury resulting from Dr. Wood's medical records. Moreover, Plaintiffs could have asked witnesses if they relied on purported inaccuracies in Dr. Wood's medical records. A lack of causation evidence does not make *res ipsa loquitor* applicable.

Plaintiffs lack the required standard of care expert witness and causation evidence, and they cannot meet the higher burden of proof. Plaintiffs' request for summary judgment should be denied.

**IV.    CONCLUSION**

For the reasons discussed above, Plaintiffs' Motion for Partial Summary Judgment should be denied. The factual findings and judgment of the State juvenile court are not binding in this matter. There is no evidence of a conspiracy between Dr. Coffman and DCS. And Plaintiffs lack evidence to support a claim for medical negligence against Dr. Wood.

DATED this 3rd day of November, 2023.

**GUST ROSENFELD, P.L.C.**


By  /s/ Kari B. Zangerle
    Kari B. Zangerle
    Robert C. Stultz
    One East Washington Street, Suite 1600
    Phoenix, AZ  85004-2553
    *Attorneys for Defendants Phoenix*
    *Children's Hospital; Dr. William S. Wood*
    *and Rachel Wood; Dr. Kathryn Coffman;*
    *Haley Dietzman and Roald Dietzman;*
    *Zachary Dion; and Carey Lewis*

1

## <u>TABLE OF CONTENTS – EXHIBITS</u>

2

3
Exhibit 1        Deposition Transcript –Jordan Oland, M.D., pp. 49-50, 110-111, 125-126

4
Exhibit 2        Conditions of Admission (PCH 1206-1207 cycn)

5
Exhibit 3        Deposition Transcript – Haley Dietzman, pp. 144-145

6
Exhibit 4        Deposition Transcript – Charles Maxfield, M.D., pp. 34-35, 123

7
Exhibit 5        Deposition Transcript – Kathryn Coffman, M.D., pp. 97-98, 196, 227

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

## <u>CERTIFICATE OF SERVICE</u>

2

3          I hereby certify that on November 3, 2023, I electronically filed the foregoing

4     with the Clerk of Court, using the CM/ECF system, which will send notification of such

5     filing to all parties, and will e-mail all notification of such filing to all non-CM/ECF

6     system participants.

7     Thomas A. Connelly, Esq.
8     Robert T. Mills, Esq.
      Sean A. Woods, Esq.
9     Mills & Woods Law PLLC
      5055 North 12th Street, Suite 101
10    Phoenix, AZ  85014
11    *Attorneys for Plaintiffs*

12    DeeAn Gillespie Strub, Esq.
13    Jenny D. Jansch, Esq.
      Gillespie, Shields & Taylor
14    7319 North 16th Street
      Phoenix, AZ  85020
15    *Attorneys for Plaintiffs*

16
      Georgia A. Staton, Esq.
17    Ravi V. Patel, Esq.
18    Jones, Skelton & Hochuli, PLC
      40 North Central Ave., Suite 2700
19    Phoenix, AZ  85004
      *Attorneys for Defendants State of Arizona and ADOCS*
20

21    Cynthia Y. Patane, Esq.
      Rachel L. Werner, Esq.
22    Gordon Rees Scully Mansukhani, LLP
      One Renaissance Square
23    Two North Central Ave., #2200
24    Phoenix, AZ  85004
      *Attorneys for Defendant Brendan Cassidy*
25

26    By  /s/  Melody Kern