# EXHIBIT 5

```
1              IN THE UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF ARIZONA
3
4   HONOR DUVALL, et al.,            )
                                     )
5            Plaintiffs,             )
                                     )
6            vs.                     )  Case No.
                                     )  21-CV-00167-PHX-ROS
7   ARIZONA DEPARTMENT OF CHILD      )
    SAFETY, et al.,                  )
8                                    )
                                     )
9            Defendants.             )
    _____    )
10
11
12
13
                DEPOSITION OF KATHRYN A. COFFMAN, M.D.
14
                          Phoenix, Arizona
15                        March 21, 2023
                            10:07 a.m.
16
17
18
19
20
    Prepared by:                        CARRIE REPORTING, LLC
21  MICHAELA H. DAVIS                   Certified Reporters
    Registered Professional Reporter    2415 E. Camelback Road
22  Certified Realtime Reporter         Suite 700
    Certified Realtime Captioner        Phoenix, AZ 85016
23  Certified LiveNote Reporter         (480) 429-7573
    AZ CR No.  #50574
24  carrie@carriereporting.com
25  (COPY)
```

```
 1                THE WITNESS:  Correct.
 2                MS. ZANGERLE:  By "parents" you mean --
 3                MR. CONNELLY:  Honor Duvall and the
 4   great-grandmother and the grandmother.
 5   BY MR. CONNELLY:
 6        Q.   All three of those women were present; correct?
 7        A.   I believe so.
 8        Q.   And we'll -- I've jumped ahead a little bit.
 9   We'll talk in more detail about it later.
10                You recommended that the child be taken to
11   PCH because of the increase in head circumference; right?
12        A.   Correct.
13        Q.   And the mother didn't want to go back to PCH;
14   right?
15        A.   Correct.
16        Q.   The mother wanted to go to Banner Cardon in
17   Mesa; right?
18        A.   I don't know where she wanted to go.
19        Q.   She wanted to go somewhere other than PCH,
20   though; right?
21        A.   Right.
22        Q.   But you didn't want her to go someplace other
23   than PCH, did you?
24                MS. ZANGERLE:  Form and foundation.
25                MS. STATON:  Join.
```

```
 1                THE WITNESS:  Correct.
 2   BY MR. CONNELLY:
 3       Q.    And why not?
 4       A.    Because all the child's medical records were
 5   already at PCH.
 6                MS. STATON:  I couldn't hear that.
 7                THE WITNESS:  All the child's medical
 8   records were already at PCH.
 9                MS. STATON:  Thank you.
10   BY MR. CONNELLY:
11       Q.    And is that the only reason?
12       A.    Yes.
13       Q.    But simply because the child's medical records
14   were at PCH wasn't an imperative reason for them to go
15   back to PCH; right?
16                MS. ZANGERLE:  Form and foundation.
17                MS. STATON:  Join.
18                THE WITNESS:  It wasn't imperative, no.
19   BY MR. CONNELLY:
20       Q.    And the medical professionals at Banner Cardon
21   or Banner Thunderbird could have performed the same
22   medical services that were performed at PCH; right?
23                MS. ZANGERLE:  Form and foundation.
24                MS. STATON:  Join.
25                THE WITNESS:  I don't know.
```

1  BY MR. CONNELLY:
2      Q.    There was a protective -- they hadn't taken
3  temporary custody of the child yet on this date, ma'am.
4      A.    Oh, I didn't realize that.  Sorry.
5      Q.    So isn't it true that the OCWI caseworker or the
6  investigator was called in to escort the parent to PCH to
7  make sure they went to PCH?
8              MS. ZANGERLE:  Form and foundation.
9              MS. STATON:  Join.
10             MS. WERNER:  Join.
11             THE WITNESS:  No, that's an unfortunate
12 choice of words.  We didn't strong-arm anybody, and she
13 didn't strong-arm anybody.  We felt for continuity of
14 care, which is important in medicine across the board, not
15 just pediatrics, that the child should be seen at the same
16 place because all the records, all the images were there.
17             Alyssa Lucero was involved.  Now, if she
18 didn't have temporary custody at that time, I don't think
19 I was aware of what was going on with this case at all,
20 but we would -- obviously, since she's involved, we would
21 have called her and discussed this with her or with her
22 supervisor.
23             That's the best I can tell you.
24 BY MR. CONNELLY:
25     Q.    Do you remember talking to Jeff Duncan at all on

1                    MS. WERNER:  Join.
2                    THE WITNESS:  I don't recall doing that.
3    BY MR. CONNELLY:
4         Q.   But it's not something out of the realm of
5    possibly of what you might say to Mr. McKay or Mr. Duncan,
6    is it?
7                    MS. ZANGERLE:  Form and foundation.
8                    MS. STATON:  Join.
9                    MS. WERNER:  Join.
10                   THE WITNESS:  It's not out of the realm of
11   possibility that I might have said I'm concerned about
12   this child's safety.
13   BY MR. CONNELLY:
14        Q.   And it's also not out of the realm of
15   possibility that you might say to them, "You ought to go
16   and take custody of this child and file a dependency
17   petition"; right?
18                   MS. ZANGERLE:  Form and foundation.
19                   MS. STATON:  Join.
20                   MS. WERNER:  Join.
21                   THE WITNESS:  I don't see myself ever saying
22   that.  That's not my role.
23   BY MR. CONNELLY:
24        Q.   Up above a little from where we were just
25   reading in the paragraph above there, after you talk about