Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
GILLESPIE, SHIELDS & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Honor Duvall, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Arizona Department of Child Safety, *et al.*, <br><br> Defendants. | Case No.: 21-cv-00167-ROS <br><br> **REPLY IN SUPPORT OF PLAINTIFFS' OMNIBUS *DAUBERT* MOTION AS TO ELEVEN EXPERTS RETAINED BY PCH DEFENDANTS AND DEFENDANT CASSIDY** <br><br> **(Hon. Roslyn O. Silver)** |

Plaintiffs submit the following Reply in Support of *Plaintiffs' Omnibus Daubert Motion as to Eleven Experts Retained by PCH Defendants and Defendant Cassidy* (Doc. 322).[1] This Reply is supported by the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  OVERVIEW**

---

[1] Plaintiffs first filed their *Daubert* Motion at (Doc. 321) but inadvertently failed to attach the exhibits to that filing. They then quickly recognized their mistake and refiled their *Daubert* Motion and exhibits at (Doc. 322).

Plaintiffs set out a robust factual history in their motion (Doc. 322) and will not repeat it here but do incorporate it here by reference.[2] Only a few words will be said to clarify some of the misleading facts in Defendants' responses (Docs. 332 and 333).

In Section I of his response (Doc. 332), Defendant Cassidy makes several misleading statements. *First*, he notes that S.Z.S.'s primary care pediatrician, Dr. Heather Gosnell, testified at deposition that she thought the child had been abused. (Doc. 332 at 2:27-28.) However, what Defendant Cassidy fails to note is that Dr. Gosnell arrived at that view only *after* the child had been (incorrectly) diagnosed as abused during his February 21-23, 2019, hospitalization at Phoenix Children's Hospital ("PCH"). Dr. Gosnell arrived at her view of abuse only *after* she saw the child for his two-month checkup, which was two days *after* he was discharged from PCH, and only *after* she reviewed the (erroneous and prejudicial) PCH medical records – records which the juvenile court found to "contain significant errors" (Doc. 319-22 at DUVALL_000052). During the several times Dr. Gosnell examined S.Z.S. in her office between his birth in December 2018 and his admission to PCH in February 2019, she *never* saw any bruising on the child, *never* noted any lethargy, and *never* diagnosed the child as abused, nor did she ever even note a mere suspicion of abuse. **Ex. 8**; **Ex. 9**. During those two months following his birth, and pursuant to her legal obligations as a mandated reporter under A.R.S. § 13-3620, *et seq.*, Dr. Gosnell *never* called in a report of suspected abuse to DCS or law enforcement.

*Second*, Defendant Cassidy states that Plaintiff/Mother, Honor Duvall, told PCH personnel that S.Z.S. had "blood in his vomit." That is false. Honor never told anyone at PCH that her son was vomiting, let alone vomiting blood. **Ex. 11**; **Ex. 12**; **Ex. 13**; **Ex. 14**.

---

[2] To the fullest extent possible, exhibit citations herein will be to exhibits already in the docket as part of Plaintiffs' Motion for Partial Summary Judgment (Doc. 319), Plaintiffs' Omnibus *Daubert* Motion as to Eleven Experts Retained by PCH Defendants and Defendant Cassidy (Doc. 322), Plaintiffs' Response in Opposition to Defendant Dr. Cassidy's *Daubert* Motion Regarding Dr. Todd A. Lefkowitz, M.D. (Doc. 331) or Plaintiffs' Response in Opposition to PCH Defendants' *Daubert* Motion Regarding Plaintiffs' Expert Thomas Young, M.D. (Doc. 335). If new exhibits are needed here, the numbering will start at "Ex. 8", in continuation of the numbering of the Exhibits filed with Plaintiffs' motion (Doc. 322).

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

She said the child had what looked to be blood in his *spit up*, not *vomit*. There is a meaningful distinction between spitting up, which all babies do when being burped after feeding, and vomiting. Even Defendants' witnesses acknowledge as much. **Ex. 13** at 54:2-22, 55:20-21. Here, on February 21, 2019, Honor told both Dr. Gosnell's office and PCH that her son had what appeared to be blood in his spit up. There was even a picture of the concerning spit up. **Ex. 10**. However, there is no medical term for "spit up". So, in their records, Dr. Gosnell and PCH use the term "hematemesis", which every medical professional reading those records thereafter interprets to mean "vomiting blood", which can be a very serious medical condition. The important nuance between spitting up and vomiting is forever lost in the medical records due to the limits of medical terminology. Notably, when PCH examined the child's internal organs during his February 2019 hospitalization, none of those organs were bleeding or injured in any way to cause blood to be in the child's spit up (or vomit, had he been vomiting), which is another indication that he had not been abused.

*Finally*, Defendant Cassidy notes only those differential diagnosis from his report that are favorable to his defense here. *See* (Doc. 332 at 3:9-10). Then, for whatever reason, in quoting from his report, Defendant Cassidy inserts a period after the phrase "abusive head trauma", *see* (Doc. 332 at 10-13), without indicating a change from the original where there is a comma, *see* (Doc. 319-20, "Assessment" paragraph), and he also fails to include the language after the comma, which is where he attributes the "abusive head trauma" to "a single massive crush injury to the skull, massive single acceleration/deceleration injury, or a repetitive acceleration/deceleration injury", *id*., none of which is consistent with how the child presented to PCH on February 21, 2019, where he did not have a fractured skull, nor bruising on his skull, nor patterned bruising around his torso indicative of being held and squeezed tightly enough to cause retinal hemorrhaging by a "massive single acceleration/deceleration injury, or a repetitive acceleration/deceleration injury." *See* (Doc. 319-5 at PCH 1259 cycn (describing the child's "General Appearance" as "Normal: well appearing, alert, no apparent distress")). The child did not even have the bruising around

the face mask area Defendant Cassidy testified about seeing at the dependency trial. Defendant Cassidy also, without citation to the record, asserts that his findings "were corroborated by other ophthalmologists", (Doc. 332 at 3:13-14), but without acknowledging that Dr. Heller refuted his findings three days later, (Doc. 319-27). These are among the reasons the juvenile court "found credibility issues with Dr. Cassidy's testimony." (Doc. 319-22 at DUVALL_000053.)

For their part in their response (Doc. 333), in a sleight of hand way, the PCH Defendants try to save their diagnosis of abuse by asserting that the juvenile court did not find that the child was not abused, as Plaintiffs' assert in their motion. *See* (Doc. 333 at 22-24). That is a one sleight of hand and simply is not true. *See* (Doc. 319-22 at DUVALL_000057, second paragraph ("Based upon its consideration of the evidence, the Court finds that the Department *failed to prove* by a preponderance of the evidence *that the child was abused* or that either parent failed to protect the child from abuse." (emphasis added))). While correctly quoting from an earlier portion of the juvenile court's ruling, *see* (Doc. 319-22 at DUVALL_000052, second paragraph (i.e., "the Court finds that the Department did not meet its burden of proof in this case and the evidence fails to establish that there is a dependency as to either parent")), PCH Defendants apparently stopped there and missed the portion quoted above, which is what Plaintiffs' motion cited. *See* (Doc. 321 at 6:6-8 (citing Doc. 319-22 "at DUVALL_000057-58)). Even if the juvenile court had left it where the PCH Defendants do, the second sleight of hand is in PCH Defendants feigning ignorance about what that ruling really means. The dependency was prosecuted under A.R.S. § 8-201(15) with allegations that the child was "dependent" as to his parents "due to physical abuse or failure to protect from physical abuse." *See* (Doc. 319-44 at 2:13-14, 3:25-37, 4:1-3, 4:16-17); *see also* (Doc. 319-22 at DUVALL_000052 (juvenile court noting that the allegations of dependency were due to "physical abuse or failure to protect from physical abuse")). The juvenile court next recited the definition of "abuse" found in A.R.S. § 8-201(2). (Doc. 319-22 at DUVALL_000052.) Clearly, the issue at the juvenile dependency trial was whether the child had been physically abused. By finding no

dependency as to either parent, the juvenile court *ipso facto* found that the child was not physically abused by either parent. For PCH Defendants to argue otherwise is to be too cute by half. Besides that, as noted, the juvenile court in fact expressly found that the evidence did not establish abuse, not even by the lowest burden proof possible.

The balance of the PCH Defendants' response seems more akin to a response to Plaintiffs' motion for partial summary judgment, and, in those respects will not be addressed here.

The *Daubert* analysis is fairly straightforward, and Plaintiffs set out important background information for the Court in their motion. Plaintiffs below step through the most salient and pertinent aspects of that analysis considering Defendants' respective responses.

## II. ARGUMENT

In determining the admissibility of expert testimony, Rule 702 requires a three-stage analysis. The Court should first determine whether the facts support the experts' opinion ("foundation"). Then the Court should examine the reliability of the methodology utilized by the experts to arrive at their conclusions ("scientific validity") and the application of that methodology to the facts of the case ("fit"). In the present motion (Doc. 322), Plaintiffs demonstrated glaring flaws in the underlying PCH Defendants and Defendant Cassidy's combined eleven retained testifying experts – such as the erroneous records on which they relied on to establish their opinions and the reliability of their opinions that S.Z.S. was a victim of abuse via Shaken Baby Syndrome/Abusive Head Trauma ("SBS/AHT"). In *Daubert* terms, these gaping holes demonstrated problems with "foundation," "scientific validity," and "fit".

### A. Defendants' Eleven Retained Experts' Opinions Lack Foundation

Defendants lineup of eleven heavyweight experts, all of them from pediatrics and most of them child abuse practitioners, not only relied on PCH's flawed medical records, which the juvenile court found to "contain significant errors", and without ever having examined S.Z.S., but intend to opine that his injuries are a result of the controversial

5

"diagnosis" of SBS/AHT, which at best, is based on faulty medical science, but more accurately, is based on "junk science". *See State v. Nieve, et al.*, Nos. A-2069-21, A-2936-21, 2023 WL 5947996, at *16 (N.J. Super. Ct. App. Div. Sept. 13, 2023) (affirming the trial court's findings that "no study has ever validated the hypothesis that shaking a child can cause the triad of symptoms associated with [SBS/]AHT, and likened the theory to junk science given the lack of testing" and that "[SBS/]AHT is a flawed diagnosis because it originates from a theory based upon speculation and extrapolation instead of being anchored in facts developed through reliable testing.") (internal quotation marks omitted).

These eleven heavyweight experts lack the necessary factual foundation for their opinions, *i.e.,* their opinions are based solely on erroneous medical records. For example, mistaking (i) S.Z.S.'s Mongolian spots as bruises, (ii) brown or pink tinged spit up as hematemesis (vomiting of blood), (iii) abnormal blood tests as normal blood tests, and (iv) a "possible" right tibial fracture as bilateral bucket handle tibial fractures. Defendants' experts relied on these erroneous records to conclude that S.Z.S was a victim of abuse via SBS/AHT. Although Defendants argue that S.Z.S. had a variety of symptoms which they attribute to SBS/AHT abuse, the symptoms upon which they rely were all drawn from erroneous medical records of PCH doctors who failed to either diagnose or attempt to diagnose or rule out other causes, such as trauma persisting since birth, or benign enlargement of subarachnoid or subdural spaces. There is no factual or medical basis that is scientifically sound or valid for finding that S.Z.S suffered from abuse via SBS/AHT.

Defendants' experts' reports are also replete with speculation and qualifiers, such as, "suspicious", "most likely", "suggest", "probable", "highly specific for", "nearly", strongly favor", or the like. Defendants retained these eleven experts for one reason, to overrule the factual findings and final judgment of the juvenile court that S.Z.S. was not abused. The problem is that those experts' opinions in that regard do not meet the reliability criteria of Rule 702 and/or *Daubert*.

B.  **SBS/AHT Has Proven Flawed Over Time and is Now Disowned by Its Widely Recognized Founder**

The natural consequence of scientific and medical progress is that evidence once thought to be credible may be proven inaccurate and unreliable over time. The Shaken Baby Syndrome is a prime example of "medical science" that has been proven flawed over time. *See, e.g.,* Doc. 322-1 (Amicus Brief to the U.S. Supreme Court by 16 current and retired forensic scientists, forensic pathologists, medical examiners, pediatric radiologists, pediatric neurologists, pediatric pathologists, emergency medicine physicians, biomechanical engineers, and others); Doc. 322-2 at §§ I, II (Amicus Brief to the U.S. Supreme Court by The Center for Integrity in Forensic Sciences); Doc. 322-3 at DUVALL_004614 (ABA article noting that "[s]haking is an unlikely mechanism for the injuries often attributed to it."). SBS is now considered to be devoid of scientific merit by the same doctor who pioneered the diagnosis in the 1970's. *See, e.g.*, Josep Shapiro, *Rethinking Shaken Baby Syndrome*, NPR (June 29, 2011), https://www.npr.org/2011/06/29/137471992/rethinking-shaken-baby-syndrome. Given the lack of scientific support for the specific mechanism of shaking, pediatricians are now encouraged to use the term "Abusive Head Trauma" ("AHT") in place of "Shaken Baby Syndrome" because the new term is more expansive and does not require physicians to identify a precise mechanism of injury.

C.  **Shaken Baby Syndrome Renamed by the Pediatrics Lobby as Abusive Head Trauma to Hide the Flaws in the Diagnosis**

Beginning in the 1970's, some physicians began advancing a hypothesis that, if an infant or young child became very ill or died without an obvious reason why, and the baby had a certain "triad" of findings – typically, (1) blood in the subdural area around the brain (subdural hemorrhage); (2) microscopic bleeding within the retina (retinal hemorrhage); and (3) encephalopathy (damage of the brain itself sometimes accompanied by comatose state or some change in affect, such as lethargy) and/or cerebral edema (brain swelling) – that *might* mean the baby had been violently shaken. *See* A. Norman Guthekelch, 2 BRITISH MED. JOURNAL 430 (1971, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1796151/;

7

John Caffey, *On the Theory and Practice of Shaking Infants*, 124 AM. J. DIS. CHILD 161 (1972). They soon named this constellation of symptoms "Shaken Baby Syndrome." Those advocating the hypothesis claimed that the constellation of physical findings is virtually unique to violent shaking alone or with impact. *See, e.g.*, Letter to the Editor, Chadwick, *et al.*, *Shaken Baby Syndrome: A Forensic Pediatric Response*, 101 PEDIATRICS 321 (1998).

Because in the last century child abuse was largely under-recognized and all-too-frequently ignored, a few physicians, particularly of the pediatric variety, began a campaign with the laudable goal to educate other doctors to recognize and report child abuse and to educate parents about the dangers of mistreating children. Even though the data was "circumstantial" and "manifestly incomplete," these well-intentioned doctors reasoned that a nationwide educational campaign to prevent the jerking, jolting and whiplash of infants was warranted. *See, e.g.*, John Caffey, *The Whiplash Shaken Infant Syndrome: Manual Shaking by the Extremities with Whiplash-Induced Intracranial and Intraocular Bleedings, Linked with Residual Permanent Brain Damage and Mental Retardation*, 54 PEDIATRICS 396, 403 (1974); A. Norman Guthkelch, *Problems of Retino-Dural Hemorrhage with Minimal External Injury,* 12 HOUS. J. OF HEALTH LAW & POL'Y 201 (2012). At the time, these doctors never envisioned, and did not advocate, criminal prosecutions based on these findings. *Id.* at 203. Nonetheless, the SBS hypothesis gradually hardened into accepted medical wisdom, even though it lacked a solid scientific foundation. *Id.* at 207; Mark Donohoe, *Evidence-based Medicine and Shaken Baby Syndrome Part I: Literature Review, 1966-1998*, 24 AM. J. FORENSIC MED. PATHOLOGY 239, 241 (2003); Deborah Tuerkheimer, *Flawed Convictions: "Shaken Baby Syndrome" and the Inertia of Injustice* (Oxford Univ. Press 2014).

Over time, the beliefs of medical doctors surrounding these findings have changed considerably. *See State v. Edmunds,* 746 N.W.2d 590, 596 (Wis. Ct. App. 2008) ("[A] significant and legitimate debate in the medical community has developed in the past ten years over whether infants can be fatally injured through shaking alone, whether an infant may suffer head trauma and yet experience a lucid interval prior to death, and whether other

causes may mimic the symptoms traditionally viewed as indicating shaken baby or shaken impact syndrome."). Many experts have come to realize that children previously thought to have been shaken may have also or instead suffered some kind of impact injury. *See, e.g.*, Ann-Christine Duhaime, *et al.*, *The Shaken Baby Syndrome: A Clinical, Pathological, and Biomechanical Study*, 66 J. NEUROSURG. 409 (1987) ("Although shaking may, in fact, be part of the process, it is more likely that such infants suffer blunt impact…"); Derek A. Bruce and Robert A. Zimmerman, *Shaken Impact Syndrome*, 18 PEDIATRIC ANNALS 482, 492-4 (1989) (the authors concluded severe acute brain trauma cannot be produced by shaking alone and that the mechanism of injury is more appropriately described as "shaking impact").  Given the lack of scientific support for the specific mechanism of shaking, pediatricians are now encouraged to no longer use the term "Shaken Baby Syndrome" (SBS); the preferred term (and the one used in this case) is "Abusive Head Trauma" (AHT), because that term is more expansive and does not require the physician to identify a precise mechanism of injury. This name change is a marketing move, recommended by the pediatric medical lobby because of the legal difficulties with SBS; it does not reflect a substantive change or advance in medical science.

Many terms are used either to describe the alleged mechanism of injury or interchangeably with AHT, including, but not limited to "acceleration-deceleration injury," "non-accidental injury," "non-accidental trauma," and "inflicted head trauma." *E.g.*, Brian Forbes, *Child Abuse: Anatomy and Pathogenesis of Retinal Hemorrhages After Abusive Head Trauma*; Up To Date, Evelyn A. Paysse & Daniel M. Lindberg (Eds.) UpToDate, Waltham, MA (Accessed on September 7, 2015); Sandeep Narang, *A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome*, 11 HOUS. J. HEALTH L. & POL'Y 505 (2011). Until recently, the leading physicians in the child abuse protection community staunchly argued that shaking or other abuse could be reliably and confidently diagnosed on the existence of the three findings of the triad. Chadwick, *et al.*, *supra,* Peter G. Richards, *et al.*, *Shaken Baby Syndrome,* 91 ARCH. DIS. CHILD 205 (2005) ("The triad of encephalopathy,

subdural hemorrhages, and retinal hemorrhages as an indicator of head injury that has stood the test of time.").

Now, leaders in the field of pediatrics claim that no responsible physician would diagnose abuse based on this "triad." An American Academy of Pediatrics ("AAP") position paper, revised in 2009, backs off the certainty of the AHT diagnosis, now asserting instead that "the mechanisms and resultant injuries of accidental and abusive head injury overlap." Christian, *et. al.*, *supra* at 1410. As Dr. Bob Sege, director of Family and Child Advocacy at Boston Medical Center and a member of the AAP Committee on Child Abuse and Neglect, told NPR, "[t]he real straw man argument is the idea that diagnosing abusive head trauma relies solely on those three injuries…." https://www.npr.org/sections/health-shots/2015/07/29/427449852/doctors-devise-a-better-way-to-diagnose-shaken-baby-syndrome. Dr. Carole Jenny, a longtime child abuse pediatrician and SBS-hypothesis advocate, and former Brown University Pediatrics professor, now teaches that "the triad is a myth." Carole Jenny, *Presentation on The Mechanics: Distinguishing AHT/SBS from Accidents and Other Medical Conditions*, slide 33, 2011 New York City Abusive Head Trauma/Shaken Baby Syndrome Training Conference (Sept. 23, 2011).

There is now widespread, if not universal, agreement that the presence of the triad alone – or its individual components alone or in any combination – is not enough to diagnose abuse. Findley, *et. al.*, *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right.* 12 HOUS. J. HEALTH L. & POL'Y 209, 213 (2012); Tuerkheimer, *supra* at 10-11. But the doctors in this case, including Defendants' experts, did not just make their diagnosis based on this disfavored set of findings; they went a step further. They diagnosed S.Z.S. with Abusive Head Trauma based on only two of the three signs previously (but no longer) thought to be diagnostic of abuse – subdural hemorrhages and retinal hemorrhages (the child did not have encephalopathy or any loss of consciousness). These findings are nonspecific, associated with a variety of mechanisms, and certainly not pathognomonic (i.e., exclusively diagnostic) of abuse. Contrary to the standard set forth by *Daubert* for the admission of medical causation testimony, these doctors utterly discounted or failed to

account for the myriad alternative explanations for S.Z.S.'s medical findings; some even offered inaccurate medical opinion and *ipse dixit*, presented as fact, to support the AHT diagnosis.

### D. Defendants' Experts' Opinions are Unreliable and Not Admissible Pursuant to Rule 702 and Daubert

Expert opinion evidence is admissible only if it is reliable, which requires the Court to assess whether the "reasons or methodology underlying the testimony is scientifically valid." *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589, 592-93 (1993). Defendants' experts' testimony must be based on sufficient facts or data, a product of reliable principles and methods, and have reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

As stated above, Defendants' experts' opinions are not based on sufficient facts or data. Although Defendants argue that S.Z.S. had a variety of symptoms which they attribute to SBS/AHT, the symptoms upon which they rely were all drawn from the erroneous medical records of PCH and are often caused by non-abusive means. There is no factual or medical basis that has been scientifically validated for finding that S.Z.S suffered from abuse via SBS/AHT.

The Court's role in conducting a *Daubert* reliability analysis of proposed expert testimony is to ensure that the experts' opinions are based on scientifically valid methods and principles. To be admissible, "it is critical that an expert's analysis be reliable at every step." *Amoriganos v. Amtrak*, 303 F.3d 256, 267 (2nd Cir. 2002). Thus, "*any* step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig*, 35 F.3d 717, 745 (3rd Cir. 1994) (emphasis in original). "Whenever a court rejects expert testimony because it is based on faulty methodology or reasoning, it follows implicitly that the expert's conclusions are not to be credited." *Claar v. Burlington N. Ry. Co.*, 29 F.3d. 499, 501 (9th Cir. 1994).

There is no evidence whatsoever (beyond Defendants' and their experts' beliefs, which are obviously not "evidence") that S.Z.S. was abused. *See* (Doc. 319-13 at 2) ("No

physician can validly claim to know whether or not the physical findings in an infant are from child abuse."). The medical records upon which they relied to find abuse were inaccurate and erroneous. Yet, Cassidy and PCH Defendants and their experts claim that S.Z.S.'s injuries were caused by abuse – specifically, SBS/AHT. The conclusion that S.Z.S.'s medical findings must have been caused by abuse and only abuse in the form of shaking (i.e., rapid acceleration and deceleration) is based on faulty scientific principles and lacks sufficient facts and data to be reliable and helpful to the jury. *See, e.g.,* (Doc. 322-4 (Matshes and Papetti, Law, Child Abuse, and Retina, Nov. 2018)); *see also*, (Doc.322-7 (PCH Defendants' expert testifies that S.Z.S. could have sustained SDH and RH at birth that persisted for 2 months)). Moreover, whether the child was abused is not a fact at issue in the claims against these Defendants, and, if it is, it has already been adjudicated by a fact finder that he was not abused. (Doc. 319-31 at DUVALL_000057). Here, Defendants eleven (11) experts' opinions lack foundation and relied upon the improper application of an outdated hypothesis to reach their opinions that S.Z.S. was abused. Their testimony is inadmissible for this reason (also because it would be extremely prejudicial given the emotional revulsion one has to child abuse and the fact that there has been a judicial determination following a trial that the child was not abused).

## III.   CONCLUSION

Despite Defendants' vociferous protestations that the SBS/AHT diagnosis is widely recognized by the pediatric community, it is not founded on reliable, verifiable scientific methodologies. It simply is not a widely recognized as scientifically valid by all the medical and scientific disciplines implicated by the theory. Rule 702 directs the Court to determine whether Defendants' experts have sufficient facts to support their opinions, whether they utilized scientifically valid methodology, and whether they reliably applied scientifically valid principles and methods to the facts of this case. In the present case the predicate facts are erroneous and lacking, and the methodology is without scientific validity. Under these circumstances, the application of "junk science" to erroneous facts can only result in rank speculation, prejudice, and injustice. Garbage in-garbage out as a modern adage holds. The

Court should exclude Defendants' eleven experts' opinions that S.Z.S. was abused via SBS/AHT in their entireties.

**RESPECTFULLY SUBMITTED** this 3rd day of November 2023.

**MILLS + WOODS LAW, PLLC**

Thomas A. Connelly
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**

By  */s/ Jenny D. Jansch*
DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on this <u>3rd</u> day of November 2023, I electronically transmitted the foregoing document to be filed electronically with the Clerk of the Court using the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

 */s/ Jenny D. Jansch*