Thomas A. Connelly (AZ Bar #019430
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
GILLESPIE, SHIELDS & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, *et al.*, | Case No.: 21-cv-00167-ROS |
| Plaintiffs, | **PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO:** |
| v. | **(1) PCH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 312)** |
| Arizona Department of Child Safety, *et al.*, | **AND** |
| Defendants. | **(2)  DR. BRENDAN CASSIDY'S MOTION FOR SUMMARY JUDGMENT (DOC. 310)** |
| | (Hon. Roslyn O. Silver) |

Plaintiffs, by and through undersigned counsel, hereby respond in opposition to *The PCH Defendants' Motion for Summary Judgment* (Doc. 312) and *Dr. Brendan Cassidy's Motion for Summary Judgment* (Doc. 310) (PCH Defendants and Defendant Cassidy are

collectively referred to as "Defendants"), for the above reference matter.[1]   The following Memorandum of Points and Authorities demonstrates why each of those motions must be denied.

## **MEMORANDUM OF POINTS AND AUTHORITY**

### **I.   OVERVIEW**

This is a simple and tragic case of overzealousness by doctors entrenched in child abuse dogma and incapable of retreating from a rush to judgment of "suspected non-accidental trauma" even when there is no objective, scientifically reliable evidence of abuse, but then going further by overstepping their limited role as consulting medical professionals to cause the removal of a child from his loving and caring parents based solely on their "suspicions" as more fully discussed in Plaintiffs' Motion for Partial Summary Judgment (Doc. 319).[2]

Plaintiff, Honor Duvall, at the recommendation of her pediatrician, took her child to PCH for cold-like symptoms where the child abuse advocates from PCH soon pressured the Arizona Department of Child Safety ("DCS") to have the child removed from the care and custody of his parents based on the PCH Child Protection Team's "suspicions" of abuse because the parents could not explain the "constellation" of medical conditions PCH doctors diagnosed via unconsented invasive testing, including conditions that were erroneously diagnosed and did not exist. Rather than put pride aside and admit they were wrong, Defendants each played a pivotal role with the State in initiating and litigating the dependency action by pushing DCS to take temporary custody of the child and file a dependency petition based on their biases and inaccurate findings. At the resultant dependency trial, the State did not call any of the involved DCS investigators or case

---

[1] The respective Motions' docket filing numbers, (Doc. 312 (PCH Defendants) and Doc. 310 (Cassidy), will be used when citing to the two motions, rather using the form "PCH Mot." or "Cassidy's Mot."

[2] To the fullest extent possible, exhibit citations herein will be to exhibits already in the docket as part of Plaintiffs' Motion for Partial Summary Judgment (Doc. 319). If citation to an exhibit that is not an exhibit to Doc. 319, if necessary, that exhibit will be attached to this motion utilizing the alphabet for numbering.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1
2
3
4

managers as witnesses; rather, the State's case-in chief was built almost entirely upon the testimony and records of Defendants. Simply put, without Defendants' consequential participation, there would not have been a dependency proceeding and this child would not have been removed from the care and custody of his loving parents.

5
6
7
8
9
10
11
12
13
14

Defendants want to relitigate the dependency trial and overturn the Juvenile Court's ruling that child was not abused and that neither parent failed to protect him from abuse. They want to continue to rely on their erroneous records and have their eleven highly credential experts overrule the factual findings and final judgment of the Juvenile Court. Defendants' lineup of heavyweight experts, all of them from pediatrics and most of them child abuse practitioners, intend to prove via their opinions, based on their review of the erroneous PCH medical records, and without ever having examined S.Z.S. themselves, that the boy was a victim of abuse via vigorous shaking. They will also seek to offer testimony and opinion evidence that Defendants Cassidy, Coffman, Wood, and Dietzman are credible, which would be improper expert testimony.

15
16
17
18
19

Based on Defendants' actions, Plaintiffs have asserted the following claims against Defendants: Claim Six against Coffman and Cassidy for Conspiracy[3]; Claim Eleven against Coffman, Cassidy, Wood, and Dietzman for medical negligence; Claim Fifteen against Coffman, Cassidy, Wood, and Dietzman for intentional infliction of emotional distress[4]; and Claim Sixteen for negligence against PCH.

20
21
22
23
24
25

Defendants have moved this Court for summary judgment arguing:  (1) that PCH Defendants were not parties to the Juvenile Court Dependency proceedings; (2) Plaintiffs cannot prove conspiracy; (3) PCH Defendants argue they have immunity; (4) Plaintiffs cannot prove medical negligence without an expert; (5) Plaintiffs cannot meet their burden for the intentional infliction of emotional distress claim; (6) PCH is entitled summary judgment on Claim Sixteen (negligence); and (7) Defendant  Cassidy argues Plaintiffs

26
27
28

[3] Plaintiffs voluntarily dismissed Claim Six against Defendant Wood and the unidentified Social Worker from PCH. (Doc. 303; Doc.307.)

[4] Plaintiffs voluntarily dismissed Claim Fifteen against Defendants Zachary Dion and Jane Doe Dion, Carey Lewis and John Doe Lewis.  (Doc. 303; Doc. 307.)

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

should be precluded from requesting punitive damages. Defendants' arguments are unpersuasive, particularly since genuine disputes exist about material facts which thus precludes summary judgment since such factual disputes must be determined by the jury, not the Court. Their motions should be denied.

## II.   BACKGROUND

### A.   Factual Background

S.Z.S. is the first-born child to Plaintiffs Donald Sankey, Jr., and Honor Duvall. Doc. 319-1 at 334-340. S.Z.S.'s birth was traumatic: first in the sense that all natural vaginal birth is traumatic, *see* Doc. 319-28 at 43:3-18, and, second, in the the fact that Honor labored down for six hours while the child's head was in the birth canal resulting in (i) the child being born with a sharply distorted skull (i.e., a "conehead"), and (ii) the presence of meconium (i.e., sticky, thick, dark green stool) in the amniotic fluid – an objective indicator of stressful or traumatic birth. Doc. 319-49.

During early February 2019, both Donald and Honor were sick with viral infections. Doc. 319-1 at 227:3-8, 11-5; Doc. 319-2 at 77; Doc. 319-3 at BPD000008.  On 21 February 2019, 60 days after he was born, Honor and Donald grew concerned that their son caught their illness because he was a little fussy, not eating as much, a bit lethargic, and had what they thought might be blood in his spit up. *Id.* at 243:1-25, 244, 245:1-19; at 79, 84; at BPD000007-8; **Ex. A**. The family pediatrician recommended the parents take their son to Phoenix Children's Hospital ("PCH") because her office could not see him until after the weekend and there was concern about a possible bleeding disorder.  Doc. 319-2 at 87-89.

That afternoon, Honor took the child to the PCH emergency department ("ED").  The ED nurse, Leah Kaufman, was the first to examine the boy.  She observed that his "skin color appears normal for the child's ethnic group", thus not mistaking his Mongolian spots for bruises. She also noted that the chief complaint was "hematemesis" (i.e., vomiting blood). This was incorrect because the child never "vomited" blood. **Ex. B**; **Ex. C**. The young Caucasian ED resident physician on duty, Kathleen Outcalt, was not as observant (or knowledgeable) and recorded that the boy had bruising numerous "unexplained" bruises in

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

several areas of his body. *Compare* Doc. 319-4 at PCH 1272 cycn *with* 319-5 at PCH 1259. Blood tests were run from blood drawn in the ED which showed numerous abnormal results, including an elevated white blood-cell count ("WBC COUNT") – a widely recognized sign of infection. Doc. 319-4 at PCH 1358 cycn-1360 cycn. However, resident Outcalt recorded his blood test results as "normal." Ostensibly due to his having "[u]nexplained bruising with normal labs," the PCH ED submitted the child to a full body skeletal survey, without parental consent, and contacted the PCH Child Protection Team ("CPT") per a PCH algorithm in use at the time. Doc. 319-5 at PCH 1262 cycn; Doc. 319-8 at Clinical Pathway 4 GR. The skeletal survey was (incorrectly) interpreted as showing the presence of "[r]ight and left tibial bucket handle metaphyseal fractures," which resident Outcalt also (mis)interpreted and recorded as "BL buckethandle fx of tibia." *Id*. at PCH 1264 cync.

Having been informed of these purported results, and without examining the child herself, a young, Caucasian CPT nurse practitioner, Defendant Haley Dietzman, "had to beg" the ED or trauma floor doctors to admit the child as a patient so that a battery of additional "SNAT" testing could be run to label him a victim of "Suspected Non-Accidental Trauma", or "SNAT" for short, i.e., an abused child. Doc. 319-9.  It is a reasonable inference from the evidence that begging was needed because the ED and/or trauma floor doctors, who were not members of the PCH CPT, did not believe the child needed to be admitted under an abuse diagnosis. Indeed, these non-CPT doctors were telling the family that test results were normal or not worrisome for abuse and that they did not suspect abuse. Doc. 319-10. Yet, at approximately 10:00 p.m. that night, a PCH CPT social worker called both the Buckeye Police Department and the DCS abuse hotline to make a report of suspected abuse. Doc. 391-3 at BPD000003. At approximately 9:17 p.m. that evening, a CT scan of the head found "blood products" in the child's head; the age of that fluid collection could not be determined. Doc. 319-11 at 25:12-23; 319-12. It could have possibly been "blood products" collecting in the head since birth since brain bleeds are common in newborns. Doc. 319-13 at DUVALL_1767**;** Doc. 319-14 at 1. It should be noted that PCH has a contract with DCS to be the single source for assisting DCS in child abuse investigations.

Doc. 319-51 at AZDCS01079, AZDCS01081. According to Dr. Coffman, the meter starts running under that contract once PCH calls the DCS hotline with a case of suspected abuse. Doc. 319-28 at 114:11-14, 119:11-13.[5]

During the late evening of 21 February 2019, and into the pre-dawn hours of 22 February 2019, both the Buckeye Police Department ("BPD") and DCS, responding to the PCH CPT's hotline call, arrived at PCH and started concurrent child abuse investigations. Doc. 319-3 at BPD000003; Doc. 319-15 at AZDCS012360. Dr. Patrick Hangge, a PCH trauma floor doctor, spoke with BPD and DCS at 3:35 a.m. on the 22nd of September and told them that a blood disorder had not been ruled out as a cause of the purported tibial fractures, and that a blood disorder or braking too hard in a car could explain the subdural hematoma seen on the CT of the head. Doc. 319-15 at AZDCS012371-372. Dr. Hangge also stated the CT did not show a skull fracture and the child has no visible outside trauma. *Id.* Dr. Hangge told BPD that the lab results were "abnormal" and that "we don't have a lot of answers at this time." Doc 319-3 at BPD000006.

Later, on 22 February 2019, DCS acted, not by taking temporary custody of the child, but by placing him and his parents under a Present Danger Plan ("PDP"), where the parents retain legal custody, and allowing the child to remain in the family home and the parents to have unlimited contact with their son but only with the designated safety monitor present. Doc. 319-16. Later that day, without legal authority or parental consent to do so, DCS authorized Defendant Dietzman, the PCH CPT nurse practitioner, to conduct a forensic medical examination of S.Z.S., *after* it had already been performed. Doc. 319-15 at AZDCS012373. Also that day, after CPT nurse practitioner Dietzman talked with DCS OCWI investigator Alyssa Lucero about the child, Lucero changed the PDP to now prohibit

---

[5] It should be further noted that PCH Defendants vigorously resisted disclosing financial information related to its services under the DCS contract during discovery in this case, and in fact, never disclosed that relevant information.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

any contact between the parents and their son.[6]  Doc. 319-16 at PCH Emails 0059 GR; Doc. 319-24 at 2.

Late in the morning or early afternoon on 22 February 2019, Defendant Cassidy, a pediatric ophthalmologist who frequently consults for the PCH CPT when there is a suspicion of abusive head trauma, arrived at PCH to examine the child's eyes. Doc. 319-17 at 108:3-5, 7-9, 13-17; Doc. 319-18 at 62:7-10, 62:20-63:1; 64:6-9, 64:11-65:2, 66:9-11, 19-21, 66:23-67:19, 68:3-11, 17-25, 69:3-8. Time should be taken here to note that the medical child abuse community places great (undue) weight on the presence of retinal hemorrhages to buttress a diagnosis of abuse by shaking, i.e., AHT. Dr. Cassidy performs consultations for PCH CPT only on cases where child abuse is suspected, particularly the AHT type – once PCH CPT pages him, he knows he will be examining an "abused child." *Id.* Dr. Cassidy was in S.Z.S.'s room for 90 seconds, during which he examined the outside of his eyes and then his retinas using an ophthalmoscope but without the child's pupils being fully dilated, as the standard of care requires. Doc. 319-17 at 96:3-12; 118:2-4; 120:15-17; Doc. 319-19 at 4. Also, following his examination, and as part of those 90 seconds he was in the child's room, Dr. Cassidy reluctantly and brusquely discussed his purported findings with the family. Doc. 319-2 at 121. He says he found extensive bleeding in all layers and quadrants of the child's retinas. Doc. 319-20. In his words, the child's retinas "were painted with blood" and shaking was the cause. Doc. 319-17 at 44:24-25, 49:6-16, 50:1-6, 16-21; *but see* Doc. 348 at DUVALL_001767 (Dr. Young explaining that Dr. Cassidy was only guessing at a cause and that his guess doesn't make sense given the lack of evidence).[7] Dr. Cassidy testified at trial that the only other time he had seen as much blood in a child's retinas was when he examined a child who had fallen to the ground from a seventh story

---

[6] Mother Honor Duvall was allowed to breastfeed the child two times a day under the revised PDP. Doc. 319-24 at 2.

[7] Dr. Young's expert report was originally filed as Doc. 319-13, as Ex. 13 to Plaintiffs' Motion for Partial Summary Judgment (Doc. 319). That filed version of the report does not have the Bates labels with which the report was disclosed in this matter. The Bates labeled version has been filed as an attachment to a Notice of Errata filed this day (Doc. 348) and should be used to replace Doc. 319-13.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

window. Doc. 319-17 at 49:20-23. On cross-examination, he refused to concede that the child had no other physical findings consistent with falling from a seventh story window, *Id*. at 85:6-11, though he later admitted at deposition that "birthing" was another example of a "massive crush injury" to the head that could case retinal bleeds, Doc. 319-18 at 180:14-23.[8] Although a retinal camera was available at PCH at the time Dr. Cassidy examined the child, and despite knowing a DCS and criminal investigation were underway, he did not photograph the boy's retinas to document and verify what he purportedly saw and to preserve that evidence. Doc. 319-18 at 178:7-13, 16-17, 23-25; 180:8-10; *see also* 319-22 at DUVALL_000057 (Juvenile Court noting that nothing was done to verify Dr. Cassidy's purported observations).

As noted above, without legal authority to do so because the parents retained legal custody and the right to direct their child's medical care, Defendant Dietzman conducted a forensic medical examination of the child and determined that he was abused. Doc. 319-23; Doc. 319-15 at AZDCS012371. The next day, S.Z.S. was discharged under a PDP to the custody of his maternal great grandmother. Doc. 319-24. PCH CPT personnel expressed their dismay that despite "push[ing]" DCS as hard as they could, the DCS investigator did not take temporary custody of the child or amend the PDP to prevent the parents from seeing their child. Doc. 319-25. PCH CPT Unit Chief Kirsch stated, "we can escalate to OCWI [DCS's Office of Child Welfare Investigation] supervisor if needed." *Id*. This is in contradiction to PCH witnesses' careful deposition testimony that they are only to diagnose and treat suspected victims of abuse and do not have a role to play in removal

---

[8] A 2016 study conducted at Stanford University School of Medicine (the "Stanford Study") concluded that 20.3%[8] of children are born with retinal/optic nerve hemorrhaging, 71% of which involved hemorrhaging in multiple layers of the retina, and 35% in all 4 quadrants, which can take up to 58 days to resolve completely. Doc. 319-52. S.Z.S. was just shy of his 2-month birthday when he was first seen at PCH. The Stanford Study concluded that hemorrhages in the eyes "are common among newborns…often involve multiple areas and layers of the retina…." and that "[v]aginal delivery was associated with a significantly increased risk" of such hemorrhaging. *Id*. at 2. Babies' retinas are not examined at birth or any other time as a routine matter.

or related child safety decisions. *E.g.*, Doc. 319-6 at 155:19-25, 156:8-10, 13-25, 157:2-3, 5-12, 20-23.

On 25 February 2019, two days after his discharge from PCH, S.Z.S. was examined by Dr. Warren Heller, a licensed ophthalmologist with over 45 years' experience, including with children, to get a second opinion to Dr. Cassidy's examination. Doc. 319-26 at 29:5-6. Dr. Heller, like Dr. Cassidy, used an ophthalmoscope to examine the boy's retinas and his examination revealed nothing alarming about the child's retinas or eyes. *Id*. at 33:4, 33:25-34:5; Doc. 319-27. Dr. Heller reported that all aspects of the child's retinas were "WNL", meaning "Within Normal Limits". *Id*. He did not find any retinal bleeding and nothing to indicate S.Z.S. had been abused. *Id*. At trial, Dr. Cassidy was dismissive of Dr. Heller and his findings; for instance, he testified that Dr. Heller's use of "WNL" meant "We Never Looked." Doc. 319-17 at 53:18, 20-24, 55:19-20, 23-25. When given the opportunity to graciously rehabilitate his lack of professionalism toward Dr. Heller, Dr. Cassidy doubled down on his contempt for Dr. Heller and his examination of the child. *Id*. at 84:13-18, 84:24-85:5. His own PCH CPT colleague, Dr. Coffman, later confirmed what even lay persons know – that WNL in medical records means "Within Normal Limits." Doc. 319-28 at 112:11-16; Doc. 319-22 at DUVALL_000053.

S.Z.S. was also seen by his pediatrician on February 25, 2019, who referred him to Valley Radiology to obtain images and a second opinion regarding his purported tibial fractures. Dr. Galvez-Trevino, a pediatric radiologist at Valley Radiology, did not find the bilateral bucket handle tibial fractures diagnosed by PCH. Doc. 319-29. Rather, he found the left tibia was normal, with no fractures or dislocation; and only a "possible" fracture of the right tibia, and recommended a bone scan to confirm whether the density found on the radiograph was a fracture or a radiological artifact, which are common. *Id.*

On 27 February 2019, the PCH CPT meet with the DCS investigators and Det. Skaggs to discuss the S.Z.S. case. Doc. 319-47; Doc. 319-25 at PCH Emails 0060 GR. PCH CPT was keen to express their concerns and to influence DCS to prevent the parents from

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

having contact with the child, such as more restrictive safety plans or removal of the child from his parents' custody. Doc. 319-16.

Dr. Galvez-Trevino's findings were, in essence if not completely, corroborated by Dr. Wood on 28 February 2019, when the child had a consultation set up by the PCH CPT. Doc. 319-30. Dr. Wood confirmed that the child did not have a left tibia fracture, and, although he diagnosed a right tibia fracture, he ordered a bone scan to confirm that diagnosis because the radiograph results were not definitive. *Id*. at PCH 1202 cycn; Doc. 319-31 at 16:23-24, 93:11-24, 242:12-25; Doc. 319-10 at AZDCS000681; Doc. 319-32. PCH never performed the bone scan to confirm a right tibia fracture. The lack of that bone scan was an issue for the State at the dependency trial. Doc. 319-31 at 280:4-12, 280:19-281:14; Doc. 319-41 at 155:8-22, 155:24-156:4; Doc. 319-50.  Additionally, Dr. Wood's records make it clear he was not careful in recording his observations. His records were replete with errors; for example, inaccurately stating that the boy was in a splint, was in pain, given pain medication, and had shrunk almost 11 inches since birth. Doc. 319-33 at 84:4-6, 86:8-12, 17-20, 107:21-25, 108:1-22; Doc. 319-31at 244:3-245:22, 246:2-17, 249:12-250:7, 253:18-254:15. These are among the reasons the Juvenile Court found Dr. Wood and his records to lack credibility. Doc. 319-22 at DUVALL_000054.

On 7 March 2019, the child had a follow up appointment with the PCH CPT at Childhelp Children's Center of Arizona, which is staffed with law enforcement, DCS, and PCH CPT personnel, to confirm the earlier SNAT findings. Doc. 319-34 at PCH 1173 cycn. At this time, Dietzman recognized that the "bruising" identified on the boy's body in February, which were material to PCH's earlier SNAT diagnosis (and which led to the accusations of abuse), were in fact Mongolian spots; that is, non-traumatic birth marks contraindicative of abuse. *Id*. at PCH 1176 cycn-1177 cycn. Deitzman found no other issues with the child and it was not until Mother expressed concern that his head circumference was increasing that Dietzman became concerned. *Id*. at PCH 1174 cycn, PCH 1177 cycn. Mother was ordered by Dr. Coffman and Dietzman to take her son back to PCH even though the family wanted to take him to Banner Cardon's Children's Hospital, another respected

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

pediatric hospital in the valley. *Id*.; Doc. 319-35 at 178:25-179:9. Coffman escalated the matter to DCS administrators who forced the case manager, over her objections, to "escort" the family to PCH and only PCH or remove the child from their custody. Doc. 319-35 at 178:5-18, 178:25-179:9, 179:19-24. S.Z.S. was readmitted to PCH that same day. Doc. 319-36.

The next day, 8 March 2019, the child underwent a medical procedure to place a drain in his head to remove the excess fluid around his brain. Doc. 319-37. Upon completion of the procedure, S.Z.S. went into respiratory distress and was subsequently admitted to the pediatric intensive care unit where he remained until shortly before discharge 12 days later. *Id*. at PCH 0407 cycn. Also on 8 March 2019, DCS investigator Lucero filed a second *ex parte* application for an order allowing DCS to take temporary custody of S.Z.S., though DCS did not act on that order at that time, partly because nothing in their investigation thus far pointed to the parents as abusers.[9] Doc. 319-38; Doc. 319-35 at 199:1-8. While the child was still hospitalized, Dr. Coffman learned that someone at DCS told the family to sue PCH. Doc. 319-40. On 14 March 2019, Dr. Coffman emailed DCS Director Greg McKay, with whom she had a long-standing relationship, about the potential of a lawsuit to inform him that she was notifying PCH Risk Management of that possibility. *Id*. She also told McKay that it was probably best that she resign her consulting position with DCS that McKay had hired her into shortly after he became Director. *Id*. Around that same time, Dr. Coffman unsuccessfully tried to influence the DCS OCWI investigating supervisor, Jeff Duncan, to remove the child. Doc. 319-21 at AZDCS017828. When that failed, she called her friend Director McKay to discuss the case one-on-one. Following that conversation, Director McKay ordered the DCS team investigating this case, i.e., State Defendants Duncan and

---

[9] DCS had applied for and obtained an *ex parte* order of removal on 27 February 2019, allowing the Department to take temporary custody of the child. Doc. 319-39. However, DCS never acted on that order and never took temporary custody pursuant to that Court Authorized Removal ("CAR") order because the investigators, Lucero and her supervisor Duncan, determined further investigation was necessary to know what exactly the cause of the child's medical conditions was. Doc. 319-42 at 63:2-64:22.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Lucero and their superior, Kimberly Pender, over that team's better collective judgment at that time, to take temporary custody of the child and file a dependency petition. Doc. 319-41 at 130:6-25, 131:1-2, 14-25, 133:1-13; Doc. 319-35 at 224:12-225:2; Doc. 319-42 at 63:2-64:22, 78:19-79:2, 92:23-93:6; Doc. 319-21 at AZDCS017828. The DCS investigators felt frustrated by McKay's order and believed it was inappropriate and unjust to remove the child from his family. Doc. 319-20 at AZDCS017828; Doc. 319-35 at 224:12-225:2.

S.Z.S. was taken into temporary custody on 16 March 2019, immediately upon his second discharge from PCH, and a dependency petition was filed on 19 March 2019. Doc. 319-43; Doc. 319-44. Defendants Cassidy, Coffman, and Wood, along with their PCH colleague Dr. Ronecker, were the only witnesses in the dependency trial regarding the issue of abuse and their sole purpose was to prove that the child had been abused by his parents. The case was prosecuted by the Arizona Attorney General's Office on behalf of the State and DCS. Doc. 319-44 at 1.  The assistant attorney general handling the trial worked closely with PCH, through its general counsel, to prepare the State's case for trial. Doc. 319-50. He also worked with Defendant Cassidy, and it is a reasonable inference that he did so with Drs. Wood and Coffman, as well. Doc. 319-17 at 87:9-20, 88:1-3. During those trial preparations, the failure to conduct the bone scan Dr. Wood ordered to confirm the right tibia fracture became a problem and area of concern for the prosecution. Doc. 319-50. As discussed below, the State's evidence of abuse was lacking in substance and credibility. Doc. 319-22. The dependency petition was dismissed with a finding that the child was not abused. *Id*. at DUVALL_000057-58.

## B.    State Juvenile Court Dependency Proceedings

On 19 March 2019, DCS filed a dependency action in the Juvenile Division of the Superior Court of Arizona, Maricopa County, seeking a court determination that the child was abused by his parents, or that they failed to protect him from abuse, and, therefore, seeking to have the child adjudicated a dependent child due to abuse pursuant to the provisions of A.R.S. § 8-201(15). Doc. 319-44 at DUVALL_000026; Doc. 319-232 at DUVALL__000027; Doc. 319-22 at DUVALL_000051. Due to the severity of the

purported medical conditions reported by Defendants and the parents' inability to explain the cause of those medical conditions, DCS sought to permanently sever the parents' right to their son. Doc. 319-45 at AZDCS000460, AZDCS000465.

In August 2019, a dependency trial was held over four days based on Defendants' "suspicions" that the child was a victim of abuse at the hands of his parents. Doc. 319-22 at DUVALL_000051. The State's only witnesses to prove the boy was abused were PCH doctors:  Brendan Cassidy, Kathryn Coffman, William Wood, all Defendants here, as well as Dr. Jennifer Ronecker, a pediatric neurosurgeon at PCH, and Det. Skaggs, the Buckeye Police Department Detective who declined to prosecute the parents for abuse following her investigation. *Id.* at DUVALL_000052-53.

On 12 November 2019, the juvenile court judge found the evidence of abuse so lacking that the State could not even satisfy the low bar of proof by a preponderance of the evidence. *Id.* at Duvall_000052, Duvall_000057. The juvenile court expressly found that Defendant Cassidy was not a credible witness and made a special note of the fact that his observation of the child's retinas being "painted with blood" was not verified by any other credible evidence. *Id.* at DUVALL_000053. Rather, the juvenile court found, the credible and unbiased evidence showed that the child's retinas were not painted with blood and that he had not been injured or abused in any of the ways Dr. Cassidy hypothesized as potential causes for what he purported to see on his examination of the child. *Id.* at DUVALL_000053-54. The Juvenile court also found that PCH's medical records, including those of Dr. Wood, the pediatric orthopedic surgeon, were riddled with material errors and false information which prejudiced readers of those records, including Dr. Coffman, towards also finding abuse where it did not exist. *Id.* at DUVALL_000054-55. The juvenile court thus expressly found that S.Z.S. was not a victim of abuse, dismissed the dependency petition, and immediately returned the child to the care and custody of his parents. *Id.* at DUVALL_000057-58. The Juvenile Court indicated that its ruling "is intended to be a final order of the Court," i.e., a final judgment, and advised the parties of their appeal rights. *Id.* at  DUVALL_0000058. Upon reading the Juvenile Court's Ruling, DCS OCWI

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

investigations supervisor Duncan remarked to DCS OCWI investigator Lucero, "Looks like the Judge saw the same things we did on this case." Doc. 319-21 at AZDCS017815. The State did not appeal the Juvenile Court's final judgment.

## III.    <u>STANDARD FOR REVIEW</u>

Rule 56 provides that a moving party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor." *Puentes v. City of San Mateo*, No. C 11-02511 SI, 2011 WL 4005383, at *2 (N.D. Cal. Sept 8, 2011), *aff'd*, 481 F. App'x 348 (9th Cir. 2012) (internal citations omitted). "Summary judgment will not lie if the dispute about a fact is 'genuine,' *i.e.*, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The trial court must inquire if "the evidence…is so one-sided that one party must prevail as a matter of law" and "should not act other than with caution in granting summary judgment." *Id.* at 242-43, 106 S.Ct. at 2507, 91 L.Ed. 2d 202.

In addition, the "[p]arty seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrette*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986); Fed. R. Civ. P. 56(a). Furthermore, the Ninth Circuit has held that "[i]n order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court there is no genuine issue of material fact. If a moving party fails to carry its ultimate burden of persuasion on the motion, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. In such a case, the nonmoving party may defeat the motion for summary judgment without

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

producing anything." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.32d 1099, 1102-03 (9th Cir. 2000) (internal citations omitted).

## IV.   **ARGUMENT**

### A.   **Defendants Played a Crucial Role in The Juvenile Court Dependency Proceedings**

PCH Defendants incorrectly assert that they were not parties to the dependency trial and had no opportunity to present expert witnesses supporting their care and treatment of S.Z.S. or to present other witnesses and evidence. Doc. 132 at 6:20-7:3. As the trial unfolded, Defendants Cassidy, Coffman, and Wood, along with their PCH colleague Dr. Ronecker, were the *only* witnesses – to the complete exclusion of any DCS personnel – in the dependency action regarding the issue of abuse and their *sole purpose* was to prove that S.Z.S. had been abused by his parents. Defendants were not prevented from testifying about any of their observations or opinions on the issue of abuse.  And they were the experts there. Indeed, the evidence shows that PCH, through its general counsel, and Defendants Cassidy and Wood, worked closely with the assistant attorney general in prosecuting the dependency trial. There is a reasonable inference that Defendants Coffman and Dietzman did, as well. In fact, Defendant Coffman had enough input in the matter to cause the State, through DCS, to take temporary custody of the child and file the dependency petition in the first place – steps that the DCS investigators themselves were unwilling to do at the time due to the conflicting evidence of abuse, but were ordered to do by the Director *only after* Dr. Coffman intervened. Simply put, Defendants not only had an opportunity to litigate the issue of abuse, but they were the driving force behind it being brought to the court and litigated. Therefore, Defendants are precluded from relitigating the issue of abuse in this matter. *Chaney v. Building Co. v. City of Tucson*, 148 Ariz. 571, 716 P.2d. 28, 20 (1986).

For issue or claim preclusion there must be some privity between the parties in the two concerned actions. "Whether by way of res judicata or collateral estoppel, the preclusive effect of a judgment is limited to the parties and person in privity with the parties. *State ex rel Winkleman v. Arizona Navigable Stream Adjudication Comm'n*, 229 P.3d 242, 257

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

(App. 2010). Privity is determined by the relationship of the parties to the action and commonality of their interests. *Hall v. Lalli*, 194 Ariz. 54, 57, 977 P.2d 776, 779 (1999). "Finding privity between a party and a non-party requires both a substantial identity of interests and 'working or functional relationship' … in which the interests of the non-party are present and protected by the party in the litigation." *Id*.

PCH made the initial report to DCS to begin the process of S.Z.S. being removed from the custody of his parents based on these Defendants' erroneous suspicions of abuse. Defendants were the primary testifying expert witnesses for the State, and their erroneous medical records were admitted to substantiate their misguided allegations of abuse. These Defendants played a crucial role in the dependency action, their interests were not only aligned with the State and DCS, but they imposed their will on the State and DCS to pursue removal and dependency findings – in short, these Defendants had an invested interest in ensuring the evidence proved the child was abused and thus dependent.

**B.** **Defendants are Not Entitled to Summary Judgment on Claim Six - Conspiracy**

**1.** **Defendants were integral participants in the violation of Plaintiffs' Constitutional rights.**

Defendants do not mention or dispute that they were integral participants in the deprivation of Plaintiffs' constitutional rights. Defendant Coffman, without the burden of citation to any binding authority, argues an exaggerated (and incorrect) claim that Plaintiffs need expert testimony to prove she breached the standard of care before Plaintiffs can prove conspiracy. On 14 October 2022, the Court ruled that Plaintiffs' "substantive claims against the PCH Defendants – conspiracy to violate Plaintiffs constitutional rights (Claim 6) and IIED (Claim 15) – do not require establishing a medical standard of care as a predicate element." *See* Doc. 149 at 5:26-6:1. The law has not changed in the interim. Defendants' argument fails.

Liability for conspiracy in a § 1983 action exists when there is an agreement to achieve the goal of violating a plaintiff's constitutional rights. *Crowe v. Cty. of San Diego*,

608 F.3d 406, 440 (9th Cir. 2010).  Evidence of an agreement to conspire here can be inferred by the Defendants' actions when their acts would have been unlikely to occur without the agreement. *Id.*; *Kunik v. Racine County*, 946 F.2dd 1574, 1580-81 (7th Cir. 1991). Thus, not only can a conspiracy rest on circumstantial evidence, but the agreement need be spoken or tacit, it can be inferred from conduct. The law provides that circumstantial evidence, such as the actions of the Defendants here, can be used to show the requisite meeting of the minds for conspiracy in a §1983 matter. *Crowe*, 608 F.3d at 440. Furthermore, under *Kunik*, evidence of the agreement can be inferred from the Defendants' actions when their conduct would have been unlikely to occur without the agreement or understanding. *Kunik*, 946 F.2d at 1580-81.

Here, the conspiracy is multi-layered, with Defendants at the core of each layer. First, Dietzman "begs" the PCH ED or trauma floor doctors, it's unclear which, to admit the child so a full SNAT workup can be done. This gets the money from the contract with DCS flowing to PCH CPT. Without any clear, obvious, verifiable and/or witnessed events of abuse by the parents, the PCH CPT calls on its self-described advocate for victims of AHT, Dr. Cassidy, to find retinal hemorrhages ("RH"), since the child abuse dogma is that RH is almost never present except in cases of abuse. Dr. Cassidy obliges and finds the child to not only have bruising around his eyes – a condition no one else observes – but also that his retinas are "painted with blood" – also a condition no one else observes and which Cassidy does not document photographically. Defendant Wood, an PCH orthopedic surgeon making nearly $500,000 a year at the time and another doctor called in by the PCH CPT, orders genetic testing to rule out any genetic disposition to brittle bones, which is rare, and a bone scan to confirm a right tibia fracture is present on the radiographs and not just a radiological artifact, which are not rare. The genetic test order gets executed, but, mysteriously, the bone scan order does not, which later becomes an issue at the dependency trial.

All the while, S.Z.S.'s family, particularly his mother, Honor Duvall, and his grandmother, Dawn Duvall, herself a registered nurse at the time studying to become a nurse practitioner, are asking too many questions and pushing back too hard on the PCH CPT's

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

17

abuse diagnosis. Internal emails show that this causes the entire PCH CPT roster to demean the family and brand them as abusers who are covering up for one another. The next layer occurs when the child arrives at Childhelp on March 8, 2019 for a CPT scheduled SNAT follow-up visit. At that time, it is discovered that the child's head circumference is expanding rapidly, which causes everyone, Honor, Dietzman and Coffman, to be concerned. Dietzman and Coffman tell Honor the child must be readmitted to PCH immediately for a neurologic consult. Hesitant and skeptical of PHC due to the February experience, Honor tells Dietzman and Coffman that she wants to take her son to Banner's Children's Hospital just a few miles away in Mesa. This won't do to keep the money flowing to PCH, so Coffman gets DCS to intervene and require the family to take the child back to PCH under threat of taking temporary custody if they don't comply. Honor complies. Second phase of conspiracy completed; third to come.

Despite PCH CPT's emphatic SNAT diagnosis, as of mid-March 2019, the front line DCS OCWI investigation team, State Defendants Duncan and Lucero, still have not taken temporary custody and are hesitant to do so because of second medical opinions obtained by the parents casting doubt on the main pillars of PCH CPT's SNAT diagnosis. Defendant Coffman then hears that someone at DCS told the family to sue PCH, which thrusts her into the third phase of the conspiracy (which actions also constitute negligence on her part). She first attempts to strong-arm Duncan into taking temporary custody and filing a dependency petition. When that fails, she goes to her long-time child abuse colleague and now Director of DCS, State Defendant Greg McKay, and convinces him to order his investigators to do what Duncan refused to do at Coffman's request. McKay issues the order and, viola, the child is taken into temporary custody and a dependency petition is filed. The totality of these circumstances, which have even more contours, are sufficient for the conspiracy claim to go to a jury.

As discussed a bit more below, these Defendants took steps which they otherwise would not have taken had there not been an agreement, a tacit understanding, with the State and DCS to violate Plaintiffs' constitutional rights to due process by investigating and

pushing the State and DCS to move forward with a dependency on their erroneous narrative that S.Z.S. was abuse.

### 2. Defendants were State Actors because they conspired with the State and DCS to have S.Z.S. removed from his parents' custody

Defendants can become state actors "by conspiring with a state officer or by engaging in a joint activity with state officials" and "by becoming so closely related to the State that the person's actions can be said to be those of the State itself. *Price v. State of Hawaii*, 939 F.2d 702, 708-09 (9th Cir. 1991) cert. denied 503 U.S. 938 (1992). Further, this "determination is usually fact bound, and that militates against too hasty a termination of an action." *Id.* (internal citations and quotations omitted). Defendants' actions are "inextricably intertwined" with those of the State and DCS, *Burnett v. Humane Society of Ventura County*, 294 F.3d 1205, 1211 (9th Cir. 2020), and "substantial cooperation" between the private actor[s] and the State must be shown. *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996). Joint action or substantial cooperation may be shown through evidence of a conspiracy between the private actors and the state. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1546-47 (9th Cir. 1989). For Plaintiffs to prove conspiracy, they must show an agreement or meeting of the minds to violate Plaintiffs' constitutional rights, and each co-conspirator must share the common objective of the conspiracy. *Id.* at 1540-41.

Here, Defendants Coffman and PCH, particularly through Coffman and Dietzman, exercised extraordinary pressure over DCS to have S.Z.S. removed from the care and custody of his parents based on Coffman's and the PCH CPT's misguided "suspicion" of abuse. Dr. Cassidy was brought in by the PCH CPT to solidify the shaken baby diagnosis, by rounding out the "constellation of findings" with retinal hemorrhages. Sure enough, Dr. Cassidy found that the child's retinas were "painted with blood" and shaking was the cause. There was nothing done to document and verify what Dr. Cassidy saw to solidify the "suspicion" of abuse. Defendants and DCS shared a common purported objective to protect S.Z.S., which Coffman, Dietzman, and PCH overly and overtly influenced DCS to do by

19

aggressively seeking DCS intervention to require the child to be readmitted to PCH for his enlarging head and then by aggressively seeking S.Z.S.'s removal and the filing of a dependency petition. This occurred most flagrantly with Coffman ignored –nay, rejected – Duncan's investigative decision to await further evidence before deciding to remove S.Z.S or not, and went over Duncan's head to take her removal and petition demands directly to the top of DCS hierarchy, to Director McKay, who then ordered his subordinates to take temporary custody and file a dependency petition. Under this set of facts, it is rightly said that DCS's actions in taking temporary custody and filing the dependency petition before they were done with their investigation was "inextricably intertwined" with Defendants' actions in seeking utilization of the child protection apparatus based on their own biased and misguided "suspicions" of abuse.

Furthermore, in acting as they did, Defendants stepped out of their limited role as medical professionals to occupy the role belonging to DCS and its personnel. Defendants each played a pivotal role with the State and DCS in having S.Z.S. removed from the care and custody of his family and in initiating and litigating the dependency action as noted above.

## C. PCH Defendants Are Not Shielded by Immunity on Plaintiffs' State Law Claims (Claims 11, 15, and 16)

PCH Defendants falsely assert they are cloaked by immunity pursuant to Arizona's mandatory child abuse reporting statute A.R.S. §13-3620. Doc. 312 at 19:4. However, for PCH Defendants to be immune, they must (1) immediately report the abuse, (2) after forming a reasonable belief, (3) during the course of treatment, and (4) after an evaluation of available medical history to look for an alternate, non-abusive explanation. *See* A.R.S. § 13-3620(A). Arizona Law provides, "[t]he immunity in the reporting statute is qualified immunity because it can be overcome by a showing of *malice* on the part of the person who reported the alleged abuse." *L.A.R. v. Ludwig*, 170 Ariz. 24, 28 (App. 1991) (emphasis added, internal citation omitted.). Malice in the context of the reporting statute means "the

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1    actor must have intended to do something that he or she knew to be wrong." *Ramsey v.*
2    *Yavapai Fam. Advoc. Ctr.*, 225 Ariz. 132, 139-40 (App. 2010).

3        There are several reasons why A.R.S. § 13-3620(A) does not protect PCH
4    Defendants. *First*, PCH Defendants only became a "mandatory reporter" based upon their
5    suspicions of abuse which were based solely on their inaccurate and erroneous medical
6    records noting the following that did not exist: hematemesis; bruising in multiple areas of
7    his body; normal lab results; and bilateral buckethandle fractures of the tibia. *Second*, the
8    statute itself only protects individuals who "reasonably believe" that a child had been abused
9    and, under the facts of this case, it cannot be said that PCH Defendants' belief was
10   reasonable. *Third*, PCH Defendants were not providing medical treatment to S.Z.S. at the
11   time the CPT caseworker made the hotline report. Indeed, none of the Defendants here
12   provided any care or treatment to S.Z.Z., they merely conducted various forensic
13   examinations in the context of ongoing law enforcement and DCS criminal investigations.
14   *Fourth*, it is not credible that PCH Defendants could have formed a reasonable belief prior
15   to the CPT caseworker reporting the abuse to the CPS hotline. Defendant Dietzman had to
16   "beg" the ED or trauma floor doctors to admit the child so that a battery of additional
17   forensic "SNAT" testing could be run. It is a reasonable inference from the evidence that
18   begging was needed because the ED and/or trauma floor doctors, the ones actually providing
19   medical care treatment and who were not members of the PCH CPT, did not believe S.Z.S.
20   needed to be admitted under an abuse diagnosis. *Fifth*, PCH's inaccurate and erroneous
21   medical records continued with Defendant Wood inaccurately stating that S.Z.S. was in a
22   splint, was in pain, given pain medication, and had shrunk almost 11 inches since birth.
23   These are among the reasons the Juvenile Court found that PCH records contained
24   significant errors and that Defendants were not credible witnesses. *Sixth*, Defendant
25   Coffman did not do an independent review of the medical records but rubber-stamped the
26   allegations of abuse. *Seventh*, Defendant Cassidy was brought in by the PCH CPT to solidify
27   the SBS/AHT SNAT diagnosis by rounding out the "constellation" with findings of retinal
28   hemorrhages, which he did finding that S.Z.S.'s retinas were "painted with blood" and

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

21

shaking was the cause.  Why he did not photograph what he saw even though a camera was available to do so is an interesting and pertinent question for the jury to consider. There was nothing done to document and verify Cassidy's observations and a second opinion only three days later casts reasonable doubt on what Cassidy says he saw.

It is well-settled law that "reasonableness" is a determination for the factfinder. *See Ornelas v. United States*, 517 U.S. 690, 695, 116 S. Ct. 1657, 1661, 134 L. Ed. 2d 911 (1966) ("…'reasonable suspicion'…[is a] commonsense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable prudent men, not legal technicians, act") (internal citations omitted).  Under state and federal law, if there are facts in dispute, immunity must be determined by the factfinder. *See Castro v. Arizona Dep't of Pub. Safety*, No. CV1800753PHXSRBESW, 2020 WL 9600817, at *11 (D. Ariz. Apr. 30, 2020) aff'd sub nom. *Castro v. Martin*, 854 F.App'x 888 (9ᵗʰ Cir. 2021) ("[w]hen the existence of immunity turns on disputed factual issue, a jury must resolve those issue before court may decide whether the facts are sufficient to establish immunity.")

Here, pointing to the law which *presumes* they were acting in good faith, PCH Defendants falsely argue that Plaintiffs failed to allege any facts to show malice. *See* Doc. 312 at 20 ¶ 19-20. However, under *Ramsey*, malice in this context means having the intent to do something the actor knows is wrong. *Ramsey*, 225 Ariz. at 139-40. As shown above, Defendants made false accusations that were unreasonable and based on the erroneous medical and factual record available to them at the time, that S.Z.S. was abused. It is a reasonable inference from these facts that PCH Defendants knew, or should have known, that providing DCS false accusations of abuse based upon erroneous medical records, which were not substantiated by the second opinions the family obtained, was so wrong it was malicious. But even more malicious was exerting improper influence over DCS to: (i) require the child to be readmitted to PCH in March, instead of allowing the family to go to Banner at a time when the parents maintained legal custody and medical decision-making, under threat of taking temporary custody; and (ii) take temporary custody and file a dependency petition after hearing that someone at DCS told the family to sue PCH. Based

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

on PCH Defendants' actions as noted above, they are not entitled to immunity for Claim 11 (Medical Negligence), Claim 15 (Intentional Infliction of Emotional Distress), or Claim 16 (Negligence against PCH), and summary judgment must be denied.

### D. Defendants are Not Entitled to Summary Judgment on the Medical Negligence Claim

To prove medical negligence under Arizona law, Plaintiffs must show "as in all . . .negligence actions...the existence of a duty, a breach of that duty, causation, and damages." *Mann v. United States*, No. CV-11-8018-PCT-LOA, 2012 WL 2131933, at *6 (D. Ariz. Jan 31, 2012); *see also* A.R.S. § 12-563 (providing the "necessary elements of proof that injury resulted from the failure of a health care provider to follow the accepted standard of care."). "Ordinarily expert medical testimony is required to establish proximate cause and make out a prima facie case of medical malpractice unless a causal relationship is readily apparent to the trier of fact." *Gregg v. Nat'l Med Health Care Servs., Inc.*, 145 Ariz. 51, 54 (App. 1985). *See also Mann* at *6; *Nunsuch ex rel. Nunsuch v. United States,* 221 F. Supp. 2d 1027, 1033 (D. Ariz. 2001) (*res ipsa loquitur* applies where a doctor's negligence is grossly apparent). In other words, expert testimony is unnecessary to prove professional negligence "when the act or omission comes within the realm of common knowledge." *Revels v. Pohle*, 101 Ariz. 208, 210 (1966); *see also, e.g., Riedisser v. Nelson*, 111 Ariz. 542, 544 (1975) (expert testimony not necessary when the negligence is so apparent that a layperson would have no difficulty in recognizing it).

In this case, PCH and Defendant Wood's records are wildly inaccurate and contain materially false information about S.Z.S.'s medical condition. Dr. Coffman relied on these inaccurate records to rubber-stamp the allegations of abuse without doing a thorough objective evaluation of her own. Defendants were so focused on their unreasonable suspicions of abuse; they failed to do thorough examinations and rule out other causes for S.Z.S.'s "constellation" of symptoms. This is apparent when the child had to return to PCH because his head circumference was increasing requiring him to undergo a medical procedure to place a drain in his head to remove the excessive fluids around his brain.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

23

Defendants clearly overlooked properly diagnosing the child so they can focus on their unreasonable suspicion of abuse. Defendants also relied on erroneous medical records to conclude that S.Z.S. was abused and subject him to forensic SNAT testing. Dr. Coffman also engaged in plainly recognized negligence when she went far beyond her role as a medical consultant to exert influence over DCS personnel, including Director McKay to (i) require the family to readmit S.Z.S. to PCH for the head drain, rather than allowing the family to exercise their preference to go to Banner, and (ii) have temporary custody taken and a dependency petition filed. It is readily apparent that Defendants fell below the standard of care.

### E.    Plaintiffs Can Prove Intentional Infliction of Emotional Distress (IIED)

Defendants argue that Plaintiffs cannot come close with any facts or evidence to establish a prima facie case of IIED. *See* Doc. 312 at 24:4-25:5; Doc. 310 at 13:8-11.

"A plaintiff suing for [IIED] must prove the defendant[s] caused severe emotional distress by extreme and outrageous conduct committed with the intent to cause emotional distress or with reckless disregard of the near-certainty that such distress would result." *Walkins v. Arpaio*, 367 P.3d 72, 74-75 (Ariz. App. 2016) (citing *Ford v. Revlon, Inc.*, 734 P.2d 580 (1987). Arizona defines extreme and outrageous as going "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Ford*, 734 P.2d at 485 (quoting Restatement (Second) of Torts § 46 cmt. d).

There should be no question that the Plaintiffs experienced serve emotional distress. One is challenged to find a situation more wrought with emotional distress then having your newly first born son taken from you and then hardly seeing him for the next seven months of his young life. Plaintiffs Donald Sankey and Honor Duvall, S.Z.S.'s doting parents, were subjected to the wrongful removal of their son, a removal that was coordinated by Defendants and DCS agents with a view toward forever severing their parental rights. Defendants each played a pivotal role in initiating and carrying out the removal and subsequent dependency action by pushing the State, through DCS, to take custody of S.Z.S

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

and file a dependency petition based on their biases and inaccurate findings and hope to stem to tide of any potential lawsuit. Without the Defendants' critical participation, there would not have been a dependency proceeding and S.Z.S would not have been removed from the care and custody of his loving parents.

Once PCH CPT team became involved, Defendant Dietzman "had to beg" the ED or trauma floor doctors to admit S.Z.S. as a patient so they could run a batter of additional forensic SNAT testing to label S.Z.S. a victim of abuse. Even though the ED doctors were telling the parents that the test results were normal or not worrisome for abuse, a PCH CPT social worker called the Buckeye Police Department and DCS hotline to make a report of suspected abuse. Per PCH's contract with DCS, once the report is made, their cash begins flowing to PCH.

DCS initially acted, not by taking temporary custody of S.Z.S., but placing him and his parent under a PDP with him in the home with his parents and a responsible supervising adult.  However, this was not enough for the Defendants.  PCH CPT contacted DCS OCWI investigators and convinced them to change the PDP to prohibit any contact between the parents and S.Z.S. Mother was only allowed to breastfeed S.Z.S two times a day under this revised PDP plan and father had only four hours of visitation a week! Without any authority to do so, PCH CPT Defendant Dietzman conducted a forensic medical examination of S.Z.S. to document her diagnosis of abuse. Once S.Z.S. was initially discharged from PCH, PCH CPT personnel expressed their dismay that despite "push[ing]" DCS as hard as they could, the DCS investigator did not take temporary custody of S.Z.S or amend the PDP to prevent the parents from seeing S.Z.S.  at all. The CPT unit Chief Kirsh was willing to escalate it up to a DCS supervisor to get the result the CPT wanted. At S.Z.S.'s follow up appointment with PCH CPT at Childhelp in March, Dietzman recognized that the "bruising" material to PCH's earlier SNAT diagnosis were in fact Mongolian spots. Dietzman did not even notice that the child's head circumference was increasing until Mother pointed it out. She was only concerned with confirming the SNAT findings, which she was not able to do. Then, Defendants Coffman and Dietzman prevailed on DCS to coerce Honor to have her

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

25

son readmitted to PCH for the head drain against her wishes and her legal right to make medical decisions for her son. Based on Coffman's escalation to DCS, Honor's choice was a real-life Sophie's Choice – take your son to PCH or DCS will take temporary custody and do it themselves. After Defendant Coffman found out someone told the parents to sue PCH, she tried to influence Duncan to remove the child. When that failed she went to the top, to Director McKay, who gave her what she wanted, the shield of temporary custody and a dependency petition. Defendants' actions in this case were extreme and outrageous. They did cause emotional distress, which the jury will hear in the voices of Honor and Donald and see on their faces.

Crediting the facts alleged above as true, and drawing all reasonable inferences in Plaintiffs' favor, a reasonable jury could easily conclude that Defendants, conspiring with or adding and abetting DCS to keep S.Z.S from the loving care of his parents based on their erroneous and unreasonable allegations of abuse, is utterly intolerable in any decent society. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678; *Earth Island Inst. v. Wheeler*, 464 F. Supp. 3d 1138, 1141 (N.D. Cal. 2020). This is a quintessential question for the jury and not one for summary judgment. *See Lucchesi v. Frederic N. Stimmel, M.D., Ltd*, 149 Ariz. 76, 79 (1986) ("[w]here reasonable men may differ, it is for the jury, subject to the control of the court to, determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.").

## F.   PCH is Not Entitled to Summary Judgment

PCH argues that Plaintiffs' negligence claim should fail as they believe summary judgment will be granted in favor of the individually named PCH personnel. Doc. 312 at 25:6-14. As stated above, there is clearly a genuine dispute as to abundant material facts in this case and the individual PCH Defendants are not entitled to summary judgment. The claim against PCH should be denied.

## G.   Plaintiffs are Entitled to Have the Question of Punitive Damages Against Defendant Cassidy go to the Jury

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Defendant Cassidy argues that if any claims against him survive, which they do, Plaintiffs should be precluded from requesting punitive damages because they cannot meet the stringent standard to justify such an award.  Doc. 310 at 15:17-23. Cassidy's argument fails.

The "purpose of § 1983 is 'to deter unconstitutional acts committed under color of state law and compensate the victims of such acts.'" *Braillard v. Maricopa Cnty.*, 224 Ariz. 481, 232 P.3d 1263, 1276 (Ariz. App. 2010).  "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct … involves reckless or callous indifference to the federally protected rights of others." *Id. citing Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).  Punitive damages may be awarded in a § 1983 action "if you find that defendant's conduct that harmed the plaintiff was malicious, oppressive or in reckless disregard of the plaintiff's rights."  Model Civ. Jury Instr. 9th Cir. 5.5 (revised 2018). "[M]alicious, wanton, or oppressive acts or omissions are within the boundaries of traditional tort standards for assessing punitive damages." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2003) *citing Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir. 1993).

As stated above, Dr. Cassidy played a pivotal role in concert with PCH Defendants and the State to violate the Plaintiffs' constitutional rights. Dr. Cassidy performs consultations for PCH CPT only on cases where child abuse is suspected, particularly when AHT is suspected. He was brought in by the PCH CPT to solidify the SBS/AHT diagnosis by rounding out the dogmatic constellation of findings with findings of retinal hemorrhages. As expected, Dr. Cassidy found that the child's retinas were "painted with blood." He failed to use a camera that was available at the time to document his purported findings even though he knew criminal investigations were underway. He was the only doctor who viewed the boy's retinas and found such substantial hemorrhaging. As a self-acknowledged warrior for abused children, he was clearly biased in helping PCH substantiate their suspicions of abuse. Just as clearly, his conduct harmed Plaintiffs, was malicious, oppressive, or in

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

reckless disregard to Plaintiffs' constitutional rights. The question of punitive damages should move forward for a jury to decide.

## V.   CONCLUSION

Summary judgment can be granted only if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.56. As stated above, this matter is replete with genuine disputes to many material facts. Defendants' motions must be denied.

WHEREFORE, Plaintiffs request this Court deny *PCH Defendants' Motion for Summary Judgment* and *Dr. Brendan Cassidy's Motion for Summary Judgment,* in their entireties.

**RESPECTFULLY SUBMITTED** this 3rd day of November 2023.

**MILLS + WOODS LAW, PLLC**

By   */s/ Thomas A. Connelly*
    Thomas A. Connelly
    Robert T. Mills
    Sean A. Woods
    5055 North 12th Street, Suite 101
    Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of November 2023, I electronically transmitted the foregoing document to be filed electronically with the Clerk of the Court using the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

   */s/ Thomas A. Connelly*