# EXHIBIT 15

Todd Allen Lefkowitz, MD, FAAO on November 14, 2022

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

```
Honor Duvall, an individual; Donald )
Sankey, Junior, an individual;      )
S.Z.S., a minor, through his        )
parents and guardians Honor         )
Duvall and Donald Sankey,           )
                                    )
              Plaintiffs,           ) Case No.:
vs.                                 ) 21-CV-00167-PHX-ROS
                                    )
Arizona Department of Child Safety, )
a governmental entity; State of     )
Arizona, a governmental entity;     )
Brenda Gualajara, individually and  )
as an employee with the State of    )
Arizona Department of Child Safety  )
and John Doe Gualajara, her spouse; )
Fernando Araizo, individually and   )
as an employee with the State of    )
Arizona Department of Child Safety  )
and Jane Doe Araizo, his spouse;    )
Alyssa Lucero, individually and as  )
an employee with the State of       )
Arizona Department of Child Safety  )
and John Doe Lucero, her spouse;    )
Jeffrey Duncan, individually and as )
an employee with the State of       )
Arizona Department of Child Safety  )
and Jane Doe Duncan, his spouse;    )
et al.,                             )
              Defendants.           )
_____)
```

DEPOSITION OF TODD ALLEN LEFKOWITZ, MD, FAAO

Phoenix, Arizona
November 14, 2022
10:11 a.m.

(COPY)

REPORTED BY:
HD REPORTING, LLC
HALEY DAWN WESTRA, RPR, CRR
Certified Court Reporter
AZ-CR No. 50762

```
1   BY MS. PATANE:
2       Q.   Did you say "waters protocols"?
3       A.   No.  No.
4       Q.   I'm sorry.
5            MR. CONNELLY:  Orders.  He said "orders."
6            MS. PATANE:  Oh, orders.
7            THE WITNESS:  Orders or protocol.
8   BY MS. PATANE:
9       Q.   Okay.  In your practice and your experience
10  over the years, have you ever performed a slit lamp
11  exam on an infant?
12      A.   No.
13      Q.   Is that possible?
14      A.   I don't believe it's possible.  You can't get
15  them to sit still.
16           Now, there are portable slip lamps that are
17  available; but even so, to get a kid to sit still,
18  unless he or she were anesthetized, is fairly impos- --
19  mainly -- is rare -- is impossible.
20      Q.   Did you see in your review of the records from
21  Dr. Heller's visit with this baby that he documented
22  performing a slit lamp exam?
23           MR. CONNELLY:  Form.  Foundation.
24           THE WITNESS:  Yeah, I saw that, and I don't
25  believe it.
```

```
 1            And I know Dr. Heller personally.  And it
 2   wouldn't surprise me that he just ignored -- that he
 3   used the template.  And basically it's the template
 4   that applies to adult exams.
 5            Now, if it were me, and I was using the -- the
 6   sheet for the progress note, I would have crossed out
 7   things like "slit lamp."
 8            I just would have mentioned an assessment of
 9   the vision, what the eye muscle situation was, and then
10   the dilated fundus exam.
11            But Dr. Heller is kind of old, and I -- I
12   think he's way beyond the time he should be in his
13   practice, so I would ignore any information from his
14   practice.
15            And I think that most of my colleagues in the
16   Valley would say the same thing.
17   BY MS. PATANE:
18       Q.   And is that the case, then, for anything from
19   his practice from 2019?
20       A.   Mm-hmm.
21            MR. CONNELLY:  Form.  Foundation.
22   BY MS. PATANE:
23       Q.   Is that a "yes"?
24       A.   Yes.
25       Q.   Just to confirm, you've never personally
```

1 Swayde Sankey's birth?
2    A.   Well, since I wasn't there, I have to rely on
3 Cassidy and maybe Rosenthal, Fecarotta.
4    Q.   Do you recall when the baby was born with
5 respect to when Dr. Cassidy and Dr. Fecarotta and
6 Dr. Rosenthal performed their evaluations?
7         In other words, how old was the baby when they
8 performed their evaluations?
9         It looks like you're referring to some of your
10 handwritten notes; is that correct?
11   A.   That's correct.
12        I don't seem to have written down the date of
13 birth here, or it's not in the report -- well,
14 actually, I'm sorry, let me take that back.
15        "Patient" -- it says, in the general
16 chronology of events, patient was born on
17 December 23rd.  December 23rd.
18        So Cassidy's consult was in February of '19,
19 so it was 2 months later, almost to the day.
20   Q.   So by that point in time, when Dr. Cassidy
21 performed his evaluation, any retinal hemorrhages that
22 were present when Swayde Sankey was born would have
23 been resolved --
24        MR. CONNELLY:  Form and foun- --
25

```
 1   BY MS. PATANE:
 2       Q.   -- correct?
 3            MR. CONNELLY:  Form and foundation.
 4            THE WITNESS:  Well, I would agree about that.
 5   BY MS. PATANE:
 6       Q.   You saw in Dr. Fecarotta's exam that he
 7   identified retinal hemorrhages; correct?
 8       A.   Correct.
 9       Q.   You would agree with me that the finding of
10   retinal hemorrhages that he describes in his report on
11   March 7th, 2019, corroborates the presence of the
12   degree of retinal hemorrhages described by Dr. Cassidy
13   on February 22, 2019; correct?
14            MR. CONNELLY:  Form and foundation.
15            THE WITNESS:  As I recall, Fecarotta noticed
16   fewer hemorrhages than Cassidy claimed.
17   BY MS. PATANE:
18       Q.   And you understand that his evaluation
19   occurred on March 7th?
20       A.   I do.
21       Q.   And Dr. Cassidy's evaluation occurred on
22   February 22nd; correct?
23       A.   Correct.
24       Q.   Dr. Fecarotta, you said, found fewer retinal
25   hemorrhages; correct?
```

1  BY MS. PATANE:
2      Q.   -- correct?
3           MR. CONNELLY:  Form and foundation.
4           THE WITNESS:  Well, I would agree about that.
5  BY MS. PATANE:
6      Q.   You saw in Dr. Fecarotta's exam that he
7  identified retinal hemorrhages; correct?
8      A.   Correct.
9      Q.   You would agree with me that the finding of
10 retinal hemorrhages that he describes in his report on
11 March 7th, 2019, corroborates the presence of the
12 degree of retinal hemorrhages described by Dr. Cassidy
13 on February 22, 2019; correct?
14          MR. CONNELLY:  Form and foundation.
15          THE WITNESS:  As I recall, Fecarotta noticed
16 fewer hemorrhages than Cassidy claimed.
17 BY MS. PATANE:
18     Q.   And you understand that his evaluation
19 occurred on March 7th?
20     A.   I do.
21     Q.   And Dr. Cassidy's evaluation occurred on
22 February 22nd; correct?
23     A.   Correct.
24     Q.   Dr. Fecarotta, you said, found fewer retinal
25 hemorrhages; correct?

1     A.    Correct.
2     Q.    Doesn't Dr. Fecarotta's finding of seeing
3  fewer retinal hemorrhages corroborate the presence of
4  more severe retinal hemorrhages being present on
5  February 22nd, 2019?
6          MR. CONNELLY:  Form and foundation.
7          THE WITNESS:  No.
8  BY MS. PATANE:
9     Q.    Why not?
10    A.    Because there would normally be a resolution
11 of hemorrhage in that time frame.
12    Q.    And what do you base that on?
13    A.    Knowledge of the pathophysiology of retinal
14 hemorrhages from 40 years of experience.
15    Q.    Do you believe that what Dr. Fecarotta was
16 seeing were hemorrhages that formed after Dr. Cassidy
17 saw the patient?
18    A.    No.
19    Q.    When do you believe those retinal hemorrhages
20 formed that Dr. Fecarotta identified?
21         MR. CONNELLY:  Form and foundation.
22         THE WITNESS:  Probably were some residual
23 hemorrhages from the time that Cassidy saw the patient.
24 BY MS. PATANE:
25    Q.    So do you believe that there were retinal