Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
GILLESPIE, SHIELDS & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, *et al.*, <br><br>    Plaintiffs, <br><br> v. <br><br> Arizona Department of Child Safety, *et al.*, <br><br>    Defendants. | Case No.: 21-cv-00167-ROS <br><br> **REPLY IN SUPPORT OF PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT** <br><br> (Hon. Roslyn O. Silver) |

Plaintiffs submit the following Reply in Support of *Plaintiffs' Motion for Partial Summary Judgment* (Doc. 319)[1]. This Reply is supported by the following Memorandum of Points and Authorities of why Plaintiffs' Motion for Partial for Summary Judgment should be granted.

### MEMORANDUM OF POINTS AND AUTHORITY

### I.   OVERVIEW

---

[1] To the fullest extent possible, exhibit citations herein will be to exhibits already in the docket as part of Plaintiffs' Motion for Partial Summary Judgment (Doc. 319), Plaintiffs' *Omnibus Daubert* Motion as to Eleven Experts Retained by PCH Defendants and Defendant Cassidy (Doc. 322) or Plaintiffs' Reply in Support of Plaintiffs' *Omnibus Daubert* Motion (Doc. 350).

Plaintiffs set out a robust factual history in their motion for partial summary judgment (Doc. 319) and will not repeat it here but do incorporate it here by reference. Only a few words will be said to clarify some of the misleading facts in Defendants' responses (Doc. 347 and Doc. 349).

PCH Defendants continue to rely on their erroneous medical records to reach to the conclusion that S.Z.S. was abused via Shaken Baby Syndrome/Abusive Head Trauma (SBS/AHT) and make several misleading statements in their reply.

*First*, PCH Defendants and Defendant Cassidy (collectively, "Defendants"), attempt to save their diagnosis of abuse by asserting that the juvenile court did not find "no abuse." *See* Doc. 349 at 16:20-26; Doc. 347 at 3:26-27. This is not true. Defendant Cassidy even went so far as to argue that "he should not be prevented from attacking the Juvenile Court's decision and findings." *See* Doc. 347 at 3:21-23. In fact, the juvenile court expressly found: "[b]ased upon its consideration of the evidence, the Court finds that the [State] ***failed to prove*** by a preponderance of the evidence ***that the child was abused or that either parent failed to protect the child from abuse***." *See* Doc. 319-22 at DUVALL_000057 (second paragraph) (emphasis added). The dependency petition was prosecuted under A.R.S. § 8-201(15) with allegations that the child was "dependent" as to his parents "due to physical abuse or failure to protect from physical abuse." *See* Doc. 319-44 at 2:13-14, 3:25-27; 4:1-3, 4:16-17; *see also* Doc. 319-22 at DUVALL_000052 (juvenile court noting that the allegations of dependency were due to "physical abuse or failure to protect from physical abuse"). The juvenile court next recited the definition of "abuse" found in A.R.S. §8-201(2). *See* Doc. 319-22 at DUVALL_000052. Clearly, the issue at the juvenile dependency trial was whether the child had been physically abused. By finding no dependency as to either parent, the juvenile court *ipso facto* found that the child was not physically abused by either parent – which, as noted above, the juvenile court also stated as an express finding. For Defendants to argue otherwise is to be too cute by half.

*Second*, PCH Defendants made misleading statements regarding S.Z.S.'s primary care pediatrician, Dr. Heather Gosnell, that she suspected abuse and further investigation was reasonable. *See* Doc. 349 at 9: 21-10:22. However, what PCH Defendants ignore is that Dr. Gosnell arrived at that view only *after* the child had been (incorrectly) diagnosed as abused during his February 21-23, 2019, hospitalization at PCH. Dr. Gosnell arrived at her view of abuse only *after* she saw the child for his two-month checkup, which was two days *after* he was discharged from PCH, and only *after* she reviewed the (erroneous and prejudicial) PCH medical records – records which the juvenile court expressly found to "contain significant errors." Doc. 319-22 at DUVALL_000052. During the several times Dr. Gosnell examined S.Z.S. in her office between his birth in December 2018 and his admission to PCH in February 2019, she *never* saw any bruising on the child, *never* noted any lethargy, and *never* diagnosed S.Z.S. as abused, nor did she even note a mere suspicion of abuse. *See* Doc. 350-8; Doc. 350-9. During those two-months following his birth, and pursuant to her legal obligations as a mandated reporter under A.R.S. §13-3620, *et seq.*, Dr. Gosnell *never* called in a report of suspected abuse to DCS or law enforcement. *See id*. (the absence of any notation in Dr. Gosnell's records of her or her office reporting suspected abuse to DCS or law enforcement).

*Third*, Section I of PCH Defendants' response (Doc. 349), notes that S.Z.S.'s chief complaint at PCH was of hematemesis (vomiting blood). This is disingenuously false. S.Z.S. was *not* "vomiting" blood, nor did his mother say that he was "vomiting" blood. *See* Doc. 350-4 at 84, 273; Doc. 350-5 at 89:7-15, 18-24, 90:1-14; Doc. 350-6 at 52:21-25, 53:11-25; Doc. 350-7. There is a meaningful distinction between spitting up, which all babies do when being burped after feeding, and vomiting. Doc. 350-6 at 54:2-22, 55:20-21. Here, on February 21, 2019, Honor told her pediatrician's office and PCH that her son had what appeared to be blood in his spit up, not that he was vomiting blood. There was a picture concerning the spit up that was shared by the parents with PCH. Doc. 350-3; Doc. 350-4 at 273. However, there is no medical term for "spit up." Doc. 350-6 at 53:6-10, 64:11-23. So, in their records, Dr. Gosnell and PCH used the term "hematemesis," which

3

every medical professional reading those records thereafter interprets to mean "vomiting blood", which can be a very serious medical condition. The important nuance between spitting up and vomiting is forever lost in medical records due to the limits of medical terminology. Notably, when PCH examined S.Z.S.'s internal organs during his February 2019 hospitalization, none of those organs were bleeding or injured in any way to cause blood to be in his spit up (or vomit, had he been vomiting, which he was not), which is another indication that he had not been abused.

*Fourth*, PCH continues to rely on their erroneous and prejudicial medical records that claim S.Z.S. had bruising around the diaper area and chest as well as conjunctive hemorrhages in his eyes and hematemesis (vomiting blood). ED nurse, Leah Kaufman, was the first to examine S.Z.S. She observed that his "skin color appears normal for the child's ethnic group," not mistaking his Mongolian spots for bruises.[2] However, the ED Resident physician on duty, Kathleen Outclat, was not as observant (or knowledgeable) and recorded that S.Z.S. had bruising, including numerous "unexplained" bruises in several areas of the body. *Compare* Doc. 319-4 at PCH 1272 cycn *with* 319-5 at PCH 1259. It was not until 7 March 2019, when S.Z.S. had a follow up appointment with PCH CPT at Childhelp Children's Center of Arizona that Defendant Dietzman recognized that the "bruising" identified on S.Z.S.'s body in February, which were material to PCH's earlier SNAT diagnosis (and which led to the accusations of abuse), were in fact Mongolian spots; that is, non-traumatic birth marks contraindicative of abuse. Doc. 319-34 at PCH 1176 cycn-1177 cycn.

*Fifth*, regarding S.Z.S.'s skeletal survey, the PCH radiologist's impression included right and left tibial bucket handle metaphyseal fractures. Doc. 349 at 3:23-25. This is inaccurate. The skeletal survey was misread and S.Z.S. did not have bilateral bucket handle metaphyseal fractures. Dr. Wood's assessment was a corner metaphyseal fracture of the

---

[2] *See* Doc. 319-6 at 72:22-73:5; *see also* Doc. 197-7 at 231 (Mongolian spots are "sometimes [] confused with bruises, especially if they present over atypical sites. This leads to mistaken diagnosis of child abuse…").

right tibia with associated periosteal reaction. *Id*. at 5:5-7. S.Z.S. was referred to Valley Radiology to obtain images and a second opinion regarding his purported tibial fractures. Dr. Galvez-Trevino, a pediatric radiologist at Valley Radiology did not find the bilateral bucket handle tibial fractures diagnosed by PCH. Doc. 319-29. Rather, he found the left tibia was normal, with no fractures or dislocation; and only a "possible" fracture of the right tibia and recommended a bone scan to confirm whether the density found on the radiograph was a fracture or a radiological artifact, which are common. *Id.*

*Sixth*, PCH Defendants claim that the inaccuracies in the medical records are irrelevant as there is no evidence that any other provider reviewed and relied on the inaccuracies or that S.Z.S. was impacted in any way by the inaccuracies. *See* Doc. 349 at 15:4-6. This is misdirection and false. S.Z.S. was severely impacted by inaccuracies within the medical records as he was removed from his parents' care. Defendants' eleven experts relied on those erroneous and prejudicial medical records to opine that S.Z.S. was abused. None of Defendants' experts conducted an independent evaluation but based their opinions entirely on the erroneous PCH medical records provided by PCH.

Defendant Cassidy argues that he listed "possible causes [differential diagnosis] of the retinal hemorrhages as abusive head trauma, a crush injury, an acceleration/deceleration injury, a bleeding disorder, sepsis and/or cancer." *See* Doc. 347 at 3:4-7. But Dr. Cassidy fails to acknowledge that he went further in his report when he said that what he professed to see in S.Z.S.'s retinas was "most consistent with abusive head trauma, could be related to a single massive crush injury to the skull, massive single acceleration/deceleration injury, or a repetitive acceleration/deceleration injury[]", Doc. 319-20, none of which is consistent with how S.Z.S. presented to PCH on February 21, 2019, where he did not have a fractured skull, nor bruising on his skull, nor patterned bruising around his torso indicative of being held and squeezed tightly enough to cause retinal hemorrhaging by a "massive single acceleration/deceleration injury, or a repetitive acceleration/deceleration injury." *See* Doc. 319-5 at PCH 1259 cycn (describing the child's "General Appearance' as normal; well appearing, alert, no apparent distress"); *see also* Doc. 319-22 at 4 (starting

5

at second line on page 4 in carryover paragraph) (juvenile court noting that Dr. Cassidy's testimony about causation for the retinal hemorrhages being "a truck rolling over his head, falling from 30 feet or higher, a crash into a wall at a high rate of speed, or a repetitive acceleration and deceleration injury" was "simply not credible."). S.Z.S. did not even have the bruising around the face mask area Defendant Cassidy testified about seeing at the dependency trial. Doc. 319-22 at 4 (starting with "Third," in fifth line on page 4 in carryover paragraph). Yet, Dr. Cassidy argues that his medical records are accurate. He could have photographed his findings to document them objectively but chose to not do so. To garner sympathy or praise, Dr. Cassidy then infers that he "was not paid for the evaluations of S.Z.S. or other children he was called upon to examine at PCH on an emergent basis where there was a suspicion of abuse." *Id.* at 3:10-11. Although whether he was paid or not is irrelevant, his comments confirm that he knew that abusive head trauma was suspected when he was called upon to examine S.Z.S.

PCH Defendants' response to Plaintiffs' statement of background facts in their motion seems more of an attack *via* race, and that the facts set forth there are irrelevant, lack foundation, and do not explain the constellation of S.Z.S.'s injuries. PCH Defendants' criticisms lack merit and, in those respects, will not be addressed here.

The balance of the PCH Defendants' response in burnishing their ten experts' reports is more akin to an additional response to Plaintiffs' Omnibus *Daubert* Motion, and, in that respect will not be replied to here.

Plaintiffs' Motion for Partial Summary Judgment analysis is straightforward, and Plaintiffs set out important background information for the Court in their motion.

## II.   ARGUMENT

### A.   The Juvenile Court's Factual Findings and Final Judgment are Binding in This Case.

Defendants continue to want to introduce evidence through their own erroneous and prejudicial medical records, their testimony, as well as that of lay witnesses and 11 experts, that S.Z.S. was abused. Defendants Cassidy, Coffman, and Wood were, in essence, expert

witnesses on the issue of abuse in the juvenile court proceedings. That court heard their testimony, judged their credibility, and in adjudicating the issue of abuse considering their testimony and records, held that evidence failed to prove the child was abused. Defendants now want a second bite at the abuse apple to overturn the juvenile court's factual findings and clear final judgment that there was no abuse. Their own expert opinions having been rejected by the juvenile court; they now seek to resuscitate their juvenile court testimonial opinions with those of eleven more child abuse experts. However, they are not allowed to relitigate that issue.

### 1. The *Rooker-Feldman* Doctrine precludes Defendants from pursuing a de facto appeal of the juvenile court's judgment.

Defendants have failed to come forward with any evidence to dispute that they are attempting to relitigate the issue of abuse. Throughout their responses, Defendants keep touting their experts to argue the issue of abuse, which has already been adjudicated. Dr. Cassidy expressly sets forth that he "should not be prevented from attacking the Juvenile Court's decisions and findings." *See* Doc. 347 at 3:21-23. The Defendants then erroneously claim that the Juvenile Court did not make a finding of "no abuse", even though there was an express finding of "no abuse" in the juvenile court. *See* Doc. 349 at 16:20-26; Doc. 347 at 3:26-27. In essence, Defendants claim they are not relitigating the issue of abuse but that is exactly what they are doing.

The Ninth Circuit has stated that *Rooker-Feldman* "prevents federal courts from second-guessing state court decisions by barring the lower courts from hearing *de facto* appeals from state-court judgments." *Bianchi v. Rylaarsdam*, 334 F.3d 855, 898 (9th Cir. 2003). It is a *de facto* appeal when a party in a subsequent proceeding, such as Defendants here, complains of a legal wrong allegedly committed by the state court in a prior proceeding, *i.e.* finding of no abuse, and in essence is seeking relief in this court from that judgment of no abuse. *Noel v. Hall*, 341 F.3d 1148, 1163 (9th Cir. 2004). A claim or defense asserted in a federal court action is considered an appeal of state court decision if arguments, i.e. that S.Z.S was a victim of abuse via SBS/AHT, "raised in the federal court

7

action are inextricably intertwined with [a] state court's decision." *Reusser v. Wachovia Bank, M.A.*, 525 F.3d 855 (9th Cir. 2008) (citing *Bianchi*, 334 F.3d at 898). That is the case here.

Defendants are attempting to relitigate the issue of abuse with their eleven experts, who rely on PCH's flawed medical records, which the juvenile court found to "contain significant errors", and without ever having examined S.Z.S., and who intend to opine that his injuries are a result of abuse, *i.e.* SBS/AHT, itself a controversial diagnosis. The Defendants are pursuing a *de facto* appeal on the issue of abuse. There is no credible factual or scientifically valid medical basis for finding that S.Z.S. was a victim of violent shaking by his parents. Defendants' and their 11 experts' opinions that S.Z.S. was abused are nothing more than an impermissible collateral attack on an issue already judicially and factually determined.

### 2. **The juvenile court's judgment has res judicata effect and claim preclusion applies.**

The doctrines of *res judicata* and/or claim preclusion "bars all grounds for recovery which could have been asserted, whether they were or not, in a prior suit between the same parties on the same cause of action." *Costantini v Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir. 1982) (internal quotations and citations omitted). This Court must look to state law to determine the preclusive effect of a state court judgment. *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007).

"[R]*es judicata* provides that 'a final judgment on the merits bars further claims by parties or their privies based on the same cause of action.'" *In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997). "'Privity'—for the purposes of applying the doctrine of res judicata – is a legal conclusion 'designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved.'" *Id.* "[F]ederal courts will bind a non-party whose interests were represented adequately by a party in the original suit. In addition, 'privity' has been found where there is a 'substantial identity' between the parties and the nonparty." *Id.* (citations omitted).

8

Privity for these Defendants exists because they "had a significant interest and participated in the prior action[,]" *id.* (citations omitted), in at least the following ways: (i) they actively advocated and interceded to cause DCS to take temporary custody of S.Z.S. and to file a dependency petition; (ii) they conferred and met the prosecuting assistant attorney general in preparation for trial; and (iii) Defendants Cassidy, Coffman, and Wood, along with their PCH colleague Dr. Roeneker, were the *only witnesses* called by the State to prove the essential element of abuse.

Finally, Arizona follows the "same evidence test" in applying claim preclusion if no additional evidence would be needed to prevail in the second action than needed in the first. *Pettit v. Pettit*, 218 Ariz. 529, 189 P.3d 1102, 1105 (Ariz. Ct. App. 2008). Nothing more is needed to determine abuse here than was necessary, and presented, at the juvenile court trial. To say expert testimony is needed here but not in the juvenile court is a smokescreen and not an answer as Defendants were the experts in that action.

As set forth in Plaintiffs' Motion for Partial Summary Judgment (Doc. 319), all elements of claim preclusion being satisfied, Plaintiffs are entitled to summary judgment on the defense of abuse. Consequently, testimony about abuse, including the bought and paid for opinions of Defendants' eleven experts, is irrelevant and would be highly prejudicial.

### 3. Issue preclusion applies and Defendants are collaterally estopped from relitigating the issue of abuse.

The doctrine of collateral estoppel aka issue preclusion, "bars a party from relitigating an issue identical to one previously litigated to a determination on the merits of another action. *State ex rel. Winkleman v. Ariz. Navigable Stream Adjudication Comm'n*, 229 P.3d 246, 256 (App. 2010). "The elements necessary to invoke collateral estoppel are: the issue is actually litigated in the previous proceeding, there is a full and fair opportunity to litigate the issue, resolution of such issue was essential to the decision, there is a valid and final decision on the merits, and there is a common identity of the parties." *Id.*

This Court is being called upon to review the state court's decision that S.Z.S. was not abused, and that PCH's medical records were replete with material errors, among other findings in the juvenile court judgment. Defendants want this Court to allow evidence, including the biased, flawed testimony of their eleven retained experts, on matters finally conclusively decided by the juvenile court so that they can continue arguing that S.Z.S. was abused.

Based upon Defendants' arguments in their response and their eleven retained expert's anticipated testimony, it is apparent that the evidence needed to sustain Defendants' arguments is the same here as it was in the juvenile court action. Here, Defendants want this court to find that S.Z.S. was abused based on their erroneous medical records. In the juvenile court, Defendants Cassidy, Coffman, and Wood all testified and Cassidy's and Wood's incomplete or erroneous medical records were admitted to substantiate their claims that S.Z.S. was abused. The only difference here is that Defendants are now calling eleven expert witnesses to testify on their behalf to essentially opine that Defendants are competent and credible, and that based on those experts' review of PCH's erroneous medical records, that S.Z.S was abused by violent shaking. The law does not allow Defendants to have two bites at the abuse apple.

### B. **Plaintiffs are Entitled to Summary Judgment on Conspiracy Claim.**

There is no genuine dispute that Defendants' actions in this case are so intertwined with the State that they became state actors and were in an agreement to achieve the goal of violating Plaintiffs' constitutional rights by separating this family and keeping them apart without constitutionally sound reasons for doing so. Liability for conspiracy in a § 1983 action exists when there is an agreement to achieve the goal of violating Plaintiffs' constitutional rights. *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010). Evidence of an agreement to conspire here can be inferred by the Defendants' actions when their acts would have been unlikely to occur without the agreement. *Id.*. Circumstantial evidence, including the actions of Defendants here, can support the requisite meeting of the minds for conspiracy in a §1983 matter. *Id.* Defendants' activity must be "inextricably

intertwined" with those of the state. *Burnette v. Humane Society of Ventura County*, 294 F.3d 1205, 1211 (9th Cir. 2020). "Under the joint action test, we consider whether 'the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant to the challenged activity. This occurs when the state knowingly accepts the benefits derived from unconstitutional behavior.'" *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003) (citations omitted). Nexus exists where "there is a such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the state itself." *Id*. at 1095.

Here, the conspiracy is multi-layered, with Defendants at the center of each layer. Moreover, the evidence shows that DCS took actions that were in their unique sphere of authority – such as authorizing a forensic medical examination of S.Z.S. without parental consent, denying the parents visitation with S.Z.S. as part of a modified Present Danger Plan, taking temporary custody of S.Z.S. and then filing a dependency petition, and requiring the child to be readmitted to PCH in March when the family wanted to go to another childrens' hospital – only after PCH Defendants' exercised inordinate and misplaced influence over DCS, most blatantly when Defendants Coffman and Dietzman called on DCS to "escort" the mother and child to PCH for his readmission in March and when Defendant Coffman called on her old buddy Director McKay to take temporary custody of the child.

Furthermore, PCH has a contract with DCS to be the single source of assisting DCS in child abuse investigations. PCH Defendants investigated to substantiate their "suspicions" of abuse for DCS by submitting S.Z.S. to numerous forensic medical procedures, including a full body skeletal survey, without parental consent, and contacted PCH Child Protection Team ("CPT") per a PCH algorithm in use at the time. PCH CPT works closely with DCS to investigate allegations of abuse – upon information and belief,[3] the only way the CPT generates revenue is through the contract with DCS. Their workup and investigation continued. Defendant Dietzman "had to beg" the ED or trauma floor

---

[3] Because PCH refused and failed to produce financial records this Court deemed relevant.

11

doctors to admit S.Z.S. as a patient so that a battery of additional forensic "SNAT" testing could be run to justify labeling S.Z.S. as an abused child. DCS authorized Defendant Dietzman to conduct a forensic medical examination of S.Z.S. only after it had already been performed. Defendant Dietzman then convinced DCS OCWI investigator, Alyssa Lucero, to change the Present Danger Plan ("PDP") to prohibit any contact between the parents and S.Z.S. Defendant Coffman and PCH, particularly through Coffman and Dietzman, exercised extraordinary pressure over DCS to have S.Z.S. removed from the care and custody of his parents based on their erroneous "suspicion" of abuse. Defendant Cassidy was brought in by the PCH CPT to solidify the shaken baby diagnosis by rounding out the "constellation of findings" with retinal hemorrhages. Sure enough, Defendant Cassidy found that the child's retinas were "painted with blood" and shaking was the cause. There was nothing done to document and verify what Dr. Cassidy saw to solidify the "suspicion" of abuse. Defendants and DCS shared a common purported objective to protect S.Z.S., which Coffman, Dietzman, and PCH overly and overtly influenced DCS to do by aggressively seeking DCS intervention to require the child to be readmitted to PCH in March and then by aggressively seeking the State's taking of temporary custody of S.Z.S. and the filing of a dependency petition. PCH CPT meet with the DCS investigators to express their concerns and to influence DCS to prevent the parents from having contact with S.ZS., such as by implementing more restrictive safety plans and the removal of S.Z.S. from his parent's custody. Then, when Mother did not want to take S.Z.S. back to PCH in March, Defendants Coffman and Dietzman escalated the matter to DCS administrators who forced the DCS investigator Lucero, over her objections, to escort the family and S.Z.S. to PCH, and only PCH, or remove him from the parents custody. PCH Defendants put pressure all the way up to Director McKay to take temporary custody of S.Z.S.  Defendants Cassidy, Coffman, and Wood, along with the PCH colleague Dr. Ronecker, testified on behalf of DCS as the only witnesses for DCS in the dependency trial regarding the issue of abuse. However, PCH Defendants allegations of abuse was so lacking in substance and credibility that the dependency petition was dismissed with an express finding of no abuse.

In acting as they did, Defendants stepped out of their limited role as medical professionals to occupy the role belonging to DCS, the State, and its personnel. Defendants played a pivotal role in the genesis and prosecution of the dependency action to achieve the goal of violating Plaintiffs' constitutional rights and acted under color of law on behalf of the State.

### C. There is No Genuine Dispute that Dr. Wood's Records Are Plainly Inaccurate as a Result of His Negligence Entitling Plaintiffs to Summary Judgment on Negligence.

There can be no genuine dispute that Dr. Wood's records are wildly inaccurate and contain materially false information about S.Z.S.'s medical condition. PCH Defendants' argument that he is a mandatory reporter and entitled to immunity does not provide any basis for his negligence and his erroneous records. Being a mandatory reporter does not absolve one from acting reasonably, prudently, and free of plain and obvious, nearly gross, negligence.[4] Dr. Woods was not the mandatory reporter who called DCS with suspicions of abuse, nor is he entitled to immunity as alleged. PCH Defendants then claim – without citation to the record – that no one relied upon Dr. Wood's erroneous records but, ironically, they then argue that one of their ten experts, Dr. Frisk, who only reviewed PCH Defendant's erroneous medical records, which necessarily included Dr. Wood's records, will opine that Dr. Wood met the standard of care and the only plausible cause of S.Z.S.'s purported distal tibia medial metaphyseal corner fracture was non-accidental trauma (i.e. abuse). *See* Doc. 349 at 27:20-26, 28:7-8.

"Ordinarily, expert medical testimony is required to establish proximate cause and make out a prima facie case of medical malpractice unless a casual relationship is readily apparent to the trier of fact." *Gregg v. Nat'l Med. Health Care Servs., Inc.*, 145 Ariz. 51,

---

[4] *See*, for instance, https://nypost.com/2023/11/10/news/take-care-of-maya-jury-awards-final-settlement-of-over-a-quarter-billion-dollars/amp/ (a recent $261 million jury verdict, with $50 million being punitive damages, against the child protection doctors at Johns Hopkins Hospital, which, if nothing else, demonstrates that doctors are not infallible and should be held to account when they make mistakes or overstep their roles and refuse to voluntarily acknowledge their mistakes and take responsibility for them.).

13

54 (App. 1985). The exception to the ordinary rules applies when "negligence is so grossly apparent that a layman would have no difficulty in recognizing it*." Peacock v. Samaritan Health Serv.*, 159 Ariz. 123, 126 (App. 1988) (quotation and citation omitted). In other words, expert testimony is unnecessary to prove negligence "when the act or omission comes within the realm of common knowledge." *Revels v. Pohle,* 101 Ariz. 208, 210 (1966); *see also, e.g., Riedisser v. Nelson*, 111 Ariz. 542, 544 (1975) (expert testimony not necessary when the negligence is so apparent that a layperson would have no difficulty recognizing it.).

Dr. Wood himself admitted at the dependency trial and during his deposition here that his records contained inaccurate and false information about S.Z.S. and his condition. His records were replete with errors; for example, inaccurately stating that the boy was in a splint, was in pain, given pain medication, and had shrunk almost 11 inches since birth. *See* Doc. 319-23 at 84:4-6, 86:8-12, 17-20, 107:21-25, 108:1-22; Doc. 319-31 at 244:3-245:22, 246:2-17, 249:2-250:7, 253:18-254:15. These are among the reasons the juvenile court found Dr. Wood and his records to lack credibility. Doc. 319-22 at 4. Dr. Wood ordered a bone scan to confirm the diagnosis of a right tibia facture because the radiographs were not definitive. *See* Doc. 319-16. However, the bone scan was never done, he never followed up to determine if the bone scan was done, and the lack of the bone scan was an issue at the dependency trial. *See* Doc. 319-31 at 280:4-12, 280:19-281:14; Doc. 319-41 at 155:8-22, 155:24-156:4; Doc. 319-50. Dr. Coffman relied on these inaccurate records to rubber-stamp the allegations of abuse without doing a thorough objective evaluation of her own. Defendants were so focused on their unreasonable suspicions of abuse that they failed to do thorough examinations and rule out other causes for S.Z.S.'s "constellation" of symptoms. Dr. Wood's negligence is so apparent that a lay person would have not difficulty recognizing it.

### III. CONCLUSION

Partial summary judgment as requested should be granted in Plaintiffs' favor as there "is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law" on the issues and claims discussed. Fed. R. Civ. P. 56. As to Claim Six and Claim Eleven, partial summary judgment as to liability should be granted and a trial as to those claims set for damages only. For the reasons stated in Plaintiffs' Motion for Partial Summary Judgment and above, the Court should enter partial summary judgment in favor of Plaintiffs as requested.

**RESPECTFULLY SUBMITTED** this 20th day of November 2023.

**MILLS + WOODS LAW PLLC**

Thomas A. Connelly
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**

By    /s/ Jenny D. Jansch
DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of November 2023, I electronically transmitted the foregoing document to be filed electronically with the Clerk of the Court using the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

*/s/ Jenny D. Jansch*