# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Honor Duvall, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No.: |
| ) | 21-CV-00167-PHX-ROS |
| Arizona Dept. of Child Safety, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

DEPOSITION OF DOROTHY ROWE, M.D.
(Videoconference via Zoom)

Phoenix, Arizona
April 11, 2023
11:04 a.m.

REPORTED BY:                    CARRIE REPORTING, LLC
Kristy A. Ceton, RPR            Certified Reporters
AZ CR No. 50200                 2415 E. Camelback Road
                                Suite 700
                                Phoenix, AZ 85016
                                (480) 429-7573

1  a.m. on the 22nd.
2       Q.   And is it the practice of PCH not to
3  switch over the attending doctor to your partner
4  since it appears like he then took over from you; is
5  that right?
6       A.   So, once again, the admitting physician
7  carries through the electronic record and that cannot
8  be removed.  There can be a designation made for the
9  attending physician.  It does not look like it
10 happened.  I don't know.  But as an admitting
11 physician, my name is always part of that medical
12 record even when I'm no longer caring for the
13 patient.
14      Q.   Okay.  So as the admitting physician, you
15 authorized the admission of ▇▇▇▇▇?
16      A.   Correct.
17      Q.   All right.  When you -- when you admitted
18 ▇▇▇▇, who did you speak to to decide to admit him?
19      A.   I don't recall the events of that
20 particular admission.  Typically, Dr. Hangge, as the
21 resident, would see the patient and then call me and
22 tell me what he had discussed with the emergency room
23 and what he had seen with the patient and what his
24 assessment was.
25      Q.   So, typically, the resident would call

```
 1   you, this time it was Dr. Hangge, and then you would

 2   say, yes, I agree, admit; no, I don't agree, don't

 3   admit.  Is that usually the practice?

 4              MR. PATEL:  Object to form.

 5              THE WITNESS:  It's variable.  Sometimes

 6   that is the practice.  But after review -- talking to

 7   him and reviewing any other things that I need to

 8   review, if I agree with admission, I will then say

 9   yes.

10        Q.   BY MS. DAUSSIN:  So is it true that

11   Dr. Hangge would not have the authority to admit

12   without your approval?

13        A.   Correct.

14        Q.   Did you speak with Dr. Outcalt?

15        A.   I do not recall speaking to Dr. Outcalt.

16        Q.   Do you recall speaking with Dr. Pickett?

17        A.   I do not recall.

18        Q.   Dr. Kirsch?

19        A.   I do not recall.

20        Q.   Did you speak with Hailey Dietzman?

21        A.   I do not recall.

22        Q.   Do you recall speaking with Zach Dion?

23        A.   I do not recall speaking with Zach.

24        Q.   Did you -- do you recall speaking with

25   Carey Lewis?
```

1            A.    Yes.
2            Q.    Anything based upon those studies that
3      would have led you to believe that there was a
4      concern that this child was hypercoagulable or at
5      risk for forming clots?
6            A.    No.
7                  MS. DAUSSIN:  Foundation.
8            Q.    BY MS. ZANGERLE:  I know that you
9      mentioned as a trauma surgeon, you're generally not
10     someone that deals with clotting disorders.  Is that
11     typically a hematologist that focuses on
12     abnormalities of the blood?
13           A.    Yes, typically.
14           Q.    And is there pediatric hematology
15     coverage at Phoenix Children's Hospital?
16           A.    Yes.
17           Q.    Did you feel based upon the results that
18     were identified in the clotting labs that were done
19     that there was any need to consult a pediatric
20     hematologist who evaluate ▇▇▇▇?
21           A.    Well, I would not have done that based on
22     these results.
23                 MS. DAUSSIN:  Foundation.
24           Q.    BY MS. ZANGERLE:  And I know that you
25     don't treat disorders of the blood.  But as a trauma

1    surgeon, if you see results that indicate that there
2    are risk factors for a child having either a
3    hypocoagulable state; meaning, that they're at risk
4    for bleeding or a hypercoagulable state; meaning,
5    that they are at a risk for clot, is that something
6    that you evaluate and then determine if you need to
7    ask for a specialty consult?
8           A.   So as a trauma surgeon --
9                MS. DAUSSIN:  Form.
10               THE WITNESS:  -- we are always more
11   concerned about hypocoagulable states.  But if I --
12   generally, my typical practice and the practice of
13   the trauma team, if there are any questions to obtain
14   a hematology consult.
15          Q.   BY MS. ZANGERLE:  And you didn't see
16   anything in his labworks that -- labwork that caused
17   you to believe that he would easily bleed or he would
18   have excessive bleeding, correct?
19          A.   Correct.
20          Q.   And nothing that indicated that he would
21   have a tendency to abnormally form clots in his
22   blood?
23          A.   Nothing on these results within my
24   knowledge base.
25          Q.   A couple more questions about what you do