**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Honor Duvall, et al.,

        Plaintiffs,

v.

Arizona Department of Child Safety, et al.,

        Defendants.

No. CV-21-00167-PHX-ROS

**ORDER**

Three summary judgment motions are before the court. Defendant Dr. Brendan Cassidy filed a motion for judgment on all claims pending against him (Doc. 310). The remaining Defendants—Phoenix Children's Hospital, Dr. William S. Wood and spouse Rachel Wood, Dr. Kathryn Coffman, and Haley Dietzman and spouse Roald Dietzman ("the PCH Defendants")—also filed for summary judgment on all claims pending against them (Doc. 312). Plaintiffs filed a motion for partial summary judgment on the conspiracy and negligence claims (Doc. 319). Parties also filed several *Daubert* motions seeking to preclude testimony from various expert witnesses at trial (Docs. 311, 315, and 321). For the reasons set forth below, Plaintiff's motion will be denied and Defendants' motions will be granted. Because Defendants will be granted summary judgment on all remaining claims, the Court need not address the pending *Daubert* motions, which will be denied as moot.

## BACKGROUND

All facts set forth below are undisputed or not subject to reasonable dispute based

on parties' proffered evidence unless otherwise noted.

On February 21, 2019, Plaintiff Honor Duvall brought her 60-day old child, SZS, to Phoenix Children's Hospital ("PCH") due to, among other concerns, possible blood in his spit up.  (Doc. 352 at 4).  A skeletal survey was performed, and the radiologist's opinion established "bucket handle metaphyseal fractures" in both his left and right tibias.  (Doc. 352 at 5; Doc. 314 ¶¶ 4–6).  Based on these findings, Dr. Kathleen Outcalt—who evaluated SZS—contacted PCH's Child Protection Team ("CPT").  (Doc. 314 at ¶ 7).  SZS was then admitted to PCH for further evaluation, (Doc. 312 at 3), which Plaintiffs allege came as a result of Defendant CPT Nurse Practitioner Haley Dietzman "beg[ging]" for his admission, (Doc. 352 at 5).  SZS then received a CT scan, which showed "blood products" collected in his head and led a radiologist to recommend further imaging to exclude potential abuse.  (Doc. 352 at 5; Doc. 314 at ¶ 8).  Social worker Marie McCormack performed a SNAT (suspected non-accidental trauma, *i.e.* child abuse) Initial Medical Assessment on SZS, noting the prior diagnoses of acute bruising, subconjunctival hemorrhage (broken blood vessel in eye), hemoptysis (coughing blood), and bucket handle fractures in his tibias. (Doc. 314-5 at PCH 1355–1356).  Plaintiff Duvall denied any accidental trauma that may have caused SZS's injuries.  *Id.*  After the assessment, Ms. McCormack reported the issue to the Arizona Department of Child Services ("DCS").  *Id.*

The next day, February 22, 2019, Defendant Dr. Brendan Cassidy, an independent pediatric ophthalmologist who often consults with PCH CPT in cases involving suspicion of abusive head trauma, examined SZS's eyes. (Doc. 352 at 7; Doc. 310 at 3; Doc 314 at ¶ 12).  Dr. Cassidy's examination found retinal hemorrhages in both eyes, "most consistent with abusive head trauma" and "could be related to a single massive crush injury to the skull, massive single acceleration/deceleration injury, or a repetitive acceleration/deceleration injury."  (Doc. 314 at ¶ 13; *see also* Doc. 310 at 3).  SZS then received an MRI of his brain, which showed fluid collections "most compatible with chronic bilateral hematomas," and "left greater than right frontal convexity consistent with hyperdense foci seen on prior CT scan and most likely representing thrombosed cortical

veins." (Doc. 314 at ¶ 14).  That day, DCS entered an initial present danger plan, allowing SZS to remain in the home with unlimited supervised contact with his parents.  (Doc. 314 at ¶ 15; Doc. 352 at 6).  The next day, February 23, 2019, SZS was discharged from PCH with instructions to follow up with a variety of specialists and CPT.  (Doc. 314 at ¶ 16; Doc. 352 at 8).

On February 28, 2019, Defendant Dr. William Wood, a pediatric orthopedic surgeon, saw SZS, evaluated his x-rays, and assessed a corner metaphyseal (i.e. bucket handle) fracture of the right tibia, but no fracture of the left tibia.  (Doc. 314 at ¶¶ 17–18; Doc. 352 at 10).

On March 7, 2019, Defendant Dietzman, a member of the CPT, saw SZS, observed a two-centimeter increase in the circumference of SZS's head, and recommended SZS return to PCH's emergency department.  (Doc. 314 at ¶¶ 21–22; *see* Doc. 352 at 10).  Defendant Dr. Kathryn Coffman agreed that SZS should return to PCH instead of being taken to a different hospital.  (Doc. 314 at ¶ 23; *see* Doc. 352 at 10).

Later that day, SZS was brought to PCH.  (Doc. 314 at ¶ 24; Doc. 352 at 11).  The next day, March 8, 2019, SZS underwent an MRI of his brain which showed further blood collection in his brain.  (Doc. 314 at ¶¶ 29–30, 34; *see* Doc. 352 at 11).  This required SZS to undergo surgery to place a drain in the left side of his head to relieve the excess fluid, which remained in place for several days.  *Id.*  After the surgery, SZS went into respiratory distress and was admitted to the pediatric intensive care unit.  (Doc. 352 at 11).  The same day, DCS investigator Alyssa Lucero filed an ex parte application for an order allowing DCS to take temporary custody of SZS.  (Doc. 352 at 11).

On March 11, 2019, SZS was evaluated by a different ophthalmologist, Dr. Christopher Fecarotta, who noted the presence of bilateral retinal hemorrhages.  (Doc. 314 at ¶ 35).  On March 13, 2019, a neurosurgeon clamped the subdural drain catheter, which was removed the next day.  (Doc. 314 at ¶¶ 36–37).  On March 16, 2019, SZS was discharged from PCH into temporary custody of DCS.  (Doc. 352 at 12).

On March 19, 2019, DCS filed a dependency action in state court.  (Doc. 314 at

¶ 39; Doc. 352 at 12).  Defendants were not parties to the dependency action.  (Doc. 314 at ¶ 40).  On November 12, 2019, the court denied DCS's dependency petition.  (Doc. 314 at ¶ 41; Doc. 352 at 13).

## LEGAL STANDARD

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The non-moving party must then point to specific facts establishing there is a genuine issue of material fact for trial.  *Id.*

At summary judgment, the Court considers only admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B).  When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A genuine issue of material fact exists "if the [admissible] evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at 248.  In ruling on the motion for summary judgment, the Court will construe the evidence in the light most favorable to the non-moving party.  *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).

## ANALYSIS

### I.     Defendants' Motions for Summary Judgment (Doc. 310 and 312)

Defendant Dr. Brendan Cassidy moves for summary judgment (Doc. 310) on all claims against him: conspiracy under 42 U.S.C. § 1983 (Claim 6); medical negligence (Claim 11); and intentional infliction of emotional distress ("IIED") (Claim 15).

PCH Defendants move for summary judgment (Doc. 312) on all claims against them: conspiracy under 42 U.S.C. § 1983 (Claim 6) against Defendant Coffman; medical

negligence (Claim 11) against Defendants Coffman, Wood, and Dietzman; intentional infliction of emotional distress (Claim 15) against Defendants Coffman, Wood, and Dietzman; and vicarious liability (Claim 16) against Defendant PCH.

### A. Issue and Claim Preclusion

Plaintiffs begin their response by asserting claim and issue preclusion apply because Defendants "played a crucial role in the juvenile court dependency proceedings." (Doc. 352 at 15).

A party asserting issue preclusion must satisfy four requirements: (1) the issue at stake is the same in both proceedings; (2) the issue was actually litigated and determined in a valid and final judgment issued by a tribunal with competent jurisdiction; (3) the opposing party had a full and fair opportunity to litigate the issue and actually did so; and (4) the issue was essential to the judgment." *Cocchia v. Testa Trustee of Karen M. Testa Separate Property Trust*, 536 P.3d 273, 279 (Ariz. Ct. App. 2023). Claim preclusion applies where "a final judgment on the merits in a prior suit involving the same parties or their privies bars a second suit based on the same claim." *Id.* A party asserting claim preclusion must prove: "(1) an identity of claims in the suit in which a judgment was entered and the current litigation, (2) a final judgment on the merits in the previous litigation, and (3) identity or privity between parties in the two suits." *Id.*

Plaintiffs argue Defendants Cassidy, Coffman, and Wood were witnesses at the proceedings with the "sole purpose" of proving SZS was abused, were not limited in testifying on their observations and opinions related to potential abuse, and Defendants PCH, Cassidy, and Wood "worked closely with the assistant attorney general in prosecuting the dependency trial." *Id.*

PCH Defendants respond that neither doctrine applies because Defendants "were not parties to the juvenile court dependency action and did not control the presentation of evidence," "did not decide whom to call as witnesses, how to present the evidence, or what arguments to make." (Doc. 358 at 9). Further, PCH Defendants assert the "issues in the juvenile court proceedings were different than the issues before this Court" and "do not

involve the same rights" because SZS's custody was at issue in that proceeding while Defendants' civil liability was not, and the opposite it true here. *Id.* PCH Defendants point out that Plaintiffs' only "evidence" in support of their contention that Defendants "worked closely with" the State is an email exchange where a PCH attorney responded to a request from a governmental authority for medical information about a bone scan. *Id.* at 10; (*see* Doc. 319-50).

The Court agrees with Defendants. Defendants here were not parties to the dependency proceedings, the claims at issue were not the same, Defendants did not have a full and fair opportunity to litigate the issues relevant to this case, and Plaintiffs have offered no admissible evidence that Defendants "worked closely with" the State as Plaintiffs suggest. Neither issue nor claim preclusion apply here.

### B.  Conspiracy (Claim 6)

Plaintiffs allege Defendants Cassidy and Coffman[1] engaged in a conspiracy under 42 U.S.C. § 1983 to violate their constitutional rights by alleging Plaintiffs abused SZS and by refusing to discharge SZS into their custody. (Doc. 1-3 at ¶ 233–34).

To prove a conspiracy, Plaintiffs "must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999) (internal quotations omitted). Plaintiffs must also show the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 49 (1988). A private actor's actions may amount to state action if the private actor is engaged in joint action with a state actor. *See Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002). To prevail on a joint action theory, the plaintiff must show the private actor is a "willful participant" with the state in depriving a plaintiff of their constitutional rights, *Dennis v. Sparks*, 449 U.S. 24, 27 (1980), the private actors actions are "inextricably intertwined" with those of the state, *Brunette v. Humane Society of Ventura Cnty.*, 294 F.3d 1205, 1211 (9th Cir. 2002), and "substantial

---

[1] Plaintiffs' argument with respect to the conspiracy claim focuses heavily on a number of PCH Defendants, but Defendant Coffman is the only remaining PCH Defendant against whom this claim is alleged.

cooperation" between the private actor and the state," *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996).

### i.  Defendant Cassidy

Defendant Cassidy argues he was not a state actor and did not act under color of state law through joint action with a state actor.  (Doc. 310 at 6).  Defendant Cassidy asserts he had no relationship with DCS, (Doc. 310-4 at 210), was not employed by DCS or acting on behalf of DCS in evaluating SZS, (Doc. 310-4 at 207, 208), never received training from DCS and was not expected to comply with any DCS policies, procedures, or rules in evaluating SZS, (Doc. 310-4 at 208), and was not an employee of PCH and did not have a service contract with PCH such that Defendant Cassidy would be bound by any contract between DCS and PCH, (Doc. 310-1 at 47–48, 279–280).  Plaintiffs' response to Defendant Cassidy's arguments regarding whether he was a state actor simply asserts, without evidentiary support, Defendant Cassidy "was brought in by the PCH CPT to solidify the shaken baby diagnosis by rounding out the 'constellation of findings' with retinal hemorrhages."  (Doc. 352 at 19).

The Court finds Plaintiffs have failed to identify or set forth admissible evidence to create a genuine issue of material fact as to whether Defendant Cassidy agreed with the state to deprive Plaintiffs of their constitutional rights, was a willful participant and substantially cooperated in such a deprivation, or that his actions were inextricably intertwined with those of the state.  As this is a necessary element of Plaintiffs' conspiracy claim under 42 U.S.C. § 1983, Defendant Cassidy's motion as to this claim will be granted and summary judgment will be entered for Defendant Cassidy with respect to Claim 6.

### ii.  PCH Defendants (Defendant Coffman)

Defendant Coffman first argues Plaintiffs cannot show a conspiracy without proving Defendant Coffman breached the standard of care in light of A.R.S. § 13-3620(A)'s mandatory reporting requirement.  (Doc. 312 at 15–17).  While Defendants' argument that "the very same conduct by a physician that complies with the medical standard of care" cannot "simultaneously constitute a conspiracy to deprive the patient and his family of their

1    constitutional rights" is persuasive, (Doc. 358 at 12), this is not sufficient in itself to prevail

2    on this claim.

3         Defendant Coffman next argues there is no evidence of a conspiracy involving

4    Defendant Coffman to violate Plaintiffs' constitutional rights.   (Doc. 312 at 17–19).

5    Plaintiff, without once citing to the record, asserts Defendant Coffman told Plaintiff Duvall

6    "the child must be readmitted to PCH immediately" and when Plaintiff Duvall expressed

7    skepticism, Defendant Coffman "g[ot] DCS to intervene and require the family to take the

8    child back to PCH under threat of taking temporary custody." (Doc. 352 at 18).  Plaintiffs

9    then claim, again with no evidentiary citation, once Defendant Coffman heard "someone

10   at DCS told the family to sue PCH," Defendant Coffman "attempt[ed] to strong-arm [DCS

11   supervisor] Duncan into taking temporary custody and filing a dependency petition," then

12   went to Director McKay and "convince[d] him to order his investigators to do what Duncan

13   refused to do at Coffman's request." *Id.*

14        It is not the Court's role to find evidentiary support for Plaintiff's contentions, but

15   even with the Court's best efforts to do so, these contentions are not supported by

16   admissible evidence.  Rather, they are mere conjecture.  First, the evidence Plaintiffs cite

17   earlier in their response to support their contention that Plaintiff Duvall "was *ordered* by

18   Dr. Coffman . . . to take [SZS] back to PCH," (Doc. 352 at 10) (emphasis added), simply

19   states that either Defendant Coffman or Defendant Dietzman *recommended* SZS be taken

20   back to PCH, (Doc. 319-34 at PCH 1174; Doc. 319-35 at 179:2–6).  Defendant Coffman

21   offers evidence that she thought SZS should be seen at PCH for continuity of care and other

22   reasons and did not "strong-arm anybody."  (Doc. 349-5 at 97:22–98:5; 196:12–16).

23   Plaintiffs do not offer, and the Court cannot locate, any evidentiary support for Plaintiffs'

24   contention that Defendant Coffman "g[ot] DCS to intervene and require the family to take

25   the child back to PCH under threat of taking temporary custody." (Doc. 352 at 18).  In

26   their factual background section, Plaintiffs assert "Coffman escalated the matter to DCS

27   administrators who forced the case manager, over her objections, to 'escort' the family to

28   PCH and only PCH or remove the child from their custody." (Doc. 352 at 11).  But, again,

Plaintiffs' purported support falls short.  Plaintiff's cited source, the deposition testimony of Alyssa Lucero, discusses that either Defendant Coffman or Defendant Dietzman contacted her, but she could not recall which, (Doc. 319-35 at 178:5–18); that one of Defendants Coffman or Dietzman recommended SZS go back to PCH because of a concern that the family might not actually go to the follow up appointment, *id.* at 178:25–179:9; and that Alyssa Lucero does not believe it was reasonable to believe the family would not have taken SZS to the follow up at a different location, *id.* at 179:19-24.  This does not come close to establishing what Plaintiff contends.  There is no discussion of threats or demands made by Defendant Coffman—in fact, the source cannot even confirm Defendant Coffman made these statements at all.  Further, Plaintiff's citation for an earlier contention related to Coffman's purported interactions with Duncan and other DCS officials contains no references to Coffman whatsoever beyond another citation to Ms. Lucero's previously referenced testimony.  (*See* Doc. 352 at 12).  Meanwhile, Defendant Coffman sets forth evidence that Director McKay denied any allegation of collusion or pressure from Defendant Coffman and testified Defendant Coffman is "not a decision maker for this organization."  (Doc. 314 at ¶ 94; Doc. 314-26 at 167:4–7, 196:7–8).  Plaintiff offers nothing to refute this statement.

Even with the Court undertaking a great deal of work on Plaintiffs' behalf, they fall far short of presenting admissible evidence sufficient to demonstrate an issue of material fact on this claim.  The Court finds there is insufficient evidence to find Defendant Coffman conspired to violate Plaintiffs' constitutional rights as alleged.  Accordingly, Defendant Coffman's motion as to this claim will be granted and summary judgment will be entered for Defendant Coffman with respect to Claim 6.

### C. Immunity From State Law Claims (Claims 11, 15, and 16)

PCH Defendants argue they are immune from civil liability with respect to Plaintiffs' Arizona state law claims: medical negligence (Claim 11), intentional infliction of emotional distress (Claim 15), and vicarious liability (Claim 16).  (Doc. 312 at 19).  PCH Defendants argue Arizona's child abuse mandatory reporting statute affords persons

obligated to reported suspected child abuse with immunity for doing so.   *Id.* A.R.S. § 13-3620(A) requires that "any person who reasonably believes that a minor" has been abused "shall immediately report . . . this information to a peace officer, [or] to the department of child safety."  "Person" is defined as including any physician or other health care worker "who develops the reasonable belief in the course of treating a patient." A.R.S. § 13-3620(A)(1).  A.R.S. § 13-3620(J) affords persons who report suspected child abuse under the statute with civil liability "unless the person acted with malice."

The "reasonable grounds" standard that triggers mandatory reporting "is a low standard" in light of the "public policy consideration of encouraging people to report child abuse," *Ramsey v. Yavapai Fam. Advoc. Ctr.*, 235 P.3d 285, 291–92 (Ariz. Ct. App. 2010) (internal quotations omitted), and is satisfied "if there are any facts from which one could reasonably conclude that a child had been abused."  *L.A.R. v. Ludwig*, 821 P.2d 291, 294 (Ariz. Ct. App. 1991).  Arizona courts "presume that a person acting pursuant to A.R.S. § 13-3620 acted in good faith and with proper motives" and that the plaintiff "has the burden to prove 'malice.'"  *Ramsey,* 235 P.3d at 292.  Malice is defined by statute as "a wish to vex, annoy or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law."  A.R.S. § 1-215.20; *Ramsey*, 235 P.3d at 292.

PCH Defendants argue Plaintiffs cannot prove malice to overcome the presumption they acted with good faith and with proper motives, noting Plaintiffs have not disclosed a single expert witness to testify that any of the PCH Defendants breached the standard of care by acting unreasonably, let alone with malice.  (Doc. 312 at 20).  Plaintiffs argue the statute does not protect PCH Defendants for a number of reasons which can be distilled to the following three: (i) their "suspicions of abuse" were "based solely on their inaccurate and erroneous medical records" noting conditions "that did not exist" including "hematemesis; bruising in multiple areas of his body; normal lab results; and bilateral bucke[t]handle fractures of the tibia;" (ii) their belief that SZS had been abused was not reasonable; (iii) PCH Defendants were not providing SZS medical treatment.

Again, Plaintiffs make no effort to support their contentions in arguing this point

with evidence, with the entire section of their response dedicated to civil immunity entirely devoid of citations to the record.  First, Plaintiffs' bizarre suggestion that the PCH Defendants were not providing SZS medical treatment and instead "merely conducted forensic examinations in the context of ongoing law enforcement and DCS criminal investigations" is without merit.  (Doc. 352 at 21).  As PCH Defendants point out, the statute cannot support such an interpretation since the statute has no carve out for "forensic examinations" and even if it did, it would make little sense to exclude, for example, providers of sexual assault forensic examinations on minors from the statute's mandatory reporting scheme.  (*See* Doc. 358 at 13).  Further, as PCH Defendants note, Plaintiffs claim Defendants Coffman, Wood, and Dietzman each committed medical negligence "in their *treatment* of SZS."  (*See* Doc. 1-3 at ¶¶ 270, 271) (emphasis added).  Plaintiffs' assertion that Defendants were not treating SZS is simply not credible based on the evidence.  Second, Plaintiffs have failed to demonstrate, aside from relying on counsel's arguments, that the medical conditions relied on in forming a reasonable belief of abuse did not, in fact, exist.  Defendants assert the suspected abuse was reported because SZS had "subdural hematomas, bilateral retinal hemorrhages, and a bucket handle fracture," each one of which is sufficient to create a reasonable belief of abuse.  (Doc. 358 at 4).  Plaintiffs have set forth admissible evidence that SZS's x-rays revealed "evidence of fracture" in SZS's right tibia and findings "worrisome for fracture" in SZS's left tibia, (Doc. 314-2 at PCH 1378), which a radiologist opined constituted "right and left tibial bucket handle metaphyseal fractures," (*id.* at PCH 1379).  Defendants also present evidence that a CT scan of SZS's head showed "findings worrisome for extra-axial blood products"—subdural hematoma—which warranted further imaging to exclude abuse.  (Doc. 314-4 at PCH 1377).  These findings satisfy the low bar of forming reasonable grounds for reporting abuse.  Plaintiffs have failed to present admissible evidence sufficient to overcome the presumption of good faith and proper motives and to find malice on the part of PCH Defendants in reporting potential abuse.  Even if these findings were incorrect, Plaintiffs would need to show that PCH Defendants *knew* they were incorrect and reported potential abuse anyway.  Plaintiffs did

not do so.

The Court finds A.R.S. § 13-3620 affords PCH Defendants immunity against Plaintiff's state law claims: medical negligence (Claim 11), intentional infliction of emotional distress (Claim 15), and vicarious liability (Claim 16).  As these are the only claims remaining against PCH Defendants, PCH Defendants' motion for summary judgment will be granted in its entirety and summary judgment will be granted for Defendants Coffman, Wood, Dietzman, and PCH on all remaining claims.

### D. Medical Negligence (Claim 11)

Plaintiffs claim Defendant Cassidy fell below the minimum accepted standard of care in his treatment of SZS.  (Doc. 1-3 at ¶¶ 270–72).

To establish medical malpractice under Arizona law, Plaintiffs bear the burden of proving (i) "the health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances;" and (ii) "[s]uch failure was a proximate cause of the injury."  Ariz. Rev. Stat. § 12-563.  "Arizona courts have long held that the standard of care normally must be established by expert medical testimony."  *Seisinger v. Siebel*, 203 P.3d 483, 492 (Ariz. 2009).  "Failure to produce the required expert testimony mandate[s] judgment for the physician-defendant" unless it is "a matter of common knowledge that the injury would not ordinarily have occurred if due care had been exercised."  *Id*. (internal quotations omitted).  Thus, medical expert testimony is required to establish the standard of care in medical negligence claims unless the "negligence is so grossly apparent that a layman would have no difficulty in recognizing it."  *Mann v. United States*, No. 11-CV-8018-PCT, 2012 WL 2131933, at *6 (D. Ariz. June 12, 2012).

Plaintiffs disclosed Dr. Todd A. Lefkowitz, M.D., as an expert witness on the applicable standard of care with respect to Defendant Cassidy.  A.R.S. § 12-2604 requires a standard of care expert in a medical malpractice action to have comparable experience and training in the same specialty as the defendant healthcare practitioner.  *See also Fadely*

- 12 -

*v. Encompass Health Valley of the Sun Rehab. Hosp.*, 515 P.3d 701, 708 (Ariz. App. 2022). A Court is permitted to preclude an expert under A.R.S. § 12-2604 if the expert does not have sufficient training or experience in the defendant physician's subspecialty, even where the expert is certified in the defendant's physician's broader specialty. *Id.*

Defendant Cassidy argues Dr. Lefkowitz does not meet these criteria (Doc. 310 at 9–12). Defendant Cassidy asserts pediatric ophthalmology is considered a subspecialty of ophthalmology, the anatomy of a child's eye is different than an adult's eye in every aspect, and the examination of a child's eye is different than an adult's eye (Doc. 310 at 8–9) (citing Doc. 310-1 at 15–19, 21–26). Defendant Cassidy further asserts he is a pediatric ophthalmologist, completed a fellowship in pediatric ophthalmology, received training in evaluating signs and symptoms and diagnosing injuries in pediatric eyes that could be associated with non-accidental trauma, and has practiced in the subspecialty of pediatric ophthalmology in Arizona since 1994, and has evaluated "hundreds if not thousands of children at Phoenix Children's Hospital for possible abusive head trauma." *Id.* at 9 (citing Doc. 310-1 at 16, 32–33, 43–44, 298–99). Citing Dr. Lefkowitz's own deposition, Defendant Cassidy argues Dr. Lefkowitz is not a pediatric ophthalmologist, did not complete a fellowship in pediatric ophthalmology, has little experience examining newborns' eyes, saw mostly adults in his practice, and has personally seen only one case of retinal bleeding in a baby or toddler, which was post-mortem. *Id.* at 9–10 (citing Doc. 310-7 at 14–15, 101, 107–08, 117, 119, 216, 222). In their response, Plaintiffs do not dispute that Dr. Lefkowitz is not "qualified" to testify as to the standard of care under A.R.S. § 12-2604. The Court finds Plaintiffs have failed to produce a qualified expert to testify as to the standard of care.

Plaintiffs instead argue no expert is required where the negligence is "readily apparent" or "within the realm of common knowledge." Resp. at 23. But Plaintiffs, after asserting these legal standards, do not address Defendant Cassidy or his alleged acts or omissions whatsoever, instead focusing solely on the PCH Defendants. *See id.* at 23–24. Defendant Cassidy's reply addresses Plaintiffs' argument that no expert is required by

piecing together factual contentions from Plaintiffs' response, essentially crafting Plaintiffs' argument for them in an attempt to fully respond. (*See* Doc. 355 at 5). Plaintiffs assert SZS's eyes were not fully dilated before Defendant Cassidy's examination, Resp. at 7, but Defendant Cassidy presents undisputed evidence that SZS's eyes were dilated before the examination, (Doc. 355-1 at 88:21–89:23). Plaintiffs argue the standard of care requires full dilation, Resp. at 7, but Plaintiffs rely on the opinions of Dr. Lefkowitz to support this contention. Plaintiffs further argue Defendant Cassidy acted improperly by not using a retinal camera—which Plaintiffs contend was available to him—to document his findings. Resp. at 8. Defendant Cassidy presents undisputed evidence that although there was a retinal camera in the PCH hospital, it was unavailable to him at the time of his examination of SZS. (Doc. 355-1 at 178:6–179:8).

Whether a pediatric eye examination requires maximal dilation instead of some other level of dilation or whether a retinal camera must be used is certainly not within the realm of common knowledge such that an expert is not required to establish that standard of care. Without qualified expert testimony, Plaintiffs cannot succeed on their claim of medical negligence against Defendant Cassidy. Defendant Cassidy's motion will be granted with respect to this claim and summary judgment will be entered for Defendant Cassidy on Claim 11.

### E.  Intentional Infliction of Emotional Distress (Claim 15)

Plaintiffs claim Defendant Cassidy committed intentional infliction of emotional distress ("IIED") by making allegedly false reports of abuse. (Doc. 1-3 at ¶¶ 291–95).

To succeed on an IIED claim, a plaintiff must prove: (i) the defendant's conduct was "extreme" and "outrageous"; (ii) the defendant intended to cause emotional distress or recklessly disregarded "the near certainty that such distress would result from his conduct;" and (iii) the plaintiff indeed suffered severe emotional distress as a result of the defendant's conduct. *Citizen Publ'g Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005). Conduct is "extreme and outrageous" if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly

intolerable in a civilized community." *Christakis v. Deitsch*, 478 P.3d 241, 245 (Ariz. Ct. App. 2020) (quoting *Cluff v. Farmers Ins. Exch.*, 460 P.2d 666, 668 (Ariz. Ct. App. 1969)). "Such conduct must completely violate human dignity and strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Id.* (quoting *Pankratz v. Willis*, 744 P.2d 1182, 1189 (Ariz. Ct. App. 1987)). "Even if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" *Nelson v. Phx. Resort Corp.*, 888 P.2d 1375, 1386 (Ariz. Ct. App. 1994) (quoting *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987)).

Defendant Cassidy asserts Plaintiffs have failed to come forward with any facts or evidence to establish a prima facie case of IIED against him, arguing there "is absolutely no evidence from which the trier of fact could conclude that Dr. Cassidy intended to cause distress or recklessly disregarded a certainty that distress would occur to Plaintiffs when he documented findings of retinal hemorrhages during the ophthalmology consultation with SZS." (Doc. 310 at 13). According to Defendant Cassidy, his "findings were not directed towards Plaintiffs, they were directed towards SZS;" he listed other possible causes of the retinal hemorrhages, (Doc. 310-3 at PCH 1281); and his findings were corroborated by a different ophthalmologist in March 2019, (Doc. 310-8). Further, Defendant Cassidy asserts there is no evidence he told anyone that Plaintiffs abused SZS and presents undisputed evidence through the testimony of former DCS Director McKay that Defendant Cassidy did not collaborate or consult with DCS in any way in the evaluation or the exam findings of SZS (Doc. 310-4 at 208), and was not involved in the decision by DCS to take custody of SZS (Doc. 310-4 at 210:18–21).

Plaintiffs do not address Defendant Cassidy or his motion's contentions in their response's section on IIED. Given the undisputed evidence Defendant Cassidy has set forth, the Court finds there is no genuine dispute of material fact as to this claim. Accordingly, Defendant Cassidy's motion will be granted with respect to Plaintiffs' IIED claim and summary judgment will be entered for Defendant Cassidy on Claim 15.

### F.  Conclusion

Plaintiffs have failed to present admissible evidence sufficient to create a genuine issue of material fact that Defendant Cassidy was a state actor or conspired with a state actor to violate Plaintiffs' constitutional rights.  Plaintiffs have failed to present a qualified expert to establish the standard of care for their medical negligence claim and cannot establish Defendant Cassidy's conduct fell below the standard of care.  And Plaintiffs have failed to present evidence that Defendant Cassidy's conduct was "extreme" or "outrageous" to sustain their IIED claim.  Accordingly, Defendant Cassidy's motion will be granted in its entirety and summary judgment will be entered for Defendant Cassidy on all remaining claims against him.

Plaintiffs have also failed to present admissible evidence sufficient to create a genuine issue of material fact that Defendant Coffman engaged in a conspiracy to deprive Plaintiffs of their constitutional rights.  And Plaintiffs have failed to present evidence to create a genuine issue of material fact that the PCH Defendants are not subject to civil immunity under A.R.S. § 13-3620 for Plaintiffs' remaining claims.  Accordingly, PCH Defendants' motion will be granted in its entirety and summary judgment will be entered for Defendants Coffman, Wood, Dietzman, and PCH on all remaining claims against them.

### II.  Plaintiffs' Motion for Partial Summary Judgment (Doc. 319)

Plaintiffs move for summary judgement on their conspiracy claim (Claim 6) against Defendants Cassidy and Coffman,[2] and their medical negligence claim (Claim 11) against Defendant Wood.  Because the Court will grant both of Defendants' motions for summary judgment (Docs. 310 and 312) and enter summary judgment in favor of Defendants on all remaining claims, Plaintiffs' motion will be denied as moot.

Accordingly,

**IT IS ORDERED** Defendant Cassidy's motion for summary judgment (Doc. 310) is **GRANTED**.

---

[2] Plaintiffs nominally move for summary judgment on this claim against Defendants Dietzman and PCH, but, as discussed above, this claim is not pending against these Defendants.

1    **IT IS FURTHER OREDERED** the PCH Defendants' motion for summary

2  judgment (Doc. 312) is **GRANTED**.

3    **IT IS FURTHER ORDERED** Plaintiffs' motion for partial summary judgment

4  (Doc. 319) is **DENIED**.

5    **IT IS FURTHER ORDERED** the pending *Daubert* motions (Docs. 311, 315, and

6  321) are **DENIED** as moot.

7    **IT IS FURTHER ORDERED** the Clerk of Court shall enter judgment in favor of

8  Defendants and close this case.

9    Dated this 18th day of July, 2024.

10

11

12  _____

13  Honorable Roslyn O. Silver
   Senior United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28