# EXHIBIT E

EXHIBIT 41

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| HONOR DUVALL, et al., )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>ARIZONA DEPARTMENT OF CHILD )<br>SAFETY, et al., )<br>)<br>)<br>Defendants. )<br>_____ ) | Case No.<br>21-CV-00167-PHX-ROS |

**DEPOSITION OF JEFFREY DUNCAN**

Phoenix, Arizona
September 29, 2022
10:03 a.m.

Prepared by:
MICHAELA H. DAVIS
Registered Professional Reporter
Certified Realtime Reporter
Certified Realtime Captioner
Certified LiveNote Reporter
AZ CR No. #50574
carrie@carriereporting.com

CARRIE REPORTING, LLC
Certified Reporters
2415 E. Camelback Road
Suite 700
Phoenix, AZ 85016
(480) 429-7573

(COPY)

1          THE WITNESS:  Take it into consideration as
2  far as the investigation we're doing.
3  BY MR. CONNELLY:
4       Q.   Would it be fair to say that when the Child
5  Protection Team is involved and they say this is a case of
6  suspected nonaccidental trauma, that DCS then simply
7  follows their lead on that and reflexively puts in
8  protective -- a present danger plan or a safety plan or
9  takes temporary custody?
10          MR. PATEL:  Objection; form and foundation.
11          MS. ZANGERLE:  Form and foundation.
12          MS. WERNER:  Join.
13          THE WITNESS:  Yes.
14  BY MR. CONNELLY:
15       Q.   As far as your understanding of the term
16  "suspected nonaccidental trauma," do you take that to mean
17  that the doctors are saying that they can't determine
18  whether or not abuse occurred?
19          MR. PATEL:  Objection; form and foundation.
20          MS. WERNER:  Join.
21          THE WITNESS:  I take it to mean --
22          MS. ZANGERLE:  Form and foundation.
23          THE WITNESS:  I take it to mean that
24  something -- this injury occurred in a manner other than
25  accidental.

1  BY MR. CONNELLY:
2      *Q.*    Is there anything other than accidental that's
3  not abuse?
4               MR. PATEL:  Objection; form and foundation.
5               MS. WERNER:  Join.
6               MS. ZANGERLE:  Join.
7               THE WITNESS:  I can't think of one.
8  BY MR. CONNELLY:
9      *Q.*    Me either.  So you don't take "suspected
10 nonaccidental trauma" to mean that the doctors are saying
11 that there is -- that these conditions were definitely
12 caused by abusive means, do you?
13              MR. PATEL:  Objection; form.
14              MS. ZANGERLE:  Join.
15              MS. WERNER:  Join.
16              THE WITNESS:  I would say that's an accurate
17 assumption.
18 BY MR. CONNELLY:
19     *Q.*    Okay.  So when PCH comes along and says
20 suspected nonaccidental trauma -- excuse me -- suspected
21 nonaccidental trauma, the assumption that you make is that
22 abuse occurred?
23              MR. PATEL:  Objection; form.
24              MS. ZANGERLE:  Form and foundation.
25              MR. PATEL:  Foundation.

|   |   |
|---|---|
| 1 | MS. WERNER: Join. |
| 2 | THE WITNESS: Yes. |
| 3 | BY MR. CONNELLY: |
| 4 | Q. And is that -- in your experience at DCS, is |
| 5 | that the assumption that the investigator makes? |
| 6 | MR. PATEL: Objection; form and foundation. |
| 7 | MS. ZANGERLE: Join. |
| 8 | MS. WERNER: Join. |
| 9 | THE WITNESS: Yes. |
| 10 | BY MR. CONNELLY: |
| 11 | Q. And if the case goes higher up the hierarchy at |
| 12 | DCS, is it your experience that that's what those above |
| 13 | you in the hierarchy assume? |
| 14 | MR. PATEL: Objection; form and foundation. |
| 15 | MS. ZANGERLE: Form and foundation. |
| 16 | MS. WERNER: Join. |
| 17 | THE WITNESS: Yes. |
| 18 | BY MR. CONNELLY: |
| 19 | Q. So is it then fair to say that when PCH said |
| 20 | suspected nonaccidental trauma, that the burden is now on |
| 21 | the parents to prove that they did not -- that the child's |
| 22 | condition is not a result of them abusing the child? |
| 23 | MS. ZANGERLE: Form and foundation. |
| 24 | MR. PATEL: Join. |
| 25 | MS. WERNER: Join. |

|    |                                                          |
|----|----------------------------------------------------------|
| 1  | THE WITNESS: Yeah.                                       |
| 2  | BY MR. CONNELLY:                                         |
| 3  | Q. Kind of turns the notion of innocent until            |
| 4  | proven guilty on its head, don't you think?              |
| 5  | MR. PATEL: Objection; form and foundation.               |
| 6  | MS. ZANGERLE: Form and foundation.                       |
| 7  | MS. WERNER: Join.                                        |
| 8  | THE WITNESS: I would disagree.                           |
| 9  | BY MR. CONNELLY:                                         |
| 10 | Q. How so?                                               |
| 11 | A. You have a medical expert saying that this            |
| 12 | didn't occur accidentally, so we just established that not |
| 13 | accidentally means abuse. So ...                         |
| 14 | Q. So --                                                 |
| 15 | A. If you have a medical expert saying that              |
| 16 | essentially this is abuse, then I think something's been |
| 17 | proven.                                                  |
| 18 | Q. So just by the doctor saying we didn't see what       |
| 19 | happened, there may be other things that could have caused |
| 20 | what happened, but we suspect it was abuse, and therefore, |
| 21 | that's enough for you to assume it was abuse?            |
| 22 | MR. PATEL: Objection; form and foundation.               |
| 23 | MS. WERNER: Join.                                        |
| 24 | MS. ZANGERLE: Join.                                      |
| 25 | THE WITNESS: Yes.                                        |

1    Q.   The director at the time was Greg McKay?
2    A.   Yes.
3    Q.   How high up in DCS did this case get reported?
4    A.   I'm sorry.  Can you repeat that?  My phone went
5 off.
6    Q.   How high up in the hierarchy that we were just
7 talking about did this case get reported?
8             MR. PATEL:  Objection; form and foundation.
9             THE WITNESS:  All the way to the top.  To
10 Greg.
11 BY MR. CONNELLY:
12   Q.   What about this case brought it all the way up
13 to Director McKay?
14             MR. PATEL:  Objection; form and foundation.
15             THE WITNESS:  I think I would be speculating
16 again on how it got to Greg.
17 BY MR. CONNELLY:
18   Q.   Well --
19   A.   So I can't say for certain how it got to Greg.
20   Q.   What aspects of the case were significant enough
21 to cause it to be reported up to Director McKay?
22             MR. PATEL:  Objection; form and foundation.
23             MS. WERNER:  Join.
24             MS. ZANGERLE:  Join.
25             THE WITNESS:  I can't really think of any

1  aspects that would have made it a case that needed to go
2  all the way to the director.
3  BY MR. CONNELLY:
4      *Q.*    Did you have any conversations with the director
5  about the case?
6      *A.*    Yes.
7      *Q.*    When did you speak to the director about the
8  case?
9      *A.*    The only specific recollection I have of
10 speaking with him was right around the time of the filing
11 of the dependency petition.  So I don't know if it was
12 that day or day before.  Somewhere in that window.
13     *Q.*    What was the conversation about?
14     *A.*    My recollection is the conversation was about
15 him wanting more information with regards to the case,
16 number one, and he wanted to speak to me about essentially
17 what the plan was moving forward.  I think we spoke a
18 little bit about the information that Dr. Coffman had
19 provided.  Things along those lines.
20     *Q.*    How long did you talk to him?
21     *A.*    If I had to guess, I would say a half hour.
22     *Q.*    Who else was present?
23     *A.*    There was nobody present.  It was in my office.
24 We were on the phone.  I think I had some people in our
25 office, some of my employees were actually in the office,

1  Q. Why you had not?
2     So you spoke to him before the petition was
3  filed?
4  A. Yes, it was before.  Yeah, it was prior to the
5  petition.
6  Q. Do you know how long before?
7  A. As I said earlier, it could have potentially
8  been that day or maybe spoke to him the day before we
9  filed it.  It was in that window.  Two to three days.
10 Two-to-three-day window, I would guess.
11 Q. During that conversation, did he direct you to
12 file a petition?
13 A. I believe he did.
14 Q. Did he say why he thought a petition needed to
15 be filed?
16 A. I'm certain he did.  I don't recall what that
17 information was, though.  I don't remember the specific
18 conversation.
19 Q. Did he tell you that he had talked to anybody
20 else about the case?
21 A. I don't recall.
22 Q. Did he tell you whether he had talked to anybody
23 from PCH about the case?
24        MR. PATEL:  Objection; foundation.
25        THE WITNESS:  I don't recall.

1  you were involved in?
2              MR. PATEL:  Objection; form and foundation.
3              THE WITNESS:  So that's a hard question to
4  answer because when I started there in 2014, Director
5  McKay was the OCWI chief, so he's the one that actually
6  hired me.  So there were quite a few cases that I
7  communicated with him at that time.  Once he became the
8  director, I can't think of -- I can't think of many.  If
9  there were more than one, maybe there was.  I just don't
10 specifically remember anything other than this one.
11 BY MR. CONNELLY:
12      Q.   Okay.  So your best recollection is that this
13 was the only case that Director McKay got involved in of
14 yours while he was director?
15             MR. PATEL:  Objection; form and foundation.
16             THE WITNESS:  Yes.
17 BY MR. CONNELLY:
18      Q.   Were you aware of him being involved in other
19 supervisors' cases while he was a director?
20             MR. PATEL:  Objection; form and foundation.
21             THE WITNESS:  None that I know of.
22 BY MR. CONNELLY:
23      Q.   Had you ever heard of him having directed that a
24 petition be filed in any other case while you were a
25 manager?  A supervisor.

```
1                MR. PATEL:  Form and foundation.
2                THE WITNESS:  None that I recall, no.
3   BY MR. CONNELLY:
4        Q.   To your knowledge, are there any policies or
5   procedures about when a director is to be involved or will
6   get involved in a case?
7                MR. PATEL:  Objection; form and foundation.
8                THE WITNESS:  No idea at all.
9   BY MR. CONNELLY:
10       Q.   To your knowledge, was this case considered a
11  high-profile case at the Department?
12               MR. PATEL:  Objection; form and foundation.
13               THE WITNESS:  I wouldn't consider it a
14  high-profile case.
15  BY MR. CONNELLY:
16       Q.   There is a category, though, that is labeled
17  High Profile; right?
18               MR. PATEL:  Objection; form.
19               THE WITNESS:  Yeah, I think that, you know,
20  they do use the term "high-profile cases" from time to
21  time.  I don't know if there's a specific criteria for
22  fitting that high-profile case, but you heard that -- you
23  do hear that term.
24  BY MR. CONNELLY:
25       Q.   Okay.  That was going to be my next question is:
```

```
 1   What are the factors that make a case a high-profile case?
 2              MS. ZANGERLE:  Foundation.
 3              MR. PATEL:  Join.
 4              MS. WERNER:  Join.
 5              THE WITNESS:  For us, typically the
 6   high-profile cases were the ones that were in the media.
 7   BY MR. CONNELLY:
 8       Q.   Media?
 9       A.   Yeah.
10       Q.   Have you ever seen it where the number of
11   lawyers representing the respondents are a factor in
12   making a case a high-profile case?
13              MR. PATEL:  Objection; form and foundation.
14              MS. ZANGERLE:  Join.
15              MS. WERNER:  Join.
16              THE WITNESS:  No.  I can't think of any.
17   BY MR. CONNELLY:
18       Q.   Who decides whether a case is a high-profile
19   case or not?
20              MR. PATEL:  Form and foundation.
21              MS. ZANGERLE:  Join.
22              MS. WERNER:  Join.
23              THE WITNESS:  I don't know.  I don't even
24   know if there's, like, a technical classification for
25   high-profile case.  I think it's just a term that's used,
```

1  *A.*  I believe she had e-mailed me, if I remember
2  correctly, sometime during the course of the
3  investigation, but I don't believe there was any other
4  communication, direct communication between the two of us.
5  *Q.*  Is that e-mail one of the e-mails you looked at
6  when you were preparing?
7  *A.*  I think it is.  I believe so, yes.
8  *Q.*  Has it ever happened that Dr. Coffman did a
9  record review and changed or disagreed with the Child
10 Protection Team's diagnosis of suspected nonaccidental
11 trauma?
12              MR. PATEL:  Objection; form and foundation.
13              MS. WERNER:  Join.
14              MS. ZANGERLE:  Join.
15              THE WITNESS:  None that I recall.
16 BY MR. CONNELLY:
17 *Q.*  If you look over to page 2 of 5, the section in
18 the middle there, Available Family Resources, and then it
19 lists resources and four different things that are
20 available family resources and supports.
21          Do you see that?
22 *A.*  I do.
23 *Q.*  Are those things consistent with people who --
24 parents who are abusive?
25              MR. PATEL:  Objection; form and foundation.

1 understand and figure out what happened to the child,
2 don't all those sort of things tend to indicate that these
3 are probably not abusive people?
4     MR. PATEL:  Objection; form and foundation.
5     MS. WERNER:  Join.
6     MS. ZANGERLE:  Join.
7     THE WITNESS:  Again, all great qualities.  I
8 would not exclude somebody just because they have those
9 qualities of being abusive to children.  And I'm basing
10 that off of my experience.
11 BY MR. CONNELLY:
12    *Q.*   Okay.  I got it.
13     Like I probably seem like a nice guy, but
14 who knows what I'm like outside of this room; right?
15    *A.*   Very, very true.
16    *Q.*   Do you see -- back on page 3 of 5, the Legal
17 Custody section, it says:  "Maintain child in
18 parent/guardian's custody."
19     Am I reading that right when I look at that
20 and I think that this means that the parents were to
21 retain custody coming out of the TDM?
22    *A.*   This report would have been completed at the
23 conclusion of the TDM.  So at the conclusion of the TDM,
24 yes, they maintained custody.
25    *Q.*   Okay.  And so if the plan for what was going to

```
 1  happen after the TDM was something other than the parents
 2  maintaining custody, would it say that in the TDM, in this
 3  report?
 4              MR. PATEL:  Objection; form.
 5              THE WITNESS:  Not necessarily.  Potentially,
 6  yes, but not necessarily.
 7  BY MR. CONNELLY:
 8      Q.   Because coming out of this TDM, there was a
 9  safety plan that was then put in place; right?
10              MR. PATEL:  Objection; form and foundation.
11              THE WITNESS:  Yes.
12  BY MR. CONNELLY:
13      Q.   If you'll look at page 4 of 5, the Backup Plan,
14  the backup plan says:  "Pending the review of ▓▓▓▓▓'s
15  medical records by Dr. Coffman, the present danger plan
16  may be lifted on or prior to March 8, 2019.  If the review
17  is not completed by March 8, 2019, the present danger plan
18  will be extended until March 22, 2014."
19              I think it's supposed to say 2019; right?
20      A.   It is.
21      Q.   Does that sentence I just read mean that
22  Dr. Coffman is effectively the decisionmaker of whether
23  the present danger plan is going to remain in place?
24              MR. PATEL:  Objection; form and foundation.
25              MS. WERNER:  Join.
```

1           THE WITNESS:  Yes.
2           MS. ZANGERLE:  Join.
3    BY MR. CONNELLY:
4       Q.   And coming out -- it's true, isn't it, that
5    coming out of the TDM, that Alyssa Lucero sent records to
6    Dr. Coffman and asked her to do the record review that was
7    talked about at the TDM?
8       A.   Yes.
9       Q.   Do you remember what Dr. Coffman's response was?
10      A.   I do not.
11      Q.   Well, if we look at the document in paragraph --
12   in packet 146, we'll find out.
13           (Deposition Exhibit No. 24 was marked for
14       identification by the reporter.)
15   BY MR. CONNELLY:
16      Q.   Have you seen this e-mail before, Mr. Duncan?
17      A.   My name is on the top, so I must have, but I
18   don't specifically recall looking at it.
19      Q.   All right.  If you look at the e-mail below, the
20   one where it's forwarded to you, it -- well, first of all,
21   if you go all the way down to the bottom, the e-mail on
22   the bottom on March 1st of 2019, from Alyssa to
23   Dr. Coffman at 4:42 p.m., which is a few hours after the
24   TDM that same day, Alyssa sends her an e-mail that's
25   attaching medical records and is asking Dr. Coffman to